ORAL ARGUMENT NOT YET SCHEDULED

No. 14-7067

# United States Court of Appeals for the D.C. Circuit

_____

COUNCIL OF THE DISTRICT OF COLUMBIA,

*Plaintiff-Appellant*,

v.

VINCENT C. GRAY, in his official capacity as Mayor of the District of Columbia, and JEFFREY S. DEWITT, in his official capacity as Chief Financial Officer for the District of Columbia,

*Defendants-Appellees*.

_____

## BRIEF FOR PLAINTIFF-APPELLANT
## COUNCIL OF THE DISTRICT OF COLUMBIA

_____

On Appeal from the U.S. District Court for the District of Columbia, No. 14-cv-655 (Emmet G. Sullivan, District Judge)

_____

Karen L. Dunn
Alexander I. Platt
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, DC 20015
(202) 237-2727

Brian D. Netter
Breanne A. Gilpatrick
Matthew A. Waring[*]
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000

[*]Admitted only in Virginia

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF PARTIES, RULINGS,
## AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

A.    <u>Parties and Amici</u>. The plaintiff-appellant in this case is the Council of

the District of Columbia.  The defendants-appellees are Vincent C. Gray, in his

official capacity as Mayor of the District of Columbia, and Jeffrey S. DeWitt, in

his official capacity as Chief Financial Officer for the District of Columbia.  The

following parties appeared in the district court as amici curiae: Alice M. Rivlin,

Thomas M. Davis, Anthony A. Williams, Carolyn B. Lamm, Ronald Jessamy,

Charles Miller, Paul Smith, Daniel Solomon, Bruce Spiva, Marc Fleischaker, D.C.

Appleseed Center for Law & Justice, D.C. Vote, D.C. for Democracy, D.C. Fiscal

Policy Institute, League of Women Voters of the District of Columbia, Jacques B.

DePuy, Jason I. Newman, Daniel M. Freeman, Linda L. Smith, Bipartisan Legal

Advisory Group of the United States House of Representatives.

B.    <u>Rulings Under Review</u>.  The ruling under review is the Order of the

U.S. District Court for the District of Columbia (Sullivan, J.), docketed May 19,

2014, granting defendants-appellees' motion for summary judgment and denying

plaintiff-appellant's motion for summary judgment, and the Memorandum Opinion

in support of that Order.

C.    <u>Related Cases</u>.  This case was originally filed in the Superior Court

for the District of Columbia (Civ. No. 14-2371).  Defendants-appellees removed to

i

the U.S. District Court for the District of Columbia (No. 14-cv-655).  Other than

those proceedings, there are no related cases in this Court or in any other court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
PURSUANT TO CIRCUIT RULE 28(a)(1) ...................................................i

TABLE OF AUTHORITIES ...........................................................................vi

GLOSSARY.......................................................................................................xiv

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................2

STATEMENT OF ISSUES ................................................................................2

STATUTES AND REGULATIONS ...................................................................3

STATEMENT OF THE CASE............................................................................3

      A.    Home Rule in the District of Columbia ................................................3

           1.    The District's Early Experience with Self-Government...........3

           2.    The Home Rule Act of 1973......................................................4

           3.    Amendments to the Home Rule Act .......................................12

           4.    The Budget Autonomy Act of 2012 ........................................13

      B.    Proceedings Below........................................................................16

SUMMARY OF ARGUMENT ...........................................................................18

ARGUMENT .......................................................................................................23

I.    THE DISTRICT COURT LACKED JURISDICTION. ...............................23

II.    THE BUDGET AUTONOMY ACT IS VALID.........................................26

      A.    Section 603(a) Does Not Exempt The Charter's Local Budget
Provisions From The Amendment Process........................................26

# TABLE OF CONTENTS—continued

**Page**

1.  The text of Section 603(a) shows only that Congress was not making any change to the budget process in 1973. ...........27

2.  The structure of the Home Rule Act confirms that Section 603(a) was not designed to remove the Charter's budget provisions from the amendment process. ....................31

3.  The overarching purpose of the Home Rule Act counsels against inferring restrictions not articulated by Congress. ......34

4.  The history of the Home Rule Act shows that Congress was not enacting a prospective limitation through Section 603(a). ...................................................................................36

B.  The Budget Autonomy Act Does Not Encroach Upon A Function Of The United States Because Spending Local Money Is A Local Function. .........................................................43

1.  Section 602(a)(3) prevents the Council from intruding into Congress's national legislative authority..........................44

2.  Spending local money is not a national function....................49

C.  The Budget Autonomy Act Is Consistent With The Anti-Deficiency Act Because It Authorizes The D.C. General Fund To Be Made Available For Expenditure. ...........................................51

1.  No annual congressional appropriation is required by the Anti-Deficiency Act.................................................53

2.  The Constitution does not require an annual congressional appropriation for funds kept outside the Treasury. ................................................................55

3.  The Budget Autonomy Act is consistent with Section 603(e). ..................................................................57

4.  The Budget Autonomy Act does not amend the Anti-Deficiency Act in violation of Section 602(a)(3). ...................58

iv

## TABLE OF CONTENTS—continued

**Page**

CONCLUSION ...................................................................................59

CERTIFICATE OF COMPLIANCE.....................................................60

CERTIFICATE OF SERVICE ............................................................61

# TABLE OF AUTHORITIES[*]

**Page(s)**

## CASES

*AINS, Inc. v. United States,*
   365 F.3d 1333 (Fed. Cir. 2004) .........................................................54

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA,*
   388 F.3d 405 (3d Cir. 2004) .......................................................53, 55

*Army & Air Force Exch. Serv. v. Sheehan,*
   456 U.S. 728 (1982)..........................................................................54

*Assassination Archives & Research Ctr. v. Dep't of Justice,*
   43 F.3d 1542 (D.C. Cir. 1995) ..........................................................30

*AT&T Co. v. Cent. Office Tel., Inc.,*
   524 U.S. 214 (1998) ..........................................................................30

*Bates v. United States,*
   522 U.S. 23 (1997) ............................................................................29

*Bergman v. District of Columbia,*
   986 A.2d 1208 (D.C. 2010) ..............................................................34

*Bishop v. District of Columbia,*
   411 A.2d 997 (D.C. 1980) (en banc) .................................................35

*Bridges v. United States,*
   346 U.S. 209 (1953)...........................................................................30

*Caterpillar Inc. v. Williams,*
   482 U.S. 386 (1987)...........................................................................23

*Cessna Aircraft Co. v. Dalton,*
   126 F.3d 1442 (Fed. Cir. 1997) ........................................................55

*Cincinnati Soap Co. v. United States,*
   301 U.S. 308 (1937)...........................................................................56

*Cosme Nieves v. Deshler,*
   786 F.2d 445 (1st Cir. 1986)..............................................................55

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES—continued

**Page(s)**

*In re Crawley*,
    978 A.2d 608 (D.C. 2009) ..............................................................49

*Decatur Liquors, Inc. v. District of Columbia*,
    478 F.3d 360 (D.C. Cir. 2007)........................................................24

*Denkler v. United States*,
    782 F.2d 1003 (Fed. Cir. 1986) .....................................................54

*\*Dimond v. District of Columbia*,
    792 F.2d 179 (D.C. Cir. 1986)...........................................24, 25, 26

*Dist. Props. Assocs. v. District of Columbia*,
    743 F.2d 21 (D.C. Cir. 1984)..........................................................50

*\*District of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*,
    442 A.2d 110 (D.C. 1982) ...................................... 44, 45, 46, 47, 48, 49, 50, 51

*District of Columbia v. John R. Thompson Co.*,
    346 U.S. 100 (1953)........................................................................3

*Foretich v. ABC, Inc.*,
    198 F.3d 270 (D.C. Cir. 1999)........................................................23

*Furash & Co. v. United States*,
    252 F.3d 1336 (Fed. Cir. 2001) .....................................................54

*Gen. Dynamics Land Sys., Inc. v. Cline*,
    540 U.S. 581 (2004)......................................................................26

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006).......................................................................37

*\*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987).......................................................................37

*INS v. Chadha*,
    462 U.S. 919 (1983)..........................................................12, 16, 41

*Knickerbocker Ice Co. v. Stewart*,
    253 U.S. 149 (1920).......................................................................30

*Knote v. United States*,
    95 U.S. 149 (1877).........................................................................56

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)..................................................................30

*L'Enfant Plaza Props., Inc. v. United States*,
    668 F.2d 1211 (Ct. Cl. 1982)....................................................54

*Lichtenstein v. FTC*,
    194 F.2d 607 (9th Cir. 1952) ....................................................30

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    134 S. Ct. 2111 (2014)..............................................................28

*McConnell v. United States*,
    537 A.2d 211 (D.C. 1988) .........................................................48

*Metro Ry. v. District of Columbia*,
    132 U.S. 1 (1889)..................................................................4, 49

*Nevada v. Department of Energy*,
    400 F.3d 9 (D.C. Cir. 2005) ......................................................58

*\*OPM v. Richmond*,
    496 U.S. 414 (1990)..................................................................56

*Partington v. Houck*,
    723 F.3d 280 (D.C. Cir. 2013)...................................................26

*Prime Time Int'l Co. v. Vilsack*,
    599 F.3d 678 (D.C. Cir. 2010)...................................................27

*Railco Multi-Constr. Co. v. Gardner*,
    902 F.2d 71 (D.C. Cir. 1990).....................................................49

*Red Canyon Sheep Co. v. Ickes*,
    98 F.2d 308 (D.C. Cir. 1938).....................................................30

*\*Sebelius v. Cloer*,
    133 S. Ct. 1886 (2013)...............................................................29

*Slattery v. United States*,
    635 F.3d 1298 (Fed. Cir. 2011) (en banc) ................................54

*Standard Oil Co. v. Johnson*,
    316 U.S. 481 (1942)..................................................................55

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Stevenson v. Linens of the Week*,
    688 F.2d 93 (D.C. Cir. 1982)...................................................49

*Storie v. Randy's Auto Sales, LLC*,
    589 F.3d 873 (7th Cir. 2009) ...............................................29

*Tahoe Reg'l Planning Agency v. McKay*,
    769 F.2d 534 (9th Cir. 1985) ...........................................37, 38

*Techworld Dev. Corp. v. D.C. Preservation League*,
    648 F. Supp. 106 (D.D.C. 1986), *vacated per curiam as moot*,
    1987 WL 1367570 (D.C. Cir. 1987)..................................48

*Thomas v. Barry*,
    729 F.2d 1469 (D.C. Cir. 1984).........................................25

*U.S. Dep't of Navy v. FLRA*,
    665 F.3d 1339 (D.C. Cir. 2012).........................................56

*United Biscuit Co. v. Wirtz*,
    359 F.2d 206 (D.C. Cir. 1965)........................................53, 54

*United States v. Hopkins*,
    427 U.S. 123 (1976)........................................................54, 55

*United States v. Locke*,
    529 U.S. 89 (2000)..............................................................30

*United States v. Wilson*,
    503 U.S. 329 (1992)..........................................................29

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..........................................................30

*\*Vonage Holdings Corp. v. FCC*,
    489 F.3d 1232 (D.C. Cir. 2007)........................................29

*\*Washington, D.C. Ass'n of Realtors, Inc. v. District of Columbia*,
    44 A.3d 299, 303 (D.C. 2012) ...........................................34

*Wilentz v. Sovereign Camp, W.O.W.*,
    306 U.S. 573 (1939)..........................................................50

*Williams v. Martinez*,
    586 F.3d 995 (D.C. Cir. 2009)...........................................46

ix

## TABLE OF AUTHORITIES—continued

**Page(s)**

**ADMINISTRATIVE DECISIONS**

59 Comp. Gen. 215 (1980) ...................................................................54

B-197118, 1980 WL 17286 (Comp. Gen. Jan. 14, 1980)........................54

*In re Local Budget Autonomy Emergency Amendment Act of 2012*,
No. 13-01, at 5 (D.C. Bd. Elections & Ethics Jan. 9, 2013)..............15

*Monarch Water Sys., Inc.*,
64 Comp. Gen. 756 (1985) ................................................................54

*St. Lawrence Seaway Dev. Corp.*,
B-193573, 1979 WL 11668 (Comp. Gen. Dec. 19, 1979) ...................54

**CONSTITUTION**

Appropriations Clause,
U.S. Const. art. I, § 9, cl. 7................................................................55

District Clause,
U.S. Const. art. I, § 8, cl. 17...............................................................3

**STATUTES**

12 U.S.C. § 1467a(d) ...........................................................................32

21 U.S.C. § 360eee-4(a)(2) ..................................................................33

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1331 .................................................................................23

*28 U.S.C. § 1366 .................................................................................23

28 U.S.C. § 1441(c) ...............................................................................2

31 U.S.C. § 665 (1970) ........................................................................58

31 U.S.C. § 1341 .................................................................................58

31 U.S.C. § 1341(a)(1).............................................................22, 53, 54

Act of Feb. 21, 1871,
ch. 62, 16 Stat. 419 ............................................................................4

# TABLE OF AUTHORITIES—continued

**Page(s)**

Act of May 3, 1802,
  ch. 53, § 1, 2 Stat. 195, 196 ...................................................................3

Act of July 9, 1846,
  ch. 35, 9 Stat. 35. ..................................................................................4

Act of Oct. 12, 1984,
  Pub. L. No. 98-473, 98 Stat. 1837 .......................................................13

District of Columbia Organic Act,
  ch. 15, 2 Stat. 103 (1801) ................................................................3, 46

D.C. Act 1016 (July 10, 1871) ..................................................................4

*Home Rule Act of 1973,
  Pub. L. No. 93-198, 87 Stat. 774

  § 102(a), D.C. Code § 1-201.02(a) .....................................................34
  § 303, D.C. Code § 1-203.03 ..............................................................31
  § 303(a), D.C. Code § 1-203.03(a) ................................. 19, 31, 32, 33, 34, 35, 41
  § 303(d), D.C. Code § 1-203.03(d).............................................19, 32, 33, 34, 40
  § 401(a), D.C. Code § 1-204.01(a) ......................................................31
  § 421(a), D.C. Code §1-204.21(a) .......................................................31
  § 441, D.C. Code § 1-204.41 ..........................................15, 19, 33,3 4
  § 446, D.C. Code § 1-204.46 ..................... 8, 10, 15, 19, 33, 34, 52, 55, 57, 58
  § 446(c), D.C. Code § 1-204.46(c) ......................................................52
  § 450, D.C. Code § 1-204.50 ........................................................56, 58
  § 601, D.C. Code § 1-206.01 ....................................................28, 32, 33
  § 602, D.C. Code § 1-206.02 ........................................................32, 33
  § 602(a), D.C. Code § 1-206.02(a) .............................................28, 33
  § 602(a)(3), D.C. Code § 1-206.02(a)(3)............................ 17, 21, 43, 44, 45, 46,
  .............................................................. 47, 48, 49, 50, 51, 58, 59
  § 602(a)(8), D.C. Code § 1-206.02(a)(8)...................................24, 49
  § 602(b), D.C. Code § 1-206.02(b).......................................................42
  § 603, D.C. Code § 1-206.03 ........................................................32, 33
  § 603(a), D.C. Code § 1-206.03(a) ................. 10, 17, 18, 19, 20, 26, 27, 28, 31,
  ..................................................... 33, 34, 35, 36, 37, 40, 42, 43, 48
  § 603(c), D.C. Code § 1-206.03(c) ......................................................28
  § 603(d), D.C. Code § 1-206.03(d) .....................................................32
  § 603(e), D.C. Code § 1-206.03(e) ...........................................17, 52, 56, 57, 58

# TABLE OF AUTHORITIES—continued

**Page(s)**

Initiative, Referendum, and Recall Charter Amendment Act,
D.C. Law 2-46, 24 D.C. Reg. 199 ...............................................12, 47

§ 1, D.C. Code § 1-204.101 ........................................................48
§ 2, D.C. Code § 1-204.102 ........................................................48

\*Local Budget Autonomy Act of 2012,
D.C. Law 19-321, 60 D.C. Reg. 1724 ..............................................1

§ 2(c) .........................................................................................15
§ 2(d) .........................................................................................15
§ 2(e) .........................................................................................15

School Governance Charter Amendment Act of 2000,
D.C. Law 13-159, 47 D.C. Reg. 2212 ..............................................13

Workers' Compensation Act of 1979,
D.C. Law 3-77, 27 D.C. Reg. 2503 .................................................45

Workmen's Compensation Act of 1928, ch. 612, 45 Stat. 600 ........................44, 45

## OTHER AUTHORITIES

*Budget Autonomy for the District of Columbia, Hearing Before the H. Comm. on Gov't Reform*, 108th Cong. (2003) ...................................14

*FY 2012 and FY 2013 Spending and Performance of the Office of Budget and Planning: Hearing Before the Comm. of the Whole, Council of D.C.* (Mar. 14, 2013), http://1.usa.gov/STdHRM ....................................14

H.R. 9056, 93d Cong. (1973)..............................................................6

H.R. 9682, 93d Cong. (1973)..............................................................6

§§ 441-55 ...................................................................................39
§ 446............................................................................................8
§ 451............................................................................................8
§ 603(a) .......................................................................................11

\*H.R. 10692, 93d Cong. § 416 (1973)...........................9, 10, 11, 36, 37

H.R. 10693, 93d Cong. (1973)............................................................10

H.R. Con. Res. 464, 95th Cong. (1978)........................................12, 47

H.R. Con. Res. 471, 95th Cong. (1978)..............................................12

xii

**TABLE OF AUTHORITIES—continued**

**Page(s)**

H.R. CONF. REP. NO. 93-703 (1973)........................................................40

H.R. REP. NO. 95-890 (1978)..............................................................48

S. 1435, 93d Cong. (1973)..............................................................5, 6

    § 304............................................................................6

    § 325(d)........................................................................5

    § 325(g)........................................................................5

    § 401(d)........................................................................6

    § 504............................................................................6

    § 505............................................................................6

    § 505(7)........................................................................6

    § 508............................................................................6

    § 701............................................................................6

S. 1527, 80th Cong. (1940)................................................................5

S. 2652, 92d Cong. (1971)..............................................................5, 46

S. REP. NO. 93-219 (1973)..............................................................5, 47

STAFF OF H. COMM. ON D.C., 93D CONG., HOME RULE FOR THE DISTRICT OF
COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY (Comm. Print
1976).........................................5, 6, 7, 8, 9, 10, 11, 31, 33, 37, 38, 39, 40, 46, 47

# GLOSSARY

| | |
|---|---|
| JA | Joint Appendix |
| LH | Legislative History of the Home Rule Act, as reprinted in STAFF OF H. COMM. ON D.C., 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY (Comm. Print 1976) |
| NAFI | Nonappropriated Fund Instrumentality |
| R.*x* at *y* | District Court Docket Entry *x*, at page *y*. |

## INTRODUCTION

The Home Rule Act of 1973 established the District of Columbia Charter and delegated to the District the authority to amend its Charter, subject to certain express exceptions.  The Council could propose amendments that would become law if District voters ratified them and if both Houses of Congress approved.  In 1984, Congress relaxed the process, permitting the Council to enact Charter amendments that would become law if ratified by District voters, unless Congress and the President acted within 35 days to disapprove.

This case is about the Local Budget Autonomy Act of 2012, D.C. Law 19-321, 60 D.C. Reg. 1724, a Charter amendment that permits the District to spend its own tax-and-fee revenues, revenues that never pass through the federal government.  There is no dispute that the District followed the correct Charter amendment procedure: The Council passed the bill, the Mayor signed it, the voters ratified, and Congress declined to exercise its prerogative to override.  So under the system created by Congress in the Home Rule Act—which makes every provision of the Charter amendable except where Congress has created an exception—the only question is whether the Home Rule Act contains an express limitation on the Charter amendment authority that precludes the Budget Autonomy Act.  It does not.

The district court invalidated the Budget Autonomy Act and enjoined its enforcement.  But that court's conclusion rests on misinterpretations of the Home Rule Act's text, structure, purpose, and legislative history.  The district court's judgment therefore should be reversed.

## JURISDICTIONAL STATEMENT

The Council filed a complaint in the Superior Court for the District of Columbia on April 17, 2014.  JA11.  Defendants-appellees Vincent C. Gray and Jeffrey S. DeWitt ("Defendants") removed the case to district court, invoking federal-question jurisdiction under 28 U.S.C. § 1441(c).  JA7.  As explained *infra*, however, the district court lacked jurisdiction because the Council's well-pleaded complaint concerned only laws applicable exclusively to the District of Columbia. The district court entered summary judgment for Defendants on May 19, 2014. JA407.  The Council filed a notice of appeal that same day.  JA456.  This Court's jurisdiction rests on 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the district court lacked federal-question jurisdiction over the Council's complaint, which seeks relief under laws applicable exclusively to the District of Columbia.

2.    Whether, if the district court had jurisdiction, it erred in invalidating the Local Budget Autonomy Act of 2012.

2

## STATUTES AND REGULATIONS

Applicable statutes are contained in the separately bound addendum.

## STATEMENT OF THE CASE

### A.    Home Rule in the District of Columbia

#### 1.    The District's Early Experience with Self-Government

The Constitution grants to Congress the authority to "exercise exclusive

Legislation" over the District.  U.S. Const. art. I, § 8, cl. 17.  That authority,

however, may be delegated (*see District of Columbia v. John R. Thompson Co.*,

346 U.S. 100, 106 (1953)), and in the very first days of the District, Congress

delegated substantial powers to the local government.

When the District was established in 1801, Congress preserved the

municipal powers of the towns of Georgetown and Alexandria.  District of

Columbia Organic Act, ch. 15, § 16, 2 Stat. 103, 108 (1801).  The City of

Washington was incorporated the next year, and Congress authorized a local

government—with an elected Council and an appointed Mayor—to "purchase and

hold real, personal and mixed property, or dispose of the same for the benefit of"

the City.  Act of May 3, 1802, ch. 53, § 1, 2 Stat. 195, 196.

In 1871, Congress merged Washington City, Washington County, and Georgetown and provided a single local government for the District.[1]  That government, too, had the authority to raise and spend local money.[2]  But the unified government under the 1871 Act took on an oversized debt load, which led Congress in 1874 to disband the government, whereupon "[l]egislative powers * * * ceased, and the municipal government [was] confined to mere administration."  *Metro Ry. v. District of Columbia*, 132 U.S. 1, 7 (1889).

### 2.    The Home Rule Act of 1973

For the next century, Congress performed all legislative functions for the District.  But as the District's population grew—from 130,000 in 1870 to a peak of 800,000 in 1950—congressional control became increasingly inefficient and impractical.

Presidents Truman, Eisenhower, Kennedy, Johnson, and Nixon all supported home rule, and the Senate passed home rule bills on seven occasions between 1949 and 1971.[3]  Each of those bills stalled in the House District Committee, but the political environment improved in 1973, when Rep. Charles Diggs, Jr.—a

---

[1] *See* Act of Feb. 21, 1871, ch. 62, 16 Stat. 419.  Alexandria had retroceded to Virginia in 1846.  Act of July 9, 1846, ch. 35, 9 Stat. 35.

[2] *See, e.g.*, D.C. Act 1016 (July 10, 1871) (appropriating $4 million for public works projects).

[3] *E.g.*, S. 1527, 80th Cong. (1949); S. 2652, 92d Cong. (1971).

4

supporter of home rule—became the Chairman.   Both Chambers took up home rule legislation again.

### a.    The Senate bill

The Senate bill (S. 1435) was similar to previous Senate efforts to confer home rule.  Its objective was to "restor[e] the powers of local self-government suspended in 1874," by delegating Congress's powers over the District as to matters "municipal as distinguished from those national in scope."[4]

The Senate bill created an elected Mayor and Council that were authorized to legislate with five enumerated limitations (such as taxation of federal property).[5] The Senate bill made clear that Congress would retain its "ultimate and exclusive legislative jurisdiction over the District"; all District legislation was subject to a one-house veto, and "Congress would continue to initiate local legislation should it so desire."[6]

On budget matters, the Senate bill created a "general fund of the District" in the custody of the Mayor that would contain all funds that "belong to the District

---

[4] S. REP. NO. 93-219, at 4 (1973), *reprinted in* STAFF OF H. COMM. ON D.C., 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY 2724 (Comm. Print 1976) [hereinafter LH].

[5] S. 1435, 93d Cong. § 325(d) (as passed by Senate, July 10, 1973) (LH2812).

[6] *Id.* § 325(g); LH2724.

government."[7]  Each year, the federal government would make an automatic contribution to that fund equal to 40 percent of the District's revenues.[8]  The District would be permitted to pass a budget that would "make available for expenditure" any of the funds within its possession.[9]

Although the Senate's proposed grant of self-government to the District was broad, only two provisions of the Senate bill—concerning the qualifications and election procedures for the Mayor and the Council—were subject to alteration by the District government.[10]

S. 1435 passed by a vote of 69-17 on July 10, 1973.

### b.    The House bill

The House District Committee developed its own home rule bill (introduced as H.R. 9056, reported as H.R. 9682).  Although the District Committee made use of the Senate's draft, it altered the structure and content of the legislation.

The key structural element of the District Committee's approach was the District Charter—a freestanding document within the Home Rule Act that was designed to spell out "what the government can do" and to establish that the

---

[7] S. 1435, §§ 505(7), 508 (LH2820).

[8] *Id.* § 701 (LH2827).

[9] *Id.* §§ 504-05 (LH2819-20).

[10] *Id.* §§ 304, 401(d) (LH2810, 2817).

authority of the District government is limited "by and in its relationship with the people."[11]

The Charter had two critical characteristics. *First*, it would be effective only after it was accepted by the people of the District through a ratification process. Without such a process, the "whole exercise in trying to simply create a democratic government here like you have in every other city in the United States would be faulty."[12] *Second*, the District could propose amendments to the Charter, similar to the process for amending a state constitution. Thus, by granting the Charter, Congress would be starting "an ongoing process" with "a facility whereby [District residents] could continue to implement and update their charter."[13]

Under the District Committee's approach, the Charter could be amended by Congress at any time or if two-thirds of the Council approved an act that was ratified by the voters and then approved by Congress in a concurrent resolution.[14]

---

[11] LH981 (statement of Rep. Brock Adams, Chairman, Subcomm. on Gov't Relations of H. Comm. on D.C.); *see also* LH207 (statement of Rep. Donald Fraser) (envisioning a "nice neat charter for the District" for use when "the school children of the District are taught about their government").

[12] LH981-82.

[13] LH207 (statement of Rep. Adams); *see also* LH261.

[14] LH1039 (statement of Rep. Adams).

On budgetary matters, the District Committee bill was similar to the bill that passed the Senate.  The Mayor was to be entrusted with a General Fund containing monies that "belong to the District government,"[15] Congress would contribute an annual federal payment (although the amount was not automatic),[16] and pursuant to a Charter provision—Section 446—the Council was permitted to pass its budget by ordinary legislation.[17]  Thus, like the Senate bill, the original House bill permitted the District to adopt its budget without affirmative congressional action.

The bill was reported favorably by the District Committee on July 31, 1973, by a vote of 20-4.

Although he supported reporting the bill, Ranking Member Ancher Nelsen was skeptical of the breadth of the home rule proposal.  In a letter dated August 3, he urged colleagues to "keep [their] options open on this matter until it reaches the Floor and can be debated on its merits."[18]  And in remarks on September 26, he identified 17 "major objections" to the Committee bill, one of which involved the substantial amount of federal money that then subsidized the District's budget:

---

[15] H.R. 9682, 93d Cong. § 451 (as reported, Sept. 11, 1973) (LH1286).

[16] *Id.* § 503 (LH1315).

[17] *Id.* § 446 (LH1281).

[18] LH1682.

8

> Elimination of Congressional line-item appropriation control (only a lump-sum unallocated Federal payment may be appropriated) over D.C. spending—which includes a substantial amount of the Nation's taxpayers' money—is an abdication of the responsibility of Congress to control and account to taxpayers for Federal spending.[19]

On October 2, Rep. Nelsen introduced H.R. 10692—the Nelsen Substitute.[20] The Nelsen Substitute eliminated the proposal for an elected Mayor and provided only modest delegations of power to the District government. With respect to the budget, the Nelsen Substitute expressly stated that further action from Congress would be required to alter the process relating to the District's budget:

> Notwithstanding any other provision of law, unless specifically authorized or directed by the Congress, there shall be no change made in existing laws, regulations, or basic procedures and practices as they relate to the respective roles of the Congress, the President, the Federal Office of Management and Budget, the United States Department of the Treasury, the Comptroller-General of the United States, the District of Columbia Council, and the Commissioner in * * * the preparation, review, submission, examination, authorization, and appropriation of the total budget for the District of Columbia.[21]

---

[19] LH1703-04.

[20] H.R. 10692, 93d Cong. (1973) (LH1975). Rep. Nelsen also cosponsored a fallback bill. H.R. 10693, 93d Cong. (1973) (LH2035).

[21] H.R. 10692, § 416 (LH2024).

9

A week later, Chairman Diggs announced a compromise bill.  As part of the compromise, Section 446 within the District Charter was amended to provide that "[n]o amount may be expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act."  LH2286.

Many of Rep. Nelsen's ideas were rejected in the Diggs Compromise (*e.g.*, his preferences for an appointed Mayor and a Council that could not amend pre-home-rule local laws).  Other ideas were incorporated and the Nelsen Substitute's budget language was used as the basis for what became Section 603(a).  Notably, however, the Diggs Compromise rejected the Nelsen Substitute's prospective prohibition on changes in the budget process, in favor of a declaration of what the Home Rule Act did *not* do.  Whereas the Nelsen Substitute provided that "there shall be no change" to the budget process unless "specifically authorized or directed by the Congress," the Diggs Compromise provided only reassurance that "this Act" was not "making any change":

> Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination,

10

authorization, and appropriation of the total budget of the District of Columbia government.[22]

On the House floor, Rep. Nelsen thanked Rep. Diggs for "his kind cooperation" in "trying to reach a goal."[23]  He nevertheless offered his substitute bill, which was defeated by a vote of 273-144.[24]  The Diggs Compromise was adopted thereafter, 343-74.[25]

### c.    The Conference bill

A Conference Committee was appointed to bridge the differences between the House and Senate bills.  The conference agenda included both the amendability of the Charter and the budget process.  In both circumstances, the Senate receded to the House position, resulting in a broadly amendable Charter that made no change to existing law regarding appropriation by Congress of the District's budget.

The Conference bill was approved by both Houses and signed by President Nixon on December 24, 1973.

---

[22] H.R. 9682, § 603(a) (LH2319).

[23] LH2451.

[24] LH2451-52.

[25] LH2455-57.

11

### 3.    Amendments to the Home Rule Act

As explained *infra*, Congress could amend the Home Rule Act at any time or the District could initiate amendments pursuant to the process set forth by the Act. The process for District-initiated amendments was first employed in 1977, when the Council passed the Initiative, Referendum, and Recall Charter Amendment Act, D.C. Law 2-46, 24 D.C. Reg. 199, to permit District voters to engage in direct democracy by passing legislation (initiatives), suspending legislation (referenda), and recalling elected officials. After ratification by District voters, Congress adopted concurrent resolutions to approve the Charter amendments. H.R. Con. Res. 464, 95th Cong. (1978) (initiative and referendum); H.R. Con. Res. 471, 95th Cong. (1978) (recall).

In 1984, Congress relaxed the procedure for District-initiated amendments to the Charter. The year before, the Supreme Court had invalidated legislative procedures (such as the Charter amendment procedure) that did not involve presentment to the President. *See INS v. Chadha*, 462 U.S. 919 (1983). Although it would have been simple to solve the defect in the Charter amendment process by keeping the requirement for congressional approval and further requiring presentment to the President, Congress instead took the opposite tack—rather than make the amendment process harder after *Chadha*, Congress made it easier. Charter amendments approved by the Council and ratified by District voters

12

became presumptively valid and would become law unless a joint resolution of *disapproval* were approved by both Chambers of Congress and signed by the President within 35 legislative days.[26]  Despite this easing of the amendment process, it was not used again until 2000.[27]

### 4.     The Budget Autonomy Act of 2012

#### a.     The Problems with the District's Budget System

The District's financial system has matured substantially in the forty years since passage of the Home Rule Act.  Through September 2013, the District's budget has been balanced and its end-of-year financial audit has been clean for 16 consecutive years.  And the District has maintained fiscal stability in the face of declining federal support.  Whereas Congress in 1973 made a federal payment of nearly 40 cents for every dollar of local revenue, the federal payment is now just 1 cent per dollar.

By contrast, the process for approving the District's budget each year has become increasingly costly for the District.  Congress routinely fails to enact an annual appropriations act by the start of the fiscal year.  Indeed, in the 25 budget cycles between 1990 and 2014, Congress has met the October 1 deadline on only

---

[26] Act of Oct. 12, 1984, Pub. L. No. 98-473, § 131(b), 98 Stat. 1837, 1974.

[27] School Governance Charter Amendment Act of 2000, D.C. Law 13-159, 47 D.C. Reg. 2212.

13

three occasions.  In the other 22 cycles, the District has either begun the year

without knowing its full budget or has been forced to initiate shutdown

procedures.[28]  Even in the best of circumstances, the District's budget proposal is

virtually certain to be outdated by the time it becomes law.  The delay and

congressional gridlock create uncertainties.  "Bond rating agencies take the

uncertainties of the Federal process into account in assessing the District's

finances, and discount to a degree whatever ratings the District might otherwise

receive."[29]  These delays lead to lower service delivery levels for "school nurses,

prescription drug benefits, police equipment, and staffing."[30]  In sum, the inability

of Congress to act promptly on the District's budget exacts tangible costs on the

District's residents.

### b.      The Budget Autonomy Act Becomes Law

In response to these and other concerns, the Council in 2012 approved the

Budget Autonomy Act, an amendment to the District Charter.  The Budget

Autonomy Act leaves intact Congress's plenary authority over the District—

---

[28] *FY 2012 and FY 2013 Spending and Performance of the Office of Budget and Planning: Hearing Before the Comm. Of the Whole, Council of D.C.* 9 (Mar. 14, 2013), http://1.usa.gov/STdHRM.

[29] *Budget Autonomy for the District of Columbia, Hearing Before the H. Comm. on Gov't Reform*, 108th Cong. 32 (2003) (statement of Natwar Gandhi).

[30] *Id.* at 10 (statement of Anthony Williams).

14

including as to the budget—and permits the District to spend locally raised funds using the same legislative procedure that applies to all other District legislation. Thus, Section 446 as amended provides that a budget must be approved by an act that is adopted by the Council after two readings, signed by the Mayor, and transmitted to Congress for a 30-day review period. *See* Budget Autonomy Act § 2(c), (e). The Budget Autonomy Act also amends Section 441 to permit the Council to change the District's fiscal year, which would permit the District to align its budgeting calendar with the school year. *See* Budget Autonomy Act § 2(d).

While the Council was considering the Budget Autonomy Act, Attorney General Irvin Nathan questioned its legality. V. David Zvenyach, General Counsel to the Council, considered the Attorney General's objections and concluded that they lacked merit. JA391. The Council proceeded to adopt the Budget Autonomy Act unanimously and Mayor Gray signed it. 60 D.C. Reg. 1724 (Feb. 15, 2013). The Act was then submitted to the D.C. Board of Elections and Ethics for inclusion on the next citywide election ballot. The Attorney General contested the inclusion of the referendum on the ballot. JA139. After holding a public hearing and evaluating the legal arguments, the Board found "no basis on which to reject" the ballot question. *In re Local Budget Autonomy Emergency Amendment Act of 2012*, No. 13-01, at 5 (D.C. Bd. Elections & Ethics Jan. 9, 2013).

15

On April 23, 2013, the voters of the District of Columbia ratified the Act by a margin of 83%-12%, and Congress took no action to disapprove of the amendment to the Charter.  Accordingly, pursuant to the amendment process as revised by Congress post-*Chadha* in 1984, the Budget Autonomy Act became law on July 25, 2013.

More than eight months later, with the next budget season already underway, the Attorney General issued an opinion letter renewing his earlier objections and advising the Mayor to "decline to implement" the Act and to "advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary."  JA69.  In separate letters dated April 11, 2014, Mayor Vincent C. Gray and CFO Jeffrey S. DeWitt each advised the Council that they would follow the Attorney General's opinion to treat the Budget Autonomy Act as a "legal nullity" and not comply with their obligations under the Act.  JA70, 74.

## B.      Proceedings Below

Facing imminent injury, the Council filed suit for declaratory and injunctive relief against the Mayor and the Chief Financial Officer in the Superior Court for the District of Columbia on April 17, 2014.  JA11.  Defendants immediately removed the matter to federal court, invoking federal-question jurisdiction.  JA7. Believing federal-question jurisdiction to be unavailable, the Council moved to

16

remand to Superior Court (R.9), whereupon the district court advised that it would consider its jurisdiction in conjunction with summary judgment proceedings.

Defendants filed a cross-claim seeking their own declaratory judgment and injunctive relief and the parties briefed cross-motions for summary judgment on a highly expedited basis.

On May 19, 2014, the district court entered judgment in favor of Defendants. JA407. In an accompanying memorandum opinion, it concluded that the Budget Autonomy Act violates three provisions of the Home Rule Act: Section 603(a), which provides that "[n]othing in [the Home Rule Act of 1973] shall be construed as making any change in existing law" with respect to the budget; Section 602(a)(3), which prohibits legislation by the District that "concerns the functions or property of the United States or [that] is not restricted in its application exclusively in or to the District;" and Section 603(e), which provides that "[n]othing in this Act shall be construed as affecting the applicability to the District government of the provisions of * * * the so-called Anti-Deficiency Act." JA409-55. The district court permanently enjoined all parties from "enforcing the Local Budget Autonomy Act of 2012." JA455. The Council moved to clarify or stay the judgment. R.47. That motion was denied. JA459.

17

# SUMMARY OF ARGUMENT

## I

The district court erred by exercising jurisdiction after the case was removed to federal court.  Laws applicable exclusively to the District of Columbia do not support federal-question jurisdiction.  The complaint in this case invokes the obligations of local officials under the Home Rule Act.  This Court's precedents demonstrate that neither the assertion of a federal defense nor the mere involvement of federal entities is sufficient basis for removal to federal court.  In this case, the question is whether local officials—the Council, the Mayor, and the Chief Financial Officer—are lawfully discharging their responsibilities.  Accordingly, federal-question jurisdiction is unavailable and the case must be remanded to D.C. Superior Court.

## II

The district court also erred by invalidating the Budget Autonomy Act because the Home Rule Act provides that Charter provisions may be amended and no exception applies.

**A.** Section 603(a) of the Home Rule Act provides that "[n]othing in this Act shall be construed as making any change in existing law" with respect to budget processes.  The district court's conclusion that Section 603(a) prohibits

18

amendments to the Charter's budget provisions is in conflict with the provision's text, structure, purpose, and history.

By its plain terms, Section 603(a) explains how to construe the Home Rule Act's budget provisions with respect to then-existing law—as making no change. But it does not follow that Congress was limiting the District's authority to initiate Charter amendments as to the budget process. Where Congress wanted to prohibit District officials from taking actions, it was explicit—providing, *e.g.*, that "[t]he Council shall have no authority" as to specifically enumerated topics. Where Congress has elsewhere used provisions similar to Section 603(a), courts have understood it to be clarifying the meaning of the statute to avoid misunderstanding, not to be making critical alterations to substantive law.

The structure of the Home Rule Act confirms the role of Section 603(a). Charter provisions that Congress wanted to exempt from the amendment process are identified in Section 303(a), which also provides that all other Charter provisions are subject to amendment. The absence of any mention of the budget process in Section 303(a) implies that Congress did not intend to make those Charter provisions, including Sections 441 and 446, unamendable. The district court erroneously made the opposite presumption. Based on a misreading of Section 303(d), the district court started from the premise that Section 603(a) *must* be interpreted as a limitation on the Council's Charter amendment authority. But

19

there is no warrant to interpret Section 603(a) to mean anything other than what it says.

The overall purpose of the Home Rule Act was to delegate authority to the District "to the greatest extent possible."  In light of that purpose, the D.C. Court of Appeals has emphasized that delegations of authority must be construed broadly and restrictions construed narrowly.  That rule of construction further reinforces the conclusion that an implied prohibition should not be read into Section 603(a).

The history of Section 603(a) demonstrates that it was adapted from the Nelsen Substitute, which would have expressly prohibited future changes to the budget process without congressional authorization.  But in enacting Section 603(a), Congress rejected the language of future prohibition that originated with the Nelsen Substitute.  That alteration has meaning and establishes that Congress did not prohibit future changes to the budget process through Section 603(a).  Legislative proceedings regarding the amendment process confirm as much.  At Conference, it was an objective of House conferees to keep Part D of their bill— which contained the provisions concerning "District Budget and Financial Management"—subject to the amendment process.  The Senate (which favored budget autonomy in the first instance) acquiesced in the House proposal, and so the final bill reflected the House's preference.

20

The district court's analysis did not account for any of the above, relying instead on an interpretation of the legislative history surrounding the Diggs Compromise.  That compromise resulted in language stating that Congress in 1973 was not making any change to existing law but did not go any further to suggest that the Charter's budget provisions would be exempted from the general rule that the Charter is subject to an amendment process.

**B.**  Section 602(a)(3) of the Home Rule Act provides that the Council shall have no authority to enact any act "which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."  That provision is not implicated by the Budget Autonomy Act.  As explained by long-standing precedents from the D.C. Court of Appeals, Section 602(a)(3) distinguishes between Congress's authority as the national legislature (which was not delegated) and its authority as the local legislature for the District (which was delegated).  That interpretation is required by the text of Section of 602(a)(3) and supported by its legislative history.

The district court concluded in a footnote that the Budget Autonomy Act violates Section 602(a)(3) because it implicates the functions of Congress.  But that approach fundamentally misunderstands Section 602(a)(3), which only precludes legislation affecting inherently federal functions, not all local functions in which federal actors play any role whatsoever.

**C.** The Anti-Deficiency Act provides that District employees may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1). In 1973, Congress gave the District a "fund"—the D.C. General Fund—with monies that belong to the District government. And the Budget Autonomy Act prescribes the method for making those amounts available for expenditure or obligation. So long as the District was otherwise authorized to initiate this amendment to its Charter under the Home Rule Act, the Anti-Deficiency Act is satisfied.

The district court labored under the misimpression that an annual congressional appropriation was nevertheless required. The Anti-Deficiency Act obviously does not require a congressional appropriation; it requires an "appropriation or fund," and other entities commonly comply with the Anti-Deficiency Act using funds rather than congressional appropriations. The Constitution does not require a congressional appropriation; it requires congressional appropriations only for funds within the U.S. Treasury, but the District's local funds reside in the D.C. General Fund and never pass through the Treasury. Finally, the Home Rule Act itself does not require an annual congressional appropriation. The only provision that did require annual

22

congressional action on the District's budget was Section 446, which was amended by the Budget Autonomy Act.

## ARGUMENT

## I.    THE DISTRICT COURT LACKED JURISDICTION.

The district court erred by exercising federal-question jurisdiction over this case.  Although a case may properly be removed to federal court when a federal question appears on the face of a plaintiff's well-pleaded complaint, "a case may *not* be removed to federal court on the basis of a federal defense, * * * even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).  For purposes of federal-question jurisdiction, "laws applicable exclusively to the District of Columbia" do not present federal questions.  28 U.S.C. §§ 1331, 1366.[31]

In this case, the Council's complaint alleges that the Mayor and the Chief Financial Officer are required to discharge their obligations under the Home Rule Act and the Budget Autonomy Act.  JA11-24.  In removing the case to federal court, Defendants invoked the Home Rule Act, the Anti-Deficiency Act, and the Budget and Accounting Act.  JA8.  The Anti-Deficiency Act and the Budget and

---

[31] "This court reviews jurisdictional issues *de novo*."  *Foretich v. ABC, Inc.*, 198 F.3d 270, 273 (D.C. Cir. 1999).

23

Accounting Act are plainly not a basis for federal-question jurisdiction; although they are federal laws, they are implicated in the case only as defenses (and, indeed, are not even mentioned in the complaint).

Nor is federal-question jurisdiction available because the complaint invokes the Home Rule Act. In *Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986), this Court held that federal-question jurisdiction was unavailable as to a claim that the District's no-fault insurance law violated, *inter alia*, Section 602(a)(8) of the Home Rule Act, which prohibits the Council from enacting legislation "relating to the United States District Court for the District of Columbia." *Id.* at 188. Despite the obvious implications for the federal courts, this Court held that jurisdiction was unavailable because "the restrictions on the authority of the District of Columbia City Council embodied in * * * the [Home Rule] Act would appear to apply exclusively to the District of Columbia." *Id.*; *see also Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360 (D.C. Cir. 2007) (declining to exercise jurisdiction over a claim that the Council had failed to follow the Home Rule Act's requirements for enacting legislation). Thus, in alleging that the Budget Autonomy Act comports with the Home Rule Act, the Council's complaint does not create a basis for federal-question jurisdiction.

The district court dismissed *Dimond* as involving "purely local legislation," as compared to "the budget process for the District," which, in its view,

24

"necessarily includes federal entities, namely the President and Congress."  JA429.
But it could be said, just as easily, that the relief sought in *Dimond* necessarily
includes federal entities, namely the U.S. District Court.

In dismissing *Dimond*, the district court instead relied upon *Thomas v.
Barry*, 729 F.2d 1469 (D.C. Cir. 1984), where this Court held that jurisdiction was
available for a claim by former Department of Labor employees who had been
transferred by the Home Rule Act to be employees of the District government and
were claiming federal benefits.  This Court held that because the Home Rule Act
"extends beyond the narrow sphere of the District of Columbia to various federal
employees and to the actual structure of the Department of Labor," an exercise of
federal-question jurisdiction was warranted.  *Id.* at 1471.

By contrast, the Council's complaint here invokes only the obligations of
local officials under laws that apply only to the District.  To be sure, Congress and
the President are implicated by the Budget Autonomy Act—as they are by virtually
every legislative act passed by the District.  But they are implicated only within the
context of the Home Rule Act, which applies only to the District.  No authority
supports the claim that federal involvement in District affairs gives rise to a federal
question.  Otherwise, every case raising a question involving the Home Rule Act in
any way could be filed in or removed to federal court.  Such an argument could
have been made in *Dimond*.

For these reasons, there is no federal-question jurisdiction, and the district court should be directed to remand the case to D.C. Superior Court.

## II.    THE BUDGET AUTONOMY ACT IS VALID.

When Congress enacted the Charter as the District's governing document, it contemplated that amendments would be warranted to keep pace with changing conditions.  Indeed, the Home Rule Act starts from the premise that the Charter is amendable, so long as the correct process is followed, unless an express prohibition applies.  The district court found that, although the proper procedures were carried out, the Budget Autonomy Act was invalid because it violated three provisions of the Home Rule Act.  But applying the traditional tools of statutory construction to each of those provisions—"text, structure, purpose, and history" (*Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004))—proves otherwise.[32]

### A.    Section 603(a) Does Not Exempt The Charter's Local Budget Provisions From The Amendment Process.

Section 603(a) explains how "this Act shall be construed" with respect to "existing law" regarding the preparation and enactment of the District's budget.  It does not exempt the Charter's fiscal year and budget provisions from the

---

[32] Summary judgments are reviewed *de novo*.  *Partington v. Houck*, 723 F.3d 280, 285 (D.C. Cir. 2013).

26

amendment process specified by Congress in the Home Rule Act. When Congress made such exemptions, it did so expressly and with specificity. In sharp contrast with neighboring provisions and with the Nelsen Substitute provision from which it was adapted, Section 603(a) contains no express prohibition on the Council's authority to legislate or to originate Charter amendments relating to the budget process. And the district court's contrary interpretation—which simply failed to address these considerations—is in error.

### 1. The text of Section 603(a) shows only that Congress was not making any change to the budget process in 1973.

"In interpreting a statute, the court begins with the text." *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 683 (D.C. Cir. 2010). Here, Section 603(a) provides:

> Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

By its plain terms, this provision explains only how to "construe[]" the Home Rule Act—the Act itself was not "making any change in existing law" with respect to the budget. Section 603(a) does not constrain the District's authority to propose future "change[s]" through the Charter amendment process. Nevertheless, the

27

district court declared it "clear" from the text that Section 603(a) is "a limitation on the Council's amendment authority."  JA434.

The district court did not explain *why* it thought the text of Section 603(a) was clear.  It did not conduct any analysis of the text.  Nor did it address the substantial textual evidence that Section 603(a) does not limit the Council's authority to originate Charter amendments.

*First*, Section 603(a) speaks in the present tense about the effect (or lack thereof) of "this Act" on "existing law."  When Congress wanted to limit the Council's authority, it "kn[ew] precisely how to do so."  *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2118 (2014).  In Section 602(a), Congress enumerated nine topics as to which "[t]he Council shall have no authority."[33]  In Section 603(c), Congress provided that "[t]he Council shall not approve any budget" that is not balanced.  And in Section 601, Congress emphasized that Congress—and not the Council—retained ultimate legislative authority, including the power to "amend or repeal * * * any act passed by the Council."

Section 603(a), in contrast, does not even mention the Council.  And it does not contain the forward-looking language of limitation that marks neighboring provisions that ***do*** limit the Council's authority.  Instead, in Section 603(a),

---

[33] A tenth limitation was added in 1995.

28

Congress explained what changes it was "making"—using the present participle, a verb tense that "implies that the legislature envisioned some form of simultaneity" between the Act and the lack of change.  *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 876–77 (7th Cir. 2009); *cf. United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

"Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Sebelius v. Cloer*, 133 S. Ct. 1886, 1894 (2013) (quoting *Bates v. United States,* 522 U.S. 23, 29-30 (1997)) (internal quotation marks omitted); *see also Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007) (this Court "ha[s] repeatedly held that where different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings") (internal quotation marks and alteration omitted).  Yet, in this case, where the differences in language were glaring, the district court ignored them.

*Second*, the district court failed to appreciate the significance of Congress's particular textual formulation, which explains that "[n]othing in this Act shall be construed as making any change in existing law."  That type of formulation is not, of course, unique to this statute.  Such provisions are understood not as substantive rules but as interpretive provisions, "specif[ying] how the Act [was] to be

29

integrated into pre-existing law" (*Assassination Archives & Research Ctr. v. Dep't of Justice*, 43 F.3d 1542, 1544 (D.C. Cir. 1995)), or providing an act with "its own rule of statutory construction" (*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 n.5 (1986)).  When Congress wants to prohibit future conduct, it does not do so through this formulation.

Provisions of this sort are sometimes referred to as "saving clauses."[34]  "The usual function of a saving clause is to preserve something from immediate interference—not to create."  *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 162 (1920).  Thus, such a provision may be included in a statute "to avoid any misunderstanding [about what] the Act" seeks to accomplish.  *Lichtenstein v. FTC*, 194 F.2d 607, 610 (9th Cir. 1952) (internal quotation marks omitted).  As guides to interpretation, such provisions are interpreted narrowly so as not to "upset the careful regulatory scheme" established by substantive law.  *United States v. Locke*,

---

[34] *See, e.g.*, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004) ("nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws"); *Locke*, 529 U.S. at 104 ("Nothing in this Act * * * shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof"); *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 234 n.3 (1998) ("Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies"); *see also Bridges v. United States*, 346 U.S. 209 (1953); *Red Canyon Sheep Co. v. Ickes*, 98 F.2d 308, 318 (D.C. Cir. 1938).

529 U.S. 89, 106 (2000).   The mandated interpretation here is to construe the

provision as describing the effect of Congress's 1973 enactment, not to imply a

very substantial limitation on the Charter amendment power.

>    **2.    The structure of the Home Rule Act confirms that Section 603(a) was not designed to remove the Charter's budget provisions from the amendment process.**

The district court also did not properly account for Section 303, which

defines the Charter amendment process.  When Congress wanted to exclude

provisions of the Charter from the Charter amendment process, it did so through

Section 303(a), which provides:

>    The charter set forth in title IV (including any provision
>    of law amended by such title), *except sections 401(a) and
>    421(a), and part C of such title*, may be amended by an
>    act passed by the Council and ratified by a majority of
>    the registered qualified electors of the District voting in
>    the referendum held for such ratification.

(Emphasis added.)  Thus, the process may not be used to abolish the Council

(Section 401(a)) or the Office of the Mayor (Section 421(a)) or to alter the

District's judiciary (Part C).  If Congress had intended to exclude the Charter's

budget provisions from the process for Council-initiated amendments, it would

have excluded them through Section 303(a).  *See* LH2916 (explaining that entire

Charter would be amendable except for enumerated provisions).

31

The district court ignored Section 303(a) and instead turned its focus on Section 303(d), which prohibits the use of amendments to the Charter as to issues "with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603."  The district court concluded that because "Section 303(d) unequivocally refers to Section 603 as a 'limitation[]' on the Council's amendment authority and does not specify that only certain provisions of that section are to be treated as limitations," it follows that Section 603 "*as a whole*"—*i.e.*, every subsection of Section 603—must be construed as a "limitation[] on the Council's authority."  JA433-34.

That approach is squarely inconsistent with the text of Section 303(d) and its function in the structure of the Home Rule Act.  Section 303(d) does not say that everything contained in Sections 601, 602, and 603 *is* a limitation on the Council's amendment authority; it says only that there are limitations on the Council's authority *specified in* those provisions and that any such limitations also restrict the Charter amendment authority.  Quite evidently, every subsection of Section 603 is not a limitation on the Council's authority—for example, Section 603(d) is a limitation on the authority of the *Mayor*, not on the authority of the Council.  Likewise, where Congress has used similar cross-references to limitations "specified in" other statutes, the cross-referenced provisions have not consisted exclusively of limitations.  *See, e.g.*, 12 U.S.C. § 1467a(d) (making certain

32

financial transactions "subject to the limitations and prohibitions specified in

section 1468"); 21 U.S.C. § 360eee-4(a)(2) (prohibiting states from imposing

regulations "which are inconsistent with * * * any restrictions specified in section

360eee-1").

Moreover, the heading of Section 603—"Budget Process; Limitations on

Borrowing and Spending"—confirms that it contains more than just limitations on

the Council.  It stands to reason that the first subsection—Section 603(a)—would

speak to the "Budget Process" rather than to "Limitations."  Indeed, before Section

603(a) was added, the heading referred only to "Limitations on Borrowing and

Spending."  LH1317.

Finally, the district court's approach makes the fiscal year (Section 441) and

the budget process (Section 446) the only provisions of the Charter that are

implicitly rendered unamendable by Section 303(d), rather than explicitly excluded

through Section 303(a).  Although portions of Sections 601, 602, and 603 limit the

District's Charter amendment authority by way of cross-reference to limitations on

the Council's legislative power, nothing in those provisions makes entire Charter

provisions unamendable.  Sections 303(a) and 602(a)(4) illustrate the distinction.

Section 602(a)(4) prohibits the Council from amending the D.C. Code provisions

concerning the judiciary.  But the related prohibition on amending the *Charter's*

judiciary provisions does not appear in Section 602(a)—it appears in Section

33

303(a).  Thus, if Congress had intended to exclude the entire budget process—including Section 441 and Section 446—from the Charter amendment process, it would have done so directly through Section 303(a), not indirectly through Section 303(d) and 603(a).

In sum, the district court was incorrect to ignore Section 303(a) and to use Section 303(d) to alter the meaning of Section 603(a).  Section 303(d) does not require Section 603(a) to mean anything other than what it says.

### 3.    The overarching purpose of the Home Rule Act counsels against inferring restrictions not articulated by Congress.

The meaning of Section 603(a) is also informed by Congress's purpose in enacting the Home Rule Act.  In Section 102(a), Congress explained its intent "to the greatest extent possible, consistent with the constitutional mandate, [to] relieve Congress of the burden of legislating upon essentially local District matters."

In light of that purpose, the D.C. Court of Appeals has long held that restrictions on the Council's legislative authority "must be narrowly construed, so as not to thwart the paramount purpose of the [Home Rule Act], namely to 'grant to the inhabitants of the District of Columbia powers of local self-government.'" *Bergman v. District of Columbia*, 986 A.2d 1208, 1226 (D.C. 2010) (quoting D.C. Code § 1-201.02(a)); *see also Washington, D.C. Ass'n of Realtors, Inc. v. District of Columbia*, 44 A.3d 299, 303 (D.C. 2012) ("In view of [Congress's] broad

34

delegation of authority and the policy of the Home Rule Act, we have held that limitations on the Council's legislative authority will be construed narrowly.").

In interpreting what constitutes such a "limitation[]," the D.C. Court of Appeals has cautioned against divining "limitations" by implication. In *Bishop v. District of Columbia*, 411 A.2d 997 (D.C. 1980) (en banc), the D.C. Court of Appeals agreed with the District's Corporation Counsel that courts "must presume Congress 'legislated with care'" in the Home Rule Act, such that only those limitations expressly articulated can restrict the District's powers. *Id.* at 999. Given the importance of the Home Rule Act and Congress's paramount purpose, Congress must be presumed to have expressly included all limitations on the authority of the District government and "not left the matter to mere implication." *Id.*

As applied here, that conclusion is unavoidable. In light of the text of Section 603(a) (which, read naturally, explains how to interpret the legal effect of the Home Rule Act's budget provisions, not to restrict future action by the Council), in context (where other provisions very clearly limit the Council's authority to originate Charter amendments), in the structure of the Act (where Section 303(a) identified a list of Charter provisions that cannot be amended), and the purpose of the Act (which counsels against reading limitations not expressly imposed), Section 603(a) cannot be read to invalidate the Budget Autonomy Act.

35

### 4.     The history of the Home Rule Act shows that Congress was not enacting a prospective limitation through Section 603(a).

The legislative history of the Home Rule Act confirms that Congress did not intend through Section 603(a) to restrict the District's authority to initiate Charter amendments. To the contrary, the Diggs Compromise *discarded* language that would have done precisely that. And negotiations in 1973 surrounding the amendment process corroborate this conclusion.

**a.** The provision that became Section 603(a) was adapted from the Nelsen Substitute, which was introduced just two legislative days before the House Committee's bill was scheduled for floor consideration. [35]

The Nelsen Substitute provided:

> ***Notwithstanding any other provision of law, unless specifically authorized or directed by the Congress, there shall be no change made in existing laws***, regulations, or basic procedures and practices as they relate to the respective roles of the Congress, the President, the Federal Office of Management and Budget, the United States Department of the Treasury, the Comptroller General of the United States, the District of Columbia Council, and the Commissioner in * * * the preparation, review, submission, examination, authorization, and appropriation of the total budget for the District of Columbia.

---

[35]  The district court's assumptions about the origin of Section 603(a) (JA439-40) prompted the additional research reflected in this brief, which was not available in the district court.

36

H.R. 10692, § 416 (LH2024) (emphasis added).  When the Diggs Compromise

emerged after a week of negotiations, the provision from the Nelsen Substitute was

revised and incorporated as Section 603(a):

> ***Nothing in this Act shall be construed as making any
> change in existing law***, regulation, or basic procedure
> and practice relating to the respective roles of the
> Congress, the President, the federal Office of
> Management and Budget, and the Comptroller General of
> the United States in the preparation, review, submission,
> examination, authorization, and appropriation of the total
> budget of the District of Columbia government.

These provisions differ in critical respects.  Whereas the Nelsen Substitute

required changes to the budget process to be "specifically authorized or directed by

the Congress," Section 603(a) does not.  And whereas the imperative of the Nelsen

Substitute is that "there shall be no change made in existing laws," Section 603(a)

provides that "[n]othing *in this Act* shall be construed as making any change in

existing law."  (Emphasis added.)

"Few principles of statutory construction are more compelling than the

proposition that Congress does not intend *sub silentio* to enact statutory language

that it has earlier discarded in favor of other language."  *INS v. Cardoza-Fonseca*,

480 U.S. 421, 442-43 (1987) (internal quotation marks omitted); *accord, e.g.*,

*Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006); *Tahoe Reg'l Planning Agency*

*v. McKay*, 769 F.2d 534, 538 (9th Cir. 1985). That principle applies here in full force.[36]

    **b.** The conference proceedings concerning the process for amending the Charter further confirm that the budget process is subject to Charter amendment.

    Going into conference, the Senate bill offered full budget autonomy to the District but no meaningful opportunity for the District to propose Charter amendments. The House bill, conversely, contemplated that the Charter could be amended but proposed to make no change to the existing budget process.

    The House believed its approach to be the "sounder position,"[37] representing "an integral part of the entire House scheme."[38] As such, the House staff "strongly urge[d]" conferees to take a "firm position" on the House proposal, which was to "allow[] [the] local council to amend all provisions of [the] Charter."[39] As a *backup plan*, to be proposed only in the case of an "impasse," the House staff

---

[36] It is also significant that the Diggs Compromise excised "the District of Columbia Council[]" and the "Commissioner"—Rep. Nelsen's preferred title for the District's chief executive—from the list of parties in the provision. It made sense to include those parties in the Nelsen Substitute's forward-looking restriction, but it made no sense to include them when the tense of the provision was changed, given that the Council's role was new in 1973.

[37] LH2931 (staff memo for Rep. Adams).

[38] LH2887 (notes of Rep. Adams as to major issues in controversy).

[39] LH2899.

recommended receding to the Senate provision but allowing "the Council to amend more provisions than in the current Senate version, such as sec. 421, and pt. D."[40] Part D of the House bill (and the resulting Home Rule Act) covered "District Budget and Financial Management," and included the budget provisions amended by the Budget Autonomy Act.[41] Thus, headed into conference, there is evidence that it was particularly important to House conferees to make sure provisions related to the District budget would be subject to the District-initiated amendment process.

At Conference, the conferees agreed to the "House concept that charter amendments can originate with the Council," leaving the details to be finalized thereafter.[42] The House staff circulated its proposal for the Charter amendment process:

> Any change from an elected Mayor-Council form of government must be initiated by Congress and approved by the President; * * * Any other changes in the Charter shall be originated by the Council by act and then shall be referred to referendum of the citizens of the District of Columbia. * * * Both Houses must approve the Charter amendment for it to go into effect.

---

[40] *Id.*

[41] *See* H.R. 9682, §§ 441-55 (LH2475-79).

[42] LH2932.

That proposal was adopted by the conferees and was reprinted in the Joint Explanatory Statement of the Committee of Conference.  *See* H.R. CONF. REP. NO. 93-703, at 71 (1973) (LH 3009).

The district court dismissed in a footnote "the legislative history of the amendment provisions of the Home Rule Act" as "irrelevant."  JA441 n.6.  As the foregoing explanation demonstrates, that conclusion is wrong.

**c.**     The district court cited two strands of legislative history in support of its interpretation of Sections 603(a) and 303(d).  But neither supports the court's conclusions.

*First*, the district court cited materials reflecting the fact that, as part of the Diggs Compromise, Congress in 1973 did not include budget autonomy in the final bill.  But the question in this case is not whether Congress in 1973 granted the District budget autonomy (obviously, it did not) but, rather, whether the Budget Autonomy Act, enacted as an amendment to the District Charter, was prohibited by an express exemption in the Home Rule Act.  The legislative history and newspaper articles invoked by the district court reflect nothing more than Congress's decision not to make any change to existing budget law in 1973, and do not show that Congress intended to prohibit the District from initiating budget-related Charter amendments.

40

Indeed, the Compromise itself *rejected* language that would have prohibited future changes. And in the final bill, Congress knowingly left the District budget provision in the Charter, where it was subject to amendment, without including it in Section 303(a), where the list of Charter provisions exempted from amendment appears.

Moreover, any discussion of Congress's intent regarding Charter amendments must take account of the fact that the Charter amendment process that existed in 1973 is not the same process that exists today. In 1973, Congress had the same authority over amendments initiated by the District as it did over those that it initiated itself—both required majority votes by each House. In 1984, Congress relaxed the process, assigning to itself a reviewing role; Congress must now act to disapprove of an amendment within 35 days. The district court dismissed the post-*Chadha* change as not "directly relevant." JA441 n.6. But this history is critical. It demonstrates that, as the District matured, Congress chose to assign itself a more relaxed role in the Charter amendment process, something it never would have done in 1973. And it demonstrates that, with respect to enactment of the Budget Autonomy Act, Congress played the role it assigned to itself. The district court's assertion that the Council amended the Charter "unilaterally" (JA428) is obviously mistaken. Congress has always retained an

41

essential role in the amendment process; this was the case after 1973, after 1984, and continues today.

*Second*, the district court relied on an erroneous representation in an eleventh-hour amicus brief claiming that it "appears clear" Section 603(a) "borrowed" language from Section 602(b) that was intended to be restrictive. JA439 (quoting R.28, at 13). It is now beyond reasonable dispute that Section 603(a) was adapted from the Nelsen Substitute and that Congress specifically declined to impose a future restriction.

Section 602(b), included under the heading "Limitations on the Council," provides that "[n]othing in this Act shall be construed as vesting in the District government any greater authority over" four entities that are arguably local entities—the National Zoo, the National Guard of the District, the Washington Aqueduct, the National Capital Planning Commission—or any federal agency.

In contrast to the considerable overlap with the Nelsen Substitute, Section 603(a) shares with Section 602(b) only a frequently used eight-word phrase ("[n]othing in this Act shall be construed as"). These eight words can hardly support the district court's conclusion that because Section 602(b) restricts the Council's authority, so must Section 603(a). Section 602(b) restricts the Council's authority only because it "construe[s]" whether the Home Rule Act "vest[s] in the District government any greater *authority*" as to agencies that are neither clearly

42

federal nor clearly local. (Emphasis added.) Section 603(a) "construe[s]"

something entirely different—the changes made by the Home Rule Act.[43]

### B. The Budget Autonomy Act Does Not Encroach Upon A Function Of The United States Because Spending Local Money Is A Local Function.

In a footnote, the district court found that the Budget Autonomy Act

"impermissibly affects a function of the United States," contrary to the

requirements of Section 602(a)(3) of the Home Rule Act, which provides:

> The Council shall have no authority to * * * [e]nact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District[.]

---

[43] Aside from the legal considerations, the district court repeatedly expressed interest in a political question—why the Budget Autonomy Act was not enacted earlier. JA233, 257, 259, 284, 358, 433. There are a number of political factors that account for the timing of the Budget Autonomy Act, ranging from the District's improved reputation for fiscal management to the dramatic reduction in size of the federal payment to the deterioration in Congress's ability to meet budget deadlines. At this point in time, it is beyond political dispute both that the District has established a track record of fiscal responsibility and that the annual wait for congressional appropriations has a concrete, negative effect on the District. The Attorney General's statements before the Board of Elections illustrate the peril of proceeding with a Charter amendment before it is established that there exists political will at both the local and federal levels. *See* JA155-56 (anticipating that Congress would take "punitive measures," during the congressional review period and explaining that "[t]o put it mildly, it is not likely to be pretty"). Although the Attorney General's predictions proved incorrect, they demonstrate why the District's decision not to pursue a similar Charter amendment at an earlier date may be a relevant political question but has no legal significance.

The district court accepted Defendants' argument that this provision was intended to "guard against" any "change to how responsibilities are divided between federal and local officials."  JA453 n.10 (internal quotation marks omitted).  But that interpretation fundamentally misunderstands Section 602(a)(3) and entirely disregards well-settled judicial interpretations of that provision.  Properly understood, Section 602(a)(3) distinguishes between local and national affairs and permits the District to modify only the former—a category that includes determining how local funds are spent.

### 1.     Section 602(a)(3) prevents the Council from intruding into Congress's national legislative authority.

The Home Rule Act was designed to delegate to the District government matters of local governance but not matters of national governance.  Section 602(a)(3) draws that distinction—"what Congress sought to protect by inserting this limitation was the integrity of the federal domain as it relates to administration of federal legislation having national implications."  *District of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982).

In *Greater Washington*, the leading case interpreting this provision, the D.C. Court of Appeals upheld Council legislation transferring authority to administer private-sector workers' compensation claims from the federal government to the District government.  Pursuant to the Workmen's Compensation Act of 1928, ch.

44

612, 45 Stat. 600, the federal Department of Labor and the federal courts had been responsible for administering and enforcing the District's private workers' compensation program. Through the Workers' Compensation Act of 1979, D.C. Law 3-77, 27 D.C. Reg. 2503, the Council transferred responsibility for administering the program to District officials.

Under the district court's interpretation, the Workers' Compensation Act would be invalid—it manifestly "change[s] * * * how responsibilities are divided between federal and local officials." JA453 n.10. But the District's highest court rejected that interpretation, focusing on the function being performed, not on the officials performing that function. 442 A.2d at 116 ("We are not persuaded that Congress intended that performance of a local function by federal officials prior to the Self-Government Act would transform the function into a 'function of the United States' for purposes of [Section 602(a)(3)].").

The D.C. Court of Appeals reasoned that although the two components of Section 602(a)(3) have different meanings, they must be read together. The provision prohibits legislation that either (1) concerns the "functions or property of the United States"; or (2) "is not restricted in its application exclusively in or to the District." The second clause prohibits the District from interfering with legislation that applies beyond the District—legislation that, by virtue of its national impact, is not an exercise of Congress's District Clause functions. The first clause recognizes

45

the possibility that even legislation restricted in its application to the District could impermissibly regulate national activities.[44]

The *Greater Washington* court found its conclusion to be reinforced by legislative history.  During the drafting of the Home Rule Act, Section 602(a)(3) was understood to refer to the *nature* of the tasks being performed, not the *identity* of the entity performing them:

> The functions reserved to the federal level would be those related to federal operations in the District and to property held and used by the Federal Government for conduct of its administrative, judicial, and legislative operations; and for the monuments pertaining to the nation's past. The functions would include physical planning of these federal areas, construction and maintenance of federal buildings, and administration of federal park areas * * *.

*Id.* at 116 (quoting D.C. Executive Branch Proposal for Home Rule Organic Act 182 (1973)).

As to questions of local law—such as limitations on the authority of the Council—this Court is bound by the authoritative interpretation of the D.C. Court of Appeals.  *Williams v. Martinez*, 586 F.3d 995, 1001 (D.C. Cir. 2009).  But even

---

[44] As shorthand for this distinction, the House Committee contemplated that the Council would be permitted to amend congressional statutes codified in the D.C. Code but not those codified in the U.S. Code.  LH1035-37.  Similarly, the Senate Committee Report emphasized that the purpose of that bill—which contained Section 602(a)(3)—was to confer powers "municipal as distinguished from those national in scope."  S. REP. NO. 93-219, at 4 (LH2724).

if reviewed *de novo*, the reasoning of *Greater Washington* comports with the text, structure, purpose, and history of the Home Rule Act.  Unlike the district court's reading, understanding Section 602(a)(3) to distinguish between local and national powers makes that provision coherent.  It aligns the scope of Section 602(a)(3) with the breadth of the other provisions in Section 602(a)—which do not swallow the District's legislative authority as would the district court's interpretation of Section 602(a)(3).  *Greater Washington* also reflects the Act's overarching purpose—to delegate local issues to the local government to the greatest extent possible.  And it comports with the legislative history, which contemplated that the Council would be permitted to amend congressional statutes in the D.C. Code but not those in the U.S. Code (LH1035-37) and emphasized that the purpose of the Senate's original bill—which contained Section 602(a)(3)—was to confer powers "municipal as distinguished from those national in scope" (LH2724).

The *Greater Washington* approach is further reinforced by Charter Amendment I, which was passed by the Council in 1977 (as the Initiative, Referendum, and Recall Charter Amendments Act) and approved the following year by Congress through concurrent resolution (H.R. Con. Res. 464, 95th Cong. (1978)).  Charter Amendment I created two forms of direct democracy in the District—initiatives (voter-initiated legislation) and referenda (voter overrides of Council legislation).  In creating initiatives, the amendment imposed review

47

requirements on Congress and the President; and in creating referenda, it required Congress and the President to take affirmative action—returning legislation to the District to assess popular opinion.  *See* D.C. Code § 1-204.102.  Congress's affirmative approval of this Charter Amendment belies the conclusion that Section 602(a)(3) prohibits Charter amendments affecting the roles of federal actors.[45]

Courts have followed the reasoning of *Greater Washington*.  *See, e.g.*, *Techworld Dev. Corp. v. D.C. Preservation League*, 648 F. Supp. 106, 114-15 (D.D.C. 1986) (applying *Greater Washington* and agreeing that Section 602(a)(3) "is included to ensure that the local government does not encroach on matters of national concern"), *vacated per curiam as moot*, 1987 WL 1367570 (D.C. Cir. 1987); *McConnell v. United States*, 537 A.2d 211, 214-15 (D.C. 1988) (applying *Greater Washington* to invalidate amendment to federal law as to which Congress was acting "in its role as national legislature," not "as a local legislative body").  Although this Court has not had an opportunity to construe Section 602(a)(3), it has acknowledged *Greater Washington* and deferred to the view of the D.C. Court of Appeals as to the interplay between the 1928 federal Act and the 1979 local Act.

---

[45] Charter Amendment I also permits referenda as to capital construction projects approved by the Council through the annual budget process.  *See* D.C. Code § 1-204.101; H.R. REP. NO. 95-890, at 19 (1978).  Thus, the Amendment altered the budget process—with Congress's affirmative assent—in a manner that would be precluded by the district court's reading both of Section 602(a)(3) and of Section 603(a).

*See Railco Multi-Constr. Co. v. Gardner*, 902 F.2d 71, 73 (D.C. Cir. 1990)

(deferring to D.C. Court of Appeals as to interrelationship between local and

federal workers' compensation acts); *see also Stevenson v. Linens of the Week*, 688

F.2d 93, 95 n.1 (D.C. Cir. 1982).[46]

### 2.    Spending local money is not a national function.

Given that Section 602(a)(3) is intended to protect interference with national

functions, the only remaining question is whether spending local tax revenues on

local projects is a national function.  It is not.  In most places, this basic precept is

taken for granted.  In fact, in the District's earliest days, Congress authorized the

---

[46] The district court ignored all of these precedents and pegged its contrary interpretation to *In re Crawley*, 978 A.2d 608 (D.C. 2009), a case interpreting a separate, express prohibition governing the peculiarities of the District's U.S. Attorney.  In *Crawley*, the D.C. Court of Appeals construed Section 602(a)(8)'s separate, express prohibition on legislation "relating to the duties or powers of the United States Attorney" to preserve the U.S. Attorney's authority to prosecute all penal violations in the District.

Although *Crawley* mentions Section 602(a)(3) in the context of the legislative history of Section 602(a)(8), the decision offers no take on what Congress generally understood functions of the United States to be.  Nor can any general understanding be inferred from *Crawley*'s holding.  Because "[c]rimes committed in the District are not crimes against the District, but against the United States" (*Metro. R.R. v. District of Columbia*, 132 U.S. 1, 9 (1889)), all penal crimes committed in the District are prosecuted in the name of the United States.  That the prosecution of crimes "against the United States" is regarded as a "function * * * of the United States" hardly supports the district court's conclusion that any function performed by a federal actor is a function of the United States—particularly given that *Greater Washington* remains binding precedent in the D.C. Court of Appeals.

District to spend its own money.  After 1874, Congress exercised control over the District's budget in its role as the District's local legislature.  But that does not turn expenditure of local funds into a function of the United States.  *See, e.g.*, *Dist. Props. Assocs. v. District of Columbia*, 743 F.2d 21, 27 (D.C. Cir. 1984) ("Congress acts as the local legislature for the District of Columbia" when it "enacts legislation applicable only to the District of Columbia and tailored to meet specifically local needs"); *cf., e.g.*, *Wilentz v. Sovereign Camp, W.O.W.*, 306 U.S. 573, 581 (1939) ("collection of taxes for payment of the local school district bonds, are not state, but local functions").

Even in the drafts of the Home Rule Act, spending the District's local money was not understood to be a "function * * * of the United States."  Section 602(a)(3) appeared in every version of the House and Senate bills, including those that would have granted budget autonomy to the District.  Thus, budget autonomy was not considered to be at odds with the restriction in Section 602(a)(3).

To the extent Congress's role in the budget process is relevant to Section 602(a)(3)'s inquiry—and it is not—it bears mention that Congress here played the role it created for itself in the amendment process and that it always retains its plenary authority to spend the District's money, restrict the District's spending, or impose policy riders.  And nothing prohibits the President from proposing legislation with respect to the District, just as he was permitted to do before the

50

Budget Autonomy Act.  The Budget Autonomy Act's reach is limited: It allows the District to spend its own local revenues following a congressional review period without having to wait for an annual congressional appropriation, but Congress can disapprove the District's local budget, enact legislation directing how local funds are spent, or even repeal the Budget Autonomy Act altogether, if it so chooses.

In sum, the Budget Autonomy Act does nothing to undermine the federal government's authority over national issues—the delegation of spending authority with respect to local projects and services is beyond the scope of Section 602(a)(3)'s prohibition—and does not (indeed, could not) take away any of Congress's plenary power.

### C.    The Budget Autonomy Act Is Consistent With The Anti-Deficiency Act Because It Authorizes The D.C. General Fund To Be Made Available For Expenditure.

The district court also erred in its conclusion that the Budget Autonomy Act violates the Anti-Deficiency Act, which provides:

> An officer or employee of the United States Government or of the District of Columbia government may not * * * make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation.

31 U.S.C. § 1341(a)(1).

Pursuant to the Budget Autonomy Act, "no amount may be obligated or expended" from the D.C. General Fund until "such amount has been approved by

an act of the Council (and then only in accordance with such authorization) and such Act has been transmitted by the Chairman to the Congress and has completed the review process." Home Rule Act § 446(c) (as amended). Thus, when the District's budget is approved by the Council and survives congressional review, an amount in an appropriation or fund has been made available for expenditure or obligation, as required by the Anti-Deficiency Act. So long as a District employee does not obligate or expend money before or in excess of what has been approved, there is no Anti-Deficiency Act violation. In short, unless the Budget Autonomy Act is invalid for other reasons, its authorization process for the spending of District-raised money satisfies the Anti-Deficiency Act.

The district court nevertheless ruled that the Budget Autonomy Act violates the Anti-Deficiency Act, as well as two provisions of the Home Rule Act: Section 603(e), which provides that "[n]othing in this Act shall be construed as affecting the applicability to the District government of the provisions of" the Anti-Deficiency Act; and Section 446, which prior to the Budget Autonomy Act, provided that "[n]o amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act." *See* JA443-51. But nothing in the Anti-Deficiency Act or the Home Rule Act can be read to state that an annual congressional appropriation is required.

52

1.    **The Anti-Deficiency Act does not require an annual congressional appropriation.**

By its terms, the Anti-Deficiency Act is satisfied so long as the "amount available in an *appropriation or fund* for the expenditure or obligation" is not outspent.  31 U.S.C. § 1341(a)(1) (emphasis added).  There is no dispute in this case that the D.C. General Fund is a "fund" for the purposes of the Anti-Deficiency Act.

Because the D.C. General Fund is a "fund" for the purposes of the Anti-Deficiency Act, the question then is whether the amount in that fund is made "available" for "expenditure or obligation" under the new budget process.  The answer is that, pursuant to the Budget Autonomy Act, such funds become available once the congressional review period for the District's budget has passed.  There is nothing in the Anti-Deficiency Act that prohibits this manner of making funds available for expenditure or obligation.

Ample precedent confirms that annual appropriations are not the only way to make an "appropriation or fund" available for expenditure or obligation.  *See Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*, 388 F.3d 405, 409 (3d Cir. 2004).  Indeed, budget schemes vary greatly in their design and many do not require annual appropriations.  For some agencies, Congress has created revolving funds, "replenished by moneys from the public" (*United Biscuit Co. v. Wirtz*, 359

F.2d 206, 212 (D.C. Cir. 1965)), that are considered to be permanently appropriated.  *See, e.g.*, *Monarch Water Sys., Inc.*, 64 Comp. Gen. 756 (1985); 59 Comp. Gen. 215 (1980); B-197118, 1980 WL 17286 (Comp. Gen. Jan. 14, 1980); *St. Lawrence Seaway Dev. Corp.*, B-193573, 1979 WL 11668 (Comp. Gen. Dec. 19, 1979).  For other agencies, Congress permits the use of nonappropriated funds—*i.e.*, funds that never undergo congressional appropriation.  Certain agencies—such as the Federal Reserve, the U.S. Mint, the Federal Housing Finance Board, and the Army and Air Force Exchange Service—are known as nonappropriated fund instrumentalities ("NAFIs").  They are "denied by the Government any use of appropriated monies" (*L'Enfant Plaza Props., Inc. v. United States,* 668 F.2d 1211, 1212 (Ct. Cl. 1982), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc))[47] and must self-fund their operations.

The existence of NAFIs demonstrates that congressional appropriations are not necessary to satisfy the Anti-Deficiency Act.  "[E]mployees of nonappropriated-fund activities, when performing their official duties, are employees of the United States."  *United States v. Hopkins*, 427 U.S. 123, 128

---

[47] *See also AINS, Inc. v. United States,* 365 F.3d 1333, 1343 (Fed. Cir. 2004); *Denkler v. United States*, 782 F.2d 1003, 1005 (Fed. Cir. 1986); *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 729 n.1 (1982); *Furash & Co. v. United States*, 252 F.3d 1336, 1341-42 (Fed. Cir. 2001).

(1976); *see also Standard Oil Co. v. Johnson,* 316 U.S. 481, 485 (1942) (NAFIs

are "arms of the [federal] government").  Accordingly, they are subject to the Anti-

Deficiency Act.  But it does not follow that they must wait for a congressional

appropriation to spend any money—to the contrary, NAFIs are *ineligible* to receive

appropriations.  *See Am. Fed'n of Gov't Employees*, 388 F.3d at 409; *Cosme*

*Nieves v. Deshler,* 786 F.2d 445, 446 (1st Cir. 1986).  Therefore, because their

nonappropriated funds are available for expenditure and obligation, the Anti-

Deficiency Act is satisfied.  Under the district court's view that all entities subject

to the Anti-Deficiency Act may only expend monies that have been appropriated,

all of these funds would be unlawful.[48]

> ### 2.     The Constitution does not require an annual congressional appropriation for funds kept outside the Treasury.

Nor is an annual appropriation required by the U.S. Constitution.  The

Constitution's Appropriations Clause instructs Congress that "No Money shall be

drawn from the Treasury, but in Consequence of Appropriations made by Law."

U.S. Const. art. I, § 9, cl. 7.  That mandate has been described as "straightforward

---

[48] The Budget Autonomy Act is also perfectly in line with the purpose of the Anti-Deficiency Act, which "addressed the problem that Executive Branch officials were obligating funds before they were appropriated by Congress, and then making deficiency requests for appropriations."  *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1448-49 (Fed. Cir. 1997).  That problem cannot arise here because the District cannot outspend the D.C. General Fund and cannot spend the contents of that fund (per Section 446) without an approved budget.

and explicit," meaning "'simply that no money can be paid *out of the Treasury* unless it has been appropriated by an act of Congress.'"  *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)); *accord Knote v. United States*, 95 U.S. 149, 154 (1877); *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012).  In other words, Congress is needed to appropriate money that is in the Treasury.

The District's local funds never pass through the Treasury.  Pursuant to Section 450, they are deposited directly into the D.C. General Fund.  Therefore, as Defendants have acknowledged (R.31 at 19), the Constitution does not require Congress to appropriate the District's local budget.  Indeed, if a congressional appropriation were required by the Constitution, then all NAFIs would be unconstitutional.[49]

---

[49] The district court misunderstood the significance of Section 450.  Section 450 did not *alone* give the District the authority to obligate or expend funds in the D.C. General Fund.  Section 450 created the D.C. General Fund, moved the District's revenues out of the Treasury, and specified that the D.C. General Fund "belong[s] to the District government."  That provision is essential because it established a "fund" for purposes of the Anti-Deficiency Act and removed that fund from the Treasury, thereby ensuring that there is no constitutional obstacle to the District's expenditure of money in that fund.  But it did not give the District the authority to obligate or expend those funds.

The district court's misunderstanding about Section 450 led it to find erroneously that unless Sections 446 and 603(e) are read to require annual congressional appropriations, they would be superfluous because they would automatically be satisfied by the D.C. General Fund.  JA448 n.9.  Not so.  Those

(footnote continued)

### 3.    The Budget Autonomy Act is consistent with Section 603(e).

While the district court also concluded that Section 603(e) was "effectively amend[ed]" by the Budget Autonomy Act, the only basis for this conclusion appears to be the district court's view that the purpose of Section 603(e) was to lock in Section 446 as the mechanism "by which the District could comply with the Anti-Deficiency Act."  JA444.

But the text of Section 603(e)—which provides that "[n]othing in this Act shall be construed as affecting the applicability to the District government of the provisions of" the Anti-Deficiency Act—says nothing of the sort.  All it says is that the District must comply with the Anti-Deficiency Act—not that it must forever comply in the same manner as it did when the Home Rule Act was passed.

The history of Section 603(e) confirms that, in specifying the application of the Anti-Deficiency Act, Congress was not trying to lock in annual congressional appropriations as the sole manner of complying with that Act.  The Home Rule bill that originally passed the Senate contained the exact language that ultimately became Section 603(e).  The provision was necessary because, at the time, the

---

provisions require more—to satisfy an anti-deficiency provision, it is not sufficient that funds be kept in the D.C. General Fund, they must also be made available for expenditure or obligation out of the Fund as the Budget Autonomy Act now provides, and the Fund must not be outspent.

57

Anti-Deficiency Act did not reference the nascent District government (*compare* 31 U.S.C. § 665 (1970), *with* 31 U.S.C. § 1341 (2012)).  Thus, the Senate's anti-deficiency clause ensured that the new District government would budget its funds before it spent them.  Because the Senate bill did not require congressional appropriations, Section 603(e) plainly was not written to guarantee congressional appropriations.  *A fortiori*, the Budget Autonomy Act did not "effectively amend[] Section 603(e) by reading compliance with the Anti-Deficiency Act * * * out of the Home Rule Act entirely."  JA444.[50]

### 4.  The Budget Autonomy Act does not amend the Anti-Deficiency Act in violation of Section 602(a)(3).

Relatedly, the district court was wrong to understand the Budget Autonomy Act to amend the Anti-Deficiency Act in violation of Section 602(a)(3) of the Home Rule Act.  The district court concluded that because the Budget Autonomy Act "authorize[s] spending without a congressional appropriation, it necessarily seeks to enact or amend an Act of Congress that is not restricted exclusively to the

---

[50] For similar reasons, the district court's discussion of *Nevada v. Department of Energy*, 400 F.3d 9 (D.C. Cir. 2005) (JA449-51)—for the proposition that "Section 450 does not constitute an appropriation"—is beside the point.  The Anti-Deficiency Act is satisfied because Section 450 created a fund that is made available for expenditure when the Section 446's budget process is followed.  In *Nevada*, this Court held that when Congress subjected money *inside* the Treasury to a statutory requirement for congressional appropriation, *without any amendment to the statutory requirement*, an appropriation is required.  That straightforward holding offers no guidance on the issues presented by this case.

District of Columbia"—namely, the Anti-Deficiency Act.  JA452.  While it is true
that the Anti-Deficiency Act applies nationwide, it is not true that the Anti-
Deficiency Act requires an annual congressional appropriation—as the text of the
statute, the history of the Home Rule Act, and the existence of nonappropriated
fund instrumentalities make clear.  Because the Budget Autonomy Act changes
merely the District's method for approving expenditures—but does not exempt the
District from the approval requirement—it does not "necessarily seek[] to * * *
amend" that Act, and Section 602(a)(3) is not implicated.

## CONCLUSION

The judgment of the district court should be vacated or reversed.


Dated: July 1, 2014                          Respectfully submitted,

/s/ Karen L. Dunn (*with permission*)        /s/ Brian D. Netter
Karen L. Dunn                                Brian D. Netter
Alexander I. Platt                           Breanne A. Gilpatrick
BOIES, SCHILLER & FLEXNER LLP                Matthew A. Waring[*]
5301 Wisconsin Avenue, N.W.                  MAYER BROWN LLP
Washington, DC 20015                         1999 K Street, N.W.
(202) 237-2727                               Washington, DC 20006
                                             (202) 263-3000

                                             [*]Admitted only in Virginia

59

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation because it contains 13,399 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.


Dated: July 1, 2014                              /s/ Brian D. Netter
                                                 Brian D. Netter

60

**CERTIFICATE OF SERVICE**

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(c), that on

July 1, 2014, the foregoing was electronically filed with the Clerk of the Court

using the CM/ECF system, which will send a notification to the attorneys of record

in this matter who are registered with the Court's CM/ECF system.

Dated: July 1, 2014                                             /s/ Brian D. Netter
                                                                Brian D. Netter