ORAL ARGUMENT NOT YET SCHEDULED

No. 14-7067

# United States Court of Appeals for the D.C. Circuit

———————

COUNCIL OF THE DISTRICT OF COLUMBIA,

*Plaintiff-Appellant*,

v.

VINCENT C. GRAY, in his official capacity as Mayor of the District of Columbia, and JEFFREY S. DEWITT, in his official capacity as Chief Financial Officer for the District of Columbia,

*Defendants-Appellees.*

———————

## JOINT APPENDIX

———————

On Appeal from the U.S. District Court for the District of Columbia, No. 14-cv-655
(Emmet G. Sullivan, District Judge)

———————

Brian D. Netter
Breanne A. Gilpatrick
Matthew A. Waring[*]
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
  [*] Admitted only in Virginia

Karen L. Dunn
Alexander I. Platt
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, DC 20015
(202) 237-2727
*Counsel for Appellants*

Irvin B. Nathan
Todd S. Kim
Loren L. AliKhan
Office of the Solicitor General
Office of the Attorney General
441 4th Street, N.W., Suite 600S
Washington, DC 20001
(202) 727-6287
*Counsel for Appellees*

Seth P. Waxman
Daniel S. Volchok
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, DC 20006
(202) 663-6800
*Of Counsel to Appellee Gray*

*(continued on inside cover)*

Lawrence S. Robbins
Eric A. White
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411-L
Washington, DC 20006
(202) 775-4501
*Of Counsel to Appellee DeWitt*

## <u>TABLE OF CONTENTS</u>

D.D.C. No. 14-655-cv Docket Sheet ................................................. JA1

04/17/2014  Notice of Removal (R. 1) ................................................. JA7

04/17/2014  Complaint (R. 1-3)  ...................................................... JA11

04/28/2014  Declaration of V. David Zvenyach (R. 12-1)................................. JA53

04/25/2014  D.C. Attorney General Irvin B. Nathan letter to
D.C. Board of Elections, Jan. 4, 2013 (R. 11-4) ........................... JA55

04/25/2014  Opinion of the Attorney General, Apr. 8, 2014 (R. 11-5).............. JA61

04/25/2014  Mayor Vincent C. Gray Letter to Phil Mendelson, Apr. 11, 2014
(R. 11-6) ................................................................. JA70

04/25/2014  Jeffrey S. DeWitt letter to Phil Mendelson,
Apr. 11, 2014 (R. 11-7) ................................................. JA74

04/29/2014  Defendants' Answer to Complaint, Affirmative Defenses &
Counterclaims (R. 13) ................................................... JA76

04/30/2014  Mayor's Signing Statement, Dec. 19, 2012 (R. 14-1)................. JA117

04/30/2014  GAO Opinion (B-324987), Jan. 30, 2014 (R. 14-2) ................... JA118

04/30/2014  U.S. House of Representatives Dear Colleague Letter,
Oct. 9, 1973 (R. 14-3) ................................................. JA130

04/30/2014  Mayor Vincent C. Gray Letter to Phil Mendelson,
Dec. 3, 2012 (R. 14-4)................................................. JA131

04/30/2014  Statement of Irvin B. Nathan on the Local Budget Autonomy
Emergency Amendment Act of 2012 Before the D.C. Board of
Elections, Jan. 7, 2013 (R. 14-5)................................................. JA139

05/05/2014  Plaintiff's Answer to Counterclaims (R. 23)............................... JA161

05/08/2014  Exhibits to DePuy Amicus Brief (R. 28-1) ................................. JA187

i

05/12/2014  Declaration of Congressman Walter E. Fauntroy (Ret.)
            (R. 33-4) .......................................................................... JA214

05/12/2014  Nelson Rimensnyder Letter to Phil Mendelson,
            May 7, 2014 (R. 33-5).................................................... JA218

05/12/2014  Dale MacIver Letter, May 9, 2014 (R. 33-6) ............... JA219

05/14/2014  Transcript of Motion Hearing ..................................... JA220

05/16/2014  Testimony of V. David Zvenyach Before the D.C. Council,
            Committee of the Whole, Public Hearing on Bill 19-993,
            Nov. 9, 2012 (R. 38-1) ................................................ JA388

05/16/2014  Memorandum from V. David Zvenyach to Phil Mendelson,
            Nov. 9, 2012 (R. 40-1) ................................................ JA391

05/19/2014  Order granting Summary Judgment to Defendants (R. 43) ......... JA407

05/19/2014  Memorandum Opinion (R. 44)....................................... JA409

05/19/2014  Notice of Appeal (R. 45) .............................................. JA456

05/22/2014  Order denying Motion to Clarify or Stay (R. 50) ........ JA459

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:14–cv–00655–EGS

COUNCIL OF THE DISTRICT OF COLUMBIA v. GRAY et al
Assigned to: Judge Emmet G. Sullivan
Case in other court:  Superior Court of the District of Columbia,
                                    14ca2371 B
Cause: 31:1341 Government employee––limitations on
expending monies

Date Filed: 04/17/2014
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 04/17/2014 | 1 | NOTICE OF REMOVAL from Superior Court of the District of Columbia, case number 14ca2371 B filed by VINCENT C. GRAY. (Attachments: # 1 Civil Cover Sheet, # 2 documents from Superior Court, # 3 Superior Court complaint, # 4 Superior Court motion for preliminary injunction)(Saindon, Andrew) (Additional attachment(s) added on 4/18/2014: # 5 Notice to Counsel/Party) (jf, ). (Entered: 04/17/2014) |
| 04/17/2014 | | ENTERED IN ERROR....Case Assigned to Judge Christopher R. Cooper. (md, ) (Entered: 04/18/2014) |
| 04/17/2014 | | Case Directly Assigned to Judge Emmet G. Sullivan pursuant to instructions by Judge's Chambers. (md, ) (Entered: 04/18/2014) |
| 04/18/2014 | 2 | NOTICE of Appearance by Alexander Platt on behalf of COUNCIL OF THE DISTRICT OF COLUMBIA (Platt, Alexander) (Entered: 04/18/2014) |
| 04/18/2014 | 3 | First MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brian D. Netter, :Firm– Mayer Brown LLP, :Address– 1999 K Street NW, Washington DC 20009. Phone No. – (202) 263–3339. Fax No. – (202) 263–5236 *bnetter@mayerbrown.com* by COUNCIL OF THE DISTRICT OF COLUMBIA (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Platt, Alexander) (Entered: 04/18/2014) |
| 04/18/2014 | 4 | First MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Karen L. Dunn, :Firm– Boies Schiller &Flexner LLP, :Address– 5301 Wisconsin Ave. NW. Phone No. – (202) 895–7569. Fax No. – (202) 237–6131 *kdunn@bsfllp.com* by COUNCIL OF THE DISTRICT OF COLUMBIA (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Platt, Alexander) (Entered: 04/18/2014) |
| 04/18/2014 | | MINUTE ORDER. In light of Plaintiff's Motion for Preliminary Injunction filed in the D.C. Superior Court prior to Removal of this action, the Court, sua sponte, schedules a status hearing on April 22, 2014 at 11:30 a.m. in Courtroom 24A. Signed by Judge Emmet G. Sullivan on April 18, 2014. (lcegs1) (Entered: 04/18/2014) |
| 04/18/2014 | | MINUTE ORDER granting 3 , 4 motions for leave to appear pro hac vice. Brian D. Netter and Karen L. Dunn are hereby admitted pro hac vice in this action. Signed by Judge Emmet G. Sullivan on April 18, 2014. (lcegs2) (Entered: 04/18/2014) |
| 04/21/2014 | 5 | First MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Breanne A. Gilpatrick, :Firm– Mayer Brown LLP, :Address– 1999 K Street NW, Washington DC 20009. Phone No. – (202) 263–3850. Fax No. – (202) 762–5263 *bgilpatrick@mayerbrown.com* by COUNCIL OF THE DISTRICT OF COLUMBIA (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Platt, Alexander) (Entered: 04/21/2014) |
| 04/21/2014 | 6 | NOTICE of Appearance by Nicholas Alan Bush on behalf of JEFFREY S. DEWITT, VINCENT C. GRAY (Bush, Nicholas) (Entered: 04/21/2014) |
| 04/21/2014 | 7 | NOTICE of Appearance by Brian D. Netter on behalf of COUNCIL OF THE DISTRICT OF COLUMBIA (Netter, Brian) (Entered: 04/21/2014) |

| 04/21/2014 | 8 | NOTICE of Appearance by Karen L. Dunn on behalf of COUNCIL OF THE DISTRICT OF COLUMBIA (Dunn, Karen) (Entered: 04/21/2014) |
|---|---|---|
| 04/21/2014 | 9 | MOTION to Remand to State Court by COUNCIL OF THE DISTRICT OF COLUMBIA (Attachments: # 1 Text of Proposed Order)(Netter, Brian) (Entered: 04/21/2014) |
| 04/22/2014 | | MINUTE ORDER granting 5 Motion for Leave to Appear Pro Hac Vice. Breanne A. Gilpatrick is hereby admitted pro hac vice in this action. Signed by Judge Emmet G. Sullivan on April 22, 2014. (lcegs1) (Entered: 04/22/2014) |
| 04/22/2014 | | MINUTE ORDER. On April 22, 2014, the Court held a status hearing with counsel for Plaintiff and Defendants. At the status hearing, the parties informed the Court that they consented to having their motion for preliminary injunction consolidated with a determination on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). See Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with a hearing."). The parties further consented to consolidation of the jurisdictional issues raised in Plaintiff's Motion for Remand with the merits determination. The Court informed the parties that all pleadings shall comply with the requirements of Local Civil Rule 7. Accordingly, the Court ordered expedited briefing on Plaintiff's motion for summary judgment and entered the following briefing schedule: Plaintiff's motion for summary judgment shall be filed by no later than April 25, 2014. Defendants' opposition shall be filed by no later than April 30, 2014. If Defendants choose to file a cross motion, it shall be combined with the opposition and filed on the same date. Plaintiff's reply and, if applicable, combined opposition shall be filed by no later than May 5, 2014. Defendants' reply, if applicable, shall be filed by no later than May 8, 2014. A hearing on Plaintiff's motion for summary judgment, and if applicable, Defendants' cross–motion for summary judgment, will be held on May 14, 2014 at 10:00 a.m. in Courtroom 24A. The parties are further directed to deliver to the chambers of the Honorable Emmet G. Sullivan three copies of their pleadings and exhibits as well as three binders containing copies of the principal points and authorities relied upon by the parties (i.e., counsel should provide copies of principal cases, statutes, regulations, etc., but need not provide copies of cases relied upon merely for the standard of review or other well established principles). SO ORDERED. Signed by Judge Emmet G. Sullivan on April 22, 2014. (lcegs1) (Entered: 04/22/2014) |
| 04/22/2014 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Status Conference held on 4/22/2014. Plaintiff Motion for Summary Judgment due by 4/25/2014. Defendants' combined cross motion for summary judgment and opposition due 4/30/14. Plaintiff's Reply due by 5/5/2014. Defendant's Reply due by 5/8/2014. Motion Hearing set for 5/14/2014 at 10:00 AM in Courtroom 24A before Judge Emmet G. Sullivan. (Court Reporter SCOTT WALLACE.) (mac) (Entered: 04/23/2014) |
| 04/24/2014 | 10 | Receipt on 04/24/2014 of ORIGINAL FILE, certified copy of transfer order and docket sheet from Superior Court. Superior Court Number 14ca2371 B. (Attachments: # 1 Superior Court Documents)(jf, ) (Entered: 04/24/2014) |
| 04/25/2014 | 11 | MOTION for Summary Judgment *or Remand* by COUNCIL OF THE DISTRICT OF COLUMBIA (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Memorandum of Points and Authorities, # 3 Declaration of V. David Zvenyach, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Text of Proposed Order, # 9 Certificate of Service)(Netter, Brian). Added MOTION to Remand on 4/28/2014 (jf, ). (Entered: 04/25/2014) |
| 04/28/2014 | 12 | ERRATA by COUNCIL OF THE DISTRICT OF COLUMBIA 11 MOTION for Summary Judgment *or Remand* filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Attachments: # 1 Declaration of V. David Zvenyach)(Netter, Brian) (Attachment 1 replaced on 4/28/2014) (td, ). (Entered: 04/28/2014) |
| 04/28/2014 | | NOTICE OF ERROR re 11 Motion for Summary Judgment; emailed to bnetter@mayerbrown.com, cc'd 9 associated attorneys –– The PDF file you docketed contains errors: 1. Two–part docket entry, 2. DO NOT REFILE––Counsel is reminded to docket all parts of their motion (jf, ) (Entered: 04/28/2014) |

| | | |
|---|---|---|
| 04/29/2014 | 13 | ANSWER to Complaint , COUNTERCLAIM against COUNCIL OF THE DISTRICT OF COLUMBIA by JEFFREY S. DEWITT, VINCENT C. GRAY.(Bush, Nicholas) (Entered: 04/29/2014) |
| 04/30/2014 | 14 | Cross MOTION for Summary Judgment by JEFFREY S. DEWITT, VINCENT C. GRAY (Attachments: # 1 Exhibit Mayors Signing Statement, # 2 Exhibit GAO Opinion, # 3 Exhibit Dear Colleague Letter, # 4 Exhibit Mayors Letter Dec 3 2012, # 5 Exhibit AG Bd of Elections testimony, # 6 Statement of Facts, # 7 Statement of Facts Response to PSMF, # 8 Text of Proposed Order)(Saindon, Andrew) (Entered: 04/30/2014) |
| 04/30/2014 | 15 | Memorandum in opposition to re 11 MOTION for Summary Judgment *or Remand* filed by JEFFREY S. DEWITT, VINCENT C. GRAY. (Saindon, Andrew) (Entered: 04/30/2014) |
| 05/02/2014 | 16 | NOTICE of Appearance by Richard Bress on behalf of ALICE M. RIVLIN, THOMAS M. DAVIS, ANTHONY A. WILLIAMS (Bress, Richard) (Entered: 05/02/2014) |
| 05/02/2014 | 17 | MOTION for Leave to File *a Brief Amici Curiae* by THOMAS M. DAVIS, ALICE M. RIVLIN, ANTHONY A. WILLIAMS (Attachments: # 1 Brief Amici Curiae in Support of Neither Party, # 2 Proposed Order)(Bress, Richard) (Entered: 05/02/2014) |
| 05/02/2014 | 18 | MOTION for Leave to File *Brief as Amici Curiae* by CAROLYN B LAMM, RONALD JESSAMY, CHARLES MILLER, PAUL SMITH, DANIEL SOLOMON, BRUCE SPIVA, MARC FLEISCHAKER (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Masters, Lorelie) (Entered: 05/02/2014) |
| 05/02/2014 | 19 | Consent MOTION for Leave to File *Amicus Curiae Brief* by DC APPLESEED CENTER FOR LAW &JUSTICE, DC VOTE, D.C. FOR DEMOCRACY, DC FISCAL POLICY INSTITUTE, LEAGUE OF WOMEN VOTERS OF THE DISTRICT OF COLUMBIA (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support, # 3 Exhibit)(Wahl, Barbara) (Entered: 05/02/2014) |
| 05/05/2014 | | MINUTE ORDER granting 17 , 18 , 19 motions for leave to file amicus curiae briefs. It is hereby ORDERED that the Clerk shall accept the amicus curiae briefs, which are attached to 17 , 18 , 19 the motions, for filing in this case. Signed by Judge Emmet G. Sullivan on May 5, 2014. (lcegs1) (Entered: 05/05/2014) |
| 05/05/2014 | 20 | AMICUS BRIEF by THOMAS M. DAVIS, ALICE M. RIVLIN, ANTHONY A. WILLIAMS. (jf, ) (Entered: 05/05/2014) |
| 05/05/2014 | 21 | AMICUS BRIEF by MARC FLEISCHAKER, RONALD JESSAMY, CAROLYN B LAMM, CHARLES MILLER, PAUL SMITH, DANIEL SOLOMON, BRUCE SPIVA. (jf, ) (Entered: 05/05/2014) |
| 05/05/2014 | 22 | AMICUS BRIEF by D.C. FOR DEMOCRACY, DC APPLESEED CENTER FOR LAW &JUSTICE, DC FISCAL POLICY INSTITUTE, DC VOTE, LEAGUE OF WOMEN VOTERS OF THE DISTRICT OF COLUMBIA. (jf, ) (Entered: 05/05/2014) |
| 05/05/2014 | 23 | ANSWER to 13 Answer to Complaint, COUNTERCLAIM by COUNCIL OF THE DISTRICT OF COLUMBIA. Related document: 13 Answer to Complaint, COUNTERCLAIM filed by VINCENT C. GRAY, JEFFREY S. DEWITT.(Netter, Brian) (Entered: 05/05/2014) |
| 05/05/2014 | 24 | Memorandum in opposition to re 14 Cross MOTION for Summary Judgment filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Attachments: # 1 Statement of Facts Response to Defendants' Statement of Undisputed Facts, # 2 Text of Proposed Order, # 3 Certificate of Service)(Netter, Brian) (Entered: 05/05/2014) |
| 05/05/2014 | 25 | REPLY to opposition to motion re 11 MOTION for Summary Judgment *or Remand* filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Attachments: # 1 Certificate of Service)(Netter, Brian) (Entered: 05/05/2014) |
| 05/06/2014 | 26 | NOTICE of Appearance by Barbara S. Wahl on behalf of D.C. FOR DEMOCRACY, DC APPLESEED CENTER FOR LAW &JUSTICE, DC FISCAL POLICY INSTITUTE, DC VOTE, LEAGUE OF WOMEN VOTERS OF THE |

DISTRICT OF COLUMBIA (Wahl, Barbara) (Entered: 05/06/2014)

| | | |
|---|---|---|
| 05/08/2014 | 27 | MOTION for Leave to File *Amici Brief* by Jacques B DePuy, Jason I Newman, Daniel M Freeman, Linda L Smith (Attachments: #1 Memorandum in Support of Motion for Leave to File, #2 Text of Proposed Order Granting Motion for Leave, #3 Exhibit Proposed Amici Brief, #4 Exhibit Exhibits to Proposed Amici Brief)(Letzler, Kenneth) (Entered: 05/08/2014) |
| 05/08/2014 | | MINUTE ORDER granting 27 motion to file amici brief. It is hereby ORDERED that the Clerk shall accept the amici brief, which is attached to 27 the motion, for filing in this case. Signed by Judge Emmet G. Sullivan on May 8, 2014. (lcegs1) (Entered: 05/08/2014) |
| 05/08/2014 | 28 | AMICUS BRIEF by JACQUES B. DEPUY, DANIEL M. FREEMAN, JASON I. NEWMAN, LINDA L. SMITH. (Attachments: #1 Exhibit)(rdj) (Entered: 05/08/2014) |
| 05/08/2014 | 29 | NOTICE of Appearance by Kerry William Kircher on behalf of BIPARTISAN LEGAL ADVISORY GROUP OF THE UNITED STATES HOUSE OF REPRESENTATIVES (Kircher, Kerry) (Entered: 05/08/2014) |
| 05/08/2014 | 30 | MOTION for Leave to File *Memorandum of Points and Authorities as Amicus Curiae* by BIPARTISAN LEGAL ADVISORY GROUP OF THE UNITED STATES HOUSE OF REPRESENTATIVES (Attachments: #1 Text of Proposed Order)(Kircher, Kerry) (Entered: 05/08/2014) |
| 05/08/2014 | | MINUTE ORDER granting 30 Motion for Leave to File Memorandum of Points and Authorities as Amicus Curiae. It is hereby ORDERED that the Clerk shall accept the amicus brief, which is attached to 30 motion, for filing in this case. Signed by Judge Emmet G. Sullivan on May 8, 2014. (lcegs1) (Entered: 05/08/2014) |
| 05/08/2014 | 31 | REPLY to opposition to motion re 14 Cross MOTION for Summary Judgment filed by JEFFREY S. DEWITT, VINCENT C. GRAY. (Saindon, Andrew) (Entered: 05/08/2014) |
| 05/08/2014 | | MINUTE ORDER. The Court, sua sponte, directs the parties to address the issues raised by and arguments made in the amicus briefs filed by 28 Jacques B. DePuy, Daniel M. Freeman, Jason I. Newman, Linda L. Smith and 30 the Bipartisan Legal Advisory Group of the United States House of Representatives. The parties shall file brief memoranda addressing those issues and arguments by no later than May 12, 2014 at 12:00 p.m. Signed by Judge Emmet G. Sullivan on May 8, 2014. (lcegs1) (Entered: 05/08/2014) |
| 05/08/2014 | 32 | AMICUS BRIEF by BIPARTISAN LEGAL ADVISORY GROUP OF THE UNITED STATES HOUSE OF REPRESENTATIVES. (rdj) (Entered: 05/09/2014) |
| 05/09/2014 | | Set/Reset Deadlines: Brief due by 5/12/2014 at 12:00PM (mac) (Entered: 05/09/2014) |
| 05/12/2014 | 33 | SUPPLEMENTAL MEMORANDUM to re 32 *Respond to Defendants' Amici* filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F)(Netter, Brian) Modified to add link on 5/13/2014 (znmw, ). (Entered: 05/12/2014) |
| 05/12/2014 | 34 | MEMORANDUM re Order, by JEFFREY S. DEWITT, VINCENT C. GRAY. (Saindon, Andrew) (Entered: 05/12/2014) |
| 05/14/2014 | | Minute Entry for proceedings held before Judge Emmet G. Sullivan: Motion Hearing held on 5/14/2014 re 11 MOTION for Summary Judgment *or Remand* filed by COUNCIL OF THE DISTRICT OF COLUMBIA and 14 Cross MOTION for Summary Judgment filed by VINCENT C. GRAY, JEFFREY S. DEWITT. (Court Reporter CHANTAL GENEUS.) (mac) (Entered: 05/14/2014) |
| 05/14/2014 | 35 | ENTERED IN ERROR.....SUPPLEMENTAL MEMORANDUM to *address cases referenced by the Court* filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Dunn, Karen) Modified on 5/15/2014 (jf, ). (Entered: 05/14/2014) |

| 05/15/2014 | 36 | ENTERED IN ERROR.....SUPPLEMENTAL MEMORANDUM to *address cases referenced by the Court* filed by JEFFREY S. DEWITT, VINCENT C. GRAY. (Saindon, Andrew) Modified on 5/15/2014 (jf, ). (Entered: 05/15/2014) |
| --- | --- | --- |
| 05/15/2014 | | NOTICE OF ERROR re 35 Supplemental Memorandum; emailed to kdunn@bsfllp.com, cc'd 23 associated attorneys –– The PDF file you docketed contained errors: 1. Incorrect header/caption/case number, 2. Incorrect document/case, 3. Please refile document, 4. Counsel should review LCvR 5.1 (b) CORRESPONDENCE WITH COURT (jf, ) (Entered: 05/15/2014) |
| 05/15/2014 | | NOTICE OF ERROR re 36 Supplemental Memorandum; emailed to andy.saindon@dc.gov, cc'd 23 associated attorneys –– The PDF file you docketed contained errors: 1. Incorrect header/caption/case number, 2. Incorrect document/case, 3. Please refile document, 4. Counsel should review LCvR 5.1 (b) CORRESPONDENCE WITH COURT (jf, ) (Entered: 05/15/2014) |
| 05/16/2014 | 37 | SUPPLEMENTAL MEMORANDUM to *address Roeder* filed by JEFFREY S. DEWITT, VINCENT C. GRAY. (Saindon, Andrew) (Entered: 05/16/2014) |
| 05/16/2014 | | MINUTE ORDER. At the motions hearing on May 14, 2014, Attorney General Irv Nathan referenced the November 9, 2012 testimony of V. David Zvenyach, General Counsel for the Council of the District of Columbia, in which he provided his opinion about the legality of the Budget Autonomy Act. Defendant is hereby ORDERED to file that opinion by no later than 1:00 p.m. on May 16, 2014. If Plaintiff chooses to file a reply, it shall do so by no later than 4:00 p.m. on May 16, 2014. SO ORDERED. Signed by Judge Emmet G. Sullivan on May 16, 2014. (lcegs1) (Entered: 05/16/2014) |
| 05/16/2014 | 38 | NOTICE *of Filing of Zvenyach Testimony* by JEFFREY S. DEWITT, VINCENT C. GRAY (Attachments: # 1 Exhibit Zvenyach testimony Nov 9, 2012)(Saindon, Andrew) (Entered: 05/16/2014) |
| 05/16/2014 | 39 | SUPPLEMENTAL MEMORANDUM to *address cases referenced by the Court* filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Netter, Brian) (Entered: 05/16/2014) |
| 05/16/2014 | 40 | RESPONSE TO ORDER OF THE COURT re Order,, filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit A)(Netter, Brian) (Entered: 05/16/2014) |
| 05/16/2014 | 41 | NOTICE *Defendants' Response to Council's Reply* by JEFFREY S. DEWITT, VINCENT C. GRAY re 40 Response to Order of the Court (Saindon, Andrew) (Entered: 05/16/2014) |
| 05/16/2014 | 42 | ERRATA by COUNCIL OF THE DISTRICT OF COLUMBIA 40 Response to Order of the Court filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Netter, Brian) (Entered: 05/16/2014) |
| 05/19/2014 | 43 | ORDER denying 11 Plaintiff's Motion for Summary Judgment, granting 14 Defendants' Cross–Motion for Summary Judgment, and permanently enjoining Mayor Vincent C. Gray, CFO Jeffrey S. DeWitt, the Council of the District of Columbia, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing the Local Budget Autonomy Act of 2012. Signed by Judge Emmet G. Sullivan on May 19, 2014. (lcegs1) (Entered: 05/19/2014) |
| 05/19/2014 | 44 | MEMORANDUM OPINION. Signed by Judge Emmet G. Sullivan on May 19, 2014. (lcegs1) (Entered: 05/19/2014) |
| 05/19/2014 | 45 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 43 Order on Motion to Remand to State Court, Order on Motion for Summary Judgment,,,,,,,,, 44 Memorandum &Opinion by COUNCIL OF THE DISTRICT OF COLUMBIA. Filing fee $ 505, receipt number 0090–3719516. Fee Status: Fee Paid. Parties have been notified. (Netter, Brian) (Entered: 05/19/2014) |
| 05/19/2014 | 46 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 45 Notice of Appeal to DC Circuit Court,. (jf, ) (Entered: 05/19/2014) |

| | | |
|---|---|---|
| 05/20/2014 | 47 | MOTION to Clarify *or, in the Alternative*, MOTION to Stay by COUNCIL OF THE DISTRICT OF COLUMBIA (Attachments: # 1 Text of Proposed Order)(Netter, Brian) (Entered: 05/20/2014) |
| 05/20/2014 | | MINUTE ORDER. In light of 47 Plaintiff's Motion to Clarify, or in the Alternative, Motion to stay, the Court hereby enters the following briefing schedule on the motion: Defendants shall file their opposition to Plaintiff's motion by no later than May 21, 2014 at 9:00 a.m. and Plaintiff's shall file a reply by no later than May 21, 2014 at 1:00 p.m. SO ORDERED. Signed by Judge Emmet G. Sullivan on May 20, 2014. (lcegs1) (Entered: 05/20/2014) |
| 05/21/2014 | 48 | Memorandum in opposition to re 47 MOTION to Clarify *or, in the Alternative* MOTION to Stay filed by JEFFREY S. DEWITT, VINCENT C. GRAY. (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 05/21/2014) |
| 05/21/2014 | 49 | REPLY to opposition to motion re 47 MOTION to Clarify *or, in the Alternative* MOTION to Stay filed by COUNCIL OF THE DISTRICT OF COLUMBIA. (Netter, Brian) (Entered: 05/21/2014) |
| 05/22/2014 | 50 | ORDER denying 47 Motion to Clarify; denying 47 Motion to Stay. Signed by Judge Emmet G. Sullivan on May 22, 2014. (lcegs1) (Entered: 05/22/2014) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――――――――――――

| | |
|---|---|
| COUNCIL OF THE DISTRICT OF COLUMBIA, ) | |
| 1350 Pennsylvania Avenue, NW ) | |
| WASHINGTON, D.C. 20004, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| VINCENT C. GRAY, in his official capacity as ) | |
| Mayor of the District of Columbia ) | |
| 1350 Pennsylvania Avenue, NW ) | |
| WASHINGTON, DC 20004 ) | |
| ) | Civil Action No. _____ |
| and ) | |
| ) | |
| JEFFREY S. DeWITT, in his official capacity as ) | |
| Chief Financial Officer of the District of Columbia ) | |
| WASHINGTON D.C. 20005 ) | |
| ) | |
| Defendants. ) | |

―――――――――――――――――――――――――――――――

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§1441 and 1446, Defendants in the case *Council of the District of Columbia v. Vincent C. Gray*, *et al.*, 2014 CA 002371 B, now pending in the Superior Court of the District of Columbia, hereby remove this case from the Superior Court of the District of Columbia to this Court because the claims raised in Plaintiff's papers raise federal questions appropriate for resolution by this Court. Causes of action "founded on a claim or right arising under the Constitution, treaties or laws of the United States" are removable without regard to the citizenship or residence of the parties. 28 U.S.C. § 1441(c). In the Complaint, Plaintiff asserts the validity of the District of Columbia Local Budget Autonomy Act of 2013 ("the Act"), effective July 25, 2013, D.C. Law 19-321, 60 D.C. Reg. 1724 (Feb. 15, 2013), which purports to reallocate the

roles under the Home Rule Act of the President and Congress in the District's budget process from active to passive review, and to change the President's role in the formation of the District's local budget from transmitting it to Congress to no longer doing so. Plaintiff seeks a declaration that the Act "is legally valid as the law of the land" and an injunction requiring the Defendants to comply with the Act. *See* Complaint, ¶ 63, attached. Plaintiff argues, *inter alia*, that the Act—contrary to the conclusion reached by the Mayor and CFO—does not violate the Home Rule Act (which is a federal statute passed by Congress), the federal Anti-Deficiency Act (31 U.S.C. §§ 1341, 1342, 1349–1351 and subchapter II of ch. 15 of Title 31), or the federal Budget and Accounting Act (31 U.S.C. § 1101 *et seq.*). *See* Plaintiffs' Motion for Preliminary Injunction, at 14–22, 25–26. Thus, federal question jurisdiction is appropriately invoked.

While 28 U.S.C. § 1366 (formerly 28 U.S.C. § 1364) excludes from "federal question" jurisdiction those cases challenging "laws applicable exclusively to the District of Columbia[,]" the D.C. Circuit long ago ruled that the Home Rule Act is a "hybrid statute" that impacts both the local and federal government, *Thomas v. Barry*, 729 F.2d 1469, 1471 (D.C. Cir. 1984), sufficient to support federal-question jurisdiction. *Id*. at 1472 ("The issues in this case, moreover, are by no means limited to local District of Columbia policy. Federal rights are implicated which are appropriate for resolution in a federal forum."); *accord, Bliley v. Kelly*, 23 F.3d 507, 511 (D.C. Cir. 1994). Also, as noted above, at least two other federal statutes—the Anti-Deficiency Act and the Budget and Accounting Act—are implicated here, giving rise to this Court's jurisdiction and the Defendants' right to remove. The defense of this action depends on a contrary interpretation of the applicable federal statutes and the United States Constitution.

The D.C. Circuit in *Barry* specifically noted as one of the core examples of the HRA's provisions that "extends beyond the narrow sphere of the District of Columbia" those sections of

the Home Rule Act that "allocate functions between the federal and District governments" precisely the type of budget-related provisions at issue in the Complaint and request for relief. *See Barry*, 729 F.2d at 1471 & nn.9–11.

Pursuant to 28 U.S.C. § 1446, Defendants have 30 days after service of a complaint to file a notice of removal of an action to the United States District Court for the district within which such action is pending. Defendants were served on April 17, 2014. Pursuant to 28 U.S.C. § 1446(a), "a copy of all process, pleadings, and orders" received by undersigned counsel in this matter are attached hereto and incorporated by reference herein.

DATE: April 17, 2014          Respectfully submitted,

                              IRVIN B. NATHAN
                              Attorney General for the District of Columbia

                              ELLEN A. EFROS
                              Deputy Attorney General
                              Public Interest Division

                              _____/s/ Andrew J. Saindon_____
                              ANDREW J. SAINDON, D.C. Bar No. 456987
                              Senior Assistant Attorney General
                              Equity Section
                              441 Fourth Street, N.W., 6th Floor South
                              Washington, D.C. 20001
                              Telephone: (202) 724-6643
                              Facsimile: (202) 730-1470
                              E-mail: andy.saindon@dc.gov

                              _____/s/ Nicholas A. Bush_____
                              NICHOLAS A. BUSH (D.C. Bar No. 1011001)
                              Assistant Attorney General
                              Public Advocacy Section
                              441 Fourth Street, N.W., 6th Floor South
                              Washington, D.C. 20001
                              Telephone: (202) 442-9841
                              Facsimile: (202) 715-7720
                              E-mail: nicholas.bush@dc.gov

Lawrence S. Robbins, D.C. Bar No. 420260
Eric A. White, D.C. Bar No. 1011080
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street NW
Suite 411 L
Washington DC 20006
202-775-4501
lrobbins@robbinsrussell.com
ewhite@robbinsrussell.com
*Of Counsel to Jeffrey S. DeWitt, Chief Financial Officer of the District of Columbia*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17 day of April, 2014, I sent a true copy of this Notice of

Removal by e-mail and fax to:

Karen L. Dunn, Esq.
Boies, Schiller & Flexner, LLP
5301 Wisconsin Avenue, NW
Washington, D.C. 20015
(202) 237-2727
(202) 237-6131
KDunn@bsfllp.com

Brian D. Netter, Esq.
Mayer Brown LLP
1999 K Street, NW
Washington, D.C. 20006-1101
(202) 263-3000
(202) 263-3300
bnetter@mayerbrown.com

/s/ Andrew J. Saindon
ANDREW J. SAINDON
Senior Assistant Attorney General, D.C.

4

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| |
|---|
| COUNCIL OF THE DISTRICT OF COLUMBIA,<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004<br><br>                  Plaintiff,<br><br>      v.<br><br>VINCENT C. GRAY, in his official capacity<br>as Mayor of the District of Columbia,<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004<br><br>        and<br><br>JEFFREY S. DeWITT, in his official capacity<br>as Chief Financial Officer for the District of<br>Columbia,<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004<br><br>              Defendants. |

Civil Action No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The Council of the District of Columbia ("Council") files this Complaint for declaratory

and injunctive relief against Vincent C. Gray, in his official capacity as Mayor of the District of

Columbia; and Jeffrey S. DeWitt, in his official capacity as Chief Financial Officer for the

District of Columbia, and alleges as follows:

**NATURE OF THIS ACTION**

1.      The residents of the District of Columbia will contribute more than $7 billion this

year in taxes and fees to fund their local government.

2.      In every other home-rule jurisdiction in the country, the locally elected officials who set the tax rates also authorize the expenditures of those locally raised funds.

3.      But prior to this budget cycle, the budget process for local funds in the District of Columbia worked differently.  The District lacked budget autonomy, which meant that local officials did not have the power to spend locally raised dollars; those funds could be spent only through an express authorization by Congress.

4.      The Local Budget Autonomy Act of 2012 ("Budget Autonomy Act" or "the Act," D.C. Law 19-321, 60 DCR 1724 (Exhibit A)), changed that.  Now, the Council is entitled to pass a budget designating local expenditures of local funds, and only passive review—as opposed to an affirmative act—by Congress is required for that budget to become law.

5.      The Budget Autonomy Act was an amendment to the District of Columbia Charter, and pursuant to the process for amending the Charter, became binding law on July 25, 2013, after it was (a) approved by a unanimous Council, (b) signed by the Mayor, (c) ratified by a substantial majority (83%) of District voters, and (d) passively approved by Congress, which did not pass a joint resolution of disapproval.

6.      As discussed in greater detail below, the District's Mayor and Chief Financial Officer ("CFO") play essential roles in preparing and implementing the District's budget.

7.      On April 11, 2014, however, both the Mayor and the CFO advised the Council that they will not honor their obligations under the Budget Autonomy Act.

8.      Defendants' position is based on a wrongful belief that the Budget Autonomy Act is invalid.  There is no constitutional or statutory basis for their decision to disregard the Act.

9.      Prompt judicial resolution of this controversy is essential to forestall injury to the Council and to the people of the District of Columbia.

10.     The Council respectfully seeks a declaration that Budget Autonomy Act is valid and an injunction compelling the CFO to comply with the law.

## JURISDICTION

11.     This Court has subject matter jurisdiction over this civil action under D.C. Code § 11-921(a).

## PARTIES

**A.      Plaintiff Council of the District of Columbia**

12.     Plaintiff Council of the District of Columbia is the legislative and policymaking body for the District of Columbia.

13.     The Council consists of thirteen members, each elected to a four-year term.  One member represents each of the District's eight wards, and five at-large members (including the Chairman) represent the entire District.

14.     The Council has a statutory obligation to enact a balanced budget for each fiscal year.  Under the Council's leadership, "the District has transformed itself from a city on the verge of bankruptcy to a thriving city reaching reassuring levels of financial security," producing "17 consecutive balanced budgets and 16 consecutive clean year-end financial audits," and finishing Fiscal Year 2012 with a $417 million budget surplus.[1]  Financial markets have recognized the District's laudable fiscal stewardship in the form of higher bond ratings and lower interest rates on borrowing.[2]

---

[1] Letter from former Virginia Representative Thomas M. Davis III & former District Mayor Anthony A. Williams to Phil Mendelson, Chairman, Council of the District of Columbia 1 (Sept. 24, 2013) (Exhibit B).

[2] D.C. Council Committee of the Whole, Committee Report on Bill 19-993, *Local Budget Autonomy Act of 2012*, at 4 (Dec. 4, 2012), http://dcclims1.dccouncil.us/images/00001/20130418101959.pdf.

15.     The Council can discharge its statutory obligations only if its duly enacted legislation is treated as binding law.

16.     The Council voted unanimously to approve the Budget Autonomy Act, and succeeded in effecting an amendment to the Charter.  The Council's legislative act, which would otherwise have taken effect, will be nullified and overridden by the promised acts and omissions of the CFO.  The Council has no further legislative recourse to compel the CFO to comply with the duly enacted amendment to the Charter.

17.     Accordingly, judicial intervention is required to resolve whether the CFO is required to implement the budget that the Council is required to enact.

18.     To achieve clarity and to effectuate the will of the people, the Council authorized this litigation in its official capacity through the unanimous adoption of the Budget Autonomy Litigation Authorization Resolution of 2014 on March 4, 2014.

**B.      Defendant Vincent C. Gray, in his Official Capacity as Mayor of the District of Columbia**

19.     Defendant Vincent C. Gray is the Mayor of the District of Columbia.

20.     As Mayor, Mr. Gray is the "the chief executive officer of the District government," and is "responsible for the proper execution of all laws relating to the District."  D.C. Code § 1–204.22.

21.     In particular, the Mayor is in "charge of the administration of the financial affairs of the District" except to the extent responsibilities have been assigned to the CFO.  *Id.* § 1–204.48(a).  Thus, he is "responsible for all financial transactions," has "custody of all public funds belonging to or under the control of the District," and is required to apportion "all appropriations and funds made available during the fiscal year for obligation."  *Id.* § 1–

204.48(a)(1), (7), (9).  He is also required to transmit the federal portion of the budget to the President for submission to Congress.  *Id.* § 1–204.46(a).

22.     On April 11, 2014, the Mayor sent a letter to Council Chairman Phil Mendelson advising that he would not enforce the Budget Autonomy Act.  In particular, he informed the Council that he would:

> (a)     "direct all subordinate agency District officials not to implement or take actions pursuant to the [Budget Autonomy Act]";
>
> (b)     "veto any [fiscal year 2015] budget transmitted by the Council that is not inclusive of both the local and federal portions of the budget"; and
>
> (c)     "transmit to the Congress and President the full District budget as it stands after the 56th day following transmission to [the Council] of the budget, whether or not the Council has taken a second vote."[3]

**C.     Defendant Jeffrey S. DeWitt, in his Official Capacity as Chief Financial Officer for the District of Columbia**

23.     Defendant Jeffrey S. DeWitt is the CFO for the District of Columbia.

24.     As CFO, Mr. DeWitt has primary responsibility for enhancing the fiscal and financial stability, accountability and integrity of the Government of the District of Columbia.[4] As part of his statutory job duties, the CFO provides fiscal impact statements for Council legislation and provides the financial analyses that the Council requires to ensure that its budgets are balanced.

25.     The CFO is specifically required by statute to prepare "under the direction of the Mayor . . . the budget for submission by the Mayor to the Council and to the public and upon

---

[3] Letter from Vincent C. Gray, Mayor, District of Columbia, to Phil Mendelson, Chairman, Council of the District of Columbia 3 (Apr. 11, 2014) ("Gray Letter") (Exhibit C).

[4] *See* About OCFO, http://cfo.dc.gov/node/198592.

final adoption to Congress and to the public." D.C. Code § 1–204.24d(26); *see also id.* § 1–204.24d(2) (charging the CFO with "preparing the 5-year financial plan based upon the adopted budget for submission with the District of Columbia budget . . . to Congress"); § 1–204.24d(25) (requiring the CFO to "[p]repar[e] fiscal impact statements . . . on legislation").

26.     Moreover, the CFO is required by statute to "[c]ertify[] and approv[e] prior to payment of all bills, invoices, payrolls, and other evidences of claims, demands, or charges against the District government, and determining the regularity, legality, and correctness of such bills, invoices, payrolls, claims, demands, or charges." *Id.* § 1–204.24d(16); *see also id.* § 1–204.24d(21) (requiring the CFO to "[a]dminister[] the centralized District government payroll and retirement systems").

27.     On April 11, 2014, the CFO sent a letter to Council Chairman Phil Mendelson advising that he would not enforce the Budget Autonomy Act.  In particular, he informed the Council that he would "not make or authorize any payment pursuant to a budget that was approved in conformance with the [Budget Autonomy Act]" and would "direct [Office of the CFO] employees not to certify contracts or make payments under this budget."[5]

## FACTUAL ALLEGATIONS

### A.     The Early History of the Budget Process for the District of Columbia

28.     The District Clause of the U.S. Constitution, Art. I, § 8, cl. 17, authorizes Congress to exercise legislative authority over a federal district serving as the seat of government.

29.     In exercise of that authority, Congress established the District of Columbia in 1801.  *See* District of Columbia Organic Act, ch. 15, 2 Stat. 103 (1801).

---

[5] Letter from Jeffrey S. DeWitt, CFO, District of Columbia, to Phil Mendelson, Chairman, Council of the District of Columbia 2 (Apr. 11, 2014) ("DeWitt Letter") (Exhibit D).

30.     Budget autonomy for the District of Columbia dates back to 1802, the year in which the City of Washington was incorporated.  At that time, the elected City Council had authority to lay and collect taxes and to spend tax revenues on matters of local concern.

31.     The authority of the city government was gradually expanded until 1871, when Congress created a unified municipal government for the District of Columbia to replace previously separate governments for the City of Washington, the County of Washington, and Georgetown.

32.     The unified municipal government, which consisted of appointed and elected officials, had authority to lay and collect taxes and to spend local tax revenues.

33.     In 1874, that system of government was abolished by Congress, and local authority to legislate with respect to local matters ceased.  The responsibility to lay taxes and to spend those tax revenues reverted to Congress.

**B.     The Budget Process Under the Home Rule Act, As Initially Enacted**

34.     Congress maintained legislative authority over the District until the 1973 enactment of the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 777 (1973), now known as the "Home Rule Act."[6]

35.     Congress, in the Home Rule Act, created a new system of local government for the District of Columbia in which it delegated legislative authority regarding local matters to local elected officials "to the greatest extent possible."  Home Rule Act § 102(a), D.C. Code § 1–201.02(a).

36.     Congress also created, as part of the Home Rule Act, the District of Columbia Charter and a process for amending that Charter.

---

[6] Congress changed the title in 1997. *See* Pub. L. No. 105-33 § 11717(a), 111 Stat. 786 (1997).

37.     Prior to the Home Rule Act, revenue collected from local sources was maintained in the U.S. Treasury.  But the Home Rule Act moved locally raised revenues out of the U.S. Treasury, declaring that those funds "belong to the District government," and exempting revenue from local sources from the requirement that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable."  31 U.S.C. § 3302(b).  Thus, following the Home Rule Act, those funds have been maintained in the General Fund of the District of Columbia and various Special Funds, outside the custody of the Treasury.  These funds were originally under the custody of the Mayor and are now under the custody of the CFO.  *See* District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8, 109 Stat. 142 (1995).

38.     Pursuant to the Home Rule Act, most legislation would become law after it was (a) approved by a majority of the Council after two readings separated by at least thirteen days; (b) approved by the Mayor, or disapproved by the Mayor but approved by two-thirds of the Council within a 30-day period; and (c) passively approved by Congress, which had a 30-day period in which to pass a joint resolution disapproving of the legislation.

39.     As originally enacted, the Charter authorized the Council to lay and collect taxes within the District pursuant to the usual process for local legislation, *i.e.*, after two readings and submission to Congress for passive review, but specified a different procedure for the District's budget.  Specifically, the Charter permitted the Council only to *recommend* a budget that was (a) approved by a majority of the Council at a single reading no more than 56 days after receipt of the Mayor's proposal; (b) approved by the Mayor, or disapproved by the Mayor but approved by two-thirds of the Council within a 30-day period; and (c) transmitted to the President for submission to Congress.  Congress was free to amend, adopt or ignore the proposed budget, on

an open-ended timeframe, with or without consulting with the District.  No local funds could be expended absent affirmative action by Congress.

40.      Under this process, the budget was treated unlike every other piece of District legislation and the District was treated unlike every other state and home-rule city in the country.

41.      This system imposed substantial costs on the District.

42.      Congress rarely finishes its appropriations process before the start of the fiscal year.  Indeed, for the 25 fiscal years between 1990 and 2014, Congress has met the deadline on only three occasions.  On the other 22 occasions, Congress has either enacted a continuing resolution (which means that the District must begin the fiscal year without knowing its total annual budget) or no budget at all (which triggers burdensome and costly government shutdown procedures).

43.      Congress's affirmative role in the budgeting process introduced substantial uncertainty into the District's finances. According to testimony from the previous CFO for the District, "Bond rating agencies take the uncertainties of the Federal process into account in assessing the District's finances, and discount to a degree whatever ratings the District might otherwise receive. In the case of new or expanded programs approved and financed locally, no implementing action can be taken until the Federal appropriation bill is enacted. This delays program initiation and guarantees programs will not be executed as planned."[7]

---

[7] *Budget Autonomy for the District of Columbia: Restoring Trust in our Nation's Capital*: *Hearing Before the H. Comm. on Gov't Reform,* 108th Cong. 32 (2003) (statement of Natwar Gandhi, Chief Financial Officer of the District of Columbia).

44.     According to testimony from the former Mayor of the District of Columbia,

delays in federal appropriations have led to lower service-delivery levels for "school nurses,

prescription drug benefits, police equipment and staffing."[8]

C.     **The Budget Autonomy Act Amends the District Charter to Establish Local Control over Expenditures of Locally-Raised Revenue and to Enhance the Efficiency of the Budget Process**

45.     For budgets enacted on or after January 1, 2014, the Budget Autonomy Act

repealed and replaced the budget process provided in the original 1973 Charter.

46.     Following the process to amend the Charter specified by Congress in the Home

Rule Act, the Council unanimously adopted the Budget Autonomy Act, the Mayor signed it, the

voters of the District of Columbia overwhelmingly ratified it, and Congress passively approved it

by failing to pass a joint resolution within 35 legislative days.

47.     The Budget Autonomy Act left in place the 1973 Home Rule Act's permanent

appropriation of funds from the U.S. Treasury to the D.C. General Fund but modified the process

by which money in the D.C. General Fund can be spent.

48.     As amended, the process for expending local tax revenues has been revised to

match the process for raising local tax revenues (or enacting any other non-emergency legislative

bill).

49.     Pursuant to the terms of the Budget Autonomy Act, the Mayor submits a proposed

budget to the Council, with the assistance of the CFO.  For the local portion, the Council then

adopts a budget after two readings within 70 days of receipt of the Mayor's proposal.  After the

Mayor approves the Council's version (or the Mayor's veto is overridden), that budget is

transmitted by the Council Chairman to Congress, with a certification from the CFO that the

---

[8] *Id.* at 10 (statement of Anthony Williams, Mayor of the District of Columbia).

District has adequate revenues to satisfy its budgetary expenditures.  If Congress does not act

within 30 days, the budget is enacted.

50.     The Budget Autonomy Act did not alter the process by which federal dollars are

expended in the District of Columbia.

51.     The Act also authorized the Council to change the fiscal year of the District.

Budget Autonomy Act § 2(d).  In most cities and states, the fiscal year runs from July to June, so

each school year can be planned for and addressed in a single budget cycle.  The District's fiscal

year, conversely, runs from October to September to correspond with the federal government's

fiscal year.  To date, the Council has not exercised its authority to change the District's fiscal

year.

**D.     Defendants Will Not Comply With or Enforce the Act**

52.     On April 11, 2014, both Defendants sent letters to Council Chairman Phil

Mendelson advising that they would refuse to enforce the Budget Autonomy Act.

53.     Following the advice of the Attorney General for the District of Columbia,[9] the

Mayor announced that he would treat the Act as a "legal nullity" and that he would:

> (a)     "direct all subordinate agency District officials not to
> implement or take actions pursuant to the [Budget Autonomy
> Act]";
>
> (b)     "veto any [fiscal year 2015] budget transmitted by the
> Council that is not inclusive of both the local and federal portions
> of the budget"; and
>
> (c)     "transmit to the Congress and President the full District
> budget as it stands after the 56th day following transmission to [the

---

[9] Op. of the D.C. Att'y Gen., *Whether the Local Budget Autonomy Act of 2012 is Legally Valid* (Apr. 8, 2014) ("Op. D.C. Att'y Gen.") (Exhibit C).

Council] of the budget, whether or not the Council has taken a
second vote."[10]

54.     Following the advice of his legal staff, the CFO announced that he would treat the

Act as having "no legal validity" and that he would:

> (a)     "not make or authorize any payment pursuant to a budget
> that was approved in conformance with the [Budget Autonomy
> Act]"; and

> (b)     "direct [Office of the CFO] employees not to certify
> contracts or make payments under this budget." [11]

55.     The CFO indicated that he would enforce the Budget Autonomy Act if a "court of

competent jurisdiction sustains the Act's legal validity."[12]

56.     As explained in the contemporaneously filed Motion for Preliminary Injunction,

the legal reasoning underlying Defendants' refusal to enforce the Budget Autonomy Act is based

on an unsound interpretation of binding law.

57.     The Council's injury will be felt immediately, as the budget cycle for Fiscal Year

2015 is already underway.  Moreover, the injury will be felt for each ensuing regular and

supplemental budget cycle until the CFO is directed to comply with the Autonomy Act.

58.     There is an urgent need to resolve the validity of the Budget Autonomy Act and to

ensure that the CFO will perform his job duties consistent with the Act.

**E.     The Council Faces Imminent Injury From Defendants' Conduct**

59.     The announced actions of the Mayor and the CFO will individually and jointly

cause injury to the Council and its interests.  In particular:

---

[10] Gray Letter, *supra* note 3, at 3 (Exhibit D).

[11] DeWitt Letter, *supra* note 5, at 2 (Exhibit D).

[12] *Id.*; *accord* Op. D.C. Att'y Gen., *supra* note 9, at 2 (concluding that the Budget
Autonomy Act "should not be enforced or followed" "absent a binding judicial ruling to the
contrary") (Exhibit C).

(a)      The Mayor's promise to submit the Council's draft budget to the President on May 29 contravenes the Council's exclusive right to legislate for the District.

(b)      Defendants' actions nullify the Council's legislative act in enacting the Budget Autonomy Act.  The Council voted unanimously for the Act, there were sufficient votes to enact the Act.  And the Council lacks a legislative remedy to guarantee enforcement of its legislation.  Likewise, Defendants' actions will nullify the Council's legislative act in enacting the fiscal year 2015 budget pursuant to the Budget Autonomy Act.  The Council is required by statute to enact such a budget but Defendants have already announced that they will treat it as a nullity once enacted. The Council lacks a legislative remedy to guarantee enforcement of its legislation.

(c)      Defendants' announced refusal to recognize the Budget Autonomy Act will needlessly deprive the Council of information to which it is entitled in the formulation of its budget.

(d)      Defendants' actions will impede the orderly administration of the District government.  The uncertainty created by Defendants' announced refusal to comply with the Budget Autonomy Act will undermine the Council's ability to satisfy its statutory obligations.  And the Council will incur unnecessary costs in preparing for the contingencies risked by Defendants' conduct.

 (f)      Defendants' refusal to enforce the District's fiscal year 2015 budget will deprive the Council of funding for its necessary governmental operations.

## CLAIM I

## DECLARATORY JUDGMENT

60.      The Council incorporates by reference and re-alleges each and every allegation contained in paragraphs 1-59, as though fully set forth herein.

61.      Defendants' refusal to comply with their duties under the Budget Autonomy Act is in violation of their responsibilities under the District Charter, as amended by the Autonomy Act.

62.     Defendants' refusal to comply will cause the Council to sustain injury that is redressable by this Court.

63.     The Council is entitled to a declaratory judgment, pursuant to D.C. Superior Court Rule 57 and 28 U.S.C. § 2201, that the Budget Autonomy Act is legally valid as the law of the land and that Defendants are required to treat the Act as binding law.

64.     The Council is further entitled to an injunction compelling Defendants to comply with the Budget Autonomy Act.

## PRAYER FOR RELIEF

WHEREFORE, the Council prays for judgment and relief as follows:

65.     A declaration that the Budget Autonomy Act is valid and enforceable law, and that no District officer or employee may refuse to treat it as such.

66.     A preliminary and permanent injunction, enjoining Defendants to fulfill their duties under the law in a timely fashion, such that the Council will be able to enact a budget for the District pursuant to the Budget Autonomy Act.

67.     Such other and further relief as the Court deems just and proper.

Dated: April 17, 2014

Respectfully submitted,
BOIES, SCHILLER & FLEXNER LLP
MAYER BROWN LLP


By: _____

Karen L. Dunn
  D.C. Bar No. 1002520
Alexander I. Platt
  D.C. Bar No. pending (admitted April 7)
Boies, Schiller & Flexner, LLP
5301 Wisconsin Avenue, NW
Washington, D.C. 20015-
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
Email: KDunn@bsfllp.com

By: _____

Brian J. Netter
  D.C. Bar No. 979362
Breanne A. Gilpatrick
  D.C. Bar No. 1018094
Mayer Brown LLP
1999 K Street, NW
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
Email: bnetter@mayerbrown.com

Attorneys for Plaintiff

# Exhibit A

# COUNCIL OF THE DISTRICT OF COLUMBIA

## NOTICE

### D.C. LAW 19-321

### "Local Budget Autonomy Amendment Act of 2012"

Pursuant to Section 412 of the District of Columbia Home Rule Act, P.L. 93-198 (the Charter), the Council of the District of Columbia adopted Bill 19-993 on first and second readings December 4, 2012 and December 18, 2012 respectively. Following the signature of the Mayor on January 18, 2013, pursuant to Section 404(e) of the Charter, the bill became Act 19-632 and was published in the February 15, 2013 edition of the D.C. Register (Vol. 60, page 1724). Act 19-632 was transmitted to Congress on May 8, 2013 for a 35-day review, in accordance with Section 303 of the Home Rule Act. The first day of the 35-day review period was May 9, 2013.

The Council of the District of Columbia hereby gives notice that the 35-day Congressional review period has ended, and Act 19-632 is now D.C. Law 19-321, effective July 25, 2013.

PHIL MENDELSON
Chairman of the Council

Days Counted During the 35-day Congressional Review Period:

May    9,13,14,15,16,20,21,22,23

June   3,4,6,10,11,12,13,17,18,19,20,24,25,26,27

July   8,9,10,11,15,16,17,18,19,23,24

**ENROLLED ORIGINAL**

Codification
District of Columbi:
Official Code
2001 Edition

Winter 2013

AN ACT

D.C. ACT 19-632

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

JANUARY 18, 2013

To amend the District of Columbia Home Rule Act to provide for local budget autonomy.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Local Budget Autonomy Amendment Act of 2012".

Sec. 2. The District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 777; D.C. Official Code § 1-201.01 *et seq*.), is amended as follows:

(a) The table of contents is amended by striking the phrase "Sec. 446. Enactment of Appropriations by Congress" and inserting the phrase "Sec. 446. Enactment of local budget by Council" in its place.

(b) Section 404(f) (D.C. Official Code § 1-204.04(f)) is amended by striking the phrase "transmitted by the Chairman to the President of the United States" both times it appears and inserting the phrase "incorporated in the budget act and become law subject to the provisions of section 602(c)" in its place.

*Amend § 1-204.04*

(c) Section 412 (D.C. Official Code § 1-204.12) is amended by striking the phrase "(other than an act to which section 446 applies)".

*Amend § 1-204.12*

(d) Section 441(a) (D.C. Official Code § 1-204.41(a)) is amended –by striking the phrase "budget and accounting year." and inserting the phrase "budget and accounting year. The District may change the fiscal year of the District by an act of the Council. If a change occurs, such fiscal year shall also constitute the budget and accounting year." in its place.

*Amend § 1-204.41*

(e) Section 446 (D.C. Official Code § 1-204.46) is amended to read as follows:
"ENACTMENT OF LOCAL BUDGET BY COUNCIL.

*Amend § 1-204.46*

"Sec. 446. (a) Adoption of Budgets and Supplements - The Council, within 70 calendar days, or as otherwise provided by law, after receipt of the budget proposal from the Mayor, and after public hearing, and by a vote of a majority of the members present and voting, shall by act adopt the annual budget for the District of Columbia government. The federal portion of the annual budget shall be submitted by the Mayor to the President for transmission to Congress. The local portion of the annual budget shall be submitted by the Chairman of the Council to the Speaker of the House of Representatives pursuant to the procedure set forth in section 602(c). Any supplements to the annual budget shall also be

**ENROLLED ORIGINAL**

adopted by act of the Council, after public hearing, by a vote of a majority of the members present and voting.

"(b) Transmission to President During Control Years - In the case of a budget for a fiscal year which is a control year, the budget so adopted shall be submitted by the Mayor to the President for transmission by the President to the Congress; except, that the Mayor shall not transmit any such budget, or amendments or supplements to the budget, to the President until the completion of the budget procedures contained in this Act and the District of Columbia Financial Responsibility and Management Assistance Act of 1995.

"(c) Prohibiting Obligations and Expenditures Not Authorized Under Budget- Except as provided in section 445A(b), section 446B, section 467(d), section 471(c), section 472(d)(2), section 475(e)(2), section 483(d), and subsections (f), (g), (h)(3), and (i)(3) of section 490, no amount may be obligated or expended by any officer or employee of the District of Columbia government unless--

"(1) such amount has been approved by an act of the Council (and then only in accordance with such authorization) and such act has been transmitted by the Chairman to the Congress and has completed the review process under section 602(c)(3); or

"(2) in the case of an amount obligated or expended during a control year, such amount has been approved by an Act of Congress (and then only in accordance with such authorization).

"(d) Restrictions on Reprogramming of Amounts - After the adoption of the annual budget for a fiscal year (beginning with the annual budget for fiscal year 1995), no reprogramming of amounts in the budget may occur unless the Mayor submits to the Council a request for such reprogramming and the Council approves the request, but and only if any additional expenditures provided under such request for an activity are offset by reductions in expenditures for another activity.

"(e) Definition - In this part, the term "control year" has the meaning given such term in section 305(4) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995.".

(f) Section 446B(a) (D.C. Official Code § 1-204.46b(a)) is amended as follows:    Amend
§ 1-204.46b

(1) Strike the phrase "the fourth sentence of section 446" and insert the phrase "section 446(c)" in its place.

(2) Strike the phrase "approved by Act of Congress".

(g) Section 447 (D.C. Official Code § 1-204.47) is amended as follows:    Amend
§ 1-204.47

(1) Strike the phrase "Act of Congress" each time it appears and insert the phrase "act of the Council (or Act of Congress, in the case of a year which is a control year)" in its place.

(2) Strike the phrase "Acts of Congress" each time it appears and insert the phrase "acts of the Council (or Acts of Congress, in the case of a year which is a control year)" in its place.

**ENROLLED ORIGINAL**

(h) Sections 467(d), 471(c), 472(d)(2), 475(e)(2), and 483(d), and 490(f), (g)(3), (h)(3), and (i)(3) are amended by striking the phrase "The fourth sentence of section 446" and inserting the phrase "Section 446(c)" in its place.

Amend
§§ 1-204.67,
1-204.71,
1-204.72,
1-204.75,
1-204.83,
1-204.90

Sec. 3. Applicability.
Section 2 shall apply as of January 1, 2014.

Sec. 4. Fiscal impact statement.
The Council adopts the fiscal impact statement in the committee report as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

Sec. 5. Effective date.
This act shall take effect as provided in section 303 of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 784; D.C. Official Code § 1-203.03).

_____
Chairman
Council of the District of Columbia

_____
Mayor
District of Columbia
APPROVED
January 18, 2013

# Exhibit B



*Federal*
*City*
*Council*

A CATALYST
FOR PROGRESS
IN THE
NATION'S
CAPITAL

CHAIRMAN
Robert J. Flanagan
Executive Vice President
Clark Enterprises, Inc.

PRESIDENT
The Honorable Tom Davis
Director of Federal Government Affairs
Deloitte & Touche, LLP

VICE PRESIDENT – FEDERAL RELATIONS
Jake Jones
Vice, President, External Affairs and Public Policy
Daimler

VICE PRESIDENT – PROJECT PLANNING
Pauline A. Schneider
Partner, Public Finance
Orrick, Herrington & Sutcliffe LLP

VICE PRESIDENT – MEMBERSHIP
Sharon Percy Rockefeller
President & CEO
WETA TV/FM

VICE PRESIDENT – MEMBERSHIP ENGAGEMENT
Josh Bernstein
President
Bernstein Management Corporation

VICE PRESIDENT – TRUST FUND
Timothy C. Coughlin
Managing Director
Edgemoor Capital Management

VICE PRESIDENT – NOMINATING
Donald E. Graham
Chairman of the Board
The Washington Post Company

VICE PRESIDENT – STRATEGIC PLANNING
Russell Lindner
Chairman and CEO
Forge Company

VICE PRESIDENT – DEVELOPMENT
Terence Golden
CEO
Bailey Capital

CHAIR – INFRASTRUCTURE TRUST TASK FORCE
Michael Harreld
President
PNC Bank of Greater Washington

TREASURER
Linda Rabbitt
Chairman and CEO
Rand Construction Corporation

SECRETARY
Katherine Bradley
President
CityBridge Foundation

GENERAL COUNSEL
Charles A. Miller
Senior Counsel
Covington & Burling LLP

CHIEF EXECUTIVE OFFICER
The Honorable Anthony Williams
CEO and Executive Director
Federal City Council

1156 15th Street, NW
Suite 600
Washington, DC 20005-2706
(202) 223-4560
Fax (202) 659-8621
www.federalcitycouncil.org

September 24, 2013

The Honorable Phil Mendelson, Chairman
Council of the District of Columbia
1350 Pennsylvania Avenue NW
Suite 504
Washington, D.C. 20004

*Re: Law 19-321, the "Local Budget Autonomy Amendment Act of 2012"*

Dear Chairman Mendelson:

At your request, we are providing our comments on the Local Budget
Autonomy Amendment Act of 2012 ("Charter Amendment").

We are pleased to expound on the importance of this small, but significant step
toward improving the financial health and governance of the District of
Columbia. As you know, we have long advocated for greater local budget
autonomy for the District through our respective leadership positions in the
nation's capital. Mr. Davis was a Republican Representative from Virginia
from 1995 to 2008 and chaired the House subcommittee and committee with
jurisdiction over the District government for much of that time. Mr. Williams
served as the District's Democratic Mayor from 1999 to 2007 and as the first
Chief Financial Officer from 1995 to 1998, testifying before Congress
numerous times on the District's finances.

Over the past 20 years, the District has transformed itself from a city on the
verge of bankruptcy to a thriving city reaching reassuring levels of financial
security and making rapid progress in service quality. At a time when state and
local governments throughout the country are having difficulties, the District
has produced 17 consecutive balanced budgets and 16 consecutive clean year-
end financial audits. The city finished Fiscal Year 2012 with a $417 million
budget surplus.

Recognizing the District's consistently strong fiscal record, we and others
believe it appropriate for the city to have greater autonomy over its own local
budget. This is why we strongly support the charter amendment. It is a small,
but significant advancement that would remedy the serious problems that result
from tying the District's local budget to the federal appropriations process.

Page 2 of 3
Letter to Chairman Mendelson

For budgeting purposes, the District is treated as both a local government and a federal agency. Unlike every other state and city in the country, until the recent charter amendment the District could not spend its own money without an Act of Congress. While the federal government does fund certain local functions, such as the courts and pensions, the vast majority of the District's budget is composed of the local budget, which is derived from locally-raised taxes and fees and federal grants available to all jurisdictions.

Because the District's local budget was before the Congress each year, unfortunately that budget often would get tied up in political disagreements that are completely unrelated to the city. This is needlessly inefficient, lengthening the time it takes for the District to respond to changing public needs, costing the District money, and disrupting the delivery of services. This is not what Congress ever intended for the District, but it is the result of the longstanding budget process.

The charter amendment solves these problems by permitting the District to spend locally-raised revenue according to a budget that will become law in the same manner as all other District legislation. Under the charter amendment, starting in 2014, the District's local budget will become law 30 days after being passed by the Council and approved by the Mayor, unless during that time Congress passes a joint resolution to disapprove it that is subsequently signed by the President. This process will eliminate delays and allow District agencies to deliver city services efficiently, rather than waiting on the sidelines wondering when or if Congress will act. We emphasize that the charter amendment will give the District greater control only over funds collected from local taxes and fees and generally available federal grants. It would make no change to federal funds specially appropriated to the District for which Congress has unique oversight responsibility.

Based on our long experience of working with Congress on this issue, we are not surprised that it has not taken action to override the charter amendment. First, there is bipartisan agreement among Members that the District should have greater autonomy over its local budget. Moreover, the current and prior presidents have also endorsed local budget autonomy. Second, Congress retains its full authority to legislate for the District, consistent with the Constitution and the Home Rule Act. It can veto any local budget passed pursuant to the charter amendment within 30 days by joint resolution, signed by the President. It can also repeal or amend the budget process established by the charter amendment at any time.

As Mr. Davis testified to the D.C. Council's Committee of the Whole on November 9, 2012, the charter amendment is not a "poke in the eye" of Congress. It simply gives the District the tools it needs to continue the strides it has made toward improved financial stability and governance, and does so in a way that already enjoys bipartisan support in Congress.

Page 3 of 3
Letter to Chairman Mendelson

Thank you for inviting us to comment, and please let us know if we can be of further assistance
on this matter.

Sincerely,

Thomas M. Davis III
President, Federal City Council

Anthony A. Williams
Chief Executive Officer, Federal City Council

# Exhibit C



**VINCENT C. GRAY**
MAYOR

April 11, 2014

The Honorable Phil Mendelson
Chairman
Council of the District of Columbia
John A. Wilson Building, Suite 504
1350 Pennsylvania Avenue, N.W.
Washington, DC 20004

Re:  Enactment of the Fiscal Year 2015 District Budget

Dear Chairman Mendelson:

I write to urge the Council to act on the FY 2015 budget submitted on April 3, 2014 within the 56 days set forth in the original Home Rule Charter, to return the budget within that time, and not to base its actions or rely in any way in considering this budget on the Local Budget Autonomy Act of 2012 (the Act), which purported to amend the Charter.  Failure to do so could have serious and destabilizing consequences for the District of Columbia government.

As you know, I believe deeply that Congress should grant the District budget autonomy and should do so as soon as possible.  Indeed, this Administration worked successfully to convince President Obama to include such a proposal in his pending budget legislation, and we are doing all we can to convince Congress of the wisdom and fairness of this proposal.

At the same time, I must take seriously my responsibility as Mayor of this great city to ensure that the District government complies in all respects with the governing federal law, including in connection with its budget and finances.  At my request, our D.C. Attorney General Irvin Nathan has issued the enclosed formal opinion concluding that the Act is null and void as it patently contravenes the Home Rule Act and provisions of Title 31 of the U.S. Code.  As explained in the Attorney General's opinion, the Act if followed would interfere improperly with the Constitutional and federal statutory roles of the Congress and President of the United States as well as the Mayor in the budget and appropriations process for the District of Columbia, and compliance with it could cause officials and employees of the District government to be in violation of federal statutes that carry administrative as well as criminal penalties.  His opinion is fully consistent with the written opinion issued by the U.S. Government Accountability Office ("GAO") on January 30, 2014.  The GAO concluded: "Provisions of the [Act] that attempt to change the federal government's role in the District's budget process have no legal effect….The District Government remains bound by provisions of federal law which require it to submit

budget estimates to the President for transmission to the Congress for the enactment of appropriations… Because acts taken *ultra vires* are, *ab initio*, legally ineffective, portions of the [Act] that purport to change the federal government's role in the District's budget process are <u>without legal force or effect</u>." (pp. 11-12, emphasis added.)  I am not willing either to violate federal appropriations laws or to subject our employees to the risks of prosecution or administrative sanctions that would flow from the Council's implementation of the illegal Act.

The Act, if implemented, would purport effectively to cut the President and Mayor out of our respective roles pursuant to the Home Rule Act in transmitting to Congress the entire budget for the District – both the federal *and* local dollars portion of the budget.  The Act would also reduce the role of Congress in appropriating local revenue, which revenue approximates 70% of the D.C. budget.  The Act would call for the local portion of the annual budget to be submitted by the Chairman of the Council to the Speaker of the House of Representatives for passive review. But the Home Rule Act expressly calls for the full District's budget – both local and federal dollars – to be transmitted by the *Mayor* to the *President* for transmission by him to the Congress and for Congress then to appropriate the full D.C. Budget.  The Council cannot usurp the Mayor's long-established authority and responsibility to submit the full unified budget, nor can it unilaterally restructure the role in the budget process played by federal officials and Congress.

The Attorney General's legal opinion is binding on the Executive branch officials in the District government absent a controlling court opinion to the contrary.  Because, as the opinion concludes, the Act is a legal nullity, the Act can have no effect on the formation of the District's budget.  Further, monies voted on by the Council but not contained in a budget passed by both houses of Congress and signed by the President cannot be spent without exposing our employees to criminal or civil liability.

We must comply with federal law while we continue to push in Congress for budget autonomy, for which we now have support from the White House and within both houses of Congress.  In support of this request to the Council, consider some of the following possible adverse consequences if the Council adheres to the Act, in the absence of a governing judicial ruling of its validity, and ignores the provisions of the binding and valid Home Rule Charter.

If the Council follows its contemplated schedule and takes more than 56 days to consider the budget  pursuant to the Act, evidenced by a currently scheduled second vote on the FY 15 Budget Request Act 70 days from the budget's submission (*i.e.,* two weeks after the 56 day statutory deadline), it will be in violation of the Home Rule Act.  That violation will deprive my Office as well as the President and Congress of the ability to comply with applicable statutory responsibilities in the creation and enactment of the District's budget, a process set up four decades ago by Congress for the benefit of funding the District's operations and followed faithfully and scrupulously until this year.  If that happens, I intend to the best of my ability to continue to comply with the Home Rule Act's budget requirements.  Therefore, I intend to transmit to the Congress and President the full District budget as it stands after the 56th day following transmission to you of the budget, whether or not the Council has taken a second vote. A dispute as to whether or not this is the District's duly proposed budget could well lead either to the President's ignoring the elected officials of the District and transmitting  his own budget for the District to the Congress (31 U.S.C. § 1108(b)(1)) or even to Congress' declining to pass any significant budget for the District in FY 2015.

2

Second, if the District fails to enact a valid Budget Request Act and submit it to Congress for inclusion in a continuing resolution or appropriations act, there is also a serious risk that the District will not be able to avail itself of the protection afforded by section 816 of the Consolidated Appropriations Act, 2014.  This crucial appropriations authority advanced to the District the funds contained in the FY 2015 Budget Request Act for periods during which no federal continuing resolution or appropriations act for the District is in effect.  However, a condition included by Congress, presumably for the District's financial benefit, is that the District have a validly enacted budget.  We have come too far to jeopardize our ability to keep the District functioning if the federal government shuts down again.  I urge the Council to be responsible and enact a valid budget for the protection of the District.  If the Council does not, it will put the District's finances in a highly precarious position.

There is even the possibility that if the District government does not come together to enact a valid budget, in accordance with the Home Rule Charter as passed by Congress, the Control Board could be reactivated.  (D.C. Official Code § 47-392.09.)  If because of the absence of Congressional appropriations, the District cannot lawfully make local expenditures in FY 2015, the District could once again become subject to governance by the Control Board. Such action occurs by operation of law if the District fails to meet its payroll for any pay period, fails to make any required payments relating to pensions and benefits or fails to make payments required under an interstate compact. (D.C. Official Code §§ 47-391.07 (b); 47-392.09)  That would be a disastrous outcome for Home Rule in the District and we should take steps to avoid it.

As you consider our urgent request, you should know of my intended actions in light of the Attorney General's opinion, and in consultation with the Chief Financial Officer.  First, I will direct all subordinate agency District officials not to implement or take actions pursuant to the Act, which contravenes our Home Rule Charter and other federal law.  Second, I will veto any FY 15 budget transmitted by the Council that is not inclusive of both the local and federal portions of the budget, as required under the Home Rule Act.  Third, as noted, to achieve compliance to the extent I am able with the Home Rule Act, I will transmit to the Congress and President the full District budget as it stands after the 56th day following transmission to you of the budget, whether or not the Council has taken a second vote.

I would be pleased to meet with you and other appropriate Members of the Council to discuss these matters and to find solutions which will avoid the dire possible consequences of failing to reach agreement on the proper procedures for the FY 2015 budget process.  As always, I appreciate a mutually respectful dialogue with you.  Thank you for your prompt consideration of these matters.

Sincerely,

Vincent C. Gray
Mayor

3

Enclosure

cc:    Jeffrey S. DeWitt, Chief Financial Officer
       Irvin B. Nathan, Esq., Attorney General
       The Honorable David A. Catania
       The Honorable Vincent B. Orange, Sr.
       The Honorable David Grosso
       The Honorable Anita D. Bonds
       The Honorable Jim Graham
       The Honorable Jack Evans
       The Honorable Mary M. Cheh
       The Honorable Muriel Bowser
       The Honorable Kenyan McDuffie
       The Honorable Tommy Wells
       The Honorable Yvette M. Alexander
       The Honorable Marion Barry

4

# Exhibit D

GOVERNMENT OF THE DISTRICT OF COLUMBIA
OFFICE OF THE CHIEF FINANCIAL OFFICER



**Jeffrey S. DeWitt**
Chief Financial Officer

April 11, 2014

The Honorable Phil Mendelson
Chairman
Council of the District of Columbia
1350 Pennsylvania Avenue, NW, Suite 504
Washington, DC 20004

**Subject:      Local Budget Autonomy Act**

Dear Chairman Mendelson:

On several occasions, you and I have discussed the legal validity of the Local Budget Autonomy
Act of 2012 (Act), which was approved by the voters of the District of Columbia (District) in
April, 2012. As you know, the Act would change the District Home Rule Act by extending the
deadline by which the Council of the District of Columbia (Council) must approve the District's
annual budget. It also authorizes the Council to submit the local portion of the District's budget
directly to the U.S. Congress, instead of to the Mayor who, if the Home Rule Act was not
changed, is required to send the budget to the President of the United States for his transmittal to
Congress. Like you and many others, I support the principle of budget autonomy for the District.
I am also committed to following the rule of law in carrying out my duties as the District's Chief
Financial Officer.

The Council's legal staff deemed the Act legally sufficient, as did opinions from private counsel
for DC Appleseed. In addition, two Board members of the D.C. Board of Elections found that
the Act was "not patently illegal." Conversely, the District's Attorney General, in his January 7,
2013 statement before the District Board of Elections, concluded that the Act violated our
governing law, and he reiterated his conclusion in his formal Opinion of the Attorney General
dated April 8, 2014. The General Counsel to the U.S. Government Accountability Office came
to the same conclusion. Given the importance of this matter and the variety of legal opinions, I
asked lawyers for the Office of the Chief Financial Officer (OCFO) to review the Act. After
their independent and exhaustive review of relevant federal and local statutes, case law,
legislative history and the competing viewpoints, OCFO lawyers have concluded that there is no
legal validity to the Act.

John A. Wilson Building * 1350 Pennsylvania Avenue, NW * Suite 203 * Washington, DC 20004
Phone: (202) 727-2476 * Fax: (202) 727-1643 * www.cfo.dc.gov

JA41

*Letter to Chairman Mendelson – Budget Autonomy*
*April 11, 2014*
*Page 2*

Accordingly, I urge the Council to weigh the risks to both the District and its employees if the Council approves the District's Fiscal Year (FY) 2015 budget under the Act's provisions amending the Home Rule Act's appropriations procedures. I am very concerned that any budget approved in this manner will not be legal unless Congress decides to approve it or a court of competent jurisdiction sustains the Act's legal validity. Absent such actions, I will not make or authorize any payment pursuant to a budget that was approved in conformance with the Act. I will also direct OCFO employees not to certify contracts or make payments under this budget given the potential civil and criminal penalties to which they, as individuals, would be subject under the federal Anti-Deficiency Act. In this regard, any contracts entered into in violation of the Anti-Deficiency Act would be void ab initio such that OAG may not be able to provide legal sufficiency for and the OCFO would not be able to make payment pursuant to these contracts. Finally, I must caution that the Council's failure to approve a District budget pursuant to pre-Act Home Rule Act provisions may cause the occurrence of one or more events (such as failure to meet District government payroll, or make pension benefit or interstate compact payments) that would trigger the re-emergence of the Control Board and result in loss of the precious, limited Home Rule currently provided to District residents.

Given the potential for these serious adverse consequences to the District and its officers and employees, I strongly advise you to take all necessary steps to avoid occurrence of the events described above. Specifically, until and unless Congress affirmatively grants budget autonomy or there is a binding judicial decision finding that the Act is valid, I ask that you and your fellow Councilmembers approve the District's FY 2015 budget pursuant to the Home Rule Act's original, pre-Act procedures while we work together with the Mayor to resolve this matter. As always, I am open to further discussion with you about this matter.

If you have any questions, please feel free to call me at (202) 727-2476.

Sincerely,

Jeffrey S. DeWitt
Chief Financial Officer

cc:     Mayor Vincent C. Gray
        All Councilmembers
        Irvin B. Nathan

# Exhibit E

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
## OFFICE OF THE ATTORNEY GENERAL



**ATTORNEY GENERAL**

April 8, 2014

## OPINION OF THE ATTORNEY GENERAL

**SUBJECT**: Whether the Local Budget Autonomy Act of 2012 is Legally Valid

The Honorable Vincent C. Gray
Mayor of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Dear Mayor Gray:

This opinion is issued pursuant to Reorganization Order 50 of 1953, as amended[1] and addresses
your request for the legal advice of this office about the validity of the Local Budget Autonomy
Act of 2012 ("Act"), effective July 25, 2013, D.C. Law 19-321, 60 DCR 1724, passed by the
Council of the District of Columbia and ratified by District of Columbia voters last year.

The Act is appealing as a matter of policy in that it attempts to secure budget autonomy for the
District, allowing the District government to control its expenditure of locally collected revenues,
a policy goal that I wholeheartedly endorse, and a goal that this Administration, members of the
Council, and supportive members of Congress have pursued and continue to pursue in Congress.

However, based on the analysis by career professionals in this Office and my review of relevant
legal authorities, I have reluctantly concluded that the Act is a nullity, with no legal force or
effect and that adhering to it could put officials and employees of the District government in

---

[1] Reorganization Order 50, Part II, effective June 26, 1953, as amended. Pursuant to Reorganization Order 50,
Opinions of the Attorney General operate as the "guiding statement of the law" in the District's Executive branch.
*U.S. Parole Comm'n v. Noble*, 693 A.2d 1084, 1099 (D.C. 1997). As an opinion of the Attorney General, it must be
followed by all District officers and employees in the performance of their official duties" until overruled by a
controlling court decision," or as to local matters not controlled by the United States Constitution or federal law by a
specific action of the Mayor or by an Act of the Council within their respective authority. See Reorganization Order
50, Part II.

legal jeopardy and risk adverse consequences from the Congress. Although we arrived at this conclusion independently, I note that this legal conclusion was also reached by the arm of Congress charged with interpreting such issues -- the Government Accountability Office -- whose extensive analysis is set forth in GAO Decision B-324987 (January 30, 2014).

Because this Act has no legal force or effect, it would be illegal for the District to establish or implement a budget that is based on the Act and that ignores the continuing need for congressional appropriation of local funds in the District's budget process. Moreover, it would be unlawful for District officers or employees to make or authorize expenditures that Congress has not approved. Doing so could expose these individuals to administrative and/or criminal penalties under the federal Anti-Deficiency Act. For the reasons detailed below, the Act is not valid, and, absent a binding judicial ruling to the contrary, it should not be enforced or followed by any official of this government.

## I.    The Act is null and void because the Council exceeded its authority in enacting it and because it violates federal law.

The Act purports to amend section 446 of the Home Rule Act (D.C. Official Code § 1-204.46)[2] to exempt the District's budget process for local funds from the congressional appropriations requirements established under Article I, section 9, clause 7 of the United States Constitution.[3] Section 446 of the Home Rule Act applies these appropriations requirements to the District by setting out the process the District must follow to obtain Congressional approval of its budget and by stating that, with limited exceptions, "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by an Act of Congress and then only according to such Act." The Act also purports to amend section 441 of the Home Rule Act[4] to allow the Council to change the District's fiscal year.

In the absence of congressional legislation establishing budget autonomy for the District, the Council attempted to make these changes using a local Charter amendment process Congress authorized in section 303 in the Home Rule Act (D.C. Official Code § 1-203.03). Section 303 sets out a procedure that relies on Council action and voter ratification to approve changes to the District Charter.[5] Section 303(a) provides that, with limited but pertinent exceptions, the Charter "may be amended by an act passed by the Council and ratified by a majority of the registered qualified electors of the District voting in the referendum held for such ratification." Such an amendment must be submitted to Congress for a 35-calendar-day period of passive review.

---

[2] District of Columbia Home Rule Act, approved December 24, 1973, 87 Stat. 798, Pub. L. 93-198, D.C. Official Code § 1-204.46 (2012 Repl.) ("Home Rule Act").

[3] This clause provides that "[n]o Money shall be drawn from the Treasury but in Consequence of Appropriations made by Law...."

[4] D.C. Official Code § 1-204.41 (2012 Repl.).

[5] The Charter is contained in title IV of the Home Rule Act.

The Council's use of the section 303 Charter amendment process to take the District's local funds budget out of federal control was ineffective because it violated several statutory restrictions on this process. Section 303(d) provides that section 303(a)'s amendment procedure "may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603." The Act violates three different limitations that are specified in Sections 602 and 603 of the Home Rule Act (D.C. Official Code §§ 1-206.02 and 1-206.03). Each of these three limitations independently renders the Act invalid.

## A.    The Act violates the limitations of Section 602(a)(3) because it changes the functions of the United States and because it is not restricted in its application exclusively in or to the District.

Section 602(a)(3) of the Home Rule Act provides that the Council has no authority to "enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." The Act violates both the "functions or property of the United States" and the "restricted in its application exclusively in or to the District" provisions of this Home Rule Act limitation.

Removing the expenditure of local funds from the federal appropriations process would affect a sea change in the "functions . . . of the United States" in the formation of the District's budget, in several ways. It would no longer give Congress, with Presidential approval, the sole right to appropriate local District funds. It would alter the functions of the federal Office of Management and Budget and the U.S. Comptroller General in the District's budget process, converting their review from active to passive with respect to the local budget. In addition, by allowing a change in the District's fiscal year, it would make it difficult, if not impossible, for Congress to review the District's finances during its regular budget cycle. This result would affect the functions of the United States and extend beyond the District's local affairs.

Further, the Act would effectively amend at least two federal laws that are not restricted in their application exclusively in or to the District. First, the federal Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1349 to 1351 and subchapter II of Chapter 15, prohibits federal and District government employees, under threat of federal criminal and administrative penalties, from, among other things, obligating or expending funds in excess or in advance of an appropriation.[6] The federal Anti-Deficiency Act is the principal mechanism the federal government uses to ensure that the District and the federal agencies comply with federal appropriations law. Removing the District's local funds budget from the federal appropriations process would effectively amend this law by exempting District transactions involving local funds from its scope.

---

[6] The federal Anti-Deficiency Act applies to the District by its own terms and through section 603(e) of the Home Rule Act (D.C. Official Code 1-603.03(e)), which states that "[n]othing in this act shall be construed as affecting the applicability to the District government of the provisions of §§ 1341, 1342, and 1349 to 1351 and subchapter II of Chapter 15 of Title 31, United States Code."

3

Second, the Act would exclude the District's local funds budget from the Budget and Accounting Act, 31 U.S.C. § 1108, which requires the Mayor and the federal agencies to submit their annual budget proposals to the President. In *McConnell v. United States,* 537 A.2d 211 (D.C. 1988), the District of Columbia Court of Appeals held that section 602(a)(3) prevents District voters from narrowing the applicability of national legislation to exclude the District. *See also Brizill v. D.C. Board of Elections and Ethics*, 911 A.2d 1212 (D.C. 2006) (District Government could not amend or repeal a federal law which barred gambling devices in certain enumerated jurisdictions, including the District). The Act's attempt partially to remove the District from the applicability of these two federal laws was therefore ineffective.

**B.      The Act violates the limitations of Section 603(a) because it changes the long-standing roles and procedures of Congress, the President, and other federal entities in the formation of the District's total budget.**

The Act violates section 603(a) of the Home Rule Act (D.C. Official Code § 1-206.03(a)), which states that:

> Nothing in this act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

There is no question that the Act's amendment of sections 441 and 446 of the Home Rule Act would change the long-standing roles and procedures of the stated federal entities with respect to the District's "total budget."[7] Rather than being subject to the federal appropriations process, the District would establish its own budget for local funds, to be authorized according to a potentially different fiscal year, subject only to passive Congressional review. This would constitute a significant change in District's budget process that would directly contradict the prohibition in section 603(a). This latter provision, through section 303(d), expressly precludes the use of the Charter amending process to accomplish this result.

**C.      The Act violates the limitations of Section 603(e) by using the ratification process to establish local budget autonomy.**

Section 603(e) of the Home Rule Act (D.C. Official Code § 1-206.03(e)) prohibits the use of the ratification process to establish local budget autonomy. As noted above, section 603(e) states that nothing in the Home Rule Act shall be construed as affecting the applicability of the federal Anti-Deficiency Act to the District government. The Act directly violates this requirement by purporting to authorize District officials and employees to spend local funds, without a

---

[7] The "total budget" includes amounts derived from local taxes and fees and federal grants and payments. The Home Rule Act defines "budget" to mean "the entire request for appropriations and loan or spending authority for all activities of all agencies of the District financed from all existing or proposed resources and shall include both operating and capital expenditures." Home Rule Act, § 103(15) (D.C. Official Code § 1-201.03(15) (2012 Repl.)).

4

congressional appropriation, based on the Council's approval of budget legislation. It is difficult to imagine an amendment to the Charter that would more directly contradict section 603(e) of the Home Rule Act. The Act removes local District funds from the requirements of the federal Anti-Deficiency Act, thereby violating the Home Rule Act itself, and the Anti-Deficiency Act's direct statement that its requirements apply to the District.

Even if the Council's use of the ratification process to adopt the Act were not expressly prohibited by three separate provisions of the Home Rule Act, it would still be defective under the federal laws discussed above. The federal Anti-Deficiency Act continues to apply to District government expenditures, and District employees would act at their peril if they authorized or spent funds made available only through the Council's local budget. The Mayor would still be bound under the Budget and Accounting Act to provide the District's total budget to the President for submission to Congress. The Mayor's failure to do so would place the District out of compliance with this federal requirement. Further, the fact that these federal statutes independently apply to the District further supports the conclusion that Congress intended its control over the District's budget, as expressed in the Home Rule Act, to remain intact.

As noted, the U.S. Government Accountability Office ("GAO") agrees that the Act is without legal force or effect. In a detailed, authoritative opinion dated January 30, 2014, GAO concludes that the Act violates the federal Anti-Deficiency Act and the Budget and Accounting Act, both of which require that the District's budget be federally appropriated. [8] GAO also agrees that, because these federal statutes apply beyond the District, section 602(a)(3) of the Home Rule Act prohibits the District from using the Charter amending process in section 303 of the Home Rule Act to change them. GAO notes that, in enacting the Home Rule Act, Congress rejected a Senate proposal to allow the Council to adopt the District budget, in favor of the current version, which maintains the then-existing system of requiring a federal appropriation. [9] Describing this

---

[8] This opinion was requested by the Hon. Ander Crenshaw, Chairman, Subcommittee on Financial Services and General Government, Committee on Appropriations, U.S. House of Representatives. It concludes that the "portions of the [Act] that purport to change the federal government's role in the District's budget process are without legal force or effect." GAO Decision B-324987 (January 30, 2014).

[9] H.R. Rep. No. 93-703 confirms that Congress intended to leave all congressional appropriation procedures in place:

> The Senate bill provided that the Mayor submit a budget to the Council in such form as he might determine, that the Council might adopt a line-item budget, and that the Mayor might transfer funds from one account to another with Council approval.

> The House Amendment required the Mayor to prepare a balanced budget for submission to the Council and to the Congress, to consist of 7 specified documents; and that the Council after public hearings, approve a balanced budget and submit same to the President for transmission to the Congress, *leaving Congressional appropriations and reprogramming procedures as presently existing.*

> The Conference substitute (sections 442-451, 603, 723, 743) adopts essentially the House provisions, *preserving the Congressional appropriations provisions of existing law.* Amendments are included to clarify procedural requirements as to the submission of the budget to the Council by the Mayor; the time for the Council to review the budget; the authority of the Mayor for line-item veto of budget proposals, with two-thirds of the Council required to override; and transmittal of the budget to the President for review and submission to the Congress . . . .

5

language, GAO noted that it "[could] think of no more specific manner for Congress to specify in the Home Rule Act that Congress would retain a firm hand in the District's budget process." GAO therefore concluded, correctly in my view, that because the Act was *ultra vires*, it was void *ab initio* and of no legal force or effect.

## II. The legal arguments advanced in support of the Act are unpersuasive.

Despite the Act's patent illegality under the Home Rule Act and other federal laws, several arguments have been advanced in its support. These arguments, put forward by lawyers for either the Council or for political activists in support of the Act, draw on the language of section 303(d) of the Home Rule Act, which prohibits use of the Charter amending process for laws prohibited "under the limitations specified in sections 601, 602, and 603." They assert that section 603(a) of the Home Rule Act does not prohibit use of the Charter amending process to change the District's budget process because it is not phrased as a limitation on the Council's authority. Claiming that section 603(a) merely provides direction on how the original version of the Home Rule Act should be interpreted, they maintain that this language does not "limit" the District's future ability to amend the Charter's budget requirements without obtaining federal legislation. This is no more than a play on words that ignores both the obvious intent of Congress and the likely reaction of a court called upon to interpret the congressional language.

In addition, it has been argued that the Act violates neither the federal Anti-Deficiency Act itself, nor section 603(e) of the Home Rule Act, which requires its continuing application to the District. These arguments claim that the federal Anti-Deficiency Act applies to the District only through section 446 of the Home Rule Act, which places District spending under the control of Congress. Further, they claim that like section 603(a) of the Home Rule Act, section 603(e) is an interpretive direction on how the original Home Rule Act should be construed, rather than a limitation on the District's authority to amend it. Still further, these arguments assert that, because the Act takes the District's local funds budget out from under active congressional control, the Act implicitly modifies the federal Anti-Deficiency Act's requirement that *Congress* must appropriate funds to support District approved obligations and expenditures. Finally, these arguments maintain that Congress, in authorizing the District to spend excess revenue not included in the appropriated budget, confirmed that the District may expend unappropriated local funds without reference to the federal Anti-Deficiency Act.[10] From this, it is argued that the

H.R. Rep. No. 93-703, 93d Cong., 1st Sess. 78 (1973) (emphasis added), *reprinted in* Staff of the House Comm. on the District of Columbia, 93d Cong., 1st Sess., Legislative History of the District of Columbia Self-Government and Governmental Reorganization Act at 3016 (Comm. Print 1974).

[10] The permanent version of this legislation is codified at D.C. Official Code § 47-369.02 (2013 Supp.), which states, in relevant part, that :

(a) Beginning in fiscal year 2009 and each fiscal year thereafter, consistent with revenue collections, the amount appropriated as District of Columbia Funds may be increased –

(1) by an aggregate amount of not more than 25 percent, in the case of amounts proposed to be allocated as "Other-Type Funds" in the annual Proposed Budget and Financial Plan submitted to Congress by the District of Columbia; and

(2) by an aggregate amount of not more than 6 percent, in the case of any other amounts proposed to be allocated in such Proposed Budget and Financial Plan.

6

District's compliance with Council allocations, in the absence of a federal appropriation, would not constitute an Anti-Deficiency Act violation.

The main defect in these arguments is that they badly misread section 303(a). Congress made its intent to maintain control over the District's finances clear in section 303 of the Home Rule Act, by expressly excluding changes to its role in appropriating District funds from the Charter amending process. Congress further expressed this intent by continuing to include the District in the Budget and Accounting Act and by making the federal Anti-Deficiency Act expressly applicable to District expenditures. As GAO notes in its opinion, under section 602(a)(3) of the Home Rule Act, the Council has no authority to enact legislation or amend its Charter in a manner that changes the applicability of a law that is not confined exclusively to the District. The arguments supporting the Act fail adequately to address this restriction. They blithely maintain that, in spite of the Home Rule Act and *McConnell, supra*, the District is entitled to a specially tailored application of two more generally applicable federal laws.[11] Notably, no legislative history has been cited to support this surprising result. The absence of such support, as well as the history of the District over the last 40 years since the enactment of the Home Rule Act, suggests that this is not the outcome Congress contemplated. Common sense reinforces the point: if Congress intended to delegate to the Council or voters of the District of Columbia the authority to unilaterally convert the role of the President and Congress in the formation of the District's budget, it can reasonably be expected that Congress would have given some indication of its intent to permit such a significant change in the federal role through local legislation. It did not give any such indication.[12]   Nor did any Council or Mayor over the last 40 years believe the District government had such authority.

Further, arguments in favor of the Act miss the point when they observe that Congress authorized the District to spend excess revenues when it enacted D.C. Official Code § 47-369.02 (2012 Repl.). Rather than empowering the District to spend unappropriated local funds for all purposes notwithstanding the Anti-Deficiency Act, Congress authorized the expenditure of the specified revenues under certain expressly stated conditions. There is no question that Congress can approve federal and District spending that is at odds with federal appropriations requirements, and thus create an exception to the Anti-Deficiency Act. The Anti-Deficiency Act is merely another part of the federal law governing the budget process. In fact, Congress could clearly under its Article I authority amend both the Home Rule Act and the Anti-Deficiency Act to provide the District with full budget autonomy over local funds. Indeed, Congress may well eventually do so, as it has recently been requested to do by President Obama. Congress has not

---

It then goes on to specify the conditions associated with their expenditure.

[11] GAO responds persuasively to this position by noting that "the applicability of the Antideficiency Act to the District, both by its very terms and by the terms of the Home Rule Act, 'reflects Congress' decision . . . to expressly limit District spending to amounts *Congress* appropriates." (emphasis in original) (quoting GAO Decision B-262069).

[12] *See In Re Crawley*, 978 A.2d 608, 617 (D.C. 2009) ("Judges, as well as detectives, may take into consideration that a watchdog did not bark in the night") (quoting *Harrison v. PPG Indust., Inc.*, 446 U.S. 578, 602 (1980) (Rehnquist, J., dissenting)).

done so *yet*, however, and the Council may not arrogate to itself authority over portions of the District's budget process that Congress, in the Home Rule Act, clearly specified would remain firmly within congressional control.

Congress' own actions with respect to the Act since its effective date are further evidence of Congress' view of the Act's invalidity and its intention not to allow the District to have budget autonomy. Although Congress did not enact a joint resolution disapproving the Act according to section 303(a) of the Home Rule Act, congressional inaction is importantly different from affirmative approval.[13] A more likely interpretation of this inaction is that Congress found it unnecessary to disapprove the Act because it was so obviously beyond the scope of the Council's and the voters' authority. After the Act sat for passive review by Congress, the Financial Services and General Government Subcommittee of the U.S. House of Representatives' Committee on Appropriations expressly found the law to be no more than a non-binding expression of District residents' "opinion" that does not change the District's responsibility to submit to the federal appropriations process. Fiscal Year 2014 Financial Services and General Government Committee Report, p. 38.

Congress has also made it perfectly clear that it views its fiscal relationship with the District as unchanged since January 1, 2014, the Act's applicability date. On January 15, 2014, Congress enacted the Consolidated Appropriations Act, 2014, Pub. L. 113-76, in which it appropriated the District's entire Fiscal Year 2014 budget, including local funds. As part of the General Provisions applicable to the District, Congress also enacted section 816, a District government shutdown avoidance provision that authorizes the District to use local funds, as stated in the District's FY 2015 Budget Request Act, in the event that Congress fails to enact an appropriations act or continuing resolution for the District.[14] In doing so, it expressed its will

---

[13] *See, e.g., Springer v. Government of the Philippine Islands*, 277 U.S. 189, 209 (1928) ("The inference of an approval by Congress from its mere failure to act at best rests upon a weak foundation. And we think where the inference is sought to be applied, as here, to a case where the legislation is clearly void as in contravention of the Organic Act, it cannot reasonably be indulged. To justify the conclusion that Congress has consented to the violation of one of its own acts of such fundamental character will require something more than such inaction upon its part as really amounts to nothing more than a failure affirmatively to declare such violation by a formal act.").

[14] Section 816 reads as follows:

> Sec. 816. (a) During fiscal year 2015, during a period in which neither a District of Columbia continuing resolution or a regular District of Columbia appropriation bill is in effect, local funds are appropriated in the amount provided for any project or activity for which local funds are provided in the Fiscal Year 2015 Budget Request Act of 2014 as submitted to Congress (subject to any modifications enacted by the District of Columbia as of the beginning of the period during which this subsection is in effect) at the rate set forth by such Act.
>
> (b) Appropriations made by subsection (a) shall cease to be available--
>
>   (1) during any period in which a District of Columbia continuing resolution for fiscal year 2015 is in effect; or
>
>   (2) upon the enactment into law of the regular District of Columbia appropriation bill for fiscal year 2015.
>
>   (c) An appropriation made by subsection (a) is provided under the authority and conditions as provided under this Act and shall be available to the extent and in the manner that would be provided by this Act.

that both section 446 of the Home Rule Act (D.C. Official Code § 1-204.46) and the federal Anti-Deficiency Act shall continue to apply to local funds and require congressional appropriations. This legislation makes clear that Congress views the Act as having no legal force or effect. I share that legal conclusion, for the reasons explained above.

## III.   Conclusion

Given the Act's patent invalidity, I recommend that you decline to implement it and recommend that you advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary. Implementation of the Act would violate multiple provisions of the Home Rule Act, the federal Anti-Deficiency Act, and the Budget and Accounting Act. It could also expose District employees to administrative and criminal penalties. Further, it would be in the District's interests for you to urge the Council to comply with the budget process defined in the version of the Home Rule Act that continues to be in effect – the one Congress enacted prior to the Act's applicability date – and to advise the Council that Executive Branch officials have no intention of abiding by the Act's void and ineffective provisions. Only Congress can provide autonomy to the District government for the processes of forming the District budget. As you and others have repeatedly urged, Congress should do so. When Congress does so through appropriate legislation, budget autonomy will be achieved. Until it has done so, the Council and the citizenry of the District have no authority to take this power from the Congress.

For the foregoing reasons, it is the opinion of this Office that the Local Budget Autonomy Act of 2012 is null and void and should not be implemented by District government officials or employees.

Sincerely,

Irvin B. Nathan
Attorney General
for the District of Columbia

---

(d) An appropriation made by subsection (a) shall cover all obligations or expenditures incurred for such project or activity during the portion of fiscal year 2015 for which this section applies to such project or activity.

(e) This section shall not apply to a project or activity during any period of fiscal year 2015 if any other provision of law (other than an authorization of appropriations)--

(1) makes an appropriation, makes funds available, or grants authority for such project or activity to continue for such period, or

(2) specifically provides that no appropriation shall be made, no funds shall be made available, or no authority shall be granted for such project or activity to continue for such period.

(f) Nothing in this section shall be construed to effect obligations of the government of the District of Columbia mandated by other law.

9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNCIL OF THE DISTRICT OF COLUMBIA,<br><br>           Plaintiff,<br><br>   v.<br><br>VINCENT C. GRAY, in his official capacity as Mayor of the District of Columbia,<br><br>    and<br><br>JEFFREY S. DeWITT, in his official capacity as Chief Financial Officer for the District of Columbia,<br><br>       Defendants. | No. 1:14-cv-00655-EGS |

## DECLARATION OF V. DAVID ZVENYACH

I, V. David Zvenyach, based on my personal knowledge, declare as follows:

1.      I am General Counsel for the Council of the District of Columbia.

2.      I make the following statements based on my personal knowledge, and could and would competently testify thereto.

3.      Attached to this Declaration as Exhibit A is a true and correct copy of the January 4, 2013, Letter from Irvin B. Nathan, Attorney General, District of Columbia, to Kenneth J. McGhie, General Counsel, District of Columbia Board of Elections.

4.      Attached to this Declaration as Exhibit B is a true and correct copy of the April 8, 2014, Opinion Letter from Irvin B. Nathan, Attorney General, District of Columbia, to Vincent C. Gray, Mayor, District of Columbia.

1

5.      Attached to this Declaration as Exhibit C is a true and correct copy of the April 11, 2014, Letter from Vincent C. Gray, Mayor, District of Columbia, to Phil Mendelson, Chairman, Council of the District of Columbia.

6.      Attached to this Declaration as Exhibit D is a true and correct copy of the April 11, 2014, Letter from Jeffrey S. DeWitt, Chief Financial Officer, District of Columbia, to Phil Mendelson, Chairman, Council of the District of Columbia.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 24, 2014 in Washington, D.C.

By: _____
V. David Zvenyach

2

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
OFFICE OF THE ATTORNEY GENERAL



January 4, 2013

**Via Hand Delivery and Email**

Kenneth J. McGhie, Esq.
General Counsel
District of Columbia Board of Elections
441 4th Street, N.W., Suite 250
Washington, D.C. 20001

Dear Mr. McGhie:

Thank you for your letter providing the Notice of Public Hearing relating to the formulation of ballot language for the proposed Charter amendment, the "Local Budget Autonomy Emergency Amendment Act of 2012" (amendment), and inviting the Office of the Attorney General (OAG) to comment on the proposed amendment.

Since the amendment was introduced in the Council, the OAG, including experienced career lawyers, has evaluated its legal strengths and weaknesses, as well as its potential consequences. The amendment is as a matter of policy appealing in that it attempts to secure budget autonomy for the District, allowing the District government to control its expenditure of locally collected revenues, a goal that this Administration has pursued and continues to pursue in Congress, and that this office fully endorses. However, I respond to your notice not as a spokesman for the Administration, but as an independent Attorney General charged with the responsibility of attempting to ensure that the District adheres to the rule of law, including complying with the provisions of the Home Rule Act, passed by Congress, that serve as the equivalent of the District's state-level Constitution.

In that capacity, the OAG has serious reservations about the legality of the amendment, whether it would be sustained if challenged in court and, most pertinently, whether the Board has the authority to place this amendment on a ballot referendum in light of the clear prohibition under Section 303(d) of the District of Columbia Home Rule Act ("Home Rule Act"), approved December 24, 1973, 87 Stat. 790, Pub. L. 93-198, D.C. Code § 1-203.03(d) (2012 Supp.). That provision of governing law provides in relevant part that "the [Charter] amending procedure ... may not be used to enact any law or affect any law with respect to which the Council may not enact... under the limitations specified in §§ 1-206.01 to 1-206.03." (Emphasis added). The statute is phrased in clear, mandatory terms: a proposed amendment is precluded by law from

---

441 Fourth Street, NW, Suite 1100S, Washington, D.C. 20001, (202) 727-3400, Fax (202) 741-0580

Kenneth J. McGhie, Esq.
January 4, 2013
Page 2

going on the ballot through the Charter-amending procedure of Section 303 if the proposed amendment would "enact any law or affect any law with respect to which the Council may not enact… under the limitations specified in" Sections 206.01-03. For reasons we detail below, it is precisely these limitations, reserving to Congress, among other things, the authority to change the laws governing the role played by Congress and the President in the District's budget that, in the considered judgment of this office, preclude using the charter amendment procedures, including the placement on a ballot for the electorate, for the proposed amendment. Likewise, it our view that under those express limitations, Congress or a court reviewing the merits of the legal issue would find the amendment to be outside the scope of the Charter amending process in section 303, and also contrary to other federal laws, those found in Title 31 of the U.S. Code.

I understand that the Board does not usually make such an analysis when the proposed amendment results from Council action. However, the very statutory provision that empowers the Board to participate in the Charter amending procedure, D.C. Code § 1-203.03, contains the express limits of subpart (d), and my lawyers and I think it clear that the Board has such authority under the law to engage in independent review as to whether subpart (d) permits use of the Charter-amending process.[1] For these reasons, I respectfully suggest that the Board of Elections has the legal obligation to make an independent assessment of whether it would be lawful under D.C. Code Section 203.03(d) for the Board to use the Charter-amending process for the amendment, and to act accordingly after that review to ensure compliance with Section 203.03(d).

## Discussion

The amendment, if it became law, would be a seachange in the District's budget process in two key ways. First, it would authorize a separate path for the appropriation of the District's local budget -- *i.e.*, revenues raised from District taxes, fees, and fines and those received under federal grant programs applicable nationally -- from the path for the federal portion -- *i.e.*, the federal payment to the District. The federal portion would continue to follow the path currently set forth in the District's Charter -- passed by Congress through its well-established authority to regulate District affairs under Article I of the U.S. Constitution -- that requires an affirmative appropriation by Congress and Presidential approval before any of it can be lawfully spent by the District Government. However, for the local portion, the rules would change. Rather than requiring an active, congressional appropriation and Presidential signature, the local portion would take effect after being passed by District lawmakers and then laying before Congress for *passive* review during the 30 legislative day period unless Congress passes, and the President approves, a Joint Resolution disapproving the act of the Council. Second, it would provide for a change in the dates of the fiscal year for the District of Columbia Government -- from its current schedule, October 1-September 30, which currently tracks the schedule of the federal budget, to run from July 1 through June 30 on its own track independent of the established federal schedule and process.

---

[1] It may be that such review has not been necessary in the past because the Council-proposed amendments have not previously raised the clear specter of violating subsection (d).

Kenneth J. McGhie, Esq.
January 4, 2013
Page 3

Rather than waiting for Congress to make the requested (and in our view highly justified) relevant amendments to the Home Rule Act, the Council has attempted to rely on the Charter amendment process in section 303 in the Home Rule Act (D.C. Code § 1-203.03) to accomplish the goal of budget autonomy. Section 303(a) provides that, with important exceptions, that the Charter "may be amended by an act passed by the Council and ratified by a majority of the registered qualified electors of the District voting in the referendum held for such ratification." Such an amendment must be submitted to Congress for a 35-calendar-day period of passive review.

Although the Charter amendment process is available to make a variety of changes to the District Charter, Section 303 itself indicates that it cannot be used to exempt the expenditure of local funds from the federal appropriations process. As noted, Section 303(d), codified in D.C. Code § 1-203.03(d), specifically provides that the amendment procedure authorized under section 303(a) "may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603." These are the provisions codified in Sections 1-206.01 through 1-206.03.[2] Sections 602 and 603 of the Home Rule Act (D.C. Code §§ 1-206.02 and 1-206.03) contain three different, independent bases for concluding that the ratification procedure established under section 303(a) may not be used to amend sections 441 and 446 of the Home Rule Act (D.C. Code §§ 1-204.41 and 1-204.46) in the manner reflected in the amendment, and thus does not permit the amendment. Read together, these provisions demonstrate that Congress, in passing the Home Rule Act and allowing the District to make certain amendments to it, evidenced its intent that the District not be allowed to unilaterally deprive the Congress or the President of their established active roles in appropriating the funds for the District's budget.

First, Section 602(a)(3) of the Home Rule Act, codified at D.C. Code § 1-206(3), provides that the Council has no authority to "enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." Removing the expenditure of local funds from the federal appropriations process would affect the functions of the United States by preventing Congress, with Presidential approval, from appropriating local District funds. It would also have an application beyond District matters by limiting the participation of the federal government in the District's budget process. In addition, changing the District's fiscal year would affect the functions of the United States and extend beyond the District's local affairs

---

[2] There are some sections of the Charter identified in Section 303(a) of the HRA by section number that Congress provided separate and explicit restrictions on: 401(a) (addressing the establishment of the Council), 421(a) (addressing the Mayor), and Part C (addressing the Judiciary). Some have suggested that since portions of the Charter dealing with the budget -- sections 441 and 446 -- are not listed there, Congress must not have objected to their being amended through the referendum process. This approach is not persuasive and fails to recognize that Congress created a separate and specific set of prohibitions in Section 303(d), which governs the analysis here, as discussed.

Kenneth J. McGhie, Esq.
January 4, 2013
Page 4

by making it difficult, if not impossible, for Congress to review the District's finances during its
regular budget cycle.

Second, the amendment would violate section 603(a) of the Home Rule Act (D.C. Official Code
§ 1-206.03(a)). This section states that:

> Nothing in this act shall be construed as making any change in existing law,
> regulation, or basic procedure and practice relating to the respective roles of the
> Congress, the President, the federal Office of Management and Budget, and the
> Comptroller General of the United States in the preparation, review, submission,
> examination, authorization, and appropriation of the total budget of the District of
> Columbia government.

We think it plain that this language is a "limitation" under Section 303(d). Some have argued
that Section 603(a) is merely a rule of construction and not a limitation. However, this
interpretation is contrary to a common-sense reading of these provisions as limitations on the
District Government's authority under the Home Rule Act. The conclusion that Congress did
not intend such a strict reading of the word "limitations" is supported by Congress's explicit
reference in § 303(d) to "limitations" found in § 601, D.C. Code § 1-206.01, which contains in it
no express limitation on the Council. Congress would not have done so if it meant in § 303(d) to
refer only to provisions that are explicitly phrased as "thou shall not." Further, the HRA's
legislative history shows that Congress intended to preserve the congressional appropriation
process for the District's budget. For example, the Conference Report explained that the bill
"required . . . that the Council after public hearings, approve a balanced budget and submit same
to the President for transmission to the Congress, leaving Congressional appropriations and
reprogramming procedures as presently existing. . . . .The Conference substitute . . . adopts
essentially the House provisions, preserving the Congressional appropriations provisions of
existing law.. . . ." H.R. Rep. No. 93-703, 93d Cong., 1st Sess. 78 (1973). Our lawyers have
looked for and have uncovered no indication in the HRA's legislative history that any member of
Congress *ever* contemplated that the Charter-amending procedures could be used to affect
Congress's appropriation of the total budget of the District Government. This matters because
changing the approval route for over half of the District budget is something significant enough
that Congress would likely have mentioned it if this was authority it intended to confer.

This limitation in Section 603(a) would be violated by the amendment. The amendment's
changes to sections 441 and 446 of the Home Rule Act would change the long-standing roles and
procedures of the stated federal entities with respect to the District's "total budget."[3] Upon

---

[3] The "total budget" includes amounts derived from local taxes and fees and federal grants and
payments. The Home Rule Act defines "budget" to mean "the entire request for appropriations
and loan or spending authority for all activities of all agencies of the District financed from all
existing or proposed resources and shall include both operating and capital expenditures."
Section 103(15) of the Home Rule Act (D.C. Official Code § 1-201.03(15).

Kenneth J. McGhie, Esq.
January 4, 2013
Page 5

enactment, rather than being subject to the federal appropriations process, the District would establish its own budget for local funds, to be appropriated according to a different fiscal year, subject only to passive Congressional review. This would constitute a major change in the District's budget process that appears to directly contradict the prohibition in section 603(a).

Third and finally, section 603(e) of the Home Rule Act (D.C. Official Code § 1-206.03(e)) also may prohibit the use of the ratification process to accomplish the amendment's objectives. Section 603(e) states that "[n]othing in this act shall be construed as affecting the applicability to the District government of the provisions of §§ 1341, 1342, and 1349 to 1351 and subchapter II of Chapter 15 of Title 31, United States Code." For reasons similar to the discussion for 603(a), we think it clear that this provision is a "limitation" for subsection (d) purposes. And, upon consideration, we conclude that these federal provisions, which comprise the relevant provisions of the federal Anti-Deficiency Act, prohibit government employees, under pain of federal criminal penalties, from, among other things, obligating or expending funds in excess or in advance of an appropriation by Congress. The federal Anti-Deficiency Act is the principal mechanism the federal government uses to ensure District and federal agency compliance with federal appropriations law. Congress' inclusion of this provision in the Home Rule Act, and in the list of subject matters that are excluded from the ratification process, reflects Congress's intent that District spending be subject to the federal budget process.

We note also that in addition to potentially violating the provisions of the Home Rule Act, as discussed above, the amendment may also be viewed as separately violating two provisions of Title 31 of the U.S. Code – (i) the anti-deficiency Act and (ii) the provisions in 31 U.S.C. § 1101, *et seq.* governing the budget approval process.

The federal Anti-Deficiency Act  independently applies to the District by its own terms. *See* 31 U.S.C. § 1341. This section prohibits District government employees from obligating or expending funds that have not been congressionally appropriated.[4] Even if sections 441 and 446 of the Home Rule Act were amended to exclude local funds from the appropriations requirement, the federal Anti-Deficiency Act would still apply. Thus, a court could find that District employees are subject to federal prosecution or civil liability under the Anti-Deficiency Act for spending money in the course of their regular duties.

The amendment would also violate Subtitle II of Title 31 of the United States Code, 31 U.S.C. § 1101 *et seq.*, which sets out the procedures for the approval of the budgets of all agencies, which, under 31 U.S.C. § 1101(1), includes the District government. Under 31 U.S.C. § 1108, each agency, including the District, must submit appropriations requests by the date established by the President, in order to allow these requests to be included in the President's annual budget

---

[4] It is not persuasive to argue that an appropriation by the Council would be sufficient to satisfy the federal Anti-Deficiency Act. Under federal law, the District is considered a federal agency for budget purposes, and federal appropriations law, including the federal appropriations process and the enforcement provisions contained in the Anti-Deficiency Act, apply to it. 31 U.S.C. § 1101(1).

Kenneth J. McGhie, Esq.
January 4, 2013
Page 6

submission to Congress. If the District were to fail to comply with these requirements, it is unlikely that the amendment would be found sufficient to justify these deviations from federal law.

## Conclusion

For the reasons discussed, we respectfully submit that the Board should make an independent legal assessment to determine whether it is lawful to permit the proposed amendment to be placed on the ballot under D.C. Code § 1-203.03(d), and to consider the detailed analysis we have provided showing why that provision of law bars the use of the Charter-amending procedure for the amendment transmitted to the Board by the Council.

In the alternative, if the Board decides to forego an independent legal analysis or otherwise concludes that it may lawfully place the amendment on the ballot, we suggest that to convey accurately the substance and effect of the proposed amendment to the voters, the summary statement must do more than simply state that, if the voters approve the amendment and it is not rejected by Congress, it will allow the District to appropriate its local budget and change the date of its fiscal year from October 1 – September 30 to July 1 – June 30. It should also convey that, because serious legal concerns have been raised about the validity of the amendment, its passage could result in Congressional action disapproving the amendment or in extended litigation and uncertainty about the validity of the District's budget, and could jeopardize the legal status of individual employees of the District government who expend locally raised government funds in accordance with the amendment but without Congressional authorization.

I hope these comments are useful to you and the Board's Commissioners. I intend to attend and testify at the Board's open hearing on the amendment scheduled for Monday, January 7, and my staff and I would be happy to discuss this matter further with you at your convenience.

Sincerely,

Irvin B. Nathan
Attorney General for the District of Columbia

cc: All Members of the Council of the District of Columbia

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
## OFFICE OF THE ATTORNEY GENERAL



**ATTORNEY GENERAL**

April 8, 2014

## OPINION OF THE ATTORNEY GENERAL

**SUBJECT**: Whether the Local Budget Autonomy Act of 2012 is Legally Valid

The Honorable Vincent C. Gray
Mayor of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Dear Mayor Gray:

This opinion is issued pursuant to Reorganization Order 50 of 1953, as amended[1] and addresses your request for the legal advice of this office about the validity of the Local Budget Autonomy Act of 2012 ("Act"), effective July 25, 2013, D.C. Law 19-321, 60 DCR 1724, passed by the Council of the District of Columbia and ratified by District of Columbia voters last year.

The Act is appealing as a matter of policy in that it attempts to secure budget autonomy for the District, allowing the District government to control its expenditure of locally collected revenues, a policy goal that I wholeheartedly endorse, and a goal that this Administration, members of the Council, and supportive members of Congress have pursued and continue to pursue in Congress.

However, based on the analysis by career professionals in this Office and my review of relevant legal authorities, I have reluctantly concluded that the Act is a nullity, with no legal force or effect and that adhering to it could put officials and employees of the District government in

---

[1] Reorganization Order 50, Part II, effective June 26, 1953, as amended. Pursuant to Reorganization Order 50, Opinions of the Attorney General operate as the "guiding statement of the law" in the District's Executive branch. *U.S. Parole Comm'n v. Noble*, 693 A.2d 1084, 1099 (D.C. 1997). As an opinion of the Attorney General, it must be followed by all District officers and employees in the performance of their official duties" until overruled by a controlling court decision," or as to local matters not controlled by the United States Constitution or federal law by a specific action of the Mayor or by an Act of the Council within their respective authority. See Reorganization Order 50, Part II.

legal jeopardy and risk adverse consequences from the Congress. Although we arrived at this conclusion independently, I note that this legal conclusion was also reached by the arm of Congress charged with interpreting such issues -- the Government Accountability Office -- whose extensive analysis is set forth in GAO Decision B-324987 (January 30, 2014).

Because this Act has no legal force or effect, it would be illegal for the District to establish or implement a budget that is based on the Act and that ignores the continuing need for congressional appropriation of local funds in the District's budget process. Moreover, it would be unlawful for District officers or employees to make or authorize expenditures that Congress has not approved. Doing so could expose these individuals to administrative and/or criminal penalties under the federal Anti-Deficiency Act. For the reasons detailed below, the Act is not valid, and, absent a binding judicial ruling to the contrary, it should not be enforced or followed by any official of this government.

## I. The Act is null and void because the Council exceeded its authority in enacting it and because it violates federal law.

The Act purports to amend section 446 of the Home Rule Act (D.C. Official Code § 1-204.46)[2] to exempt the District's budget process for local funds from the congressional appropriations requirements established under Article I, section 9, clause 7 of the United States Constitution.[3] Section 446 of the Home Rule Act applies these appropriations requirements to the District by setting out the process the District must follow to obtain Congressional approval of its budget and by stating that, with limited exceptions, "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by an Act of Congress and then only according to such Act." The Act also purports to amend section 441 of the Home Rule Act[4] to allow the Council to change the District's fiscal year.

In the absence of congressional legislation establishing budget autonomy for the District, the Council attempted to make these changes using a local Charter amendment process Congress authorized in section 303 in the Home Rule Act (D.C. Official Code § 1-203.03). Section 303 sets out a procedure that relies on Council action and voter ratification to approve changes to the District Charter.[5] Section 303(a) provides that, with limited but pertinent exceptions, the Charter "may be amended by an act passed by the Council and ratified by a majority of the registered qualified electors of the District voting in the referendum held for such ratification." Such an amendment must be submitted to Congress for a 35-calendar-day period of passive review.

---

[2] District of Columbia Home Rule Act, approved December 24, 1973, 87 Stat. 798, Pub. L. 93-198, D.C. Official Code § 1-204.46 (2012 Repl.) ("Home Rule Act").

[3] This clause provides that "[n]o Money shall be drawn from the Treasury but in Consequence of Appropriations made by Law...."

[4] D.C. Official Code § 1-204.41 (2012 Repl.).

[5] The Charter is contained in title IV of the Home Rule Act.

The Council's use of the section 303 Charter amendment process to take the District's local funds budget out of federal control was ineffective because it violated several statutory restrictions on this process. Section 303(d) provides that section 303(a)'s amendment procedure "may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603." The Act violates three different limitations that are specified in Sections 602 and 603 of the Home Rule Act (D.C. Official Code §§ 1-206.02 and 1-206.03). Each of these three limitations independently renders the Act invalid.

## A.    The Act violates the limitations of Section 602(a)(3) because it changes the functions of the United States and because it is not restricted in its application exclusively in or to the District.

Section 602(a)(3) of the Home Rule Act provides that the Council has no authority to "enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." The Act violates both the "functions or property of the United States" and the "restricted in its application exclusively in or to the District" provisions of this Home Rule Act limitation.

Removing the expenditure of local funds from the federal appropriations process would affect a sea change in the "functions . . . of the United States" in the formation of the District's budget, in several ways. It would no longer give Congress, with Presidential approval, the sole right to appropriate local District funds. It would alter the functions of the federal Office of Management and Budget and the U.S. Comptroller General in the District's budget process, converting their review from active to passive with respect to the local budget. In addition, by allowing a change in the District's fiscal year, it would make it difficult, if not impossible, for Congress to review the District's finances during its regular budget cycle. This result would affect the functions of the United States and extend beyond the District's local affairs.

Further, the Act would effectively amend at least two federal laws that are not restricted in their application exclusively in or to the District. First, the federal Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1349 to 1351 and subchapter II of Chapter 15, prohibits federal and District government employees, under threat of federal criminal and administrative penalties, from, among other things, obligating or expending funds in excess or in advance of an appropriation.[6] The federal Anti-Deficiency Act is the principal mechanism the federal government uses to ensure that the District and the federal agencies comply with federal appropriations law. Removing the District's local funds budget from the federal appropriations process would effectively amend this law by exempting District transactions involving local funds from its scope.

---

[6] The federal Anti-Deficiency Act applies to the District by its own terms and through section 603(e) of the Home Rule Act (D.C. Official Code 1-603.03(e)), which states that "[n]othing in this act shall be construed as affecting the applicability to the District government of the provisions of §§ 1341, 1342, and 1349 to 1351 and subchapter II of Chapter 15 of Title 31, United States Code."

3

Second, the Act would exclude the District's local funds budget from the Budget and Accounting Act, 31 U.S.C. § 1108, which requires the Mayor and the federal agencies to submit their annual budget proposals to the President. In *McConnell v. United States,* 537 A.2d 211 (D.C. 1988), the District of Columbia Court of Appeals held that section 602(a)(3) prevents District voters from narrowing the applicability of national legislation to exclude the District. *See also Brizill v. D.C. Board of Elections and Ethics*, 911 A.2d 1212 (D.C. 2006) (District Government could not amend or repeal a federal law which barred gambling devices in certain enumerated jurisdictions, including the District). The Act's attempt partially to remove the District from the applicability of these two federal laws was therefore ineffective.

## B. The Act violates the limitations of Section 603(a) because it changes the long-standing roles and procedures of Congress, the President, and other federal entities in the formation of the District's total budget.

The Act violates section 603(a) of the Home Rule Act (D.C. Official Code § 1-206.03(a)), which states that:

> Nothing in this act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

There is no question that the Act's amendment of sections 441 and 446 of the Home Rule Act would change the long-standing roles and procedures of the stated federal entities with respect to the District's "total budget."[7] Rather than being subject to the federal appropriations process, the District would establish its own budget for local funds, to be authorized according to a potentially different fiscal year, subject only to passive Congressional review. This would constitute a significant change in District's budget process that would directly contradict the prohibition in section 603(a). This latter provision, through section 303(d), expressly precludes the use of the Charter amending process to accomplish this result.

## C. The Act violates the limitations of Section 603(e) by using the ratification process to establish local budget autonomy.

Section 603(e) of the Home Rule Act (D.C. Official Code § 1-206.03(e)) prohibits the use of the ratification process to establish local budget autonomy. As noted above, section 603(e) states that nothing in the Home Rule Act shall be construed as affecting the applicability of the federal Anti-Deficiency Act to the District government. The Act directly violates this requirement by purporting to authorize District officials and employees to spend local funds, without a

---

[7] The "total budget" includes amounts derived from local taxes and fees and federal grants and payments. The Home Rule Act defines "budget" to mean "the entire request for appropriations and loan or spending authority for all activities of all agencies of the District financed from all existing or proposed resources and shall include both operating and capital expenditures." Home Rule Act, § 103(15) (D.C. Official Code § 1-201.03(15) (2012 Repl.)).

4

congressional appropriation, based on the Council's approval of budget legislation. It is difficult to imagine an amendment to the Charter that would more directly contradict section 603(e) of the Home Rule Act. The Act removes local District funds from the requirements of the federal Anti-Deficiency Act, thereby violating the Home Rule Act itself, and the Anti-Deficiency Act's direct statement that its requirements apply to the District.

Even if the Council's use of the ratification process to adopt the Act were not expressly prohibited by three separate provisions of the Home Rule Act, it would still be defective under the federal laws discussed above. The federal Anti-Deficiency Act continues to apply to District government expenditures, and District employees would act at their peril if they authorized or spent funds made available only through the Council's local budget. The Mayor would still be bound under the Budget and Accounting Act to provide the District's total budget to the President for submission to Congress. The Mayor's failure to do so would place the District out of compliance with this federal requirement. Further, the fact that these federal statutes independently apply to the District further supports the conclusion that Congress intended its control over the District's budget, as expressed in the Home Rule Act, to remain intact.

As noted, the U.S. Government Accountability Office ("GAO") agrees that the Act is without legal force or effect. In a detailed, authoritative opinion dated January 30, 2014, GAO concludes that the Act violates the federal Anti-Deficiency Act and the Budget and Accounting Act, both of which require that the District's budget be federally appropriated.[8] GAO also agrees that, because these federal statutes apply beyond the District, section 602(a)(3) of the Home Rule Act prohibits the District from using the Charter amending process in section 303 of the Home Rule Act to change them. GAO notes that, in enacting the Home Rule Act, Congress rejected a Senate proposal to allow the Council to adopt the District budget, in favor of the current version, which maintains the then-existing system of requiring a federal appropriation.[9] Describing this

---

[8] This opinion was requested by the Hon. Ander Crenshaw, Chairman, Subcommittee on Financial Services and General Government, Committee on Appropriations, U.S. House of Representatives. It concludes that the "portions of the [Act] that purport to change the federal government's role in the District's budget process are without legal force or effect." GAO Decision B-324987 (January 30, 2014).

[9] H.R. Rep. No. 93-703 confirms that Congress intended to leave all congressional appropriation procedures in place:

> The Senate bill provided that the Mayor submit a budget to the Council in such form as he might determine, that the Council might adopt a line-item budget, and that the Mayor might transfer funds from one account to another with Council approval.

> The House Amendment required the Mayor to prepare a balanced budget for submission to the Council and to the Congress, to consist of 7 specified documents; and that the Council after public hearings, approve a balanced budget and submit same to the President for transmission to the Congress, *leaving Congressional appropriations and reprogramming procedures as presently existing.*

> The Conference substitute (sections 442-451, 603, 723, 743) adopts essentially the House provisions, *preserving the Congressional appropriations provisions of existing law.* Amendments are included to clarify procedural requirements as to the submission of the budget to the Council by the Mayor; the time for the Council to review the budget; the authority of the Mayor for line-item veto of budget proposals, with two-thirds of the Council required to override; and transmittal of the budget to the President for review and submission to the Congress . . . .

language, GAO noted that it "[could] think of no more specific manner for Congress to specify in the Home Rule Act that Congress would retain a firm hand in the District's budget process." GAO therefore concluded, correctly in my view, that because the Act was *ultra vires*, it was void *ab initio* and of no legal force or effect.

## II.    The legal arguments advanced in support of the Act are unpersuasive.

Despite the Act's patent illegality under the Home Rule Act and other federal laws, several arguments have been advanced in its support. These arguments, put forward by lawyers for either the Council or for political activists in support of the Act, draw on the language of section 303(d) of the Home Rule Act, which prohibits use of the Charter amending process for laws prohibited "under the limitations specified in sections 601, 602, and 603." They assert that section 603(a) of the Home Rule Act does not prohibit use of the Charter amending process to change the District's budget process because it is not phrased as a limitation on the Council's authority. Claiming that section 603(a) merely provides direction on how the original version of the Home Rule Act should be interpreted, they maintain that this language does not "limit" the District's future ability to amend the Charter's budget requirements without obtaining federal legislation. This is no more than a play on words that ignores both the obvious intent of Congress and the likely reaction of a court called upon to interpret the congressional language.

In addition, it has been argued that the Act violates neither the federal Anti-Deficiency Act itself, nor section 603(e) of the Home Rule Act, which requires its continuing application to the District. These arguments claim that the federal Anti-Deficiency Act applies to the District only through section 446 of the Home Rule Act, which places District spending under the control of Congress. Further, they claim that like section 603(a) of the Home Rule Act, section 603(e) is an interpretive direction on how the original Home Rule Act should be construed, rather than a limitation on the District's authority to amend it. Still further, these arguments assert that, because the Act takes the District's local funds budget out from under active congressional control, the Act implicitly modifies the federal Anti-Deficiency Act's requirement that *Congress* must appropriate funds to support District approved obligations and expenditures. Finally, these arguments maintain that Congress, in authorizing the District to spend excess revenue not included in the appropriated budget, confirmed that the District may expend unappropriated local funds without reference to the federal Anti-Deficiency Act.[10] From this, it is argued that the

---

H.R. Rep. No. 93-703, 93d Cong., 1st Sess. 78 (1973) (emphasis added), *reprinted in* Staff of the House Comm. on the District of Columbia, 93d Cong., 1st Sess., Legislative History of the District of Columbia Self-Government and Governmental Reorganization Act at 3016 (Comm. Print 1974).

[10] The permanent version of this legislation is codified at D.C. Official Code § 47-369.02 (2013 Supp.), which states, in relevant part, that :

(a)  Beginning in fiscal year 2009 and each fiscal year thereafter, consistent with revenue collections, the amount appropriated as District of Columbia Funds may be increased –

(1) by an aggregate amount of not more than 25 percent, in the case of amounts proposed to be allocated as "Other-Type Funds" in the annual Proposed Budget and Financial Plan submitted to Congress by the District of Columbia; and

(2) by an aggregate amount of not more than 6 percent, in the case of any other amounts proposed to be allocated in such Proposed Budget and Financial Plan.

6

District's compliance with Council allocations, in the absence of a federal appropriation, would not constitute an Anti-Deficiency Act violation.

The main defect in these arguments is that they badly misread section 303(a). Congress made its intent to maintain control over the District's finances clear in section 303 of the Home Rule Act, by expressly excluding changes to its role in appropriating District funds from the Charter amending process. Congress further expressed this intent by continuing to include the District in the Budget and Accounting Act and by making the federal Anti-Deficiency Act expressly applicable to District expenditures. As GAO notes in its opinion, under section 602(a)(3) of the Home Rule Act, the Council has no authority to enact legislation or amend its Charter in a manner that changes the applicability of a law that is not confined exclusively to the District. The arguments supporting the Act fail adequately to address this restriction. They blithely maintain that, in spite of the Home Rule Act and *McConnell*, *supra*, the District is entitled to a specially tailored application of two more generally applicable federal laws.[11] Notably, no legislative history has been cited to support this surprising result. The absence of such support, as well as the history of the District over the last 40 years since the enactment of the Home Rule Act, suggests that this is not the outcome Congress contemplated. Common sense reinforces the point: if Congress intended to delegate to the Council or voters of the District of Columbia the authority to unilaterally convert the role of the President and Congress in the formation of the District's budget, it can reasonably be expected that Congress would have given some indication of its intent to permit such a significant change in the federal role through local legislation. It did not give any such indication.[12] Nor did any Council or Mayor over the last 40 years believe the District government had such authority.

Further, arguments in favor of the Act miss the point when they observe that Congress authorized the District to spend excess revenues when it enacted D.C. Official Code § 47-369.02 (2012 Repl.). Rather than empowering the District to spend unappropriated local funds for all purposes notwithstanding the Anti-Deficiency Act, Congress authorized the expenditure of the specified revenues under certain expressly stated conditions. There is no question that Congress can approve federal and District spending that is at odds with federal appropriations requirements, and thus create an exception to the Anti-Deficiency Act. The Anti-Deficiency Act is merely another part of the federal law governing the budget process. In fact, Congress could clearly under its Article I authority amend both the Home Rule Act and the Anti-Deficiency Act to provide the District with full budget autonomy over local funds. Indeed, Congress may well eventually do so, as it has recently been requested to do by President Obama. Congress has not

---

It then goes on to specify the conditions associated with their expenditure.

[11] GAO responds persuasively to this position by noting that "the applicability of the Antideficiency Act to the District, both by its very terms and by the terms of the Home Rule Act, 'reflects Congress' decision . . . to expressly limit District spending to amounts *Congress* appropriates." (emphasis in original) (quoting GAO Decision B-262069).

[12] *See In Re Crawley*, 978 A.2d 608, 617 (D.C. 2009) ("Judges, as well as detectives, may take into consideration that a watchdog did not bark in the night") (quoting *Harrison v. PPG Indust., Inc.*, 446 U.S. 578, 602 (1980) (Rehnquist, J., dissenting)).

7

done so *yet*, however, and the Council may not arrogate to itself authority over portions of the District's budget process that Congress, in the Home Rule Act, clearly specified would remain firmly within congressional control.

Congress' own actions with respect to the Act since its effective date are further evidence of Congress' view of the Act's invalidity and its intention not to allow the District to have budget autonomy. Although Congress did not enact a joint resolution disapproving the Act according to section 303(a) of the Home Rule Act, congressional inaction is importantly different from affirmative approval.[13] A more likely interpretation of this inaction is that Congress found it unnecessary to disapprove the Act because it was so obviously beyond the scope of the Council's and the voters' authority. After the Act sat for passive review by Congress, the Financial Services and General Government Subcommittee of the U.S. House of Representatives' Committee on Appropriations expressly found the law to be no more than a non-binding expression of District residents' "opinion" that does not change the District's responsibility to submit to the federal appropriations process. Fiscal Year 2014 Financial Services and General Government Committee Report, p. 38.

Congress has also made it perfectly clear that it views its fiscal relationship with the District as unchanged since January 1, 2014, the Act's applicability date. On January 15, 2014, Congress enacted the Consolidated Appropriations Act, 2014, Pub. L. 113-76, in which it appropriated the District's entire Fiscal Year 2014 budget, including local funds. As part of the General Provisions applicable to the District, Congress also enacted section 816, a District government shutdown avoidance provision that authorizes the District to use local funds, as stated in the District's FY 2015 Budget Request Act, in the event that Congress fails to enact an appropriations act or continuing resolution for the District.[14] In doing so, it expressed its will

---

[13] *See, e.g., Springer v. Government of the Philippine Islands*, 277 U.S. 189, 209 (1928) ("The inference of an approval by Congress from its mere failure to act at best rests upon a weak foundation. And we think where the inference is sought to be applied, as here, to a case where the legislation is clearly void as in contravention of the Organic Act, it cannot reasonably be indulged. To justify the conclusion that Congress has consented to the violation of one of its own acts of such fundamental character will require something more than such inaction upon its part as really amounts to nothing more than a failure affirmatively to declare such violation by a formal act.").

[14] Section 816 reads as follows:

> Sec. 816. (a) During fiscal year 2015, during a period in which neither a District of Columbia continuing resolution or a regular District of Columbia appropriation bill is in effect, local funds are appropriated in the amount provided for any project or activity for which local funds are provided in the Fiscal Year 2015 Budget Request Act of 2014 as submitted to Congress (subject to any modifications enacted by the District of Columbia as of the beginning of the period during which this subsection is in effect) at the rate set forth by such Act.
>
> (b) Appropriations made by subsection (a) shall cease to be available--
>
>   (1) during any period in which a District of Columbia continuing resolution for fiscal year 2015 is in effect; or
>
>   (2) upon the enactment into law of the regular District of Columbia appropriation bill for fiscal year 2015.
>
>   (c) An appropriation made by subsection (a) is provided under the authority and conditions as provided under this Act and shall be available to the extent and in the manner that would be provided by this Act.

8

JA68

that both section 446 of the Home Rule Act (D.C. Official Code § 1-204.46) and the federal Anti-Deficiency Act shall continue to apply to local funds and require congressional appropriations. This legislation makes clear that Congress views the Act as having no legal force or effect. I share that legal conclusion, for the reasons explained above.

## III.   Conclusion

Given the Act's patent invalidity, I recommend that you decline to implement it and recommend that you advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary. Implementation of the Act would violate multiple provisions of the Home Rule Act, the federal Anti-Deficiency Act, and the Budget and Accounting Act. It could also expose District employees to administrative and criminal penalties. Further, it would be in the District's interests for you to urge the Council to comply with the budget process defined in the version of the Home Rule Act that continues to be in effect – the one Congress enacted prior to the Act's applicability date – and to advise the Council that Executive Branch officials have no intention of abiding by the Act's void and ineffective provisions. Only Congress can provide autonomy to the District government for the processes of forming the District budget. As you and others have repeatedly urged, Congress should do so. When Congress does so through appropriate legislation, budget autonomy will be achieved. Until it has done so, the Council and the citizenry of the District have no authority to take this power from the Congress.

For the foregoing reasons, it is the opinion of this Office that the Local Budget Autonomy Act of 2012 is null and void and should not be implemented by District government officials or employees.

Sincerely,

Irvin B. Nathan
Attorney General
for the District of Columbia

---

(d) An appropriation made by subsection (a) shall cover all obligations or expenditures incurred for such project or activity during the portion of fiscal year 2015 for which this section applies to such project or activity.

(e) This section shall not apply to a project or activity during any period of fiscal year 2015 if any other provision of law (other than an authorization of appropriations)--

   (1) makes an appropriation, makes funds available, or grants authority for such project or activity to continue for such period, or

   (2) specifically provides that no appropriation shall be made, no funds shall be made available, or no authority shall be granted for such project or activity to continue for such period.

(f) Nothing in this section shall be construed to effect obligations of the government of the District of Columbia mandated by other law.

9



**VINCENT C. GRAY**
MAYOR

April 11, 2014

The Honorable Phil Mendelson
Chairman
Council of the District of Columbia
John A. Wilson Building, Suite 504
1350 Pennsylvania Avenue, N.W.
Washington, DC 20004

Re:  Enactment of the Fiscal Year 2015 District Budget

Dear Chairman Mendelson:

I write to urge the Council to act on the FY 2015 budget submitted on April 3, 2014 within the
56 days set forth in the original Home Rule Charter, to return the budget within that time, and not
to base its actions or rely in any way in considering this budget on the Local Budget Autonomy
Act of 2012 (the Act), which purported to amend the Charter.  Failure to do so could have
serious and destabilizing consequences for the District of Columbia government.

As you know, I believe deeply that Congress should grant the District budget autonomy and
should do so as soon as possible.  Indeed, this Administration worked successfully to convince
President Obama to include such a proposal in his pending budget legislation, and we are doing
all we can to convince Congress of the wisdom and fairness of this proposal.

At the same time, I must take seriously my responsibility as Mayor of this great city to ensure
that the District government complies in all respects with the governing federal law, including in
connection with its budget and finances.  At my request, our D.C. Attorney General Irvin Nathan
has issued the enclosed formal opinion concluding that the Act is null and void as it patently
contravenes the Home Rule Act and provisions of Title 31 of the U.S. Code.  As explained in the
Attorney General's opinion, the Act if followed would interfere improperly with the
Constitutional and federal statutory roles of the Congress and President of the United States as
well as the Mayor in the budget and appropriations process for the District of Columbia, and
compliance with it could cause officials and employees of the District government to be in
violation of federal statutes that carry administrative as well as criminal penalties.  His opinion is
fully consistent with the written opinion issued by the U.S. Government Accountability Office
("GAO") on January 30, 2014.  The GAO concluded: "Provisions of the [Act] that attempt to
change the federal government's role in the District's budget process have no legal effect….The
District Government remains bound by provisions of federal law which require it to submit

budget estimates to the President for transmission to the Congress for the enactment of appropriations... Because acts taken *ultra vires* are, *ab initio*, legally ineffective, portions of the [Act] that purport to change the federal government's role in the District's budget process are <u>without legal force or effect</u>." (pp. 11-12, emphasis added.) I am not willing either to violate federal appropriations laws or to subject our employees to the risks of prosecution or administrative sanctions that would flow from the Council's implementation of the illegal Act.

The Act, if implemented, would purport effectively to cut the President and Mayor out of our respective roles pursuant to the Home Rule Act in transmitting to Congress the entire budget for the District – both the federal *and* local dollars portion of the budget.  The Act would also reduce the role of Congress in appropriating local revenue, which revenue approximates 70% of the D.C. budget.  The Act would call for the local portion of the annual budget to be submitted by the Chairman of the Council to the Speaker of the House of Representatives for passive review. But the Home Rule Act expressly calls for the full District's budget – both local and federal dollars – to be transmitted by the *Mayor* to the *President* for transmission by him to the Congress and for Congress then to appropriate the full D.C. Budget.  The Council cannot usurp the Mayor's long-established authority and responsibility to submit the full unified budget, nor can it unilaterally restructure the role in the budget process played by federal officials and Congress.

The Attorney General's legal opinion is binding on the Executive branch officials in the District government absent a controlling court opinion to the contrary.  Because, as the opinion concludes, the Act is a legal nullity, the Act can have no effect on the formation of the District's budget.  Further, monies voted on by the Council but not contained in a budget passed by both houses of Congress and signed by the President cannot be spent without exposing our employees to criminal or civil liability.

We must comply with federal law while we continue to push in Congress for budget autonomy, for which we now have support from the White House and within both houses of Congress.  In support of this request to the Council, consider some of the following possible adverse consequences if the Council adheres to the Act, in the absence of a governing judicial ruling of its validity, and ignores the provisions of the binding and valid Home Rule Charter.

If the Council follows its contemplated schedule and takes more than 56 days to consider the budget  pursuant to the Act, evidenced by a currently scheduled second vote on the FY 15 Budget Request Act 70 days from the budget's submission (*i.e.*, two weeks after the 56 day statutory deadline), it will be in violation of the Home Rule Act.  That violation will deprive my Office as well as the President and Congress of the ability to comply with applicable statutory responsibilities in the creation and enactment of the District's budget, a process set up four decades ago by Congress for the benefit of funding the District's operations and followed faithfully and scrupulously until this year.  If that happens, I intend to the best of my ability to continue to comply with the Home Rule Act's budget requirements.  Therefore, I intend to transmit to the Congress and President the full District budget as it stands after the 56th day following transmission to you of the budget, whether or not the Council has taken a second vote. A dispute as to whether or not this is the District's duly proposed budget could well lead either to the President's ignoring the elected officials of the District and transmitting  his own budget for the District to the Congress (31 U.S.C. § 1108(b)(1)) or even to Congress' declining to pass any significant budget for the District in FY 2015.

2

Second, if the District fails to enact a valid Budget Request Act and submit it to Congress for inclusion in a continuing resolution or appropriations act, there is also a serious risk that the District will not be able to avail itself of the protection afforded by section 816 of the Consolidated Appropriations Act, 2014. This crucial appropriations authority advanced to the District the funds contained in the FY 2015 Budget Request Act for periods during which no federal continuing resolution or appropriations act for the District is in effect. However, a condition included by Congress, presumably for the District's financial benefit, is that the District have a validly enacted budget. We have come too far to jeopardize our ability to keep the District functioning if the federal government shuts down again. I urge the Council to be responsible and enact a valid budget for the protection of the District. If the Council does not, it will put the District's finances in a highly precarious position.

There is even the possibility that if the District government does not come together to enact a valid budget, in accordance with the Home Rule Charter as passed by Congress, the Control Board could be reactivated. (D.C. Official Code § 47-392.09.) If because of the absence of Congressional appropriations, the District cannot lawfully make local expenditures in FY 2015, the District could once again become subject to governance by the Control Board. Such action occurs by operation of law if the District fails to meet its payroll for any pay period, fails to make any required payments relating to pensions and benefits or fails to make payments required under an interstate compact. (D.C. Official Code §§ 47-391.07 (b); 47-392.09)   That would be a disastrous outcome for Home Rule in the District and we should take steps to avoid it.

As you consider our urgent request, you should know of my intended actions in light of the Attorney General's opinion, and in consultation with the Chief Financial Officer. First, I will direct all subordinate agency District officials not to implement or take actions pursuant to the Act, which contravenes our Home Rule Charter and other federal law. Second, I will veto any FY 15 budget transmitted by the Council that is not inclusive of both the local and federal portions of the budget, as required under the Home Rule Act. Third, as noted, to achieve compliance to the extent I am able with the Home Rule Act, I will transmit to the Congress and President the full District budget as it stands after the 56th day following transmission to you of the budget, whether or not the Council has taken a second vote.

I would be pleased to meet with you and other appropriate Members of the Council to discuss these matters and to find solutions which will avoid the dire possible consequences of failing to reach agreement on the proper procedures for the FY 2015 budget process. As always, I appreciate a mutually respectful dialogue with you. Thank you for your prompt consideration of these matters.

Sincerely,

Vincent C. Gray
Mayor

3

Enclosure

cc:      Jeffrey S. DeWitt, Chief Financial Officer
         Irvin B. Nathan, Esq., Attorney General
         The Honorable David A. Catania
         The Honorable Vincent B. Orange, Sr.
         The Honorable David Grosso
         The Honorable Anita D. Bonds
         The Honorable Jim Graham
         The Honorable Jack Evans
         The Honorable Mary M. Cheh
         The Honorable Muriel Bowser
         The Honorable Kenyan McDuffie
         The Honorable Tommy Wells
         The Honorable Yvette M. Alexander
         The Honorable Marion Barry

4

GOVERNMENT OF THE DISTRICT OF COLUMBIA

OFFICE OF THE CHIEF FINANCIAL OFFICER



**Jeffrey S. DeWitt**
Chief Financial Officer

April 11, 2014

The Honorable Phil Mendelson
Chairman
Council of the District of Columbia
1350 Pennsylvania Avenue, NW, Suite 504
Washington, DC 20004

**Subject:    Local Budget Autonomy Act**

Dear Chairman Mendelson:

On several occasions, you and I have discussed the legal validity of the Local Budget Autonomy Act of 2012 (Act), which was approved by the voters of the District of Columbia (District) in April, 2012. As you know, the Act would change the District Home Rule Act by extending the deadline by which the Council of the District of Columbia (Council) must approve the District's annual budget. It also authorizes the Council to submit the local portion of the District's budget directly to the U.S. Congress, instead of to the Mayor who, if the Home Rule Act was not changed, is required to send the budget to the President of the United States for his transmittal to Congress. Like you and many others, I support the principle of budget autonomy for the District. I am also committed to following the rule of law in carrying out my duties as the District's Chief Financial Officer.

The Council's legal staff deemed the Act legally sufficient, as did opinions from private counsel for DC Appleseed. In addition, two Board members of the D.C. Board of Elections found that the Act was "not patently illegal." Conversely, the District's Attorney General, in his January 7, 2013 statement before the District Board of Elections, concluded that the Act violated our governing law, and he reiterated his conclusion in his formal Opinion of the Attorney General dated April 8, 2014. The General Counsel to the U.S. Government Accountability Office came to the same conclusion. Given the importance of this matter and the variety of legal opinions, I asked lawyers for the Office of the Chief Financial Officer (OCFO) to review the Act. After their independent and exhaustive review of relevant federal and local statutes, case law, legislative history and the competing viewpoints, OCFO lawyers have concluded that there is no legal validity to the Act.

John A. Wilson Building * 1350 Pennsylvania Avenue, NW * Suite 203 * Washington, DC 20004
Phone: (202) 727-2476 * Fax: (202) 727-1643 * www.cfo.dc.gov

**JA74**

*Letter to Chairman Mendelson – Budget Autonomy*
*April 11, 2014*
*Page 2*

Accordingly, I urge the Council to weigh the risks to both the District and its employees if the Council approves the District's Fiscal Year (FY) 2015 budget under the Act's provisions amending the Home Rule Act's appropriations procedures. I am very concerned that any budget approved in this manner will not be legal unless Congress decides to approve it or a court of competent jurisdiction sustains the Act's legal validity. Absent such actions, I will not make or authorize any payment pursuant to a budget that was approved in conformance with the Act. I will also direct OCFO employees not to certify contracts or make payments under this budget given the potential civil and criminal penalties to which they, as individuals, would be subject under the federal Anti-Deficiency Act. In this regard, any contracts entered into in violation of the Anti-Deficiency Act would be void <u>ab</u> <u>initio</u> such that OAG may not be able to provide legal sufficiency for and the OCFO would not be able to make payment pursuant to these contracts. Finally, I must caution that the Council's failure to approve a District budget pursuant to pre-Act Home Rule Act provisions may cause the occurrence of one or more events (such as failure to meet District government payroll, or make pension benefit or interstate compact payments) that would trigger the re-emergence of the Control Board and result in loss of the precious, limited Home Rule currently provided to District residents.

Given the potential for these serious adverse consequences to the District and its officers and employees, I strongly advise you to take all necessary steps to avoid occurrence of the events described above. Specifically, until and unless Congress affirmatively grants budget autonomy or there is a binding judicial decision finding that the Act is valid, I ask that you and your fellow Councilmembers approve the District's FY 2015 budget pursuant to the Home Rule Act's original, pre-Act procedures while we work together with the Mayor to resolve this matter. As always, I am open to further discussion with you about this matter.

If you have any questions, please feel free to call me at (202) 727-2476.

Sincerely,

Jeffrey S. DeWitt
Chief Financial Officer

cc:     Mayor Vincent C. Gray
        All Councilmembers
        Irvin B. Nathan

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COUNCIL OF THE DISTRICT OF COLUMBIA,

      Plaintiff/Counterclaim Defendant,

      v.

VINCENT C. GRAY, Mayor of the District of
Columbia,

and

JEFFREY S. DEWITT, Chief Financial Officer for the
District of Columbia,

      Defendants/Counterclaimants.

Civil Action No. 1:14-cv-00655-EGS

## DEFENDANTS' ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Vincent C. Gray, Mayor of the District of Columbia, and Jeffrey S. DeWitt, Chief

Financial Officer for the District of Columbia (collectively "Defendants"), respond to the

allegations in the Complaint as follows:

Any allegation not expressly admitted is denied.

## ANSWER

## NATURE OF THIS ACTION

1.    *The residents of the District of Columbia will contribute more than $7 billion this*

*year in taxes and fees to fund their local government.*

**Response**:  Admitted that in Fiscal Year 2013, District residents contributed over $7

billion in taxes and fees to the District government.

2.      *In every other home-rule jurisdiction in the country, the locally elected officials who set the tax rates also authorize the expenditures of those locally raised funds.*

**Response**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of these allegations.  Defendants aver that, generally, cities in the United States are not subject to plenary control of the U.S. Congress, which the District of Columbia *is* under Article I, Section 8, Clause 17 of the United States Constitution.

3.      *But prior to this budget cycle, the budget process for local funds in the District of Columbia worked differently. The District lacked budget autonomy, which meant that local officials did not have the power to spend locally raised dollars; those funds could be spent only through an express authorization by Congress.*

**Response**:  Regretfully admitted that the District lacks budget autonomy for its locally raised revenues and that the Home Rule Charter, passed by Congress and signed by the President, requires the Mayor to submit a proposed budget to the D.C. Council, the Council to adopt a budget, and the Mayor to submit the adopted budget to the President for legislative appropriations by an Act of Congress.  Admitted that the District of Columbia Local Budget Autonomy Act of 2012 ("Act" or "BAA") purports to change this congressionally-mandated budget process to allow the Council to enact and submit the "local" and supplemental portions of the District's budget directly to Congress for passive rather than active review, thereby unilaterally altering—by local legislation—Congress' and the President's federally-mandated review authority.  Defendants deny the remaining allegations.  Defendants refer the Court to Section 446 of the Home Rule Act, entitled "Enactment of Appropriations By Congress," for a statement of the budgetary process for the District as mandated by Congress in 1973 and followed consistently for the past 40 years.

4.      *The Local Budget Autonomy Act of 2012 ("Budget Autonomy Act" or "the Act," D.C. Law 19-321, 60 DCR 1724 (Exhibit A)), changed that. Now, the Council is entitled to pass a budget designating local expenditures of local funds, and only passive review—as opposed to an affirmative act—by Congress is required for that budget to become law.*

**Response**:  Admitted to the extent stated in the previous response, otherwise denied.

5.      *The Budget Autonomy Act was an amendment to the District of Columbia Charter, and pursuant to the process for amending the Charter, became binding law on July 25, 2013, after it was (a) approved by a unanimous Council, (b) signed by the Mayor, (c) ratified by a substantial majority (83%) of District voters, and (d) passively approved by Congress, which did not pass a joint resolution of disapproval.*

**Response**:  Denied that the BAA is binding law, or in any respect legally valid, but admitted that it was (i) enacted by the Council, (ii) signed by the Mayor, (iii) ratified by a majority of those District voters who went to the polls on that occasion (according to the D.C. Board of Elections website, approximately 46,788 out of 505,698 registered voters, i.e., less than ten percent of the District's registered voters, voted in favor of the BAA), and (iv) submitted by the Council to Congress, which did not pass a joint resolution of disapproval.  Defendants deny the remaining allegations.

6.      *As discussed in greater detail below, the District's Mayor and Chief Financial Officer ("CFO") play essential roles in preparing and implementing the District's budget.*

**Response**:  Admitted.

7.      *On April 11, 2014, however, both the Mayor and the CFO advised the Council that they will not honor their obligations under the Budget Autonomy Act.*

**Response**:  Admitted that, on April 11, 2014, the Mayor and the CFO separately informed the Council that the BAA was legally invalid and that they would not authorize expenditures under any budget not enacted lawfully under the Home Rule Charter as passed by Congress and signed by the President.  Defendants deny the remaining allegations.

8.      *Defendants' position is based on a wrongful belief that the Budget Autonomy Act is invalid. There is no constitutional or statutory basis for their decision to disregard the Act.*

**Response**:  Denied.

9.      *Prompt judicial resolution of this controversy is essential to forestall injury to the Council and to the people of the District of Columbia.*

**Response**:  Admitted that a prompt judicial decision is essential to avoid harm to the Mayor, the CFO, other District residents, District employees, and the government itself. Defendants deny the remaining allegation.

10.     *The Council respectfully seeks a declaration that Budget Autonomy Act is valid and an injunction compelling the CFO to comply with the law.*

**Response**:  Defendants deny that Plaintiff is entitled to any of the relief requested.

## JURISDICTION

11.     *This Court has subject matter jurisdiction over this civil action under D.C. Code § 11-921(a).*

**Response**:  The allegation that the District of Columbia Superior Court has subject matter jurisdiction is a legal conclusion not subject to admission or denial.  To the extent a response is required, Defendants deny that the Superior Court has jurisdiction now that Defendants have timely removed this action to this Court.  Defendants assert this federal court has subject matter

jurisdiction of this action, which raises a substantial question of federal law, under 28 U.S.C. §1331.

## PARTIES

**A.    Plaintiff Council of the District of Columbia**

12.      *Plaintiff Council of the District of Columbia is the legislative and policymaking body for the District of Columbia.*

**Response**:  Defendants admit that the Council is the legislative branch of the District of Columbia government.  Defendants deny the remaining allegation.

13.      *The Council consists of thirteen members, each elected to a four-year term. One member represents each of the District's eight wards, and five at-large members (including the Chairman) represent the entire District.*

**Response**:  Admitted.

14.      *The Council has a statutory obligation to enact a balanced budget for each fiscal year. Under the Council's leadership, "the District has transformed itself from a city on the verge of bankruptcy to a thriving city reaching reassuring levels of financial security," producing "17 consecutive balanced budgets and 16 consecutive clean year-end financial audits," and finishing Fiscal Year 2012 with a $417 million budget surplus. Financial markets have recognized the District's laudable fiscal stewardship in the form of higher bond ratings and lower interest rates on borrowing.*

**Response**:  Admitted that the Mayor, with assistance from the CFO, must submit a balanced budget to the Council, which the Council must adopt as modified in accordance with the Home Rule Act.  Admitted that the District, under the leadership of Mayor Gray and the Office of the Chief Financial Officer, and in cooperation with the Council, has reached a level of

great financial security, and that financial markets and rating agencies have recognized the District's financial stability.

15.     *The Council can discharge its statutory obligations only if its duly enacted legislation is treated as binding law.*

**Response**:  Denied to the extent the allegation is that invalid legislation enacted by the Council—such as the BAA—should be treated as "binding law."

16.     *The Council voted unanimously to approve the Budget Autonomy Act, and succeeded in effecting an amendment to the Charter. The Council's legislative act, which would otherwise have taken effect, will be nullified and overridden by the promised acts and omissions of the CFO. The Council has no further legislative recourse to compel the CFO to comply with the duly enacted amendment to the Charter.*

**Response**:  Admitted that the Council enacted the BAA and that the Act purported to amend the District's Charter.  Admitted that Defendants will neither comply with provisions of the BAA that violate the Home Rule Act nor authorize expenditures under any budget not enacted in accordance with the Home Rule Charter as passed by Congress and signed by the President.  Defendants deny the remaining allegations.

17.     *Accordingly, judicial intervention is required to resolve whether the CFO is required to implement the budget that the Council is required to enact.*

**Response**:  Admitted that judicial review is necessary to resolve the illegality of the BAA, and the propriety of the Mayor and CFO in following the governing federal law. Defendants deny the remaining allegations.

18.     *To achieve clarity and to effectuate the will of the people, the Council authorized this litigation in its official capacity through the unanimous adoption of the Budget Autonomy Litigation Authorization Resolution of 2014 on March 4, 2014.*

**Response**:  Admitted that the Council adopted the Budget Autonomy Litigation Authorization Resolution of 2014 on March 4, 2014.  Defendants refer the Court to the Resolution itself for a complete and accurate description of its contents.  Defendants deny the remaining allegations.

### B.     Defendant Vincent C. Gray, in his Official Capacity as Mayor of the District of Columbia

19.     *Defendant Vincent C. Gray is the Mayor of the District of Columbia.*

**Response**:  Admitted.

20.     *As Mayor, Mr. Gray is the "the chief executive officer of the District government," and is "responsible for the proper execution of all laws relating to the District." D.C. Code § 1–204.22.*

**Response**:  Admitted.

21.     *In particular, the Mayor is in "charge of the administration of the financial affairs of the District" except to the extent responsibilities have been assigned to the CFO. Id. § 1–204.48(a). Thus, he is "responsible for all financial transactions," has "custody of all public funds belonging to or under the control of the District," and is required to apportion "all appropriations and funds made available during the fiscal year for obligation." Id. § 1–204.48(a)(1), (7), (9). He is also required to transmit the federal portion of the budget to the President for submission to Congress. Id. § 1–204.46(a).*

**Response**:  Admitted that the Mayor has charge over the financial administration of the District's affairs, except to the extent responsibilities have been assigned to the CFO, and that the

quoted language appears in the cited sections of law.  Admitted that the BAA purports to allow

the Council to submit a portion of the District's budget directly to Congress for passive review,

thereby infringing on the Mayor's power, under the Charter, to submit the total District budget to

the President for submission to Congress for an enactment of appropriations.  Defendants deny

the remaining allegations.

22.     *On April 11, 2014, the Mayor sent a letter to Council Chairman Phil Mendelson*

*advising that he would not enforce the Budget Autonomy Act. In particular, he informed the*

*Council that he would:*

> *(a) "direct all subordinate agency District officials not to*
> *implement or take actions pursuant to the [Budget Autonomy*
> *Act]";*
>
> *(b) "veto any [fiscal year 2015] budget transmitted by the Council*
> *that is not inclusive of both the local and federal portions of the*
> *budget"; and*
>
> *(c) "transmit to the Congress and President the full District budget*
> *as it stands after the 56th day following transmission to [the*
> *Council] of the budget, whether or not the Council has taken a*
> *second vote."*

**Response**:  Admitted that, on April 11, 2014, the Mayor sent a letter to Council

Chairman Mendelson (with a copy to each of the other councilmembers) that contains the quoted

language.  Defendants refer the Court to the letter itself for a complete and accurate description

of its contents.

**C.     Defendant Jeffrey S. DeWitt, in his Official Capacity as Chief Financial
        Officer for the District of Columbia**

23.     *Defendant Jeffrey S. DeWitt is the CFO for the District of Columbia.*

**Response**:  Admitted.

24.     *As CFO, Mr. DeWitt has primary responsibility for enhancing the fiscal and*

*financial stability, accountability and integrity of the Government of the District of Columbia. As*

part of his statutory job duties, the CFO provides fiscal impact statements for Council legislation and provides the financial analyses that the Council requires to ensure that its budgets are balanced.

      **Response**:  Admitted.

      25.    *The CFO is specifically required by statute to prepare "under the direction of the Mayor . . . the budget for submission by the Mayor to the Council and to the public and upon final adoption to Congress and to the public." D.C. Code § 1–204.24d(26); see also id. § 1–204.24d(2) (charging the CFO with "preparing the 5-year financial plan based upon the adopted budget for submission with the District of Columbia budget . . . to Congress"); § 1–204.24d(25) (requiring the CFO to "[p]repar[e] fiscal impact statements . . . on legislation").*

      **Response**:  Admitted.

      26.    *Moreover, the CFO is required by statute to "[c]ertify[] and approv[e] prior to payment of all bills, invoices, payrolls, and other evidences of claims, demands, or charges against the District government, and determining the regularity, legality, and correctness of such bills, invoices, payrolls, claims, demands, or charges." Id. § 1–204.24d(16); see also id. § 1–204.24d(21) (requiring the CFO to "[a]dminister[] the centralized District government payroll and retirement systems").*

      **Response**:  Admitted.

      27.    *On April 11, 2014, the CFO sent a letter to Council Chairman Phil Mendelson advising that he would not enforce the Budget Autonomy Act. In particular, he informed the Council that he would "not make or authorize any payment pursuant to a budget that was approved in conformance with the [Budget Autonomy Act]" and would "direct [Office of the CFO] employees not to certify contracts or make payments under this budget."*

**Response**:  Admitted that, on April 11, 2014, the CFO sent a letter to Council Chairman Mendelson (with a copy to each of the other councilmembers) that contains the quoted language. Defendants refer the Court to the letter itself for a complete and accurate description of its contents.

### FACTUAL ALLEGATIONS

**A.     The Early History of the Budget Process for the District of Columbia**

28.     *The District Clause of the U.S. Constitution, Art. I, § 8, cl. 17, authorizes Congress to exercise legislative authority over a federal district serving as the seat of government.*

**Response**:  Admitted.

29.     *In exercise of that authority, Congress established the District of Columbia in 1801. See District of Columbia Organic Act, ch. 15, 2 Stat. 103 (1801).*

**Response**:  Admitted.

30.     *Budget autonomy for the District of Columbia dates back to 1802, the year in which the City of Washington was incorporated. At that time, the elected City Council had authority to lay and collect taxes and to spend tax revenues on matters of local concern.*

**Response**:  Admitted that the City Council had authority in 1802 to lay and collect taxes and to spend tax revenues on matters of local concern, but deny the remaining allegations and aver that this did not constitute budget autonomy as the presidentially-appointed Mayor had authority to veto the Council's actions, as did Congress. Further, the Council was elected by only white, male voters of the District and was thus not fully representative of the city.

31.     *The authority of the city government was gradually expanded until 1871, when Congress created a unified municipal government for the District of Columbia to replace*

- 10 -

*previously separate governments for the City of Washington, the County of Washington, and Georgetown.*

**Response**:  Admitted.

32.      *The unified municipal government, which consisted of appointed and elected officials, had authority to lay and collect taxes and to spend local tax revenues.*

**Response**:  Admitted but aver that only federally-appointed officials had control of expenditures, all of which was subject to a veto by Congress.

33.      *In 1874, that system of government was abolished by Congress, and local authority to legislate with respect to local matters ceased. The responsibility to lay taxes and to spend those tax revenues reverted to Congress.*

**Response**:  Admitted except that at all times from 1802 forward, Congress had expressly reserved its constitutional authority over "local" District matters.

**B.      The Budget Process Under the Home Rule Act, As Initially Enacted**

34.      *Congress maintained legislative authority over the District until the 1973 enactment of the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 777 (1973), now known as the "Home Rule Act."*

**Response**:  Admitted that in 1973 Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, commonly known as the Home Rule Act. Defendants deny the remaining allegations.

35.      *Congress, in the Home Rule Act, created a new system of local government for the District of Columbia in which it delegated legislative authority regarding local matters to local elected officials "to the greatest extent possible." Home Rule Act § 102(a), D.C. Code § 1–201.02(a).*

**Response**:  Admitted that Congress, in the Home Rule Act, established a tripartite system of government for the District of Columbia and created a system of partial home rule in the District.  Defendants refer the Court to the Home Rule Act itself for a complete and accurate description of its contents, including the express reservations of authority to itself that Congress included in the Home Rule Act (particularly over matters concerning the District's budget).

36.     *Congress also created, as part of the Home Rule Act, the District of Columbia Charter and a process for amending that Charter.*

**Response:**  Admitted, but the Charter also provided that Congress enacted specific limitations on the Council's ability to amend the Charter, and specifically reserved certain authority to Congress, including appropriation authority over the District's budget.

37.     *Prior to the Home Rule Act, revenue collected from local sources was maintained in the U.S. Treasury. But the Home Rule Act moved locally raised revenues out of the U.S. Treasury, declaring that those funds "belong to the District government," and exempting revenue from local sources from the requirement that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable." 31 U.S.C. § 3302(b). Thus, following the Home Rule Act, those funds have been maintained in the General Fund of the District of Columbia and various Special Funds, outside the custody of the Treasury. These funds were originally under the custody of the Mayor and are now under the custody of the CFO. See District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8, 109 Stat. 142 (1995).*

**Response**:  Admitted that locally raised revenues are kept in the General Fund of the District of Columbia, and aver that this has been at the direction of Congress since the enactment

of the Home Rule Act.  Defendants refer the Court to the Home Rule Act itself for a complete and accurate description of its contents.

38.   *Pursuant to the Home Rule Act, most legislation would become law after it was (a) approved by a majority of the Council after two readings separated by at least thirteen days; (b) approved by the Mayor, or disapproved by the Mayor but approved by two-thirds of the Council within a 30-day period; and (c) passively approved by Congress, which had a 30-day period in which to pass a joint resolution disapproving of the legislation.*

**Response**:  Admitted with the clarification that "most legislation" excludes not only permanent criminal-law legislation, which generally requires a 60-day period of passive congressional review, and also—and of particular relevance here—budget legislation, which requires an appropriation by an affirmative Act of Congress to be valid.  Defendants refer the Court to the provisions of the Home Rule Act which govern the adoption of the District's budget.

39.   *As originally enacted, the Charter authorized the Council to lay and collect taxes within the District pursuant to the usual process for local legislation, i.e., after two readings and submission to Congress for passive review, but specified a different procedure for the District's budget. Specifically, the Charter permitted the Council only to recommend a budget that was (a) approved by a majority of the Council at a single reading no more than 56 days after receipt of the Mayor's proposal; (b) approved by the Mayor, or disapproved by the Mayor but approved by two-thirds of the Council within a 30-day period; and (c) transmitted to the President for submission to Congress. Congress was free to amend, adopt or ignore the proposed budget, on an open-ended timeframe, with or without consulting with the District. No local funds could be expended absent affirmative action by Congress.*

**Response**:  Admitted.

40.     *Under this process, the budget was treated unlike every other piece of District legislation and the District was treated unlike every other state and home-rule city in the country.*

**Response**:  Defendants lack knowledge or information sufficient to form a belief about the truth or falsity of the allegation that the District budget process is unlike that of "every state and home-rule city in the country."  Defendants deny the remaining allegation.

41.     *This system imposed substantial costs on the District.*

**Response**:  Admitted that the lack of budget autonomy thus far provided by Congress to the District has imposed and continues to impose costs on the District.  Both Defendants are on record as publicly supporting the prompt passage by Congress of budget autonomy for the District.

42.     *Congress rarely finishes its appropriations process before the start of the fiscal year. Indeed, for the 25 fiscal years between 1990 and 2014, Congress has met the deadline on only three occasions. On the other 22 occasions, Congress has either enacted a continuing resolution (which means that the District must begin the fiscal year without knowing its total annual budget) or no budget at all (which triggers burdensome and costly government shutdown procedures).*

**Response**:  Admitted.

43.     *Congress's affirmative role in the budgeting process introduced substantial uncertainty into the District's finances. According to testimony from the previous CFO for the District, "Bond rating agencies take the uncertainties of the Federal process into account in assessing the District's finances, and discount to a degree whatever ratings the District might otherwise receive. In the case of new or expanded programs approved and financed locally, no*

*implementing action can be taken until the Federal appropriation bill is enacted. This delays*

*program initiation and guarantees programs will not be executed as planned.*"

**Response**:  Admitted that Congress' affirmative role in the District's budget process introduces substantial uncertainty into the District's finances.  Defendants refer the Court to the full statement of former CFO Natwar Gandhi for a complete and accurate description of its contents.

44.    *According to testimony from the former Mayor of the District of Columbia, delays in federal appropriations have led to lower service-delivery levels for "school nurses, prescription drug benefits, police equipment and staffing."*

**Response**:  Admitted that delays in the federal appropriations process have deleterious effects on the District of Columbia and its residents.  Defendants refer the Court to the full testimony of former D.C. Mayor Anthony Williams for a complete and accurate description of its contents.

C.    **The Budget Autonomy Act Amends the District Charter to Establish Local Control over Expenditures of Locally-Raised Revenue and to Enhance the Efficiency of the Budget Process**

45.    *For budgets enacted on or after January 1, 2014, the Budget Autonomy Act repealed and replaced the budget process provided in the original 1973 Charter.*

**Response**:  Admitted that the BAA purported to repeal and replace the budget process set forth by Congress in the Home Rule Act.  Defendants deny the remaining allegations.

46.    *Following the process to amend the Charter specified by Congress in the Home Rule Act, the Council unanimously adopted the Budget Autonomy Act, the Mayor signed it, the voters of the District of Columbia overwhelmingly ratified it, and Congress passively approved it by failing to pass a joint resolution within 35 legislative days.*

**Response**:  Admitted that the Council enacted the BAA, the Mayor signed it, and the majority of District voters who appeared at the polls and voted on the issue when the matter was on the ballot ratified it.  Defendants deny the remaining allegations.

47.      *The Budget Autonomy Act left in place the 1973 Home Rule Act's permanent appropriation of funds from the U.S. Treasury to the D.C. General Fund but modified the process by which money in the D.C. General Fund can be spent.*

**Response**:  Admitted that the BAA purported to modify the District's budget process for "local" and supplemental funds.  Defendants deny the remaining allegations.

48.      *As amended, the process for expending local tax revenues has been revised to match the process for raising local tax revenues (or enacting any other non-emergency legislative bill).*

**Response**:  Admitted that the BAA purported to allow the "local" and supplemental portions of the budget to be submitted by the Council directly to Congress for passive review. Defendants deny the remaining allegations.

49.      *Pursuant to the terms of the Budget Autonomy Act, the Mayor submits a proposed budget to the Council, with the assistance of the CFO. For the local portion, the Council then adopts a budget after two readings within 70 days of receipt of the Mayor's proposal. After the Mayor approves the Council's version (or the Mayor's veto is overridden), that budget is transmitted by the Council Chairman to Congress, with a certification from the CFO that the District has adequate revenues to satisfy its budgetary expenditures.  If Congress does not act within 30 days, the budget is enacted.*

**Response**:  Admitted that the BAA purports to allow the Council to submit the "local" and supplemental portions of the District's budget directly to Congress for Congress' passive review.  Defendants deny the remaining allegations.

50.      *The Budget Autonomy Act did not alter the process by which federal dollars are expended in the District of Columbia.*

**Response**:  Denied because the BAA purports to disaggregate the federal-dollar portion of the District's budget from the local-dollar portion, and further purports to subject these portions to different budget processes, including different transmissions to the federal government.  Under governing federal law, the total District budget is comprised of both the local- and federal-dollar portions of the budget, and both are required to be transmitted, together, by the Mayor to the President.  The BAA further purports to allow the Council to transmit any supplemental budget directly to Congress, regardless of whether the supplemental budget is funded by local or federal dollars.

51.      *The Act also authorized the Council to change the fiscal year of the District. Budget Autonomy Act § 2(d). In most cities and states, the fiscal year runs from July to June, so each school year can be planned for and addressed in a single budget cycle. The District's fiscal year, conversely, runs from October to September to correspond with the federal government's fiscal year. To date, the Council has not exercised its authority to change the District's fiscal year.*

**Response**:  Admitted that Section § 2(d) of the BAA purported to authorize the Council to unilaterally change the District's fiscal year, and that the District's fiscal year runs from October to September to correspond with the federal government's fiscal year.  Defendants lack

knowledge or information sufficient to form a belief about the truth or falsity of the allegation

that most cities and states have a fiscal year that runs from July to June.

### D.   Defendants Will Not Comply With or Enforce the Act

52.   *On April 11, 2014, both Defendants sent letters to Council Chairman Phil*

*Mendelson advising that they would refuse to enforce the Budget Autonomy Act.*

**Response**:  Admitted to the extent stated in the responses to paragraphs 7, 22, and 27.

53.   *Following the advice of the Attorney General for the District of Columbia, the*

*Mayor announced that he would treat the Act as a "legal nullity" and that he would:*

> *(a) "direct all subordinate agency District officials not to implement or take actions pursuant to the [Budget Autonomy Act]";*
>
> *(b) "veto any [fiscal year 2015] budget transmitted by the Council that is not inclusive of both the local and federal portions of the budget"; and*
>
> *(c) "transmit to the Congress and President the full District budget as it stands after the 56th day following transmission to [the Council] of the budget, whether or not the Council has taken a second vote."*

**Response**:  Admitted that the Mayor's letter to the Council included the quoted language

(except as altered).  Defendants refer the Court to the letter itself for a complete and accurate

description of its contents.

54.   *Following the advice of his legal staff, the CFO announced that he would treat*

*the Act as having "no legal validity" and that he would:*

> *(a) "not make or authorize any payment pursuant to a budget that was approved in conformance with the [Budget Autonomy Act]"; and*
>
> *(b) "direct [Office of the CFO] employees not to certify contracts or make payments under this budget."*

**Response**:  Admitted that the CFO's letter to the Council included the quoted language (except as altered).  Defendants refer the Court to the letter itself for a complete and accurate description of its contents.

55.    *The CFO indicated that he would enforce the Budget Autonomy Act if a "court of competent jurisdiction sustains the Act's legal validity."*

**Response**:  Admitted that the CFO's letter to the Council included the quoted language (except as altered).  Defendants refer the Court to the letter itself for a complete and accurate description of its contents.

56.    *As explained in the contemporaneously filed Motion for Preliminary Injunction, the legal reasoning underlying Defendants' refusal to enforce the Budget Autonomy Act is based on an unsound interpretation of binding law.*

**Response**:  This allegation states legal conclusions not subject to admission or denial.  To the extent a response is required, Defendants deny the allegation.  Defendants deny that Plaintiff is entitled to a preliminary injunction.

57.    *The Council's injury will be felt immediately, as the budget cycle for Fiscal Year 2015 is already underway. Moreover, the injury will be felt for each ensuing regular and supplemental budget cycle until the CFO is directed to comply with the Autonomy Act.*

**Response**:  Denied.

58.    *There is an urgent need to resolve the validity of the Budget Autonomy Act and to ensure that the CFO will perform his job duties consistent with the Act.*

**Response**:  Admitted that a prompt resolution of this lawsuit is important.  Otherwise denied.

E.       **The Council Faces Imminent Injury From Defendants' Conduct**

59.     *The announced actions of the Mayor and the CFO will individually and jointly*

*cause injury to the Council and its interests. In particular:*

> *(a) The Mayor's promise to submit the Council's draft budget to
> the President on May 29 contravenes the Council's exclusive right
> to legislate for the District.*
>
> *(b) Defendants' actions nullify the Council's legislative act in
> enacting the Budget Autonomy Act. The Council voted
> unanimously for the Act, there were sufficient votes to enact the
> Act. And the Council lacks a legislative remedy to guarantee
> enforcement of its legislation. Likewise, Defendants' actions will
> nullify the Council's legislative act in enacting the fiscal year 2015
> budget pursuant to the Budget Autonomy Act. The Council is
> required by statute to enact such a budget but Defendants have
> already announced that they will treat it as a nullity once enacted.
> The Council lacks a legislative remedy to guarantee enforcement
> of its legislation.*
>
> *(c) Defendants' announced refusal to recognize the Budget
> Autonomy Act will needlessly deprive the Council of information to
> which it is entitled in the formulation of its budget.*
>
> *(d) Defendants' actions will impede the orderly administration of
> the District government. The uncertainty created by Defendants'
> announced refusal to comply with the Budget Autonomy Act will
> undermine the Council's ability to satisfy its statutory obligations.
> And the Council will incur unnecessary costs in preparing for the
> contingencies risked by Defendants' conduct.*
>
> *(f) Defendants' refusal to enforce the District's fiscal year 2015
> budget will deprive the Council of funding for its necessary
> governmental operations.*

**Response**:  Denied.

## CLAIM I

## DECLARATORY JUDGMENT

60.     *The Council incorporates by reference and re-alleges each and every allegation*

*contained in paragraphs 1-59, as though fully set forth herein.*

61.     *Defendants' refusal to comply with their duties under the Budget Autonomy Act is in violation of their responsibilities under the District Charter, as amended by the Autonomy Act.*

62.     *Defendants' refusal to comply will cause the Council to sustain injury that is redressable by this Court.*

63.     *The Council is entitled to a declaratory judgment, pursuant to D.C. Superior Court Rule 57 and 28 U.S.C. § 2201, that the Budget Autonomy Act is legally valid as the law of the land and that Defendants are required to treat the Act as binding law.*

64.     *The Council is further entitled to an injunction compelling Defendants to comply with the Budget Autonomy Act.*

**Response to Paragraphs 60 – 64**:  Denied.  Defendants deny that Plaintiff is entitled to any of the relief requested in these paragraphs.

## PRAYER FOR RELIEF

*WHEREFORE, the Council prays for judgment and relief as follows:*

65.     *A declaration that the Budget Autonomy Act is valid and enforceable law, and that no District officer or employee may refuse to treat it as such.*

66.     *A preliminary and permanent injunction, enjoining Defendants to fulfill their duties under the law in a timely fashion, such that the Council will be able to enact a budget for the District pursuant to the Budget Autonomy Act.*

67.     *Such other and further relief as the Court deems just and proper.*

**Response to Paragraphs 65 – 67**:  Denied.  Defendants deny that Plaintiff is entitled to any of the relief requested in these paragraphs.

## AFFIRMATIVE DEFENSES

Defendants assert the following defenses, without assuming the burden of proof on such

defenses that would otherwise rest with Plaintiff:

68.     The Complaint fails to state a claim on which relief can be granted.

69.     Granting relief as requested by Plaintiff is contrary to the public interest.

70.     The BAA was enacted in violation of the Home Rule Act and other federal laws,

and thus is legally null and void.

71.     The BAA is preempted by federal law, including the Anti-Deficiency Act, 31

U.S.C. § 1341.

72.     The BAA conflicts with the Anti-Deficiency Act and is thus null and void under

the Supremacy Clause of the United States Constitution.

73.     Defendants reserve the right to assert other defenses as they become known to

Defendants.

## COUNTERCLAIMS

Vincent C. Gray, Mayor of the District of Columbia, and Jeffrey S. DeWitt, Chief Financial

Officer for the District (collectively "Counterclaimants"), counterclaim against the Council of the

District of Columbia for declaratory and injunctive relief, challenging the legality of the District of

Columbia Local Budget Autonomy Act of 2012 ("BAA" or "Act"), D.C. Law 19-321, 60 D.C. Reg.

1724 (Feb. 15, 2013).

## OVERVIEW

74.     The actions of the Council, in enacting the BAA, violate the Home Rule Act,

other federal statutes, the U.S. Constitution, and the principle of separation of powers

incorporated in the District's Charter.  The Home Rule Act does not permit either the Council or

the citizens of the District to unilaterally seize budget autonomy for the District and thereby deprive the President, Congress, and other federal agencies of their long-established roles in the enactment of the District's budget.  The only lawful way the Charter can be amended as proposed by the BAA is through an Act of Congress, as President Obama and members of both the House and the Senate have proposed.

75.     The Charter outlines the specific steps that must be taken in order for the District to develop and propose, and for Congress to enact, the District's yearly budget and any supplements thereto.  The Charter requires that the Mayor, in consultation with the CFO, draft and submit a proposed budget to the Council for adoption.  The Council must adopt a final budget within 56 days of receiving the Mayor's proposal, and then the Mayor must submit the adopted budget to the President for ultimate enactment by Congress of an appropriations Act signed by the President.  The Home Rule Act does not grant the District authority to alter this process through local legislation; such authority rests solely with Congress and the President to do so through the prescribed Article 1, Section 7 process by which federal laws are enacted or amended.

76.     Nonetheless, the Council enacted the BAA, which purported to alter the District's budget process under the Charter.  Specifically, the BAA maintained the congressionally-mandated budget process for the "federal portion" of the District's budget but purported to make an act of the Council, without more, sufficient to permit the spending of (i) the "local portion" of the District's budget and (ii) any supplement to the budget, regardless of whether the supplement obligated federal or local funds.  In addition, the BAA purported to permit the Council to change the District's fiscal year.

77.     The BAA amendments to the Charter violate the Home Rule Act in several ways. Title VI of the Charter is entitled "Reservation of Congressional Authority" and Section 602 under that Title is entitled "Limitations on the Council."  Section 602(a) provides that the "Council shall have no authority. . . to . . . (3) enact any act, or . . . amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."  In violation of this provision, and hence of the Supremacy Clause, the BAA purports to affect the functions of the federal government under the Home Rule Act (and under the Anti-Deficiency Act and Budget and Accounting Act).

78.     Section 603 of the Home Rule Act, which is entitled "Budget Process: Limitations on Borrowing and Spending," provides that "Nothing in this act shall be construed as making any change in existing law. . . or basic procedure and practice relating to the respective roles of Congress, the President, the federal office of Management and Budget and the Comptroller General of the United States in the preparation, review, submission, examination, authorization and appropriation of the total budget of the District of Columbia government."  The BAA violates this provision as well, because the BAA purports to change "existing law, regulation, or basic procedure and practice" regarding every one of these federal institutions in the District's budget process.

79.     The BAA violates Section 603(e) of the Home Rule Act by purporting to remove the "local portion" of the District's budget and any subsequent supplements to the budget from the purview of the Anti-Deficiency Act.  Section 603(e) states: "Nothing in this Act shall be construed as affecting the applicability to the District government" of the Anti-Deficiency Act, Title 31, Ch. 15 of the U.S. Code.  So insistent was Congress in the Home Rule Act that the District comply with the Anti-Deficiency Act that it repeated this injunction in Section 446

(entitled "Enactment of Appropriations By Congress"):  "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and only according to such Act."

80.    The language of the Home Rule Act, reserving the power of appropriations to Congress and precluding any amendment of the Charter by the Council on that issue, is clear because without that assurance Congress would never have granted limited home rule to the District.  Opponents of home rule for the District predicated their position on congressional loss of control over the District's budget.  To garner their support, Congressman Walter Fauntroy of the District and others, including Congressmen Charles Diggs of Michigan and Brock Adams of Washington, brokered a compromise that in return for limited home rule, the legislation would insure that Congress kept control over the District's budget, including expenditures.  That bargain carried the legislative day, and for 40 years every local Administration and Council adhered to that bargain—until enactment of the BAA.

81.    The Attorney General for the District of Columbia has issued a formal legal Opinion that the Act is legally invalid and null and void.  So, too, has the General Counsel of the General Accountability Office ("GAO").  In reliance on those opinions, confirmed independently by the CFO's legal staff, Counterclaimants have concluded that any budget approved pursuant to the BAA would not be legally valid.  Accordingly, Counterclaimants will neither comply with the provisions of the BAA that violate the Home Rule Act and the Anti-Deficiency Act, nor approve expenditures under an illegally-enacted budget at the risk of criminal, civil, or administrative penalties.  Counterclaimants' refusal to abide by the BAA, a legal nullity, supports a request for necessary and expedited judicial review of the Act, to confirm that

Counterclaimants are justified in following the binding federal law and not implementing the patently illegal BAA.

82.     The BAA's amendments to the Charter would, if implemented, impermissibly intrude on congressionally-mandated functions of the Mayor and CFO, and would expose Counterclaimants and thousands of other Executive employees to potential criminal, civil, and administrative liability under the Anti-Deficiency Act.  Further, the Council's actions expose Counterclaimants to a substantial and imminent risk of the loss of funding for their respective offices, as well as a loss of funding for District government operations as a whole.  Indeed, if the District does not have appropriated funds for the CFO to authorize payment of salaries and pensions of current and former employees of the District, the District could be faced with the return of the federal control board as a matter of law.

## PARTIES

83.     Counterclaimant Vincent C. Gray is the Mayor of the District of Columbia.  The District, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States.

84.     Counterclaimant Jeffrey S. DeWitt is the Chief Financial Officer for the District.

85.     Mayor Gray and CFO DeWitt bring this counterclaim through the District's Attorney General, pursuant to the Attorney General's authority to uphold the public interest and to institute suit on behalf of the District in court under D.C. Official Code § 1-301.81(a)(1) (2013 Supp.).

86.     Counterclaim Defendant Council of the District of Columbia is the legislative branch of the District of Columbia government.

## JURISDICTION AND VENUE

87.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 2201.  The challenged Council legislation interferes with the execution of federal

law under Title 31 of the United States Code.

88.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## STATEMENT

### I.     District of Columbia Home Rule Act

89.     Article 1, Section 8, Clause 17 of the U.S. Constitution vests Congress with the

power "to exercise exclusive legislation in all Cases whatsoever" over the District of Columbia.

90.     In 1973, pursuant to this authority, Congress enacted the District of Columbia

Self-Government and Governmental Reorganization Act, later codified as D.C. Official Code

§§ 1-201.01, *et seq.* (2013) ("Home Rule Act").  The Home Rule Act provides residents of the

District substantial, but not unlimited, powers of local self-government.  However, it also

explicitly reserves to Congress (in Section 1-201.02) "the ultimate legislative authority over the

nation's capital granted by article I, § 8, of the Constitution[.]"  Further, Congress expressly

identified a number of what Title VI of the Charter identifies as "Limitations on the Council."

These limitations include the following, now codified at D.C. Section 602(a)(3):  "The Council

shall have no authority to pass any act contrary to the provisions of this Act except as

specifically provided in this Act, or to. . . (3) enact any act, or enact any act to amend or repeal

any Act of Congress, which concerns the functions or property of the United States or which is

not restricted in its application exclusively in or to the District . . . ."

91.     Sections 1-204.01 through 1-204.115 of the Home Rule Act constitute the District

of Columbia Charter, which sets forth the organizational structure of the District government.

The Charter created a tripartite form of government, vesting legislative power in the Council and executive power in the Mayor.  D.C. Official Code §§ 1-204.04, 1-204.22.

92.     The Charter mandates that each year the Mayor submit an annual budget for the District to the Council.  § 1-204.42.  After receipt of the Mayor's budget proposal, the Council must adopt a budget for the District, which the Mayor must then submit to the President for transmission to Congress.  The Charter requires a similar process for any supplements to the budget.  The Charter also provides that "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act." *Id.*,§ 1- 1-204.46 (2012).

93.     Section 103(15) of the Home Rule Act (D.C. Official Code § 1-201.03(15)) defines "budget" as "the entire request for appropriations and loan or spending authority for all activities of all agencies of the District financed from all existing or proposed resources and shall include both operating and capital expenditures."

94.     In the Home Rule Act, Congress provided that the Charter could be amended in some respects by an act passed by the Council and ratified by a majority of District voters.  *Id.*, § 1-203.03.  Section 303(d), however, explicitly prohibits the use of this process to enact any law contrary to the limitations set forth in Sections 601, 602, and 603 of the Home Rule Act, which, among other things, specifically reserves to Congress control of the District's budget.

## II.   Budget Autonomy Act of 2013

95.     The BAA was passed by the Council on December 4, 2012, and subsequently signed by the Mayor.  On or about December 19, 2012, the Mayor sent a letter to the Chairman of the Council (with copies to every other councilmember), expressing his belief that while he "fully and passionately support[s] the goal of securing budget autonomy for the District of Columbia as soon as possible[,]" the proposed legislation likely violated the Home Rule Act and

- 28 -

other provisions of federal law.  In a special election held on April 23, 2013, a majority of those voting approved the Budget Autonomy Act.  The number of voters who voted for the BAA in the special election constituted less than ten percent of the total number of registered voters in the District.  As required by the Home Rule Act, the District's Board of Elections certified the ratification of the Act, on May 8, 2013, and the Chairman of the Council submitted the Act's purported Charter amendments to Congress that same day, per D.C. Official Code § 1-203.03(b).

96.    Congress took no formal action with respect to the Act, and the BAA, by its terms, purported to become effective as of January 1, 2014.

97.    The BAA purports to amend several provisions of the Charter relating to the District's budget process by (i) exempting the District's budget process for "local" funds and subsequent supplements to the budget from the congressional appropriations requirements established by Congress in the Home Rule Act, and (ii) permitting the Council to change the District's fiscal year.

98.    The Act purported to change the title of Charter Section 446 (D.C. Official Code § 1-204.46) from "Enactment of Appropriations by Congress" to "Enactment of local budget by Council."  The Act would separately treat the "federal portion" and the "local portion" of the District's budget.  Although neither of those terms is defined in either the BAA or the Home Rule Act, it appears that the "local portion" is that segment of the District's budget derived from local sources, including District of Columbia income, sales, and property tax revenues.  Approximately two-thirds of the District's budget stems from such local revenues.  The Act purports to change the review by Congress and the President of the District's local budget appropriations from active—as mandated by the Home Rule Act, and followed by the District and federal governments for the past forty years—to passive.

- 29 -

**JA104**

99.     Additionally, the Act purports to require that the Council Chairman submit the local portion directly to the Speaker of the House of Representatives for passive review "pursuant to the procedure set forth in section 602(c) of the Home Rule Act."  D.C. Law 19-321, § 2(e).  Under this provision, the Mayor would no longer submit the local portion to the President, and the President would no longer submit it to Congress for enactment.  The federal portion of the District's budget would continue to be submitted by the Mayor to the President for transmission to Congress for enactment.

100.     Furthermore, the Act purports to allow the Council to enact any supplements to the annual budget, and submit the supplements directly to Congress for passive review.  D.C. Law 19-321, § 2(e).  The Act does not distinguish between supplements using *federal* funds and supplements using *local* funds.

101.     Because Section 446 of the Charter prohibits District employees from obligating or expending funds except in accordance with an act of Congress, the Act attempts to amend that section of the Charter to allow District employees to obligate or expend local funds if the amount "has been approved by an act of the Council."  *Id*., *amending* D.C. Code 1-204.46.  Thus, under the Act, no congressional action would be necessary before District employees could obligate and expend local and supplemental funds.

**III.     The Illegality and Invalidity of the Budget Autonomy Act**

102.     The BAA's purported amendments to the Charter violate the Home Rule Act because they contravene Sections 602 and 603, and thus are prohibited amendments under Section 303(d).  These violations of federal law render the BAA null and void.

**A.     Section 602(a)(3)**

103.     Section 602(a) of the Charter (D.C. Official Code § 1-206.02(a)(3)) provides that the Council "shall have no authority . . . to . . . (3) enact any act, or . . . amend or repeal any Act of

Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."

104.    The BAA amendments remove the budgeting of local and supplemental funds from the federal appropriations process and allow the Council to change the District's fiscal year. These changes would affect the functions of the United States by (i) preventing Congress, with Presidential approval, from appropriating local District funds and supplemental District funds; (ii) eliminating the President, the federal Office of Management and Budget ("OMB") and the U.S. Comptroller General from their respective roles in the local portion of the District's budget process and the entire District supplemental budget process; and (iii) making it difficult, if not impossible, for Congress to review the District's finances during Congress' regular budget cycle. Further, because the Home Rule Act, including the Charter, allocates functions between the District and the federal government, it is an Act of Congress not limited in its application "exclusively in or to the District." The BAA amendments to the Charter thus violate Section 602(a)(3) of the Home Rule Act.

105.    In addition, the Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1349 to 1351 and subchapter II of Chapter 15, expressly prohibits federal and District government employees, under pain of federal criminal and administrative penalties, from obligating or expending funds in excess or advance of a congressional appropriation. The Anti-Deficiency Act is the principal mechanism the federal government uses to ensure District and federal agency compliance with federal appropriations law.

106.    The BAA amendments purport to exempt the District's local-funds budget and supplemental budgets from the federal appropriations process, unilaterally removing District transactions involving local and supplemental funds from the scope of the Anti-Deficiency Act – an

Act of Congress that applies to all federal agencies, not just the District.  As a result, the BAA amendments attempt to amend the requirements of the Anti-Deficiency Act, and thus violate Section 602(a)(3) of the Home Rule Act.  That violation renders them a nullity under the Supremacy Clause.  *See* Article 6, Section 2 of the Constitution ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[.]").

107.    Finally, the Budget and Accounting Act, 31 U.S.C. § 1108, requires the Mayor and federal agencies to submit annual budget proposals to the President.  The BAA amendments purport to exclude the District's local-funds budget from the coverage of the Budget and Accounting Act – again, an Act of Congress that applies to all federal agencies, not just to the District.  Accordingly, the BAA amendments attempt to amend the requirements of the Budget and Accounting Act, and thus violate Section 602(a)(3) of the Home Rule Act, rendering it invalid under the Supremacy Clause.

**B.    Section 603(a)**

108.    Section 603(a) of the Home Rule Act (D.C. Official Code § 1-206.03(a)) provides:

> Nothing in this act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

109.    The BAA mandates that the District establish its own budget for local and supplemental funds, to be authorized according to a potentially different fiscal year, subject only to passive congressional review.  The BAA also eliminates the President, OMB, and the U.S. Comptroller General from the District's budget process for local and supplemental funds.  The BAA

amendments therefore contradict the express prohibition in Section 603(a), and thus are not legal amendments to the Charter under Section 303(d).

     **C.**    **Section 603(e)**

110.    Section 603(e) of the Home Rule Act (D.C. Official Code § 1-206.03(e)) states that nothing in the Home Rule Act shall be construed as affecting the applicability of the Anti-Deficiency Act to the District government.

111.    The BAA amendments purport to authorize District officials and employees to spend local and supplemental funds, without a congressional appropriation, based only on the Council's approval of budget legislation.

112.    The Act unilaterally exempts local and supplemental District funds from the requirements of the Anti-Deficiency Act, thereby violating both Section 603(e) of the Home Rule Act, and the Anti-Deficiency Act's own statement that its requirements apply to the District.

     **D.**    **Counterclaimants, the District's Attorney General, the GAO, and Congress all view the Act as invalid.**

113.    On April 8, 2014, the Attorney General for the District of Columbia issued a formal legal Opinion concluding that the Act is a nullity because it violates Sections 602 and 603 of the Home Rule Act, the Anti-Deficiency Act, and the Budget and Accounting Act.  In addition, the Attorney General noted that under Reorganization Order 50, Part II, effective July 26, 1953, his Opinion operates as the "guiding statement of the law" for the District's Executive branch, and that it "must be followed by all District officers and employees in the performance of their official duties unless and 'until overruled by a controlling court decision.'"

114.    On April 11, 2014, in a letter to the Council, Mayor Gray stated that the Opinion was "binding on the Executive branch officials in the District government absent a controlling court opinion to the contrary," and thus the BAA could have "no effect on the formation of the District's

budget." The CFO, aided by his own legal staff, also analyzed the legality of the BAA, and, on April 11, 2014, informed the Council of the CFO's conclusion that there was "no legal validity to the Act" and that any budget approved pursuant to the BAA, absent congressional or judicial approval, would not be legal.

115.     Counterclaimants and the Attorney General are not alone in their view that the Act is invalid. In a January 30, 2014 decision, the GAO, through its Office of General Counsel, also concluded that the Act is invalid, noting, following an extensive review of the Council's and Attorney General's legal views, that the "portions of the [Act] that purport to the change the federal government's role in the District's budget process are without legal force or effect." GAO Decision B-324987 (Jan. 30, 2014) (*available online at* http://www.gao.gov/assets/670/660543.pdf). The GAO also pointed to the legislative history of the Home Rule Act, noting that while that legislation was under consideration, Congress *rejected* a Senate proposal to grant the District budget autonomy, which—just like the BAA—would have granted the Council authority to make funds available for obligation and expenditure on its action alone. The GAO decision is especially noteworthy since the GAO not only is empowered to audit the District's finances, 31 U.S.C. § 715, and make "investigation[s] and report[s] [to Congress]" relating to federal "revenue, appropriations, and expenditures," *Id.* § 712, but is also the federal agency responsible for compiling all violations of the Anti-Deficiency Act, *id.* § 1351.

116.     Congressional action following the enactment of the BAA makes clear that Congress itself views its fiscal relationship with the District as unchanged. On January 15, 2014, Congress enacted the Consolidated Appropriations Act of 2014. Section 816 of that law authorizes the District to use local funds in the event of a federal government shutdown during fiscal year 2015. In doing so, Congress expressed its will that *both* Section 446 of the Home

Rule Act (D.C. Official Code § 1-204.46) *and* the Anti-Deficiency Act would continue to apply to local funds and require congressional appropriations.  This legislation leaves no doubt that Congress views the BAA as having no legal force.  Additionally, in reference to the BAA, the Financial Services and General Government Subcommittee of the U.S. House of Representatives' Committee on Appropriations has specifically noted that the BAA represented the "opinion" of District residents, but stated that the vote did not effectuate any *legal* change to the District's appropriations process.  Fiscal Year 2014 Financial Services and General Government Committee Report, p. 38. (*available online at* http://appropriations.house.gov/uploadedfiles/hrpt-113-hr-fy2014-fservices.pdf).

117.     Counterclaimants have concluded that any budget enacted pursuant to the BAA would be illegal and inoperative.  Counterclaimants cannot legally comply with the amended budget process enacted by the Council through the BAA.

118.     Counterclaimants' inability and unwillingness to comply with the BAA or authorize expenditures under any budget approved pursuant to the BAA—and face exposure to federal sanctions—calls for necessary and expedited judicial review of the Act.

## IV.     Injurious Effects of the BAA

### A.     Infringement on Executive Powers

119.     The BAA amendments violate the separation of powers inherent in the District's Charter; they annex powers and functions Congress specifically delegated to the Mayor and CFO, and prevent the Mayor and CFO from fulfilling their legal obligations under the Home Rule Act.

120.     Section 446 of the Charter empowers the Mayor to submit the District's total budget to the President.  In addition, Section 448 of the Charter (D.C. Official code § 1-204.48) provides that the Mayor "shall have charge of the administration of the financial affairs of the District," and

shall "supervise and be responsible for all financial transactions to insure adequate control of revenues and resources to insure that appropriations are not exceeded."

121.    The CFO's duties pursuant to Section 424d of the Charter (D.C. Official Code § 1-204.24d) include "preparing under the direction of the Mayor … the budget for submission by the Mayor to the Council and to the public and upon final adoption to Congress and to the public." *Id.* The CFO's duties also include: (i) "apportioning the total of all appropriations and funds made available during the year for obligation so as to prevent deficiency," (ii) "certifying all contracts and leases . . . prior to execution as to the availability of funds to meet the obligations expected," and (iii) "certifying and approving prior to payment of all bills, invoices, payrolls, and other evidences of claims, demands, or charges against the District government . . . ." *Id.*

122.    The BAA amendments, by allowing the Council to submit the local portion of the District's budget, and any subsequent supplements, directly to Congress for passive review, impermissibly intrude on the Mayor's duty under Section 446 to submit the District's total budget to the President for enactment by Congress.

123.    Furthermore, under Section 446 of the Home Rule Act (D.C. Official Code § 1-204.46), the Council must adopt a budget, after a public hearing, "within 56 calendar days after receipt of the budget proposal from the Mayor."  The BAA purports to amend this provision to allow the Council to enact the budget, as any ordinary Council legislation upon two readings, within 70 days.

124.    Pursuant to the schedule issued by the Council, the Mayor submitted the District's FY 2015 budget to the Council on April 3, 2014.  Under the Home Rule Act, the Council must therefore adopt the budget by May 29, 2014.  However, the Council schedule authorized final

Council action on the Fiscal Year 2015 Budget Request Act and the Fiscal Year 2015 Budget Support Act with two readings by June 11, or 69 days after the Mayor's submission of the budget.

125.    Because of the Council's actions, the Mayo will be unable to submit a budget to the President within the timeframe required by Section 446 of the Home Rule Act, as has been the District's practice over the past 40 years.

126.    The Home Rule Act makes clear that the District's Executive branch, through the Mayor and the CFO, is empowered and required to administer the District's finances.  The Charter further describes the Mayor's required role in the District's budget process – to develop and submit a proposed budget to the Council, and to submit the total, adopted budget to the President for enactment by Congress.  By vesting these executive functions in the Council, the BAA drastically reduces the Mayor's role in the District's budget process and severely impairs his ability to effectively comply with his congressionally-mandated duty to manage the District's finances.

**B.    Imminent Risk of Loss of Funding for District Operations**

127.    The District's finances are threatened because the Council has made clear that it will no longer comply with the budget procedures laid out in the Home Rule Act.  Thus, under the BAA, Counterclaimants will be unable to lawfully fund the operations of their respective offices.

128.    Further, the Council's refusal to follow federal law regarding District budgeting could have disastrous effects on District operations as a whole.  As noted, Section 816 of the Consolidated Appropriations Act of 2014 grants the District the right to expend local funds under the federal Budget Request Act for FY 2015 in the event of a federal government shutdown.  However, this right is contingent on the District having a validly-enacted budget for FY 2015.  Since any budget approved pursuant to the BAA would be invalid, the District risks losing the right to continue operating in the event of a federal government shutdown during FY 2015.

129.     Additionally, under D.C. Official Code § 47-392.09, control of District financial operations *automatically* reverts to a federal control board should the District (i) default on any loans, bonds, notes, or other obligations, (ii) fail to meet payroll for any pay period, (iii) fail to meet pension or benefits payments for current or former employees, or (iv) fail to make any required payments "to any entity established under an interstate compact to which the District of Columbia is a signatory." The federal control board would supersede the Mayor, the CFO, and the Council in matters relating to the District's financial operations. The Council's adherence to the BAA, should it continue past May of this year, thus creates a substantial and imminent risk that the Mayor and the CFO will lose authority over District financial operations as set forth in the Home Rule Act, and that the District as a whole will lose a substantial portion of its right to self-governance.

### C.      Counterclaimants' Liability under the Anti-Deficiency Act

130.     Under Section 603(e) of the Charter (D.C. Official Code § 1-603(e)), the Anti-Deficiency Act applies to all District spending and appropriations. Therefore, even if Counterclaimants were inclined to approve expenditures under an illegally-enacted budget, they could not do so without exposing themselves to criminal liability and administrative discipline by the federal government.

131.     Executive branch officials, including the Counterclaimants, who undertook to spend money or enter into contractual commitments as a result of the appropriations "approved" solely by the Council would be risking federal criminal and/or administrative charges for violations of the Anti-Deficiency Act. Under 31 U.S.C. § 1350, an "officer or employee . . . of the District of Columbia government knowingly and willfully violating [the Anti-Deficiency Act] . . . shall be fined not more than $5,000, imprisoned for not more than 2 years, or both."

132.     Further, under 31 U.S.C. § 1351, the Mayor is required to report all violations of the Anti-Deficiency Act to the President and Congress. The Mayor's report must include all the

relevant facts as well as a statement outlining the administrative discipline taken.  31 U.S.C. § 1349 states that such discipline can include "suspension from duty without pay or removal from office."

133.    Thus, Counterclaimants and their personnel (including thousands of District officials and employees) risk criminal prosecution and administrative discipline should they authorize expenditures under any budget enacted in accordance with the BAA.

## FIRST COUNTERCLAIM

## DECLARATORY JUDGMENT OF ILLEGALITY OF BUDGET AUTONOMY ACT

134.    Counterclaimants reallege Paragraphs l through 133 as if set forth fully in this paragraph.

135.    The BAA amendments, to the extent they purport to amend the District's budget process under the Home Rule Act, violate the Home Rule Act, the Anti-Deficiency Act, and the Budget and Accounting Act.  They are thus invalid under the Supremacy Clause.

136.    The BAA, by removing local and supplemental funds from the District's required budget process under the Home Rule Act, purport to (i) amend the requirements of the Home Rule Act, Anti-Deficiency Act, and Budget and Accounting Act in violation of Section 602(a)(3), (ii) eliminate the President, Congress, OMB, and the Comptroller General from their respective roles in the District's budget process for local and supplemental funds in violation of Section 603(a), and (iii) remove a portion of the District's budget from the purview of the Anti-Deficiency Act in violation of Section 603(e).

137.    The BAA violates the Anti-Deficiency Act and is thus null and void under the Supremacy Clause of the United States Constitution.

138.    Absent a declaratory judgment, Counterclaimants' refusal to authorize expenditures under any budget enacted pursuant to these invalid amendments creates a substantial and imminent

risk that Counterclaimants will lose funding for their respective offices and for the operations of the District of Columbia government.

## SECOND COUNTERCLAIM

## VIOLATION OF SEPARATION OF POWERS

139.    Counterclaimants reallege Paragraphs 1 through 138 as if set forth fully in this paragraph.

140.    The BAA amendments violate the principle of separation of powers inherent in the D.C. Charter by purporting to empower the Council to perform functions expressly reserved by the Charter to the Mayor.

141.    As a result of these amendments, the Mayor is unable to submit the District's total budget to the President, and thus the Mayor cannot comply with the requirements of the Home Rule Act.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants request that this Court:

a.  Declare that the Budget Autonomy Act, D.C. Law 19-321, 60 D.C. Reg. 1724 (Feb. 15, 2013), is null and void because it violates the Home Rule Act, the Anti-Deficiency Act, and the Budget and Accounting Act;

b.  Permanently enjoin the Council of the District of Columbia from enacting, approving, or submitting any portion of the District's budget in accordance with the Budget Autonomy Act; and

c.  Order such other relief as the Court determines to be just and proper.

Date: April 30, 2014                    Respectfully submitted,

                                        IRVIN B. NATHAN (D.C. Bar No. 90449)
                                        Attorney General for the District of Columbia

/s/ Ellen A. Efros
ELLEN A. EFROS (D.C. Bar No. 250746)
Deputy Attorney General
Public Interest Division


/s/ Andrew J. Saindon
ANDREW J. SAINDON (D.C. Bar No. 456987)
Senior Assistant Attorney General
Equity Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov


/s/ Nicholas A. Bush
NICHOLAS A. BUSH (D.C. Bar No. 1011001)
Assistant Attorney General
Public Advocacy Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9841
Facsimile: (202) 715-7720
E-mail: nicholas.bush@dc.gov

Lawrence S. Robbins, D.C. Bar No. 420260
Eric A. White, D.C. Bar No. 1011080
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street NW, Suite 411 L
Washington DC 20006
202-775-4501
lrobbins@robbinsrussell.com
ewhite@robbinsrussell.com
*Of Counsel to Jeffrey S. DeWitt, Chief Financial Officer of the District of Columbia*

Seth P. Waxman, D.C. Bar No. 257337
Daniel S. Volchok, D.C. Bar No. 497341
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
202 663 6000
*Of Counsel to Vincent C. Gray, Mayor of the District of Columbia*



2012 DEC 19   PM 4:20

VINCENT C. GRAY
MAYOR

December 19, 2012

The Honorable Phil Mendelson
Chairman, Council of the District of Columbia
The John A. Wilson Building
1350 Pennsylvania Avenue, N.W., Suite 504
Washington, D.C. 20004

Dear Chairman Mendelson:

        Today, I signed Bill 19-993, the Local Budget Autonomy Act of 2012. As you know, the bill
calls for the Charter-amending procedure of the District of Columbia Home Rule Act (HRA) to
provide for local budget autonomy without any affirmative congressional action. I write to briefly
explain my remaining, significant doubt as to its legality and wisdom, and why, nonetheless, I have
signed the bill.

        I take very seriously my obligation to help ensure that the District Government complies with
the governing law. After close study by the OAG and senior lawyers in my administration, I remain
doubtful that Congress has delegated the power to the District to convert unilaterally the role played
by Congress and the President in the District's budget from active participation to passive
review. For the reasons specified in further detail in my December 3, 2012 letter to you, I am
concerned about whether the bill violates a number of provisions in the HRA and in Title 31 of the
U.S. Code, which govern the process and rules for the budget enacted by Congress and carry civil
and criminal penalties for violations. The legal problems are significant and are exacerbated by the
risks, delays, and uncertainties that could be associated with likely future litigation over the validity
of the District's local budget expenditures.

        As I have said many times and in many places, I fully and passionately support the goal of
securing budget autonomy for the District of Columbia as soon as possible. And I have deep respect
for the institution of the Council of the District of Columbia, which has unanimously decided to enact
this bill. Most fundamentally, I support giving the voters of the District of Columbia an opportunity
to express their views, on record, on the issue of budget autonomy for the District. For these reasons,
I am signing the Local Budget Autonomy Act of 2012.

Sincerely,

Vincent C. Gray

Vincent C. Gray

# GAO   U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**United States Government Accountability Office**
**Washington, DC  20548**

B-324987

January 30, 2014

The Honorable Ander Crenshaw
Chairman
Subcommittee on Financial Services
and General Government
Committee on Appropriations
House of Representatives

Subject:  *District of Columbia—Local Budget Autonomy Amendment Act of 2012*

Dear Mr. Chairman:

This responds to your request for our opinion regarding the effect of the District of
Columbia's Local Budget Autonomy Amendment Act of 2012 (Budget Autonomy
Act).  In the District of Columbia Home Rule Act, Congress established the District
Government and delineated its budget process.  Through the Budget Autonomy Act,
the Council of the District of Columbia and District voters attempt to change the
federal government's role in this budget process by removing Congress from the
appropriation process of most District funds and by removing the President from the
District's budget formulation process.  In this opinion, we address the conflict
between the Budget Autonomy Act and two other federal laws:  the Antideficiency
Act[1] and the Budget and Accounting Act, 1921.[2]  The Antideficiency Act bars officers
and employees of the U.S. Government and of the Government of the District of
Columbia from making or authorizing expenditures or obligations exceeding the
amount available in an appropriation or fund.  The Budget and Accounting Act
requires the head of each agency, which for the purposes of this Act includes the
District Government, to submit a budget request to the President for transmission to
Congress.

At issue here is whether the Home Rule Act and the Antideficiency Act allow the
District Government to authorize its officers and employees to obligate and expend
funds in accordance with an act of the Council of the District of Columbia, rather
than in accordance with appropriations enacted into federal law in exercise of

---

[1] 31 U.S.C. § 1341.

[2] 31 U.S.C. § 1108.

Congress's constitutional prerogative to legislate for the seat of government and its constitutional power of the purse.  Also at issue is whether the Home Rule Act and the Budget and Accounting Act permit the District Government to change the process through which the District submits its budget request to the President for transmission to Congress.

Our practice when rendering opinions is to contact relevant agencies and officials to obtain their legal views on the subject of the request.[3]  We contacted the Chairman of the Council of the District of Columbia, the Mayor of the District of Columbia, and the Attorney General of the District of Columbia; all provided us with their views.[4]

As explained below, we conclude that provisions of the Budget Autonomy Act that attempt to change the federal government's role in the District's budget process have no legal effect.  The Home Rule Act, as well as the Antideficiency Act and the Budget and Accounting Act, serve and protect two important constitutional powers reserved to the Congress:  (1) its power "to exercise exclusive Legislation in all Cases whatsoever" over the District, U.S. Const. art. I, § 8, cl. 17, and (2) Congress's constitutional power of the purse.  We conclude, therefore, that without affirmative congressional action otherwise, the requirements of the Antideficiency Act continue to apply and District officers and employees may not obligate or expend funds except in accordance with appropriations enacted by Congress.  The District Government also remains bound by the Budget and Accounting Act, which requires it to submit budget estimates to the President.

In this opinion we express no views on the merits of Congress granting greater budget autonomy to the District.

BACKGROUND

Congressional delegation of authority in the Home Rule Act

The Constitution vests Congress with the power "to exercise exclusive Legislation in all Cases whatsoever, over . . . the Seat of the Government of the United States."

---

[3] GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* www.gao.gov/legal/resources.html.

[4] Letter from Chairman, Council of the District of Columbia, to Senior Attorney, GAO, Sept. 27, 2013 (Council Letter); Letter from Mayor, District of Columbia, to Assistant General Counsel, GAO, Sept. 11, 2013 (Mayor Letter); Letter from Attorney General, District of Columbia, to Assistant General Counsel, GAO, Sept. 10, 2013 (Attorney General Letter).

U.S. Const. art. I, § 8, cl. 17.  The Supreme Court has held that this clause vests Congress with "plenary" authority to exercise, in the District of Columbia, "the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes."  *Palmore v. United States*, 411 U.S. 389, 397 (1973).  Pursuant to this authority, in 1973, Congress enacted the District of Columbia Home Rule Act, which provides the residents of the District with limited, but substantial, powers of local self-government.[5]  Pub. L. No. 93-198, 87 Stat. 774 (Dec. 24, 1973), *codified as amended at* D.C. Code §§ 1-201.01–1-207.71 (2013).  The Home Rule Act vests in an elected Council of the District of Columbia the District's legislative power, and in an elected Mayor the District's executive power. D.C. Code §§ 1-204.04, 1-204.22.

A portion of the Home Rule Act is designated as the "District Charter," which prescribes the structure and duties of the three branches of the District Government. *Id.* §§ 1-204.01–1-204.115.  Since the enactment of the Home Rule Act, the Charter has required the Mayor to submit an annual budget for the District Government to the Council.  *Id.* § 1-204.42.  A section of the Charter titled "Enactment of Appropriations by Congress" requires the Council, after receipt of the Mayor's budget proposal, to adopt the District's annual budget, which the Mayor must then submit to the President for transmission to the Congress.  *Id.* § 1-204.42.  This Charter section also provides that "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act."  *Id.*

Budget Autonomy Act

In the Home Rule Act, Congress provided that the Charter may be amended by an act passed by the Council and ratified by District voters.  *Id.* § 1-203.03.  The Budget Autonomy Act, which is the subject of this opinion, was proposed as such a charter amendment.[6]  The Act attempts to amend sections of the District Charter pertaining

---

[5] Upon enactment, the act was titled the District of Columbia Self-Government and Governmental Reorganization Act.  Pub. L. No. 93-198, § 101.  In 1997, Congress renamed the act to the District of Columbia Home Rule Act.  Pub. L. No. 105-33, § 11717, 111 Stat. 251, 786 (Aug. 5, 1997).

[6] The Council passed the Budget Autonomy Act on December 18, 2012; the Mayor signed the measure on January 18, 2013.  *See* 60 D.C. Reg. 1724 (Feb. 15, 2013). District voters considered the Budget Autonomy Act in an election held on April 23, 2013.  *See* District of Columbia Board of Elections, *Summary of Minutes, May 8, 2013 Regular Board Meeting*, *available at* www.dcboee.org/popup.asp?url=/pdf_files/Mins_May08_13.pdf (last visited Jan. 27, 2014).  Under the Home Rule Act, the Chairman of the Council must submit charter amendments to Congress on the day the Board of Elections and Ethics certifies that

(continued...)

to the District's budget process.  In particular, the Act renames the Charter section titled "Enactment of Appropriations by Congress," replacing this title with "Enactment of local budget by Council."  D.C. Law 19-321, § 2(a), *amending* D.C. Code § 1-204.46.  The Act further attempts to amend this section to provide separate treatment for the "federal portion" and the "local portion" of the District's budget.[7]  D.C. Law No. 19-321, § 2(e), *amending* D.C. Code § 1-204.46(a).  The "federal portion" would continue to be submitted by the Mayor to the President for transmission to Congress.  *Id.*  In a key change from the original provisions of the Home Rule Act, the Budget Autonomy Act would require the Chairman of the Council, instead, to submit the "local portion" directly to the Speaker of the House of Representatives "under the procedure set forth in section 602(c) of the Home Rule Act."[8]  *Id.*  Section 602(c) requires the Council to submit its enactments to the Congress.  D.C. Code § 1-206.02.  Acts so submitted become law about

---

(...continued)
such act was ratified by the requisite number of District voters.  D.C. Code § 1-203.03(b).  The Board of Elections and Ethics so certified the Budget Autonomy Act on May 8, 2013.  Charter amendments become effective only upon (1) the expiration of a 35-day period (excluding weekends, holidays, and days in which either house of Congress is not in session) after the Chairman submits the amendment to Congress; or (2) the date specified in the charter amendment, whichever is later.  *Id.*  The Budget Autonomy Act set January 1, 2014 as its effective date.  D.C. Law 19-321, § 3.

[7] Neither the Budget Autonomy Act nor the Home Rule Act as amended contains definitions for the terms "local portion" and "federal portion."  A memorandum provided to us by the Council in support of its position indicates that the "local portion" is derived from District of Columbia tax revenues.  Letter from Chairman, Council of the District of Columbia, to Senior Attorney, GAO, Sept. 27, 2013, Appendix A, at 1.  Our conclusions on the legal effect of the Budget Autonomy Act do not turn on the meaning of either of these terms.

[8] There are some incongruities between the Budget Autonomy Act and the Home Rule Act.  For example, the Budget Autonomy Act states that "local portion of the annual budget shall be submitted by the Chairman of the Council to the *Speaker of the House of Representatives* pursuant to the procedure set forth in section 602(c)."  D.C. Law 19-321, § 2(e) (emphasis added).  Section 602(c), however, requires the Chairman to submit particular acts not only to the Speaker but also to the President of the Senate.  D.C. Code § 1-206.02(c).  We need not resolve these incongruities for the purposes of this opinion.

30 business days after submission to Congress, unless a measure disapproving the legislation is enacted into law.[9]  *Id.* § 1-206.02(c).

In addition, the Budget Autonomy Act attempts to amend language in the District Charter which forbids District employees from obligating or expending funds except in accordance with an act of Congress.  Under the amended language, District officers and employees would be forbidden from obligating or expending local funds unless the amount "has been approved by an act of the Council."  D.C. Law 19-321, § 2(e), *amending* D.C. Code § 1-204.46(c).  Though the Council's act must have been submitted to Congress under section 602(c), under the Budget Autonomy Act, no congressional action would be necessary before District officers and employees may permissibly obligate and expend local funds.  *Id.*

Under the Home Rule Act and the Charter as originally enacted, only the enactment of an appropriation, which requires passage by both Houses of Congress and presentment to the President, makes District funds available for obligation or expenditure.  Under the Budget Autonomy Act, merely an act of the Council would suffice to make local amounts available for obligation and expenditure, even in the absence of any congressional action.

The Antideficiency Act and the Budget and Accounting Act apply to the District

In furtherance of its constitutional powers, Congress has applied both the Antideficiency Act and the Budget and Accounting Act to the District Government.  The Antideficiency Act itself makes clear that it applies to officers and employees not only of the United States Government but also to the District of Columbia Government.  31 U.S.C. § 1341.  When the Home Rule Act was enacted in 1974, it confirmed the Antideficiency Act's continuing application to the District by stating that nothing in the Home Rule Act affects the applicability of the Antideficiency Act to the District Government.[10]  D.C. Code § 1-206.03(e).  This continuing application of the Antideficiency Act to the District "reflects Congress' decision . . . to expressly limit District spending to amounts Congress appropriates."  B-262069, Aug. 1, 1995.  In addition, the Budget and Accounting Act requires the head of each "agency" to submit a budget request to the President.  31 U.S.C. § 1108(b)(1).  The Budget and

---

[9] Section 602(c) applies to most acts of the Council.  It does not, however, apply to charter amendments (which are enacted under a procedure set forth in section 303) or to "acts of the Council which are submitted to the President in accordance with [the Budget and Accounting Act]" or to other limited exceptions not applicable here.  D.C. Code § 1-206.02(c).

[10] Because this section of the Home Rule Act is not contained in the Charter, the Home Rule Act grants Council and District voters no authority to amend or repeal this provision.

B-324987

Accounting Act explicitly defines the word "agency" to include the District Government.  31 U.S.C. § 1101(1).

<u>Limitations upon the powers of the District Government</u>

The Home Rule Act limits the District Government's power in many respects.  As discussed above, the Home Rule Act grants the Council and voters authority to amend the Charter.  *See* D.C. Code § 1-203.03.  However, the Home Rule Act grants the Council and voters no authority to amend provisions of the Home Rule Act outside of the Charter.  Provisions not encompassed within the Charter include section 602(a)(3), which provides that the Council may not "enact any act to amend or repeal any Act of Congress . . . which is not restricted in its application exclusively in or to the District."  *Id.* § 1-206.02(a)(3).

The District of Columbia Court of Appeals has ruled on the scope of section 602(a)(3) of the Home Rule Act.  The court considered whether criminal sentencing requirements enacted by a District voter initiative could supersede those contained in a federal law.  *McConnell v. United States*, 537 A.2d 211 (D.C. 1988).  The court noted that the federal sentencing requirements, in addition to applying to defendants convicted under District law, also applied to federal defendants in every jurisdiction in the United States.  *Id.* at 214.  The court held that because the requirements applied outside of the District, the Council and District voters had no authority to repeal the requirements.  "The District of Columbia is not authorized to repeal legislation national in scope, notwithstanding that the repeal would affect enforcement of the legislation only within the District's jurisdiction."  *Id.* at 215.  *See also Brizill v. D.C. Board of Elections and Ethics*, 911 A.2d 1212 (D.C. 2006) (District Government could not amend or repeal a federal law which barred gambling devices in certain enumerated jurisdictions, including the District).

DISCUSSION

The issue before us presents a matter of statutory interpretation.  Our analysis is rooted in the fundamental constitutional principle that Congress is empowered "to exercise exclusive Legislation in all Cases whatsoever" over the District.  All legislative authority that the District government may legitimately assert must have been given to it by Congress.  B-302230, Dec. 30, 2003.  Congress created the District Government by enacting the Home Rule Act.  Any act of the District Government must comport with the provisions of the Home Rule Act.  In this opinion, we consider whether the Home Rule Act granted the District Government authority to enact certain provisions of the Budget Autonomy Act.  In particular, we address the conflict between the Budget Autonomy Act and two other federal laws:  the Antideficiency Act and the Budget and Accounting Act.

B-324987

<u>The District Government cannot amend or repeal the requirements of the
Antideficiency Act or the Budget and Accounting Act</u>

The Home Rule Act states that the Council may not "amend or repeal any Act of
Congress . . . which is not restricted in its application exclusively in or to the
District."[11]  D.C. Code § 1-206.02(a)(3).  As the D.C. Court of Appeals has held, the
District Government cannot amend statutes that have any application outside of the
District, even if such an amendment would "affect enforcement of the legislation only
within the District's jurisdiction."  *McConnell*, 527 A.2d at 215.  Both the
Antideficiency Act and the Budget and Accounting Act have application outside of
the District, and neither act is restricted in its application exclusively to the District.
The language of the Antideficiency Act makes clear that it applies not only to officers
and employees of the District of Columbia Government but also to *all* officers and
employees of the United States Government.  31 U.S.C. § 1341(a)(1)(A) ("an officer
or employee of the United States Government or of the District of Columbia
Government may not" make an expenditure or obligation exceeding available
amounts).  The Budget and Accounting Act applies not only to the District
Government but also to the head of each federal agency.  31 U.S.C. § 1108(b)(1).
Because both of these statutes apply outside of the District and its government and
are not restricted in application exclusively to the District, the Home Rule Act bars
the District from amending or repealing either statute.

The legislative history of the Home Rule Act shows that consideration was made in
1973 to a proposal to grant budget autonomy to the District and that the proposal
was rejected.  The Senate version of the Home Rule Act would have granted
considerable fiscal autonomy to the District by providing that the "adoption of any
budget by act of the Council shall operate to appropriate and to make available for
expenditure, for the purposes therein named, the several amounts stated therein as
proposed expenditures."  S. 1435, 93rd Cong., § 504 (1973); S. Rep. No. 93-219,
at 8 (1973).  In contrast, House amendments to the Senate bill would have required
the Council to submit a budget "to the President for transmission to the Congress,
leaving Congressional appropriations and reprogramming procedures as presently
existing."  H.R. Rep. No. 93-703, at 78 (1973).  The conferees adopted the House
provisions, "preserving the Congressional appropriations provisions of existing law"
and using language that Congress ultimately enacted in the Home Rule Act.  *Id.*  As
this review of the history demonstrates, Congress considered granting the Council
authority to make funds available for obligation and expenditure.  Under the Home
Rule Act, however, pursuant to its constitutional authority to legislate for the District,

---

[11] Section 602(a)(3) of the Home Rule Act is a limitation upon the Council's authority.
Because all Charter amendments must first be passed by the Council, all Charter
amendments must comport with the limitations of section 602(a)(3).  *Hessey v.
Board of Elections and Ethics*, 601 A.2d 3, 16 (D.C. 1991); D.C. Code
§ 1-206.02(a)(3).

Congress ultimately withheld from the District the authority to make funds available for obligation or expenditure, instead reserving this authority exclusively for Congress.

The Home Rule Act also provides that it makes no "change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government." D.C. Code § 1-206.03(a). This section first states that it makes no change not only to existing "law" but also to "regulation" or to "basic procedure or practice" in the District's budget process. It preserves the federal role in that process not merely by mentioning the federal government generally but instead by specifying not one, but four federal entities: Congress, the President, the Office of Management and Budget, and GAO. It states that these four entities would continue to play their respective roles in several precisely enumerated steps of that budget process: "preparation, review, submission, examination, authorization, and appropriation." We can think of no more specific manner for Congress to specify in the Home Rule Act that Congress would retain a firm hand in the District's budget process.

The Budget Autonomy Act arrogates to the Council of the District of Columbia authority over portions of the District's budget process that Congress, in the Home Rule Act, clearly specified would remain firmly within congressional control. Only Congress may enact legislation authorizing the District Government to obligate and expend funds, contrary to the Budget Autonomy Act, which attempts to grant to the Council authority to authorize such obligations and expenditures. Under the Home Rule Act, the District must submit its budget request to the President for transmission to the Congress as part of the President's budget request, which is submitted to Congress to await potential legislative action. Yet the Budget Autonomy Act attempts to authorize the Council to send its budget directly to the Speaker of the House and, further, states that the Council's transmission becomes law not after congressional enactment but, rather, after congressional silence.

Because Congress established the District Government pursuant to its constitutional authority "to exercise exclusive Legislation in all Cases whatsoever" over the District, it is elementary that "all legislative authority that the District government may legitimately assert . . . must have been given to it by Congress." B-302230, Dec. 30, 2003. However, portions of the Budget Autonomy Act stand in direct conflict with the Antideficiency Act and with the Budget and Accounting Act and, therefore, are not permissible under the Home Rule Act, which states that the District Government may not "amend or repeal any Act of Congress . . . which is not restricted in its application exclusively in or to the District." As we pointed out in 2003, it "is well accepted in the law that *ultra vires* behavior is, *ab initio*, legally ineffective." B-302230, at 11–12. Therefore, portions of the Budget Autonomy Act that purport to

change the federal government's role in the District's budget process are without
legal force or effect.

Views of officials of the Government of the District of Columbia

As noted above, we contacted the Chairman of the Council of the District of
Columbia, the Mayor of the District of Columbia, and the Attorney General of the
District of Columbia for their views on the subject of this opinion; all provided us with
their views.  The Chairman of the Council states:

> "We strongly believe that the Home Rule Act allows the Autonomy
> Act.  The process for amending the Home Rule Act has been used
> before and is proper.  The role of Congress is retained, both
> through legislative review and its plenary authority under the
> U.S. Constitution.  Also, the new procedure meets the requirements
> of the Anti-Deficiency Act."

Council Letter.  The Chairman asserts that "[t]here is no dispute that the
Antideficiency Act applies to District officers and employees."  Council Letter,
Attachment A, at 6.  We agree with this position.  Our views diverge, however, where
the Chairman asserts that the Antideficiency Act allows District officers and
employees to obligate or expend funds "in strict accordance with a budget act duly
enacted [by the Council] pursuant to the District's charter, as amended by the
Autonomy Act."  *Id.*  The Chairman asserts that Congress has granted to the District
a permanent appropriation of the District's local funds.  Council Letter, Attachment A,
at 9–10.  A permanent appropriation is available for obligation and expenditure
without further congressional action.  B-204078.2, May 6, 1988; GAO, *A Glossary of
Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.:
Sept. 2005), at 22–23.  He concludes that the Budget Autonomy Act lawfully
repealed provisions of the Home Rule Act that restricted the District's authority to
obligate and expend this permanent appropriation.  Council Letter, Attachment A,
at 12.

We disagree with the Chairman's assertion that Congress has provided the District
with a permanent appropriation.  By law, the making of an appropriation must be
expressly stated.  31 U.S.C. § 1301(d).  An appropriation cannot be inferred or made
by implication.  50 Comp. Gen. 863 (1971).  The Chairman asserts that the District
Charter established a permanent appropriation because it provided that District
monies "belong to the District government."  Council Letter, Attachment A, at 9; D.C.
Code § 1-204.50.  However, this language is not the express statement of
appropriation that is necessary under 31 U.S.C. § 1301(d).

The Chairman also cites decisions in which we concluded that Congress had
provided agencies with a permanent appropriation.  B-228777, Aug. 26, 1988;
B-197118, Jan. 14, 1980.  However, these decisions are not pertinent here.  We

have concluded that only statutes that authorize both the deposit and the expenditure of a class of receipts make those funds available for the specified purpose without further congressional action. *See, e.g.,* B-228777, B-197118. In this case, though the Home Rule Act requires the deposit of funds, it does not authorize their expenditure and, therefore, manifests no congressional intent to make these amounts available for obligation or expenditure without further congressional action. Indeed, section 446 of the Home Rule Act expressly provided that "no amount may be obligated or expended by any officer or employee of the District of Columbia Government unless such amount has been approved by Act of Congress, and then only according to such Act." D.C. Code § 1-204.46. Congress could not have intended to provide a permanent appropriation to the District in the Home Rule Act where, in the very same act, it provided that funds would be available only with the approval of an act of Congress.

In the alternative, the Chairman argues:

> "[T]he purpose and text of the Antideficiency Act would be satisfied when the District Government enacts an annual appropriation pursuant to the Autonomy Act. This is evident by the text of the Antideficiency Act, which provides that obligations and expenditures must be consistent with an appropriation, but does not specifically state that it must be a *congressional* appropriation."

Council Letter, Attachment A, at 11–12. We disagree. The applicability of the Antideficiency Act to the District, both by its very terms and by the terms of the Home Rule Act, "reflects Congress' decision . . . to expressly limit District spending to amounts *Congress* appropriates." B-262069 (emphasis added). Only acts of Congress, not acts by the Council or by officers or employees of the District Government or the federal government, make amounts available for obligation and expenditure.

The Chairman also places significance in the fact that Congress has not enacted into law a resolution disapproving of the Budget Autonomy Act.[12] Council Letter,

---

[12] Specifically, the Chairman asserted that "now that the Autonomy Act has completed the process set forth in [Home Rule Act] section 303, including the Congressional review period, the Autonomy Act is law and was a legitimate exercise of the charter-amendment power." Council Letter, Attachment A, at 5–6. A memorandum provided to us in support of the Council's position states that "Congress had the opportunity to veto the Charter amendment . . . but declined to do so," which suggests that "Congress determined that the District has the legal authority under the Anti-Deficiency Act to amend its Charter in the way it did." Council Letter, Attachment B, at 5.

Attachment A, at 5–6.  As discussed above, the Home Rule Act provided no authority to enact the Budget Autonomy Act.  It is elementary that acts taken without legal authority are void at the outset.  *See* B-302230, at 11–12; *McConnell*, 537 A.2d at 215 (District ballot initiative had no effect because it exceeded powers granted to the District in the Home Rule Act).  It is, therefore, of no legal significance that Congress did not enact a resolution disapproving of the Budget Autonomy Act.  *See id.*  Even in the absence of such a resolution, the amendments of the Budget Autonomy Act have no force or effect.

The Mayor stated that "[a]lthough I strongly support budget autonomy for the District of Columbia and believe that the status quo is unacceptable, I continue to have legal concerns with the act and refer you to the Attorney General's Response for details."  Mayor Letter.  In his response to us, the Attorney General of the District of Columbia stated that he "fully support[s] the concept of budget autonomy for the District for the revenues that we raise from our citizens."  Attorney General Letter, Attachment, at 2.  However, he also states that "any fair reading" of the Home Rule Act and of the District Charter contained therein demonstrates that the Home Rule Act does not provide the Council and the District voters authority to enact the Budget Autonomy Act.  Attorney General Letter, Attachment, at 3–4.  For the reasons we discussed in this opinion, we agree with the concerns the Mayor and the Attorney General of the District of Columbia have expressed.

CONCLUSION

Provisions of the Budget Autonomy Act that attempt to change the federal government's role in the District's budget process have no legal effect.  District officers and employees continue to be bound by the Antideficiency Act, which bars them from obligating funds except in accordance with appropriations enacted by Congress.  The District Government remains bound by provisions of federal law which require it to submit budget estimates to the President for transmission to the Congress for the enactment of appropriations.

The Constitution vests Congress with power "to exercise exclusive Legislation in all Cases whatsoever" over the District.  Pursuant to this authority, Congress has enacted the Home Rule Act.  While the Home Rule Act grants the District Government substantial powers of self-government, the District Government must also comport with the all of the act's limitations.  A key limitation in the Home Rule Act provides that the District Government may not amend or repeal any act of Congress which is not restricted in its application exclusively in or to the District.  However, portions of the Budget Autonomy Act irreconcilably conflict with two laws that are not restricted in their application exclusively in or to the District: the Antideficiency Act and the Budget and Accounting Act.  These conflicts render the Budget Autonomy Act impermissible under the Home Rule Act and, therefore, the District Government acted beyond the scope of its authority when it attempted to enact the Budget Autonomy Act.  Because acts taken *ultra vires* are, *ab initio*, legally

ineffective, portions of the Budget Autonomy Act that purport to change the federal government's role in the District's budget process are without legal force or effect.

The plain meaning of the Home Rule Act, coupled with the continuing force of the Antideficiency Act and of the Budget and Accounting Act, compels us to reach the conclusions we draw in this opinion.  In this opinion we express no views on the merit of greater budget autonomy for the District; it is a matter that rests with the Congress.[13]

We are providing copies of this opinion to the Chairman of the Council, the Mayor, and to the Attorney General of the District of Columbia.  If you have any questions, please contact Edda Emmanuelli Perez, Managing Associate General Counsel, at (202) 512-2853, or Katherine S. Lenane, Assistant General Counsel for Appropriations Law, at (202) 512-2792.

Sincerely yours,

Susan A. Poling
General Counsel

---

[13] Some members of Congress have proposed legislation that would affect some aspects of the budget process as it applies to the District Government.  *See, e.g.*, H.R. 2793, 113th Cong. (2013).

Document #150D0336       Filed: 07/01/20

U.S. HOUSE OF REPRESENTATIVES,
Washington, D.C., October 9, 1973.

DEAR COLLEAGUE: Because of the unusual parliamentary situation regarding H.R. 9682; the Self-Determination bill for the District of Columbia, the undersigned Members of the D.C. Committee will offer an amendment in the nature of a substitute during the Floor debate.

The Committee substitute contains six important changes which were made after numerous conversations and sessions with Members of Congress and other interested parties. These changes clarify the intent of H.R. 9682 and accommodate major reservations expressed since the bill was reported out.

They are as follows:

1. Budgetary process. Return to the Existing Line Item Congressional Appropriation Role.

2. Change Election for Mayor and City Council from Partisan to Non-Partisan.

3. Authorize the President in an Emergency to Take Control of D.C. Police Force.

4. *Further* Federal Oversight re City Council:

(a) Require a 30-day Lay-Over for Effective Date of Legislative Actions of the City Council.

(b) Give the President Authority to Sustain the Veto by the Mayor When Overridden by the City Council.

5. Judiciary:

(a) Require Senate Confirmation of Judges.

(b) Provide for Automatic Reappointment for "Exceptionally Well Qualified" and "Well Qualified" Judges as determined by the Commission on Judicial Disabilities and Tenure.

6. Reservation of Congressional Authority—*Additional* Limitations on Council:

(a) City Council Prohibited from Changing Functions or Duties of U.S. Attorney and U.S. Marshal in D.C.

(b) City Council is prohibited from making changes in Statutes Under Titles 22, 23 and 24, of the D.C. Code—the Criminal Code.

Other than these changes, the committee substitute follows the committee bill, H.R. 9682.

For further information the undersigned, their staffs and the staff of the House District Committee welcome your inquiries.

Sincerely,

Charles C. Diggs, Donald M. Fraser, Thomas M. Rees, Brock Adams, Walter E. Fauntroy, Romano L. Mazzoli, James J. Howard.

Les Aspin, John Breckinridge, Fortney H. (Pete) Stark, Gilbert Gude, Charles B. Rangel, Henry P. Smith, III, James R. Mann, Stewart B. McKinney.

**JA130**



VINCENT C. GRAY
MAYOR

**VIA HAND DELIVERY**

The Honorable Phil Mendelson
Chairman, Council of the District of Columbia
The John A. Wilson Building
1350 Pennsylvania Avenue, N.W., Suite 504
Washington, D.C.  20004

Dear Chairman Mendelson:

Thank you for the opportunity to comment on Bill 19-993, the Local Budget Autonomy Act of 2012.

If enacted, the proposed bill would call for the Charter-amending procedure of the District of Columbia Home Rule Act (HRA) to provide for local budget autonomy without any affirmative congressional action.  It would do so in two ways.

First, it would authorize a separate path for the appropriation of the District's local budget -- *i.e.*, revenues raised from District taxes, fees, and fines and those received under federal grant programs applicable nationally -- from the path for the federal portion -- *i.e.*, the federal payment to the District.  The federal portion would continue to follow the path currently set forth in the District's Charter -- passed by Congress through its well-established authority to regulate District affairs under Article I of the U.S. Constitution -- that requires an affirmative appropriation by Congress and Presidential approval before any of it can be lawfully spent by the District Government.  However, for the local portion, the rules would change.  Rather than requiring an active, congressional appropriation and Presidential signature, the local portion would take effect after being passed by District lawmakers and then laying before Congress for *passive* review during the 30 legislative day period unless Congress passes, and the President approves, a Joint Resolution disapproving the act of the Council.

Second, it would provide for a change in the dates of the fiscal year for the District of Columbia Government -- from its current schedule, October 1-September 30, which currently

The Honorable Phil Mendelson
December 3, 2012
Page 2

tracks the schedule of the federal budget, to run from July 1 through June 30 on its own
independent track.

As you know, I fully and passionately support the goal of securing budget autonomy for
the District of Columbia as soon as possible. I know that the Council generally shares this view,
and I applaud the Councilmembers for focusing on this critical issue. Indeed, I have been
diligently working with federal leaders to achieve this goal through congressional legislation.

At the same time, I take very seriously my obligation to help ensure that the District
Government complies with the governing law. After close study by the OAG and senior lawyers
in my administration, I am doubtful that Congress has delegated the power to the District to
convert unilaterally the role played by Congress and the President in the District's budget from
active participation to passive review. I am concerned about whether the bill if enacted would
violate a number of provisions in the HRA and in Title 31 of the U.S. Code, which governs the
process and rules for the budget enacted by Congress and carries civil and criminal penalties for
violations.

My administration is not alone in raising these legal concerns. Independent experts with
decades of experience in District of Columbia jurisprudence have expressed this view.   On
October 26, 2012 Wayne Witkowski, a former OAG deputy attorney general for the Legal
Counsel Division in OAG and Leonard Becker, a former general counsel to Mayor Anthony A.
Williams and former D.C. Bar counsel, wrote an Op-Ed piece in the Washington Post on Bill 19-
993 titled "*An Unlawful Proposal for D.C. Budget Autonomy*," which I have attached to this
letter. The two conclude unequivocally after their legal analysis: "[T]he Home Rule Act does
not permit a referendum on budget autonomy. The only way the charter can be amended as
proposed is through an act of Congress." As the op-ed notes, this is a long-held understanding
within the District government: "for almost four decades, the District's elected leadership,
officials and lawyers have not viewed Section 303 as a vehicle for changing the District's budget
procedures."

The legal problems that they and our lawyers raise are significant and are exacerbated by
the risks, delays, and uncertainties that could be associated with likely future litigation over the
validity of the District's local budget expenditures.   Budgets require predictability and stability
and the proposed plan threatens to send us in the opposite direction.

Further, I am also concerned about whether the bill has been carefully enough vetted so
as to avoid undermining the District's crucially important relationship with Congress and our
federal partners, damage to which could affect us adversely across a range of key issues for the
resources and effectiveness of our local government.

Below I discuss in more detail my deep, abiding support for District budget autonomy,
and also summarize the significant legal and practical concerns about seeking to achieve that
goal through the approach embodied in this bill. I provide a summary of these concerns for the

The Honorable Phil Mendelson
December 3, 2012
Page 3

Council's consideration before it takes steps that in the long-run may not be in the District's best
interests.

**The District's Need for Budget Autonomy**

The District of Columbia's lack of budget autonomy creates major and disruptive
uncertainty in the functioning of this government. Over the past 15 years, Congress has in
virtually every one of those years failed to pass the appropriations bill that covers the District
budget by the start of the fiscal year. Despite the District submitting a balanced budget each and
every year during that period, Congress has forced the District to operate in a fluctuating fiscal
year. Every year, the District provides our budget, balanced and on time. Every year, we are
forced to wait days, weeks and months for Congress to get around to us.

This is unacceptable and should end.

The District of Columbia, unlike the federal government, cannot simply print more
money or increase its debt level to provide breathing room. Not having budget autonomy
imposes significant costs upon us. As things currently stand, the District is at risk of shutting
down *every time* the federal government faces a shutdown. Each time this occurs, the District, as
a result of our lack of budget autonomy, is held hostage to Congress' inability to pass the budget
timely and is forced to spend precious time and significant resources planning for a shutdown
contingency. In addition, the routine months-long delays in Congress to approve our local
budget cost the District millions in interest charges, and they undermine sound fiscal planning.
Throughout the year, the District adjusts its budget to ensure that a balance between what we
take in and what we spent is maintained.

Not only does the lack of budget autonomy exact an unnecessary and unfortunate cost
on the District, it is also clear that the District's performance affirmatively justifies budget
autonomy. The District Government collects well over $5 billion annually in local government
taxes and fees. Over the past several years, the District's financial health is the envy of most
other local jurisdictions: we have had a balanced budget for over 15 years, and our fiscal stability
has gained and under my administration, I am proud to say, sustained and increased the well-
earned confidence of the investment community. And yet our ongoing lack of budget autonomy
-- our legal inability to spend a dime of even our locally generated tax dollars without an
affirmative federal appropriation -- threatens to undermine this progress.

Budget autonomy is not only a fiscal policy issue. Fundamentally, it is a civil rights
issue. The way the District is treated is shameful.

The District should not be required to submit its local funds for congressional review.
Our government represents the over 600,000 residents of the nation's capital. Most Americans
would be appalled if their decisions for their schools, libraries and parks required inspection and
approval by Congress. The District should have the authority to decide how and when to spend
the billions in annual locally generated tax dollars that our local government brings in -- similar
to every other jurisdiction in this country. There is no good reason we should not be able as a

The Honorable Phil Mendelson
December 3, 2012
Page 4

core principle of local governance to have the authority to decide how and when to spend the billions of dollars in annual tax dollars that we as local government generate.

I have spoken out time and time again on this issue at every chance. I feel so strongly about this that, for example, in April 2011 I joined DC Vote, a number of members of the Council, and dozens of fed up District residents in a protest in front of the United States Senate, and I was arrested and jailed along with my fellow protesters by the U.S. Capitol Police. Similarly, in 2011, on behalf of the District, as co-Chair of our delegation to the Democratic convention, I took the message of budget autonomy to the national convention of the Democratic Party in Charlotte, where it was the central theme of my remarks. We have succeeded in persuading President Obama to advocate for this view in Congress. As the President's FY 13 budget submission stated (at page 1317): "Consistent with the principle of home rule, it is the Administration's view that the District's local budget should be authorized to take effect without a separate annual Federal appropriations bill. The Administration will work with *Congress* and the Mayor to pass legislation to amend the D.C. Home Rule Act to provide the District with local budget autonomy." (Emphasis added). And, of course, my administration has worked closely with Congresswoman Eleanor Holmes Norton and the leaders of both houses of Congress to continue to move this issue forward so that we can attain a budget autonomy bill in Congress free from noxious social policy riders. That has been and continues to be one of our principal goals -- to secure a clean budget autonomy bill in Congress and, ultimately, to secure permanent, legally sound budget autonomy protections.

**<u>Legal Concerns About the Bill</u>**

But, and this is a significant "but": we have substantial concerns that by purporting to grant the District budget autonomy through local legislation with no affirmative vote by Congress, the bill, if enacted, may violate federal law. In particular, our lawyers have concerns that the bill may violate the Home Rule Act, Title 31 of the U.S. Code, or both. These concerns are summarized below.

*Concerns that the Bill Would Violate the Home Rule Act*

As you know, the HRA is a fundamental piece of legislation in which Congress in 1973 delegated many, though not all, of its governing responsibilities over the District of Columbia to the Mayor and the Council. It serves as our equivalent of a state constitution. The key concern is Section 303(d) of the HRA, which as enacted by Congress nearly forty years ago, provides that "The amending procedure provided in this section may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603." D.C. Code § 1-203.03 (emphasis added). This provision means that if the Council may not enact a law with respect to which the Council is barred from legislating under the "limitations specified" in sections 601-603 of the HRA, the referendum process of the HRA likewise may not lawfully be used to do so. The bill may violate this provision of the HRA in at least three different ways, any one of which would render it invalid if the bill were challenged in court.

The Honorable Phil Mendelson
December 3, 2012
Page 5

  i.  **HRA § 602(a)(3)**

  Section 602(a)(3) provides that the Council may not: "[e]nact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." D.C. Code § 1-206.02(a)(3). Section 602 of the Home Rule Act is expressly titled by Congress as a statement of "Limitations on the Council," so it is plain that it is a limitation. Thus, if the proposed bill would "concern[] the functions . . . of the United States" it is precluded by Section 303(d) from being legislated by the Charter amendment. By altering (albeit not eliminating) the role of Congress and the President in the review of the District's budget, the proposed initiative appears to concern the functions of the United States *and*, because it alters the role of Congress and the President, would not be limited in its application to the District. The bill is therefore problematic under this standard.

  ii.  **HRA § 603(a)**

  If enacted, the bill may also violate HRA Section 603(a), which provides that "Nothing in this Act [the Home Rule Act] shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government."

  Because Section 303(d) bars the use of referendum process to enact or amend any law under the limitations specified in Section 603, a key initial question is whether this provision in Section 603(a) is a limitation. The conclusion that Congress did not intend such a strict reading of the word "limitations" is supported by Congress's explicit reference in § 303(d) to "limitations" found in § 601, D.C. Code § 1-206.01, which contains in it no express limitation on the Council. Congress would not have done so if it meant in § 303(d) to refer only to provisions that are explicitly phrased as "limitations." Further, the HRA's legislative history shows that Congress intended to preserve the congressional appropriation process for the District's budget. Indeed, our lawyers have uncovered no indication in the HRA's legislative history that any member of Congress *ever* contemplated that the Charter-amending procedures could be used to affect Congress's appropriation of the total budget of the District Government. This matters because changing the approval route for over half of the District budget is something significant enough that Congress would likely have mentioned it if this was authority it intended to confer.

  We are concerned that the bill's proposed change of the fiscal year would violate this limitation. Changing the timing of the fiscal year would appear to alter "existing law . . . relating to the respective roles of the Congress [and] the President . . . in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government," contrary to Section 603(a).

The Honorable Phil Mendelson
December 3, 2012
Page 6

      iii.     **HRA § 603(e)**

Beyond Section 602(a)(3) and 603(a), we are further concerned that Section 603(e) would constitute a third, independent basis for invalidity of the proposed bill under the HRA. Section 603(e) provides that "Nothing in this Act shall be construed as affecting the applicability to the District Government of the provisions of section 3679 of the Revised Statutes of the United States, the so-called Anti-Deficiency Act," a long-standing law which requires that all expenditures of funds come from an appropriation so that federal agencies do not spend beyond their budgets.

Just as with Section 603(a), there is an initial question of whether 603(e) is a "limitation." For similar reasons as discussed above for Section 603(a), we think it is unlikely that Section 603(e) would be held by a court to be a mere canon of construction or suggestion by Congress. Further, the HRA legislative history makes clear that the language adopting the Anti-deficiency Act was intended to be substantively identical, *i.e.*, to keep the appropriations limits of the Anti-deficiency Act fully applicable to the District.

Because 603 is a "limitation[]" for purposes of the HRA's Section 303(d), the question is whether the bill if enacted would violate this limitation. I have substantial concerns that it would. My concern is that because under the proposed bill Congress will not have passed any appropriation for the District's local budget, those expending the District's local budget will be violating the federal Anti-deficiency Act, which carries with it criminal and civil penalties. I am very concerned about exposing our highly valued District employees to such professional and personal risks.

### *Concerns That the Proposed Bill Would Violate Title 31 of the U.S. Code*

Even if the proposed bill did not exceed the limitations on the use of the Charter amending procedure specified in Section 303(d) the Home Rule Act, we are, separately, concerned that the bill would directly conflict with Title 31 of the United States Code, which deals with "Money and Finance." Under the Constitution, federal law would trump the Charter amendments if they became the law of the District and were in conflict with federal law.

Title 31 is an exercise of Congress's power under Article I of the Constitution, section 9, clause 7, which provides that "[n]o Money shall be drawn from the Treasury but in Consequence of Appropriations made by Law . . . ." Title 31 was originally a codification of the Budget and Accounting Act of 1921, as amended. In 1982, Congress revised Title 31 and enacted it into law.

For reasons similar to those outlined above, it could conflict with the Anti-deficiency Act itself, the provisions of Title 31 requiring that expenditures of the District's budget not exceed the amounts available as appropriated by Congress. The limitations on the District's expenditures and obligations under 31 U.S.C. § 1341 are substantively the same as the provision in Section 446 of the Home Rule Act that "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been

The Honorable Phil Mendelson
December 3, 2012
Page 7

approved by Act of Congress, and then only according to such Act." Expenditure or obligations of District funds pursuant to an act of the Council, but without congressional authorization, would not comply with Section 1341.

We are also concerned that if the proposed bill amended the Charter to provide a different fiscal year for the entire budget of the District Government, it would be in irreconcilable conflict with these provisions of federal law. No advocates for the bill have pointed us to any interpretations or guidance to the contrary from the federal agencies that administer these laws.

If the referendum were passed, executive branch officials who undertook to spend money as a result of the appropriations by the Council would be risking potential federal criminal charges for violations of the Anti-deficiency Act. This is not a dilemma that I would wish anyone working in my Administration or any future one in the District Government to have to face.

**Practical Concerns**

We must also evaluate additional practical risks associated with the bill.

First, I am not convinced that enough has been done to ensure that the bill will not undermine our crucial relationship with Congress before we take such a momentous step. For years, we have been working tirelessly on the difficult path through Congress that, while slow and arduous, like so many fights before that we have overcome, would after we achieved victory give us the clear, legally clean and necessary path to the desired result. It would be unfortunate and unwise to short-circuit efforts by Congresswoman Norton and those of the House and Senate leaders to continue pressing forward for this clean budget autonomy provision. If the District moves forward with Bill 19-993, I am concerned that the cause of getting Congress to approve D.C. budget autonomy may be set back many years if Members bristle at this attempt to circumvent their authority. Further, it would be even worse if such short-circuiting hurts our efforts on other significant fiscal and policy matters that the District has before Congress.

Second, we need to consider the risks, delays, and uncertainties that could be associated with future litigation over the validity of the District's local budget expenditures. As noted, budgets require predictability and stability, which could be threatened if the bill and referendum are passed.

Finally, I am concerned about going down the path proposed by the bill of a charter initiative to accompany the 2013 special election, as opposed to an election that will have a full slate of candidates for the Council and Mayor running as is scheduled in 2014. If, as some have said, the goal of the bill is to send a resounding message to Congress that District residents want budget autonomy, including the referendum during a special election may not be the best approach -- turnout for the April 2011 at-large special election was a little above 10%.

\*\*\*

USCA Case #14-7067      Document #1500336        Filed: 07/01/2014      Page 142 of 470

The Honorable Phil Mendelson
December 3, 2012
Page 8

    For all these reasons, the bill's legal and practical risks should be more closely mitigated
before we make a misstep that hurts the District and the stability of its budget process and
exposes our highly valued District Government employees to civil or criminal liability risks. I
respectfully urge caution and further consideration before leaping to the admittedly attractive
prospect of attempting to secure budget autonomy for the District without any affirmative vote
by Congress.

Sincerely,

Vincent C. Gray

cc:      All Councilmembers
         The Honorable Eleanor Holmes Norton

**STATEMENT OF IRVIN B. NATHAN, ATTORNEY GENERAL OF THE
DISTRICT OF COLUMBIA, ON THE LOCAL BUDGET AUTONOMY
EMERGENCY AMENDMENT ACT OF 2012**

**BEFORE THE DISTRICT OF COLUMBIA BOARD OF ELECTIONS**

**JANUARY 7, 2013**

Good morning, Madam Chair, Board Members, and staff.  I am Irv

Nathan, Attorney General for the District of Columbia.  I'm joined today

by my Senior Counsel Ariel Levinson-Waldman.  Thank you for the

opportunity to testify about the Local Budget Autonomy Emergency Act

Amendment of 2012 and the D.C. Charter amendment process.

Like each of you, I am a member of the D.C. Bar and an official of the

District of Columbia government. In both capacities we have taken

oaths to uphold and faithfully execute the laws of the United States and

the District of Columbia. In light of these oaths, I am here today to do

something that is very difficult and sad, and will be urging you to do

something that may be even more difficult and courageous.  What I, in

my capacity as an independent Attorney General and not as a

spokesman for the Gray Administration, am asking you, as independent

referees of our electoral system, to do is to adhere to the D.C. Charter, passed by the Congress, signed by the President, endorsed by the citizens of the District and codified in the D.C. Code,  and decline to place on a ballot for the electorate a politically popular proposed amendment to our charter, unanimously passed by the Council, signed by the Mayor, and praised by high-profile and well-meaning advocacy groups.  What makes this so difficult and sad for me is that I fully support the concept of budget autonomy for the District for the revenues that we raise from our citizens.  It is only just and right that we in the District be able to spend the funds we raise locally without advance permission from the Congress, which may not always have the best interests of the District in mind. That's why I fully support the diligent efforts of Mayor Gray, Congresswoman Norton and others to convince Congress to pass legislation providing budget autonomy for our locally raised revenues.  For that is the only lawful way to achieve this worthy and just goal.

USCA Case #14-7067      Document #1500336      Filed: 07/01/2014      Page 145 of 470

Any fair reading of the Charter demonstrates the proposed amendment

violates the Charter's amendment procedures and that it would violate

our governing law to place it on the election ballot. Specifically, section

303(d) of the Home Rule Act, Codified in D.C. Code section 206.03(d),

states unequivocally "The [Charter] amending procedure ... may not be

used to enact any law or affect any law with respect to which the

Council may not enact ... under the limitations specified in §§ 1-206.01

to 1-206.03."  Those sections reserve and retain for the federal

government full authority over the D.C. budget  and specifically

provide that nothing in the Charter gives the District  any right to make

any change in the existing laws, regulations, procedures or practice

relating to the roles of Congress, the President, the federal Office of

Management and Budget, and the U.S. Comptroller General in the

preparation, review, authorization and appropriation of the total

budget of the District of Columbia government.  Moreover, these

provisions say that the D.C. Council may not pass any law that concerns

or affects the functions of the United States government, and these

provisions further make clear that no expenditure by any D.C.

government employee is lawful without an appropriation from

Congress.  The statutory provision (§ 206.03(d)) which forbids using the

Charter amendment process to make any changes to the federal

budget process is in the same section, indeed immediately follows the

provision (§ 206.03 (c)), that empowers this Board to have a role in the

Charter amending process. The prohibition is stated in clear, mandatory

terms and must be followed by every entity, including most especially

the Board, which is involved in the charter amendment process. As an

independent agency where each of its members is chosen for

"demonstrated integrity, independence, and public credibility…with

knowledge [and] training… in government ethics or in elections law and

procedure…" the Board has, in our judgment, a statutory obligation to

make an independent examination of whether its actions would violate

subsection (d).

4

The D.C. Court of Appeals spoke definitively on this topic more than

two decades ago, when it stated: "Under the Self-Government [Home

Rule] Act, Congress retains the power to appropriate all District

government revenues…; the Council cannot authorize the spending of

local revenues; only Congress can."  *Hessey v. District of Columbia*

*Board of Elections and Ethics*, 601 A.2d 3 (D.C. 1991) (en banc).

(emphasis added).  The Court added in a footnote:  "The legislative

history of the Self-Government Act makes clear that the … Act left in

place the pre-existing Congressional appropriations process for the

District government."  (Citations omitted.)

In my letter to you on Friday, I detailed the three separate limitations

specified within D.C. Code §§ 206.01- 206.03 that would be violated by

the proposed amendment and therefore barred under subsection (d)

from the Charter amendment process.  Any one of these three

statutory limitations would, by operation of subsection (d), make it

unlawful to use the Charter amendment process for the proposed

USCA Case #14-7067      Document #1500336      Filed: 07/01/2014      Page 148 of 470

amendment and thus unlawful for the Board to place it on the ballot as part of that process.  When the three are considered in their totality, the impropriety of this procedure is manifest.  I'll discuss the three limitations here briefly, and would be pleased to address any of your questions on them as well.  I will then discuss in more detail what I believe the Board's obligations are under the law, which is certainly not limited to the ministerial role of a clerk, as the D.C. Council's submissions would suggest.

First, Code §206.02(a)(3) provides that the Council has no authority to "enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."  Removing the expenditure of local funds from the federal appropriations process would affect the functions of the United States by preventing Congress, with Presidential approval, from appropriating local District funds.  It would also alter the functions of the federal OMB

and the U.S. Comptroller General in our budget process.  It would also have an application beyond District matters by limiting the participation of the federal government in the District's budget process.  In addition, changing the District's fiscal year would affect the functions of the United States and extend beyond the District's local affairs by making it difficult, if not impossible, for Congress and federal officials to review the District's finances during its regular budget cycle.

Second, the amendment would violate Code §206.03(a) because the amendment would change the long-standing roles and procedures of the stated federal entities with respect to the District's "total budget." Upon enactment, rather than being subject to the federal appropriations process, the District would establish its own budget for local funds, to be appropriated according to a different fiscal year, subject only to passive Congressional review, rather than the currently mandated active review by Congress and the President.  The

amendment's major change in the District's budget process would

directly contradict the prohibition in this section, which states:

> (a) Nothing in this act [The Home Rule Act] shall be
>
> construed as making any change in existing law, regulation,
>
> or basic procedure relating to the respective roles of the
>
> Congress, the President the federal Office of Management
>
> and Budget, and the Comptroller of the United States in the
>
> preparation, review, submission, examination, authorization
>
> and appropriation of the total budget of the District of
>
> Columbia government.

While ignoring the two other limitations, the D.C. Council's submission

suggests that there are two possible readings of this provision.  The first

it admits is "a bright-line prohibition of the ability of the [D.C.] Council

to affect the budget process as set forth" in the Charter.  As an

alternative it posits the provision could be read simply to mean that

Congress maintains ultimate authority with respect to D.C.'s budget

and that the Council can change by Charter amendment all the parts that deal with the local part of the budget. The submission concludes that the Council prefers the second reading, without any statutory or legislative history justification. Indeed, the submission, in a part of the memo it has provided, said that Congress's legislative intent "is not dispositive of the issue," presumably admitting that the Council recognizes that Congressional intent favors the first interpretation. We submit there is only one fair reading of that provision, which accords with both the express language of Charter and Congressional intent: the bright-line prohibition against the Council altering the budget process as it existed when Home Rule was passed.

Third, the amendment would violate Code § 206.03(e) (a provision not discussed by the Council's submission) because the federal law provisions incorporated by reference there prohibit government employees from obligating or expending funds in excess or in advance of an appropriation by Congress.

The proposed Charter amendment would also violate the Anti-Deficiency Act and other provisions of Title 31 of the U.S. Code, which provide for criminal and civil penalties for any government employee, including explicitly any D.C. government employee, who expends government funds without an express Congressional appropriation. Under the Supremacy Clause of the U.S. Constitution, the Anti-Deficiency Act would prevail and any D.C. employee who spent local funds on the basis of the proposed amendment, assuming it became operative, would be in jeopardy of federal enforcement action and job loss.

Based on these provisions of the Charter and federal law, and after an extended period of research and analysis, my office, including apolitical career lawyers who have been with the office for decades, has reluctantly concluded that each of these provisions separately, independently and collectively precludes use of the charter amendment procedures for the proposed amendment, including its

**JA148**

placement on a ballot for the electorate. As two prominent District

lawyers, Wayne Witkowski, for over 30 years a revered member of the

Corporation Counsel's office (later the OAG), and Leonard Becker,

former General Counsel to Mayor Williams and a former D.C. Bar

Counsel, wrote in an op-ed piece, finding the proposed amendment

unlawful, "It is no wonder that for almost four decades, the District's

elected leadership, officials and lawyers have not viewed Section 303 as

a vehicle for changing the District's budget procedures."  (I am

appending a copy of the Washington Post op-ed piece to my

testimony.)

In a supplemental submission over the weekend, the Council has

claimed that the Board has simply ministerial duties relating to Charter

amendments that the Council has proposed, that the Board has no

"jurisdiction" to consider the legality of its proposed amendment, that

the Board should just defer to the Council's actions, and that the

Board's regulations and precedent preclude its making an independent

legal analysis and judgment.  The Council is wrong on all counts.

The Congress chose the Board to be involved in the amendment

process  precisely because of its independence, neutrality and

knowledge and expertise in election law and procedure.  The Mayor

chose, and the Council ratified, lawyers for this Board who would

understand and be bound by the law and, in accordance with the

statute, in the performance of their duties, "would not be subject to

the direction of any nonjudicial officer of the District..."  D.C. Code

§ 1001.06.

Hypothetically, if the Council's views were accepted, the Board would

have to put on the ballot, without any independent legal analysis,

Charter amendment legislation passed by the Council no matter how

plainly unlawful it was, such as:  1) abolishing the office of the Mayor

(in violation of §§1-203.03 (a) and 1-204.21); or 2) precluding the U.S.

Attorney from prosecuting any Council Member or Mayor for any

federal criminal offense (in violation of D.C. Code  §1-206.02 (a) (8)); or

3) resegregating our public schools (in violation of the law of the land as

expressed in _Brown v. Board of Education,_ 347 U.S. 483 (1954), and

_Bolling v. Sharpe_, 347 U.S. 497 (1954)). Of course, the Board would do

no such thing, and in each case, it would exercise an independent legal

judgment and conclude that the patently illegal measure could not be

placed on the ballot, notwithstanding the Council's (hypothetical) votes

and urgings.

The controlling principle is set forth in the binding case which must

govern the Board, _Mayers v. Ridley_, 465 F.2d 630 (D.C. Cir. 1972).  In

that case, the D.C. Circuit ruled en banc that the D.C. Recorder of

Deeds, who generally has a ministerial role in accepting deeds for filing,

may not violate with impunity governing federal law and the U.S.

Constitution and thus could not lawfully record and file deeds

containing racially restrictive covenants which had been declared void

and unenforceable in _Shelley v. Kraemer_, 334 U.S. 1 (1948).  The D.C.

Circuit held that even though the Recorder's duties are ministerial, he had to make an independent legal judgment to insure that his actions were lawful under applicable law.

That is what this Board must do in this situation.  It must insure that its actions in the Charter amendment process are lawful and in accordance with applicable law, including D.C. Code §1-203.03 (d).  It is not a question of having "jurisdiction."  It is not a question of giving deference to the Council, which may act for political reasons not strictly in accordance with the law.  It is not a question of having to have regulations to deal with the rare time that the Council may propose an amendment barred by the Charter.  The Board has no regulations that speak one way or the other to the question.  In any event, what controls here is the statute, which gives the Board a role in the Charter amendment process.  The question is solely one of the Board making sure that its actions are lawful and not misleading the electorate that its votes will be valid and not struck down as in violation of the Charter

or other federal law.  As history is our guide, this type of issue will not arise frequently and even more rarely with such clarity.

The Board's independent legal analysis of its action is not inconsistent with its decision in _In Re School Governance Charter Amendment Act of 2000_ (DCBOEE, May 11, 2000). In that case, the question was whether the Council had violated its own procedures in passing the proposed charter amendment regarding two readings of the proposed legislation in "substantially the same form."  The Board concluded it did not sit in judgment or review of the Council's internal procedures and declined "to look behind the Council's actions." In this case, the Board has to decide if it can participate in the Charter amendment process by placing on the ballot a proposed amendment that is barred by the same Charter provision that gives the Board a role in the process.  We are not asking the Board to "look behind the Council's actions."  We are asking the Board to consider carefully before it takes its own action, and to be

sure that it is acting lawfully, just as the Recorder of Deeds has to do when presented with a deed that may violate federal law.

The Council's counsel also argues that if the Board refuses to place the proposed Charter amendment on the ballot, the Board will effectively deny the District's electorate the opportunity to let their views on this topic to be known.  This, too, is wrong.  The Council is fully able to pass a bill calling for a non-binding vote by the electorate in which District voters can express their views on local budget autonomy.  By following the law here, the Board will prevent the voters from being misled about the likely consequence of their vote.

The Board's independent legal analysis can and does end the necessary inquiry for the Board.  However, I note that, politically unpopular as this result may seem, the Board should take some comfort, as I do, in the fact that keeping this proposed amendment off the ballot may well be in the long-term interests of the District.  As you may know, before becoming the Attorney General for the District, I served from 2007 to

January 2011 as the General Counsel of the U.S. House of

Representative.  And many years prior to that I served as a special

outside counsel for a standing committee of the U.S. Senate.  This

service does not color my view of the law, which is derived from the

objective analysis of all of the career lawyers in my office who have

examined the issue; but this service does give me some sense of how

Congress views its prerogatives and powers and how it will likely react

if the proposed amendment goes forward  and is passed by our voters,

purporting to unilaterally change Congress's  and the federal

government's role with respect to the District budget.

To put it mildly, it is not likely to be pretty.  As we have seen all too

vividly, Congress is already able and has been willing to intrude on the

District's affairs by enacting social policy that runs contrary to the views

of the majority of District citizens regarding such issues as firearms,

women's health, and the District government's ability to protect HIV

patients.  Any doubt about the likely reaction on the Hill was dispelled

by the public comments of Chairman Issa of the House Government

Oversight Committee, which has jurisdiction over the District of

Columbia.  As quoted by <u>Rollcall</u> on December 7, 2012, he said, the

proposed amendment "does undermine my ability to get for them

[District residents]  what I believe they want  . . . It has been my

proposal all along that nonbinding referendums, a statement of the

people, a redress to their government, is positive . . . as opposed to

essentially a partial secession from the union by saying, 'We believe we

have this inalienable right' even though nowhere in the [Constitution]

does this exist."  In short, he has compared the passage of this

proposed amendment as a "partial secession" from the United States.

In apparent sympathy with D.C. voters, he noted "If D.C. residents are

being asked to vote on a legal, constitutional question, it isn't a fair

question to place to the people."  Mr. Issa's words may be the tip of the

iceberg of problems the District would have in Congress.  Congress

could react not only by invalidating the amendment, but also by taking

punitive  measures.

Even without a punitive response, if the amendment became law, it will likely be subjected to litigation and delay in the courts, never a good thing for the budget process, which requires stability and predictability. Finally, if the amendment became law, I and every other employee of the District government would have to be concerned about our personal civil and criminal legal exposure under the federal Anti-Deficiency Act if we were to expend funds pursuant to the local budget passed by the Council but not appropriated by the Congress.

In the end, of course, these are policy decisions to be made by the Council and the Mayor.  But the one question which the Board and only the Board can decide is whether it will be acting lawfully in placing this proposed amendment on the ballot and leading D.C. voters to believe that when they vote on this proposed amendment they are engaged in a matter which is properly before them.  On that issue, I am urging you to make an informed independent judgment, and the analysis I have provided from our office is designed to assist you in that endeavor.

19

USCA Case #14-7067      Document #1500336      Filed: 07/01/2014      Page 162 of 470

Thank you for your consideration.  I am pleased to answer any

questions you may have.

# The Washington Post, October 26, 2012

# An unlawful proposal for D.C. budget autonomy

**By Wayne C. Witkowski and Leonard H. Becker, Published: October 26**

The D.C. Council is moving forward with a proposal to use the referendum process to give the District autonomy over its local budget — that is, the approximately $6 billion a year that the District raises in local taxes — and thereby enable it to avoid the need to wait for congressional action as part of the often-delayed federal budget process. But this raises one big question: Can the referendum process lawfully be employed in this way to reduce the role of Congress under the Home Rule Act?

At the outset, let us state that we strongly believe that, after almost four decades of home rule, the District should be able to enact its budget for local revenue without having to get approval from Congress. Section 446 of the D.C. Charter (part of the Home Rule Act) is obsolete in this respect. Unfortunately, only an act of Congress can cure this defect.

Under the Constitution, Congress has the exclusive authority to legislate for the District. The Home Rule Act is the product of Congress's exercise of that authority, and what Congress has given, Congress can limit or even take away. To advance the discussion on this important issue, we want to state firmly the Home Rule Act does not permit a referendum on budget autonomy. The only way the charter can be amended as proposed is through an act of Congress.

To understand why, one has to look closely at the pertinent provisions of the Home Rule Act, so bear with us as we walk through the law. Section 303 of the act specifies that it may not be used "under the limitations of sections 601, 602, and 603." Those sections are titled "Reservation of Congressional Authority," and Section 603(a) states: "Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice" regarding "the preparation, review, submission, examination, authorization and appropriation of the total budget of the District of Columbia government." When the Home Rule Act was enacted, existing law, procedure and practice required the District's total budget to be approved by Congress, and the language of the act leaves little doubt that Congress intended to prevent the District from using Section 303 to eliminate this authority — including over the portion of the D.C. budget based on local revenue.

Essentially, the District is seeking to replace affirmative congressional review of its local budget (meaning that Congress must act to pass legislation approving the budget) with passive review (meaning the local budget becomes law unless Congress takes action to disapprove it). But Congress understood

that overturning D.C. Council legislation under passive review — entailing diverting Congress from pressing national issues, expending scarce legislative time and resources to educate members about D.C. matters, winning majorities in both houses of Congress and obtaining the president's sign-on — is a cumbersome process. Indeed, Congress has rarely overturned council legislation during the almost four decades of home rule. It is absurd to think that Congress gave the District the power to make its budget acts subject only to passive review, especially when such a change itself would be subject only to passive review.

Besides Section 603(a), Congress made its primary role in enacting the District's budget triply sure. Section 303 also adds the limitation in Section 603(e) declaring the continued applicability to the District of the federal Anti-Deficiency Act, which requires that expenditures of the federal and the D.C. governments not exceed the amounts as appropriated by Congress. Section 303 further adds the limitation in Section 602(a)(3), which prohibits the council from amending any act of Congress, such as the Anti-Deficiency Act, that concerns the functions of the United States. It's no wonder that for almost four decades, the District's elected leadership, officials and lawyers have not viewed Section 303 as a vehicle for changing the District's budget procedures.

Finally, among the legal risks of the current proposal is the prospect that the District will be sued and that the courts will rule this use of Section 303 to be unlawful. Unfortunately, if the District inflicts such an injury on itself, the cause of getting Congress to approve D.C. budget autonomy — the proper method to accomplish this — may be set back many years as members bristle at this attempt to circumvent their authority. Even if no suit is brought, D.C. government personnel who obligate and spend locally raised revenue will be in the untenable position of risking prosecution under the Anti-Deficiency Act — a strict liability statute that, under the Supremacy Clause of the U.S. Constitution, would preempt the proposed charter amendment.

It is simply unfair to place the District's employees in the position of choosing possible insubordination if they refuse to obligate or spend District funds, on the one hand, and prosecution under the Anti-Deficiency Act if they obligate or spend funds, on the other.

Wayne Witkowski is a former deputy attorney general for the Legal Counsel Division in the D.C. attorney general's office. Leonard Becker served as general counsel to Mayor Anthony A. Williams from 2003 through 2006.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

COUNCIL OF THE DISTRICT OF
COLUMBIA,

      Plaintiff,

      v.

VINCENT C. GRAY, in his official capacity
as Mayor of the District of Columbia,

         and

JEFFREY S. DeWITT, in his official capacity
as Chief Financial Officer for the District of
Columbia,

      Defendants.

</td><td>

No. 1:14-cv-00655-EGS

Hon. Emmet G. Sullivan

</td></tr>
</table>

**PLAINTIFF'S ANSWER TO DEFENDANTS' COUNTERCLAIMS**[*]

The Council of the District of Columbia responds to the allegations in Defendants'

Counterclaims as follows:

Any allegation not expressly admitted is denied.

**OVERVIEW**

*74.      The actions of the Council, in enacting the BAA, violate the Home Rule Act,*

*other federal statutes, the U.S. Constitution, and the principle of separation of powers*

*incorporated in the District's Charter. The Home Rule Act does not permit either the Council or*

*the citizens of the District to unilaterally seize budget autonomy for the District and thereby*

*deprive the President, Congress, and other federal agencies of their long-established roles in the*

---

[*] For simplicity, the Council refers to itself throughout as "the Council" or "Plaintiff" and
refers to Defendants/Counterclaimants as "Defendants."

*enactment of the District's budget. The only lawful way the Charter can be amended as proposed by the BAA is through an Act of Congress, as President Obama and members of both the House and the Senate have proposed.*

**Response:** Denied.

*75.      The Charter outlines the specific steps that must be taken in order for the District to develop and propose, and for Congress to enact, the District's yearly budget and any supplements thereto. The Charter requires that the Mayor, in consultation with the CFO, draft and submit a proposed budget to the Council for adoption. The Council must adopt a final budget within 56 days of receiving the Mayor's proposal, and then the Mayor must submit the adopted budget to the President for ultimate enactment by Congress of an appropriations Act signed by the President. The Home Rule Act does not grant the District authority to alter this process through local legislation; such authority rests solely with Congress and the President to do so through the prescribed Article 1, Section 7 process by which federal laws are enacted or amended.*

**Response:** Admitted the Charter requires the Mayor, in consultation with the CFO, to draft and submit a proposed budget to the Council for adoption.  Otherwise denied.

*76.      Nonetheless, the Council enacted the BAA, which purported to alter the District's budget process under the Charter.  Specifically, the BAA maintained the congressionally-mandated budget process for the "federal portion" of the District's budget but purported to make an act of the Council, without more, sufficient to permit the spending of (i) the "local portion" of the District's budget and (ii) any supplement to the budget, regardless of whether the supplement obligated federal or local funds. In addition, the BAA purported to permit the Council to change the District's fiscal year.*

**Response:** Denied that the Budget Autonomy Act only "purported" to change the law.  In light of the congressional review period, further denied that the Budget Autonomy Act "make[s] an act of the Council, without more, sufficient to permit the spending of . . . the 'local portion' of the District's budget."  Denied that the Budget Autonomy Act applies to "any supplement to the budget, regardless of whether the supplement obligated federal or local funds."  Admitted that the Budget Autonomy Act "permit[s] the Council to change the District's fiscal year."

77.     *The BAA amendments to the Charter violate the Home Rule Act in several ways. Title VI of the Charter is entitled "Reservation of Congressional Authority" and Section 602 under that Title is entitled "Limitations on the Council." Section 602(a) provides that the "Council shall have no authority . . . to . . . (3) enact any act, or . . . amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." In violation of this provision, and hence of the Supremacy Clause, the BAA purports to affect the functions of the federal government under the Home Rule Act (and under the Anti-Deficiency Act and Budget and Accounting Act).*

**Response:** Denied.

78.     *Section 603 of the Home Rule Act, which is entitled "Budget Process: Limitations on Borrowing and Spending," provides that "Nothing in this act shall be construed as making any change in existing law. . . or basic procedure and practice relating to the respective roles of Congress, the President, the federal office of Management and Budget and the Comptroller General of the United States in the preparation, review, submission, examination, authorization and appropriation of the total budget of the District of Columbia government." The BAA violates this provision as well, because the BAA purports to change "existing law,*

*regulation, or basic procedure and practice" regarding every one of these federal institutions in the District's budget process.*

**Response:** Denied. The Council further notes that Section 603 is entitled "Budget Process; Limitations on Borrowing and Spending."

*79.      The BAA violates Section 603(e) of the Home Rule Act by purporting to remove the "local portion" of the District's budget and any subsequent supplements to the budget from the purview of the Anti-Deficiency Act. Section 603(e) states: "Nothing in this Act shall be construed as affecting the applicability to the District government" of the Anti-Deficiency Act, Title 31, Ch. 15 of the U.S. Code. So insistent was Congress in the Home Rule Act that the District comply with the Anti-Deficiency Act that it repeated this injunction in Section 446 (entitled "Enactment of Appropriations By Congress"): "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and only according to such Act."*

**Response:** Denied.

*80.      The language of the Home Rule Act, reserving the power of appropriations to Congress and precluding any amendment of the Charter by the Council on that issue, is clear because without that assurance Congress would never have granted limited home rule to the District. Opponents of home rule for the District predicated their position on congressional loss of control over the District's budget. To garner their support, Congressman Walter Fauntroy of the District and others, including Congressmen Charles Diggs of Michigan and Brock Adams of Washington, brokered a compromise that in return for limited home rule, the legislation would insure that Congress kept control over the District's budget, including expenditures. That bargain carried the legislative day, and for 40 years every local Administration and Council*

*adhered to that bargain—until enactment of the BAA.*

**Response:** Denied.

81.     *The Attorney General for the District of Columbia has issued a formal legal*
*Opinion that the Act is legally invalid and null and void. So, too, has the General Counsel of the*
*General Accountability Office ("GAO"). In reliance on those opinions, confirmed independently*
*by the CFO's legal staff, Counterclaimants have concluded that any budget approved pursuant*
*to the BAA would not be legally valid. Accordingly, Counterclaimants will neither comply with*
*the provisions of the BAA that violate the Home Rule Act and the Anti-Deficiency Act, nor*
*approve expenditures under an illegally-enacted budget at the risk of criminal, civil, or*
*administrative penalties. Counterclaimants' refusal to abide by the BAA, a legal nullity, supports*
*a request for necessary and expedited judicial review of the Act, to confirm that*
*Counterclaimants are justified in following the binding federal law and not implementing the*
*patently illegal BAA.*

**Response:** Admitted that the Attorney General and the GAO have issued legal opinions
on the subject of the BAA. The Plaintiff refers the Court to these opinion letters for a complete
and accurate description of their contents. Admitted that Defendants have refused to abide by the
BAA, and that this refusal supports a request for necessary and expedited judicial review.
Plaintiff lacks knowledge or information sufficient to form a belief about the truth or falsity of
the allegation that these opinions were confirmed "independently" by the CFO's legal staff.
Plaintiff denies the remaining allegations.

82.     *The BAA's amendments to the Charter would, if implemented, impermissibly*
*intrude on congressionally-mandated functions of the Mayor and CFO, and would expose*
*Counterclaimants and thousands of other Executive employees to potential criminal, civil, and*

*administrative liability under the Anti-Deficiency Act. Further, the Council's actions expose Counterclaimants to a substantial and imminent risk of the loss of funding for their respective offices, as well as a loss of funding for District government operations as a whole. Indeed, if the District does not have appropriated funds for the CFO to authorize payment of salaries and pensions of current and former employees of the District, the District could be faced with the return of the federal control board as a matter of law.*

**Response:** Denied.

## PARTIES

*83.     Counterclaimant Vincent C. Gray is the Mayor of the District of Columbia. The District, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States.*

**Response:** Admitted.

*84.     Counterclaimant Jeffrey S. DeWitt is the Chief Financial Officer for the District.*

**Response:** Admitted.

*85.     Mayor Gray and CFO DeWitt bring this counterclaim through the District's Attorney General, pursuant to the Attorney General's authority to uphold the public interest and to institute suit on behalf of the District in court under D.C. Official Code § 1-301.81(a)(1) (2013 Supp.).*

**Response:** The allegation that Defendants may bring these counterclaims through the Attorney General is a legal conclusion not subject to admission or denial.  Denied that the Attorney General is "uphold[ing] the public interest."

*86.     Counterclaim Defendant Council of the District of Columbia is the legislative branch of the District of Columbia government.*

**Response:** Admitted.

## JURISDICTION AND VENUE

87.     *This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201. The challenged Council legislation interferes with the execution of federal law under Title 31 of the United States Code.*

**Response:** The allegation that this Court has subject matter jurisdiction is a legal conclusion not subject to admission or denial.

88.     *Venue lies in this Court pursuant to 28 U.S.C. § 1391.*

**Response:**  The allegation that this Court is a proper venue is a legal conclusion not subject to admission or denial.

## STATEMENT

**I.     District of Columbia Home Rule Act**

89.     *Article 1, Section 8, Clause 17 of the U.S. Constitution vests Congress with the power "to exercise exclusive legislation in all Cases whatsoever" over the District of Columbia.*

**Response:** The Council refers the Court to the Constitution for a complete and accurate description of its contents.

90.     *In 1973, pursuant to this authority, Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, later codified as D.C. Official Code §§ 1-201.01, et seq. (2013) ("Home Rule Act"). The Home Rule Act provides residents of the District substantial, but not unlimited, powers of local self-government. However, it also explicitly reserves to Congress (in Section 1-201.02) "the ultimate legislative authority over the nation's capital granted by article I, § 8, of the Constitution[.]"  Further, Congress expressly identified a number of what Title VI of the Charter identifies as "Limitations on the Council."*

7

*These limitations include the following, now codified at D.C. Section 602(a)(3): "The Council*

*shall have no authority to pass any act contrary to the provisions of this Act except as*

*specifically provided in this Act, or to. . . (3) enact any act, or enact any act to amend or repeal*

*any Act of Congress, which concerns the functions or property of the United States or which is*

*not restricted in its application exclusively in or to the District . . . ."*

**Response:** The Council refers the Court to these statutes for a complete and accurate
description of their contents.

*91.      Sections 1-204.01 through 1-204.115 of the Home Rule Act constitute the*

*District of Columbia Charter, which sets forth the organizational structure of the District*

*government. The Charter created a tripartite form of government, vesting legislative power in*

*the Council and executive power in the Mayor. D.C. Official Code §§ 1-204.04, 1-204.22.*

**Response:** The Council refers the Court to the Charter for a complete and accurate
description of its contents.

*92.      The Charter mandates that each year the Mayor submit an annual budget for the*

*District to the Council. § 1-204.42. After receipt of the Mayor's budget proposal, the Council*

*must adopt a budget for the District, which the Mayor must then submit to the President for*

*transmission to Congress. The Charter requires a similar process for any supplements to the*

*budget. The Charter also provides that "no amount may be obligated or expended by any officer*

*or employee of the District of Columbia government unless such amount has been approved by*

*Act of Congress, and then only according to such Act." Id.,§ 1- 1-204.46 (2012).*

**Response:** The Council refers the Court to the Charter for a complete and accurate
description of its contents.

*93.      Section 103(15) of the Home Rule Act (D.C. Official Code § 1-201.03(15))*

defines "budget" as "the entire request for appropriations and loan or spending authority for all activities of all agencies of the District financed from all existing or proposed resources and shall include both operating and capital expenditures."

**Response:** The Council refers the Court to the Home Rule Act for a complete and accurate description of its contents.

94.     In the Home Rule Act, Congress provided that the Charter could be amended in some respects by an act passed by the Council and ratified by a majority of District voters. *Id.*, § 1-203.03. Section 303(d), however, explicitly prohibits the use of this process to enact any law contrary to the limitations set forth in Sections 601, 602, and 603 of the Home Rule Act, which, among other things, specifically reserves to Congress control of the District's budget.

**Response:** The Council refers the Court to the Charter for a complete and accurate description of its contents.

## II.     Budget Autonomy Act of 2013

95.     The BAA was passed by the Council on December 4, 2012, and subsequently signed by the Mayor. On or about December 19, 2012, the Mayor sent a letter to the Chairman of the Council (with copies to every other councilmember), expressing his belief that while he "fully and passionately support[s] the goal of securing budget autonomy for the District of Columbia as soon as possible[,]" the proposed legislation likely violated the Home Rule Act and other provisions of federal law.  In a special election held on April 23, 2013, a majority of those voting approved the Budget Autonomy Act. The number of voters who voted for the BAA in the special election constituted less than ten percent of the total number of registered voters in the District. As required by the Home Rule Act, the District's Board of Elections certified the ratification of the Act, on May 8, 2013, and the Chairman of the Council submitted the Act's

*purported Charter amendments to Congress that same day, per D.C. Official Code § 1-203.03(b).*

**Response:** Admitted that the BAA was unanimously enacted by the Council, signed by the Mayor, and  ratified by a majority of District voters. Otherwise denied.

96.   *Congress took no formal action with respect to the Act, and the BAA, by its terms, purported to become effective as of January 1, 2014.*

**Response:** Denied that the BAA only "purported" to become effective.  Otherwise admitted.

97.   *The BAA purports to amend several provisions of the Charter relating to the District's budget process by (i) exempting the District's budget process for "local" funds and subsequent supplements to the budget from the congressional appropriations requirements established by Congress in the Home Rule Act, and (ii) permitting the Council to change the District's fiscal year.*

**Response:** Denied that the BAA only "purports" to amend Charter provisions. Plaintiff refers the Court to the BAA for a complete and accurate description of its contents.

98.   *The Act purported to change the title of Charter Section 446 (D.C. Official Code § 1-204.46) from "Enactment of Appropriations by Congress" to "Enactment of local budget by Council." The Act would separately treat the "federal portion" and the "local portion" of the District's budget. Although neither of those terms is defined in either the BAA or the Home Rule Act, it appears that the "local portion" is that segment of the District's budget derived from local sources, including District of Columbia income, sales, and property tax revenues. Approximately two-thirds of the District's budget stems from such local revenues. The Act purports to change the review by Congress and the President of the District's local budget*

*appropriations from active—as mandated by the Home Rule Act, and followed by the District*

*and federal governments for the past forty years—to passive.*

**Response:** Plaintiff refers the Court to the BAA for a complete and accurate description

of its contents.

99.     *Additionally, the Act purports to require that the Council Chairman submit the*

*local portion directly to the Speaker of the House of Representatives for passive review*

*"pursuant to the procedure set forth in section 602(c) of the Home Rule Act." D.C. Law 19-321,*

*§ 2(e). Under this provision, the Mayor would no longer submit the local portion to the*

*President, and the President would no longer submit it to Congress for enactment. The federal*

*portion of the District's budget would continue to be submitted by the Mayor to the President for*

*transmission to Congress for enactment.*

**Response:** Plaintiff refers the Court to the BAA for a complete and accurate description

of its contents.

100.     *Furthermore, the Act purports to allow the Council to enact any supplements to*

*the annual budget, and submit the supplements directly to Congress for passive review.  D.C.*

*Law 19-321, § 2(e). The Act does not distinguish between supplements using federal funds and*

*supplements using local funds.*

**Response:** Plaintiff refers the Court to the BAA for a complete and accurate description

of its contents.

101.     *Because Section 446 of the Charter prohibits District employees from obligating*

*or expending funds except in accordance with an act of Congress, the Act attempts to amend that*

*section of the Charter to allow District employees to obligate or expend local funds if the amount*

*"has been approved by an act of the Council."  Id., amending D.C. Code 1-204.46. Thus, under*

*the Act, no congressional action would be necessary before District employees could obligate and expend local and supplemental funds.*

**Response:** Plaintiff refers the Court to the BAA for a complete and accurate description of its contents.

### III.   The Illegality and Invalidity of the Budget Autonomy Act

*102.      The BAA's purported amendments to the Charter violate the Home Rule Act because they contravene Sections 602 and 603, and thus are prohibited amendments under Section 303(d). These violations of federal law render the BAA null and void.*

**Response:** Denied.

### A.      Section 602(a)(3)

*103.      Section 602(a) of the Charter (D.C. Official Code § 1-206.02(a)(3)) provides that the Council "shall have no authority . . . to . . . (3) enact any act, or . . . amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."*

**Response:** Plaintiff refers the Court to this provision for a complete and accurate description of its contents.

*104.      The BAA amendments remove the budgeting of local and supplemental funds from the federal appropriations process and allow the Council to change the District's fiscal year.  These changes would affect the functions of the United States by (i) preventing Congress, with Presidential approval, from appropriating local District funds and supplemental District funds; (ii) eliminating the President, the federal Office of Management and Budget ("OMB") and the U.S. Comptroller General from their respective roles in the local portion of the District's budget process and the entire District supplemental budget process; and (iii) making it difficult, if not impossible,*

for Congress to review the District's finances during Congress' regular budget cycle.  Further, because the Home Rule Act, including the Charter, allocates functions between the District and the federal government, it is an Act of Congress not limited in its application "exclusively in or to the District."  The BAA amendments to the Charter thus violate Section 602(a)(3) of the Home Rule Act.

   **Response:** Denied.

   105.   In addition, the Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1349 to 1351 and subchapter II of Chapter 15, expressly prohibits federal and District government employees, under pain of federal criminal and administrative penalties, from obligating or expending funds in excess or advance of a congressional appropriation.  The Anti-Deficiency Act is the principal mechanism the federal government uses to ensure District and federal agency compliance with federal appropriations law.

   **Response:** Plaintiff refers the Court to the Anti-Deficiency Act for a complete and accurate description of its contents.

   106.   The BAA amendments purport to exempt the District's local-funds budget and supplemental budgets from the federal appropriations process, unilaterally removing District transactions involving local and supplemental funds from the scope of the Anti-Deficiency Act – an Act of Congress that applies to all federal agencies, not just the District.  As a result, the BAA amendments attempt to amend the requirements of the Anti-Deficiency Act, and thus violate Section 602(a)(3) of the Home Rule Act.  That violation renders them a nullity under the Supremacy Clause.  See Article 6, Section 2 of the Constitution ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[.]").

   **Response:** Denied.

107.    Finally, the Budget and Accounting Act, 31 U.S.C. § 1108, requires the Mayor and federal agencies to submit annual budget proposals to the President.  The BAA amendments purport to exclude the District's local-funds budget from the coverage of the Budget and Accounting Act – again, an Act of Congress that applies to all federal agencies, not just to the District.  Accordingly, the BAA amendments attempt to amend the requirements of the Budget and Accounting Act, and thus violate Section 602(a)(3) of the Home Rule Act, rendering it invalid under the Supremacy Clause.

**Response:** Denied.

### B.      Section 603(a)

108.    Section 603(a) of the Home Rule Act (D.C. Official Code § 1-206.03(a)) provides: Nothing in this act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

**Response:** Admitted.

109.    The BAA mandates that the District establish its own budget for local and supplemental funds, to be authorized according to a potentially different fiscal year, subject only to passive congressional review.  The BAA also eliminates the President, OMB, and the U.S. Comptroller General from the District's budget process for local and supplemental funds.  The BAA amendments therefore contradict the express prohibition in Section 603(a), and thus are not legal amendments to the Charter under Section 303(d).

**Response:** Denied.

**C.        Section 603(e)**

*110.        Section 603(e) of the Home Rule Act (D.C. Official Code § 1-206.03(e)) states that*

*nothing in the Home Rule Act shall be construed as affecting the applicability of the Anti-*

*Deficiency Act to the District government.*

**Response:** Plaintiff refers the Court to this provision for a complete and accurate

description of its contents.

*111. The BAA amendments purport to authorize District officials and employees to spend*

*local and supplemental funds, without a congressional appropriation, based only on the Council's*

*approval of budget legislation.*

**Response:** Plaintiff refers the Court to the BAA for a complete and accurate description

of its contents.

*112.        The Act unilaterally exempts local and supplemental District funds from the*

*requirements of the Anti-Deficiency Act, thereby violating both Section 603(e) of the Home Rule*

*Act, and the Anti-Deficiency Act's own statement that its requirements apply to the District.*

**Response:** Denied.

**D.        Counterclaimants, the District's Attorney General, the GAO, and Congress
all view the Act as invalid.**

*113.        On April 8, 2014, the Attorney General for the District of Columbia issued a formal*

*legal Opinion concluding that the Act is a nullity because it violates Sections 602 and 603 of the*

*Home Rule Act, the Anti-Deficiency Act, and the Budget and Accounting Act.  In addition, the*

*Attorney General noted that under Reorganization Order 50, Part II, effective July 26, 1953, his*

*Opinion operates as the "guiding statement of the law" for the District's Executive branch, and that*

*it "must be followed by all District officers and employees in the performance of their official duties*

*unless and 'until overruled by a controlling court decision.'"*

**Response:** Admitted.

114.    On April 11, 2014, in a letter to the Council, Mayor Gray stated that the Opinion

was *"binding on the Executive branch officials in the District government absent a controlling*

*court opinion to the contrary," and thus the BAA could have "no effect on the formation of the*

*District's budget." The CFO, aided by his own legal staff, also analyzed the legality of the BAA,*

*and, on April 11, 2014, informed the Council of the CFO's conclusion that there was "no legal*

*validity to the Act" and that any budget approved pursuant to the BAA, absent congressional or*

*judicial approval, would not be legal.*

**Response:** Plaintiff lacks knowledge or information sufficient to form a belief about the

truth or falsity of the allegation that these opinions were "confirmed independently" by the

CFO's legal staff. Plaintiff admits the remaining allegations.

115.    *Counterclaimants and the Attorney General are not alone in their view that the Act*

*is invalid. In a January 30, 2014 decision, the GAO, through its Office of General Counsel, also*

*concluded that the Act is invalid, noting, following an extensive review of the Council's and*

*Attorney General's legal views, that the "portions of the [Act] that purport to the change the*

*federal government's role in the District's budget process are without legal force or effect." GAO*

*Decision B-324987 (Jan. 30, 2014) (available online at http://www.gao.gov/assets/670/660543.pdf).*

*The GAO also pointed to the legislative history of the Home Rule Act, noting that while that*

*legislation was under consideration, Congress rejected a Senate proposal to grant the District*

*budget autonomy, which—just like the BAA—would have granted the Council authority to make*

*funds available for obligation and expenditure on its action alone. The GAO decision is especially*

*noteworthy since the GAO not only is empowered to audit the District's finances, 31 U.S.C. § 715,*

*and make "investigation[s] and report[s] [to Congress]" relating to federal "revenue,*

*appropriations, and expenditures," Id. § 712, but is also the federal agency responsible for*

*compiling all violations of the Anti-Deficiency Act, id. § 1351.*

**Response:** Denied that the GAO opinion is "especially noteworthy." Plaintiff lacks

knowledge or information sufficient to form a belief about the truth or falsity of the allegation

that the GAO conducted an "extensive" review of competing legal views before issuing its

opinion.

*116.     Congressional action following the enactment of the BAA makes clear that*

*Congress itself views its fiscal relationship with the District as unchanged. On January 15, 2014,*

*Congress enacted the Consolidated Appropriations Act of 2014. Section 816 of that law*

*authorizes the District to use local funds in the event of a federal government shutdown during*

*fiscal year 2015. In doing so, Congress expressed its will that both Section 446 of the Home Rule*

*Act (D.C. Official Code § 1-204.46) and the Anti-Deficiency Act would continue to apply to local*

*funds and require congressional appropriations. This legislation leaves no doubt that Congress*

*views the BAA as having no legal force.  Additionally, in reference to the BAA, the Financial*

*Services and General Government Subcommittee of the U.S. House of Representatives'*

*Committee on Appropriations has specifically noted that the BAA represented the "opinion" of*

*District residents, but stated that the vote did not effectuate any legal change to the District's*

*appropriations process. Fiscal Year 2014 Financial Services and General Government*

*Committee Report, p. 38. (available online at http://appropriations.house.gov/uploadedfiles/hrpt-*

*113-hr-fy2014-fservices.pdf).*

**Response:** Denied.

*117.     Counterclaimants have concluded that any budget enacted pursuant to the BAA*

*would be illegal and inoperative.  Counterclaimants cannot legally comply with the amended*

*budget process enacted by the Council through the BAA.*

**Response:** Denied.

*118.      Counterclaimants' inability and unwillingness to comply with the BAA or authorize expenditures under any budget approved pursuant to the BAA—and face exposure to federal sanctions—calls for necessary and expedited judicial review of the Act.*

**Response:** Admitted that Defendants' refusal to comply with binding law calls for necessary and expedited judicial review of the Act. Otherwise denied.

**IV.      Injurious Effects of the BAA**

**A.      Infringement on Executive Powers**

*119.      The BAA amendments violate the separation of powers inherent in the District's Charter; they annex powers and functions Congress specifically delegated to the Mayor and CFO, and prevent the Mayor and CFO from fulfilling their legal obligations under the Home Rule Act.*

**Response:** Denied.

*120.      Section 446 of the Charter empowers the Mayor to submit the District's total budget to the President.  In addition, Section 448 of the Charter (D.C. Official code § 1-204.48) provides that the Mayor "shall have charge of the administration of the financial affairs of the District," and shall "supervise and be responsible for all financial transactions to insure adequate control of revenues and resources to insure that appropriations are not exceeded."*

**Response:** Plaintiff refers the Court to these provisions for a complete and accurate description of their contents.

*121.      The CFO's duties pursuant to Section 424d of the Charter (D.C. Official Code § 1-204.24d) include "preparing under the direction of the Mayor … the budget for submission by the Mayor to the Council and to the public and upon final adoption to Congress and to the public."  Id.*

*The CFO's duties also include: (i) "apportioning the total of all appropriations and funds made available during the year for obligation so as to prevent deficiency," (ii) "certifying all contracts and leases . . . prior to execution as to the availability of funds to meet the obligations expected," and (iii) "certifying and approving prior to payment of all bills, invoices, payrolls, and other evidences of claims, demands, or charges against the District government . . . ."  Id.*

**Response:** Plaintiff refers the Court to these provisions for a complete and accurate description of their contents.

*122.     The BAA amendments, by allowing the Council to submit the local portion of the District's budget, and any subsequent supplements, directly to Congress for passive review, impermissibly intrude on the Mayor's duty under Section 446 to submit the District's total budget to the President for enactment by Congress.*

**Response:** Denied.

*123.     Furthermore, under Section 446 of the Home Rule Act (D.C. Official Code § 1-204.46), the Council must adopt a budget, after a public hearing, "within 56 calendar days after receipt of the budget proposal from the Mayor."  The BAA purports to amend this provision to allow the Council to enact the budget, as any ordinary Council legislation upon two readings, within 70 days.*

**Response:** Plaintiff refers the Court to these provisions for a complete and accurate description of their contents.

*124.     Pursuant to the schedule issued by the Council, the Mayor submitted the District's FY 2015 budget to the Council on April 3, 2014.  Under the Home Rule Act, the Council must therefore adopt the budget by May 29, 2014.  However, the Council schedule authorized final Council action on the Fiscal Year 2015 Budget Request Act and the Fiscal Year 2015 Budget*

*Support Act with two readings by June 11, or 69 days after the Mayor's submission of the budget.*

**Response:** Denied that the current law requires the Council to adopt the budget by May 29, 2014.  Otherwise admitted.

125.    *Because of the Council's actions, the Mayor will be unable to submit a budget to the President within the timeframe required by Section 446 of the Home Rule Act, as has been the District's practice over the past 40 years.*

**Response:** Denied.

126.    *The Home Rule Act makes clear that the District's Executive branch, through the Mayor and the CFO, is empowered and required to administer the District's finances. The Charter further describes the Mayor's required role in the District's budget process – to develop and submit a proposed budget to the Council, and to submit the total, adopted budget to the President for enactment by Congress. By vesting these executive functions in the Council, the BAA drastically reduces the Mayor's role in the District's budget process and severely impairs his ability to effectively comply with his congressionally-mandated duty to manage the District's finances.*

**Response:** Denied.

B.      **Imminent Risk of Loss of Funding for District Operations**

127. *The District's finances are threatened because the Council has made clear that it will no longer comply with the budget procedures laid out in the Home Rule Act.  Thus, under the BAA, Counterclaimants will be unable to lawfully fund the operations of their respective offices.*

**Response:** Denied.

128.    *Further, the Council's refusal to follow federal law regarding District budgeting could have disastrous effects on District operations as a whole.  As noted, Section 816 of the*

*Consolidated Appropriations Act of 2014 grants the District the right to expend local funds under the federal Budget Request Act for FY 2015 in the event of a federal government shutdown. However, this right is contingent on the District having a validly-enacted budget for FY 2015. Since any budget approved pursuant to the BAA would be invalid, the District risks losing the right to continue operating in the event of a federal government shutdown during FY 2015.*

**Response:** Denied.

*129. Additionally, under D.C. Official Code § 47-392.09, control of District financial operations automatically reverts to a federal control board should the District (i) default on any loans, bonds, notes, or other obligations, (ii) fail to meet payroll for any pay period, (iii) fail to meet pension or benefits payments for current or former employees, or (iv) fail to make any required payments "to any entity established under an interstate compact to which the District of Columbia is a signatory." The federal control board would supersede the Mayor, the CFO, and the Council in matters relating to the District's financial operations. The Council's adherence to the BAA, should it continue past May of this year, thus creates a substantial and imminent risk that the Mayor and the CFO will lose authority over District financial operations as set forth in the Home Rule Act, and that the District as a whole will lose a substantial portion of its right to self-governance.*

**Response:** Denied.

**C. Counterclaimants' Liability under the Anti-Deficiency Act**

*130. Under Section 603(e) of the Charter (D.C. Official Code § 1-603(e)), the Anti-Deficiency Act applies to all District spending and appropriations. Therefore, even if Counterclaimants were inclined to approve expenditures under an illegally-enacted budget, they could not do so without exposing themselves to criminal liability and administrative discipline by the federal government.*

**Response:** Denied.

131.      *Executive branch officials, including the Counterclaimants, who undertook to spend money or enter into contractual commitments as a result of the appropriations "approved" solely by the Council would be risking federal criminal and/or administrative charges for violations of the Anti-Deficiency Act.  Under 31 U.S.C. § 1350, an "officer or employee . . . of the District of Columbia government knowingly and willfully violating [the Anti-Deficiency Act] . . . shall be fined not more than $5,000, imprisoned for not more than 2 years, or both."*

**Response:** Denied.

132.      *Further, under 31 U.S.C. § 1351, the Mayor is required to report all violations of the Anti-Deficiency Act to the President and Congress.  The Mayor's report must include all the relevant facts as well as a statement outlining the administrative discipline taken.  31 U.S.C. § 1349 states that such discipline can include "suspension from duty without pay or removal from office."*

**Response:** Plaintiff refers the Court to these provisions for a complete and accurate description of their contents.

133.      *Thus, Counterclaimants and their personnel (including thousands of District officials and employees) risk criminal prosecution and administrative discipline should they authorize expenditures under any budget enacted in accordance with the BAA.*

**Response:** Denied.

## FIRST COUNTERCLAIM

## DECLARATORY JUDGMENT OF ILLEGALITY OF BUDGET AUTONOMY ACT

134.      *Counterclaimants reallege Paragraphs l through 133 as if set forth fully in this paragraph.*

**Response:** The Council restates the responses to paragraphs 74 through 133 as if set forth

fully in this response.  The Council admits paragraphs 1 through 67, which appear in the

Council's Complaint.  Paragraphs 68 through 73 are denied.

*135. The BAA amendments, to the extent they purport to amend the District's budget process under the Home Rule Act, violate the Home Rule Act, the Anti-Deficiency Act, and the Budget and Accounting Act.  They are thus invalid under the Supremacy Clause.*

**Response:** Denied.

*136.     The BAA, by removing local and supplemental funds from the District's required budget process under the Home Rule Act, purport to (i) amend the requirements of the Home Rule Act, Anti-Deficiency Act, and Budget and Accounting Act in violation of Section 602(a)(3), (ii) eliminate the President, Congress, OMB, and the Comptroller General from their respective roles in the District's budget process for local and supplemental funds in violation of Section 603(a), and (iii) remove a portion of the District's budget from the purview of the Anti-Deficiency Act in violation of Section 603(e).*

**Response:** Denied.

*137.     The BAA violates the Anti-Deficiency Act and is thus null and void under the Supremacy Clause of the United States Constitution.*

**Response:** Denied.

*138.     Absent a declaratory judgment, Counterclaimants' refusal to authorize expenditures under any budget enacted pursuant to these invalid amendments creates a substantial and imminent risk that Counterclaimants will lose funding for their respective offices and for the operations of the District of Columbia government.*

**Response:** Denied.

**SECOND COUNTERCLAIM**

## VIOLATION OF SEPARATION OF POWERS

*139.      Counterclaimants reallege Paragraphs 1 through 138 as if set forth fully in this*

*paragraph.*

**Response:** The Council restates the responses to paragraphs 74 through 138 as if set forth

fully in this response.  The Council admits paragraphs 1 through 67, which appear in the

Council's Complaint.  Paragraphs 68 through 73 are denied.

*140. The BAA amendments violate the principle of separation of powers inherent in the*

*D.C. Charter by purporting to empower the Council to perform functions expressly reserved by the*

*Charter to the Mayor.*

**Response:** Denied.

*141.      As a result of these amendments, the Mayor is unable to submit the District's total*

*budget to the President, and thus the Mayor cannot comply with the requirements of the Home Rule*

*Act.*

**Response:** Denied.

## PRAYER FOR RELIEF

*WHEREFORE, Counterclaimants request that this Court:*

> *a. Declare that the Budget Autonomy Act, D.C. Law 19-321, 60 D.C. Reg. 1724 (Feb. 15, 2013), is null and void because it violates the Home Rule Act, the Anti-Deficiency Act,  and the Budget and Accounting Act;*

> *b. Permanently enjoin the Council of the District of Columbia from enacting, approving, or submitting any portion of the District's budget in accordance with the Budget Autonomy Act; and*

> *c. Order such other relief as the Court determines to be just and proper.*

**Response:** Denied. Plaintiff denies that Defendants are entitled to any of the relief

requested in these paragraphs.

## AFFIRMATIVE DEFENSES TO COUNTERCLAIMS

1.     Defendants fail to state a claim on which relief can be granted.

2.     Defendants' claims are beyond the jurisdiction of this Court.

3.     Granting relief as requested by Defendants is contrary to public policy.

4.     Injunctive relief is unavailable as a matter of law.

5.     Defendants' claims have been abrogated by the Local Budget Autonomy Act of

2012.


Dated: May 5, 2014                              Respectfully submitted,

                                                BOIES, SCHILLER & FLEXNER LLP
                                                MAYER BROWN LLP



By: */s/ Karen L. Dunn (with permission)*        By:  */s/ Brian D. Netter*
    Karen L. Dunn                                   Brian D. Netter
     D.C. Bar No. 1002520                          D.C. Bar No. 979362
    Alexander I. Platt                              Breanne A. Gilpatrick
     D.D.C. Bar No. D00396                         D.C. Bar No. 1018094
    BOIES, SCHILLER & FLEXNER, LLP                  MAYER BROWN LLP
    5301 Wisconsin Avenue, NW                       1999 K Street, NW
    Washington, D.C.  20015                         Washington, D.C.  20006-1101
    Telephone:  (202) 237-2727                      Telephone:  (202) 263-3000
    Facsimile:  (202) 237-6131                      Facsimile:  (202) 263-3300
    Email:  KDunn@bsfllp.com                        Email:  bnetter@mayerbrown.com

*Attorneys for Plaintiff Council of the District of Columbia*

USCA Case #14-7067      Document #1500336         Filed: 07/01/2014      Page 190 of 470

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COUNCIL OF THE DISTRICT OF
COLUMBIA,

      Plaintiff,

      v.

VINCENT C. GRAY, in his official capacity
as Mayor of the District of Columbia,

          and

JEFFREY S. DeWITT, in his official capacity
as Chief Financial Officer for the District of
Columbia,

      Defendants.

No. 1:14-cv-00655-EGS

Hon. Emmet G. Sullivan

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for the Council of the District of Columbia, hereby certifies that on the 5th day of May 2014, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered counsel of record.

By:  */s/ Brian D. Netter* _____
     Brian D. Netter
      D.C. Bar No. 979362
     MAYER BROWN LLP
     1999 K Street, NW
     Washington, D.C.  20006-1101
     Telephone:  (202) 263-3000
     Facsimile:  (202) 263-3300
     Email:  bnetter@mayerbrown.com

# EXHIBIT A

B-2
x

## Metro

WASHINGTON STAR-NEWS
Washington, D. C., Tuesday, October 16, 1973

# Ford Insists Hill Run D.C. Budget

By Jack Kneece
Star-News Staff Writer

Vice president-designate Gerald R. Ford says congressional control of the D.C. budget should stay in a House-passed home rule bill and not be subject to negotiation in a House-Senate conference.

"In my view, this particular provision of the bill is non-negotiable in the House-Senate conference," said Ford in a statement issued yesterday.

A spokesman for Senate District Committee Chairman Thomas F. Eagleton, D-Mo., said the senator would prefer to await the conference to discuss the matter, rather than get into a public dispute with Ford. (Ford, if confirmed as vice president, will be presiding officer of the Senate.)

"I am firmly convinced that if Congress is to be true to its constitutional mandate regarding the Nation's Capi-

tal, the Congress must retain control over the District budget," Ford said.

"A Senate-passed home rule bill provides more fiscal autonomy for the District, including a provision to allow the City Council, rather than Congress, to review the city budget.

FORD ELABORATED his position:

"In the last dozen years, the federal payment to thee District has jumped from $25 million to $187.5 million.

"In the last dozen years, we have built 3,228 new classrooms in the District at a cost of $303.3 million. Our per capita expenditure for education in the Nation's Capital for fiscal 1974 is $1,358 — one of the highest in the country."

Ford, who as vice president and chief Nixon lobbyist could be a formidable foe to further liberalization of home rule, quoted from the portion of the Constitution that says Congress shall "exercise exclusive legislation in all cases whatsoever" over the District.



GERALD FORD

JA188

# EXHIBIT B

# Diggs Ready to Deal on Home Rule Bill

## SAVING A DREAM

**By Jack Kneece**
Star-News Staff Writer

The chairman of the House District Committee says he is prepared to continue congressional oversight and control over the D.C. budget as a means of "reaching an accommodation" with home rule foes.

The committee home rule bill would give such line item oversight of the budget to an elected City Council.

But the chairman, Rep. Charles C. Diggs, D-Mich., said he is "prepared to maintain the role of the House and Senate District appropriation subcommittees" with certain minor modifications of the present appropriations process.

Diggs stressed that he is "trying to be reasonable" in an effort to save the fundamental thrust of the committee bill." He did not use the word compromise. Although he said he is prepared to make the major concession of retaining congressional line item oversight of the budget, Diggs said he plans to work out something with the chairman of the House D.C. appropriations subcommittee, Rep. William H. Natcher, D-Ky., to alter the existing system.

DIGGS ALSO revealed yesterday he is ready to make changes in that portion of the committee bill governing the system of appointing judges to D.C. Superior Court and the process by which Congress approves or disapproves legislation enacted by an elected City Council.

Specifically, he said line item oversight before the House subcommittee now involves every D.C. agency, with agency heads and their subordinates often spending several days waiting in Capitol hallways to testify.

"MEANWHILE, with all the trekking back and forth and the waiting, everything stops in the agency," Diggs said.

As for the judges, Diggs said he still intends that the mayor appoint them to 15-year terms, as provided in the committee's bill. He said the President — who now appoints Superior Court judges — already has enough of a role in the choice under terms of the committee bill because the President appoints three members of a nine-member nominating commission.

Diggs said the principal area of accommodation would be in allowing for the advice and consent of the Senate of the committee bill would allow any act of an elected council to become law immediately, leaving the burden for a veto on Congress. There are indications a compromise would stay the effectiveness of council-enacted legislation until approval by Congress. But Diggs would only say this veto area is "adjustable."

DIGGS INDICATED that he is still undecided or not ready to yield on changing the federal payment provision of the committee bill. There have been indications, however, he also may yield on this provision.

The federal payment section, as now written in the committee bill, would establish a D.C. federal payment trust fund with a four-year authorization for lump sum annual federal payments in amounts predetermined through the congressional appropriations process.

The mayor would be required to submit for council approval a recommended federal payment level based on the costs and benefits to the District resulting from its role as the U.S. capital.

Payments would be requested a year in advance. After council approval, recommendations would go to the Office of Management and Budget for action and transmission to Congress in the president's budget.

See HOME RULE, B-4

---

## Washington Star-News

### B

**OBITUARIES**

**COMICS — ACTION LINE**

### Metro Life

WASHINGTON, D. C., FRIDAY, OCTOBER 5, 1973

# HOME RULE

### Continued From B-1

**THIS PROVISION** would implement a Nelsen Commission recommendation for a predictable federal payment but retain congressional power to review the request and determine the total amount of the payment.

This provision—thought more palatable than a fixed formula based on revenues as written into the Senate's home rule bill — has encountered stiff criticism. Diggs may yet be forced to change it to the Senate version.

Meanwhile, the House Rules Committee, after an unusual three days of testimony, yesterday granted an open rule to four home-rule bills. This means the bills will be fair game for floor amendments. They also will be read by section rather than title — as requested by Diggs — making them vulnerable to a lengthy debate on each section.

**THERE ARE 88 sections** in the 132-page committee bill and this means home rule enemies could stall it by debating each section. Although filibuster is prohibited in the House, opponents often use the tactic of debating separate sections as a delaying tactic.

Rep. Earl F. Landgrebe, R-Ind., promised yesterday: "We'll filibuster it to death."

Diggs said it appears the bill will take up much of the time of Congress in day-long sessions Wednesday, Thursday and possibly even Friday.

Diggs also said any dilatory tactic might work to the advantage of the bill.

After the rules panel denied Diggs' request to cut time required by reading the bill by title by an 8-6 vote, Rep. Richard Bolling, D-Mo., said, "This is the most destructive thing we could have done to the bill."

# EXHIBIT C

# Home Rule—At Last

After the long fight was over last night, Representative Charles Diggs put just the right face on the result. If it was not "all we had dreamed about," he said, the home rule bill passed by the House—ending a century-long impasse—certainly represented a worthwhile, historic breakthrough for the cause of more self-determination in the District of Columbia.

Assuming, as we do, a conference agreement with the Senate, what District residents gained was the right for the first time to elect a mayor and 13 city council members who will exercise significantly greater powers of local autonomy in a substantially reorganized city government. Those who complain that more was not gained are blind to two realities: First, that this was an immense legislative achievement, for which the city is indebted chiefly to District Committee Chairman Diggs; second, that the intricate federal-local relationships of this hybrid city cannot be totally separated, nor should they be, and that further delegations of local authority also inevitably will be linked with federal restraints to preserve that political marriage.

Early in yesterday's debate, Speaker Carl Albert predicted that the temper of the House favored enactment of a bill, and the final 343-to-74 vote proved him right. But the real turning point had come 24 hours before with the disclosure that the compromises maneuvered by Diggs had won the full support of the single most influential member of the House District Committee, Representative William H. Natcher.

Natcher's high price was ultimate congressional control over the city's budget—and it was not the only price paid. Before it ended, opponents of the original Diggs bill had won nonpartisan rather than partisan District elections, a continuation of judicial appointments by the President rather than the mayor and a series of federal "oversight" restraints against the city council's legislative actions—the most notable being a 30-day delay in the effective date of the actions to provide a chance for review by Congress. Those concessions, in our view, were reasonable.

For no rational purpose we can decipher, the House voted to create a federal enclave—a "National Capital Service Area" encompassing federal buildings and the downtown monuments—to be administered by an entirely superfluous new layer of bureaucracy in the White House. That provision deserves to die in conference.

Indeed, that forthcoming House-Senate conference should command the attention of us all, and the sooner the better. There are vast differences between the two bills, some of which will be hard to reconcile. In the House version, particularly, we want to take a longer, harder look at the precise impact of some provisions which obviously were not fully understood by many members in the maze of this week's debate.

For all that, though, the ingredients of compromise are there for a conference agreement that can give all District residents an immeasurably greater participation in the level of government that most directly affects them. It is an exhilarating prospect. And that, for the moment, is enough.

# EXHIBIT D

Union Calendar No. 217

93D CONGRESS
1ST SESSION

# H. R. 9682

[Report No. 93–482]

---

## IN THE HOUSE OF REPRESENTATIVES

JULY 30, 1973

Mr. DIGGS (for himself, Mr. ADAMS, Mr. FRASER, Mr. DELLUMS, Mr. REES, Mr. FAUNTROY, Mr. HOWARD, Mr. MANN, Mr. MAZZOLI, Mr. ASPIN, Mr. RANGEL, Mr. BRECKINRIDGE, Mr. STARK, Mr. GUDE, Mr. SMITH of New York, and Mr. McKINNEY) introduced the following bill; which was referred to the Committee on the District of Columbia

SEPTEMBER 11, 1973

Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

# A BILL

To reorganize the governmental structure of the District of Columbia, to provide a charter for local government in the District of Columbia subject to acceptance by a majority of the registered qualified electors in the District of Columbia, to delegate certain legislative powers to the local government, to implement certain recommendations of the Commission on the Organization of the Government of the District of Columbia, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

### TABLE OF CONTENTS

TITLE I—SHORT TITLE, PURPOSES, AND DEFINITIONS

Sec. 101. Short title.
Sec. 102. Statement of purposes.
Sec. 103. Definitions.

1

(861)

952

92

1          AUTHORIZATION OF APPROPRIATIONS

2      SEC. 503. For the fiscal year ending June 30, 1976,

3  and for each of the three fiscal years immediately there-

4  after, there is authorized to be appropriated to the trust fund

5  a lump-sum unallocated Federal payment for each fiscal year

6  (not including those payments reimbursing the District for

7  water, sewer, and other special services) in such an amount

8  as the Congress may from time to time appropriate.

9  TITLE VI—RESERVATION OF CONGRESSIONAL

10                  AUTHORITY

11          RETENTION OF CONSTITUTIONAL AUTHORITY

12      SEC. 601. Notwithstanding any other provision of this

13  Act, the Congress of the United States reserves the right,

14  at any time, to exercise its constitutional authority as legis-

15  lature for the District, by enacting legislation for the District

16  on any subject, whether within or without the scope of

17  legislative power granted to the Council by this Act, includ-

18  ing legislation to amend or repeal any law in force in the

19  District prior to or after enactment of this Act and any act

20  passed by the Council.

21                  LIMITATIONS ON THE COUNCIL

22      SEC. 602. (a) The Council shall have no authority to

23  pass any act contrary to the provisions of this Act except as

24  specifically provided in this Act, or to—

953

93

1        (1) impose any tax on property of the United

2    States or any of the several States;

3        (2) lend the public credit for support of any pri-

4    vate undertaking;

5        (3) enact any act, or enact any act to amend or

6    repeal any Act of Congress, which concerns the func-

7    tions or property of the United States or which is not

8    restricted in its application exclusively in or to the

9    District;

10        (4) enact any act, resolution, or rule with respect

11    to any provision of title 11 of the District of Columbia

12    Code (relating to organization and jurisdiction of the

13    District of Columbia courts) ;

14        (5) impose any tax on the whole or any portion of

15    the personal income, either directly or at the source

16    thereof, of any individual not a resident of the District

17    (the terms "individual" and "resident" to be understood

18    for the purposes of this paragraph as they are defined in

19    section 4 of the Act of July 16, 1947) ;

20        (6) enact any act, resolution, or rule which permits

21    the building of any structure within the District of Co-

22    lumbia in excess of the height limitations contained in

23    section 5 of the Act of June 1, 1910 (D.C. Code, sec.

954

94

1    5–405), and in effect on the date of enactment of this
2    Act;

3        (7) enact any act or regulation relating to the
4    United States District Court for the District of Columbia
5    or any other court of the United States in the District
6    other than the District courts.

7    (b) Nothing in this Act shall be construed as vesting in
8    the District government any greater authority over the Na-
9    tional Zoological Park, the National Guard of the District of
10   Columbia, the Washington Aqueduct, the National Capital
11   Planning Commission, or, except as otherwise specifically
12   provided in this Act, over any Federal agency, than was
13   vested in the Commissioner prior to the effective date of title
14   IV of this Act.

15   LIMITATIONS ON BORROWING AND SPENDING

16   SEC. 603. (a) No general obligation bonds shall be
17   issued during any fiscal year in an amount which, including
18   all authorized but unissued general obligation bonds, would
19   cause the amount of principal and interest required to be
20   paid in any fiscal year on the aggregate amounts of all out-
21   standing general obligation bonds to exceed 14 per centum
22   of the District revenues (less court fees and revenue derived
23   from the sale of general obligation bonds) which the Mayor
24   determines, and the District of Columbia Auditor certifies,
25   were credited to the District during the immediately preced-

# EXHIBIT E

| 93D CONGRESS<br>*1st Session* } | HOUSE OF REPRESENTATIVES | { REPORT<br>No. 93–482 |
|---|---|---|

# DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL REORGANIZATION ACT

## REPORT

BY THE

## COMMITTEE ON THE DISTRICT OF COLUMBIA

### TOGETHER WITH DISSENTING VIEWS

[To accompany H.R. 9682]



SEPTEMBER 11, 1973.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1973

(993)

1014

## SECTION-BY-SECTION ANALYSIS

## TITLE I—SHORT TITLE PURPOSES, AND DEFINITIONS

This title contains a statement of purposes and definitions of the principal terms used in the bill.

## TITLE II—GOVERNMENTAL REORGANIZATION

As heretofore stated, Title II of H.R. 9682 would carry out a number of the important recommendations of the Nelsen Commission.

The interest of the Federal establishment in proper city planning is amply protected, as indicated, by the provisions in Title II which authorize the National Capital Planning Commission to review all local plans and to overrule such plans as may have a negative impact on the Federal establishment. As is hereinafter specifically set forth, Section 203 provides an effective procedural arrangement whereby the interests of the local and Federal governments are to be reconciled whenever disputes occur as to local planning and development issues.

### SEC. 201. REDEVELOPMENT LAND AGENCY

RLA is established as an instrumentality of the District of Columbia Government, composed of five members, as at present, appointed by the Commissioner and confirmed by the Council for five-year staggered terms. While RLA's corporate status and Board of Directors are retained, this section also gives the Commissioner power to dissolve the corporation, eliminate the Board of Directors, or take any other action as deemed necessary and appropriate with respect to the powers and duties of the Agency as a corporate body of perpetual duration.

This section also provides that the agency's present Board of Directors shall be terminated on July 1, 1974, and that the terms of the members appointed under the new provisions would begin on the same date. It is clearly not the intention of the Committee to create a new corporation, but rather to constitute a new Board effective July 1, 1974.

### SEC. 202. NATIONAL CAPITAL HOUSING AUTHORITY

This section transfers the present Federal agency (NCHA) to the local government. It would permit the Commissioner, with the approval of the Council, to reorganize the agency, and subsection (b) transfers all functions, powers, and duties of the President under the District of Columbia Alley Dwelling Act of 1934 to the Commissioner.

Subsection 202(b) provides a statutory basis for the transfer of the

(16)

1034

The vacancy created by such recall will be filled in the same manner as other vacancies.

## TITLE V—FEDERAL PAYMENT

### SEC. 501. FEDERAL PAYMENT TRUST FUND

Section 501 of the bill establishes in the United States Treasury a Federal payment Trust Fund administered by the Secretary of the Treasury who reports annually to Congress on the status of this fund. Congress may act to appropriate a Federal payment at any time during the fiscal year. The appropriated funds do not go directly to the city government, but rather are deposited in the trust fund for release by the Secretary of the Treasury at the beginning of such fiscal year. This is the same administrative procedure as used for Revenue Sharing funds.

### SEC. 502. DUTIES OF MAYOR, COUNCIL, AND OMB

The Mayor, in section 502, is responsible for preparing a request for an annual Federal payment and such supplemental requests as he deems necessary. In making these requests, he may take into consideration intercity expenditure and revenue comparisons, and among other elements, nine factors for assessing the cost and benefits to the District because of its role as the Nation's Capital. It is the intent of this Committee that these factors should be used to the extent feasible, but they are not the exclusive criteria for determining the amount of the Federal payment sought. The Mayor shall submit his such request to the Council, which may approve, disapprove, or modify the amount. The request is then forwarded to the President (OMB) for his review, revision and submission to Congress. This procedure is carried out in line with the provisions of the Budget and Accounting Act of 1921, as amended, and parallels that followed for all Federal fund requests.

### SEC. 503. AUTHORIZATION OF APPROPRIATIONS

Section 503 would authorize the appropriation of a lump sum unallocated Federal payment for fiscal years 1976, 1977, 1978, and 1979.

## TITLE VI—RESERVATION OF CONGRESSIONAL AUTHORITY

### SEC. 601. RETENTION OF CONSTITUTIONAL AUTHORITY

Congress, in section 601, retains its constitutional authority to legislate and to amend or repeal any law or any act passed by the Council.

### SEC. 602. LIMITATIONS ON THE COUNCIL

This section lists specific prohibitions against the District Council's legislative authority, which include prohibitions against:
    (1) taxation of United States or state properties;
    (2) lending the public credit for any private undertaking;

36

JA202

1035

(3) enactment of any Act which amends or repeals an Act of Congress, which concerns the functions or property of the United States, and which is not restricted entirely to the affairs of the District of Columbia;

(4) enactment of any act, resolution or rule which concerns the organization and jurisdiction of the District of Columbia courts;

(5) imposition of a personal income tax upon non-residents of the District;

(6) enactment of any act, resolution or rule that exceeds height limitations contained in section 5 of the Act of June 1, 1910, D.C. Code, Sec. 5–405 (concerns specific height limitations in the District of Columbia);

(7) enactment of any or regulation related to the United States District Court for the District of Columbia, or any other United States court in the District.

Subsection (b) prohibits the Council from exceeding its present authority over the National Zoological Park, the District National Guard, the Washington Aqueduct, the National Capital Planning Commission, or any other Federal agency.

### SEC. 603. LIMITATIONS ON BORROWING AND SPENDING

This section establishes three limitations on the District's authority to spend and borrow monies. First, in section 603(a), the city cannot issue a new, long-term general obligation bond if in any year the amount of principal and interest that must be paid on this and the bonds already issued will exceed the 14% limitation. This single limitation on general obligation indebtedness replaces a series of complicated borrowing limitations currently governing the city, which are previously described. The purpose of this limitation is to insure that the city does not borrow beyond its reasonable capacity to repay its debts. The Committee has been advised that the 14% limitation is sufficient to meet the projected capital improvement plans of the District of Columbia, and is consistent with borrowing revenue ratios in comparable metropolitan areas.

In addition, section 603(a) clarifies that the outstanding indebtedness of the Redevelopment Land Agency and the National Capital Housing Authority at the time of their transfer into the city government shall not be included in calculating the 14% limitation.

Section 603(b) states that the 14 percent limitation mentioned in subsection (a) shall be calculated specifically according to the formula set forth in that subsection.

Section 603(c) establishes a general requirement that the city operate with a balanced budget, that is, the City Council cannot approve expenditures above the Mayor's best estimate of financial resources available for that year. In the event that Congress has not enacted the city budget, for the purpose of retaining a balanced budget, the Mayor shall consider the Federal payment amount to be the Federal payment appropriated for the past year; or if one House has acted, that amount; or if both Houses have acted to appropriate different

37

# EXHIBIT F

# OPINION

# Washington Star-News

JOHN H. KAUFFMANN, President

NEWBOLD NOYES, Editor

WASHINGTON, D. C., SUNDAY, DECEMBER 2, 1973

G

EDITORIAL ARTICLES

FINANCE

# Home Rule: One More Step to Go!



## Ziegler Strikes Again

# EXHIBIT G

# Senate to Seek Strong Home Rule Bill

## VERSIONS DIFFER WIDELY

**A Generally Quiet Protest** ... Page B-2

# Metro Life

WASHINGTON, D. C., FRIDAY, OCTOBER 12, 1973

## Washington Star-News

**OBITUARIES** B

**Metrobus Ride For 25 Cents?** ... Page B-4

**By Jack Kneece**
Star-News Staff Writer

The Senate conferees will insist on a strong home rule measure exemplifying the best features of House-passed and Senate approved bills, says Sen. Charles McC. Mathias, R-Md.

Mathias said yesterday he had met with Sen. Thomas F. Eagleton, D-Mo., chairman of the Senate District Committee, "and we decided to work for the strongest bill we can get in conference."

Although Mathias said he did not want to comment on any single provision of the bill passed by the House 343-74, he smiled when asked if Senate conferees would insist on removing a provision for a nonvoting Senate delegate from the District.

ALTHOUGH the Senate leadership has not appointed conferees to work out differences between the two bills, Mathias said he is certain that he and Eagleton will be among them.

Meanwhile, congressional sources say there will be an effort on the House side to persuade the Senate conferees to accede to most of the House version with minor exceptions.

Sources said the Senate, long partial to home rule legislation, could be expected to go along with most of the House bill.

There are many differences between the two bills, but the House bill is more thorough than the Senate version and the Sen-

ate is expected to go along with many House provisions.

The Senate bill would establish an 11-member city council and provide for an elected mayor—all on a partisan basis.

THE HOUSE version would set up a 13-member council and an elected mayor on a nonpartisan basis.

Both bills would require election of a council member from each of the city's eight wards, but the House version would provide for five at-large members while

the Senate version would provide for three.

The Senate bill gives far more fiscal autonomy to an elected government. The city council would be the reviewing body for the budget under the Senate bill, which also would provide for an automatic federal payment based on a fixed formula.

The House and Senate District Appropriations subcommittees would review the budgets by line item under the House-passed version.

**See HOME RULE, B-4**

# HOME RULE

Continued from B-1

UNDER the Senate bill, the federal payment would increase from approximately $200 million to $264 million by fiscal year 1978 in uniform increments based on a projection of the annual growth rate of the city's tax base.

The House version sets a $250 million limit on the amount authorized for fiscal year 1975 and "each fiscal year thereafter," although that would be subject to congressional change.

Both bills would provide for an independent audit of D.C. fiscal management.

The House bill would provide more authority over zoning and planning than the Senate bill. It also would provide for city takeover of two controversial agencies, the Redevelopment Land Agency and the National Capital Housing Authority.

THE MOST obvious difference in the two pieces of legislation is in the sheer size of the House bill — 129 pages compared to a thin Senate bill of a few pages.

Both bills would allow a substantial amount of autonomy to the city council in setting tax rates but both bills also provide

for a congressional veto by resolution of any act passed by the council.

As the home rule measure rolled toward final action in Congress, speculation was rising about candidates to be presented to a newly created District electorate.

"People are already worrying about who's going to run for what," City Council Vice Chairman Sterling Tucker observed to some 150 persons gathered at the District Building to celebrate House passage of a bill Wednesday night.

No comment was forthcoming from either Mayor Walter E. Washington or D.C. Del. Walter E. Fauntroy on whether they would bid for the mayor's post.

SUPPORTERS of Washington feel certain he will run for the elective office, but the mayor has rebuffed all attempts by the press to draw him out about his possible candidacy.

One source close to the mayor said, "He's just not going to say anything about this now. He feels it's too premature to talk about getting into a campaign before Congress passes a home rule bill."

Fauntroy said that "I have given no thought" to the question of running for mayor. "It is much too early to be even speculating about that."

# EXHIBIT H

B-2

**Metro**

WASHINGTON STAR-NEWS
Washington, D. C., Sunday, October 14, 1973

# HOME RULE:

# Lack of Budget Authority Dismays Council

**By Harvey Kabaker**
Star-News Staff Writer

Several members of the District of Columbia City Council are reacting with dismay over the lack of budget authority for the proposed elected council in the House-passed home rule bill.

Some say that an elected councilman, who will owe his position to the people of the city, will be in a competition to hold the city's pursestrings.

They would also advise Nevius not to run for the first elected council.

Joyce associate of Council Chairman John A. Nevius said that they gutted the bill and possibly damaging consequences to further political ambitions.

The Rev. Jerry A. Moore Jr., a Republican council veteran who also heads the area Metro rapid transit and bus agency, feels that "they gutted the bill."

Moore believes that "elected officials who are controlled by the Hill are worse off than the appointed ones who know exactly where they stand."

He said this situation. "You'll have some fellow coming down here to lobby with the city council for a new recreation center, and the councilman will tell him that there isn't anything he can do, because someone on the Hill has line-item control over the budget."

FOR VARIOUS reasons, none of the present council members will say with assurance that he might be running. Mrs. Marguerite Selden, a Democrat and one of the three most recent appointees of President Nixon, is the only one who is certain she will not be a candidate.

"I am not a politician," she said. "I took the appointment knowing that I would not want to run if home rule is passed. I told them at the White House,

and I've said the same thing to others. I'll serve my term out, but I won't run.

Dr. Henry S. Robinson Jr., a three-term Republican member, said that the proposed taxing power without final spending authority "puts the onus on the council. Every time we raise taxes, the citizens will raise hell with us." He added, "The whole ball game is out of control over your own budget."

But more than his colleagues, Robinson sounds like he wants to run. "I don't know whether it will be from the ward or at large," he said. He is worried, he said, about nonpartisan elections, which he believes will be bad for Republicans.

IN CURRENT registration, Republicans are outnumbered by Democrats in a ratio of nearly 6 to 1, about 236,000 Democrats to about 40,000 Republicans. There are about 33,000 registered in no party, 600 in the Statehood Party and 600 miscellaneous registrations, such as the Socialist Workers and American Independent.

In the bill originally reported out of the House District Committee, he pointed out more than three of the five at-large seats, so Republicans would be guaranteed at least 2 or 3 of 13. Robinson fears that in a citywide "nonpartisan" election, which the compromise bill specifies, the Democratic Party could set up a nominally nonpartisan organization and dominate the field.

Therefore, Robinson thinks his dilemma would be whether to take his chances against the Democrats in council chairmanship, or to attempt a citywide campaign and become eligible for the potentially powerful and prestigious chair.

Mrs. Marguerite Parker, also a Republican, disagrees with Robinson. She thinks she would be helped because "if I were to run — and I'm not saying that for me — there might be a lot of people who would vote for me than if I were running on a strictly partisan basis."

SHE HINTED strongly that she would like to run — if the financial backing is available.

Another candidate, and hopes that "a woman" could be elected to chair the council. Though "disappointed" by the lack of budget authority, she said she believes that issue would not affect her decision to run.

Another Republican, Mrs. W. Antoinette Ford, agreed that budget power is "the bone of contention. Really, how can you be an effective elected council member if you can't even control your own pursestrings?" Her decision on running is months away, she said.

Republican Brian Rockwood H. Foster and Democrat Tobson J. Meyers view the power limitation philosophically. "Authority, in many ways, is what you make of the opportunities before you, and power of foreign service officer.

As for his own plans, Foster flatly noted without bitterness that "it's a bit late for an overweight, white WASP from Northwest Washington to be running in an election here."

MEYERS BELIEVES that "no matter what the conditions Congress gives us, you have the best possible you can find."

Acknowledging that the time that passes before the city may become "fraught with frustrations," Meyers said this simply emphasizes the need for elected officials who can determination.

He added that he hopes there will be "a kind of interregnum period," during which a successful elected government can further major concession from Congress. As in the case of Mrs. Ford, he said he will have to spend some time before deciding whether to run.

Tucker is known to have ambitions that go beyond the council, but he steadfastly refuses to reveal any plans. Like Mayor Walter E. Washington, he puts the passage of a final home rule bill and the campaign for home rule charter adoption in a citywide referendum ahead of any overt personal campaigning. He also

has a delicate route to tred between the Democratic ranks of the mayor and Del. Walter E. Fauntroy.

AS CHAIRMAN of the umbrella Coalition for Self Determination, Tucker is solidly behind the compromise bill and dismisses the objections of its detractors.

"There's more in that bill than many of us realize," he said. "Our job now is to educate ourselves, to look for the conference bill and to educate the public so they will vote for the charter."

Few, if any, conflicts will arise because of the residences of the present members. Meyers lives in Ward 1, the central city. None lives in Ward 2, which includes the area north of downtown. Southwest and part of Capitol Hill.

Among the council members, Mrs. Parker are in Ward 3, west of Rock Creek. With Foster unlikely to run, any competition for Nevius would come from persons not now on the council, unless he decides to try an at-large candidacy.

Tucker and Moore both live in Ward 4, upper 16th Street NW. In Ward 5, Northeast, with Mrs. Selden not running, Robinson could be up against a non-incumbent.

NO PRESENT council member lives in Ward 6, Capitol Hill and part of Anacostia. Mrs. Ford lives in Ward 7, Far Northeast-Southeast, and none lives in Ward 8, Far Southeast-Southwest.

In weighing their personal considerations, some will have to weigh whether they could afford to quit present jobs for the full-time salary of $22,500 a year (plus $5,000 for the chairman). Mrs. Ford would have to resign a position at the Commerce Department and Mrs. Parker would have to leave her job at D.C. Teachers College, because the bill bars government employees from holding elective office.

Foster and Mrs. Selden are retired. Moore is a minister. Tucker is executive director of the Washington Urban League. Meyers has said that his "part-time" council position has cut deeply into a lucrative law practice. Robinson is a private physician.

**JA210**

# EXHIBIT I

Diggs Is Accused Of 'Power Ploy'
By Cathe Wolhowe Washington Post Staff Writer
(1973) Oct 8, 1973

# Diggs Is Accused Of 'Power Ploy'

By Cathe Wolhowe
Washington Post Staff Writer

The Rev. David H. Eaton, pastor of All Souls Unitarian Church, accused House District Committee Chairman Charles C. Diggs Jr. (D-Mich.) yesterday of selling his soul to retain power by agreeing that Congress should continue to hold complete budget authority over the D.C. government.

". . . Diggs does not seem to understand that he has sold something that is not for sale —our souls, our ability to control our own lives," Mr. Eaton said in his sermon yesterday, as a congregation of about 250 persons clapped loudly.

"He (Diggs) can sell his soul if he wants, but not ours," Mr. Eaton said.

The clergyman was referring to Diggs' revelation last week that he and Rep. William H. Natcher (D-Ky.) chairman of the House District Appropriations Subcommittee, had reached agreement on the budgetary provision of proposed D.C. home rule legislation that is due to come before the House Tuesday.

Diggs said he and Natcher agreed that Congress should continue to have appropriations control over line items in the city's budget rather than accepting a provision in the home rule bill, endorsed by D i g g s' committee, that would limit congressional control over the budget.

"Chairman Diggs made his deal only to keep himself in power," Mr. Eaton said. "And he made it without consulting any other members of the (District) Committee."

Upon hearing of Mr. Eaton's remarks, Diggs said, "I am prepared to take my lumps from the home-rule, self-determination purists who, like Reverend Eaton, think anything short of statehood represents a deficient or imperfect product. . ."

He added that he had made his agreement with Natcher because "we're not going to get anything through Congress like the purists want. This is a practical tactic."

Diggs said he did not consider his agreement a major change because "as long as the federal government is involved in financing the local government, it has the right to review and modify the entire matter."

Mr. Eaton said Diggs' agreement with Natcher takes "the guts out of the home rule bill, the ability to control what we spend, to determine what our spending priorities are."

He also said also that he was saddened by how the agreement was reached, adding that "Diggs actively acted against the wishes of our representative."

Del. Walter E. Fauntroy (D-D.C.) refused to comment on whether Diggs had reached agreement with Natcher without consulting him. He said he

See RULE, C5, Col. 1



CHARLES C. DIGGS JR.
. . . prepared to take lumps



DAVID H. EATON
. . . souls not for sale

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# Diggs' Home Rule Action Is Assailed

**RULE, From C1**

may comment after meeting today with other members of the District Committee.

Mr. Eaton told his congregation that the issue should not be considered "a merely political question, but a moral one — a matter of justice."

He added that the Board of Governors of the District of Columbia Bar had just written Diggs on this subject. The letter said the lawyers "considered suffrage for citizens of the District of Columbia so fundamental to American principles of law and justice as to transcend the ordinary and traditional political question.

"The issue of self-determination was the moral issue we fought over in 1776," Mr. Eaton said. "Just like Americans then had to go down to the harbor to get some action, maybe we are going to have to consider some different alternatives if this bill doesn't pass."

Although he said he was not advocating violence, he added, "I just can't keep going to meetings to ask for something that is my inherent right."

The home rule bill reported out by the House District Committee, similar to a measure already passed by the Senate, would have an elected mayor and city council and transfer to the local government some authority now held by Congress and the President.

A compromise measure sponsored by Rep. Ancher Nelsen (R-Minn.), ranking minority member of the District Committee, and Rep. Edith Green (D-Ore.), would have the council elected but the President would continue to appoint the mayor.



**WILLIAM H. NATCHER**
. . . said to agree

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COUNCIL OF THE DISTRICT OF COLUMBIA,** ) | |
| Plaintiff, ) | |
| **v.** ) | |
| **VINCENT C. GRAY** ) | **Case Number 1:14-cv-00655-EGS** |
| **And** ) | |
| **JEFFREY S. DeWITT,** ) | |
| Defendants. ) | |

### DECLARATION OF CONGRESSMAN WALTER E. FAUNTROY (RETIRED)

I served as the Delegate to Congress for the District of Columbia from the 92nd through the 101st Congress, 1971 to 1991.  During that 20 year period, in addition to other responsibilities, I served for the entire time on the House District of Columbia Committee and rose to the level of Chair of four different Subcommittees on that Committee: Fiscal Affairs and Health; Government Affairs and Budget; Government Operations; and Judiciary.  Prior to my election to Congress, I served as Vice-Chair of the appointed D.C. Council.  Once elected to Congress, I introduced a Bill to grant Home Rule to the people of Washington, D.C.  I was a Member of the House District of Columbia Committee and an active participant when the District of Columbia Self-Government and Governmental Reorganization Act, Public Law Number 93-198, 87 Stat. 774, D.C. Code Section 1-221 (1973) ("The Home Rule Act") passed the Congress and became law with President Richard Nixon's signature on Christmas Eve, 1973.  I attended the Hearings on the Bill in the House and Senate, participated in the crafting of the

Bill's language and mark-up in the House, voted in Subcommittee and Full Committee

proceedings and witnessed the same in the Senate.  As the Delegate from the District of

Columbia, I was directly and intimately involved in the discussions and negotiations leading up

to the House-Senate Conference and the floor votes in both the United States House of

Representatives and the United States Senate.

From my perch, I am well aware of the thinking of the Members and Senators, and the

exchanges that took place as well as the compromises that were made as the legislation moved

through the Congress.  As a consequence, I can address the history and context of the Home Rule

Act and state:

1.      In 1972, I personally led the effort to defeat the then Chair of the House District

of Columbia Committee, John L. McMillan a Democrat from South Carolina who had long stood

in the way of local self-government.

2.      The defeat of Congressman McMillan led to the ascension of Charles Diggs, Jr.,

a Democrat from Michigan to be Chair of the Committee.  Congressman Diggs was a Home

Rule proponent.

3.      The Charter in the Home Rule Act, envisioned to be regarded like a State

Constitution, was never intended to be a static, unchanging document.  Indeed, House Report

Number 482 which accompanied the Bill, it is stated that, "It is undoubtedly intended by Section

302 to expand the legislative authority given the District to that of a state and limit it only by the

provisions of Article I, Section 10, of the Constitution."

4.      While the Charter can be changed, the role of Congress under Article I, Section 8,

Clause 17, cannot, without amending the United States Constitution.

5.      Thus, Congress retains the power to legislate with respect to the District of

Declaration of Congressman Walter E. Fauntroy (Retired)                                    2

Columbia or reject legislation that might be enacted by the Local Government.

6.      With the ultimate authority to exercise exclusive legislative authority over the District of Columbia, it is obviously redundant for Congress to limit forever any legislative powers that may be given to the D.C. Council and Mayor, including budgetary powers.

7.      The stated purpose, found at § 102(A) of the Home Rule Act is, in part, "to the greatest extent possible . . . relieve Congress of the burden of legislating upon essentially local District matters."  The overall design of the Act was to remove Congress from governing with respect to the District of Columbia, a design consistent with the D.C. Council's Budget Autonomy Act.

8.      Indeed, some restrictions on the legislative power of the Local Government were in time removed.  Section 602(a)(9) which restricted the D.C. Council from enacting laws related to criminal procedure, crimes and the treatment of prisoners was lifted.  And, when the Home Rule Act was passed, the Charter required an affirmative act of Congress to be amended.  In time, in 1984 to be exact, that too changed to now only require an affirmative rejection or disapproval by Congress to prevent the change.

9.      In the early stages of the legislative process, language in the Home Rule Act provided for Budget Autonomy.  That language however was removed as a compromise in deference to those who preferred a more gradual delegation of power to the new Local Government.

10.     There is nothing in the Home Rule Act or in the Charter amending process that plainly, clearly and unambiguously prevents the D.C. Council from enacting the Budget Autonomy Act.  It is my belief that, in time, those of us who worked on and voted for the Bill expected and intended such a legislative initiative in time.  Now is the time.

Declaration of Congressman Walter E. Fauntroy (Retired)                                    3

11.     During the period in which the Home Rule Act was passed, William Rehnquist as an Assistant Attorney General, later to become the Chief Justice of the United States Supreme Court, indicated that passage of the 23rd Amendment to the U.S. Constitution, allowing District residents to vote for President, was but a "first step" in the journey to recapture the full bundle of rights the people of Washington D.C. once held.  An elected School Board, the Non-Voting Delegate Act and Home Rule marked the path contemplated by the Chief Justice.  Budget Autonomy as passed by the D.C. Council is just another step in that divined path.

**Friday, May 9 2014**                    _____/s/ Walter E. Fauntroy_____

                              **Walter E. Fauntroy**

Nelson Rimensnyder
Washington, D.C.

May 7, 2014

Hon. Phil Mendelson
Chairman
Council of the District of Columbia
1350 Pennsylvania Ave., NW
Washington, DC 20004

Dear Chairman Mendelson:

My name is Nelson Rimensnyder.  I am writing to share my personal recollections of the Home Rule Act of 1973.

I came to Washington in 1970 to work for the Congressional Research Service.  In that job, I came to know Representative Charles Diggs of Michigan and became CRS's resident expert on the District of Columbia.  I ultimately became the Director of Research for the House D.C. Committee, where I compiled the only existing comprehensive archive on the history of the D.C.-Federal relationship.  While I was at CRS, I worked on the Home Rule Act and was aware of the evolution of the various bills before President Nixon ultimately signed the law.

Based on my experience, the Home Rule Act was based on the idea that the District should be autonomous as much as possible.  Part of that autonomy was the ability to amend the District Charter, just like states have the ability to amend their constitutions.  In 1973, Congress wanted to control amendments to the District Charter, so it required both the House and the Senate to approve amendments before they became law.

Since the Home Rule Act was passed, history has shown that the District has achieved more and more power, all of which was consistent with the original plan for home rule.  Congress relaxed one of its biggest controls over the District in 1984.  In that year, Congress changed the process for amending the Charter.  Support from both the House and the Senate is no longer needed.  Unless both the House and the Senate disapprove, Charter amendments now become law.

I have followed the latest Charter amendment that grants budget autonomy to the District.  I was there in 1973 and knew that there weren't enough votes to grant budget autonomy at the time.  But I do not know any reason why the Charter amendment process could not be used to change that part of the Charter.  After all, Congress designed the Charter to be amended.

Sincerely,

Nelson Rimensnyder

Nelson Rimensnyder

May 9, 2014

My name is Dale MacIver.

I was an Assistant Counsel of the House Committtee on the District of Columbia working on the drafting and adoption of the Home Rule Act in 1973.

President Nixon, as early as 1969, stated "But there is no cause for delay: Self-government has remained an unfulfilled promise for far too long… I ask the Congress, and the American people, to join in this great enterprise…"

So Congress adopted and President Nixon signed The Home Rule Act, P.L. 93-198.

The restraints on the broad new legislative powers for the District of Columbia were very limited and very specific. Sec. 102 (a) of the act cites Article I, Sec. 8 of the US Constitution giving ultimate legisaltive authority over the District to Congress.

Sec. 602 lists a number of laws the Council cannot amend – such as Height of Buildings, Mental Health, Criminal law.

But as to amending the basic Charter – Title IV - Sec. 303 "Charter Amendment Procedure" lists three specific exceptions to the Council's ability to amend the Charter (Title IV). – They are "except sections 401 (a) …[a Council elected by the people], section 421 …[a mayor elected by the people] and Part C . The Judiciary…"

In the original Home Rule Act Congress still has the ability to check on charter amendments made under Sec. 303 – affirmative approval in a concurrent resolution by Congress.

Sec. 303 is clear in applying to all of Title IV – the Charter. Sec. 446 "Enactment of Appropriations by Congress" is part of Title IV. There was no intent of the Members of Congress during its deliberations, in which I was involved, to make Sec. 446 an exception from the procedures of Sec. 303.

*Dale MacIver*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNCIL OF THE DISTRICT      :
OF COLUMBIA, et al.,         :
                             :  Docket No.: CA 14-655
        Plaintiffs,          :
                             :      Washington, DC
     vs.                     :  10:23 a.m., Wednesday
                             :      May 14, 2014
VINCENT C. GRAY, et al.,     :
                             :
        Defendants.          :
_____X


REPORTER'S OFFICIAL TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

 For the Plaintiffs:    KAREN L. DUNN, ESQ.
                        ALEXANDER PLATT, ESQ.
                        Boies, Schiller & Flexner LLP
                        5301 Wisconsin Avenue, NW
                        Washington, DC 20015
                        (202) 237-2727

                        BRIAN D. NETTER, ESQ.
                        BREANNE A. GILPATRICK, ESQ.
                        Mayer Brown LLP
                        1999 K Street, NW
                        Washington, DC 20006
                        (202) 263-3339


Proceedings reported by machine shorthand. Transcript
produced by computer-aided transcription.

_____

**CHANTAL M. GENEUS, RPR, CRR**
Certified Realtime Reporter
Registered Professional Reporter
United States District Court
333 Constitution Avenue, NW
Washington, DC 20001

```
 1                 A P P E A R A N C E S  (Continued)

 2

 3
        For the Defendants:    IRVIN B. NATHAN, ESQ.
 4                             ELLEN EFROS, ESQ.
                               ANDREW J. SAINDON, ESQ.
 5                             NICHOLAS ALAN BUSH, ESQ.
                               Office of the Attorney General
 6                             441 4th Street NW
                               Suite 600 South
 7                             Washington, DC 20001
                               (202) 724-6643
 8

 9      Also Present:          V. DAVID ZVENYACH, ESQ.
                               LAWRENCE ROBBINS, ESQ.
10                             ERIC WHITE, ESQ.
                               SETH WAXMAN, ESQ.
11                             DANIEL VOLCHOK, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S

 2              (Whereupon, at 10:23 a.m. the proceedings

 3              commenced and the following ensued:)

 4              THE COURTROOM DEPUTY:  Your Honor, this is

 5   Civil Action 14-655, *Council of District of Columbia*

 6   *versus Vincent Gray, et al.*

 7              Would counsel please come forward and

 8   identify yourselves for the record, please.

 9              MS. DUNN:  Good morning, Your Honor.  Karen

10   Dunn from Boise, Schiller on behalf of DC Council.

11              THE COURT:  Good morning, counsel.

12              MR. NATHAN:  Good morning, Your Honor.

13   Irvin Nathan.  I have the honor of representing Mayor

14   Gray and CFO --

15              THE COURT:  Good morning.  Do you wish to

16   introduce your colleagues?

17              MS. DUNN:  I would, Your Honor.  Right here

18   is co-lead counsel Brian Netter from the law firm of

19   Mayer Brown.  Next to him, Breanne Gilpatrick, also

20   from Mayer Brown.  Next to her, Dave Zvenyach, the

21   general counsel of the Council.  And also here, Alex

22   Platt, also of Boise, Schiller.  Thank you.

23              THE COURT:  All right.

24              MR. NATHAN:  Your Honor, with me is Ellen

25   Efros from the Attorney General's office.
```

```
 1                THE COURT:  Miss Efros.
 2                MR. NATHAN:  And Andy Saindon and Nick Bush.
 3     And also with me are Daniel Volchok of the Wilmer Hale
 4     firm, and Larry Robbins of the Robbins Russell firm,
 5     and Eric White.
 6                THE COURT:  All right.  Good morning,
 7     everyone.
 8                The Court recognizes Mr. Mendelson is
 9     present.  Good morning.  Are your other colleagues
10     present as well?
11                All right.  Good morning.  Good to have you
12     here.  Good to see you.
13                Let me first give my thanks and appreciation
14     for the various amici who have weighed in.  It's very
15     interesting, we don't have an amici rule in the
16     District Court.  I've often wondered why.  But I'm
17     glad that people took the initiative to file motions
18     and seek to file their pleadings on behalf of various
19     organizations and individuals, and I wish to thank
20     them, the amici and their counsel, for their
21     contributions.
22                Unfortunately, in view of time constraints,
23     I'm not going to be able to hear from the amici, but
24     I've read everything that's been filed, and I just
25     want to express, on behalf of myself and my staff,
```

```
1     appreciation for your taking the time and effort to
2     file the -- your pleadings.
3              And to the parties, regardless of the
4     outcome, thank you very much for your excellent
5     submissions.  It's a lot of work, a lot of time and
6     effort has been expended in a very short period of
7     time, and I appreciate that.  My staff does as well.
8              Let me hear from plaintiff's counsel first.
9     I have a few questions I absolutely have to get
10    answers to and then I'll give you an opportunity to
11    emphasize any principal points you've made.  But rest
12    assured, I've read everything that you've filed.
13             I want to focus on jurisdiction briefly,
14    though, unless you tell me that you've abandoned that
15    argument.
16             MS. DUNN:  Your Honor, we have not abandoned
17    the argument.  Although, given what you said at the
18    status hearing, which is that if we made it to this
19    day, it's likely you have assured yourself that you do
20    have jurisdiction, we don't have any affirmative
21    argument to add to what we made in our papers.
22             THE COURT:  All right.  I just have a couple
23    of questions.  Let me pose this hypothetical.
24             Suppose the Mayor and the City Council were
25    defendants, because as we know, City Council approved
```

```
 1    legislation, the Mayor enacted the law, and suppose a
 2    District of Columbia supervisor with budget authority
 3    filed a lawsuit saying, I've got some problems with
 4    this act because of the Antideficiency Act, because of
 5    the Home Rule Act, because of the charter, would that
 6    person have standing to confer jurisdiction on this
 7    court?
 8              MS. DUNN:  Your Honor, clarify, please, who
 9    the plaintiff is in the case.
10              THE COURT:  A supervisor, DC Government
11    supervisor, with authority to -- with budget
12    authority.
13              MS. DUNN:  Your Honor, it would depend on
14    what the allegations in the complaint were.  So the
15    well-pleaded complaint rule would apply.  And so in
16    your hypothetical, it's hard to assess because I'm
17    unsure what allegations that potential plaintiff would
18    be making.
19              If the plaintiff were making the same --
20              THE COURT:  Well, let's assume the plaintiff
21    says the law is unlawful, and I'm concerned because
22    I -- you know, I'm a supervisor, and I spend money
23    every day consistent with the budget process that's
24    been recognized for the past forty years, and I'm
25    concerned about being prosecuted because of
```

1    Antideficiency Act violations.  Essentially, that's

2    it.  I mean, I haven't carved out a complaint.  But,

3    essentially, that would be the reason why that

4    employee is in court.

5              MS. DUNN:  Well, two things come to mind.

6    The first is, in order to make that complaint, there

7    would have to be adversity on the other side.  So if

8    what Your Honor's question is getting at is, if you do

9    rule and find jurisdiction, what would happen in

10    Superior Court, which is very similar to the question

11    you outline in what defendants say might happen.

12              What would happen is that the question of

13    whether it could ever arise, given the question of

14    whether there would be an adverse party on the other

15    side; in other words, would the Mayor filing a ruling

16    by Your Honor actually be adverse in that

17    circumstance?  And that alone is a question.  So I'm

18    not sure that --

19              THE COURT:  Well, my hypothetical, the Mayor

20    and the City Council, the defendants, the City Council

21    passed this law and the Mayor approved it.  The

22    plaintiff is the DC budget supervisor, is concerned

23    about violating the Antideficiency Act and simply

24    whether or not there would be standing for that

25    individual to confer jurisdiction here.  Yes or no?

```
 1              MS. DUNN:  I believe that the individual

 2     would have standing, but that jurisdiction would not

 3     lie because the claims would be the same as they are

 4     in this case, which are local claims.  It would be

 5     asking for performance of responsibility by local

 6     officials, by the Mayor and the CFO, and they would be

 7     bringing the same -- the same essential claims that

 8     are being brought in this case, which is whether the

 9     provisions of the Home Rule Act, which are exclusively

10     applicable to DC, whether those provisions are --

11     under those provisions, the Budget Autonomy Act would

12     be lawful.

13              THE COURT:  Right.  That involves

14     interpretation of the Home Rule Act, right?

15              MS. DUNN:  That's correct.

16              THE COURT:  Would that be enough to confer

17     jurisdiction?

18              MS. DUNN:  Your Honor, we don't believe so

19     for the reasons we state in our papers with regard to

20     why jurisdiction would not be proper in this case.

21     But I want to say that we raised this issue because we

22     felt we had to raise it because there is a question

23     about jurisdiction.

24              What I will say is that the exclusively

25     applicable jurisdiction in 1366 that applies is
```

```
 1   generally narrow.  The idea would be there's a
 2   reluctance to take jurisdiction away from the federal
 3   court.  So we do think it's a question, which is why
 4   we raised it.  We centered our argument on the claims
 5   that we have made, which would be defined by the
 6   well-pleaded complaint rule and which, in particular,
 7   the courts have looked for the form of relief being
 8   requested.
 9            So the form of relief being requested in
10   this case is compliance by the Mayor and the CFO.  In
11   particular, the Mayor has responsibilities with regard
12   to the budget, and the CFO has responsibility with
13   regard to cutting checks.  And so I think that a
14   plaintiff in the position that you describe would be
15   making precisely the same arguments as we are making
16   here.
17            And also asking --
18            THE COURT:  And the same -- well...
19            MS. DUNN:  So I think it would be different
20   in Superior Court than here because, obviously, the
21   jurisdictional rules --
22            THE COURT:  I guess I left that out of the
23   hypothetical.  Because it's my hypothetical, I can
24   make up the rules as I'm going on.
25            I'm sorry.  The case was filed here
```

```
 1    originally and not in Superior Court, by that

 2    individual.

 3              MS. DUNN:  I think the result, Your Honor,

 4    would be the same.  I think because the complaint is

 5    the same, and the allegations are the same, it would

 6    be the same.  And the way that we view the complaint

 7    that we have brought, and the reason we brought it in

 8    Superior Court to begin with is because we view these

 9    provisions upon which we are seeking relief to be

10    applicable to the District.

11              I do think, however, if what -- if one of

12    the questions you're asking is, can you find

13    jurisdiction in this case and still consider the other

14    arguments we made?  I think the answer is, yes,

15    because the Home Rule Act itself has a different

16    purpose than the Court Reform Act of 1970, which is

17    where the provisions regarding jurisdiction of this

18    court versus Superior Court have come from.

19              I'm not sure --

20              THE COURT:  That means the Court could rely

21    on Thomas v. Barry, then, to have jurisdiction.  You

22    concede that?

23              MS. DUNN:  I don't concede that it's our

24    position that you should rely on Thomas v. Barry, but

25    if the Court were to rely on that case, I think that
```

```
 1   it's an open question whether there's jurisdiction and

 2   that would certainly be one way to resolve it.

 3             THE COURT:  Thank you.  I appreciate your

 4   candor.

 5             I'll ask the Mayor this, through counsel.

 6   So if the Mayor's position is that the law is indeed

 7   unlawful, why did he enact this law?  Why did you sign

 8   it in law?

 9             What's your view about that, if you have

10   one?

11             MS. DUNN:  Your Honor, I do think that that

12   is a question best directed for the Mayor.

13             THE COURT:  I will.  I'm interested what

14   your view is, if you have one.

15             MS. DUNN:  My view is that the Mayor signing

16   the law into law was lawful, and I think that when the

17   bill crosses --

18             THE COURT:  Was unlawful?

19             MS. DUNN:  Was lawful to do.  And I think

20   that when the bill crossed the Mayor's desk, he was in

21   an awkward position because his attorney general had

22   already informed him of the opinion that the attorney

23   general did not believe that this was lawful.

24             THE COURT:  So he was aware of that before

25   he signed off on the law.
```

```
 1                    MS. DUNN:  That is my understanding.

 2                    THE COURT:  He had a choice.  He could have,

 3      I guess, vetoed it.  He probably would have been --

 4      that probably would have been overwritten by the City

 5      Council, I assume.

 6                    MS. DUNN:  Your Honor, it's interesting.

 7      There's actually no requirement that the Major sign

 8      the amendment into law.  So --

 9                    THE COURT:  He didn't have to do anything.

10                    MS. DUNN:  That's my understanding is that

11      he didn't have to do anything.  But I do think it's

12      fair to appreciate that he was in a strange position

13      where he did sign the law but was aware at the time of

14      his attorney general's view that the law was not

15      legal.

16                    And I think it is telling that he did sign

17      the law.  I think it is an important -- makes a very

18      important public statement, and it was part of the

19      amendment process that happened here.

20                    THE COURT:  Because the question would be

21      why would someone, especially a lawyer who knows the

22      law is potentially illegal, nevertheless, do something

23      that is not even required of him to enact the law?

24      And that is the law; he doesn't have to do anything.

25                    MS. DUNN:  Yes, Your Honor.  I don't know
```

```
1    the answer to that question.  I will tell you that

2    there was some part of me that hoped that the Mayor

3    would wish to settle this case for the same reasons

4    that led him to sign the law to begin with.  That did

5    not happen, and so we are here today.

6              But I will be candid with you, that that

7    question has been on my mind as well and on the minds

8    of perhaps other people who have asked the same

9    question.

10             THE COURT:  I'm almost tempted to ask you

11   how could a case of this type, this magnitude, be

12   settled.  I will leave that to the parties.  I'll stay

13   out of that.  Maybe there was a way.  I don't know.

14   If there's a way, then maybe the parties should

15   consider.

16             MS. DUNN:  I think the answer may be sort of

17   what you see here, which is that, unfortunately, it

18   cannot.

19             THE COURT:  All right.  And quite frankly, I

20   think I may have been unaware that it was not required

21   for the Mayor to do anything at all.  That's the law.

22             MS. DUNN:  That is my understanding.  I will

23   verify it for you at the next break.

24             THE COURT:  All right.  Reading plaintiff's

25   pleadings, I get the sense that the plaintiff's
```

```
 1   position is that steps that have been taken over the

 2   past forty years have actually led to this.  This is

 3   the culmination of forty years of effort and moving

 4   to -- the city can't plead its own budget autonomy.

 5   Is that right?

 6              I guess that's an argument that I can't

 7   really follow, though, because I -- I guess the

 8   question is that the Council has always had the

 9   ability to amend the charter, to implement budget

10   autonomy.  Why did it wait forty years to do so?

11   Because especially during the last forty years, when,

12   if I'm not mistaken, legislation has been introduced,

13   federal legislation introduced every term of Congress

14   to give the city full budget autonomy.  So what's

15   happened?  Why all of a sudden have you arrived at

16   this?

17              MS. DUNN:  Your Honor, I think that's a

18   great question and an important question here.  And I

19   think it requires us to look at the path between 1973

20   and now.

21              And I think the baseline answer is, just

22   because it's a change doesn't mean it wasn't legal the

23   entire time.  Because there were political and

24   practical reasons --

25              THE COURT:  Excuse me one second.  I see
```

1    Mr. Hennessy here.  He wants to do something.

2                  Please, you could have a seat in the jury

3    box.

4                  How are you today?  Good to see you.

5                  MS. DUNN:  Your Honor, when Congress passed

6    the Home Rule Act, the District was brand-new.  The

7    amendment process required approval of two Houses of

8    Congress, and the federal payment to the District of

9    Columbia was over forty percent.  So it was a very

10   different time.

11                  And so the Congress then enacted the Home

12   Rule Act in 1973, did not have to worry if it didn't

13   want budget autonomy, that the next day the District

14   would turn around and claim budget autonomy because

15   there was still a two-House approval rule, and that is

16   very significant.

17                  So as I'm sure that you know, after 1984 in

18   the decision, *INS v. Chadha*, Congress revisited the

19   rule about two Houses.  And it said -- *Chadha* said

20   that it is required that there be presentment to the

21   President.

22                  So when it revisited the charter amendment

23   process, rather than just add a presentment

24   requirement to the President, Congress did something

25   different.  It loosened up the reins on the charter

```
 1    amendment process and assigned itself the role of
 2    passive reviewer as opposed to two-House approval.  So
 3    that is one of the things that happened along the way
 4    that was a legal change that made this more possible.
 5    But other things also happened along the way.
 6              So as we stand here today, the District has
 7    a record of fiscal discipline and responsibility that
 8    did not exist at times previous.
 9              So we stand here today, they have had
10    seventeen balanced budgets, sixteen years of clean
11    financial audits, and the federal payment that
12    Congress was very concerned about in 1973, which was
13    upwards of forty percent, is now -- aside from things
14    that states got like Medicaid, one percent, and that
15    amounts to things like reimbursement for the
16    inaugural.
17              So while there were political and practical
18    reasons that this could not be done previously, there
19    are not legal reasons.  And I would say, because I do
20    think that this argument probates the defendants'
21    filing because it's new and because it's a change,
22    that must mean it's illegal.
23              But I would say that there are, particularly
24    in the civil rights context, times when laws on the
25    books, and that law is later found to permit things
```

```
1    that are possible, but along the way nobody thought to
2    bring the claim, because as a political and a
3    practical matter, it would not have been a successful
4    claim.
5            So this is the first time that these legal
6    issues are being visited, and they are being visited
7    in this court.  And this is not something that could
8    have happened previously because there simply wasn't
9    the political will or the practical reality.
10           And it is notable that at this time in our
11   history, and in the District's history, there is
12   support for budget autonomy on every level.  And
13   that's very important because the legitimacy of what
14   has been done here has to be respected and accepted by
15   Congress because, as we all know and respect, Congress
16   has plenary authority.
17           So --
18           THE COURT:  So is it your position that by
19   doing nothing, by inaction, Congress has approved this
20   legislation?
21           MS. DUNN:  By failing to disapprove of the
22   Budget Autonomy Act --
23           THE COURT:  Just inaction.  Just by
24   inaction.  They didn't take any action.
25           MS. DUNN:  They didn't disapprove, but I
```

1    would disagree with the assertion that they didn't

2    take any action.  Their role in the amendment process,

3    and it was a role that they assigned to themselves in

4    Congress, is to review the legislation.  And they

5    decide, can we -- should we disapprove of this

6    legislation or should we let it pass into law?

7              And I think current events have actually

8    shown us, Congress is well-aware of its disapproval

9    authority.  I read in the paper the other day that

10   there are hearings on the District's marijuana law.

11   So if Congress had wanted to have such hearings and to

12   bring a vote of disapproval, which under the statute

13   is quite easy, any member can affect a discharge

14   petition to the floor without any trouble, they could

15   have well done that.  So our position is, absolutely

16   not, that they did nothing.

17             Our position is --

18             THE COURT:  Okay.  Let me just phrase it

19   this way.  In view of Congress' -- I don't want to say

20   failure -- in view of the congressional decision to

21   not take any action to disapprove, is that a tacit

22   approval of the law?

23             MS. DUNN:  That -- you could take it as

24   tacit approval.  The way that --

25             THE COURT:  I want to know what the law will

```
 1   support.
 2            MS. DUNN:  The law supports that Congress
 3   played the role it assigned itself in approving --
 4            THE COURT:  Right.  It took no action to
 5   disapprove.  Does that mean that as a matter of law
 6   the Budget Autonomy Act became final authority, final
 7   law?
 8            MS. DUNN:  Yes, that is what it means.
 9            THE COURT:  Because of Congress' failure to
10   take any action to disapprove that law?
11            MS. DUNN:  That's right.
12            THE COURT:  So there's a requirement, then,
13   if Congress wants to disapprove it, it has to
14   affirmatively say so, it disapproves legislation;
15   otherwise, it's the law.
16            MS. DUNN:  That's correct.
17            THE COURT:  And where is that stated?
18            MS. DUNN:  So the Home Rule Act sets out in
19   Section 303 a process for amending the charter.  And
20   it requires approval by the legislature, which in this
21   case was unanimous.  It requires ratification by the
22   voters.  In this case, it was 83 percent of the voters
23   that ratified.  And then it requires that the
24   amendment go to Congress for a period of thirty-five
25   days during which time Congress can pass a joint
```

```
 1    resolution to disapprove.

 2            THE COURT:  So the City Council and the

 3    Mayor can effectively write out the President and the

 4    Congress from any budget authority then?

 5            MS. DUNN:  No, Your Honor.  That would not

 6    be the case at all.  Congress and the President are --

 7    have all the power that they had before the Budget

 8    Autonomy Act.  If Congress wants to enact a budget, it

 9    can absolutely do that.  If the President wants to

10    send the budget to the Congress, he can do that.  The

11    District -- and this is another point that probates

12    the defendants' filing, so I'm very glad you asked

13    about it.

14            They paint this as some unilateral power

15    grab from the President and the Congress, but that is

16    not at all the case.

17            This has changed the process from the

18    District's point of view.  So they no longer have to

19    wait on Congress to pass an appropriations bill.

20            And this is another critical difference from

21    now and 1973.  In 1973, Congress' approval was a very

22    prudent thing to do, and now it is really costing the

23    District.

24            THE COURT:  So is the City Council

25    essentially saying, We don't have to wait for Congress
```

1    anymore to spend the money that we raised locally"  I

2    mean, that's the bottom line here, right?

3            MS. DUNN:  That's right.

4            THE COURT:  And you still send to the

5    Congress the portion of the budget that's implicated

6    by federal authority; is that right?

7            MS. DUNN:  That's right.

8            THE COURT:  So the City Council and the

9    Mayor then are asserting authority to spend the city's

10   money in the way in which the city counsel and the

11   Mayor want to spend the city's money notwithstanding

12   the federal component?

13           MS. DUNN:  That's correct.  The federal

14   component is subject to a separate process.  And as

15   actually the BLAG amici point out, the President

16   doesn't even send the portions of the budget

17   separately.  He sends the federal portion first and

18   then waits to send the local portion.  And Congress

19   has always treated the local portion differently.

20           But I want to be responsive to something you

21   said earlier, which is about Congress' role.  Under

22   the Budget Autonomy Act, Congress' role is now the

23   same with regard to the budget as it is for all other

24   legislation.  So there's nothing questionable about

25   Congress' role, vis-à-vis the budget, or else it would

```
1    be questionable, vis-à-vis, all other District

2    legislation.  So the role that Congress has given

3    itself and that it has followed here in the amendment

4    process is precisely the same.

5              THE COURT:  All right.  So what has changed,

6    then?

7              MS. DUNN:  It's different as to the budget

8    process.  Previously, obviously, the budget had to

9    be -- the funds had to be authorized for expenditure

10   by the Congress.  That is no longer the case.

11             THE COURT:  Right.  The city has taken the

12   position it can authorize and spend its own funds that

13   it raises from taxes, principally taxes, and I guess

14   other ways, right?

15             MS. DUNN:  Taxes and fees.  So in other -- I

16   mean, other cities may be a great example.  So you

17   look at other cities, they raise their taxes and fees,

18   parking meters, parking tickets, speeding tickets,

19   whatever, they take in that money, and they decide

20   what local projects they can spend it on.

21             THE COURT:  The money that the city raises

22   from income taxes, is that placed into a DC fund or

23   does that go to the federal government at some point?

24             MS. DUNN:  That's placed in the DC general

25   fund.
```

```
 1              THE COURT:  And prior to the passage of BAA,

 2    spending of that money and other money raised is

 3    subject to the Antideficiency Act and subject to

 4    Congress saying, You can spend it when we tell you can

 5    spend it and how we approve it, right?  Is that right?

 6              MS. DUNN:  It was subject to Section 446 of

 7    the Budget Autonomy Act, which was within the District

 8    charter, subject to amendment.  The Antideficiency Act

 9    has applied the whole way along, continues to apply

10    and applies -- and is satisfied so long as the DC

11    general fund is not outspent.

12              So if the District outspends the general

13    funds under the Budget Autonomy Act, it would violate

14    the Antideficiency Act.  Same with Congress -- well,

15    Congress would authorize, but same with any other

16    agency.  You can't outspend the amount of money that

17    is in the fund made specifically for expenditure.

18              So I want to make sure that I appropriately

19    address that question, because I think it is a matter

20    of some confusion and has been a matter of some

21    confusion throughout the briefing.

22              The other note I would like to make in

23    response to something that you said is that Congress,

24    for the past ten years, hasn't made any change to the

25    District budget.  So it's very much treated
```

```
1   differently than federal appropriations where changes
2   are made, Congress is very involved, OMB receives from
3   agencies' descriptions of what they intend to spend
4   because it affects the budget and the treasury.  That
5   does not happen with regard to the DC local budget.
6   It is not -- there is no requirement in OMB's very
7   critical A-11 circular that the local plans for
8   expenditure go to OMB, and that's because that money
9   isn't in the treasury.  That's because that money is
10  in the DC general fund, and Congress told the District
11  that that money belonged to the District in the Home
12  Rule Act.
13          So there's a deep history of this money
14  being treated differently, which is not the impression
15  you would get from reading the defendants' papers.
16          THE COURT:  During the recent shutdown,
17  sequestration, whatever you want to call it, was the
18  city able to spend its local money?
19          MS. DUNN:  The city was only able to spend
20  its local money because it drew on its emergency
21  reserve fund.  And at the time there was deep concern
22  about what would happen when it wasn't able to spend
23  from that reserve fund anymore, when it ran out of the
24  ability to spend the money.
25          And at the time, there was a conversation
```

```
 1    that was very much like the conversation we're having
 2    now because Congress' failure to appropriate money was
 3    really costing the District and creating the threat of
 4    extreme hardship.  And at that time, the Attorney
 5    General made similar arguments to those he's making
 6    now, that the use of that reserve fund would violate
 7    the Antideficiency Act and that there would be some
 8    implications from that, and there were not.
 9              So it is -- it's a good demonstration of why
10    budget autonomy is so important to the District,
11    because prior to the Budget Autonomy Act, they were
12    subject to the difficulties that are happening on the
13    national level with regard to the budget.
14              THE COURT:  You touched upon this, but let
15    me ask you about the Antideficiency Act.  As I
16    understand it, that Act does not require that funds
17    have to be located under the treasury, the federal
18    treasury; is that right?
19              MS. DUNN:  That's correct, Your Honor.
20              THE COURT:  Is it significant or not, and if
21    so why, that the DC general fund is not part of the
22    treasury?
23              MS. DUNN:  Yes, Your Honor.
24              THE COURT:  What's the significance?
25              MS. DUNN:  A question for the Court.  We
```

```
 1   have a slide with the text of the antideficiency

 2   statute.  Would that be of assistance?

 3              THE COURT:  It might be.  I don't know.

 4              MS. DUNN:  Let's just put up the slide, see

 5   if it is of assistance.

 6              So the Antideficiency Act says, "An officer

 7   or employee of the United States government or of the

 8   District of Columbia government may not make or

 9   authorize an expenditure or obligation exceeding an

10   amount available in an appropriation or fund for the

11   expenditure or obligation."

12              So the reason it's important that the money

13   was taken out of the treasury and given to the

14   District by Section 450 of the Home Rule Act is

15   because that constitutes the appropriation or fund.

16              And there was a lot of discussion in the

17   early briefs about this, whether or not the money had

18   been drawn from the treasury sufficient to constitute

19   an appropriation or a fund.

20              In defendants' surreply or reply brief on

21   Page 19, they recognize there is not an appropriations

22   clause issue.  The appropriations clause is the clause

23   that says, "No money shall be drawn from the treasury

24   but for an appropriation."

25              So if an appropriation -- if there's money
```

```
 1    out of the treasury, something has happened, an
 2    appropriation has occurred.
 3               THE COURT:  Is there any language in
 4    Section 450 that suggests that it is an appropriation?
 5               MS. DUNN:  Your Honor, the important
 6    language is that the money was moved out of the
 7    treasury and that the District has held this money
 8    belongs to the District.  To effect an appropriation,
 9    you don't need the word "appropriation."  You don't
10    need any special language.  But the Constitution says,
11    no money shall be drawn from the treasury but in the
12    consequence of an appropriation by law.  So, here, the
13    money is out of the treasury.  Congress has made an
14    appropriation.
15               So that satisfied -- and the defendants
16    appear to agree that it satisfies the constitutional
17    requirement of making sure that there's an
18    appropriation or fund by virtue of the Antideficiency
19    Act.
20               So then the question that follows from that
21    is, well, okay, is that amount available in the
22    appropriation or fund, is it available for expenditure
23    or obligation?
24               And before the Budget Autonomy Act, the
25    amount could not be available for expenditure or
```

```
 1    obligation unless Congress said it was okay.  And

 2    that's what Section 446 before amendment said.  It

 3    said, there are some strings attached to this money,

 4    and Congress needs to approve its expenditure.  And

 5    that's what they've been doing for the past forty

 6    years, in accordance with Section 446, which is

 7    located in the District charter and subject to

 8    amendment.

 9             So the Budget Autonomy Act amended the

10    District charter, amended that provision, 446, and

11    means that the amount is available for expenditure by

12    the District of Columbia.

13             And there's no constitutional obstacles to

14    that because Congress is necessary to spend money out

15    of the treasury.  It is not required to spend money

16    out of the DC general fund.  The only requirement for

17    that was Section 446, which has now been amended.

18             So that folds into the larger question, was

19    it a valid amendment under the Home Rule Act?  And I

20    think that's a very important thing to understand,

21    which is that these arguments basically collapse into

22    one another.  And then the question before the Court,

23    hopefully, is actually much simpler, it's really is

24    this a valid amendment of the Home Rule Act?

25             THE COURT:  You mentioned your reading in
```

1    the newspaper the other day about the congressional

2    hearing, and you accepted that what you read is true,

3    that there was a hearing on marijuana, right?

4            MS. DUNN:  Yes.  I checked it out first.

5            THE COURT:  All right.  One of the amici

6    submitted numerous articles from the *Washington Star*,

7    or the *Evening Star*, whatever it was, years ago that

8    the amici takes the position outlines the history of

9    the origin of the Home Rule Act, the charter,

10   et cetera.  The Court can indeed take judicial notice

11   of those articles, can it not?

12           MS. DUNN:  Yes, Your Honor.

13           THE COURT:  All right.  There was some back

14   and forth about belated recollections, but by the same

15   token, challenging, quote/unquote, "belated

16   recollections," there were also opposite belated

17   recognitions.  And putting aside the recollections of

18   individuals who arguably were intimately involved in

19   this process, what about those newspaper articles?

20           What weight should the Court give, if any,

21   to those articles that essentially chronicles what was

22   going on back in the early '70s leading up to passage

23   of the Home Rule Act?  Does the Court just attribute

24   it to historical significance?

25           MS. DUNN:  Well, I think the articles inform

1    the Court.

2             THE COURT:  Accurately?

3             MS. DUNN:  Well, I think you should credit

4    them with as much accuracy as you would credit the

5    newspaper article.  Everybody knows what goes into

6    making a newspaper article.

7             THE COURT:  But you accept as true that

8    article you read about Congress having that hearing

9    the other day?

10            MS. DUNN:  No.  I, in fact, independently

11   verified that that hearing existed.

12            THE COURT:  So what weight do I give to

13   those articles?  Which were very interesting.

14            MS. DUNN:  I found them interesting too.

15            THE COURT:  But not truthful?

16            MS. DUNN:  Excuse me?

17            THE COURT:  Truthful?

18            MS. DUNN:  I can't speak to whether they are

19   truthful.  I did find them interesting, and I think

20   that the Court can find them interesting.

21            THE COURT:  So they are uncontroverted?  The

22   accuracy of what's printed is uncontroverted?

23            MS. DUNN:  Your Honor, I cannot ascribe to

24   that view.

25            THE COURT:  You are going to tell me

```
 1   something.  I'm not going to let you off the hook that

 2   easy.  Either it's true or not true.  Sure, it's

 3   hearsay, but it's something the Court can --

 4              MS. DUNN:  It's not text of the statute.

 5   It's not legislative history.  It's not statements of

 6   legislators on the floor during discussion of the Act

 7   or before passage of the Act.  Those things, I think,

 8   are accorded some real legal significance.

 9              THE COURT:  Are they biased?  Are they

10   biased articles?

11              MS. DUNN:  I think that the articles are --

12   I mean, I think that they are interesting.  But I

13   think I will answer Your Honor's point in the

14   following way, which is:  These articles inform us

15   about what gestalt was going on at the time.  What was

16   the political landscape?  What was happening?

17              And they say, obviously, that there were

18   members of Congress that did not want to grant budget

19   autonomy in 1973, and nobody disagrees with that.

20              THE COURT:  That's a fairly common fact,

21   right?

22              MS. DUNN:  Yes.  That is uncontroverted.

23              THE COURT:  The Diggs plan, true or not

24   true?

25              MS. DUNN:  There was a Diggs plan and it was
```

```
 1    a compromise.  And we don't dispute that it was a

 2    compromise that facilitated passage of the Budget

 3    Autonomy Act.  I think there's ample evidence to

 4    suggest that that's the case.

 5            But the interesting part to me about these

 6    articles is that it showed how different the political

 7    situation was in 1973 than it is now, and it shows

 8    that there were people who were very reluctant to give

 9    additional rights to the District.  And they had to be

10    addressed, or their votes would not have been gotten.

11            And so when I read the statute -- which I

12    think is very important to figuring out the answer to

13    this question of Budget Autonomy Act validity.  When I

14    read the statute, what I see is an effort to make very

15    clear what the Council could do and what the Council

16    could not do to reassure the people in Congress who

17    were worried that we're not giving more rights than we

18    all have agreed to in signing up for this bill.

19            The other interesting thing --

20            THE COURT:  Congress essentially retained

21    the rights it had over the city's purse strings?

22            MS. DUNN:  Congress made no -- as it said,

23    made no change to the existing law.

24            THE COURT:  Right.

25            MS. DUNN:  But I think Your Honor's question
```

```
 1    gets to something else which is interesting, which is

 2    the flip side of that.  And that's a comment that is

 3    found in the Newman and DePuy article that both

 4    parties cite that was written close-ish to the time of

 5    passage.

 6              THE COURT:  Everyone recognizes that article

 7    as authority.

 8              MS. DUNN:  I wouldn't recognize it as a case

 9    that you would have to follow its interpretation.

10              THE COURT:  No.  But you rely on it, though,

11    in your submission; do you not?

12              MS. DUNN:  It contains information that

13    informs the Court and informs everybody about what

14    those authors saw going on at the time.  And one thing

15    that they saw --

16              THE COURT:  They weren't simply authors.

17    They were directly involved in the process; were they

18    not?

19              MS. DUNN:  They were involved.  We didn't

20    impeach the authors of people involved.  They were

21    involved.  They wrote an article, a very interesting

22    article.  One thing that it says is that the

23    proponents of the budget autonomy -- or the proponents

24    of the Home Rule Act did not want to be explicit about

25    how broad a delegation of authority it was, rather
```

```
1    than scare off the people who would have been opposed.

2              And so I think when we get to the textual

3    interpretation and statutory interpretation part of

4    our discussion, I think it would be clear that how

5    these principles are reflected.  One is the desire to

6    bring clarity to what the council may or may not do in

7    a very specific way, and the other is why there's an

8    absence of explanation for certain things in the

9    legislative history.

10             THE COURT:  What -- is there any legislative

11   history at all that supports your principal argument?

12             MS. DUNN:  That -- there's legislative

13   history that supports many of our arguments.

14             THE COURT:  That this Act is lawful?

15             MS. DUNN:  Yes.  So there's legislative

16   history that supports our argument as to 602(a)(3).

17   There's legislative history that supports our argument

18   as to the fact that there was a broad amendment power

19   embedded in the Home Rule Act and that the House of

20   Representatives, in particular, went into Congress

21   wanting to retain a broad amendment power rather than

22   accede to the Senate's desire for a very

23   narrow amendment power.

24             THE COURT:  Talk to me briefly about

25   construction, rule of construction versus limitation.
```

```
 1   That's the 603(a) argument, right?  That's a principal

 2   argument that you make.

 3            MS. DUNN:  Yes, Your Honor.  I think it

 4   would be best to talk about the argument in the

 5   context of 603(a), since that's the context in which

 6   we make it.

 7            THE COURT:  Right.  That's what I'm asking.

 8   Right.  And the question is:  Why should I read this

 9   as a rule of construction and not one as limitation?

10            MS. DUNN:  So Section 603(a) says, "Nothing

11   in this Act shall be construed as making any change in

12   existing law" --

13            THE COURT:  All right.  Just stop there.

14   The law that existed at that time vested exclusive

15   budget authority with the United States Congress and

16   the President, right?

17            MS. DUNN:  That's correct.

18            THE COURT:  It seems clear there, "Nothing

19   in this Act shall be construed as making change in the

20   existing law," the other side wins.  Why do I even

21   need to look at legislative history?  What could be

22   plainer than that language there?

23            MS. DUNN:  Your Honor, I agree, nothing

24   could be cleaner, except my clean reading is not the

25   defendants' clean reading.
```

```
 1              "Nothing in this Act shall be construed as
 2   making any change in existing law."  And this means
 3   what it says.  It speaks in the present tense.  It
 4   speaks about what the Congress was doing, not about
 5   what the Council may or may not do.  And its saying --
 6              THE COURT:  All right.  So this was a law
 7   for the moment at that time?  It's a moment in time,
 8   right?
 9              MS. DUNN:  Yes.  It was communicating to
10   people, we are not making any change to existing law.
11   And I think it is most helpful to look -- this 603 is
12   contained in a section entitled "Budget Process;
13   Limitations on Borrowing and Spending."  And after
14   this provision about the budget process, it goes on to
15   talk about limitations on borrowing and spending.
16   Similarly, 602 is about limitations on the Council.
17   And the language in those sections that are
18   expressed --
19              THE COURT:  You have 602 there?
20              MS. DUNN:  Yes.  Can we --
21              THE COURT:  I've read it, but it's good to
22   see it as well.
23              MS. DUNN:  So "The Council shall have no
24   authority to impose any tax on property, lend the
25   public credit" --
```

```
 1                THE COURT:  And that's forever language,
 2   right?  That wasn't just for the moment, right?
 3                MS. DUNN:  That's forever.
 4                THE COURT:  If Congress intended to limit
 5   forever the authority of the City Council, the Mayor,
 6   et cetera, then Congress knew how to do so, right?
 7                MS. DUNN:  That's exactly right.
 8                THE COURT:  That's your argument, right?
 9                MS. DUNN:  That is our argument.
10                THE COURT:  Is this your principal argument?
11   Is that your strongest argument, then?
12                MS. DUNN:  603(a)?
13                THE COURT:  603(a) and its interplay with
14   602(a).  603 defined the moment at the time what
15   Congress was dong; 602 thought about the moment going
16   forward and forever.
17                MS. DUNN:  Yes to 602.  I think let's also
18   look --
19                THE COURT:  I have to read them in tandem;
20   don't I?  I have to; don't I?
21                MS. DUNN:  Yes.  But the other thing that we
22   need to read in tandem is 603 does contain specific
23   limitations.  So 603(a) is that provision we just
24   talked about, making no change in the existing law.
25   And then if we could put 603, if we have the whole
```

```
 1    thing -- oh, we don't.

 2             So --

 3             THE COURT:  I'm sure we have it.  I'm sure

 4    we have it.

 5             MS. DUNN:  Well, it says --

 6             THE COURT:  Wait a minute.  That's part of

 7    the handout.  I have that.

 8             MS. DUNN:  Right.  So it says things like,

 9    the Council shall not approve; the Council may not

10    approve; the Mayor may not forward; no general

11    obligation bonds shall issue.

12             602, similarly, The Council shall have no

13    authority to; the Council shall submit.

14             As Your Honor said, when Congress wanted to

15    specifically prohibit something, it knew how to do so.

16    And Your Honor also asked us about 602(b), and I think

17    we should talk about the comparison between 602(b) and

18    603(a) that defendant --

19             THE COURT:  Why has it taken forty years to

20    make this argument?

21             MS. DUNN:  Your Honor, this would turn

22    towards, I think, your first question.

23             THE COURT:  The political climate is ripe

24    for this argument now; is that right?

25             MS. DUNN:  Yes.  But it's not just --
```

```
 1              THE COURT:  I didn't mean that in a critical

 2    way when I said that.  Everything's leading up to

 3    this, and I understand that, political climate may be

 4    better.  I don't know that to be a fact.  Economic

 5    conditions of the city is absolutely better than it

 6    was prior to enactment of the Home Rule Act, correct?

 7              MS. DUNN:  Absolutely.

 8              THE COURT:  And Mr. Nathanson [sic] would

 9    agree with that, right?

10              MR. NATHAN:  Yes, I do, Your Honor.

11              MS. DUNN:  We'll give Mr. Nathan his full

12    credit.

13              So there are other facts here that I think

14    are important.  So before 2000, the amendment process

15    under the charter had only been used once.  So it's

16    not really -- I mean, think about that.

17              THE COURT:  That was 1984, right?

18              MS. DUNN:  No, that was in 1977 with the

19    Initiative Referendum and Recall Act, which notably

20    also had an effect on the roles of Congress and the

21    President, and yet, is a valid Act by everybody's

22    attestation.

23              In 1984, as you refer to, the Congress

24    changed its own role in the amendment process.

25    Before, Congress had to approve by both Houses.  1984
```

1    it said, nope, only passive review.  We will review

2    the legislation and that will be sufficient to enact

3    it into law.

4            And so after 1984 until 2000, still sixteen

5    years past, the amendment process was not used at all.

6    So I do think that it's an important question.  I

7    think historically, people do ask, okay, forty years,

8    why now?  But there were many legal and practical and

9    political things that happened along the way that

10   makes this makes sense now.

11           And, you know, the Second Amendment happened

12   many, many, many years ago, but in 2007 the Supreme

13   Court said there's an individual right to bear arms.

14   Nobody had brought that claim before.

15           The equal protection clause has been around

16   a long time.  Until recently, not used in addressing

17   same-sex marriage.

18           This kind of thing happens all the time and

19   it happens in courts because claims are not ready to

20   be brought for one reason or another, and that doesn't

21   mean that there was a legal obstacle.  It doesn't mean

22   there was a legal opinion or a provision of this

23   statute, which was very clear in its prohibitions that

24   said, You can't do it.  None of that existed.  And so

25   there are -- I think you can say at a very high level,

```
 1    Okay.  Why now as opposed to in forty years?  But once
 2    you look at the reality, once you look at all the
 3    things that have happened -- and this is true in many
 4    context when we're talking about greater rights for
 5    people or entities -- that, you know, in a lot of ways
 6    the District has earned its right to budget autonomy.
 7    It has demonstrated that this time would be
 8    appropriate.
 9             THE COURT:  I don't think anyone nor the
10    Court doubts that.
11             MS. DUNN:  I agree.  I think that's
12    undisputed.  And the only thing really in dispute is
13    whether these provisions of the Home Rule Act,
14    Section 602(a)(3), and Section 603(a) really stand in
15    the way.
16             And so one thing that I think is very
17    important that we do for you today is to fully satisfy
18    you on 603(a) and 602(a)(3) because those are the
19    principal provisions that the defendants rely upon.
20             We believe strongly that the text and
21    legislative history on both support us.  So I want to
22    make sure that today we fully answer your questions on
23    both subsections.
24             THE COURT:  In fact, partisan legislative
25    committee, congressional legislative committee, is of
```

```
1    the opinion that the Act is unlawful.  The general

2    accounting office has issued an opinion.  The esteemed

3    Attorney General of DC has issued his opinion.  What

4    weight does the Court give to all those opinions, if

5    any?  Any deference to any opinion?  And if not, why

6    not?

7              And I think that our circuit has talked

8    about deferential review on occasions when an agency

9    that has certain expertise issues an opinion about it.

10             What about the General Accounting Office

11   opinion?

12             MS. DUNN:  So the GAO is an arm of Congress

13   and is accorded no legal deference.  And there's case

14   law on that fact.  Particularly in this case.  If Your

15   Honor has looked at the GAO opinion -- and this means

16   no respect to the GAO -- it is very hard to find this

17   opinion persuasive on any metric.

18             You have seen how many pages of paper we

19   have handed to you, and these issues are not

20   uncomplicated.  The GAO devoted little over four pages

21   of discussion to the merits of these issues.  And then

22   on the specifics, they assume that, without analysis,

23   that the Antideficiency Act and the Budget Autonomy

24   Act are violated.  They just assume that.

25             So already, if you're not totally persuaded
```

```
 1    that that's right, that's a good reason to doubt.

 2    They don't apply the authoritative line of cases,

 3    beginning with *Greater Washington,* to the analysis of

 4    602(a)(3), which is critical.  And they don't -- they

 5    do rely on the *McConnell* case, which doesn't really

 6    support their position, and they don't analyze that

 7    case.

 8              THE COURT:  What about that *McConnell* case?

 9    Why isn't that case instructive?

10              MS. DUNN:  It is instructive.  Your Honor, I

11    think with respect, I think the discussion of each of

12    these provisions, 602(a)(3) and 603(a) might be best

13    talked about in -- as a whole, and I question -- my

14    question for the Court is whether that would help you

15    or not.  Because I think it's easier to understand

16    looking at all the case law.

17              THE COURT:  Go ahead.  You've structured

18    your argument.  Go ahead.  Sure.

19              MS. DUNN:  Is Your Honor fully satisfied on

20    the response to the GAO and the --

21              THE COURT:  What about the Attorney General

22    of DC?

23              MS. DUNN:  I think the Attorney General's

24    opinions, respectfully, are without merit.  However, I

25    think that that is what this Court --
```

```
1              THE COURT:  He made a passionate

2    presentation before the board of elections, I think,

3    in order to urge that group not to place it on the

4    ballot.  And you could just feel the care and concern

5    that he had; wasn't meanspirited, unfounded, and it

6    was nevertheless based on ballot, which was the next

7    step in the approval process.  Right?

8              MS. DUNN:  Yes, Your Honor.  The Attorney

9    General did go before the board of elections.  He did.

10   I was not there, but I heard it was quite a passionate

11   presentation.

12             The board of elections --

13             THE COURT:  I was not there either.  I read

14   it, but you could feel the passion in reading it.

15             MS. DUNN:  I don't doubt that the Attorney

16   General does feel very strongly about his views, and I

17   don't doubt that they are well-meaning views.  I

18   believe, however, that they are incorrect as a legal

19   matter, and that this Court should evaluate them in

20   the course of this case.  And that if the Court --

21             THE COURT:  But he's the Attorney General of

22   the District of Columbia.  Is there any circuit

23   authority that addresses the weight, if any, to be

24   given to the highest ranking legal officer in the

25   District of Columbia?
```

```
 1              MS. DUNN:  Not that I'm aware of, Your

 2    Honor.  And the Council is on the other side.  So in

 3    this case, you really have an intrabranch dispute in

 4    the District of Columbia.

 5              THE COURT:  Right.  You raise an interesting

 6    question.  I'm going to sidetrack just for a second.

 7              When the Council is a party, does the

 8    Council rely on the Attorney General for legal

 9    representation on occasion or not, the City Council?

10              MS. DUNN:  I believe so.

11              THE COURT:  But in an instance like this,

12    Council has to obtain outside counsel when there's a

13    dispute between the two branches?

14              MS. DUNN:  So, in this case, the Mayor and

15    the CFO are relying on the advice of the Attorney

16    General, and he is their representative in this court.

17    So the Council has retained outside counsel to

18    represent it in these matters when we are appearing

19    here.

20              THE COURT:  If the Council were sued,

21    though, individually, in a different matter and the

22    Mayor is not in that lawsuit, could the Council then

23    rely upon the representation of the Attorney General?

24              MS. DUNN:  Yes, Your Honor.  Absolutely.

25              As to your question about deference, I'd be
```

1    remiss if I didn't point out that there is case law

2    that says the Council's interpretation of its -- the

3    Council's interpretation of its responsibilities under

4    the Home Rule Act is accorded deference.  I believe

5    there's some mix case law on that, but I should say

6    that there is -- as far as deference goes, it would

7    be -- there is some case law that says --

8              THE COURT:  The City Council's

9    interpretation.

10              MS. DUNN:  Defer to the Council's

11    interpretation of what it is allowed to do under the

12    Home Rule Act.

13              Shall we proceed to Section 602(a)(3)?

14    Would that assist?

15              THE COURT:  I want to talk about, briefly,

16    the cases that the government -- strike that.

17              It's hard not to say the government because

18    everyone's the government here.  I have to keep in

19    mind it's the Mayor being sued by the City Council.

20              The Mayor relies on a number of cases,

21    opinions decided by the DC Court of Appeals; the

22    *Crawley* decision, the *McConnell* decision, I think the

23    *Jackson*, the *Hessey* v. *Board of Elections*; it's an

24    en banc court decision.  I mean, from the highest

25    court, highest appellate court of general jurisdiction

1    in this city.

2            And *Hessey* especially, en banc court, the

3    legislative history of the Subgovernment Act makes

4    clear that the Subgovernment Act left in place the

5    preexisting congressional appropriations for the

6    District government.  And you don't dispute that at

7    all.  But that only goes as far as --

8            MS. DUNN:  Your Honor, I do not believe that

9    those cases stand for the proposition that the

10   defendants say that they stand for.  I have read all

11   of those cases.  I have read them in detail.

12           THE COURT:  You think those cases were

13   wrongly decided?

14           MS. DUNN:  No, I am not questioning the

15   decision.  I think that, in the filings they are not

16   portrayed to stand for the propositions that they

17   actually stand for.

18           *Hessey* is a great example.  *Hessey* simply

19   acknowledges that the Council can't authorize spending

20   of local revenues, which at the time *Hessey* was

21   decided was true, and has absolutely nothing to do

22   with the Budget Autonomy Act or the amendment process

23   or any of this.  And so to read more into that is

24   completely baseless.

25           THE COURT:  What about the *Crawley* case?

```
 1   That was the amendment of the Controlled Substance
 2   Act?
 3              MS. DUNN:  So Crawley has to do with a case
 4   that is unlike this one, in that there was an express
 5   limitation on the Council's authority.  So 602(a)(8)
 6   is an express limit on Council's authority, and it's
 7   right here up on the screen.
 8              THE COURT:  And your argument is that
 9   Congress intended that 602 applied to the Budget Act,
10   used the same language, right?  Is that right?
11              MS. DUNN:  So the way defendant used this
12   case is in support of their argument under 603(a), I
13   believe.  And in 603(a) there is no express
14   prohibition.  That provision speaks to what the
15   Congress was doing at the time, making no change to
16   existing law.  And so Crawley, I think actually
17   supports our position in that it is an example of a
18   place where there is a very explicit prohibition.
19              Congress can't act -- the Council can't
20   act -- enact any regulation relating to the U.S.
21   District Court of the District of Columbia.  This also
22   speaks to the fact that Congress wanted to make very
23   clear, because it didn't take a Home Rule Act to tell
24   the DC Council it couldn't legislate for the U.S.
25   District Court.  I mean, that's constitutionally
```

1    mandated.

2              So to the extent that *Crawley* talks about --

3    *Crawley* does speak about the provision 602(a)(3)

4    legislative history -- oh, no.  I'm sorry.  I

5    apologize, Your Honor.

6              *Crawley* speaks about 602(a)(8)'s legislative

7    history.  And, again, there, you can see that there's

8    a dramatic difference between 602(a)(8) and the

9    section that concerns us, 602(a)(3).

10             The legislative history of 602(a)(3)

11   supports the proposition that local budgeting, local

12   taxing and spending of dollars is not a function of

13   the United States, which is a relevant part of the

14   language in 602(a)(3) that defendants point to.

15             Defendants make an extremely broad claim

16   that any District law having to do with functions of

17   the United States would be barred by that provision.

18   That would include, of course, if the District passed

19   an income tax because that would affect a function of

20   the United States, because people would take more

21   deductions, and a function of the United States, i.e.

22   collecting more money, would be affected.

23             So the *Crawley* case says -- talks a great

24   deal about 602(a)(8)'s legislative history, which is

25   very particular.  And 602(a)(3)'s legislative history

```
1    demonstrates that the House original bill and the

2    Senate bill both contained a budget autonomy

3    provision, and they also both contained the language

4    in 602(a)(3), functions of the United States.

5             So it is clear that the drafters of these

6    bills did not think that the District's control over

7    its own local dollars and expenditure was a function

8    of the United States, or those two things could not

9    exist.

10            So Crawley is an entirely different case

11   about a different provision with different legislative

12   history.

13            THE COURT:  What about the Jackson case?

14            MS. DUNN:  So the relevance of Jackson, I

15   think, there are two things.  And if Your Honor sees

16   other things in the defendants' brief, then I will

17   address --

18            THE COURT:  That's also an en banc decision,

19   I believe.

20            MS. DUNN:  I --

21            THE COURT:  It is.

22            MS. DUNN:  We recognize that it's an en banc

23   decision.  We believe its only relevance to this case,

24   defendants point to Footnote 20, where it says, "The

25   budget is off limits to direct democracy."
```

```
 1              That is not talking at all about this.  This

 2    case is about the Initiative Referendum and Recall

 3    Act.  Indeed, *Jackson* in Footnote 5 supports our

 4    position because it lists the limitations on the

 5    Council and does not include 603(a).

 6              So I would urge the Court to look very

 7    carefully at these case cites because I do think there

 8    are a lot of cases cited.  We don't disagree that

 9    those cases are important cases, but they were in many

10    respects cases on different topics, and the

11    propositions for which they are cited are not correct.

12              THE COURT:  All right.  We're going to take

13    a ten-minute recess.

14              Are there additional points we've not

15    covered during my questioning that you'd like to

16    address?

17              MS. DUNN:  Yes, Your Honor.

18              THE COURT:  Many?

19              MS. DUNN:  No, Your Honor.

20              THE COURT:  All right.  We'll take a

21    ten-minute recess, and then I want to be fair to -- I

22    was going to say the government again -- the Mayor

23    when we return.  We'll take a ten-minute recess and

24    we'll start back at 11:35.

25              (Whereupon, a recess was taken from
```

```
1                  11:19 a.m. to 11:45 a.m.)

2              THE COURT:  Counsel, I want to be clear

3   about the apparent conflict between 446 and 603(a).

4   603(a), what the language says, nothing in here shall

5   change the balance of power, essentially.  That's not

6   verbatim.

7              And 446, which essentially writes out the

8   President in the process.  And the authority, again,

9   for the City Council, do you have that?  The authority

10  for the City Council to do that.

11             MS. DUNN:  Your Honor, the amendment to 446

12  doesn't take away any authority from the Council or

13  the President.  The -- from the Congress or the

14  President.  The Congress and the President retain all

15  the authority they had previously.

16             What 446 amendment does is it says that the

17  District doesn't have to wait for approval by the

18  Congress or the President to go forward in order to

19  expend --

20             THE COURT:  That's what I'm saying,

21  essentially writes out those two other coequal

22  branches of government, though.  I'm just wondering

23  where the City Council gets that authority.

24             MS. DUNN:  Your Honor, the City Council gets

25  that authority -- and it's not just the Council, it's
```

1    really all actors that acted in the amendment process.

2    Because Congress delegated to the District the ability

3    to amend its charter, which included 446, subject only

4    to express prohibitions.  And the two prohibitions

5    that are on the table for discussion, one is a

6    prohibition, one is actually not a prohibition.

7    602(a)(3) is a limitation on the Council's authority,

8    it just does not apply here and we can speak about

9    why.

10            THE COURT:  Tell me why it doesn't apply

11    here.

12            MS. DUNN:  If we could put 603(a) up on the

13    screen -- or 602(a)(3).  I apologize.

14            So 602(a)(3) is contained in 602, which is

15    entitled "Limitations on the Council."  And so this is

16    a substantive prohibition.

17            THE COURT:  I understand all that.

18            MS. DUNN:  It says, "The Council shall have

19    no authority to enact any act" --

20            THE COURT:  I understand that.  Right.

21            MS. DUNN:  Okay.  So *Greater Washington*

22    *Central Labor Council* is the case that authors the

23    controlling limitation of this provision.  The reason

24    it's helpful to have the statute up here is because

25    it's a cannon of construction, obviously, that all

```
1    parts of the statute need to mean something, and it

2    also needs to mean something together.

3              So here you have the phrase, "functions or

4    property of the United States," and you have the

5    phrase, "which is not exclusively -- not restricted in

6    its application exclusively in or to the District."

7              So what Greater Washington did was it gave

8    effect to this entire provision, and it read the first

9    part in light of the second part.  Because in that

10   case the plaintiffs did what defendants are doing

11   here, which is they relied on functions of the United

12   States.

13             So the second portion says, the District

14   can't legislate outside of the District.  It has to

15   exclusively apply to the District.  So things applying

16   to other states, those are off the table.  And what

17   "functions or property of the United States" does in

18   this sentence is it recognizes that there are things

19   that happen in the District that the Council also

20   shouldn't legislate about.

21             And I think the facts of Greater Washington

22   itself explain very well how this works.  So in that

23   case, the Department of Labor and federal courts

24   administered a program that gave private Workers'

25   Compensation benefits to District residents.  And they
```

```
 1   had hearings, and they enforced the judgments, but
 2   they did it because it was a law for the District.
 3   Their role, even though they were federal actors, was
 4   in the context of a law that applied exclusively to
 5   the District.
 6           And so in Greater Washington, the Court knew
 7   that this was a local function not just because the
 8   law applies only to DC but also because Congress was
 9   acting as a local legislature for DC as opposed to a
10   national legislature.  And this is the distinction
11   made in other cases in this line that we can talk
12   about.
13           But just as administering that Workers'
14   Compensation program to the District was considered to
15   be a local function, notwithstanding the involvement
16   of federal actors like the federal courts, here too,
17   spending local tax dollars is a classic local
18   function.  Not only is it a classic local function in
19   all other jurisdictions in America, it's a classic
20   local function to DC.
21           DC, from 1802 to 1871 --
22           THE COURT:  I'm familiar with the history.
23           MS. DUNN:  So this started out as a local
24   function here.  And when Congress took it back over
25   and decided it was going to play a role, it did so in
```

1    its supervisory role as a local legislature for the

2    District.  And Greater Washington points to this

3    distinction by saying that Congress was exercising its

4    District clause authority as opposed to other

5    authority.

6            This is particularly highlighted by the fact

7    that the Longshoreman's Act, which was the part being

8    amended in that case -- there were two of them.  One

9    was a national law.  The other -- and, by the way,

10   that national law also applied to the District.  The

11   other was a law that applied exclusively to the

12   District.

13           So the determination was this is Congress

14   acting pursuant to its District clause authority as a

15   local legislature.  The District never would have

16   dared messed with that national law.  But it was

17   appropriate that it amend the law that applied

18   exclusively to the District because the functions were

19   local.

20           And it's very important, I think, to

21   understand that the defendants are not just urging to

22   throw out the *Greater Washington* and that line of

23   cases.  They urge we focus on the who -- so who is

24   involved?  -- as opposed to the what?  What is the

25   function?

1          But in none of the cases is that what the

2    courts are looking at.  They are looking at what is

3    the function?  Is it a local function that's being

4    performed?  And here it is very clear that it's a

5    local function.  And *Greater Washington* puts a fine

6    point on it.  It says, "Just because federal actors

7    perform a District function, that doesn't transform it

8    into being a function of the United States."

9          And this intersects nicely with the

10   legislative history point that I brought up earlier,

11   which is that, when the budget autonomy provision

12   existed in the House bill and in the Senate bill, it

13   coexisted with this language.  So there were not

14   people at the time that thought this was a function of

15   the United States.

16         And, indeed, the United States doesn't treat

17   this as a function of the United States.  The

18   Congress, when it plays its role in performing this

19   local function, takes money out of the DC general fund

20   and appropriates it to local projects.  As we said

21   earlier, the OMB even require a submission about the

22   local budget.

23         So I think that *Greater Washington* is a very

24   important case in this line.  Similarly, to the

25   *McConnell* case that you talk about.  And I think

1    *McConnell* illustrates this point very nicely.

2           So *McConnell* had to do with the Uniform

3    Control Substances Act in DC.  And that Act provided

4    for mandatory minimum sentences for narcotics

5    offenders and would have deprived narcotics offenders

6    of an opportunity under a national law that said that

7    those offenders could have an opportunity for

8    rehabilitation.  And it was adjudged to be

9    inappropriate under 602(a)(3) because it effectively

10   repealed that national law.

11          And *McConnell* says, in this case, Congress

12   is acting as a national legislature.  There is, in the

13   words of *Greater Washington*, a federal law, national

14   in scope.  And that is what matters.

15          So what matters for this provision -- and

16   you can tell, this provision is in a list of things

17   that are very specific.  It does not mean to address

18   any function of the United States, which, by the way,

19   the defendants' definition of any function that in any

20   way affected the United States would swallow up --

21          THE COURT:  Excuse me just a second.

22          For the folks standing, I think there's an

23   overflow courtroom.

24          THE COURTROOM DEPUTY:  Yes, there is, Your

25   Honor, 25A.

```
 1              THE COURT:  There's an overflow courtroom
 2    down the hall, Courtroom 25A.  You don't have to
 3    sit -- if you want to sit on the floor, that's fine,
 4    but you don't have to.
 5              Go ahead.
 6              MS. DUNN:  So, for example, if the District
 7    wanted to impose an income tax, it couldn't for the
 8    reason we discussed.  It would need federal
 9    deductions.  We use examples in our brief that were
10    not answered by the defendants.
11              For example, marriage equality, federal
12    benefits now for District residents.  That would not
13    be possible.  The minimum wage, DC legislates with
14    regard to the DC National Guard.  None of that would
15    be possible.  And even the Initiative Referendum and
16    Recall Act, which was a chartered amendment in 1977
17    that went through the harder congressional approval
18    process of both Houses, even that would violate under
19    the Attorney General's reading because it impacts
20    federal actors.  Indeed, the same federal actor, the
21    Congress.
22              So I think these cases are very important to
23    the interpretation of 602(a)(3).  I think it's very
24    clear when you read these cases in context, that not
25    only would defendants' interpretation make it too
```

```
1   broad, it also doesn't fit into the list, but it

2   doesn't even make sense in the context of the same

3   statute.

4           THE COURT:  All right.  I want to hear from

5   the city.  But there were a couple of points -- I've

6   asked you a lot of questions.  There may be a few more

7   questions, but I want to hear from the city.  But if

8   there are a couple of points that you would like to

9   make that have not been raised by my questions, go

10  right ahead.

11          I believe I've read everything in your

12  submission.  So if there's something you want to

13  emphasize, be my guest.

14          MS. DUNN:  Well, I think I owe you answers

15  on two questions:  One is with regard to the

16  requirement of the Mayor signing what he's required to

17  sign.

18          THE COURT:  Right.

19          MS. DUNN:  So I inquired about this, and

20  there is no legal requirement, as I said.  But it has

21  been practice, common practice, for the amendment to

22  be submitted to the Mayor, and that --

23          THE COURT:  Could that be -- I'm not being

24  critical.  I'm just asking the question.  I don't

25  know.  I'm not a politician.  Is that a matter of
```

1    politics, though, for the Mayor to sign that, in your

2    view?

3                MS. DUNN:  Is that --

4                THE COURT:  -- politically appropriate to do

5    because the law was passed unanimously by the City

6    Council?

7                MS. DUNN:  Is it appropriate to submit?

8                THE COURT:  Was that a political decision to

9    sign, do you think?

10               MS. DUNN:  No, Your Honor, it was not a

11   political decision, as I understand it.

12               THE COURT:  Then I'll ask Mr. Nathan.

13               I'm sorry I said Nathanson earlier.  I know

14   you well.

15               So what was the reason, as far as you know?

16               MS. DUNN:  As far as I know, it was regular

17   pattern of practice to just submit this amendment.  I

18   don't think it was politically motivated beyond that.

19   But I wanted to answer Your Honor's question.

20               I also wanted to answer your question with

21   regard to whether there is case law or whether -- when

22   Congress reviews and approves something as opposed

23   to -- you know, fails to disapprove during a review

24   period, whether that is persuasive.

25               So the *Jackson* case that we mentioned

```
1    earlier, it went up to the Supreme Court on request

2    for a stay.  And Chief Justice Roberts has language in

3    that opinion that past approval by Congress is

4    meaningful, and then the Tech World decision, which

5    also has been cited in the papers, also has language

6    to that effect.

7            So, hopefully, that answers Your Honor's two

8    questions on those issues.

9            THE COURT:  Anything else you want to say?

10           MS. DUNN:  The only other thing that I would

11   like to briefly revisit, because I do think answering

12   questions on 602(a)(3) and 603(a) is very important,

13   is just briefly revisit 603(a).

14           And Your Honor previously asked what our

15   strongest arguments are.  And our strongest arguments,

16   quite clearly, are as we discussed earlier, the plain

17   text of this provision and then also its relationship

18   with the rest of the provisions around it --

19           THE COURT:  I want to be clear now.  You

20   said that essentially refers to that moment in time,

21   1973, making any change.  Expressly --

22           MS. DUNN:  We are, at this moment, not

23   making any change in existing law.  It doesn't mean

24   that in the 1974 law was changed.  So I want to be

25   very clear about that.  But in dramatic contrast to
```

1    the rest of the provisions around, and including the

2    provision we just discussed which say that Council

3    shall have no authority to enact, this says -- and, by

4    the way, Congress was fully aware of budget autonomy

5    when it wrote this.  It knew that this issue was on

6    the table.  And so if it wanted to say, You cannot do

7    this forever, it amply could have done this.  And it

8    said, "Nothing shall be construed as making any change

9    in existing law."

10            So this explains what Congress was doing and

11   not what the Council or the District may or may not

12   do.

13            THE COURT:  In the future?

14            MS. DUNN:  In the future, correct.

15            And I want --

16            THE COURT:  If Congress intended that, they

17   could have made that clearer too; couldn't they?

18            MS. DUNN:  Which one?

19            THE COURT:  They could have made that

20   clearer; couldn't they?  If that was their intent,

21   maybe added that language, nothing in this Act shall

22   be construed as making any change in existing law, but

23   excluding future law or something like that?  I

24   mean --

25            MS. DUNN:  Your Honor, Congress created a

1   charter that was the only part of the Home Rule Act

2   that was amendable.  And within that charter it placed

3   Section 446.  And that was a communication that 446

4   was subject to amendment.

5           At the time, would it have been --

6           THE COURT:  So they say, This is what we're

7   doing.  Don't be concerned that we're making any

8   changes in existing law.  It will still be

9   President -- there will still be Congress

10  congressional review period with respect to the budget

11  of the District of Columbia.  We're not changing that.

12          But that language, you say, should persuade

13  the Court to interpret it to mean that it did not

14  preclude City Council from making any changes in then

15  existing law in 1973 in the future, right?

16          MS. DUNN:  Right.  And I would say, Your

17  Honor, further, this was not an ordinary piece of

18  legislation.  This was the District's governing

19  document.  Basically, a state constitution.  So the

20  premise that the Home Rule Act starts from is that it

21  is amendable subject to express limitations.  And so

22  it would be contrary to the purpose of the Home Rule

23  Act, which was to relieve Congress to the greatest

24  extent possible of the burdens of local government to

25  read into this text limitations that do not expressly

```
 1    exist.

 2              And so they did not say it, and at the time

 3    they could not have possibly said, And by the way, you

 4    could do this in the future.  And the newspaper

 5    articles demonstrate that.

 6              This was the best they could do at the time,

 7    and it does not expressly take a Budget Autonomy Act

 8    off the table.  And I think that, all adversaries

 9    aside, when you drill down on this provision and this

10    language and the language surrounding it, that is the

11    only conclusion that can be reached.

12              THE COURT:  All right.  But for forty years,

13    you agree, no one's attempted to modify the law that

14    existed in 1973.  And your argument is the political

15    climate would not support it, a modification?

16              MS. DUNN:  My argument is that there were

17    some legal, some political, and some practical

18    realities.  The legal thing is the 1984 change by

19    Congress of its review function, and that mattered.  I

20    don't know what the gestalt was about budget autonomy

21    in 1984, but that is significant, that Congress

22    decided, having tried this home rule experiment for

23    eleven years, said, We can loosen up the reins.  We

24    can make this amendment process a little more smoother

25    for the District.  And it did.
```

```
 1            And subsequent to that, in 2000, the
 2    amendment process started being used.  And subsequent
 3    to that, the District created a track record that is
 4    really an extraordinary track record of fiscal
 5    responsibility, as we all have agreed.
 6            And so just because now is the time for this
 7    amendment does not mean that this amendment was
 8    previously prohibited.  There was no legal judgment.
 9    There's nothing in this text that says so.
10            And so I do think -- you know, I'm glad this
11    happened in forty years and not eighty years, but
12    sometimes it takes time for entities to earn their
13    rights, and that is the basis, in our history,
14    sometimes for amendments.
15            THE COURT:  Any other points you want to
16    make?
17            MS. DUNN:  One small point, because I feel
18    confident that defendants will bring this up, and I
19    know that Your Honor's time is very precious.
20            THE COURT:  It's a very important issue.
21    It's very interesting, very important.  I'll give --
22    I'm not going to say all the time you want, but I'll
23    certainly give you a few more minutes.
24            MS. DUNN:  Thank you, Your Honor.
25            So defendants point to Subsection 602(b) --
```

```
1              THE COURT:  Right.

2              MS. DUNN:  -- as a counterpoint to 603(a),

3    because it uses this language, "Nothing in this Act

4    shall be construed."

5              So we urge the Court to keep reading because

6    it is very different.  And I think we should put the

7    comparison side up on the screen.

8              It is very different to say in 602(b), which

9    is in the provision entitled "Limitations on the

10   Council," "Nothing in this Act shall be construed as

11   vesting in the District government any greater

12   authority."

13             And in 603(a) saying, "Nothing in this Act

14   shall be construed as making any change to existing

15   law."

16             So Congress was construing, in 603(a),

17   whether they were making any change, and in 602(b)

18   they were construing a greater grant of authority to

19   the Council.  And I think, actually, if you put 602(b)

20   back on the screen, it's a very interesting provision,

21   not just for its comparison to 602(a), which I think

22   is pretty clear that one is talking in the present

23   tense about existing law, and this is talking about

24   greater authority, but 602(b) may also be helpful in

25   understanding 602(a)(3).  Because 602(a)(3), as we
```

1    discussed, talks about functions or property of the

2    United States.

3         And this lists things that sort of are on

4    the bubble.  So the National Zoo, the National Guard

5    of the District of Columbia, the Washington Aqueduct,

6    these things are sort of on the bubble.  So, likely,

7    602(b) is construing -- although it's hard to know for

8    sure, but it seems likely that it's helping to

9    construe 602(a)(3), which does talk about property of

10    the United States and is making clear what is property

11    of the United States, what is property of the

12    District, and how much authority the Council has over

13    those things.

14         I actually learned a little something about

15    the zoo in working on this case, which is, the zoo was

16    previously -- its operations were managed by the

17    District for a long time until about 1971 when they

18    were taken over by the federal government and made

19    part of the Smithsonian.

20         So I think that 602(b), I'm glad the

21    defendants pointed out, because I think it's

22    clarifying for two reasons:  One is by contrast to

23    602(a)(3), because it's very clear that it's talking

24    about properties that are related to either the United

25    States or the District and wants to be very clear that

```
 1   the definition in 602(a)(3) is not expansive.

 2            And it's also clarifying with regard to its

 3   comparison to 603(a), which just because it uses

 4   "Nothing in this Act shall be construed" does not mean

 5   that they don't mean two different things, because

 6   they do.

 7            Your Honor, in closing, I would just say

 8   that I expect for the Attorney General to get up and

 9   give a great presentation, but I also expect from him

10   to urge you at every possible juncture to adopt a very

11   rigid approach to the statute, and I urge you not to

12   do that because that would be in conflict with the

13   text of the statute and the very principle of granting

14   this amendable charter to the District.

15            THE COURT:  All right.  Thank you very much.

16            MS. DUNN:  Thank you very much.

17            THE COURT:  All right.  Counsel, how are you

18   today?  I know you well.  Sorry for

19   mispronouncing your name -- misstating your name.

20            MR. NATHAN:  Not a problem.

21            THE COURT:  Let's get to the last part, 602

22   versus 603, and 446.  What do you have to say?

23   Miss Dunn already told me you are going to be great.

24   Here's your chance.

25            MR. NATHAN:  I know it's a tough act to
```

```
 1    follow.
 2              Your Honor, I want to make clear, first,
 3    that the Mayor and CFO wholeheartedly support budget
 4    autonomy, and we agree with the Council and their
 5    amici.
 6              THE COURT:  I asked you a question.  But
 7    before you get to that answer, why did the Mayor sign
 8    this?  Why did he enact this law if he thought it was
 9    unlawful?
10              MR. NATHAN:  It's in the record, Your Honor.
11              THE COURT:  Attachment to the pleading.
12    I've read it, right.  But it doesn't --
13              MR. NATHAN:  Right.  It explains it
14    completely.  Except Exhibit 1 of the defendants, the
15    Mayor made clear he did not believe this law was
16    valid.  And before that, he had sent a very detailed
17    letter on December 3rd urging the Council not to pass
18    that law because of its legal deficiencies.  But then
19    he said -- and I appreciate that you thought my views
20    were passionate to the board of elections -- the Mayor
21    said, I believe --
22              THE COURT:  I read it.  They were heartfelt
23    views that you articulated.
24              MR. NATHAN:  What the Mayor was saying is, I
25    don't want to prevent the citizens of the District
```

1    from expressing their views with respect to budget

2    autonomy.  So he signed the Act telling the Council, I

3    don't believe this Act is valid.  I do want the

4    citizens to get a chance to vote, maybe that will make

5    a difference to the Congress; the Congress will see

6    how passionate people are in favor of it.  But I'm

7    telling you that the Mayor said that this is not

8    lawful.

9            So when the Council both passed it and it

10   was ratified by less than ten percent of the

11   population that came out, then --

12           THE COURT:  Is that significant or not?

13           MR. NATHAN:  I think it is.  You know,

14   because said it's overwhelmingly passed.  The question

15   is, how significant did the population view this?  The

16   Council --

17           THE COURT:  It wouldn't be significant if

18   someone had won an election, though, would it?

19           MR. NATHAN:  No.  Sure.  No.  It counts as a

20   ratification, there's no question about that.  But if

21   this was the top of the agenda for folks who think

22   that more than ten percent of the population would

23   come out and, in fact, the Council deliberately put

24   this on the ballot when it was a special election,

25   they knew it would be a low turnout.

```
 1                If you'll look at our chart that we

 2      prepared, I'm --

 3                THE COURT:  I'm not being disrespectful at

 4      all, but is the answer to the question why -- is that

 5      just a political -- was that just a political move?

 6      I'm not being critical of that, but is that -- a

 7      political decision, I guess?

 8                MR. NATHAN:  I think you can describe it as

 9      a political decision.  They wanted the population to

10      get a chance to express its view, but he told the

11      Council before and at the signing that this really is

12      unlawful.

13                THE COURT:  I read the letter.  He sent the

14      letter out the same day he signed it.

15                MR. NATHAN:  It's a signing letter.  And he

16      sent a much longer letter in advance urging the

17      Council not to do this, not to pass this.  And then he

18      explained later on, when the Council insisted on going

19      forward by acting pursuant to it, that he wasn't going

20      to take the political legal risk of enforcing this

21      because it's unlawful, as he told them.  He gave them

22      every fair warning that this was unlawful.

23                Your Honor, let me show you graphically, if

24      I can -- and if I can hand up to the Court the version

25      of this.
```

```
 1              THE COURT:  If you want to put it on the

 2   ELMO, you can.  It will come up on the screen if you

 3   wanted to.

 4              MR. NATHAN:  If you can put that on the

 5   ELMO, that would be great.  Your Honor, I'm an

 6   old-fashioned guy...

 7              THE COURT:  You want a pad and pencil too?

 8              MR. NATHAN:  If I can show the Court what's

 9   right here.  It says, The amending procedure may not

10   be used to enact any law or affect any law with

11   respect to which the Council may not enact any act

12   under the limitations specified in Rule 601, 602, and

13   603 of the Home Rule Act.

14              Note the word "limitations," all right?

15              And then we come to the Title VI, which is

16   outside of the charter but in the Home Rule Act.  So

17   these provisions are immutable.  They cannot be

18   changed by the Council.  These stay until and unless

19   the Congress changes it.

20              And so they say in 602(a), "The Council

21   shall have no authority to pass any act contrary to

22   the provisions of the chapter...or to...enact any act

23   to amend or repeal any Act of Congress which concerns

24   the functions or property of the United States."

25              Then it says, "or which is not" -- this last
```

1    phrase does not modify the functions.  It says, "or

2    which is not restricted in its application exclusively

3    in or to the District."

4         Then 603(a), which we've been talking about,

5    says "Nothing in this chapter shall."  And I focus on

6    "shall," because that is the future.  It's not today.

7    It's not yesterday.  It's in the future.  And it's

8    "Nothing in this chapter" -- and "this chapter" is, of

9    course, the entire Home Rule Act, including the

10   charter and including the amendment procedures --

11   "shall be construed as making any change in existing

12   law, regulation, or basic procedure and practice

13   relating to the respective roles of the Congress, the

14   President, the federal Office of Management and Budget

15   and the Comptroller General in the preparation,

16   review, submission, examination, authorization, and

17   appropriation of the total budget" -- the total

18   budget -- "of the District of Columbia government."

19        And then the finally, 603(e).  It says,

20   "Nothing in this chapter shall be construed as

21   effecting the applicability to the District government

22   of the provisions of Title 31, which is the

23   Antideficiency Act."

24        Now, let's take a look and see what the

25   Council did in amending 446.  First thing they did was

```
1    they say, "Enactment of appropriations by Congress."

2    They strike out "appropriations by Congress."  If that

3    is not a function of the United States, a function of

4    the Congress, if that does not change the way that the

5    budget had been operated for 140 years prior to that,

6    then I don't know what does.  And I don't know what

7    else could be clearer that this is a violation of the

8    Antideficiency Act, which says, The funds are only

9    available if there's an appropriation by Congress.

10              So first it takes out the Congress from

11   appropriations.  It says, We can do this local budget

12   by the Council.

13              Then is it says, The budget should be

14   submitted by the Mayor to the President for

15   transmission by him to the Congress.  That is

16   eliminated.  So the role of the President in the local

17   budget is eliminated by the amendment to 446, the

18   so-called Budget Autonomy Act.  That too violates

19   every one of these provisions.

20              It concerns the function of the United

21   States, the function of the President.  It changes the

22   basic procedure and operation of the budget.

23              And then in this last section, it says that

24   "No amount may be obligated or expended by any officer

25   or employee of the District of Columbia government
```

1   unless such amount has been approved by an Act of

2   Congress" and then only according to such act.  Which,

3   of course, is exactly what 603 is about.  So they

4   violate 603.  They violate 603(e), (a), and 602.

5          Now, let me first address the 603(a), which

6   is the point that you had a lot of discussion with

7   Miss Dunn about.

8          They basically are eliminating this from the

9   statute, which cannot be eliminated because it's in

10   Title VI, which is not part of the charter.  It's in

11   the Home Rule Act.  They would give this no meaning

12   whatsoever.

13          It's undisputed by the Council, and you've

14   heard them say so, that home rule would not have been

15   enacted if they did not reach the *Diggs* compromise

16   which left the appropriations power to the Congress

17   and left the budget being operated exactly as it had

18   been prior to that.  If that had not changed, if they

19   didn't agree to that, there would be no home rule.  So

20   that was the key.

21          It is inconceivable, of course, that the

22   members of Congress who voted for that would say,

23   well, it's okay until the President signs it, and as

24   soon as the ink is dry because that's their argument,

25   as soon as the ink is dry on the President's approval

1    on this legislation, the City Council could change it.

2    They could do an amendment, because they did it forty

3    years later, they could have done it then, because

4    that's their position, because nothing's changed.

5    This was telling them you cannot do that.

6              Let me make it clear, the key thing here is,

7    as you heard, 602(b) had precisely the same language

8    about nothing can be construed to vest authority in

9    the District.

10             When 446 was changed pursuant to the *Diggs*

11   amendment and it laid out everything that had to be

12   done -- that's this legislation before the changes are

13   made, it laid it out.  So appropriations by Congress,

14   it went to the President, couldn't do it without --

15   that was what it said.  That was clear.  There was no

16   change in the budget process.  They didn't have to say

17   anything else.

18             The Council's argument is 603(a) is

19   completely unnecessary because it's just saying, we

20   put in 446, and it's exactly the same.  But the

21   charter amendment said, you can't change anything that

22   violates the limitations specified in 601, 602, or

23   603.

24             The key thing is, as you'll see on Page 23

25   of their reply brief, they say, 603(a) is not a

 1   limitation.  That is what this is all about.  They say

 2   it's not a limitation.

 3           Well, I suggest to you, three things

 4   demonstrate that that is wrong.

 5           First, when the staff -- and that's what the

 6   *Amicus* brief demonstrates.  When the staff was told

 7   that we have the *Diggs* amendment, here's 446, they

 8   were told to put in a prohibition against the Council

 9   from changing that.  So they took the language that

10   they had in 602(b), which in prior reports it said,

11   when it says nothing in this chapter vests the

12   authority, they said, that is a prohibition.  That's

13   what the legislative history said.  This is intended

14   as a prohibition.

15           So they took the same language, being:

16   Nothing in this chapter shall be construed in the

17   future.  And "nothing in this chapter," by the way,

18   includes the charter amendment procedure.  It says,

19   you can't use the charter amendment to construe that

20   to make any change in the budget situation.  So you

21   first get to 602(b).

22           Second, as we point out in our brief, the

23   Eleventh Amendment to the United States Constitution

24   had that same language:  Nothing here shall extend the

25   judicial power to suits between citizens of one state

1    and other states or citizens of other states -- of

2    foreign countries.

3              That has been repeatedly interpreted by the

4    courts to say, not only can the courts not do this,

5    but the Congress cannot pass legislation that

6    authorizes that.  It's a ban -- it's a prohibition.

7    It's a limitation on the powers of Congress.

8              But the key thing, the most dramatic thing

9    is in a case that is starred by the Council as

10   principally relied upon.  This is *Louisiana Public*

11   *Service Commission against Federal Communications*

12   *Commission.*  It's found at 476 U.S. 355.  It's a

13   decision by Mr. Justice Brennan on behalf of the

14   majority of the court.

15             In here he's interpreting -- the court is

16   interpreting language that is virtually identical to

17   this, that nothing in this chapter shall be construed.

18   And six times -- not just once, not twice -- six times

19   the Court refers to that as a limitation on the power

20   of the FCC, which was the subject of that provision.

21             So the Supreme Court has ruled that a

22   provision that says that nothing shall be construed to

23   give power or change things is read as a limitation.

24   And that's how the Congress understood it when it

25   said, you can't make any change that's covered by the

```
 1    limitations in 603.  And the first limitation that is
 2    mentioned under the heading, by the way, "reservation
 3    of Congressional Authority," then it has, limitations
 4    which deal with 602.  603 talks about the budget and
 5    then limitations on expenditures, which of course, is
 6    what the budget is all about.
 7              And it says, you can't construe it this way,
 8    which is a limitation.  That limitation applies to the
 9    amendment process, so the drafters of the legislation,
10    the people who wouldn't let this go through but for a
11    representation and agreement, a binding agreement, a
12    commitment by the District and the citizens who
13    ratified the charter, that you're accepting this
14    charter with the understanding that you don't have
15    budget autonomy, that the appropriations for your
16    budget have to come from the Congress.
17              That was the way it was understood by the
18    entire Congress, but not only the Congress; that was
19    the way it was understood by the City Council.  That's
20    why those clippings are significant and should be read
21    and should be accepted.
22              THE COURT:  Accepted and given what weight
23    and why?
24              MR. NATHAN:  There's no counterweight, so
25    they should be accepted by the Court.
```

```
 1                THE COURT:  Uncontroverted hearsay?

 2                MR. NATHAN:  They are uncontroverted.  They

 3      say there's no material dispute of fact.  I didn't

 4      hear anybody say they disputed it.  So that when the

 5      citizens voted to ratify and when the Council accepted

 6      the charter, they didn't have to accept it.  They

 7      could have said this deal is no good.

 8                THE COURT:  Accept it for historical

 9      significance if nothing more, right?

10                MR. NATHAN:  I think it's accepted for its

11      understanding at the time of what this meant going

12      forward.  Because this is talking in the future.  It's

13      what shall be done in the future.

14                THE COURT:  So --

15                MR. NATHAN:  Not only by --

16                THE COURT:  Congress could have addressed

17      the issue that plaintiff raises by not using the

18      language, the future language "shall be construed" in

19      at least two, three instances and just used, what,

20      present sense, nothing in this chapter makes any

21      changes in existing law?

22                Would your argument be the same if Congress

23      had done that, nothing in this chapter affects the

24      applicability of the DC government?

25                MR. NATHAN:  Yes.  I think it would be the
```

```
 1   same.

 2              THE COURT:  Your argument would still be the

 3   same?

 4              MR. NATHAN:  Yes, it would be.  I'm not

 5   saying that Congress couldn't have been more specific

 6   and clearer, but there's no question what the intent

 7   was, the intent of the Congress.

 8              And, by the way, that is agreed to in

 9   Mr. Zvenyach's opinion.  Mr. Zvenyach is the general

10   counsel of the Council.  And he gave them an opinion,

11   which is in the record, of what was -- what was

12   authorized.  And he said, "There is no doubt that

13   Congress intended to improve the entirety of the

14   District's budget, and the District operated on that

15   scheme for almost forty years."

16              So there's no dispute what Congress

17   intended.  They understand what Congress intended.

18   Their argument is, well, we can find a loophole.  We

19   can get out of it.  We know what they meant.  We know

20   what this was intended to do, but it doesn't really do

21   it, so we can slip out.

22              Think of that, a legislature is coming

23   before you and saying, don't give the legislative

24   intent any weight.  Don't give weight to what they

25   said.  Let us, forty years later, disagree.
```

```
 1                    And let me also point out, in his opinion --
 2        which this is at Page 3 of his opinion -- it's his
 3        testimony on November 9th, 2012 -- he apparently
 4        didn't get the memo that the Council was not arguing
 5        about limitations.  Because if you look at his --
 6        here's what he says.  "Section 303(d) prevents the
 7        Council from enacting any law or affecting any law
 8        with respect to which the Council may not enact any
 9        act or rule under the limitations specified, 601, 602,
10        and 603."
11                    Then he says, "of these limitations, of
12        these limitations, the most difficult hurdle is
13        Section 603(a)."
14                    Now, he's admitting it's a limitation.  And
15        if it's a limitation, you can't amend the charter
16        because 603(d) says you can't amend the charter if it
17        hits one of these limitations.
18                    And then he says, "603(a) could be read as a
19        bright-line prohibition of the ability of the Council
20        to affect the budget process."  I suggest to you
21        there's no other reading.
22                    He says, "Or, it could be read as a
23        declaration that Congress maintains ultimate authority
24        with respect to the budget and that home rule, as
25        originally approved, meant to leave the budget process
```

```
1    intact."  He says, "The latter reading is preferable."

2              Yeah, it's preferable to the Council, but

3    it's not preferable to the Congress.  It's not what

4    Congress meant when it put this in.  He knows, and the

5    Council understood that this is a bright-line test

6    prohibited for the ability of the Council to affect

7    the budget.

8              THE COURT:  The Council's attorney knew

9    that.  So what?

10             MR. NATHAN:  But he told the Council that

11   before they changed this law.

12             THE COURT:  Right.  So he told the Council

13   that, the Council approved it and the Mayor enacted

14   it.

15             MR. NATHAN:  The Mayor didn't enact it.  The

16   Mayor signed it.

17             THE COURT:  Had he not signed it, then what

18   would have happened?

19             MR. NATHAN:  We would be right here.  If he

20   hadn't signed it, it was voted unanimously by the

21   Council.  So, therefore -- and it only takes nine to

22   override a veto.  If he hadn't signed it, it would be

23   law.

24             And he has the ability not to sign it.  He

25   has the ability to veto it.  He could have vetoed it.
```

```
 1    And if he vetoed it, a unanimous twelve-person vote in
 2    the Council, it would have been an enacted over his
 3    veto, and it would still have gone to the citizens.
 4              So his position was, look, I don't want to
 5    be seen as against budget autonomy.  I've been
 6    arrested for budget autonomy.  I'm in favor of it.  I
 7    want the Congress to give us budget autonomy.  I don't
 8    want there to be a view that I'm not in favor of this.
 9    I want the citizens to get a chance to vote on it.
10    But, Council, I'm telling you, if they do and if it
11    all goes out, don't implement it.  It's a violation of
12    law.
13              THE COURT:  Essentially, that was the issue
14    of defining the statement, when he signed it --
15              MR. NATHAN:  That's what he said.  Under all
16    three --
17              THE COURT:  Couldn't he have gotten more
18    mileage out of just not signing it at all and taking a
19    stand?
20              MR. NATHAN:  First of all, it's not about
21    mileage.  I don't want to get into politics.  But the
22    question is, what's the legal significance of this.
23              THE COURT:  But that's what we're talking
24    about.  This case is about politics.
25              MR. NATHAN:  This is about law, Your Honor.
```

```
 1    We are here before you.  And I appreciate your

 2    expediting this.

 3              THE COURT:  Well, I had to because there are

 4    significant time constraints here.

 5              MR. NATHAN:  Exactly.  And we're trying to

 6    deal with that.

 7              And let me take your first hypothetical,

 8    which is exactly right, and I heard the counsel agree

 9    with this.

10              You are absolutely right that someone who is

11    facing criminal prosecution for following the

12    amendment by the Council and facing federal criminal

13    sanctions or just civil -- just civil sanctions, loss

14    of job, barring from employment -- there are a lot of

15    possibilities -- and the complete voiding of any

16    contract, they definitely would have standing to sue

17    and say, I can't be required to comply with this

18    amendment.  It puts me in jeopardy.  I don't think

19    there's any question about that.

20              And what I think is gonna happen, if we

21    don't get any ruling promptly --

22              THE COURT:  You are going to get a ruling

23    promptly.  It won't be today, but you'll get -- I'm

24    not gonna let the clock run out.

25              MR. NATHAN:  I appreciate that.  Okay.  And
```

```
 1   if we get a ruling that says, well, what the Council

 2   did was fine, even though you have all these

 3   restrictions -- and for forty years, forty consecutive

 4   years by the people who were involved in both drafting

 5   this and enacting it and receiving it and accepting it

 6   as a charter, the Council, they have repeatedly, for

 7   forty consecutive years, abided by this and done

 8   exactly what is said here that the Mayor proposes the

 9   Council votes once, adopts a budget, it goes back to

10   the Mayor, he sends it to the President, who includes

11   it within a larger budget, the President then sends it

12   to the Congress for enactment of an appropriation, and

13   only then, then and only then, can anybody in the

14   District government spend a dime that has been

15   collected.

16           And so if Your Honor were to rule against us

17   and say, no, the amendment is just fine, go and do

18   that, I assure you there will be chaos in the city

19   because of exactly what you describe.  Not only would

20   people sue and say, you know, I don't want to violate

21   the law, so I'm going to get a ruling on this too, but

22   as we point out in this case -- and the Crawley case

23   is a very good example.

24           THE COURT:  One second.

25           (Whereupon, a discussion was held off the
```

```
1              record.)

2              THE COURT:  Go ahead, counsel.

3              MR. NATHAN:  People who are affected by this

4    law -- for example, take a drunk driver.  Drunk driver

5    is picked up after this.  This law passes and the

6    Council says, We don't need your appropriations from

7    Congress.  We are going to pass a law.  We are going

8    to appropriate, and you can spend the money.  We tell

9    that to the police, you can arrest the guy.  We tell

10   that to our prosecutor, you can prosecute him.  So he

11   gets arrested by the cop, and the defendant who wants

12   to use any defense he can, says, well, you are not

13   authorized to do this because you don't have an

14   appropriation from Congress to pay your salary here.

15   And you, Mr. Prosecutor, from my office, you don't

16   have the authority to prosecute me because you don't

17   have an appropriation from Congress and this is all

18   invalid.

19             And that's exactly what happened in the

20   Crawley case.  In the Crawley case the Council changed

21   the functions between the federal government, the U.S.

22   Attorney's Office, and our office.  They said in this

23   false claims case, the Attorney General's office can

24   prosecute you.  So the guy's prosecuted for violation

25   of a misdemeanor law.  He raises the defense that
```

```
 1    provision by the Council is illegal and goes beyond

 2    what their authority is because it -- you've changed

 3    the function of the federal government; that was for

 4    the U.S. Attorney's Office to prosecute.  And not

 5    only --

 6              THE COURT:  Congress approved that change,

 7    though; did it not?

 8              MR. NATHAN:  But the same kind of silence

 9    that's here.

10              THE COURT:  Doesn't that mean something

11    though, silence?

12              MR. NATHAN:  It means absolutely nothing.

13    As Your Honor said only a month ago in the Associated

14    Contractors case, it is very hazardous to deal with

15    silence as consent -- silence of Congress, which has

16    so much to do.

17              THE COURT:  Is that a federal quote?

18              MR. NATHAN:  That's a quote.  I'll get you

19    the exact cite.

20              Your opinion, and even in Chief Judge

21    Roberts' one-page issue on the stay, he said --

22              THE COURT:  Where did I say that?  What's

23    the cite?  I don't doubt you.  I want to read it

24    again.

25              MR. NATHAN:  I'll find the cite for you,
```

1    Your Honor.

2              THE COURT:  That was only a month ago?

3              MR. NATHAN:  It was less than a month ago.

4    I'll give you the name of the case because I did put

5    it in my notes.  I was impressed by it, as you can

6    imagine.

7              It's the *Associated Builders and Contractors*

8    case, and you were quoting a Seventh Circuit decision,

9    which said -- and this is what you quoted.  It said,

10   "Inferences from congressional silence are

11   treacherous.  Oversights are common in the hurly-burly

12   congressional activity.  Omissions are not enactments,

13   and even deliberate omissions are subject to

14   alternative interpretations."

15             Ring a bell?

16             THE COURT:  Sounds like something I might

17   have said.

18             MR. NATHAN:  So, Your Honor -- and in the

19   *Crawley* case, to come back to that, you're exactly

20   right.  In *Crawley*, Congress didn't do anything.  The

21   Council passed this law, changed the function, said,

22   our office can prosecute.  Congress did nothing about

23   it.  They didn't say boo.  They didn't say yes, didn't

24   say no.

25             We get to court.  First of all, in the

```
 1   court, the Department of Justice came in on the side

 2   of the defendant and said the defendants' right, we

 3   have that authority, and it's not the Attorney

 4   General's authority.  And the Superior Court and then

 5   the Court of Appeals in the opinion by Judge Oberly

 6   said the defendant is right, you don't have the

 7   authority to prosecute this case.

 8           So even though it had not been rejected by

 9   the Congress, they didn't say anything about it, the

10   Court said it's not valid and the Council has exceeded

11   its authority.

12           So in the same premise, in our drunk driving

13   case, that's what gonna happen.  People who have every

14   reason to fight the government -- which they do -- and

15   we try to enforce a law or we try to get money for the

16   District on a civil authority, there's a whole line of

17   cases, Your Honor.  And with all due respect to

18   Miss Dunn, she does not appear to understand the

19   Antideficiency's Act.

20           The Antideficiency Act says, if you don't

21   have an appropriation from Congress, you can't spend a

22   dime.

23           THE COURT:  Even the money you raise from

24   taxes?

25           MR. NATHAN:  Even the money you raise from
```

```
 1    taxes.

 2              THE COURT:  Can't spend your own money?

 3              MR. NATHAN:  It's unfair.  It's unjust,

 4    untenable.  We agree that Congress should change it.

 5    But it can only be changed by the Congress.  Counsel

 6    can't just get tired of being -- in fact, you know,

 7    Walter Fauntroy, who I respect and say the delegate

 8    here --

 9              THE COURT:  And Mr. Fauntroy filed a

10    declaration.

11              MR. NATHAN:  He filed a declaration.

12              He was part of the Diggs amendment.  He was

13    on the "Dear Colleague" letter.  He explained, number

14    one, the only way we're going to get home rule through

15    is if we leave with the Congress the appropriation

16    authority on a line item, item-by-item basis of the

17    District budget.

18              And then a few years later, in -- I think it

19    was in '81, so it's eight years later, he proposed an

20    amendment.  But from Congress -- he asked -- he

21    submitted a bill and said, In Congress, give us budget

22    autonomy.  That was the first time, and it's been done

23    every year since that representatives of the District,

24    whether it's the delegate now, Miss Norton or

25    Mr. Fauntroy, or members of the Council who have gone
```

1   up and urged the Congress for forty years -- not

2   saying forty years, but for the thirty-three years --

3              THE COURT:  And the President on occasion.

4              MR. NATHAN:  And the President has done it

5   now.  The President has said Congress needs to do

6   this.  We agree with the President.  We are supporting

7   that legislation.  We want that legislation to pass.

8   But it has to come from the Congress.  The Congress by

9   this statute, by 446 and by the limitations, including

10  603(a), which is a limitation which you cannot violate

11  to amend the charter, that makes clear that this

12  remains with Congress.

13             Congress is what -- is the institution that

14  said, We don't have budget autonomy, and Congress is

15  the place that has to give it to us.  I agree with you

16  and the Mayor agrees with you and the CFO and Jeff

17  DeWitt agrees with you, budget autonomy is fair and

18  right.  The question is, what is the lawful way to

19  obtain it?  A way that would not cause the problems

20  that I'm describing.

21             And let me give you another example.  Under

22  the Antideficiencies Act, the District is precluded

23  from entering into any contracts, because it talks

24  about obligations as well as spending money, can't

25  enter into any contract that is not appropriated,

```
1    where you don't have the funds already appropriated

2    for it.  And any contract like that, under the cases,

3    it's void from the beginning.

4              So even if a contract has been performed, it

5    is a defense to the District to say, We're not paying

6    you because we didn't have appropriations for this.

7    That's an inequitable result, but that's the result

8    from the courts.

9              And what's going to happen, and you mark my

10   words, if you were to allow this to go forward, when

11   the District goes to put out an RFP and say, Here's

12   our proposed contract, people who are opposed to that

13   contract -- and you know everything we do somebody's

14   opposing it -- they would say this RFP is illegal

15   because you're going to rely on money that has been

16   agreed to by the counsel but has not been appropriated

17   by the Congress and, therefore, you can't spend it.

18   If you do spend it, if you do enter into even the

19   agreement for it, you are violating the Antideficiency

20   Act and it's null and void.

21             So this is going to cause tremendous

22   difficulties for the District.

23             Your Honor, you asked about deference.  I

24   believe this Court, under the law, needs to give

25   deference to the GAO opinion because they are the
```

1    expert.  The law is clear.  They are the expert on

2    appropriations, on budget matters.  And when they

3    issue their opinion, that is entitled to the -- as an

4    expert opinion.  There's no expert opinion on the

5    other side.  It's the only opinion before you.

6              I believe the House of Representatives and

7    their brief is entitled to deference because they

8    understand appropriation.  They know that this 450

9    argument, which is indispensable to their argument but

10   completely untenable, makes no sense.

11             Their argument is that in 1973 the Congress

12   said, Okay.  You can take the District money and put

13   it in a different fund, separate, put it away from the

14   federal treasury in a fund in the District.  But you

15   can't spend a dime of that, 446 says, unless you have

16   appropriations by Congress for every penny that's in

17   that fund.

18             446 is the statute that deals with

19   appropriations.  450 has nothing to do with

20   appropriations.  It's just the location of where the

21   money is.  It says that when you collect money, when

22   the District collects money, you don't have to put it

23   in the U.S. Treasury; you can put it in your special

24   450 fund.

25             THE COURT:  But, nonetheless, the

```
 1   Antideficiency Act controls.

 2                MR. NATHAN:  And this applies to it.  And

 3   you can't spend it until we appropriate it for you and

 4   tell you what it can be used for.  And you can use it

 5   only for that.  That's what this is about.  So the

 6   whole 450 argument is out the window.

 7                And this doesn't come from the

 8   appropriations clause of the constitution, Your Honor.

 9   That is not where this comes from.  This comes from

10   the provision in the constitution that gives the

11   Congress plenary control over the seat of government,

12   over the District of Columbia.

13                They said that's our authority.  We are the

14   government, the District of Columbia.  We're gonna

15   give you limited home rule.  You'll have certain

16   legislative power.  You'll have a tripart-type system;

17   you'll have a Mayor; you'll have a legislature; a

18   Council; you'll have the courts.  But the one thing

19   you won't have is a power and a purpose.  That is what

20   we are retaining.

21                And we put provisions in the -- in Title VI

22   of the Home Rule Act, outside of the charter that

23   says, You can't change that.  You can't change it

24   without coming to us.  And that's why Mr. Fauntroy

25   came to the Congress and said, Please change it;
```

1    please give us budget autonomy.  That's why

2    Miss Norton has gone to the Congress repeatedly and

3    appropriately, and we support her, to get budget

4    autonomy.

5          And that's why the President, the President

6    of the United States, says the District should have

7    budget autonomy.  Congress, you are the right

8    institution to give it to them.  And every act that

9    they have taken, the Congress and the President, since

10   this amendment was passed, is completely inconsistent.

11         It says this is invalid.  This doesn't

12   change a thing.  After this was passed, that's when

13   the President proposed Congress do budget autonomy.

14   After this is passed is when Congress passed a law

15   that we would not have the same situation about the

16   shutdown.

17         Let me turn to the shutdown, because

18   Miss Dunn totally misrepresented the accurate facts in

19   that situation.

20         During the shutdown, the Mayor said he

21   wanted to keep the government open, but he can only do

22   it with appropriated funds.  He didn't want to be in

23   violation of the Antideficiency Act.

24         THE COURT:  He could not use local funds?

25         MR. NATHAN:  He could not use local funds

```
 1    unless they had previously been appropriated, and
 2    there was an emergency fund that had previously been
 3    appropriated by the Congress.  And we relied only on
 4    those emergency funds to keep the government alive for
 5    as long as we could.  It happened that we got very
 6    lucky that we had the emergency funds, and we used
 7    them up and we didn't use all of them before the
 8    Congress came to its senses and reopened the
 9    government.  So we were able to keep the government
10    afloat.  But under this previously appropriated --
11              THE COURT:  Have you replenished that fund?
12              MR. NATHAN:  Yes, that fund has been
13    replenished.  The courts are not paid from that fund,
14    Your Honor.
15              Your Honor, I started to say that the GAO
16    opinion deserves preference, some deference.
17              THE COURT:  There's some circuit authority
18    to that effect; is that right?
19              MR. NATHAN:  Absolutely.  And so does the
20    brief that was filed --
21              THE COURT:  Do I even have to reach that --
22    you said issues of who to give deference to?
23              MR. NATHAN:  I --
24              THE COURT:  With your opinion and the City
25    Council's lawyers' opinion and the GAO opinion, I
```

```
 1    mean, it's here for a reason.  Without even getting

 2    into the amici -- I thought all the amici submissions

 3    were just really great.  It's like walking down memory

 4    lane.

 5              MR. NATHAN:  I thought the amici were very

 6    helpful.  All of them, Your Honor.

 7              THE COURT:  I agree.

 8              MR. NATHAN:  But let me say with respect to

 9    our opinion, I don't ask for any deference to that

10    opinion.  The question is, are we right or wrong?  And

11    it's a matter of law, and it's for the Court to

12    decide.  But I do want to say one thing about that

13    opinion.

14              That opinion is the result of the work of

15    career professionals in my office, people who have

16    been in the office for over thirty years.

17              When this issue came up, I didn't sit in a

18    corner and just decide, you know, does this violate

19    the Home Rule Act?  Can we do this?  And especially

20    because the Mayor wants budget autonomy.  If we can

21    find a way to say this is okay, we would do that.  But

22    every one of them, like myself, like the Court, is

23    sworn to uphold the law.  We took an oath to say that

24    we are going to uphold the U.S. Constitution, federal

25    laws as well as the District laws.  And, obviously,
```

```
 1    that meant valid District laws.

 2              So I asked the brightest people and the most

 3    long-serving people in my office to do a memorandum

 4    and tell me is this lawful or is it not.

 5              They came back unanimously.  There's not a

 6    single person in our office who thinks there is any

 7    validity to the Budget Autonomy Act as passed by the

 8    Council.  And it's based on that analysis that we

 9    wrote our opinion.  And we gave our best opinion to

10    the Mayor, even though it's not the answer he would

11    have preferred, not the answer that the CFO would have

12    preferred, but it's the right answer.  I don't ask for

13    deference because it's a legal opinion.  The Court can

14    read the cases and the law as well as we can and this

15    Court makes that decision.  But I think it's the right

16    decision, and I ask you to look at that.

17              Your Honor, in thinking about this, I was

18    reminded of the play, *A Man for All Seasons*, which is

19    a play that I saw with Judge Soberloff when I clerked

20    with him some time ago in the late '60s.  And in the

21    play, a character says, Mr. Thomas Moore, wouldn't you

22    agree to chop down all the laws of England if you can

23    capture the devil?  And Moore says, When the last law

24    was down and the devil turned around on you, where

25    would you hide?  The law is all being flat.  If you
```

1    cut all the laws down, do you really think you can

2    stand upright in the winds that would blow then?  Yes,

3    he says, I'll give the devil the benefit of the law

4    but for my own sake and for the sake of my family.

5    And that's the situation here, Your Honor.

6         The Council -- and I sympathize, I

7    understand.  They are frustrated.  Forty years they

8    have wanted budget autonomy, forty years they've asked

9    their representatives to go to Congress and ask for

10   budget autonomy.  What they decided to do is take the

11   law in their own hands, saying, Well, we saw these

12   things, but time has passed.  I agree, Miss Dunn, time

13   has passed, conditions have changed, but the law has

14   not changed.  That is the key thing.

15        Yes, I think the District is ready for

16   budget autonomy.  Yes, the situation was different

17   forty years ago.  And, yes, that's why Congress should

18   change and give us budget autonomy.  But it is no

19   excuse and it is not something that we can tell our

20   youth that when you get tired of making the request

21   from the proper people you can take the law in your

22   own hands, strike down the law, ignore all that, give

23   your interpretations to it and decide we can do this

24   and ignore what was the intent of the legislature,

25   which is what the Council is asking you to do.

1              Let me talk, Your Honor, about the cases

2     that were mentioned in your discussion with Miss Dunn.

3     The *Hessey* case and the *Jackson* case.

4              The *Hessey* case was extremely important.  It

5     is a unanimous en banc decision of the highest court

6     in the District of Columbia.  It happens.  It was

7     affirming a decision that you made when you were a

8     Superior Court Judge.

9              And what it said --

10             THE COURT:  I do recall affirmances.

11             MR. NATHAN:  That case was whether you put

12     on the ballot an initiative that affected the

13     appropriations of the District of Columbia.  Nothing

14     could be more pertinent to our discussion here.  And

15     what the unanimous Court of Appeals, en banc appeal

16     said was, first of all, this is what the law is, that

17     the Congress appropriates.  And it couldn't have been

18     the intent of the Congress that citizens by initiative

19     could change the power of the Congress to take away

20     appropriations.  So that is not a possible

21     interpretation of this.

22             Second, they went to the intent of the

23     Council.  And they said, Well, the Council doesn't

24     really have appropriation, but they do have specific

25     and important assignments with respect to 446.  They

1    develop the budget, they adopt it, they send it back

2    to the Mayor, and they send it to Congress for its

3    enactment.

4              And so it said, We can't believe that the

5    Council intended that individuals, citizens, would get

6    a chance to change even that.  So they said, You can't

7    have an amendment -- you can't have an initiative that

8    deals with the appropriations.  They meant more than

9    just the actual appropriations by Congress.  They

10   meant the functions of the Council and their role,

11   which is short of appropriation but a role in the

12   budget.

13             So the Court said, In light of what we see

14   as the intent of Congress with respect to our

15   appropriations and the Council's intent in enacting

16   446 and laws that they passed for the number of

17   years -- that was, I guess, a '91 decision -- they

18   said nothing that relates to the way the budget is

19   developed can be used as an initiative.

20             And so now the Council is coming into this

21   court and saying, We think it's consistent with the

22   intent of Congress and with our intent that we can

23   take away the appropriations of power of the Congress

24   and we can change all this.  We can ignore all these

25   or give interpretations to it that don't count, and we

1    can change the law.  And the citizens can do it.  We

2    can do it by referendum.  They said, You couldn't do

3    it by initiative, but you can do it by referendum.  If

4    we vote first and then they ratify, then it's

5    perfectly kosher.

6            That is so in violation of the *Hessey*

7    decision, which was unanimous, and it never suggested

8    for an instant that this could be changed in the

9    legislation.  They said, This is the way the

10   legislation is, that the Congress has the only power

11   to appropriate; the Council can't appropriate.  But

12   the Council has other roles in the budget process, and

13   that's the way it is.  But it could be amended.  If it

14   could have been amended by the Council or by a vote of

15   the citizens, that decision would come out entirely

16   differently.  So it makes no sense.

17           The same thing with the *Jackson* case.

18   Another en banc decision.  It said Certain things are

19   off limits to the citizens to change.  And one of

20   those is matters that deal with human rights and would

21   cause discrimination.  There are certain things that

22   the Council -- this is the Council now -- has put off

23   limits and that's unanimous.

24           Well, this is what the Congress has put off

25   limits to the Council and to the citizens of the

```
 1    District.  You can't change our authority to

 2    appropriate.  You can't take away the power of the

 3    President.  And, you know, I've given you 603(e) and

 4    603(a), but I don't want to ignore 602(a) as well.  It

 5    talks about the functions of the United States.  And I

 6    want to talk about that later case, the Greater

 7    Washington Labor Council.  In our view, that decision

 8    is right.  It reached the right result, but it was

 9    very -- it belied the statute.  It didn't pay

10    attention to the statute.

11            In that case it was a question of the

12    unemployment insurance for private people in the

13    District working for private employers, laid off, and

14    who is going to administer that program.  And as a

15    convenience, it had previously been done by the labor

16    secretary -- United States labor secretary -- not

17    essential to have him do it.

18            So when they said, Well, is this a function

19    of the United States?  They said, Well, within the

20    whole thing, you know, it's the United States; it's

21    not restricted; it's essentially the District, because

22    he's only doing it for the locals, it's okay to change

23    that.

24            But when the Congress acts, it is a function

25    of the United States.  And it doesn't matter if it
```

1    applies elsewhere.  And, in fact, it does apply

2    elsewhere.  The United States -- the Congress is very

3    different from the labor secretary.  The Congress,

4    which is made up of representatives from every state,

5    and when they have this appropriation, they have

6    different committees as described in the House brief,

7    and they are from all different parts of the country.

8            And they are deciding, even if it's the

9    local budget for the District of Columbia, as the

10   *Banner* case makes clear, this has an impact on other

11   funds of the United States because, if we don't have

12   enough money in the local budget to do what we need to

13   do, we are going to have to draw from the federal

14   funds, funds that come from all other states.  We have

15   to put together what they called the entire budget of

16   the District of Columbia.  And that's -- it's a

17   defined term.  "Entire budget" means both the federal

18   part and the local part.

19           And so by definition, when the Congress from

20   all over the country is dealing with funds from all

21   over the country as well as funds that are raised

22   locally and are deciding what the distribution is

23   gonna be, they have to deal with things that are

24   outside of the District and, in fact, the function of

25   the United States -- of the Congress to deal with the

1    District of Columbia.  It's not like a secretary of

2    labor on an unemployment.  This is something that the

3    United States Constitution has given to the Congress.

4    They have the authority.  They have the exclusive

5    plenary authority over the District of Columbia.  That

6    is a constitutional function that they have.

7          And that -- in exercising that

8    constitutional function, the Congress has decided that

9    we're going to be responsible for the appropriations

10   for the District of Columbia.  And when the Council

11   takes that away, they are taking away a basic

12   constitutional function of the Congress of the United

13   States.

14          You can't think of anything more that's a

15   function of the United States.  And, by the way, you

16   can't amend it even if it just concerns the functions.

17   Just concern the function.  They didn't just concern

18   the function; they took the function away.  They

19   eliminated the function.  They said, Okay.  But you

20   don't vote on appropriations; we take care of all

21   that.  And after we're done, if you'd like to have

22   your views known, if you like to pass on something,

23   you can do it but you don't have to do it and we can

24   keep spending your money.

25          This is a violation of what the Congress

1    said is our function.  It's our constitutional

2    function.  It's the way that we are going to control

3    the spending and the finances of the District of

4    Columbia.

5            THE COURT:  When is the last time that you

6    recall Congress with joint resolution disapproved of

7    any proposed legislation by the District of Columbia?

8            MR. NATHAN:  There have only been a couple

9    of examples, and it goes back a couple of decades.

10   But as you said in the marijuana case, they did, in

11   fact, hold hearings.  They are considering it.  That's

12   not what happened with respect to this amendment.

13           They basically held no hearings.  They took

14   no action.  But they did the following things:  They

15   asked the GAO for an opinion.  Is this valid?  And

16   they got the opinion.  No, it is null and void.

17           The committee, the subcommittee that deals

18   with the District, said, We thank the citizens of the

19   District for their opinion, but, of course, this has

20   no valid, legal effect.  And they filed a brief with

21   this Court, the House of Representatives.  That brief,

22   which they denigrate as saying, No, this is just three

23   people.  That is a brief of the House of

24   Representatives.

25           The way -- this is something I know a little

1   about.  The way that the House lets the courts know

2   their views, there's a five-person committee that's

3   made up of the speaker and majority leader and

4   majority whip and then the two minority leaders.  And

5   the minority leaders have several possibilities when

6   they are not interested in joining.  They can abstain,

7   which is what happened here.  In other words, they

8   didn't say we are against it.  They just said we're

9   not participating.  They could oppose.  They could say

10  we're against it, and they could file a brief in

11  support of their position, and they did none of that.

12          That opinion that comes to you, that brief

13  that comes to you from the House deserves a lot of

14  deference because that's how the House understands the

15  law, understand the appropriations, understands that

16  this 450 argument is nonsense.  It makes no sense.

17  This is not an appropriation.  This is a location for

18  the money, and you can't spend a dime of it.  That's

19  what the Nevada case in the circuit here says.  Okay,

20  you can put the money somewhere other than in the

21  treasury and you can get it from different sources,

22  but you can't pay it because it's subject to

23  appropriations.  And that's what the Congress said

24  about the DC budget.  It is subject to our

25  appropriations, so you cannot spend it.

1          Your Honor, I will leave it there, and I'll

2     answer any questions you have.  But I would say, if

3     you rule in our favor and hold this law to be invalid,

4     as we think appropriate, there will be really no harm

5     done to the Council because we can have the budget for

6     fiscal '15 as we have had it for the last forty years,

7     and the Council can take an appeal and they can say,

8     The Judge got it wrong.  I will be happy to defend

9     Your Honor's ruling on it.  And then we'll have a

10    budget; we can all operate.

11         But if you rule that it is valid and it's

12    not stayed and therefore they go off on what they're

13    proposing to do, which is to divide the budget up and

14    send part of it back to the Mayor for the federal part

15    and just have the local start spending money -- and,

16    by the way, they can change the fiscal year.  So they

17    can make the fiscal year starting this July, and

18    starting in July they can say, Okay.  You should start

19    spending the money that the Congress never

20    appropriated, and then the lawsuit that you raised in

21    your first hypothetical will happen like July 2nd when

22    people say, I can't -- I'm not going to subject myself

23    to criminal prosecution, to civil sanctions.

24         The circuit has said that officials of the

25    District government must comply with the law.  And by

```
 1    "law" they mean by the federal law, valid law.
 2              In the Mayor's case, they said the recorder
 3    of deeds, even though that's an administerial job,
 4    just takes the deed and files it, he can't record a
 5    deed that is in violation of federal law that has a
 6    restrictive covenant in it.
 7              So it said you can't do this.  If you do it,
 8    you are going to be in violation.  You will be subject
 9    to injunctions and potential other penalties.  This
10    one carries the penalties of a criminal prosecution
11    and civil sanctions.
12              And if they do this and start spending money
13    pursuant to this Act, All The negative consequences
14    that I described, every contract, every litigation
15    that we have, everybody who's adverse to the District,
16    who wants to raise a problem with it -- and there are
17    many people.  From my office we get all that
18    litigation -- they will raise this point and say, What
19    you're doing is not lawful.  And we'll be litigating.
20    We'll be litigating in the Superior Court.  We'll be
21    litigating in the DC court.
22              THE COURT:  Is there anything that precludes
23    the Mayor from submitting a budget to the President
24    now --
25              MR. NATHAN:  Yes.
```

1              THE COURT:  -- if he firmly believes this

2    law is unlawful?

3              MR. NATHAN:  He believes that 446 is still

4    applicable and unamended.  And that requires the

5    Council to adopt the budget, and they have until May

6    28 to do that.  That's the way it's been done for

7    forty years.  What happens is the Mayor sends over a

8    budget; they take one vote.

9              THE COURT:  The onus would be on the City

10   Council to do something by May 28.

11             MR. NATHAN:  Exactly.

12             THE COURT:  What happens if the City Council

13   doesn't?  Suppose this Court decides this issue, and

14   regardless of the -- well, what would happen if -- on

15   May 28th -- if the City receives an adverse ruling?  I

16   mean -- putting aside appeals, I understand that.  But

17   what would practically happen?

18             MR. NATHAN:  Well, that's what I'm

19   describing to Your Honor.  If you were to say this law

20   is valid --

21             THE COURT:  Yeah.

22             MR. NATHAN:  -- and didn't stay that

23   decision, then the Council would say, Okay, we're

24   going to pass the budget leaving Congress out of this.

25   We'll let them know what we've done and they can take

```
 1   action later.

 2              THE COURT:  So they don't follow the law

 3   that's been enacted.

 4              MR. NATHAN:  Yeah, they'll follow this law.

 5   They set up the schedule.  Mr. Mendelson, who was here

 6   but left early -- he didn't want to hear all the

 7   arguments, I guess -- he had said the second vote on

 8   this -- for the past forty years, the way it's worked

 9   is the Council takes one vote on the Budget Request

10   Act because it is not legislation by the Council.

11   It's their adoption pursuant to 446.

12              They send it back to the Mayor; the Mayor

13   sends it to the President; the Congress enacts it.

14   What changes now, what they are saying, Well, we'll do

15   that with the federal portion.  But with respect to

16   the local money, we're going to take a second vote,

17   and they're not going to take that until mid-June.

18   And when we take that second vote, it's now valid.  We

19   can now spend that money.  That money that's in 450

20   that the Congress said you cannot spend unless you

21   have an appropriation from us, they say, That's out

22   the window.  We're taking that power from Congress,

23   Congress wants to do something about it, you know, let

24   them do something later.  So that's what happened.

25              So they'll start spending the money.  They
```

 1    will say, Here's our budget.  And as I say, they can

 2    change the fiscal year.  If they don't change the

 3    fiscal year, that would start in October.

 4             October 1 is the beginning of the current

 5    fiscal year.  So then we'll have the situation when

 6    we're spending -- we're asked by the Council to spend

 7    this money, and the people who are adversely affected

 8    by our spending the money will come running in and

 9    say --

10             THE COURT:  Supervisors over budget

11    authority or thirty-eight employees maybe.

12             MR. NATHAN:  Not only employees, people

13    outside the District.

14             THE COURT:  Service providers.

15             MR. NATHAN:  Service providers, exactly, and

16    a whole host of people.  That will cause the chaos.

17    But on the other side, if the Court says, Look, this

18    is invalid and if counsel wants to take an appeal,

19    fine.  If they take an appeal, then we can have this

20    litigated over the next year or so before the next

21    fiscal year, before fiscal '16.  And if they are

22    right -- which they are not -- but if they were --

23             THE COURT:  Why have an appeal?

24             MR. NATHAN:  Well, we can change the law as

25    they propose to do it for --

```
 1                THE COURT:  I presume this would be on a

 2      fast track.

 3                MR. NATHAN:  Hopefully.  We don't know what

 4      the Court of Appeals -- how fast it would be; not as

 5      accommodating as this Court has been.  You've been

 6      great about expediting this.

 7                But the point is, if this is right, you can

 8      do it in forty-one years instead of in forty years.

 9      What's the harm?  Why would you start now in the

10      middle of the budget season to make this change before

11      getting a definitive ruling from the Court of Appeals.

12      So there's no harm to the District -- to the

13      Council -- to say, This violates these limitations.

14      If you don't think so, take it up to the Court of

15      Appeals.  You have time do it.

16                THE COURT:  Should the Court stay whatever

17      it does pending appellate review?  In other words, if

18      plaintiffs prevail, should the Court stay or not?  I

19      mean both sides have asked for a permanent injunction.

20                MR. NATHAN:  You know, it cuts the other

21      way.  I would say that if the Court ruled in favor of

22      the Council, it should stay it so we can get this

23      budget done without all the problems and we can

24      litigate it.  But if the Court rules for the Mayor and

25      the CFO, I don't think a stay is needed because we can
```

```
1    get rid -- we can deal with this budget, the fiscal

2    '15 budget --

3              THE COURT:  Would that be unfair to you if

4    it's unfair to the plaintiffs though?

5              MR. NATHAN:  I don't think so.  Because the

6    point is -- first of all, I don't think their position

7    is correct.  But even if it were correct, it's forty

8    years -- have been operating on this method that we've

9    done for forty years.  What's the harm of doing it --

10   making the change in the forty-first year instead of

11   right now.

12             THE COURT:  Maybe what the Court should do,

13   say regardless as to how the Court rules, the Court

14   should stay whatever it does for at least a day to

15   give the circuit court a chance to determine what, if

16   anything, should be stayed pending appellate review.

17             MR. NATHAN:  No, I wouldn't oppose that.  I

18   don't know how quickly the Court of Appeals would

19   operate.  I think it's important that we get a prompt

20   decision from this Court as you've promised, and I

21   think that's great, and I really appreciate your doing

22   it so soon.

23             THE COURT:  Well, I don't think this Court

24   had any choice.

25             MR. NATHAN:  Right.
```

```
1              And just a final note on jurisdiction.  I
2    don't think there's any question, and I think
3    basically it was conceded today --
4              THE COURT:  I'm sorry.  I think counsel did
5    concede applicability of Thomas v. Barry.  So I was
6    going to ask you -- this is really a local law, so why
7    shouldn't it be decided by the local courts?
8              MR. NATHAN:  Well, they say This is the law
9    of the land.  Wherever the land is, I don't know.  But
10   the point is this is a law that affects the Congress
11   and the President of the United States, and it
12   violates a law that limited exactly what they could
13   do.  And this part is clearly a national law.  It's
14   not a local law.  So I don't think there's any
15   question the Court has subject matter jurisdiction,
16   and we urge the Court to look at the cases, read the
17   statutes, and decide.
18             THE COURT:  Did the Mayor feel so strongly
19   about the fact that this law is not lawful?  Does he
20   not have the ability to propose legislation to repeal
21   it?  And if so, why hasn't he done that?
22             MR. NATHAN:  Well, the vote of the Council
23   was twelve to nothing.  So I think a vote to repeal is
24   unlikely to prevail.  I think everybody wants to get a
25   judicial review of this, and that's why the Council
```

```
1    brought this lawsuit.  So I don't think that the Mayor

2    has any, well, political option to deal with this.

3    It's either valid or it's not valid, and we need a

4    judicial ruling on that.

5              THE COURT:  Right.

6              MR. NATHAN:  Thank you very much.

7              THE COURT:  Thank you very much, counsel.

8              Miss Dunn, briefly, anything?  Very brief.

9    I've got a few other matters.

10             MS. DUNN:  Yes, Your Honor, I understand.

11   Thank you very much.

12             So the first thing I'd like to note is this:

13   The Attorney General does not at all address the

14   charter amendment process, which is the core question

15   in this case, whether this was an appropriate exercise

16   of the charter amendment process.

17             Congress delegated to the District amendment

18   authority to amend its charter.  That process was

19   followed here, and the only question before the Court

20   is whether there is some obstacle in the Home Rule Act

21   that prevents the District from amending the charter

22   in this way.

23             Our argument is that there is not because,

24   as we've shown under 602(a)(3) and 603(a), there is no

25   problem.  And so all of this conversation is -- does
```

```
 1    not apply to the charter amendment process.  And it's
 2    very important we understand that we're talking about
 3    an amendment process, which is particularly irrelevant
 4    to these points about congressional silence.  So even
 5    though the case cited was not in defendants'
 6    pleadings, we were able to look it up.
 7              THE COURT:  I'm sorry.  Unless you get away
 8    from telling me that -- it's not in your plea.  I was
 9    looking for the Louisiana case.  I don't recall
10    reading it.  That's not in the pleadings, is it?
11              MR. NATHAN:  Yes, it is.  It's in the
12    plaintiff's papers as --
13              THE COURT:  Okay.  I was looking for it in
14    yours.
15              MR. NATHAN:  It should have been.  It's
16    starred by the plaintiff as a case they heavily relied
17    on.  It's Justice Brennan.  Six times he refers to
18    that as a limitation.
19              THE COURT:  All right.  Fair enough.
20              MS. DUNN:  I think, actually, we're talking
21    about a different case.  I think the case the Attorney
22    General just addressed that is in our papers, is
23    Louisiana Public Service Commission, which has a rule
24    of construction, but the case that I'm speaking about
25    with regard to congressional silence is the cases that
```

1    the defendant cited that Your Honor has delivered, and

2    that is not in the pleadings.  But if it's helpful, I

3    could tell everybody what it's about and how to

4    distinguish it.

5              MR. NATHAN:  Just to make clear --

6              THE COURT:  Why don't you come forward.

7              MR. NATHAN:  Counsel is quite right.  I was

8    talking about the Louisiana Supreme Court decision on

9    whether 603(a), language like that, is a limitation,

10   which they said it was.

11             THE COURT:  That's right.  I don't recall

12   where that case was cited.

13             MR. NATHAN:  That's cited in the plaintiff's

14   papers and starred in their reply brief.

15             THE COURT:  Okay.

16             MR. NATHAN:  If you want to talk about the

17   Judge's decision of the last month, that's a different

18   case.

19             THE COURT:  Very well.

20             MS. DUNN:  That case, which is not cited in

21   the pleadings but speaks to congressional automatic

22   reenactment of the Rehabilitation Act -- I'm sure Your

23   Honor remembers, since you decided that case a month

24   ago.

25             THE COURT:  I do remember.

```
 1              MS DUNN:  So what you said in that case is

 2    not applicable here.  We're talking about an amendment

 3    process to the District's governing document, and

 4    Congress played the role that Congress assigned itself

 5    and meant to play in that process.

 6              And so if the Attorney General's position

 7    were correct, it would call into question not just

 8    this amendment but all amendments to the District

 9    charter and, in fact, all legislation in the District,

10    because it's all reviewed in the same way by the

11    Congress.  And that is the structure that was set up

12    in this amendment process and it was followed, and

13    that is what Congress designed.

14              The other thing that I think is very

15    important to correct, actually, are a couple of things

16    over here.  So -- nothing in this chapter, which is

17    repeated a few times.  This is a change that the

18    codifiers made.  It was not the congressional

19    enactment.  So this should say nothing in this act.

20    The more significant correction is that this says

21    limitations on the Council as if it applies all the

22    way down.  And it doesn't.

23              Section 602 does -- is within the subsection

24    limitations on the Council.  But Section 603(a) is

25    within a subsection that says "budget process;
```

1    limitations on borrowing and spending."  And actually,

2    if that means anything, it supports our position

3    because this section, 603(a), was a late-breaking

4    event in the process as was the addition of the term

5    "budget process; limitations on borrowing and

6    spending."  So I don't want the Court to be misled by

7    this demonstrative because it's incorrect in a very

8    important way.

9            Defendants also spend a lot of time talking

10   about the implications if Your Honor were to rule for

11   us.  And while I think many of those implications

12   would be quite good, they do not -- and it is a very

13   familiar tune that the Attorney General is singing.

14   At every stage of this process, he has predicted

15   doomsday occurrences.  He predicted when the board of

16   elections put this on the ballot that there would be

17   retribution by Congress, and that has not happened.

18   And none of his predictions actually have come true.

19   And I believe that they will not come true in this

20   case, and I particularly believe that because a number

21   of his predictions center on suits brought under the

22   Antideficiency Act in fear of prosecution.

23            In a case called *Clarke v. United States*,

24   the DC Circuit said that the Antideficiency Act has

25   not been ever used for criminal prosecution, and, in

```
1    addition, a decision by a Federal District Court Judge

2    such as Your Honor would serve as a defense in such a

3    prosecution.

4             And so I continue to not understand how such

5    a suit could be brought.  But if it were brought, Your

6    Honor should not worry that any of the Attorney

7    General's predictions would actually come true.

8             Similarly, fiscal year starts on

9    October 1st, as the Attorney General well knows.  So

10   if you rule for us or any ruling -- but there would be

11   no budget in place until October 1st, and we feel

12   confident that we could get resolution by the DC

13   Circuit by that time.  So that should absolutely not

14   stand in your way.  In particular it shouldn't stand

15   in your way because you should be guided by the

16   legality of the amendment, but there should be no

17   worry that that would be the case.

18            The other thing I would say is I am not sure

19   it's a foregone conclusion that if you do rule for us

20   that there would be an appeal in this case.  My

21   understanding is that the difficulties on the

22   defendants' side are fear of prosecution, or similar,

23   under the Antideficiency Act, and as I just said, that

24   fear should go away with the federal District Court

25   ruling and the concern that the law is patently
```

1    illegal.

2              And so a decision by Your Honor would

3    demonstrate to the defendants that, in fact, a

4    reasonable person and, in fact, a federal District

5    Court judge finds that this law is not illegal and

6    therefore their concern should be erased, and I don't

7    think we should assume that there would be an appeal.

8              On your question of a stay, my position is

9    different than the Attorney General's position.  And

10   we don't think a stay would be warranted no matter

11   what because what is needed here is certainty.  And we

12   will get certainty from your ruling.  A stay of one

13   day might be a different story.

14             THE COURT:  The Court would have to address

15   the issue of stay as a condition precedent to any

16   party seeking a stay on the Court of Appeals.  I think

17   if I didn't address it, I think that case -- the Court

18   of Appeals might ask me to address it.  So I think I

19   have to address it.

20             MS DUNN:  That's sensible.  I would

21   represent to you as I stand here, although I represent

22   a legislative body, but it would not be our

23   recommendation to seek a stay even if we would seek an

24   appeal.

25             The other thing, just briefly, Your Honor,

1    some of the cases cited, again, do not stand for the

2    proposition for which they are cited.  The GAO case

3    that was discussed says, and I quote, "We have no

4    obligation to defer."

5              So in that case the GAO was opining on a law

6    that it was expert on.  I'm not sure the Home Rule Act

7    falls into that category but maybe.  Again, the Court

8    says, "We have no obligation to defer."

9              THE COURT:  The Circuit Court -- or Circuit?

10             MS. DUNN:  Correct.  So I encourage Your

11   Honor to take that GAO opinion for whatever you think

12   it's worth on its face.

13             *Jackson* and *Hessey* are cases that refer to

14   the same thing, which is Section 1 of the Initiative

15   and Referendum Amendment to the District charter,

16   which if -- for anyone that's been following our

17   findings know, that the fact of this amendment

18   supports our position greatly.  But, in any event,

19   those cases refer to Section (1)(A) where it defines

20   the term "initiative," meaning the process by which

21   electors of the District of Columbia may propose laws

22   except laws appropriating funds.

23             So this is a specific provision that

24   excludes the law as appropriating funds, and that's

25   what those cases refer to.

```
 1              So, again, I just urge the Court to make
 2    sure to read the cases carefully because frequently
 3    they do not stand for the propositions for which they
 4    are cited.  And Greater Washington is another example
 5    of that.  It does not say, as the Attorney General
 6    represents, that when Congress acts, it is a function
 7    of the United States.  In fact, it stands in dramatic
 8    contradistinction to that, making the point that in
 9    that case Congress was acting under its District
10    clause authority.  And that was extra support the
11    Court found for the fact that it was a local function
12    and not a national function.
13              Moving on to the representation of the BLAG
14    brief, which, while informative, does not represent
15    the views of the House.  The only House members --
16              THE COURT:  That's a bipartisan committee,
17    though, correct?
18              MS. DUNN:  It is a bipartisan committee, and
19    the Democrat portion did not sign on as the Attorney
20    General correctly said.  But it would be very improper
21    to think this was the rule of the House.  Because, in
22    fact, I would bet 430 members of the House did not see
23    this brief, and two of the remaining five did not sign
24    the brief.  So I think it's very careful to be precise
25    there.
```

1          I think it stands alone that Congress

2     enacted the Home Rule Act and then changed the

3     amendment process in 1984, but there was a subsequent

4     congressional act that is cited in the briefs, and

5     that is this just-in-case provision about the

6     emergency funding should the government shut down

7     again.

8          And, actually, that provision seems to be

9     written with the Budget Autonomy Act in mind.  And it

10    provides that the section appropriating money in an

11    emergency shall not apply if any other provision of

12    law makes funds available.  And further says, "That

13    nothing in this section shall be construed to affect

14    obligations of the government of the District of

15    Columbia mandated by other law."  So as far as

16    subsequent congressional enactments go, this actually

17    was one and, frankly, supports our position.

18          The only remaining point I'd like to make is

19    with regard to that case that the Attorney General

20    cited as cited in our brief.  And, similarly, there,

21    that nothing-shall-be-construed provision is similar

22    to 602(b), which talks about vesting authority.  This

23    one talks about getting the Commission jurisdiction

24    over something.  Those are similar, another piece, and

25    very different from 603(a), which says, "Nothing shall

1    be construed as making any change in existing law."

2              THE COURT:  All right.  Thank you very much.

3              MS. DUNN:  Thank you, Your Honor.

4              THE COURT:  Let me put the husher on for one

5    second.

6              (Discussion held off the record.)

7              MR. NATHAN:  May I have a few minutes?  I'll

8    be very short.

9              THE COURT:  Yes.

10             MR. NATHAN:  First, with respect to the GAO

11   report, this is the language from the Circuit.  It

12   says, "Although GAO decisions are not binding, courts

13   must give special weight to GAO opinions due to its

14   cumulative experience and expertise in the field of

15   government appropriations."  That's in *Nevada*

16   *Department of Energy*, 400 F.3d at 16.

17             And another case, the *Scheduled Airlines*

18   *Traffic* case, 87 F.3d, says "In giving special weight

19   to the GAO opinion, a court should regard the

20   assessment of the GAO as an expert opinion which the

21   court should prudently consider."

22             It's the only expert opinion you have on the

23   subject of appropriations and this 450 argument and

24   whether or not this violates the Antideficiencies Act

25   in which they are the experts.  They get these reports

1    from the entire government as to any violations of the

2    Antideficiencies Act.  They do a report, they analyze

3    it, that's their expertise, and they say this law is

4    null and void.  While I say I'm not asking deference

5    to our opinion, the GAO opinion deserves it.

6              With respect to the House, the rule of the

7    House is that this five-person committee speaks for

8    the House when it files a brief.  So this brief -- I

9    agree with Miss Dunn.  The members didn't see this

10   brief, but this represents the views of the House as

11   authorized by the delegation in the rules to the

12   bilateral advisory committee, and there's no dissent.

13   There is an abstention but no dissent to the views

14   that are expressed.

15             With respect to silence, it is quite

16   incorrect what Miss Dunn is saying.  The fact that the

17   Congress doesn't act with respect to either a charter

18   amendment or a legislation, it works the same way

19   that affects this regular legislation.

20             When the counsel passes legislation, the

21   Congress has the right -- and it doesn't take effect

22   until a period of time has passed when the Congress

23   could act.  But even if the Congress doesn't act, that

24   doesn't make the law valid.  And that's the situation

25   both in the *McConnell* case and also in the *Crawley*

```
 1    case.
 2              The Congress didn't act.  They didn't say
 3    this was beyond their authority.  But when the case
 4    came to court, at the urging of a criminal defendant
 5    in both of those cases, both times the Court of
 6    Appeals -- once in the DC Circuit, once in the DC
 7    Court of Appeals -- said the law is invalid.  It
 8    exceeds the authority of the Council.  So even though
 9    the Congress didn't take any action, that doesn't mean
10    that the law is valid or is immune from judicial
11    review.
12              With respect to my predictions, I don't
13    propose to be a great prognosticator, but I would say
14    on this one, the jury is still out.  It is not over.
15    That's what Yogi Berra said:  It's not over until it's
16    over.  And the Congress has plenty of time to deal
17    with it.  It has given every opportunity to Council.
18    It has told the Council; it had asked the GAO and said
19    this is null and void and gave that opinion to the
20    Council.
21              A subcommittee sent a report.  It was
22    published and given to the Council.  Thanks for your
23    opinion, but your law is invalid and has no binding
24    effect.  The House has come into this court and said,
25    This law is null and void, and there is no legal
```

```
 1   effect.
 2           Whatever the courts do, including the
 3   appellate courts, the Congress is going to have the
 4   last word on this subject, and so I think it's
 5   premature to deal with my prediction on that point.
 6           With respect to 816(a), that's the
 7   appropriation.  What the Congress has said is if you
 8   submit a budget to the Congress in fiscal '15 -- and
 9   what they've meant, of course, is a budget consistent
10   with 446 as not amended -- then in fiscal '15, even if
11   the government shuts down, the federal government
12   shuts down, you will still have the ability to make
13   expenditures pursuant to our appropriation as you did
14   in fiscal '14.
15           But it is dependent on a valid budget.  It's
16   a budget submitted to us by the Mayor, after getting
17   it from the Council, going to the President and to the
18   Congress.  If there is monkey business and it's
19   different from what has been the rule for forty years,
20   it's an open question whether that statute would still
21   apply and whether we will not have problems if the
22   federal government shuts down.  We hope they don't
23   shut down.  We hope the budget is done in the normal
24   course that has been done for forty years.  That's the
25   way this should be handled.
```

```
 1              So for all these reasons, Your Honor, and I
 2    do say that if you were to uphold this law, I do think
 3    a stay would be in order so that, first of all, the
 4    appellate courts could have an opportunity there, and
 5    since Miss Dunn gave her -- told you about her
 6    recommendation, I would certainly recommend an appeal
 7    to get this thing resolved in the Court of Appeals and
 8    ask for a stay in the meantime so that in fiscal '15,
 9    for the budget for fiscal '15, we can operate as we
10    have done for the last forty years, get the budget
11    back to the Mayor, have it all one budget, not divided
12    up as to the federal part and local part, get it to
13    the federal government, get it appropriated, have
14    ourselves clear for the next year, and then if they
15    want to litigate this question, the validity, we'll
16    have time to do it in the Court of Appeals.
17              Thank you very much.
18              THE COURT:  Thank you.  I'm going to say one
19    point.  I'm not going to rule from the bench, but I'm
20    not going to let the clock run out.  I understand the
21    time constraints.
22              Thank you, Mr. Nathan.
23              MR. NATHAN:  Thank you.
24              THE COURT:  I didn't want to burden everyone
25    with additional cases to start reading and thinking
```

1    about, but I will share a couple of thoughts about a

2    couple of opinions that this Court issued over the

3    past ten years, both which were affirmed by the

4    Circuit.

5            And they are cases that the central theme is

6    like this one.  It tugs at the heartstrings.  But as

7    we know, the Court can't rule from the heart.  One

8    case -- and actually both cases involve the same

9    plaintiffs, the lead plaintiff was David Roeder.  And

10   the name is spelled R-O-E-D-E-R.  And he was the lead

11   plaintiff on behalf of a group of plaintiffs who had

12   been captured and imprisoned by the Republic of Iran

13   for many years.

14           And in the views of many, and including the

15   courts, they were American heroes for what they

16   suffered at the hands of terrorists and thugs.  And

17   they filed a lawsuit years ago against the Republic of

18   Iran seeking vast sums of money for the damages that

19   they had sustained while incarcerated.

20           The Republic of Iran -- you may not know

21   this, but it is true -- has been very active in

22   litigating in the courts of this country and

23   especially in the U.S. District Court for DC.  It

24   chose for whatever reason to not file any pleading.

25   So the case proceeded by way of default, which I

1   thought was somewhat strange.  But, nonetheless, the

2   rules were followed, Rule 55(a) and (b).  And because

3   the damages were for unliquidated sums, there was a

4   need for an evidentiary hearing.

5          What that meant was that those American

6   heroes and the survivors of some who had died while in

7   captivity and would die afterwards came from all over

8   the world to testify in a hearing before the Court --

9   it was nonjury -- about what they had -- about the

10  conditions during their confinement, what they had

11  sustained during that horrible period of time not only

12  in their lives but in the lives of all Americans.

13         On the eve of the evidentiary hearing, the

14  United States moved to intervene, and I found

15  appropriately so, because -- because the case was

16  proceeding by way of default.  What had not been

17  brought to the Court's attention was indeed the

18  significance of what was then known and still is now

19  known as the Algiers court or courts.

20         The Algiers court was negotiated as part of

21  a treaty between the United States and Iran for the

22  release of those hostages, and I think seventy-nine or

23  eighty or so.  And it essentially extinguished the

24  rights of individuals to file suit for damage.  It

25  didn't extinguish the right of oil companies to sue

1    for damages, but it extinguished the rights of those

2    American heroes to file suits for damages in any way

3    at any time.

4          And that was the reason that the government

5    learned of the suit and filed a motion to intervene.

6    And that was a significant development, but at the end

7    of the day, these people had been planning to come to

8    court to testify about the horrible conditions that

9    they've been detained and tortured, and some were

10   waken up in the middle of the night and taken out; all

11   right, today we're going to shoot you; lined up the

12   firing squad.  That's the kind of horror that they

13   endured for the extent of their detention and other

14   atrocities committed upon them.

15         So I wasn't gonna call that off.  I thought

16   at the very end there was some doubt as to whether or

17   not -- in my mind as to whether the Algiers court

18   extinguished the rights, but, nonetheless, they had

19   planned to come to testify.  This was their only

20   opportunity to testify in a court of appropriate

21   jurisdiction about the horror that they sustained,

22   their family.  There wasn't a dry eye in court for a

23   week.  We took time, listened to the families, some of

24   the heroes who had died leaving family members, some

25   had committed suicide.

```
 1              It was just a horrible week.  But it was

 2   also very important to give them an opportunity to try

 3   and bring some closure to that horrific period of time

 4   in their lives.  All that to say is this:  At the end

 5   of the day, the Court was powerless to do anything

 6   other than to shed tears.

 7              It was very interesting what's going on

 8   during that lawsuit because Congress was paying

 9   attention.  There was some movement in Congress to

10   address the lawsuit.  There was some movement by the

11   President even who signed a statement approving

12   certain legislation, and he said, to the extent that

13   the Algiers court does not preclude award of damages,

14   the President firmly believes that those American

15   heroes should be compensated.

16              But it wasn't enough.  It wasn't enough to

17   give the Court -- to enable the Court to reach the

18   conclusion that indeed the treaty had been modified or

19   amended or indeed repealed because Congress retained

20   control over that.

21              Congress did that.  And it was presidential

22   action that was approved by Congress.  It was law.

23   The Algiers court extinguished the right of those

24   American heroes to be compensated for those

25   atrocities.  And I tell you, it was not easy writing
```

```
1     that opinion.

2            And I say that because in some respects -- I

3     mean, that opinion doesn't control here, but in many

4     respects it's very analogous to where this Court

5     finds -- or potentially this Court finds itself.  I

6     have not finally resolved any issue in this case, but

7     it's important enough because I have been thinking

8     about this to share this with you because the Court

9     may well be in that situation now where it is indeed

10    powerless to provide a legal remedy to so many people

11    who arguably are entitled to the right to spend their

12    own money.

13           And I say that in that way because I am not

14    an advocate in this, and I -- you know, that's what

15    this case is about, budget autonomy for the District

16    of Columbia.  Do they have it now as a result of the

17    passage of this legislation?  That remains to be seen.

18           But the point I'm raising is that it may

19    well be that the Court is powerless to sanction this,

20    because query whether Congress reserve the right, the

21    exclusive right, to forever determine how the citizens

22    of the District of Columbia spend their money, does

23    that require additional congressional action?  Did the

24    Iranians' suit require additional congressional

25    action?
```

```
 1              I firmly believe that it did.  Even though
 2    the Congress talked about it and the President then
 3    talked around it and everyone was supporting the award
 4    of damages to those American heroes, to the extent it
 5    did not conflict with the Algiers court, I had to find
 6    that that was insufficient.
 7              Indeed -- I'll give you the citations.  It
 8    would be interesting to read them.  Maybe you can -- I
 9    don't have a lot of time.  I am not going to let the
10    clock run out, as I said, about the issuing of an
11    opinion.  But I said -- in the first Roeder opinion, I
12    said this court empowered the Judge by its sense of
13    justice.  The heartbreaking accounts of the emotional,
14    physical toll of those 444 days on plaintiffs would be
15    more than sufficient justification but granting all
16    the relief that they requested.  However, this Court
17    is bound to apply the law that Congress has created
18    according to the rules of interpretation that the
19    Supreme Court has determined.
20              There are two branches of government that
21    are empowered to aggregate and rescind the Algiers
22    courts, and the judiciary is not one of them.  I said
23    a lot of other things in those two opinions.  One is
24    195 F.Supp.2d 140.  And that was affirmed, 333 F.3d
25    228.  And there was a subsequent Roeder lawsuit.  My
```

```
1    opinion is at 742 F.Supp.2d 1, and the Circuit opinion
2    is found at 646 F.3d 56.
3            The only reason I'm saying that is because,
4    in reading the pleadings in this case and considering
5    the arguments and considering how long this has gone
6    on, certainly longer than 444 days, we're talking
7    about forty years where the DC -- in which DC has not
8    had full budget autonomy.
9            You know, compelling arguments can be made
10   that it's high time for the citizens of the District
11   of Columbia to have full budget autonomy.  Maybe the
12   law that's passed gets into that.
13           I have not finally resolved the issues, but
14   I just raise these opinions because this Court found
15   itself not too long ago in other litigation that tears
16   at the heartstrings just as this does, but I can't
17   rule from my heart.  I wish I could in a lot of cases,
18   but I can't.
19           But I'll -- this has been very helpful, this
20   hearing.  And indeed I was hoping that it would be
21   very helpful to clarify some of the arguments made.  I
22   thought the pleadings were great, but it's always
23   great to hear from outstanding advocates who appear
24   before the Court and articulate their positions, and
25   you both did a job -- did an excellent job.  And it's
```

1    great to have this block of time to be able to

2    accommodate you and also to be accommodated by you.

3           But I am troubled.  I'm troubled about

4    what -- how much authority this Court has.  But it's

5    still an open question.  I'm not prepared to rule

6    today, and I can assure you, I am not going to let the

7    time -- let the sand run out of the hourglass.  I can

8    assure you on that.

9           There's no need to comment on those

10   opinions.  I just want to share.  If someone has a

11   reaction, you are not required to do so.  There was a

12   lot of -- a lot in those cases.  Maybe you are not

13   even familiar with those cases.  I'm not going to

14   require you to respond to some authority that I didn't

15   ask you to read beforehand.  I thought about it, but

16   you've read enough.  I had you do too much over the

17   Mother's Day weekend.  I apologize to all the mothers

18   and fathers, but it's important to get your views on

19   the responses of the amici.

20           MR. NATHAN:  Can I have just one thirty-

21   second response?

22           THE COURT:  Yeah.  Sure.  Why don't you come

23   up here.

24           MR. NATHAN:  Because it's very powerful what

25   was said, and the views you expressed are just like

1    the Mayor's views in terms of budget autonomy.

2          I would ask the Court to take a look at

3    Judge Huvelle's decision in the commuter tax case in

4    which she made exactly the same -- it's in the *Banner*

5    case.  It's a District Court decision.  Of course, she

6    was affirmed.  She said, This breaks my heart.  I

7    think that the District should be able to tax

8    commuters, but the Congress has ruled against us,

9    and --

10          THE COURT:  I think I shed a tear when I

11   read that opinion.  I recall that.  It wasn't too

12   long.  She was affirmed?

13          MR. NATHAN:  Yeah.  I think that is

14   something to look at here.  It's a shame.  We should

15   have budget autonomy.  We all agree with that.  It's a

16   question of where it has to come from.

17          THE COURT:  I didn't say it's a shame.  I'm

18   not going to get into that.  I would say it tugs at my

19   heart.

20          MR. NATHAN:  I think it's unjust that we

21   don't have budget autonomy.  I want to make that

22   clear.  I support it; the Mayor supports it.  The

23   question is, what is the lawful way to obtain it?

24          Thank you.

25          THE COURT:  Thank you.

```
 1              Miss Dunn.

 2              MS. DUNN:  Thank you, Your Honor.

 3              I appreciate your sharing those thoughts,

 4    and I'm looking forward to reading the cases.  And I

 5    want to do what I can to alleviate your discomfort

 6    here, because I think that the situation is --

 7              THE COURT:  I think both the attorneys have

 8    been great, so you've done a great job in articulating

 9    your position.

10              Go ahead.

11              MS DUNN:  I especially want to make one

12    point because I think what the Attorney General's

13    position is with regard to the amendment authority and

14    the potential outcome here, if you are to find that

15    the Budget Autonomy Act is not valid, is very damaging

16    and very dangerous.

17              Congress delegated to the District a

18    charter, and the charter is in many respects like a

19    state constitution.  And the Home Rule Act started

20    from the premise that the charter is amendable, that

21    you can amend it.  And this is really in the nature of

22    governing documents like U.S. Constitution, many state

23    constitutions.  So the baseline here really is a

24    document for the District that can be amended so long

25    as you go through the correct process and so long as
```

```
1    no prohibition applies.

2              And so a view of Congress' role that

3    requires enactment would really cut the amendment

4    possibility and really cut the whole charter amendment

5    process out of the Home Rule Act itself which was the

6    very purpose of giving this charter to the District.

7              And so I want you to rest assured Congress

8    has all the authority it ever had.  It has a plenary

9    authority.  It would review the budget in the same way

10   it reviews all other legislation.  But, most

11   particularly, it played the role that it created for

12   itself in giving this amendment process to the

13   District and enclosing within that charter the

14   provision that said that Congress would spend the

15   money.  So that means that this was within a charter

16   where the premise was this is amendable.

17             I also would like to respond briefly to the

18   Attorney General's reference to the commuter tax and

19   Judge Huvelle's opinion.  The commuter tax is

20   expressly prohibited.  It's in 602(a)(5).  And I

21   couldn't help prove the point better myself than the

22   Attorney General just did for me.  Because if you

23   scour the Home Rule Act -- and I hope that you will --

24   I hope that you will look at each provision with the

25   detail that is required and look at --
```

```
1            THE COURT:  That was 602(a)(5) argument?

2            MS DUNN:  And so while Judge Huvelle may

3   have felt very upset, she was staring an express

4   prohibition in the face.

5            And you, Your Honor, you are not.  Congress

6   did not include an express provision.  It made a very

7   different decision about where it placed this budget

8   provision.  And then it decided that its own role

9   should be that of a reviewer, and that's what it did

10  in this process.

11           And if the Court were to find that that is

12  not the right role for Congress, it would not just be

13  contravening Congress' own decision for what its role

14  should be, it would dismantle the amendment process.

15  And that would be extremely damaging to the District

16  and not at all what Congress intended when it tried to

17  give to the District to the greatest extent possible

18  the burdens of local governance like spending its own

19  tax dollars.

20           Thank you.

21           THE COURT:  Thank you very much.

22           Also, these charts have been extremely

23  helpful.  I have them in paper format.  I'd like to

24  get them in .pdf format.

25           MR. NATHAN:  I'm happy to read them to the
```

```
 1    Court.

 2              THE COURT:  No.  It would be hard to put

 3    them into an opinion.  I might want to use them.  I

 4    don't want to rule out using them, but I'd like to get

 5    them in .pdf format.

 6              MR. NATHAN:  We'll send that to you this

 7    afternoon.

 8              MS. DUNN:  Your Honor, if we can request

 9    that counsel change to be accurate the demonstrative.

10              THE COURT:  Do you agree with what Miss Dunn

11    said about the inaccuracy?

12              MR. NATHAN:  Well, the one on the title of

13    603(a) is correct -- she's correct.  We can change it.

14              THE COURT:  I want the accurate versions.  I

15    don't think -- they weren't intentionally altered.

16              MS. DUNN:  No, that's not my --

17              THE COURT:  I may not use them, but I would

18    like to have the opportunity without bothering you

19    later.

20              I'm going to do something else, counsel,

21    because I think that the hearing was extremely

22    helpful.  I'm going to ask -- I don't normally do it,

23    but I am going to ask that counsel, if you have

24    appropriated funds to do so, to buy the transcript

25    because I would benefit from the transcript.
```

```
1              MR. NATHAN:  We had appropriated funds for
2     the chart, and we'll get it.
3              THE COURT:  I would like to get that today
4     or tomorrow if that's possible.
5              Thank you all.
6              Thank you very much.  There's no need to
7     stand.  Have a nice day.
8              MS. DUNN:  Thank you, Your Honor.
9              MR. NATHAN:  Thank you.
10             (Whereupon, at 1:40 p.m. the proceedings
11             concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    REPORTER'S CERTIFICATE

2

3          I, Chantal M. Geneus, a Certified Realtime

4    Reporter and Registered Professional Reporter of the

5    United States District Court for the District of

6    Columbia, do hereby certify that I stenographically

7    reported the proceedings in the matter of CA 14-655,

8    *Council of the District of Columbia vs. Gray, et al.,*

9    on Wednesday, May 14, 2014, in the United States

10   District Court for the District of Columbia, before

11   the Honorable Emmet G. Sullivan, United States

12   District Judge.

13         I further certify that the Page Numbers 1 through

14   146 constitute the official transcript of the

15   proceedings as transcribed by me from my stenographic

16   notes to the within typewritten matter.

17         In witness whereof, I have affixed my signature

18   on May 15, 2014.

19

20

21                         /s/ Chantal M. Geneus
                           Chantal M. Geneus, RPR, CRR
22                         Official Court Reporter

23

24

25

**'** 

**'14** [1] - 131:14
**'15** [6] - 110:6, 116:2, 131:8, 131:10, 132:8, 132:9
**'16** [1] - 114:21
**'60s** [1] - 100:20
**'70s** [1] - 29:22
**'81** [1] - 92:19
**'91** [1] - 103:17

**1**

**1** [5] - 70:14, 114:4, 125:14, 139:1, 147:13
**1)(A** [1] - 125:19
**10:23** [2] - 1:5, 3:2
**11:19** [1] - 52:1
**11:35** [1] - 51:24
**11:45** [1] - 52:1
**1366** [1] - 8:25
**14** [2] - 1:6, 147:9
**14-655** [3] - 1:4, 3:5, 147:7
**140** [2] - 75:5, 138:24
**146** [1] - 147:14
**15** [1] - 147:18
**16** [1] - 128:16
**1802** [1] - 55:21
**1871** [1] - 55:21
**19** [1] - 26:21
**195** [1] - 138:24
**1970** [1] - 10:16
**1971** [1] - 68:17
**1973** [11] - 14:19, 15:12, 16:12, 20:21, 31:19, 32:7, 62:21, 64:15, 65:14, 95:11
**1974** [1] - 62:24
**1977** [2] - 39:18, 59:16
**1984** [8] - 15:17, 39:17, 39:23, 39:25, 40:4, 65:18, 65:21, 127:3
**1999** [1] - 1:18
**1:40** [1] - 146:10
**1st** [2] - 123:9, 123:11

**2**

**20** [1] - 50:24
**2000** [3] - 39:14, 40:4, 66:1
**20001** [2] - 1:25, 2:7
**20006** [1] - 1:18
**20015** [1] - 1:15
**2007** [1] - 40:12
**2012** [1] - 83:3

**2014** [3] - 1:6, 147:9, 147:18
**202** [3] - 1:15, 1:19, 2:7
**228** [1] - 138:25
**23** [1] - 77:24
**237-2727** [1] - 1:15
**25A** [2] - 58:25, 59:2
**263-3339** [1] - 1:19
**28** [2] - 112:6, 112:10
**28th** [1] - 112:15
**2nd** [1] - 110:21

**3**

**3** [1] - 83:2
**303** [1] - 19:19
**303(d** [1] - 83:6
**31** [1] - 74:22
**333** [2] - 1:24, 138:24
**355** [1] - 79:12
**3rd** [1] - 70:17

**4**

**400** [1] - 128:16
**430** [1] - 126:22
**441** [1] - 2:6
**444** [2] - 138:14, 139:6
**446** [26] - 23:6, 28:2, 28:6, 28:10, 28:17, 52:3, 52:7, 52:11, 52:16, 53:3, 64:3, 69:22, 74:25, 75:17, 77:10, 77:20, 78:7, 93:9, 95:15, 95:18, 102:25, 103:16, 112:3, 113:11, 131:10
**450** [9] - 26:14, 27:4, 95:8, 95:19, 95:24, 96:6, 109:16, 113:19, 128:23
**476** [1] - 79:12
**4th** [1] - 2:6

**5**

**5** [1] - 51:3
**5301** [1] - 1:14
**55(a** [1] - 134:2
**56** [1] - 139:2

**6**

**600** [1] - 2:6
**601** [3] - 73:12, 77:22, 83:9
**602** [14] - 36:16, 36:19, 37:15, 37:17, 38:12,

48:9, 53:14, 69:21, 73:12, 76:4, 77:22, 80:4, 83:9, 121:23
**602(a** [3] - 67:21, 73:20, 105:4
**602(a)** [1] - 37:14
**602(a)(3** [18] - 41:14, 41:18, 43:4, 43:12, 46:13, 49:3, 49:10, 49:14, 50:4, 53:7, 53:14, 58:9, 62:12, 67:25, 68:9, 68:23, 69:1, 118:24
**602(a)(3)** [5] - 34:16, 49:9, 53:13, 59:23, 67:25
**602(a)(3)'s** [1] - 49:25
**602(a)(5** [1] - 144:1
**602(a)(5)** [1] - 143:20
**602(a)(8** [2] - 48:5, 49:8
**602(a)(8)'s** [2] - 49:6, 49:24
**602(b** [12] - 38:16, 38:17, 66:25, 67:8, 67:17, 67:19, 67:24, 68:7, 68:20, 77:7, 78:10, 127:22
**602(b)** [1] - 78:21
**603** [12] - 36:11, 37:14, 37:22, 37:25, 69:22, 73:13, 76:3, 76:4, 77:23, 80:1, 80:4, 83:10
**603(a** [32] - 35:1, 35:5, 35:10, 37:12, 37:13, 37:23, 38:18, 41:14, 41:18, 43:12, 48:12, 48:13, 52:4, 53:12, 62:12, 67:2, 67:13, 67:16, 69:3, 74:4, 76:5, 77:18, 77:25, 83:18, 93:10, 105:4, 118:24, 120:9, 121:24, 122:3, 127:25, 145:13
**603(a)** [4] - 51:5, 52:3, 62:13, 83:13
**603(d** [1] - 83:16
**603(e** [2] - 76:4, 105:3
**603(e)** [1] - 74:19
**646** [1] - 139:2

**7**

**724-6643** [1] - 2:7
**742** [1] - 139:1

**8**

**816(a** [1] - 131:6
**83** [1] - 19:22
**87** [1] - 128:18

**9**

**9th** [1] - 83:3

**A**

**A-11** [1] - 24:7
**a.m** [4] - 1:5, 3:2, 52:1
**abandoned** [2] - 5:14, 5:16
**abided** [1] - 87:7
**ability** [9] - 14:9, 24:24, 53:2, 83:19, 84:6, 84:24, 84:25, 117:20, 131:12
**able** [8] - 4:23, 24:18, 24:19, 24:22, 98:9, 119:6, 140:1, 141:7
**absence** [1] - 34:8
**absolutely** [5] - 5:9, 18:15, 20:9, 39:5, 39:7, 45:24, 47:21, 86:10, 89:12, 98:19, 123:13
**abstain** [1] - 109:6
**abstention** [1] - 129:13
**accede** [1] - 34:22
**accept** [3] - 30:7, 81:6, 81:8
**accepted** [7] - 17:14, 29:2, 80:21, 80:22, 80:25, 81:5, 81:10
**accepting** [2] - 80:13, 87:5
**accommodate** [1] - 140:2
**accommodated** [1] - 140:2
**accommodating** [1] - 115:5
**accordance** [1] - 28:6
**accorded** [3] - 31:8, 42:13, 46:4
**according** [2] - 76:2, 138:18
**accounting** [1] - 42:2
**Accounting** [1] - 42:10
**accounts** [1] - 138:13
**accuracy** [2] - 30:4, 30:22
**accurate** [2] - 97:18, 145:9, 145:14

**accurately** [1] - 30:2
**acknowledges** [1] - 47:19
**act** [17] - 6:4, 48:19, 48:20, 53:19, 69:25, 73:11, 73:21, 73:22, 76:2, 83:9, 97:8, 121:19, 127:4, 129:17, 129:23, 130:2
**Act** [110] - 6:4, 6:5, 7:1, 7:23, 8:9, 8:11, 8:14, 10:15, 10:16, 15:6, 15:12, 17:22, 19:6, 19:18, 20:8, 21:22, 23:3, 23:7, 23:8, 23:13, 23:14, 24:12, 25:7, 25:11, 25:15, 25:16, 26:6, 26:14, 27:19, 27:24, 28:9, 28:19, 28:24, 29:9, 29:23, 31:6, 31:7, 32:3, 32:13, 33:24, 34:14, 34:19, 35:11, 35:19, 36:1, 39:6, 39:19, 39:21, 41:13, 42:1, 42:23, 42:24, 46:4, 46:12, 47:3, 47:4, 47:22, 48:2, 48:9, 48:23, 51:3, 56:7, 58:3, 59:16, 63:21, 64:1, 64:20, 64:23, 65:7, 67:3, 67:10, 67:13, 69:4, 71:2, 71:3, 73:13, 73:16, 73:23, 74:9, 74:23, 75:8, 75:18, 76:1, 76:11, 91:19, 91:20, 93:22, 94:20, 96:1, 96:22, 97:23, 99:19, 100:7, 111:13, 113:10, 118:20, 120:22, 122:22, 122:24, 123:23, 125:6, 127:2, 127:9, 128:24, 129:2, 142:15, 142:19, 143:5, 143:23
**acted** [1] - 53:1
**acting** [5] - 55:9, 56:14, 58:12, 72:19, 126:9
**action** [11] - 17:24, 18:2, 18:21, 19:4, 19:10, 108:14, 113:1, 130:9, 136:22, 137:23, 137:25
**Action** [1] - 3:5

**active** [1] - 133:21
**activity** [1] - 90:12
**actor** [1] - 59:20
**actors** [5] - 53:1, 55:3, 55:16, 57:6, 59:20
**acts** [2] - 105:24, 126:6
**actual** [1] - 103:9
**add** [2] - 5:21, 15:23
**added** [1] - 63:21
**addition** [2] - 122:4, 123:1
**additional** [5] - 32:9, 51:14, 132:25, 137:23, 137:24
**address** [11] - 23:19, 50:17, 51:16, 58:17, 76:5, 118:13, 124:14, 124:17, 124:18, 124:19, 136:10
**addressed** [3] - 32:10, 81:16, 119:22
**addresses** [1] - 44:23
**addressing** [1] - 40:16
**adjudged** [1] - 58:8
**administer** [1] - 105:14
**administered** [1] - 54:24
**administerial** [1] - 111:3
**administering** [1] - 55:13
**admitting** [1] - 83:14
**adopt** [3] - 69:10, 103:1, 112:5
**adoption** [1] - 113:11
**adopts** [1] - 87:9
**advance** [1] - 72:16
**adversaries** [1] - 65:8
**adverse** [4] - 7:14, 7:16, 111:15, 112:15
**adversely** [1] - 114:7
**adversity** [1] - 7:7
**advice** [1] - 45:15
**advisory** [1] - 129:12
**advocate** [1] - 137:14
**advocates** [1] - 139:23
**affect** [6] - 18:13, 49:19, 73:10, 83:20, 84:6, 127:13
**affected** [5] - 49:22, 58:20, 88:3, 102:12, 114:7
**affecting** [1] - 83:7
**affects** [4] - 24:4, 81:23, 117:10, 129:19
**affirmances** [1] -

102:10
**affirmatively** [1] - 19:14
**affirmed** [4] - 133:3, 138:24, 141:6, 141:12
**affirming** [1] - 102:7
**affixed** [1] - 147:17
**afloat** [1] - 98:10
**afternoon** [1] - 145:7
**afterwards** [1] - 134:7
**agencies'** [1] - 24:3
**agency** [2] - 23:16, 42:8
**agenda** [1] - 71:21
**aggregate** [1] - 138:21
**ago** [10] - 29:7, 40:12, 89:13, 90:2, 90:3, 100:20, 101:17, 120:24, 133:17, 139:15
**agree** [17] - 27:16, 35:23, 39:9, 41:11, 65:13, 70:4, 76:19, 86:8, 92:4, 93:6, 93:15, 99:7, 100:22, 101:12, 129:9, 141:15, 145:10
**agreed** [4] - 32:18, 66:5, 82:8, 94:16
**agreement** [3] - 80:11, 94:19
**agrees** [2] - 93:16, 93:17
**ahead** [6] - 43:17, 43:18, 59:5, 60:10, 88:2, 142:10
**aided** [1] - 1:21
**Airlines** [1] - 128:17
**al** [4] - 1:3, 1:6, 3:6, 147:8
**ALAN** [1] - 2:5
**Alex** [1] - 3:21
**ALEXANDER** [1] - 1:13
**Algiers** [7] - 134:19, 134:20, 135:17, 136:13, 136:23, 138:5, 138:21
**alive** [1] - 98:4
**allegations** [3] - 6:14, 6:17, 10:5
**alleviate** [1] - 142:5
**allow** [1] - 94:10
**allowed** [1] - 46:11
**almost** [2] - 13:10, 82:15
**alone** [2] - 7:17, 127:1
**altered** [1] - 145:15
**alternative** [1] - 90:14

**amend** [10] - 14:9, 53:3, 56:17, 73:23, 83:15, 83:16, 93:11, 107:16, 118:18, 142:21
**amendable** [5] - 64:2, 64:21, 69:14, 142:20, 143:16
**amended** [9] - 28:9, 28:10, 28:17, 56:8, 104:13, 104:14, 131:10, 136:19, 142:24
**amending** [4] - 19:19, 73:9, 74:25, 118:21
**amendment** [66] - 12:8, 12:19, 15:7, 15:22, 16:1, 18:2, 19:24, 22:3, 23:8, 28:2, 28:8, 28:19, 28:24, 34:18, 34:21, 34:23, 39:14, 39:24, 40:5, 47:22, 48:1, 52:11, 52:16, 53:1, 59:16, 60:21, 61:17, 64:4, 65:24, 66:2, 66:7, 74:10, 75:17, 77:2, 77:11, 77:21, 78:7, 78:18, 78:19, 80:9, 86:12, 86:18, 87:17, 92:12, 92:20, 97:10, 103:7, 108:12, 118:14, 118:16, 118:17, 119:1, 119:3, 121:2, 121:8, 121:12, 123:16, 125:17, 127:3, 129:18, 142:13, 143:3, 143:4, 143:12, 144:14
**Amendment** [3] - 40:11, 78:23, 125:15
**amendments** [2] - 66:14, 121:8
**America** [1] - 55:19
**American** [6] - 133:15, 134:5, 135:2, 136:14, 136:24, 138:4
**Americans** [1] - 134:12
**amici** [12] - 4:14, 4:15, 4:20, 4:23, 21:15, 29:5, 29:8, 70:5, 99:2, 99:5, 140:19
**Amicus** [1] - 78:6
**amount** [7] - 23:16, 26:10, 27:21, 27:25, 28:11, 75:24, 76:1

**amounts** [1] - 16:15
**ample** [1] - 32:3
**amply** [1] - 63:7
**analogous** [1] - 137:4
**analysis** [3] - 42:22, 43:3, 100:8
**analyze** [2] - 43:6, 129:2
**ANDREW** [1] - 2:4
**Andy** [1] - 4:2
**answer** [15] - 10:14, 13:1, 13:16, 14:21, 31:13, 32:12, 41:22, 61:19, 61:20, 70:7, 72:4, 100:10, 100:11, 100:12, 110:2
**answered** [1] - 59:10
**answering** [1] - 62:11
**answers** [3] - 5:10, 60:14, 62:7
**Antideficiencies** [3] - 93:22, 128:24, 129:2
**Antideficiency** [20] - 6:4, 7:1, 7:23, 23:3, 23:8, 23:14, 25:7, 25:15, 26:6, 27:18, 42:23, 74:23, 75:8, 91:20, 94:19, 96:1, 97:23, 122:22, 122:24, 123:23
**antideficiency** [1] - 26:1
**Antideficiency's** [1] - 91:19
**apologize** [3] - 49:5, 53:13, 140:17
**apparent** [1] - 52:3
**appeal** [9] - 102:15, 110:7, 114:18, 114:19, 114:23, 123:20, 124:7, 124:24, 132:6
**Appeals** [13] - 46:21, 91:5, 102:15, 115:4, 115:11, 115:15, 116:18, 124:16, 124:18, 130:6, 130:7, 132:7, 132:16
**appeals** [1] - 112:16
**appear** [3] - 27:16, 91:18, 139:23
**APPEARANCES** [1] - 1:12
**appearing** [1] - 45:18
**appellate** [5] - 46:25, 115:17, 116:16, 131:3, 132:4
**applicability** [3] - 74:21, 81:24, 117:5

**applicable** [5] - 8:10, 8:25, 10:10, 112:4, 121:2
**application** [2] - 54:6, 74:2
**applied** [6] - 23:9, 48:9, 55:4, 56:10, 56:11, 56:17
**applies** [8] - 8:25, 23:10, 55:8, 80:8, 96:2, 106:1, 121:21, 143:1
**apply** [11] - 6:15, 23:9, 43:2, 53:8, 53:10, 54:15, 106:1, 119:1, 127:11, 131:21, 138:17
**applying** [1] - 54:15
**appreciate** [8] - 5:7, 11:3, 12:12, 70:19, 86:1, 86:25, 116:21, 142:3
**appreciation** [2] - 4:13, 5:1
**approach** [1] - 69:11
**appropriate** [13] - 25:2, 41:8, 56:17, 61:4, 61:7, 88:8, 96:3, 104:11, 105:2, 110:4, 118:15, 135:20
**appropriated** [11] - 93:25, 94:1, 94:16, 97:22, 98:1, 98:3, 98:10, 110:20, 132:13, 145:24, 146:1
**appropriately** [3] - 23:18, 97:3, 134:15
**appropriates** [2] - 57:20, 102:17
**appropriating** [3] - 125:22, 125:24, 127:10
**appropriation** [28] - 26:10, 26:15, 26:19, 26:24, 26:25, 27:2, 27:4, 27:8, 27:9, 27:12, 27:14, 27:18, 27:22, 74:17, 75:9, 87:12, 88:14, 88:17, 91:21, 92:15, 95:8, 102:24, 103:11, 106:5, 109:17, 113:21, 131:7, 131:13
**appropriations** [31] - 20:19, 24:1, 26:21, 26:22, 47:5, 75:1, 75:2, 75:11, 76:16,

77:13, 80:15, 88:6,
94:6, 95:2, 95:16,
95:19, 95:20, 96:8,
102:13, 102:20,
103:8, 103:9,
103:15, 103:23,
107:9, 107:20,
109:15, 109:23,
109:25, 128:15,
128:23
**approval** [12] - 15:7,
15:15, 16:2, 18:22,
18:24, 19:20, 20:21,
44:7, 52:17, 59:17,
62:3, 76:25
**approve** [5] - 23:5,
28:4, 38:9, 38:10,
39:25
**approved** [8] - 5:25,
7:21, 17:19, 76:1,
83:25, 84:13, 89:6,
136:22
**approves** [1] - 61:22
**approving** [2] - 19:3,
136:11
**Aqueduct** [1] - 68:5
**arguably** [2] - 29:18,
137:11
**arguing** [1] - 83:4
**argument** [36] - 5:15,
5:17, 5:21, 9:4, 14:6,
16:20, 34:11, 34:16,
34:17, 35:1, 35:2,
35:4, 37:8, 37:9,
37:10, 37:11, 38:20,
38:24, 43:18, 48:8,
48:12, 65:14, 65:16,
76:24, 77:18, 81:22,
82:2, 82:18, 95:9,
95:11, 96:6, 109:16,
118:23, 128:23,
144:1
**arguments** [11] - 9:15,
10:14, 25:5, 28:21,
34:13, 62:15, 113:7,
139:5, 139:9, 139:21
**arise** [1] - 7:13
**arm** [1] - 42:12
**arms** [1] - 40:13
**arrest** [1] - 88:9
**arrested** [2] - 85:6,
88:11
**arrived** [1] - 14:15
**article** [7] - 30:5, 30:6,
30:8, 33:3, 33:6,
33:21, 33:22
**articles** [11] - 29:6,
29:11, 29:19, 29:21,
29:25, 30:13, 31:10,
31:11, 31:14, 32:6,

65:5
**articulate** [1] - 139:24
**articulated** [1] - 70:23
**articulating** [1] - 142:8
**ascribe** [1] - 30:23
**aside** [4] - 16:13,
29:17, 65:9, 112:16
**asserting** [1] - 21:9
**assertion** [1] - 18:1
**assess** [1] - 6:16
**assessment** [1] -
128:20
**assigned** [4] - 16:1,
18:3, 19:3, 121:4
**assignments** [1] -
102:25
**assist** [1] - 46:14
**assistance** [2] - 26:2,
26:5
**Associated** [2] -
89:13, 90:7
**assume** [6] - 6:20,
12:5, 42:22, 42:24,
124:7
**assure** [3] - 87:18,
140:6, 140:8
**assured** [3] - 5:12,
5:19, 143:7
**atrocities** [2] - 135:14,
136:25
**attached** [1] - 28:3
**attachment** [1] - 70:11
**attempted** [1] - 65:13
**attention** [3] - 105:10,
134:17, 136:9
**attestation** [1] - 39:22
**attorney** [4] - 11:21,
11:22, 12:14, 84:8
**Attorney** [29] - 2:5,
3:25, 25:4, 42:3,
42:31, 43:23, 44:8,
44:15, 44:21, 45:8,
45:15, 45:23, 59:19,
69:8, 88:23, 91:3,
118:13, 119:21,
121:6, 122:13,
123:6, 123:9, 124:9,
126:5, 126:19,
127:19, 142:12,
143:18, 143:22
**Attorney's** [2] - 88:22,
89:4
**attorneys** [1] - 142:7
**attribute** [1] - 29:23
**audits** [1] - 16:11
**authoritative** [1] - 43:2
**authority** [62] - 6:2,
6:11, 6:12, 17:16,
18:9, 19:6, 20:4,
21:6, 21:9, 33:7,

33:25, 35:15, 36:24,
37:5, 38:13, 44:23,
48:5, 48:6, 52:8,
52:9, 52:12, 52:15,
52:23, 52:25, 53:7,
53:19, 56:4, 56:5,
56:14, 63:3, 67:12,
67:18, 67:24, 68:12,
73:21, 77:8, 78:12,
83:23, 88:16, 89:2,
91:3, 91:4, 91:7,
91:11, 91:16, 92:16,
96:13, 98:17, 105:1,
107:4, 107:5,
114:11, 118:18,
126:10, 127:22,
130:3, 130:8, 140:4,
140:14, 142:13,
143:8, 143:9
**Authority** [1] - 80:3
**authorization** [1] -
74:16
**authorize** [4] - 22:12,
23:15, 26:9, 47:19
**authorized** [4] - 22:9,
82:12, 88:13, 129:11
**authorizes** [1] - 79:6
**authors** [4] - 33:14,
33:16, 33:20, 53:22
**automatic** [1] - 120:21
**autonomy** [38] - 14:4,
14:10, 14:14, 15:13,
15:14, 17:12, 25:10,
31:19, 33:23, 41:6,
50:2, 57:11, 63:4,
65:20, 70:4, 71:2,
80:15, 85:5, 85:6,
85:7, 92:22, 93:14,
93:17, 97:1, 97:4,
97:7, 97:13, 99:20,
101:8, 101:10,
101:16, 101:18,
137:15, 139:8,
139:11, 141:1,
141:15, 141:21
**Autonomy** [19] - 8:11,
17:22, 19:6, 20:8,
21:22, 23:7, 23:13,
25:11, 27:24, 28:9,
32:3, 32:13, 42:23,
47:22, 65:7, 75:18,
100:7, 127:9, 142:15
**available** [7] - 26:10,
27:21, 27:22, 27:25,
28:11, 75:9, 127:12
**Avenue** [1] - 1:14,
1:24
**award** [2] - 136:13,
138:3
**aware** [5] - 11:24,

12:13, 18:8, 45:1,
63:4
**awkward** [1] - 11:21

# B

**b)** [1] - 134:2
**BAA** [1] - 23:1
**balance** [1] - 52:5
**balanced** [1] - 16:10
**ballot** [5] - 44:4, 44:6,
71:24, 102:12,
122:16
**ban** [1] - 79:6
**banc** [7] - 46:24, 47:2,
50:18, 50:22, 102:5,
102:15, 104:18
**Banner** [2] - 106:10,
141:4
**barred** [1] - 49:17
**barring** [1] - 86:14
**Barry** [3] - 10:21,
10:24, 117:5
**based** [2] - 44:6, 100:8
**baseless** [1] - 47:24
**baseline** [2] - 14:21,
142:23
**basic** [2] - 74:12,
75:22, 107:11
**basis** [2] - 66:13,
92:16
**bear** [1] - 40:13
**became** [1] - 19:6
**BEFORE** [1] - 1:10
**beforehand** [1] -
140:15
**begin** [2] - 10:8, 13:4
**beginning** [3] - 43:3,
94:3, 114:4
**behalf** [5] - 3:10, 4:18,
4:25, 79:13, 133:11
**belated** [3] - 29:14,
29:15, 29:16
**belied** [1] - 105:9
**believes** [3] - 112:1,
112:3, 136:14
**bell** [1] - 90:15
**belonged** [1] - 24:11
**belongs** [1] - 27:8
**bench** [1] - 132:19
**benefit** [2] - 101:3,
145:25
**benefits** [2] - 54:25,
59:12
**Berra** [1] - 130:15
**best** [5] - 11:12, 35:4,
43:12, 65:6, 100:9
**bet** [1] - 126:22
**better** [3] - 39:4, 39:5,
143:21

**between** [8] - 14:19,
38:17, 45:13, 49:8,
52:3, 78:25, 88:21,
134:21
**beyond** [3] - 61:18,
89:1, 130:3
**biased** [2] - 31:9,
31:10
**bilateral** [1] - 129:12
**bill** [9] - 11:17, 11:20,
20:19, 32:18, 50:1,
50:2, 57:12, 92:21
**bills** [1] - 50:6
**binding** [3] - 80:11,
128:12, 130:23
**bipartisan** [2] -
126:16, 126:18
**BLAG** [2] - 21:15,
126:13
**block** [1] - 140:1
**blow** [1] - 101:2
**board** [5] - 44:2, 44:9,
44:12, 70:20, 122:15
**Board** [1] - 46:23
**body** [1] - 124:22
**Boies** [1] - 1:14
**Boise** [2] - 3:10, 3:22
**bonds** [1] - 38:11
**boo** [1] - 90:23
**books** [1] - 16:25
**Borrowing** [1] - 36:13
**borrowing** [3] - 36:15,
122:1, 122:5
**bothering** [1] - 145:18
**bottom** [1] - 21:2
**bound** [2] - 138:17
**box** [1] - 15:3
**branches** [3] - 45:13,
52:22, 138:20
**brand** [1] - 15:6
**brand-new** [1] - 15:6
**break** [1] - 13:23
**breaking** [1] - 122:3
**breaks** [1] - 141:6
**Breanne** [1] - 3:19
**BREANNE** [1] - 1:17
**Brennan** [2] - 79:13,
119:17
**Brian** [1] - 3:18
**BRIAN** [23] - 26:20,
50:16, 59:9, 77:25,
78:6, 78:22, 95:7,
98:20, 106:6,
108:20, 108:21,
108:23, 109:10,
109:12, 118:8,
120:14, 126:14,
126:23, 126:24,
127:20, 129:8,

129:10
**briefing** [1] - 23:21
**briefly** [8] - 5:13, 34:24, 46:15, 62:11, 62:13, 118:8, 124:25, 143:17
**briefs** [2] - 26:17, 127:4
**bright** [2] - 83:19, 84:5
**bright-line** [2] - 83:19, 84:5
**brightest** [1] - 100:2
**bring** [5] - 17:2, 18:12, 34:6, 66:18, 136:3
**bringing** [1] - 8:7
**broad** [5] - 33:25, 34:18, 34:21, 49:15, 60:1
**brought** [11] - 8:8, 10:7, 40:14, 40:20, 57:10, 118:1, 122:21, 123:5, 134:17
**Brown** [3] - 1:17, 3:19, 3:20
**bubble** [2] - 68:4, 68:6
**Budget** [23] - 8:11, 17:22, 19:6, 20:7, 21:22, 23:7, 23:13, 25:11, 27:24, 28:9, 32:2, 32:13, 36:12, 42:23, 47:22, 48:9, 65:7, 74:14, 75:18, 100:7, 113:9, 127:9, 142:15
**budget** [118] - 6:2, 6:11, 6:23, 7:22, 9:12, 14:4, 14:9, 14:14, 15:13, 15:14, 17:12, 20:4, 20:8, 20:10, 21:5, 21:16, 21:23, 21:25, 22:7, 22:8, 23:25, 24:4, 24:5, 25:10, 25:13, 31:18, 33:23, 35:15, 36:14, 41:6, 50:2, 50:25, 57:11, 57:22, 63:4, 64:10, 65:20, 70:3, 71:1, 74:17, 74:18, 75:5, 75:11, 75:13, 75:17, 75:22, 76:17, 77:16, 78:20, 80:4, 80:6, 80:15, 80:16, 82:14, 83:20, 83:24, 83:25, 84:7, 85:5, 85:6, 85:7, 87:9, 87:11, 92:17, 92:21, 93:14, 93:17, 95:2, 97:1, 97:3, 97:7, 97:13, 99:20,

101:8, 101:10, 101:16, 101:18, 103:1, 103:12, 103:18, 104:12, 106:9, 106:12, 106:15, 106:17, 109:24, 110:5, 110:10, 110:13, 111:23, 112:5, 112:8, 112:24, 114:1, 114:10, 115:10, 115:23, 116:1, 116:2, 121:25, 122:5, 123:11, 131:8, 131:9, 131:15, 131:16, 131:23, 132:9, 132:10, 132:11, 137:15, 139:8, 139:11, 141:1, 141:15, 141:21, 143:9, 144:7
**budgeting** [1] - 49:11
**budgets** [1] - 16:10
**Builders** [1] - 90:7
**burden** [1] - 132:24
**burdens** [2] - 64:24, 144:18
**burly** [1] - 90:11
**BUSH** [1] - 2:5
**Bush** [1] - 4:2
**business** [1] - 131:18
**buy** [1] - 145:24

---

# C

**CA** [2] - 1:4, 147:7
**candid** [1] - 13:6
**candor** [1] - 11:4
**cannon** [1] - 53:25
**cannot** [10] - 13:18, 30:23, 63:6, 73:17, 76:9, 77:5, 79:5, 93:10, 109:25, 113:20
**captivity** [1] - 134:7
**capture** [1] - 100:23
**captured** [1] - 133:12
**care** [2] - 44:4, 107:20
**career** [1] - 99:15
**careful** [1] - 126:24
**carefully** [2] - 51:7, 126:2
**carries** [1] - 111:10
**carved** [1] - 7:2
**case** [108] - 6:9, 8:4, 8:8, 8:20, 9:10, 9:25, 10:13, 10:25, 13:3, 13:11, 19:21, 19:22, 20:6, 20:16, 22:10,

32:4, 33:8, 42:13, 42:14, 43:5, 43:7, 43:8, 43:9, 43:16, 44:20, 45:3, 45:14, 46:1, 46:5, 46:7, 47:25, 48:3, 48:12, 49:23, 50:10, 50:13, 50:23, 51:2, 51:7, 53:22, 54:10, 54:23, 56:8, 57:24, 57:25, 58:11, 61:21, 61:25, 68:15, 79:9, 85:24, 87:22, 88:20, 88:23, 89:14, 90:4, 90:8, 90:19, 91:7, 91:13, 102:3, 102:4, 102:11, 104:17, 105:6, 105:11, 106:10, 108:10, 109:19, 111:2, 118:15, 119:5, 119:9, 119:16, 119:21, 119:24, 120:12, 120:18, 120:20, 120:23, 121:1, 122:20, 122:23, 123:17, 123:20, 124:17, 125:2, 125:5, 126:9, 127:5, 127:19, 128:17, 128:18, 129:25, 130:1, 130:3, 133:8, 133:25, 134:15, 137:6, 137:15, 139:4, 141:3, 141:5
**cases** [34] - 43:2, 46:16, 46:20, 47:9, 47:11, 47:12, 51:8, 51:9, 51:10, 55:11, 56:23, 57:1, 59:22, 59:24, 91:17, 94:2, 100:14, 102:1, 117:16, 119:25, 125:1, 125:13, 125:19, 125:25, 126:2, 130:5, 132:25, 133:5, 133:8, 139:17, 140:12, 140:13, 142:4
**category** [1] - 125:7
**center** [1] - 122:21
**centered** [1] - 9:4
**Central** [1] - 53:22
**central** [1] - 133:5
**Certain** [1] - 104:18
**certain** [5] - 34:8, 42:9, 96:15, 104:21, 136:12

**certainly** [4] - 11:2, 66:23, 132:6, 139:6
**certainty** [2] - 124:11, 124:12
**CERTIFICATE** [1] - 147:1
**Certified** [2] - 1:23, 147:3
**certify** [2] - 147:6, 147:13
**cetera** [2] - 29:10, 37:6
**CFO** [9] - 3:14, 8:6, 9:10, 9:12, 45:15, 70:3, 93:16, 100:11, 115:25
**Chadha** [2] - 15:18, 15:19
**challenging** [1] - 29:15
**chance** [6] - 69:24, 71:4, 72:10, 85:9, 103:6, 116:15
**change** [51] - 14:22, 16:4, 16:21, 23:24, 32:23, 35:11, 35:19, 36:2, 36:10, 37:24, 48:15, 52:5, 62:21, 62:23, 63:8, 63:22, 65:18, 67:14, 67:17, 74:11, 75:4, 77:1, 77:16, 77:21, 78:20, 79:23, 79:25, 89:6, 92:4, 96:23, 96:25, 97:12, 101:18, 102:19, 103:6, 103:24, 104:1, 104:19, 105:1, 105:22, 110:16, 114:2, 114:24, 115:10, 116:10, 121:17, 128:1, 145:9, 145:13
**changed** [17] - 20:17, 22:5, 39:24, 62:24, 73:18, 76:18, 77:4, 77:10, 84:11, 88:20, 89:2, 90:21, 92:5, 101:13, 101:14, 104:8, 127:2
**changes** [8] - 24:1, 64:8, 64:14, 73:19, 75:21, 77:12, 81:21, 113:14
**changing** [2] - 64:11, 78:9
**Chantal** [2] - 147:3, 147:21
**CHANTAL** [1] - 1:22
**chaos** [2] - 87:18, 114:16

**chapter** [11] - 74:5, 74:8, 74:20, 78:11, 78:16, 78:17, 79:17, 81:20, 81:23, 121:16
**chapter...or** [1] - 73:22
**character** [1] - 100:21
**chart** [2] - 72:1, 146:2
**charter** [43] - 6:5, 14:9, 15:22, 15:25, 19:19, 23:8, 28:7, 28:10, 29:9, 39:15, 53:3, 64:1, 64:2, 69:14, 73:16, 74:10, 76:10, 77:21, 78:18, 78:19, 80:13, 80:14, 81:6, 83:15, 83:16, 87:6, 93:11, 96:22, 118:14, 118:16, 118:18, 118:21, 119:1, 121:9, 125:15, 129:17, 142:18, 142:20, 143:4, 143:6, 143:13, 143:15
**chartered** [1] - 59:16
**charts** [1] - 144:22
**checked** [1] - 29:4
**checks** [1] - 9:13
**Chief** [2] - 62:2, 89:20
**choice** [2] - 12:2, 116:24
**chop** [1] - 100:22
**chose** [1] - 133:24
**chronicles** [1] - 29:21
**circuit** [6] - 42:7, 44:22, 98:17, 109:19, 110:24, 116:15
**Circuit** [9] - 90:8, 122:24, 123:13, 125:9, 128:11, 130:6, 133:4, 139:1
**circular** [1] - 24:7
**circumstance** [1] - 7:17
**citations** [1] - 138:7
**cite** [4] - 33:4, 89:19, 89:23, 89:25
**cited** [14] - 51:8, 51:11, 62:5, 119:5, 120:1, 120:12, 120:13, 120:20, 125:1, 125:2, 126:4, 127:4, 127:20
**cites** [1] - 51:7
**cities** [2] - 22:16, 22:17
**citizens** [17] - 70:25, 71:4, 78:25, 79:1,

80:12, 81:5, 85:3, 85:9, 102:18, 103:5, 104:1, 104:15, 104:19, 104:25, 108:18, 137:21, 139:10

**City** [24] - 5:24, 5:25, 7:20, 12:4, 20:2, 20:24, 21:8, 37:5, 45:9, 46:8, 46:19, 52:9, 52:10, 52:23, 52:24, 61:5, 64:14, 77:1, 80:19, 98:24, 112:9, 112:12, 112:15

**city** [12] - 14:4, 14:14, 21:10, 22:11, 22:21, 24:18, 24:19, 39:5, 47:1, 60:5, 60:7, 87:18

**city's** [3] - 21:9, 21:11, 32:21

**civil** [6] - 16:24, 86:13, 91:16, 110:23, 111:11

**Civil** [1] - 3:5

**claim** [5] - 15:14, 17:2, 17:4, 40:14, 49:15

**claims** [6] - 8:3, 8:4, 8:7, 9:4, 40:19, 88:23

**clarify** [2] - 6:8, 139:21

**clarifying** [2] - 68:22, 69:2

**clarity** [1] - 34:6

**Clarke** [1] - 122:23

**classic** [3] - 55:17, 55:18, 55:19

**clause** [8] - 26:22, 40:15, 56:4, 56:14, 96:8, 126:10

**clean** [3] - 16:10, 35:24, 35:25

**cleaner** [1] - 35:24

**clear** [26] - 32:15, 34:4, 35:18, 40:23, 47:4, 48:23, 50:5, 52:2, 57:4, 59:24, 62:19, 62:25, 67:22, 68:10, 68:23, 68:25, 70:2, 70:15, 77:6, 77:15, 93:11, 95:1, 106:10, 120:5, 132:14, 141:22

**clearer** [4] - 63:17, 63:20, 75:7, 82:6

**clearly** [2] - 62:16, 117:13

**clerked** [1] - 100:19

**climate** [3] - 38:23,

39:3, 65:15

**clippings** [1] - 80:20

**clock** [3] - 86:24, 132:20, 138:10

**close** [1] - 33:4

**close-ish** [1] - 33:4

**closing** [1] - 69:7

**closure** [1] - 136:3

**co** [1] - 3:18

**co-lead** [1] - 3:18

**codifiers** [1] - 121:18

**coequal** [1] - 52:21

**coexisted** [1] - 57:13

**collapse** [1] - 28:21

**Colleague** [1] - 92:13

**colleagues** [2] - 3:16, 4:9

**collect** [1] - 95:21

**collected** [1] - 87:15

**collecting** [1] - 49:22

**collects** [1] - 95:22

**Columbia** [32] - 3:5, 6:2, 15:9, 26:8, 28:12, 44:22, 44:25, 45:4, 48:21, 64:11, 68:5, 74:18, 75:25, 96:12, 96:14, 102:6, 102:13, 106:9, 106:16, 107:1, 107:5, 107:10, 108:4, 108:7, 125:21, 127:15, 137:16, 137:22, 139:11, 147:6, 147:8, 147:10

**COLUMBIA** [2] - 1:1, 1:3

**coming** [1] - 82:22, 96:24, 103:20

**commenced** [1] - 3:3

**comment** [2] - 33:2, 140:9

**Commission** [4] - 79:11, 79:12, 119:23, 127:23

**commitment** [1] - 80:12

**committed** [2] - 135:14, 135:25

**committee** [8] - 41:25, 108:17, 109:2, 126:16, 126:18, 129:7, 129:12

**committees** [1] - 106:6

**common** [3] - 31:20, 60:21, 90:11

**communicating** [1] - 36:9

**communication** [1] -

64:3

**Communications** [1] - 79:11

**commuter** [3] - 141:3, 143:18, 143:19

**commuters** [1] - 141:8

**companies** [1] - 134:25

**comparison** [4] - 38:17, 67:7, 67:21, 69:3

**compelling** [1] - 139:9

**compensated** [2] - 136:15, 136:24

**Compensation** [2] - 54:25, 55:14

**complaint** [7] - 6:14, 6:15, 7:2, 7:6, 9:6, 10:4, 10:6

**complete** [1] - 86:15

**completely** [5] - 47:24, 70:14, 77:19, 95:10, 97:10

**compliance** [1] - 9:10

**comply** [2] - 86:17, 110:25

**component** [2] - 21:12, 21:14

**compromise** [3] - 32:1, 32:2, 76:15

**Comptroller** [1] - 74:15

**computer** [1] - 1:21

**computer-aided** [1] - 1:21

**concede** [3] - 10:22, 10:23, 117:5

**conceded** [1] - 117:3

**concern** [6] - 24:21, 44:4, 107:17, 123:25, 124:6

**concerned** [5] - 6:21, 6:25, 7:22, 16:12, 64:7

**concerns** [4] - 49:9, 73:23, 75:20, 107:16

**concluded** [1] - 146:11

**conclusion** [3] - 65:11, 123:19, 136:18

**condition** [1] - 124:15

**conditions** [4] - 39:5, 101:13, 134:10, 135:8

**confer** [3] - 6:6, 7:25, 8:16

**confident** [2] - 66:18, 123:12

**confinement** [1] -

134:10

**conflict** [3] - 52:3, 69:12, 138:5

**confusion** [2] - 23:20, 23:21

**Congress** [210] - 14:13, 15:5, 15:8, 15:11, 15:18, 15:24, 16:12, 17:15, 17:19, 18:4, 18:8, 18:11, 19:2, 19:13, 19:24, 19:25, 20:4, 20:6, 20:8, 20:10, 20:15, 20:19, 20:25, 21:5, 21:18, 22:2, 22:10, 23:4, 23:14, 23:15, 23:23, 24:2, 24:10, 27:13, 28:1, 28:4, 28:14, 30:8, 31:18, 32:16, 32:20, 32:22, 34:20, 35:15, 36:4, 37:4, 37:6, 37:15, 38:14, 39:20, 39:23, 39:25, 42:12, 48:9, 48:15, 48:19, 48:22, 52:13, 52:14, 52:18, 53:2, 55:8, 55:24, 56:3, 56:13, 57:18, 58:11, 59:21, 61:22, 62:3, 63:4, 63:10, 63:16, 63:25, 64:9, 64:23, 65:19, 65:21, 67:16, 71:5, 73:19, 73:23, 74:13, 75:1, 75:2, 75:4, 75:9, 75:10, 75:15, 76:2, 76:16, 76:22, 77:13, 79:5, 79:7, 79:24, 80:16, 80:18, 81:16, 81:22, 82:5, 82:7, 82:13, 82:16, 82:17, 83:23, 84:3, 84:4, 85:7, 87:12, 88:7, 88:14, 88:17, 89:6, 89:15, 90:20, 90:22, 91:9, 91:21, 92:4, 92:5, 92:15, 92:20, 92:21, 93:1, 93:5, 93:8, 93:12, 93:14, 94:17, 95:11, 95:16, 96:11, 96:25, 97:2, 97:7, 97:9, 97:13, 97:14, 98:3, 98:8, 101:9, 101:17, 102:17, 102:18, 102:19, 103:2, 103:9, 103:14, 103:22, 103:23, 104:10, 104:24, 105:24, 106:2, 106:3, 106:19,

106:25, 107:3, 107:8, 107:12, 107:25, 108:6, 109:23, 110:19, 112:24, 113:13, 113:20, 113:22, 113:23, 117:10, 118:17, 121:4, 121:11, 121:13, 122:17, 126:6, 126:9, 127:1, 129:17, 129:21, 129:22, 129:23, 130:2, 130:9, 130:16, 131:3, 131:7, 131:8, 131:18, 136:8, 136:9, 136:19, 136:21, 136:22, 137:20, 138:2, 138:17, 141:8, 142:17, 143:7, 143:14, 144:5, 144:12, 144:16

**congress** [1] - 93:13

**Congress'** [9] - 18:19, 19:9, 20:21, 21:21, 21:22, 21:25, 25:2, 143:2, 144:13

**Congressional** [1] - 80:3

**congressional** [16] - 18:20, 29:1, 41:25, 47:5, 59:17, 64:10, 90:10, 90:12, 119:4, 119:25, 120:21, 121:18, 127:4, 127:16, 137:23, 137:24

**consecutive** [2] - 87:3, 87:7

**consent** [1] - 89:15

**consequence** [1] - 27:12

**consequences** [1] - 111:13

**consider** [3] - 10:13, 13:15, 128:21

**considered** [1] - 55:14

**considering** [3] - 108:11, 139:4, 139:5

**consistent** [3] - 6:23, 103:21, 131:9

**constitute** [2] - 26:18, 147:14

**constitutes** [1] - 26:15

**constitution** [4] - 64:19, 96:8, 96:10, 142:19

**Constitution** [6] -

1:24, 27:10, 78:23,
99:24, 107:3, 142:22
**constitutional** [6] -
27:16, 28:13, 107:6,
107:8, 107:12, 108:1
**constitutionally** [1] -
48:25
**constitutions** [1] -
142:23
**constraints** [3] - 4:22,
86:4, 132:21
**construction** [5] -
34:25, 35:9, 53:25,
119:24
**construe** [3] - 68:9,
78:19, 80:7
**construed** [19] -
35:11, 35:19, 36:1,
63:8, 63:22, 67:4,
67:10, 67:14, 69:4,
74:11, 74:20, 77:8,
78:16, 79:17, 79:22,
81:18, 127:13,
127:21, 128:1
**construing** [3] -
67:16, 67:18, 68:7
**contain** [1] - 37:22
**contained** [4] - 36:12,
50:2, 50:3, 53:14
**contains** [1] - 33:12
**context** [7] - 16:24,
35:5, 41:4, 55:4,
59:24, 60:2
**continue** [1] - 123:4
**Continued** [1] - 2:1
**continues** [1] - 23:9
**contract** [7] - 86:16,
93:25, 94:2, 94:4,
94:12, 94:13, 111:14
**Contractors** [2] -
89:14, 90:7
**contracts** [1] - 93:23
**contradistinction** [1] -
126:8
**contrary** [2] - 64:22,
73:21
**contrast** [2] - 62:25,
68:22
**contravening** [1] -
144:13
**contributions** [1] -
4:21
**control** [5] - 50:6,
96:11, 108:2,
136:20, 137:3
**Control** [1] - 58:3
**Controlled** [1] - 48:1
**controlling** [1] - 53:23
**controls** [1] - 96:1
**convenience** [1] -

105:15
**conversation** [3] -
24:25, 25:1, 118:25
**cop** [1] - 88:11
**core** [1] - 118:14
**corner** [1] - 99:18
**correct** [17] - 8:15,
19:16, 21:13, 25:19,
35:17, 39:6, 51:11,
63:14, 116:7, 121:7,
121:15, 125:10,
126:17, 142:25,
145:13
**correction** [1] - 121:20
**correctly** [1] - 126:20
**costing** [2] - 20:22,
25:3
**council** [1] - 34:6
**Council** [135] - 3:5,
3:10, 3:21, 5:24,
5:25, 7:20, 12:5,
14:8, 20:2, 20:24,
21:8, 32:15, 36:5,
36:16, 36:23, 37:5,
38:9, 38:12, 38:13,
45:2, 45:7, 45:8,
45:9, 45:12, 45:17,
45:20, 45:22, 46:19,
47:19, 48:19, 48:24,
51:5, 52:9, 52:10,
52:12, 52:23, 52:24,
52:25, 53:15, 53:18,
53:22, 54:19, 61:6,
63:2, 63:11, 64:14,
67:10, 67:19, 68:12,
70:4, 70:17, 71:2,
71:9, 71:16, 71:23,
72:11, 72:17, 72:18,
73:11, 73:18, 73:20,
74:25, 75:12, 76:13,
77:1, 78:8, 79:9,
80:19, 81:5, 82:10,
82:23, 83:7, 83:8,
83:19, 84:2, 84:5,
84:6, 84:10, 84:12,
84:13, 84:21, 85:2,
85:10, 86:12, 87:1,
87:6, 87:9, 88:6,
88:20, 89:1, 90:21,
91:10, 92:25, 96:18,
100:8, 101:6,
101:25, 102:23,
103:5, 103:10,
103:20, 104:11,
104:12, 104:14,
104:22, 104:25,
105:7, 107:10,
110:5, 110:7, 112:5,
112:10, 112:12,
112:23, 113:9,

113:10, 114:6,
115:13, 115:22,
117:22, 117:25,
121:21, 121:24,
130:8, 130:17,
130:18, 130:20,
130:22, 131:17,
147:8
**COUNCIL** [1] - 1:3
**Council's** [11] - 46:2,
46:3, 46:8, 46:10,
48:5, 48:6, 53:7,
77:18, 84:8, 98:25,
103:15
**counsel** [25] - 3:7,
3:11, 3:18, 3:21,
4:20, 5:8, 11:5,
21:10, 45:12, 45:17,
52:2, 69:17, 82:10,
86:8, 88:2, 92:5,
94:16, 114:18,
117:4, 118:7, 120:7,
129:20, 145:9,
145:20, 145:23
**count** [1] - 103:25
**counterpoint** [1] -
67:2
**counterweight** [1] -
80:24
**countries** [1] - 79:2
**country** [4] - 106:7,
106:20, 106:21,
133:22
**counts** [1] - 71:19
**couple** [8] - 5:22,
60:5, 60:8, 108:8,
108:9, 121:15,
133:1, 133:2
**course** [10] - 44:20,
49:18, 74:9, 76:3,
76:21, 80:5, 108:19,
131:9, 131:24, 141:5
**COURT** [227] - 1:1,
3:11, 3:15, 3:23, 4:1,
4:6, 5:22, 6:10, 6:20,
7:19, 8:13, 8:16,
9:18, 9:22, 10:20,
11:3, 11:13, 11:18,
11:24, 12:2, 12:9,
12:20, 13:10, 13:19,
13:24, 14:25, 17:18,
17:23, 18:18, 18:25,
19:4, 19:9, 19:12,
19:17, 20:2, 20:24,
21:4, 21:8, 22:5,
22:11, 22:21, 23:1,
24:16, 25:14, 25:20,
25:24, 26:3, 27:3,
28:25, 29:5, 29:13,
30:2, 30:7, 30:12,

30:15, 30:17, 30:21,
30:25, 31:9, 31:20,
31:23, 32:20, 32:24,
33:6, 33:10, 33:16,
34:10, 34:14, 34:24,
35:7, 35:13, 35:18,
36:6, 36:19, 36:21,
37:1, 37:4, 37:8,
37:10, 37:13, 37:19,
38:3, 38:6, 38:19,
38:23, 39:1, 39:8,
39:17, 41:9, 41:24,
43:8, 43:17, 43:21,
44:1, 44:13, 44:21,
45:5, 45:11, 45:20,
46:8, 46:15, 47:12,
47:25, 48:8, 50:13,
50:18, 50:21, 51:12,
51:18, 51:20, 52:2,
52:20, 53:10, 53:17,
53:20, 55:22, 58:21,
59:1, 60:4, 60:18,
60:23, 61:4, 61:8,
61:12, 62:9, 62:19,
63:13, 63:16, 63:19,
64:6, 65:12, 66:15,
66:20, 67:1, 69:15,
69:17, 69:21, 70:6,
70:11, 70:22, 71:12,
71:17, 72:3, 72:13,
73:1, 73:7, 80:22,
81:1, 81:8, 81:14,
81:16, 82:2, 84:8,
84:12, 84:17, 85:13,
85:17, 85:23, 86:3,
86:22, 87:24, 88:2,
89:6, 89:10, 89:17,
89:22, 90:2, 90:16,
91:23, 92:2, 92:9,
93:3, 95:25, 97:24,
98:11, 98:17, 98:21,
98:24, 99:7, 102:10,
108:5, 111:22,
112:1, 112:9,
112:12, 112:21,
113:2, 114:10,
114:14, 114:23,
115:1, 115:16,
116:3, 116:12,
116:23, 117:4,
117:18, 118:5,
118:7, 119:7,
119:13, 119:19,
120:6, 120:11,
120:15, 120:19,
120:25, 124:14,
125:9, 126:16,
128:2, 128:4, 128:9,
132:18, 132:24,
140:22, 141:10,
141:17, 141:25,

142:7, 144:1,
144:21, 145:2,
145:10, 145:14,
145:17, 146:3
**Court** [111] - 1:24, 4:8,
4:16, 7:10, 9:20,
10:1, 10:8, 10:16,
10:18, 10:20, 10:25,
25:25, 28:22, 29:10,
29:20, 29:23, 30:1,
30:20, 31:3, 33:13,
40:13, 41:10, 42:4,
43:14, 43:25, 44:19,
44:20, 46:21, 48:21,
48:25, 51:6, 55:6,
62:1, 64:13, 67:5,
72:24, 73:8, 79:19,
79:21, 80:25, 91:4,
91:5, 91:10, 94:24,
99:11, 99:22,
100:13, 100:15,
102:8, 102:15,
103:13, 108:21,
111:20, 112:13,
114:17, 115:4,
115:5, 115:11,
115:14, 115:16,
115:18, 115:21,
115:24, 116:12,
116:13, 116:18,
116:20, 116:23,
117:15, 117:16,
118:19, 120:8,
122:6, 123:1,
123:24, 124:5,
124:14, 124:16,
124:17, 125:7,
125:9, 126:1,
126:11, 130:5,
130:7, 132:7,
132:16, 133:2,
133:7, 133:23,
134:8, 136:5,
136:17, 137:4,
137:5, 137:8,
137:19, 138:16,
138:19, 139:14,
139:24, 140:4,
141:2, 141:5,
144:11, 145:1,
147:5, 147:10,
147:22
**court** [32] - 6:7, 7:4,
9:3, 10:18, 17:7,
45:16, 46:24, 46:25,
47:2, 79:14, 79:15,
90:25, 91:1, 102:5,
103:21, 111:21,
116:15, 128:19,
128:21, 130:4,
130:24, 134:19,

134:20, 135:8,
135:17, 135:20,
135:22, 136:13,
136:23, 138:5,
138:12
**Court's** [1] - 134:17
**courtroom** [2] - 58:23,
59:1
**COURTROOM** [2] -
3:4, 58:24
**Courtroom** [1] - 59:2
**courts** [20] - 9:7,
40:19, 54:23, 55:16,
57:2, 79:4, 94:8,
96:18, 98:13, 109:1,
117:7, 128:12,
131:2, 131:3, 132:4,
133:15, 133:22,
134:19, 138:22
**covenant** [1] - 111:6
**covered** [2] - 51:15,
79:25
**Crawley** [15] - 46:22,
47:25, 48:3, 48:16,
49:2, 49:3, 49:6,
49:23, 50:10, 87:22,
88:20, 90:19, 90:20,
129:25
**created** [4] - 63:25,
66:3, 138:17, 143:11
**creating** [1] - 25:3
**credit** [4] - 30:3, 30:4,
36:25, 39:12
**criminal** [6] - 86:11,
86:12, 110:23,
111:10, 122:25,
130:4
**critical** [6] - 20:20,
24:7, 39:1, 43:4,
60:24, 72:6
**crossed** [1] - 11:20
**crosses** [1] - 11:17
**CRR** [2] - 1:22, 147:21
**culmination** [1] - 14:3
**cumulative** [1] -
128:14
**current** [2] - 18:7,
114:4
**cut** [3] - 101:1, 143:3,
143:4
**cuts** [1] - 115:20
**cutting** [1] - 9:13

**D**

**damage** [1] - 134:24
**damages** [6] - 133:18,
134:3, 135:1, 135:2,
136:13, 138:4
**damaging** [2] -

142:15, 144:15
**dangerous** [1] -
142:16
**Daniel** [1] - 4:3
**DANIEL** [1] - 2:11
**dared** [1] - 56:16
**Dave** [1] - 3:20
**David** [1] - 133:9
**DAVID** [1] - 2:9
**days** [3] - 19:25,
138:14, 139:6
**DC** [38] - 1:5, 1:15,
1:18, 1:25, 2:7, 3:10,
6:10, 7:22, 8:10,
22:22, 22:24, 23:10,
24:5, 24:10, 25:21,
28:16, 42:3, 43:22,
46:21, 48:24, 55:8,
55:9, 55:20, 55:21,
57:19, 58:3, 59:13,
59:14, 81:24,
109:24, 111:21,
122:24, 123:12,
130:6, 133:23, 139:7
**deal** [12] - 49:24, 80:4,
81:7, 86:6, 89:14,
104:20, 106:23,
106:25, 116:1,
118:2, 130:16, 131:5
**dealing** [1] - 106:20
**deals** [3] - 95:18,
103:8, 108:17
**Dear** [1] - 92:13
**decades** [1] - 108:9
**December** [1] - 70:17
**decide** [6] - 18:5,
22:19, 99:12, 99:18,
101:23, 117:17
**decided** [10] - 46:21,
47:13, 47:21, 55:25,
65:22, 101:10,
107:8, 117:7,
120:23, 144:8
**decides** [1] - 112:13
**deciding** [2] - 106:8,
106:22
**decision** [34] - 15:18,
18:20, 46:22, 46:24,
47:15, 50:18, 50:23,
61:8, 61:11, 62:4,
72:7, 72:9, 79:13,
90:8, 100:15,
100:16, 102:5,
102:7, 103:17,
104:7, 104:15,
104:18, 105:7,
112:23, 116:20,
120:8, 120:17,
123:1, 124:2, 141:3,
141:5, 144:7, 144:13

**decisions** [1] - 128:12
**declaration** [3] -
83:23, 92:10, 92:11
**deductions** [2] -
49:21, 59:9
**deed** [2] - 111:4, 111:5
**deeds** [1] - 111:3
**deep** [2] - 24:13, 24:21
**default** [2] - 133:25,
134:16
**defend** [1] - 110:8
**defendant** [7] - 38:18,
48:11, 88:11, 91:2,
91:6, 120:1, 130:4
**defendants** [18] -
5:25, 7:11, 7:20,
27:15, 41:19, 47:10,
49:14, 49:15, 50:24,
54:10, 56:21, 59:10,
66:18, 66:25, 68:21,
70:14, 122:9, 124:3
**Defendants** [2] - 1:7,
2:3
**defendants'** [11] -
16:20, 20:12, 24:15,
26:20, 35:25, 50:16,
58:19, 59:25, 91:2,
119:5, 123:22
**defense** [4] - 88:12,
88:25, 94:5, 123:2
**defer** [3] - 46:10,
125:4, 125:8
**deference** [14] - 42:5,
42:13, 45:25, 46:4,
46:6, 94:23, 94:25,
95:7, 98:16, 98:22,
99:9, 100:13,
109:14, 129:4
**deferential** [1] - 42:8
**deficiencies** [1] -
70:18
**defined** [3] - 9:5,
37:14, 106:17
**defines** [1] - 125:19
**defining** [1] - 85:14
**definitely** [1] - 86:16
**definition** [3] - 58:19,
69:1, 106:19
**definitive** [1] - 115:11
**delegate** [2] - 92:7,
92:24
**delegated** [1] - 53:2,
118:17, 142:17
**delegation** [2] - 33:25,
129:11
**deliberate** [1] - 90:13
**deliberately** [1] -
71:23
**delivered** [1] - 120:1
**democracy** [1] - 50:25

**Democrat** [1] - 126:19
**demonstrate** [3] -
65:5, 78:4, 124:3
**demonstrated** [1] -
41:7
**demonstrates** [2] -
50:1, 78:6
**demonstration** [1] -
25:9
**demonstrative** [2] -
122:7, 145:9
**denigrate** [1] - 108:22
**Department** [3] -
54:23, 91:1, 128:16
**dependent** [1] -
131:15
**deprived** [1] - 58:5
**DEPUTY** [2] - 3:4,
58:24
**DePuy** [1] - 33:3
**describe** [3] - 9:14,
72:8, 87:19
**described** [2] - 106:6,
111:14
**describing** [2] - 93:20,
112:19
**descriptions** [1] - 24:3
**deserves** [3] - 98:16,
109:13, 129:5
**designed** [1] - 121:13
**desire** [2] - 34:5,
34:22
**desk** [1] - 11:20
**detail** [2] - 47:11,
143:25
**detailed** [1] - 70:16
**detained** [1] - 135:9
**detention** [1] - 135:13
**determination** [1] -
56:13
**determine** [2] -
116:15, 137:21
**determined** [1] -
138:19
**develop** [1] - 103:1
**developed** [1] -
103:19
**development** [1] -
135:6
**devil** [3] - 100:23,
100:24, 101:3
**devoted** [1] - 42:20
**DeWitt** [1] - 93:17
**die** [1] - 134:7
**died** [2] - 134:6,
135:24
**difference** [3] - 20:20,
49:8, 71:5
**different** [27] - 9:19,
10:15, 15:10, 15:25,

22:7, 32:6, 45:21,
50:10, 50:11, 51:10,
67:6, 67:8, 69:5,
95:13, 101:16,
106:3, 106:6, 106:7,
109:21, 119:21,
120:17, 124:9,
124:13, 127:25,
131:19, 144:7
**differently** [4] - 21:19,
24:1, 24:14, 104:16
**difficult** [1] - 83:12
**difficulties** [3] - 25:12,
94:22, 123:21
**Diggs** [6] - 31:23,
31:25, 76:15, 77:10,
78:7, 92:12
**dime** [4] - 87:14,
91:22, 95:15, 109:18
**direct** [1] - 50:25
**directed** [1] - 11:12
**directly** [1] - 33:17
**disagree** [3] - 18:1,
51:8, 82:25
**disagrees** [1] - 31:19
**disapproval** [2] - 18:8,
18:12
**disapprove** [9] -
17:21, 17:25, 18:5,
18:21, 19:5, 19:10,
19:13, 20:1, 61:23
**disapproved** [1] -
108:6
**disapproves** [1] -
19:14
**discharge** [1] - 18:13
**discipline** [1] - 16:7
**discomfort** [1] - 142:5
**discrimination** [1] -
104:21
**discussed** [5] - 59:8,
62:16, 63:2, 68:1,
125:3
**Discussion** [1] - 128:6
**discussion** [10] -
26:16, 31:6, 34:4,
42:21, 43:11, 53:5,
76:6, 87:25, 102:2,
102:14
**dismantle** [1] - 144:14
**dispute** [7] - 32:1,
41:12, 45:3, 45:13,
47:6, 81:3, 82:16
**disputed** [1] - 81:4
**disrespectful** [1] -
72:3
**dissent** [2] - 129:12,
129:13
**distinction** [2] - 55:10,
56:3

distinguish [1] - 120:4
distribution [1] -
106:22
DISTRICT [4] - 1:1,
1:1, 1:3, 1:10
District [141] - 1:24,
3:5, 4:16, 6:2, 10:10,
15:6, 15:8, 15:13,
16:6, 20:11, 20:23,
22:1, 23:7, 23:12,
23:25, 24:10, 24:11,
25:3, 25:10, 26:8,
26:14, 27:7, 27:8,
28:7, 28:10, 28:12,
32:9, 41:6, 44:22,
44:25, 45:4, 47:6,
48:21, 48:25, 49:16,
49:18, 52:17, 53:2,
54:6, 54:13, 54:14,
54:15, 54:19, 54:25,
55:2, 55:5, 55:14,
56:2, 56:4, 56:10,
56:12, 56:14, 56:15,
56:18, 57:7, 59:6,
59:12, 63:11, 64:11,
65:25, 66:3, 67:11,
68:5, 68:12, 68:17,
68:25, 69:14, 70:25,
74:3, 74:18, 74:21,
75:25, 77:9, 80:12,
82:14, 87:14, 91:16,
92:17, 92:23, 93:22,
94:5, 94:11, 94:22,
95:12, 95:14, 95:22,
96:12, 96:14, 97:6,
99:25, 100:1,
101:15, 102:6,
102:13, 105:1,
105:13, 105:21,
106:9, 106:16,
106:24, 107:1,
107:5, 107:10,
108:3, 108:7,
108:18, 108:19,
110:25, 111:15,
114:13, 115:12,
118:17, 118:21,
121:8, 121:9, 123:1,
123:24, 124:4,
125:15, 125:21,
126:9, 127:14,
133:23, 137:15,
137:22, 139:10,
141:5, 141:7,
142:17, 142:24,
143:6, 143:13,
144:15, 144:17,
147:5, 147:8,
147:10, 147:12
District's [7] - 17:11,

18:10, 20:18, 50:6,
64:18, 82:14, 121:3
divide [1] - 110:13
divided [1] - 132:11
Docket [1] - 1:4
document [2] - 64:19,
121:3, 142:24
documents [1] -
142:22
dollars [4] - 49:12,
50:7, 55:17, 144:19
done [23] - 16:18,
17:14, 18:15, 63:7,
77:3, 77:12, 81:13,
81:23, 87:7, 92:22,
93:4, 105:15,
107:21, 110:5,
112:6, 112:25,
115:23, 116:9,
117:21, 131:23,
131:24, 132:10,
142:8
dong [1] - 37:15
doomsday [1] -
122:15
doubt [6] - 43:1,
44:15, 44:17, 82:12,
89:23, 135:16
doubts [1] - 41:10
down [13] - 59:2, 65:9,
99:3, 100:22,
100:24, 101:1,
101:22, 121:22,
127:6, 131:11,
131:12, 131:22,
131:23
drafters [2] - 50:5,
80:9
drafting [1] - 87:4
dramatic [4] - 49:8,
62:25, 79:8, 126:7
draw [1] - 106:13
drawn [3] - 26:18,
26:23, 27:11
drew [1] - 24:20
drill [1] - 65:9
driver [2] - 88:4
driving [1] - 91:12
drunk [3] - 88:4, 91:12
dry [3] - 76:24, 76:25,
135:22
due [2] - 91:17, 128:13
Dunn [13] - 3:10,
69:23, 76:7, 91:18,
97:18, 101:12,
102:2, 118:8, 129:9,
129:16, 132:5,
142:1, 145:10
DUNN [145] - 1:13, 3:9,
3:17, 5:16, 6:8, 6:13,

7:5, 8:1, 8:15, 8:18,
9:19, 10:3, 10:23,
11:11, 11:15, 11:19,
12:1, 12:6, 12:10,
12:25, 13:16, 13:22,
14:17, 15:5, 17:21,
17:25, 18:23, 19:2,
19:8, 19:11, 19:16,
19:18, 20:5, 21:3,
21:7, 21:13, 22:7,
22:15, 22:24, 23:6,
24:19, 25:19, 25:23,
25:25, 26:4, 27:5,
29:4, 29:12, 29:25,
30:3, 30:10, 30:14,
30:16, 30:18, 30:23,
31:4, 31:11, 31:22,
31:25, 32:22, 32:25,
33:8, 33:12, 33:19,
34:12, 34:15, 35:3,
35:10, 35:17, 35:23,
36:9, 36:20, 36:23,
37:3, 37:7, 37:9,
37:12, 37:17, 37:21,
38:5, 38:8, 38:21,
38:25, 39:7, 39:11,
39:18, 41:11, 42:12,
43:10, 43:19, 43:23,
44:8, 44:15, 45:1,
45:10, 45:14, 45:24,
46:10, 47:8, 47:14,
48:3, 48:11, 50:14,
50:20, 50:22, 51:17,
51:19, 52:11, 52:24,
53:12, 53:18, 53:21,
55:23, 59:6, 60:14,
60:19, 61:3, 61:7,
61:10, 61:16, 62:10,
62:22, 63:14, 63:18,
63:25, 64:16, 65:16,
66:17, 66:24, 67:2,
69:16, 118:10,
119:20, 120:20,
121:1, 124:20,
125:10, 126:18,
128:3, 142:2,
142:11, 144:2,
145:8, 145:16, 146:8
during [10] - 14:11,
19:25, 24:16, 31:6,
51:15, 61:23, 97:20,
134:10, 134:11,
136:8

# E

early [3] - 26:17,
29:22, 113:6
earn [1] - 66:12
earned [1] - 41:6
easier [1] - 43:15

easy [3] - 18:13, 31:2,
136:25
economic [1] - 39:4
effect [9] - 27:8,
39:20, 54:8, 62:6,
98:18, 108:20,
129:21, 130:24,
131:1
effecting [1] - 74:21
effectively [2] - 20:3,
58:9
effort [4] - 5:1, 5:6,
14:3, 32:14
EFROS [1] - 2:4
Efros [2] - 3:25, 4:1
eight [2] - 92:19,
114:11
eighty [2] - 66:11,
134:23
either [5] - 31:2,
44:13, 68:24, 118:3,
129:17
election [2] - 71:18,
71:24
Elections [1] - 46:23
elections [5] - 44:2,
44:9, 44:12, 70:20,
122:16
electors [1] - 125:21
eleven [1] - 65:23
Eleventh [1] - 78:23
eliminated [4] - 75:16,
75:17, 76:9, 107:19
eliminating [1] - 76:8
Ellen [1] - 3:24
ELLEN [1] - 2:4
ELMO [2] - 73:2, 73:5
elsewhere [2] - 106:1,
106:2
embedded [1] - 34:19
emergency [6] -
24:20, 98:2, 98:4,
98:6, 127:6, 127:11
Emmet [1] - 147:11
EMMET [1] - 1:10
emotional [1] - 138:13
emphasize [2] - 5:11,
60:13
employee [3] - 7:4,
26:7, 75:25
employees [2] -
114:11, 114:12
employers [1] -
105:13
employment [1] -
86:14
empowered [2] -
138:12, 138:21
en [7] - 46:24, 47:2,
50:18, 50:22, 102:5,

102:15, 104:18
enable [1] - 136:17
enact [12] - 11:7,
12:23, 20:8, 40:2,
48:20, 53:19, 63:3,
70:8, 73:10, 73:11,
83:8, 84:15
enacted [7] - 6:1,
15:11, 76:15, 84:13,
85:2, 113:3, 127:2
enacting [2] - 83:7,
87:5, 103:15
Enactment [1] - 75:1
enactment [5] - 39:6,
87:12, 103:3,
121:19, 143:3
enactments [2] -
90:12, 127:16
enacts [1] - 113:13
enclosing [1] - 143:13
encourage [1] -
125:10
end [2] - 135:6,
135:16, 136:4
endured [1] - 135:13
Energy [1] - 128:16
enforce [1] - 91:15
enforced [1] - 55:1
enforcing [1] - 72:20
England [1] - 100:22
ensued [1] - 3:3
enter [2] - 93:25,
94:18
entering [1] - 93:23
entire [7] - 14:23,
54:8, 74:9, 80:18,
106:15, 106:17,
129:1
entirely [2] - 50:10,
104:15
entirety [1] - 82:13
entities [2] - 41:5,
66:12
entitled [6] - 36:12,
53:15, 67:9, 95:3,
95:7, 137:11
equal [1] - 40:15
equality [1] - 59:11
erased [1] - 124:6
Eric [1] - 4:5
ERIC [1] - 2:10
especially [6] - 12:21,
14:11, 47:2, 99:19,
133:23, 142:11
ESQ [13] - 1:13, 1:13,
1:16, 1:17, 2:3, 2:4,
2:4, 2:5, 2:9, 2:9,
2:10, 2:10, 2:11
essential [2] - 8:7,
105:17

**essentially** [12] - 7:1, 7:3, 20:25, 29:21, 32:20, 52:5, 52:7, 52:21, 62:20, 85:13, 105:21, 134:23
**esteemed** [1] - 42:2
**et** [6] - 1:3, 1:6, 3:6, 29:10, 37:6, 147:8
**evaluate** [1] - 44:19
**eve** [1] - 134:13
**Evening** [1] - 29:7
**event** [2] - 122:4, 125:18
**events** [1] - 18:7
**evidence** [1] - 32:3
**evidentiary** [2] - 134:4, 134:13
**exact** [1] - 89:19
**exactly** [14] - 37:7, 76:3, 76:17, 77:20, 86:5, 86:8, 87:8, 87:19, 88:19, 90:19, 112:11, 114:15, 117:12, 141:4
**examination** [1] - 74:16
**example** [9] - 22:16, 47:18, 48:17, 59:6, 59:11, 87:23, 88:4, 93:21, 126:4
**examples** [2] - 59:9, 108:9
**exceeded** [1] - 91:10
**exceeding** [1] - 26:9
**exceeds** [1] - 130:8
**excellent** [2] - 5:4, 139:25
**except** [3] - 35:24, 70:14, 125:22
**excludes** [1] - 125:24
**excluding** [1] - 63:23
**exclusive** [3] - 35:14, 107:4, 137:21
**exclusively** [9] - 8:9, 8:24, 54:5, 54:6, 54:15, 55:4, 56:11, 56:18, 74:2
**excuse** [4] - 14:25, 30:16, 58:21, 101:19
**exercise** [1] - 118:15
**exercising** [2] - 56:3, 107:7
**Exhibit** [1] - 70:14
**exist** [3] - 16:8, 50:9, 65:1
**existed** [5] - 30:11, 35:14, 40:24, 57:12, 65:14
**existing** [17] - 32:23, 35:12, 35:20, 36:2,

36:10, 37:24, 48:16, 62:23, 63:9, 63:22, 64:8, 64:15, 67:14, 67:23, 74:11, 81:21, 128:1
**expansive** [1] - 69:1
**expect** [2] - 69:8, 69:9
**expediting** [2] - 86:2, 115:6
**expend** [1] - 52:19
**expended** [2] - 5:6, 75:24
**expenditure** [10] - 22:9, 23:17, 24:8, 26:9, 26:11, 27:22, 27:25, 28:4, 28:11, 50:7
**expenditures** [2] - 80:5, 131:13
**experience** [1] - 128:14
**experiment** [1] - 65:22
**expert** [7] - 95:1, 95:4, 125:6, 128:20, 128:22
**expertise** [3] - 42:9, 128:14, 129:3
**experts** [1] - 128:25
**explain** [1] - 54:22
**explained** [2] - 72:18, 92:13
**explains** [2] - 63:10, 70:13
**explanation** [1] - 34:8
**explicit** [2] - 33:24, 48:18
**express** [9] - 4:25, 48:4, 48:6, 48:13, 53:4, 64:21, 72:10, 144:3, 144:6
**expressed** [2] - 36:18, 129:14, 140:25
**expressing** [1] - 71:1
**expressly** [4] - 62:21, 64:25, 65:7, 143:20
**extend** [1] - 78:24
**extent** [6] - 49:2, 64:24, 135:13, 136:12, 138:4, 144:17
**extinguish** [1] - 134:25
**extinguished** [4] - 134:23, 135:1, 135:18, 136:23
**extra** [1] - 126:10
**extraordinary** [1] - 66:4
**extreme** [1] - 25:4
**extremely** [5] - 49:15,

102:4, 144:15, 144:22, 145:21
**eye** [1] - 135:22

# F

**F.3d** [4] - 128:16, 128:18, 138:24, 139:2
**F.Supp.2d** [2] - 138:24, 139:1
**face** [2] - 125:12, 144:4
**facilitated** [1] - 32:2
**facing** [2] - 86:11, 86:12
**fact** [23] - 30:10, 31:20, 34:18, 39:4, 41:24, 42:14, 48:22, 56:6, 71:23, 81:3, 92:6, 106:1, 106:24, 108:11, 117:19, 121:9, 124:3, 124:4, 125:17, 126:7, 126:11, 126:22, 129:16
**facts** [3] - 39:13, 54:21, 97:18
**failing** [1] - 17:21
**fails** [1] - 61:23
**failure** [3] - 18:20, 19:9, 25:2
**fair** [5] - 12:12, 51:21, 72:22, 93:17, 119:19
**fairly** [1] - 31:20
**falls** [1] - 125:7
**false** [1] - 88:23
**familiar** [3] - 55:22, 122:13, 140:13
**families** [1] - 135:23
**family** [1] - 101:4, 135:22, 135:24
**far** [5] - 46:6, 47:7, 61:15, 61:16, 127:15
**fashioned** [1] - 73:6
**fast** [2] - 115:2, 115:4
**fathers** [1] - 140:18
**Fauntroy** [4] - 92:7, 92:9, 92:25, 96:24
**favor** [5] - 71:6, 85:6, 85:8, 110:3, 115:21
**FCC** [1] - 79:20
**fear** [3] - 122:22, 123:22, 123:24
**federal** [41] - 9:2, 14:13, 15:8, 16:11, 21:6, 21:12, 21:13, 21:17, 22:23, 24:1, 25:17, 54:23, 55:3, 55:16, 57:6, 58:13,

59:8, 59:11, 59:20, 68:18, 74:14, 86:12, 88:21, 89:3, 89:17, 95:14, 99:24, 106:13, 106:17, 110:14, 111:1, 111:5, 113:15, 123:24, 124:4, 131:11, 131:22, 132:12, 132:13
**Federal** [2] - 79:11, 123:1
**fees** [2] - 22:15, 22:17
**felt** [2] - 8:22, 144:3
**few** [7] - 5:9, 60:6, 66:23, 92:18, 118:9, 121:17, 128:7
**field** [1] - 128:14
**fight** [1] - 91:14
**figuring** [1] - 32:12
**file** [7] - 4:17, 4:18, 5:2, 109:10, 133:24, 134:24, 135:2
**filed** [10] - 4:24, 5:12, 6:3, 9:25, 92:9, 92:11, 98:20, 108:20, 133:17, 135:5
**files** [2] - 111:4, 129:8
**filing** [3] - 7:15, 16:21, 20:12
**filings** [1] - 47:15
**final** [3] - 19:6, 117:1
**finally** [2] - 74:19, 137:6, 139:13
**finances** [1] - 108:3
**financial** [1] - 16:11
**findings** [1] - 125:17
**fine** [5] - 57:5, 59:3, 87:2, 87:17, 114:19
**firing** [1] - 101:9
**firm** [3] - 3:18, 4:4
**firmly** [2] - 112:1, 136:14, 138:1
**first** [28] - 4:13, 5:8, 7:6, 17:5, 21:17, 29:4, 38:22, 54:8, 70:2, 74:25, 75:10, 76:5, 78:5, 78:21, 80:1, 85:20, 86:7, 90:25, 92:22, 102:16, 104:4, 110:21, 116:6, 116:10, 118:12, 128:10, 132:3, 138:11
**fiscal** [17] - 16:7, 66:4, 110:6, 110:16, 110:17, 114:2, 114:3, 114:5,

114:21, 116:1, 123:8, 131:8, 131:10, 131:14, 132:8, 132:9
**fit** [1] - 60:1
**five** [4] - 19:24, 109:2, 126:23, 129:7
**five-person** [1] - 109:2, 129:7
**flat** [1] - 100:25
**Flexner** [1] - 1:14
**flip** [1] - 33:2
**floor** [3] - 18:14, 31:6, 59:3
**focus** [3] - 5:13, 56:23, 74:5
**folds** [1] - 28:18
**folks** [2] - 58:22, 71:21
**follow** [5] - 14:7, 33:9, 70:1, 113:2, 113:4
**followed** [4] - 22:3, 118:19, 121:12, 134:2
**following** [5] - 3:3, 31:14, 86:11, 108:14, 125:16
**follows** [1] - 27:20
**Footnote** [2] - 50:24, 51:3
**FOR** [1] - 1:1
**foregone** [1] - 123:19
**foreign** [1] - 79:2
**forever** [6] - 37:1, 37:3, 37:5, 37:16, 63:7, 137:21
**form** [2] - 9:7, 9:9
**format** [3] - 144:23, 144:24, 145:5
**forth** [1] - 29:14
**forty** [36] - 6:24, 14:2, 14:3, 14:10, 14:11, 15:9, 16:13, 28:5, 38:19, 40:7, 41:1, 65:12, 66:11, 77:2, 82:15, 82:25, 87:3, 87:7, 93:1, 93:2, 101:7, 101:8, 101:17, 110:6, 112:7, 113:8, 115:8, 116:7, 116:9, 116:10, 131:19, 131:24, 132:10, 139:7
**forty-first** [1] - 116:10
**forty-one** [1] - 115:8
**forward** [9] - 3:7, 37:16, 38:10, 52:18, 72:19, 81:12, 94:10, 120:6, 142:4
**four** [1] - 42:20

**frankly** [2] - 13:19, 127:17
**frequently** [1] - 126:2
**frustrated** [1] - 101:7
**full** [4] - 14:14, 39:11, 139:8, 139:11
**fully** [4] - 41:17, 41:22, 43:19, 63:4
**function** [44] - 49:12, 49:19, 49:21, 50:7, 55:7, 55:15, 55:18, 55:20, 55:24, 56:25, 57:3, 57:5, 57:7, 57:8, 57:14, 57:17, 57:19, 58:18, 58:19, 65:19, 75:3, 75:20, 75:21, 89:3, 90:21, 105:18, 105:24, 106:24, 107:6, 107:8, 107:12, 107:15, 107:17, 107:18, 107:19, 108:1, 108:2, 126:6, 126:11, 126:12
**functions** [13] - 49:16, 50:4, 54:3, 54:11, 54:17, 56:18, 68:1, 73:24, 74:1, 88:21, 103:10, 105:5, 107:16
**funding** [1] - 127:6
**funds** [21] - 22:9, 22:12, 23:13, 25:16, 75:8, 94:1, 97:22, 97:24, 97:25, 98:4, 98:6, 106:11, 106:14, 106:20, 106:21, 125:22, 125:24, 127:12, 145:24, 146:1
**future** [11] - 63:13, 63:14, 63:23, 64:15, 65:4, 74:6, 74:7, 78:17, 81:12, 81:13, 81:18

**G**

**GAO** [19] - 42:12, 42:15, 42:16, 42:20, 43:20, 94:25, 98:15,

98:25, 108:15, 125:2, 125:5, 125:11, 128:10, 128:12, 128:13, 128:19, 128:20, 129:5, 130:18
**General** [21] - 2:5, 25:5, 42:3, 42:10, 43:21, 44:9, 44:16, 44:21, 45:8, 45:16, 45:23, 69:8, 74:15, 118:13, 119:22, 122:13, 123:9, 126:5, 126:20, 127:19, 143:22
**general** [14] - 3:21, 11:21, 11:23, 22:24, 23:11, 23:12, 24:10, 25:21, 28:16, 38:10, 42:1, 46:25, 57:19, 82:9
**general's** [1] - 12:14
**General's** [10] - 3:25, 43:23, 59:19, 88:23, 91:4, 121:6, 123:7, 124:9, 142:12, 143:18
**generally** [1] - 9:1
**GENEUS** [1] - 1:22
**Geneus** [2] - 147:3, 147:21
**gestalt** [2] - 31:15, 65:20
**GILPATRICK** [1] - 1:17
**Gilpatrick** [1] - 3:19
**given** [10] - 5:17, 7:13, 22:2, 26:13, 44:24, 80:22, 105:3, 107:3, 130:17, 130:22
**glad** [4] - 4:17, 20:12, 66:10, 68:20
**gonna** [6] - 86:20, 86:24, 91:13, 96:14, 106:23, 135:15
**governance** [1] - 144:18
**governing** [3] - 64:18, 121:3, 142:22
**government** [37] - 22:23, 26:7, 26:8, 46:16, 46:17, 46:18, 47:6, 51:22, 52:22, 64:24, 67:11, 68:18, 74:18, 74:21, 75:25, 81:24, 87:14, 88:21, 89:3, 91:14, 96:11, 96:14, 97:21, 98:4, 98:9, 110:25, 127:6, 127:14, 128:15,

129:1, 131:11, 131:22, 132:13, 135:4, 138:20
**Government** [1] - 6:10
**grab** [1] - 20:15
**grant** [2] - 31:18, 67:18
**granting** [2] - 69:13, 138:15
**graphically** [1] - 72:23
**GRAY** [1] - 1:6
**Gray** [3] - 3:6, 3:14, 147:8
**great** [16] - 14:18, 22:16, 47:18, 49:23, 69:9, 69:23, 73:5, 99:3, 115:6, 116:21, 130:13, 139:22, 139:23, 140:1, 142:8
**greater** [4] - 41:4, 67:11, 67:18, 67:24
**Greater** [12] - 43:3, 53:21, 54:7, 54:21, 55:6, 56:2, 56:22, 57:5, 57:23, 58:13, 105:6, 126:4
**greatest** [2] - 64:23, 144:17
**greatly** [1] - 125:18
**group** [2] - 44:3, 133:11
**Guard** [2] - 59:14, 68:4
**guess** [8] - 9:22, 12:3, 14:6, 14:7, 22:13, 72:7, 103:17, 113:7
**guest** [1] - 60:13
**guided** [1] - 123:15
**guy** [1] - 88:9
**guy..** [1] - 73:6

**H**

**Hale** [1] - 4:3
**hall** [1] - 59:2
**hand** [1] - 72:24
**handed** [1] - 42:19
**handled** [1] - 131:25
**handout** [1] - 38:7
**hands** [3] - 101:11, 101:22, 133:16
**happy** [2] - 110:8, 144:25
**hard** [5] - 6:16, 42:16, 46:17, 68:7, 145:2
**harder** [1] - 59:17
**hardship** [1] - 25:4
**harm** [4] - 110:4, 115:9, 115:12, 116:9
**hazardous** [1] - 89:14

**heading** [1] - 80:2
**hear** [7] - 4:23, 5:8, 60:4, 60:7, 81:4, 113:6, 139:23
**heard** [4] - 44:10, 76:14, 77:7, 86:8
**hearing** [10] - 5:18, 29:2, 29:3, 30:8, 30:11, 134:4, 134:8, 134:13, 139:20, 145:21
**HEARING** [1] - 1:9
**hearings** [5] - 18:10, 18:11, 55:1, 108:11, 108:13
**hearsay** [2] - 31:3, 81:1
**heart** [4] - 133:7, 139:17, 141:6, 141:19
**heartbreaking** [1] - 138:13
**heartfelt** [1] - 70:22
**heartstrings** [2] - 133:6, 139:16
**heavily** [1] - 119:16
**held** [4] - 27:7, 87:25, 108:13, 128:6
**help** [2] - 43:14, 143:21
**helpful** [9] - 36:11, 53:24, 67:24, 99:6, 120:2, 139:19, 139:21, 144:23, 145:22
**helping** [1] - 68:8
**Hennessy** [1] - 15:1
**hereby** [1] - 147:6
**heroes** [7] - 133:15, 134:6, 135:2, 135:24, 136:15, 136:24, 138:4
**Hessey** [38] - 46:23, 47:2, 47:18, 47:20, 102:3, 102:4, 104:6, 125:13
**hide** [1] - 100:25
**high** [2] - 40:25, 139:10
**highest** [4] - 44:24, 46:24, 46:25, 102:5
**highlighted** [1] - 56:6
**historical** [2] - 29:24, 81:8
**historically** [1] - 40:7
**history** [23] - 17:11, 24:13, 29:8, 31:5, 34:9, 34:11, 34:13, 34:16, 34:17, 35:21, 41:21, 47:3, 49:4,

49:7, 49:10, 49:24, 49:25, 50:12, 55:22, 57:10, 66:13, 78:13
**hits** [1] - 83:17
**hold** [2] - 108:11, 110:3
**Home** [35] - 6:5, 8:9, 8:14, 10:15, 15:6, 15:11, 19:18, 24:11, 26:14, 28:19, 28:24, 29:9, 29:23, 33:24, 34:19, 39:6, 41:13, 46:4, 46:12, 48:23, 64:1, 64:20, 64:22, 73:13, 73:16, 74:9, 76:11, 96:22, 99:19, 118:20, 125:6, 127:2, 142:19, 143:5, 143:23
**home** [6] - 65:22, 76:14, 76:19, 83:24, 92:14, 96:15
**Honor** [83] - 3:4, 3:9, 3:12, 3:17, 3:24, 5:16, 6:8, 6:13, 7:16, 8:18, 10:3, 11:11, 12:6, 12:25, 14:17, 15:5, 20:5, 25:19, 25:23, 27:5, 29:12, 30:23, 35:3, 35:23, 38:14, 38:16, 38:21, 39:10, 42:15, 43:10, 43:19, 44:8, 45:2, 45:24, 47:8, 49:5, 50:15, 51:17, 51:19, 52:11, 52:24, 58:25, 61:10, 62:14, 63:25, 64:17, 66:24, 69:7, 70:2, 70:10, 72:23, 73:5, 85:25, 87:16, 89:13, 90:1, 90:18, 91:17, 94:23, 96:8, 98:14, 98:15, 99:6, 100:17, 101:5, 102:1, 110:1, 112:19, 118:10, 120:1, 120:23, 122:10, 123:2, 123:6, 124:2, 124:25, 125:11, 128:3, 132:1, 142:2, 144:5, 145:8, 146:8
**honor** [1] - 3:13
**Honor's** [7] - 7:8, 31:13, 32:25, 61:19, 62:7, 66:19, 110:9
**HONORABLE** [1] - 1:10
**Honorable** [1] - 147:11

**hook** [1] - 31:1
**hope** [4] - 131:22, 131:23, 143:23, 143:24
**hoped** [1] - 13:2
**hopefully** [3] - 28:23, 62:7, 115:3
**hoping** [1] - 139:20
**horrible** [3] - 134:11, 135:8, 136:1
**horrific** [1] - 136:3
**horror** [2] - 135:12, 135:21
**host** [1] - 114:16
**hostages** [1] - 134:22
**hourglass** [1] - 140:7
**House** [21] - 15:15, 16:2, 34:19, 50:1, 57:12, 95:6, 106:6, 108:21, 108:23, 109:1, 109:13, 109:14, 126:15, 126:21, 126:22, 129:6, 129:7, 129:8, 129:10, 130:24
**Houses** [4] - 15:7, 15:19, 39:25, 59:18
**human** [1] - 104:20
**hurdle** [1] - 83:12
**hurly** [1] - 90:11
**hurly-burly** [1] - 90:11
**husher** [1] - 128:4
**Huvelle** [1] - 144:2
**Huvelle's** [2] - 141:3, 143:19
**hypothetical** [7] - 5:23, 6:16, 7:19, 9:23, 86:7, 110:21

## I

**i.e** [1] - 49:21
**idea** [1] - 9:1
**identical** [1] - 79:16
**identify** [1] - 3:8
**ignore** [4] - 101:22, 101:24, 103:24, 105:4
**illegal** [6] - 12:22, 16:22, 89:1, 94:14, 124:1, 124:5
**illustrates** [1] - 58:1
**imagine** [1] - 90:6
**immune** [1] - 130:10
**immutable** [1] - 73:17
**impact** [1] - 106:10
**impacts** [1] - 59:19
**impeach** [1] - 33:20
**implement** [2] - 14:9, 85:11

**implicated** [1] - 21:5
**implications** [3] - 25:8, 122:10, 122:11
**important** [28] - 12:17, 12:18, 14:18, 17:13, 25:10, 26:12, 27:5, 28:20, 32:12, 39:14, 40:6, 41:17, 51:9, 56:20, 57:24, 59:22, 62:12, 66:20, 66:21, 102:4, 102:25, 116:19, 119:2, 121:15, 122:8, 136:2, 137:7, 140:18
**impose** [2] - 36:24, 59:7
**impressed** [1] - 90:5
**impression** [1] - 24:14
**imprisoned** [1] - 133:12
**improper** [1] - 126:20
**improve** [1] - 82:13
**inaccuracy** [1] - 145:11
**inaction** [3] - 17:19, 17:23, 17:24
**inappropriate** [1] - 58:9
**inaugural** [1] - 16:16
**incarcerated** [1] - 133:19
**include** [3] - 49:18, 51:5, 144:6
**included** [1] - 53:3
**includes** [2] - 78:18, 87:10
**including** [6] - 63:1, 74:9, 74:10, 93:9, 131:2, 133:14
**income** [3] - 22:22, 49:19, 59:7
**inconceivable** [1] - 76:21
**inconsistent** [1] - 97:10
**incorrect** [3] - 44:18, 122:7, 129:16
**indeed** [11] - 11:6, 29:10, 51:3, 57:16, 59:20, 134:17, 136:18, 136:19, 137:9, 138:7, 139:20
**independently** [1] - 30:10
**indispensable** [1] - 95:9
**individual** [4] - 7:25, 8:1, 10:2, 40:13
**individually** [1] - 45:21

**individuals** [4] - 4:19, 29:18, 103:5, 134:24
**inequitable** [1] - 94:7
**Inferences** [1] - 90:10
**inform** [2] - 29:25, 31:14
**information** [1] - 33:12
**informative** [1] - 126:14
**informed** [1] - 11:22
**informs** [2] - 33:13
**Initiative** [4] - 39:19, 51:2, 59:15, 125:14
**initiative** [7] - 4:17, 102:12, 102:18, 103:7, 103:19, 104:3, 125:20
**injunction** [1] - 115:19
**injunctions** [1] - 111:9
**ink** [2] - 76:24, 76:25
**inquired** [1] - 60:19
**INS** [1] - 15:18
**insisted** [1] - 72:18
**instance** [1] - 45:11
**instances** [1] - 81:19
**instant** [1] - 104:8
**instead** [2] - 115:8, 116:10
**institution** [2] - 93:13, 97:8
**instructive** [2] - 43:9, 43:10
**insufficient** [1] - 138:6
**insurance** [1] - 105:12
**intact** [1] - 84:1
**intend** [1] - 24:3
**intended** [10] - 37:4, 48:9, 63:16, 78:13, 82:13, 82:17, 82:20, 103:5, 144:16
**intent** [11] - 63:20, 82:6, 82:7, 82:24, 101:24, 102:18, 102:22, 103:14, 103:15, 103:22
**intentionally** [1] - 145:15
**interested** [2] - 11:13, 109:6
**interesting** [16] - 4:15, 12:6, 30:13, 30:14, 30:19, 30:20, 31:12, 32:5, 32:19, 33:1, 33:21, 45:5, 66:21, 67:20, 136:7, 138:8
**interplay** [1] - 37:13
**interpret** [1] - 64:13
**interpretation** [12] - 8:14, 33:9, 34:3,

46:2, 46:3, 46:9, 46:11, 59:23, 59:25, 102:21, 138:18
**interpretations** [3] - 90:14, 101:23, 103:25
**interpreted** [1] - 79:3
**interpreting** [2] - 79:15, 79:16
**intersects** [1] - 57:9
**intervene** [2] - 134:14, 135:5
**intimately** [1] - 29:18
**intrabranch** [1] - 45:3
**introduce** [1] - 3:16
**introduced** [2] - 14:12, 14:13
**invalid** [6] - 88:18, 97:11, 110:3, 114:18, 130:7, 130:23
**involve** [1] - 133:8
**involved** [8] - 24:2, 29:18, 33:17, 33:19, 33:20, 33:21, 56:24, 87:4
**involvement** [1] - 55:15
**involves** [1] - 8:13
**Iran** [4] - 133:12, 133:18, 133:20, 134:21
**Iranians'** [1] - 137:24
**irrelevant** [1] - 119:3
**Irvin** [1] - 3:13
**IRVIN** [1] - 2:3
**ish** [1] - 33:4
**issue** [13] - 8:21, 26:22, 38:11, 63:5, 66:20, 81:17, 85:13, 89:21, 95:3, 99:17, 112:13, 124:15, 137:6
**issued** [3] - 42:2, 42:3, 133:2
**issues** [7] - 17:6, 42:9, 42:19, 42:21, 62:8, 98:22, 139:13
**issuing** [1] - 138:10
**item** [1] - 92:16
**item-by-item** [1] - 92:16
**itself** [10] - 10:15, 16:1, 19:3, 22:3, 54:22, 121:4, 137:5, 139:15, 143:5, 143:12

## J

**Jackson** [8] - 46:23, 50:13, 50:14, 51:3, 61:25, 102:3, 104:17, 125:13
**Jeff** [1] - 93:16
**jeopardy** [1] - 86:18
**job** [5] - 86:14, 111:3, 139:25, 142:8
**joining** [1] - 109:6
**joint** [2] - 19:25, 108:6
**JUDGE** [1] - 1:10
**judge** [1] - 124:5
**Judge** [11] - 89:20, 91:5, 100:19, 102:8, 110:8, 123:1, 138:12, 141:3, 143:19, 144:2, 147:12
**Judge's** [1] - 120:17
**judgment** [1] - 66:8
**judgments** [1] - 55:1
**judicial** [5] - 29:10, 78:25, 117:25, 118:4, 130:10
**judiciary** [1] - 138:22
**July** [3] - 110:17, 110:18, 110:21
**juncture** [1] - 69:10
**June** [1] - 113:17
**jurisdiction** [20] - 5:13, 5:20, 6:6, 7:9, 7:25, 8:2, 8:17, 8:20, 8:23, 8:25, 9:2, 10:13, 10:17, 10:21, 11:1, 46:25, 117:1, 117:15, 127:23, 135:21
**jurisdictional** [1] - 9:21
**jurisdictions** [1] - 55:19
**jury** [1] - 15:2, 130:14
**just-in-case** [1] - 127:5
**justice** [1] - 79:13, 138:13
**Justice** [3] - 62:2, 91:1, 119:17
**justification** [1] - 138:15

## K

**KAREN** [1] - 1:13
**Karen** [1] - 3:9
**keep** [6] - 46:18, 67:5, 97:21, 98:4, 98:9, 107:24

**key** [5] - 76:20, 77:6, 77:24, 79:8, 101:14
**kind** [3] - 40:18, 89:8, 135:12
**known** [3] - 107:22, 134:18, 134:19
**knows** [4] - 12:21, 30:5, 84:4, 123:9
**kosher** [1] - 104:5

## L

**Labor** [3] - 53:22, 54:23, 105:7
**labor** [4] - 105:15, 105:16, 106:3, 107:2
**laid** [3] - 77:11, 77:13, 105:13
**land** [2] - 117:9
**landscape** [1] - 31:16
**lane** [1] - 99:4
**language** [27] - 27:3, 27:6, 27:10, 35:22, 36:17, 37:1, 48:10, 49:14, 50:3, 52:4, 57:13, 62:2, 62:5, 63:21, 64:12, 65:10, 67:3, 77:7, 78:9, 78:15, 78:24, 79:16, 81:18, 120:9, 128:11
**larger** [2] - 28:18, 87:11
**Larry** [1] - 4:4
**last** [10] - 14:11, 69:21, 73:25, 75:23, 100:23, 108:5, 110:6, 120:17, 131:4, 132:10
**late** [2] - 100:20, 122:3
**late-breaking** [1] - 122:3
**latter** [1] - 84:1
**law** [140] - 3:18, 6:1, 6:21, 7:21, 11:6, 11:7, 11:8, 11:16, 11:25, 12:8, 12:13, 12:14, 12:17, 12:22, 12:23, 12:24, 13:4, 13:21, 16:25, 18:6, 18:10, 18:22, 18:25, 19:2, 19:5, 19:7, 19:10, 19:15, 27:12, 32:23, 35:12, 35:14, 35:20, 36:2, 36:6, 36:10, 37:24, 40:3, 42:14, 43:16, 46:1, 46:5, 46:7, 48:16, 49:16, 55:2, 55:4, 55:8, 56:9, 56:10, 56:11, 56:16, 56:17,

58:6, 58:10, 58:13, 61:5, 61:21, 62:23, 62:24, 63:9, 63:22, 63:23, 64:8, 64:15, 65:13, 67:15, 67:23, 70:8, 70:15, 70:18, 73:10, 74:12, 81:21, 83:7, 84:11, 84:23, 85:12, 85:25, 87:21, 88:4, 88:5, 88:7, 88:25, 90:21, 91:15, 94:24, 95:1, 97:14, 99:11, 99:23, 100:14, 100:23, 100:25, 101:3, 101:11, 101:13, 101:21, 101:22, 102:16, 104:1, 109:15, 110:3, 110:25, 111:1, 111:5, 112:2, 112:19, 113:2, 113:4, 114:24, 117:6, 117:8, 117:10, 117:12, 117:13, 117:14, 117:19, 123:25, 124:5, 125:5, 125:24, 127:12, 127:15, 128:1, 129:3, 129:24, 130:7, 130:10, 130:23, 130:25, 132:2, 136:22, 138:17, 139:12
**lawful** [11] - 8:12, 11:16, 11:19, 11:23, 34:14, 71:8, 93:18, 100:4, 111:19, 117:19, 141:23
**LAWRENCE** [1] - 2:9
**laws** [9] - 16:24, 99:25, 100:1, 100:22, 101:1, 103:16, 125:21, 125:22
**lawsuit** [8] - 6:3, 45:22, 110:20, 118:1, 133:17, 136:8, 136:10, 138:25
**lawyer** [1] - 12:21
**lawyers'** [1] - 98:25
**lead** [3] - 3:18, 133:9, 133:10
**leader** [1] - 109:3
**leaders** [2] - 109:4, 109:5
**leading** [2] - 29:22, 39:2

**learned** [2] - 68:14, 135:5
**least** [2] - 81:19, 116:14
**leave** [4] - 13:12, 83:25, 92:15, 110:1
**leaving** [2] - 112:24, 135:24
**led** [2] - 13:4, 14:2
**left** [5] - 9:22, 47:4, 76:16, 76:17, 113:6
**legal** [24] - 12:15, 14:22, 16:4, 16:19, 17:5, 31:8, 40:8, 40:21, 40:22, 42:13, 44:18, 44:24, 45:8, 60:20, 65:17, 65:18, 66:8, 70:18, 72:20, 85:22, 100:13, 108:20, 130:25, 137:10
**legality** [1] - 123:16
**legislate** [3] - 48:24, 54:14, 54:20
**legislates** [1] - 59:13
**legislation** [29] - 6:1, 14:12, 14:13, 17:20, 18:4, 18:6, 19:14, 21:24, 22:2, 40:2, 64:18, 77:1, 77:12, 79:5, 80:9, 93:7, 104:9, 104:10, 108:7, 113:10, 117:20, 121:9, 129:18, 129:19, 129:20, 136:12, 137:17, 143:10
**legislative** [22] - 31:5, 34:9, 34:10, 34:12, 34:15, 34:17, 35:21, 41:21, 41:24, 41:25, 47:3, 49:4, 49:6, 49:10, 49:24, 49:25, 50:11, 57:10, 78:13, 82:23, 96:16, 124:22
**legislators** [1] - 31:6
**legislature** [9] - 19:20, 55:9, 55:10, 56:1, 56:15, 58:12, 82:22, 96:17, 101:24
**legitimacy** [1] - 17:13
**lend** [1] - 36:24
**less** [2] - 71:10, 90:3
**letter** [6] - 70:17, 72:13, 72:14, 72:15, 72:16, 92:13
**level** [3] - 17:12, 25:13, 40:25
**lie** [1] - 8:3
**light** [2] - 54:9, 103:13

**likely** [3] - 5:19, 68:6, 68:8
**limit** [2] - 37:4, 48:6
**limitation** [18] - 34:25, 35:9, 48:5, 53:7, 53:23, 78:1, 78:2, 79:7, 79:19, 79:23, 80:1, 80:8, 83:14, 83:15, 93:10, 119:18, 120:9
**Limitations** [3] - 36:13, 53:15, 67:9
**limitations** [23] - 36:15, 36:16, 37:23, 51:4, 64:21, 64:25, 73:12, 73:14, 77:22, 80:1, 80:3, 80:5, 83:5, 83:9, 83:11, 83:12, 83:17, 93:9, 115:13, 121:21, 121:24, 122:1, 122:5
**limited** [2] - 96:15, 117:12
**limits** [4] - 50:25, 104:19, 104:23, 104:25
**line** [9] - 21:2, 43:2, 55:11, 56:22, 57:24, 83:19, 84:5, 91:16, 92:16
**lined** [1] - 135:11
**list** [2] - 58:16, 60:1
**listened** [1] - 135:23
**lists** [2] - 51:4, 68:3
**litigate** [2] - 115:24, 132:15
**litigated** [1] - 114:20
**litigating** [1] - 111:19, 111:20, 111:21, 133:22
**litigation** [3] - 111:14, 111:18, 139:15
**lives** [3] - 134:12, 136:4
**LLP** [2] - 1:14, 1:17
**local** [45] - 8:4, 8:5, 21:18, 21:19, 22:20, 24:5, 24:7, 24:18, 24:20, 47:20, 49:11, 50:7, 55:7, 55:9, 55:15, 55:17, 55:18, 55:20, 55:23, 56:1, 56:15, 56:19, 57:3, 57:5, 57:19, 57:20, 57:22, 64:24, 75:11, 75:16, 97:24, 97:25, 106:9, 106:12, 106:18, 110:15, 113:16, 117:6, 117:7, 117:14,

126:11, 132:12, 144:18
**locally** [2] - 21:1, 106:22
**locals** [1] - 105:22
**located** [2] - 25:17, 28:7
**location** [2] - 95:20, 109:17
**long-serving** [1] - 100:3
**Longshoreman's** [1] - 56:7
**Look** [1] - 114:17
**look** [19] - 14:19, 22:17, 35:21, 36:11, 37:18, 41:2, 51:6, 72:1, 74:24, 83:5, 85:4, 100:16, 117:16, 119:6, 141:2, 141:14, 143:24, 143:25
**looked** [2] - 9:7, 42:15
**looking** [6] - 43:16, 57:2, 119:9, 119:13, 142:4
**loophole** [1] - 82:18
**loosen** [1] - 65:23
**loosened** [1] - 15:25
**loss** [1] - 86:13
**Louisiana** [4] - 79:10, 119:9, 119:23, 120:8
**low** [1] - 71:25
**lucky** [1] - 98:6

## M

**machine** [1] - 1:20
**magnitude** [1] - 13:11
**maintains** [1] - 83:23
**Major** [1] - 12:7
**majority** [3] - 79:14, 109:3, 109:4
**Man** [1] - 100:18
**managed** [1] - 68:16
**Management** [1] - 74:14
**mandated** [2] - 49:1, 127:15
**mandatory** [1] - 58:4
**marijuana** [3] - 18:10, 29:3, 108:10
**mark** [1] - 94:9
**marriage** [2] - 40:17, 59:11
**material** [1] - 81:3
**matter** [13] - 17:3, 19:5, 23:19, 23:20, 44:19, 45:21, 60:25, 99:11, 105:25,

117:15, 124:10,
147:7, 147:16
**mattered** [1] - 65:19
**matters** [6] - 45:18,
58:14, 58:15, 95:2,
104:20, 118:9
**Mayer** [3] - 1:17, 3:19,
3:20
**Mayor** [56] - 3:13,
5:24, 6:1, 7:15, 7:19,
7:21, 8:6, 9:10, 9:11,
11:5, 11:12, 11:15,
13:2, 13:21, 20:3,
21:9, 21:11, 37:5,
38:10, 45:14, 45:22,
46:19, 46:20, 51:22,
60:16, 60:22, 61:1,
70:3, 70:7, 70:15,
70:20, 70:24, 71:7,
75:14, 84:13, 84:15,
84:16, 87:8, 87:10,
93:16, 96:17, 97:20,
99:20, 100:10,
103:2, 110:14,
111:23, 112:7,
113:12, 115:24,
117:18, 118:1,
131:16, 132:11,
141:22
**Mayor's** [4] - 11:6,
11:20, 111:2, 141:1
**McConnell** [8] - 43:5,
43:8, 46:22, 57:25,
58:1, 58:2, 58:11,
129:25
**mean** [29] - 7:2, 14:22,
16:22, 19:5, 21:2,
22:16, 31:12, 39:1,
39:16, 40:21, 46:24,
48:25, 54:1, 54:2,
58:17, 62:23, 63:24,
64:13, 66:7, 69:4,
69:5, 89:10, 99:1,
111:1, 112:16,
115:19, 130:9, 137:3
**meaning** [3] - 44:17,
76:11, 125:20
**meaningful** [1] - 62:4
**means** [9] - 10:20,
19:8, 28:11, 36:2,
42:15, 89:12,
106:17, 122:2,
143:15
**meanspirited** [1] -
44:5
**meant** [10] - 81:11,
82:19, 83:25, 84:4,
100:1, 103:8,
103:10, 121:5,
131:9, 134:5

**meantime** [1] - 132:8
**Medicaid** [1] - 16:14
**member** [1] - 18:13
**members** [7] - 31:18,
76:22, 92:25,
126:15, 126:22,
129:9, 135:24
**memo** [1] - 83:4
**memorandum** [1] -
100:3
**memory** [1] - 99:3
**Mendelson** [2] - 4:8,
113:5
**mentioned** [4] - 28:25,
61:25, 80:2, 102:2
**merit** [1] - 43:24
**merits** [1] - 42:21
**messed** [1] - 56:16
**meters** [1] - 22:18
**method** [1] - 116:8
**metric** [1] - 42:17
**mid** [1] - 113:17
**mid-June** [1] - 113:17
**middle** [2] - 115:10,
135:10
**might** [7] - 7:11, 26:3,
43:12, 90:16,
124:13, 124:18,
145:3
**mileage** [2] - 85:18,
85:21
**mind** [5] - 7:5, 13:7,
46:19, 127:9, 135:17
**minds** [1] - 13:7
**minimum** [2] - 58:4,
59:13
**minority** [2] - 109:4,
109:5
**minute** [4] - 38:6,
51:13, 51:21, 51:23
**minutes** [2] - 66:23,
128:7
**misdemeanor** [1] -
88:25
**misled** [1] - 122:6
**mispronouncing** [1] -
69:19
**misrepresented** [1] -
97:18
**Miss** [15] - 4:1, 69:23,
76:7, 91:18, 92:24,
97:2, 97:18, 101:12,
102:2, 118:8, 129:9,
129:16, 132:5,
142:1, 145:10
**misstating** [1] - 69:19
**mistaken** [1] - 14:12
**mix** [1] - 46:5
**modification** [1] -
65:15

**modified** [1] - 136:18
**modify** [2] - 65:13,
74:1
**moment** [7] - 36:7,
37:2, 37:14, 37:15,
62:20, 62:22
**money** [59] - 6:22,
21:1, 21:10, 21:11,
22:19, 22:21, 23:2,
23:16, 24:8, 24:9,
24:11, 24:13, 24:18,
24:20, 24:24, 25:2,
26:12, 26:17, 26:23,
26:25, 27:6, 27:7,
27:11, 27:13, 28:3,
28:14, 28:15, 49:22,
57:19, 88:8, 91:15,
91:23, 91:25, 92:2,
93:24, 94:15, 95:12,
95:21, 95:22,
106:12, 107:24,
109:18, 109:20,
110:15, 110:19,
111:12, 113:16,
113:19, 113:25,
114:7, 114:8,
127:10, 133:18,
137:12, 137:22,
143:15
**monkey** [1] - 131:18
**month** [5] - 89:13,
90:2, 90:3, 120:17,
120:23
**Moore** [2] - 100:21,
100:23
**morning** [7] - 3:9,
3:11, 3:12, 3:15, 4:6,
4:9, 4:11
**most** [5] - 36:11, 79:8,
83:12, 100:2, 143:10
**Mother's** [1] - 140:17
**mothers** [1] - 140:17
**MOTION** [1] - 1:9
**motion** [1] - 135:5
**motions** [1] - 4:17
**motivated** [1] - 61:18
**move** [1] - 72:5
**moved** [2] - 27:6,
134:14
**movement** [2] - 136:9,
136:10
**moving** [2] - 14:3,
126:13
**MR** [84] - 3:12, 3:24,
4:2, 39:10, 69:20,
69:25, 70:10, 70:13,
70:24, 71:13, 71:19,
72:8, 72:15, 73:4,
73:8, 80:24, 81:2,
81:10, 81:15, 81:25,

82:4, 84:10, 84:15,
84:19, 85:15, 85:20,
85:25, 86:5, 86:25,
88:3, 89:8, 89:12,
89:18, 89:25, 90:3,
90:18, 91:25, 92:3,
92:11, 93:4, 96:2,
97:25, 98:12, 98:19,
98:23, 99:5, 99:8,
102:11, 108:8,
111:25, 112:3,
112:11, 112:18,
112:22, 113:4,
114:12, 114:15,
114:24, 115:3,
115:20, 116:5,
116:17, 116:25,
117:8, 117:22,
118:6, 119:11,
119:15, 120:5,
120:7, 120:13,
120:16, 128:7,
128:10, 132:23,
140:20, 140:24,
141:13, 141:20,
144:25, 145:6,
145:12, 146:1, 146:9
**MS** [144] - 3:9, 3:17,
5:16, 6:8, 6:13, 7:5,
8:1, 8:15, 8:18, 9:19,
10:3, 10:23, 11:11,
11:15, 11:19, 12:1,
12:6, 12:10, 12:25,
13:16, 13:22, 14:17,
15:5, 17:21, 17:25,
18:23, 19:2, 19:8,
19:11, 19:16, 19:18,
20:5, 21:3, 21:7,
21:13, 22:7, 22:15,
22:24, 23:6, 24:19,
25:19, 25:23, 25:25,
26:4, 27:5, 29:4,
29:12, 29:25, 30:3,
30:10, 30:14, 30:16,
30:18, 30:23, 31:4,
31:11, 31:22, 31:25,
32:22, 32:25, 33:8,
33:12, 33:19, 34:12,
34:15, 35:3, 35:10,
35:17, 35:23, 36:9,
36:20, 36:23, 37:3,
37:7, 37:9, 37:12,
37:17, 37:21, 38:5,
38:8, 38:21, 38:25,
39:7, 39:11, 39:18,
41:11, 42:12, 43:10,
43:19, 43:23, 44:8,
44:15, 45:1, 45:10,
45:14, 45:24, 46:10,
47:8, 47:14, 48:3,
48:11, 50:14, 50:20,

50:22, 51:17, 51:19,
52:11, 52:24, 53:12,
53:18, 53:21, 55:23,
59:6, 60:14, 60:19,
61:3, 61:7, 61:10,
61:16, 62:10, 62:22,
63:14, 63:18, 63:25,
64:16, 65:16, 66:17,
66:24, 67:2, 69:16,
118:10, 119:20,
120:20, 121:1,
124:20, 125:10,
126:18, 128:3,
142:2, 142:11,
144:2, 145:8,
145:16, 146:8
**must** [3] - 16:22,
110:25, 128:13

## N

**name** [4] - 69:19, 90:4,
133:10
**narcotics** [2] - 58:4,
58:5
**narrow** [2] - 9:1, 34:23
**Nathan** [3] - 3:13,
39:11, 61:12, 132:22
**NATHAN** [85] - 2:3,
3:12, 3:24, 4:2,
39:10, 69:20, 69:25,
70:10, 70:13, 70:24,
71:13, 71:19, 72:8,
72:15, 73:4, 73:8,
80:24, 81:2, 81:10,
81:15, 81:25, 82:4,
84:10, 84:15, 84:19,
85:15, 85:20, 85:25,
86:5, 86:25, 88:3,
89:8, 89:12, 89:18,
89:25, 90:3, 90:18,
91:25, 92:3, 92:11,
93:4, 96:2, 97:25,
98:12, 98:19, 98:23,
99:5, 99:8, 102:11,
108:8, 111:25,
112:3, 112:11,
112:18, 112:22,
113:4, 114:12,
114:15, 114:24,
115:3, 115:20,
116:5, 116:17,
116:25, 117:8,
117:22, 118:6,
119:11, 119:15,
120:5, 120:7,
120:13, 120:16,
128:7, 128:10,
132:23, 140:20,
140:24, 141:13,
141:20, 144:25,

145:6, 145:12, 146:1, 146:9
**Nathanson** [2] - 39:8, 61:13
**national** [11] - 25:13, 55:10, 56:9, 56:10, 56:16, 58:6, 58:10, 58:12, 58:13, 117:13, 126:12
**National** [3] - 59:14, 68:4
**nature** [1] - 142:21
**necessary** [1] - 28:14
**need** [12] - 27:9, 27:10, 35:21, 37:22, 54:1, 59:8, 88:6, 106:12, 118:3, 134:4, 140:9, 146:6
**needed** [2] - 115:25, 124:11
**needs** [4] - 28:4, 54:2, 93:5, 94:24
**negative** [1] - 111:13
**negotiated** [1] - 134:20
**Netter** [1] - 3:18
**NETTER** [1] - 1:16
**Nevada** [2] - 109:19, 128:15
**never** [3] - 56:15, 104:7, 110:19
**nevertheless** [2] - 12:22, 44:6
**new** [2] - 15:6, 16:21
**Newman** [1] - 33:3
**newspaper** [5] - 29:1, 29:19, 30:5, 30:6, 65:4
**next** [8] - 3:19, 3:20, 13:23, 15:13, 44:6, 114:20, 132:14
**nice** [1] - 146:7
**nicely** [1] - 57:9, 58:1
**NICHOLAS** [1] - 2:5
**Nick** [1] - 4:2
**night** [1] - 135:10
**nine** [2] - 84:21, 134:22
**nobody** [3] - 17:1, 31:19, 40:14
**none** [5] - 40:24, 57:1, 59:14, 109:11, 122:18
**nonetheless** [3] - 95:25, 134:1, 135:18
**nonjury** [1] - 134:9
**nonsense** [1] - 109:16
**normal** [1] - 131:23
**normally** [1] - 145:22
**Norton** [2] - 92:24,

97:2
**notable** [1] - 17:10
**notably** [1] - 39:19
**note** [4] - 23:22, 73:14, 117:1, 118:12
**notes** [2] - 90:5, 147:16
**Nothing** [13] - 35:10, 35:18, 36:1, 63:8, 67:3, 67:10, 67:13, 69:4, 74:5, 74:8, 74:20, 78:24, 127:25
**nothing** [27] - 17:19, 18:16, 21:24, 35:23, 47:21, 52:4, 63:21, 66:9, 77:8, 78:11, 78:16, 78:17, 79:17, 79:22, 81:9, 81:20, 81:23, 89:12, 90:22, 95:19, 102:13, 103:18, 117:23, 121:16, 121:19, 127:13, 127:21
**nothing's** [1] - 77:4
**nothing-shall-be-construed** [1] - 127:21
**notice** [1] - 29:10
**notwithstanding** [2] - 21:11, 55:15
**November** [1] - 83:3
**null** [5] - 94:20, 108:16, 129:4, 130:19, 130:25
**number** [4] - 46:20, 92:13, 103:16, 122:20
**Numbers** [1] - 147:13
**numerous** [1] - 29:6
**NW** [4] - 1:14, 1:18, 1:24, 2:6

## O

**oath** [1] - 99:23
**Oberly** [1] - 91:5
**obligated** [1] - 75:24
**obligation** [7] - 26:9, 26:11, 27:23, 28:1, 38:11, 125:4, 125:8
**obligations** [2] - 93:24, 127:14
**obstacle** [2] - 40:21, 118:20
**obstacles** [1] - 28:13
**obtain** [3] - 45:12, 93:19, 141:23
**obviously** [5] - 9:20, 22:8, 31:17, 53:25, 99:25

**occasion** [2] - 45:9, 93:3
**occasions** [1] - 42:8
**occurred** [1] - 27:2
**occurrences** [1] - 122:15
**October** [4] - 114:3, 114:4, 123:9, 123:11
**OF** [4] - 1:1, 1:3, 1:3, 1:9
**offenders** [1] - 58:5, 58:7
**Office** [5] - 2:5, 42:10, 74:14, 88:22, 89:4
**office** [11] - 3:25, 42:2, 88:15, 88:22, 88:23, 90:22, 99:15, 99:16, 100:3, 100:6, 111:17
**officer** [2] - 26:6, 44:24, 75:24
**official** [1] - 147:14
**OFFICIAL** [1] - 1:9
**Official** [1] - 147:22
**officials** [2] - 8:6, 110:24
**often** [1] - 4:16
**oil** [1] - 134:25
**old** [1] - 73:6
**old-fashioned** [1] - 73:6
**OMB** [3] - 24:2, 24:8, 57:21
**OMB's** [1] - 24:6
**omissions** [2] - 90:12, 90:13
**once** [7] - 39:15, 41:1, 41:2, 79:18, 87:9, 130:6
**one** [52] - 10:11, 11:2, 11:10, 11:14, 14:25, 16:3, 16:14, 28:22, 29:5, 33:14, 33:22, 34:5, 35:9, 40:20, 41:16, 48:4, 53:5, 53:6, 56:8, 60:15, 63:18, 66:17, 67:22, 68:22, 75:19, 78:25, 83:17, 87:24, 89:21, 92:14, 96:18, 99:12, 99:22, 104:19, 111:10, 112:8, 113:9, 115:8, 124:12, 127:17, 127:23, 128:4, 130:14, 132:11, 132:18, 133:6, 133:7, 138:22, 138:23, 140:20, 142:11, 145:12
**one's** [1] - 65:13

**one-page** [1] - 89:21
**onus** [1] - 112:9
**open** [4] - 11:1, 97:21, 131:20, 140:5
**operate** [3] - 110:10, 116:19, 132:9
**operated** [2] - 75:5, 76:17, 82:14
**operating** [1] - 116:8
**operation** [1] - 75:22
**operations** [1] - 68:16
**opining** [1] - 125:5
**opinion** [54] - 11:22, 40:22, 42:1, 42:2, 42:3, 42:5, 42:9, 42:11, 42:15, 42:17, 62:3, 82:9, 82:10, 83:1, 83:2, 89:20, 91:5, 94:25, 95:3, 95:4, 95:5, 98:16, 98:24, 98:25, 99:9, 99:10, 99:13, 99:14, 100:9, 100:13, 108:15, 108:16, 108:19, 109:12, 125:11, 128:19, 128:20, 128:22, 129:5, 130:19, 130:23, 137:1, 137:3, 138:11, 139:1, 141:11, 143:19, 145:3
**opinions** [8] - 42:4, 43:24, 46:21, 128:13, 133:2, 138:23, 139:14, 140:10
**opportunity** [8] - 5:10, 58:6, 58:7, 130:17, 132:4, 135:20, 136:2, 145:18
**oppose** [2] - 109:9, 116:17
**opposed** [8] - 16:2, 34:1, 41:1, 55:9, 56:4, 56:24, 61:22, 94:12
**opposing** [1] - 94:14
**opposite** [1] - 29:16
**option** [1] - 118:2
**order** [4] - 7:6, 44:3, 52:18, 132:3
**ordinary** [1] - 64:17
**organizations** [1] - 4:19
**origin** [1] - 29:9
**original** [1] - 50:1
**originally** [2] - 10:1, 83:25
**otherwise** [1] - 19:15

**ourselves** [1] - 132:14
**outcome** [2] - 5:4, 142:14
**outline** [1] - 7:11
**outlines** [1] - 29:8
**outside** [5] - 45:12, 45:17, 54:14, 73:16, 96:22, 106:24, 114:13
**outspend** [1] - 23:16
**outspends** [1] - 23:12
**outspent** [1] - 23:11
**outstanding** [1] - 139:23
**overflow** [2] - 58:23, 59:1
**override** [1] - 84:22
**oversights** [1] - 90:11
**overwhelmingly** [1] - 71:14
**overwritten** [1] - 12:4
**owe** [1] - 60:14
**own** [12] - 14:4, 22:12, 39:24, 50:7, 92:2, 101:4, 101:11, 101:22, 137:12, 144:8, 144:13, 144:18

## P

**p.m** [1] - 146:10
**pad** [1] - 73:7
**Page** [4] - 26:21, 77:24, 83:2, 147:13
**page** [1] - 89:21
**pages** [2] - 42:18, 42:20
**paid** [1] - 98:13
**paint** [1] - 20:14
**paper** [3] - 18:9, 42:18, 144:23
**papers** [7] - 5:21, 8:19, 24:15, 62:5, 119:12, 119:22, 120:14
**parking** [2] - 22:18
**part** [23] - 12:18, 13:2, 25:21, 32:5, 34:3, 38:6, 49:13, 54:9, 56:7, 64:1, 68:19, 69:21, 76:10, 92:12, 106:18, 110:14, 117:13, 132:12, 134:20
**participating** [1] - 109:9
**particular** [5] - 9:6, 9:11, 34:20, 49:25, 123:14

**particularly** [6] - 16:23, 42:14, 56:6, 119:3, 122:20, 143:11
**parties** [4] - 5:3, 13:12, 13:14, 33:4
**partisan** [1] - 41:24
**parts** [2] - 54:1, 106:7
**party** [3] - 7:14, 45:7, 124:16
**pass** [11] - 18:6, 19:25, 20:19, 70:17, 72:17, 73:21, 79:5, 88:7, 93:7, 107:22, 112:24
**passage** [6] - 23:1, 29:22, 31:7, 32:2, 33:5, 137:17
**passed** [17] - 7:21, 15:5, 49:18, 61:5, 71:9, 71:14, 90:21, 97:10, 97:12, 97:14, 100:7, 101:12, 101:13, 103:16, 129:22, 139:12
**passes** [2] - 88:5, 129:20
**passion** [1] - 44:14
**passionate** [4] - 44:1, 44:10, 70:20, 71:6
**passive** [2] - 16:2, 40:1
**past** [8] - 6:24, 14:2, 23:24, 28:5, 40:5, 62:3, 113:8, 133:3
**patently** [1] - 123:25
**path** [1] - 14:19
**pattern** [1] - 61:17
**pay** [3] - 88:14, 105:9, 109:22
**paying** [2] - 94:5, 136:8
**payment** [2] - 15:8, 16:11
**pdf** [2] - 144:24, 145:5
**penalties** [2] - 111:9, 111:10
**pencil** [1] - 73:7
**pending** [2] - 115:17, 116:16
**penny** [1] - 95:16
**people** [31] - 4:17, 13:8, 32:8, 32:16, 33:20, 34:1, 36:10, 40:7, 41:5, 49:20, 57:14, 71:6, 80:10, 87:4, 87:20, 88:3, 91:13, 94:12, 99:15, 100:2, 100:3, 101:21, 105:12,

108:23, 110:22, 111:17, 114:7, 114:12, 114:16, 135:7, 137:10
**percent** [6] - 15:9, 16:13, 16:14, 19:22, 71:10, 71:22
**perfectly** [1] - 104:5
**perform** [1] - 57:7
**performance** [1] - 8:5
**performed** [2] - 57:4, 94:4
**performing** [1] - 57:18
**perhaps** [1] - 13:8
**period** [7] - 5:6, 19:24, 61:24, 64:10, 129:22, 134:11, 136:3
**permanent** [1] - 115:19
**permit** [1] - 16:25
**person** [6] - 6:6, 85:1, 100:6, 109:2, 124:4, 129:7
**persuade** [1] - 64:12
**persuaded** [1] - 42:25
**persuasive** [2] - 42:17, 61:24
**pertinent** [1] - 102:14
**petition** [1] - 18:14
**phrase** [4] - 18:18, 54:3, 54:5, 74:1
**physical** [1] - 138:14
**picked** [1] - 88:5
**piece** [2] - 64:17, 127:24
**place** [5] - 44:3, 47:4, 48:18, 93:15, 123:11
**placed** [4] - 22:22, 22:24, 64:2, 144:7
**plain** [1] - 62:16
**plainer** [1] - 35:22
**plaintiff** [10] - 6:9, 6:17, 6:19, 6:20, 7:22, 9:14, 81:17, 119:16, 133:9, 133:11
**plaintiff's** [5] - 5:8, 13:24, 13:25, 119:12, 120:13
**Plaintiffs** [2] - 1:4, 1:13
**plaintiffs** [6] - 54:10, 115:18, 116:4, 133:9, 133:11, 138:14
**plan** [2] - 31:23, 31:25
**planned** [1] - 135:19
**planning** [1] - 135:7
**plans** [1] - 24:7

**Platt** [1] - 3:22
**PLATT** [1] - 1:13
**play** [5] - 55:25, 100:18, 100:19, 100:21, 121:5
**played** [2] - 19:3, 121:4, 143:11
**plays** [1] - 57:18
**plea** [1] - 119:8
**plead** [1] - 14:4
**pleaded** [2] - 6:15, 9:6
**pleading** [2] - 70:11, 133:24
**pleadings** [9] - 4:18, 5:2, 13:25, 119:6, 119:10, 120:2, 120:21, 139:4, 139:22
**plenary** [4] - 17:16, 96:11, 107:5, 143:8
**plenty** [1] - 130:16
**point** [28] - 20:11, 20:18, 21:15, 22:23, 31:13, 46:1, 49:14, 50:24, 57:6, 57:10, 58:1, 66:17, 66:25, 76:6, 78:22, 83:1, 87:22, 111:18, 115:7, 116:6, 117:10, 126:8, 127:18, 131:5, 132:19, 137:18, 142:12, 143:21
**pointed** [1] - 68:21
**points** [7] - 5:11, 51:14, 56:2, 60:5, 60:8, 66:15, 119:4
**police** [1] - 88:9
**political** [19] - 14:23, 16:17, 17:2, 17:9, 31:16, 32:6, 38:23, 39:3, 40:9, 61:8, 61:11, 65:14, 65:17, 72:5, 72:7, 72:9, 72:20, 118:2
**politically** [2] - 61:4, 61:18
**politician** [1] - 60:25
**politics** [3] - 61:1, 85:21, 85:24
**population** [4] - 71:11, 71:15, 71:22, 72:9
**portion** [7] - 21:5, 21:17, 21:18, 21:19, 54:13, 113:15, 126:19
**portions** [1] - 21:16
**portrayed** [1] - 47:16
**pose** [1] - 5:23
**position** [26] - 9:14,

10:24, 11:6, 11:21, 12:12, 14:1, 17:18, 18:15, 18:17, 22:12, 29:8, 43:6, 48:17, 51:4, 77:4, 85:4, 109:11, 116:6, 121:6, 122:2, 124:8, 124:9, 125:18, 127:17, 142:9, 142:13
**positions** [1] - 139:24
**possibilities** [2] - 86:15, 109:5
**possibility** [1] - 143:4
**possible** [9] - 16:4, 17:1, 59:13, 59:15, 64:24, 69:10, 102:20, 144:17, 146:4
**possibly** [1] - 65:3
**potential** [5] - 6:17, 111:9, 142:14
**potentially** [2] - 12:22, 137:5
**power** [17] - 20:7, 20:14, 34:18, 34:21, 34:23, 52:5, 76:16, 78:25, 79:19, 79:23, 96:16, 96:19, 102:19, 103:23, 104:10, 105:2, 113:22
**powerful** [1] - 140:24
**powerless** [3] - 136:5, 137:10, 137:19
**powers** [1] - 79:7
**practical** [6] - 14:24, 16:17, 17:3, 17:9, 40:8, 65:17
**practically** [1] - 112:17
**practice** [4] - 60:21, 61:17, 74:12
**precedent** [1] - 124:15
**precious** [1] - 66:19
**precise** [1] - 126:24
**precisely** [3] - 9:15, 22:4, 77:7
**preclude** [2] - 64:14, 136:13
**precluded** [1] - 93:22
**precludes** [1] - 111:22
**predicted** [2] - 122:14, 122:15
**prediction** [1] - 131:5
**predictions** [4] - 122:18, 122:21, 123:7, 130:12
**preexisting** [1] - 47:5
**preferable** [3] - 84:1,

84:2, 84:3
**preference** [1] - 98:16
**preferred** [2] - 100:11, 100:12
**premature** [1] - 131:5
**premise** [4] - 64:20, 91:12, 142:20, 143:16
**preparation** [1] - 74:15
**prepared** [2] - 72:2, 140:5
**present** [5] - 4:9, 4:10, 36:3, 67:22, 81:20
**Present** [1] - 2:9
**presentation** [3] - 44:2, 44:11, 69:9
**presentment** [2] - 15:20, 15:23
**President** [39] - 15:21, 15:24, 20:3, 20:6, 20:9, 20:15, 21:15, 35:16, 39:21, 52:8, 52:13, 52:14, 52:18, 64:9, 74:14, 75:14, 75:16, 75:21, 76:23, 77:14, 87:10, 87:11, 93:3, 93:4, 93:5, 93:6, 97:5, 97:9, 97:13, 105:3, 111:23, 113:13, 117:11, 131:17, 136:11, 136:14, 138:2
**President's** [1] - 76:25
**presidential** [1] - 136:21
**presume** [1] - 115:1
**pretty** [1] - 67:22
**prevail** [2] - 115:18, 117:24
**prevent** [1] - 70:25
**prevents** [2] - 83:6, 118:21
**previous** [1] - 16:8
**previously** [11] - 16:18, 17:8, 22:8, 52:15, 62:14, 66:8, 68:16, 98:1, 98:2, 98:10, 105:15
**principal** [5] - 5:11, 34:11, 35:1, 37:10, 41:19
**principally** [2] - 22:13, 79:10
**principle** [1] - 69:13
**principles** [1] - 34:5
**printed** [1] - 30:22
**private** [3] - 54:24, 105:12, 105:13

probates [2] - 16:20, 20:11
problem [3] - 69:20, 111:16, 118:25
problems [4] - 6:3, 93:19, 115:23, 131:21
procedure [4] - 73:9, 74:12, 75:22, 78:18
procedures [1] - 74:10
proceed [1] - 46:13
proceeded [1] - 133:25
proceeding [1] - 134:16
proceedings [5] - 1:20, 3:2, 146:10, 147:7, 147:15
Process [1] - 36:12
process [48] - 6:23, 12:19, 15:7, 15:23, 16:1, 18:2, 19:19, 20:17, 21:14, 22:4, 22:8, 29:19, 33:17, 36:14, 39:14, 39:24, 40:5, 44:7, 47:22, 52:8, 53:1, 59:18, 65:24, 66:2, 77:16, 80:9, 83:20, 83:25, 104:12, 118:14, 118:16, 118:18, 119:1, 119:3, 121:3, 121:5, 121:12, 121:25, 122:4, 122:5, 122:14, 125:20, 127:3, 142:25, 143:5, 143:12, 144:10, 144:14
produced [1] - 1:21
Professional [2] - 1:23, 147:4
professionals [1] - 99:15
prognosticator [1] - 130:13
program [3] - 54:24, 55:14, 105:14
prohibit [1] - 38:15
prohibited [2] - 66:8, 84:6, 143:20
prohibition [12] - 48:14, 48:18, 53:6, 53:16, 78:8, 78:12, 78:14, 79:6, 83:19, 143:1, 144:4
prohibitions [3] - 40:23, 53:4
projects [2] - 22:20, 57:20

promised [1] - 116:20
prompt [1] - 116:19
promptly [2] - 86:21, 86:23
proper [2] - 8:20, 101:21
properties [1] - 68:24
property [8] - 36:24, 54:4, 54:17, 68:1, 68:9, 68:10, 68:11, 73:24
proponents [2] - 33:23
propose [4] - 114:25, 117:20, 125:21, 130:13
proposed [4] - 92:19, 94:12, 97:13, 108:7
proposes [1] - 87:8
proposing [1] - 110:13
proposition [3] - 47:9, 49:11, 125:2
propositions [3] - 47:16, 51:11, 126:3
prosecute [6] - 88:10, 88:16, 88:24, 89:4, 90:22, 91:7
prosecuted [2] - 6:25, 88:24
prosecution [7] - 86:11, 110:23, 111:10, 122:22, 122:25, 123:3, 123:22
prosecutor [2] - 88:10, 88:15
protection [1] - 40:15
prove [1] - 143:21
provide [1] - 137:10
provided [1] - 58:3
providers [2] - 114:14, 114:15
provides [1] - 127:10
provision [32] - 28:10, 36:14, 37:23, 40:22, 48:14, 49:3, 49:17, 50:3, 50:11, 53:23, 54:8, 57:11, 58:15, 58:16, 62:17, 63:2, 65:9, 67:9, 67:20, 79:20, 79:22, 89:1, 96:10, 125:23, 127:5, 127:8, 127:11, 127:21, 143:14, 143:24, 144:6, 144:8
provisions [15] - 8:9, 8:10, 8:11, 10:9, 10:17, 41:13, 41:19,

43:12, 62:18, 63:1, 73:17, 73:22, 74:22, 75:19, 96:21
prudent [1] - 20:22
prudently [1] - 128:21
public [2] - 12:18, 36:25
Public [2] - 79:10, 119:23
published [1] - 130:22
purpose [4] - 10:16, 64:22, 96:19, 143:6
purse [1] - 32:21
pursuant [6] - 56:14, 72:19, 77:10, 111:13, 113:11, 131:13
put [26] - 26:4, 37:25, 53:12, 67:6, 67:19, 71:23, 73:1, 73:4, 77:20, 78:8, 84:4, 90:4, 94:11, 95:12, 95:13, 95:22, 95:23, 96:21, 102:11, 104:22, 104:24, 106:15, 109:20, 122:16, 128:4, 145:2
puts [2] - 57:5, 86:18
putting [2] - 29:17, 112:16

## Q

query [1] - 137:20
questionable [2] - 21:24, 22:1
questioning [2] - 47:14, 51:15
questions [11] - 5:9, 5:23, 10:12, 41:22, 60:6, 60:7, 60:9, 60:15, 62:8, 62:12, 110:2
quickly [1] - 116:18
quite [7] - 13:19, 18:13, 44:10, 62:16, 120:7, 122:12, 129:15
quote [3] - 89:17, 89:18, 125:3
quote/unquote [1] - 29:15
quoted [1] - 90:9
quoting [1] - 90:8

## R

R-O-E-D-E-R [1] - 133:10
raise [8] - 8:22, 22:17,

45:5, 91:23, 91:25, 111:16, 111:18, 139:14
raised [7] - 8:21, 9:4, 21:1, 23:2, 60:9, 106:21, 110:20
raises [4] - 22:13, 22:21, 81:17, 88:25
raising [1] - 137:18
ran [1] - 24:23
ranking [1] - 44:24
rather [3] - 15:23, 33:25, 34:21
ratification [1] - 19:21, 71:20
ratified [3] - 19:23, 71:10, 80:13
ratify [2] - 81:5, 104:4
reach [2] - 76:15, 98:21, 136:17
reached [2] - 65:11, 105:8
reaction [1] - 140:11
read [35] - 4:24, 5:12, 18:9, 29:2, 30:8, 32:11, 32:14, 35:8, 36:21, 37:19, 37:22, 44:13, 47:10, 47:11, 47:23, 54:8, 59:24, 60:11, 64:25, 70:12, 70:22, 72:13, 79:23, 80:20, 83:18, 83:22, 89:23, 100:14, 117:16, 126:2, 138:8, 140:15, 140:16, 141:11, 144:25
reading [14] - 13:24, 24:15, 28:25, 35:24, 35:25, 44:14, 59:19, 67:5, 83:21, 84:1, 119:10, 132:25, 139:4, 142:4
ready [2] - 40:19, 101:15
real [1] - 31:8
realities [1] - 65:18
reality [2] - 17:9, 41:2
really [23] - 14:7, 20:22, 25:3, 28:23, 39:16, 41:12, 41:14, 43:5, 45:3, 53:1, 66:4, 72:11, 82:20, 99:3, 101:1, 102:24, 110:4, 116:21, 117:6, 142:21, 142:23, 143:3, 143:4
Realtime [2] - 1:23, 147:3
reason [13] - 7:3, 10:7,

26:12, 40:20, 43:1, 53:23, 59:8, 61:15, 91:14, 99:1, 133:24, 135:4, 139:3
reasonable [1] - 124:4
reasons [7] - 8:19, 13:3, 14:24, 16:18, 16:19, 68:22, 132:1
reassure [1] - 32:16
receives [2] - 24:2, 112:15
receiving [1] - 87:5
recent [1] - 24:16
recently [1] - 40:16
recess [4] - 51:13, 51:21, 51:23, 51:25
recognitions [1] - 29:17
recognize [3] - 26:21, 33:8, 50:22
recognized [1] - 6:24
recognizes [3] - 4:8, 33:6, 54:18
recollections [3] - 29:14, 29:16, 29:17
recommend [1] - 132:6
recommendation [2] - 124:23, 132:6
record [9] - 3:8, 16:7, 66:3, 66:4, 70:10, 82:11, 88:1, 111:4, 128:6
recorder [1] - 111:2
reenactment [1] - 120:22
refer [4] - 39:23, 125:13, 125:19, 125:25
reference [1] - 143:18
referendum [2] - 104:2, 104:3
Referendum [4] - 39:19, 51:2, 59:15, 125:15
refers [3] - 62:20, 79:19, 119:17
reflected [1] - 34:5
Reform [1] - 10:16
regard [14] - 8:19, 9:11, 9:13, 21:23, 24:5, 25:13, 59:14, 60:15, 61:21, 69:2, 119:25, 127:19, 128:19, 142:13
regarding [1] - 10:17
regardless [3] - 5:3, 112:14, 116:13
Registered [2] - 1:23, 147:4

**regular** [2] - 61:16, 129:19
**regulation** [2] - 48:20, 74:12
**rehabilitation** [1] - 58:8
**Rehabilitation** [1] - 120:22
**reimbursement** [1] - 16:15
**reins** [2] - 15:25, 65:23
**rejected** [1] - 91:8
**related** [1] - 68:24
**relates** [1] - 103:18
**relating** [2] - 48:20, 74:13
**relationship** [1] - 62:17
**release** [1] - 134:22
**relevance** [2] - 50:14, 50:23
**relevant** [1] - 49:13
**relied** [4] - 54:11, 79:10, 98:3, 119:16
**relief** [4] - 9:7, 9:9, 10:9, 138:16
**relies** [1] - 46:20
**relieve** [1] - 64:23
**reluctance** [1] - 9:2
**reluctant** [1] - 32:8
**rely** [9] - 10:20, 10:24, 10:25, 33:10, 41:19, 43:5, 45:8, 45:23, 94:15
**relying** [1] - 45:15
**remaining** [2] - 126:23, 128:17
**remains** [2] - 93:12, 137:17
**remedy** [1] - 137:10
**remember** [1] - 120:25
**remembers** [1] - 120:23
**reminded** [1] - 100:18
**remiss** [1] - 46:1
**reopened** [1] - 98:8
**repeal** [2] - 73:23, 117:20, 117:23
**repealed** [2] - 58:10, 136:19
**repeated** [1] - 121:17
**repeatedly** [3] - 79:3, 87:6, 97:2
**replenished** [2] - 98:11, 98:13
**reply** [3] - 26:20, 77:25, 120:14
**report** [2] - 128:11, 129:2, 130:21

**reported** [2] - 1:20, 147:7
**Reporter** [5] - 1:23, 1:23, 147:4, 147:22
**REPORTER'S** [2] - 1:9, 147:1
**reports** [2] - 78:10, 128:25
**represent** [4] - 45:18, 124:21, 126:14
**representation** [4] - 45:9, 45:23, 80:11, 126:13
**representative** [1] - 45:16
**representatives** [3] - 92:23, 101:9, 106:4
**Representatives** [4] - 34:20, 95:6, 108:21, 108:24
**representing** [1] - 3:13
**represents** [2] - 126:6, 129:10
**Republic** [3] - 133:12, 133:17, 133:20
**Request** [1] - 113:9
**request** [3] - 62:1, 101:20, 145:8
**requested** [3] - 9:8, 9:9, 138:16
**require** [5] - 25:16, 57:21, 137:23, 137:24, 140:14
**required** [9] - 12:23, 13:20, 15:7, 15:20, 28:15, 60:16, 86:17, 140:11, 143:25
**requirement** [8] - 12:7, 15:24, 19:12, 24:6, 27:17, 28:16, 60:16, 60:20
**requires** [6] - 14:19, 19:20, 19:21, 19:23, 112:4, 143:3
**rescind** [1] - 138:21
**reservation** [1] - 80:2
**reserve** [4] - 24:21, 24:23, 25:6, 137:20
**residents** [2] - 54:25, 59:12
**resolution** [3] - 20:1, 108:6, 123:12
**resolve** [1] - 11:2
**resolved** [3] - 132:7, 137:6, 139:13
**respect** [21] - 17:15, 42:16, 43:11, 64:10, 71:1, 73:11, 83:8, 83:24, 91:17, 92:7,

99:8, 102:25, 103:14, 108:12, 113:15, 128:10, 129:6, 129:15, 129:17, 130:12, 130:6
**respected** [1] - 17:14
**respectfully** [1] - 43:24
**respective** [1] - 74:13
**respects** [4] - 51:10, 137:2, 137:4, 142:18
**respond** [2] - 140:14, 143:17
**response** [3] - 23:23, 43:20, 140:21
**responses** [1] - 140:19
**responsibilities** [2] - 9:11, 46:3
**responsibility** [4] - 8:5, 9:12, 16:7, 66:5
**responsible** [1] - 107:9
**responsive** [1] - 21:20
**rest** [4] - 5:11, 62:18, 63:1, 143:7
**restricted** [2] - 54:5, 74:2, 105:21
**restrictions** [1] - 87:3
**restrictive** [1] - 111:6
**result** [6] - 10:3, 94:7, 99:14, 105:8, 137:16
**retain** [2] - 34:21, 52:14
**retained** [3] - 32:20, 45:17, 136:19
**retaining** [1] - 96:20
**retribution** [1] - 122:17
**return** [1] - 51:23
**revenues** [1] - 47:20
**review** [13] - 18:4, 40:1, 42:8, 61:23, 64:10, 65:19, 74:16, 115:17, 116:16, 117:25, 130:11, 143:9
**reviewed** [1] - 121:10
**reviewer** [1] - 16:2, 144:9
**reviews** [1] - 61:22, 143:10
**revisit** [2] - 62:11, 62:13
**revisited** [2] - 15:18, 15:22
**RFP** [2] - 94:11, 94:14
**rid** [1] - 116:1
**rights** [10] - 16:24,

32:9, 32:17, 32:21, 41:4, 66:13, 104:20, 134:24, 135:1, 135:18
**rigid** [1] - 69:11
**ring** [1] - 90:15
**ripe** [1] - 38:23
**risk** [1] - 72:20
**Robbins** [2] - 4:4
**ROBBINS** [1] - 2:9
**Roberts** [1] - 62:2
**Roberts'** [1] - 89:21
**Roeder** [3] - 133:9, 138:11, 138:25
**role** [22] - 16:1, 18:2, 18:3, 19:3, 21:21, 21:22, 21:25, 22:2, 39:24, 55:3, 55:25, 56:1, 57:18, 75:16, 103:10, 103:11, 121:4, 143:2, 143:11, 144:8, 144:12, 144:13
**roles** [3] - 39:20, 74:13, 104:12
**RPR** [2] - 1:22, 147:21
**rule** [30] - 4:15, 6:15, 7:9, 9:6, 15:15, 15:19, 34:25, 35:9, 65:22, 76:14, 76:19, 83:9, 83:24, 87:16, 92:14, 96:15, 110:3, 110:11, 119:23, 122:10, 123:10, 123:19, 126:21, 129:6, 131:19, 132:19, 133:7, 139:17, 140:15, 145:4
**Rule** [37] - 6:5, 8:9, 8:14, 10:15, 15:6, 15:12, 19:18, 24:12, 26:14, 28:19, 28:24, 29:9, 29:23, 33:24, 34:19, 39:6, 41:13, 46:4, 46:12, 48:23, 64:1, 64:20, 64:22, 73:12, 73:13, 73:16, 74:9, 76:11, 96:22, 99:19, 118:20, 125:6, 127:2, 134:2, 142:19, 143:5, 143:23
**ruled** [3] - 79:21, 115:21, 141:8
**rules** [7] - 9:21, 9:24, 115:24, 116:13, 129:11, 134:2, 138:18
**ruling** [12] - 7:15, 86:21, 86:22, 87:1,

87:21, 110:9, 112:15, 115:11, 118:4, 123:10, 123:25, 124:12
**run** [4] - 86:24, 132:20, 138:10, 140:7
**running** [1] - 114:8
**Russell** [1] - 4:4

**S**

**SAINDON** [1] - 2:4
**Saindon** [1] - 4:2
**sake** [2] - 101:4
**salary** [1] - 88:14
**same-sex** [1] - 40:17
**sanction** [1] - 137:19
**sanctions** [4] - 86:13, 110:23, 111:11
**sand** [1] - 140:7
**satisfied** [3] - 23:10, 27:15, 43:19
**satisfies** [1] - 27:16
**satisfy** [1] - 41:17
**saw** [4] - 33:14, 33:15, 100:19, 101:11
**scare** [1] - 34:1
**schedule** [1] - 113:5
**Scheduled** [1] - 128:17
**scheme** [1] - 82:15
**Schiller** [3] - 1:14, 3:10, 3:22
**scope** [1] - 58:14
**scour** [1] - 143:23
**screen** [5] - 48:7, 53:13, 67:7, 67:20, 73:2
**season** [1] - 115:10
**Seasons** [1] - 100:18
**seat** [2] - 15:2, 96:11
**Second** [1] - 40:11
**second** [13] - 14:25, 45:6, 54:9, 54:13, 58:21, 78:22, 87:24, 102:22, 113:7, 113:16, 113:18, 128:5, 140:21
**secretary** [4] - 105:16, 106:3, 107:1
**Section** [18] - 19:19, 23:6, 26:14, 27:4, 28:2, 28:6, 28:17, 35:10, 41:14, 46:13, 64:3, 83:6, 83:13, 121:23, 121:24, 125:14, 125:19
**section** [6] - 36:12, 49:9, 75:23, 122:3,

127:10, 127:13

**sections** [1] - 36:17

**see** [14] - 4:12, 13:17, 14:25, 15:4, 26:4, 32:14, 36:22, 49:7, 71:5, 74:24, 77:24, 103:13, 126:22, 129:9

**seek** [3] - 4:18, 124:23

**seeking** [3] - 10:9, 124:16, 133:18

**sees** [1] - 50:15

**Senate** [2] - 50:2, 57:12

**Senate's** [1] - 34:22

**send** [9] - 20:10, 21:4, 21:16, 21:18, 103:1, 103:2, 110:14, 113:12, 145:6

**sends** [5] - 21:17, 87:10, 87:11, 112:7, 113:13

**sense** [8] - 13:25, 40:10, 60:2, 81:20, 95:10, 104:16, 109:16, 138:12

**senses** [1] - 98:8

**sensible** [1] - 124:20

**sent** [4] - 70:16, 72:13, 72:16, 130:21

**sentence** [1] - 54:18

**sentences** [1] - 58:4

**separate** [2] - 21:14, 95:13

**separately** [1] - 21:17

**sequestration** [1] - 24:17

**serve** [1] - 123:2

**Service** [2] - 79:11, 119:23

**service** [2] - 114:14, 114:15

**serving** [1] - 100:3

**set** [2] - 113:5, 121:11

**SETH** [1] - 2:10

**sets** [1] - 19:18

**settle** [1] - 13:3

**settled** [1] - 13:12

**seventeen** [1] - 16:10

**Seventh** [1] - 90:8

**seventy** [1] - 134:22

**seventy-nine** [1] - 134:22

**several** [1] - 109:5

**sex** [1] - 40:17

**shall** [35] - 26:23, 27:11, 35:11, 35:19, 36:1, 36:23, 38:9, 38:11, 38:12, 38:13, 46:13, 52:4, 53:18,

---

63:3, 63:8, 63:21, 67:4, 67:10, 67:14, 69:4, 73:21, 74:5, 74:6, 74:11, 74:20, 78:16, 78:24, 79:17, 79:22, 81:13, 81:18, 127:11, 127:13, 127:21, 127:25

**shame** [2] - 141:14, 141:17

**share** [3] - 133:1, 137:8, 140:10

**sharing** [1] - 142:3

**shed** [2] - 136:6, 141:10

**shoot** [1] - 135:11

**short** [3] - 5:6, 103:11, 128:8

**shorthand** [1] - 1:20

**show** [2] - 72:23, 73:8

**showed** [1] - 32:6

**shown** [2] - 18:8, 118:24

**shows** [1] - 32:7

**shut** [2] - 127:6, 131:23

**shutdown** [4] - 24:16, 97:16, 97:17, 97:20

**shuts** [3] - 131:11, 131:12, 131:22

**sic** [1] - 39:8

**side** [10] - 7:7, 7:15, 33:2, 35:20, 45:2, 67:7, 91:1, 95:5, 114:17, 123:22

**sides** [1] - 115:19

**sidetrack** [1] - 45:6

**sign** [12] - 11:7, 12:7, 12:13, 12:16, 13:4, 60:17, 61:1, 61:9, 70:7, 84:24, 126:19, 126:23

**signature** [1] - 147:17

**signed** [9] - 11:25, 71:2, 72:14, 84:16, 84:17, 84:20, 84:22, 85:14, 136:11

**significance** [6] - 25:24, 29:24, 31:8, 81:9, 85:22, 134:18

**significant** [10] - 15:16, 15:20, 65:21, 71:12, 71:15, 71:17, 80:20, 86:4, 121:20, 135:6

**signing** [6] - 11:15, 32:18, 60:16, 72:11, 72:15, 85:18

**signs** [1] - 76:23

**silence** [8] - 89:8,

---

89:11, 89:15, 90:10, 119:4, 119:25, 129:15

**similar** [5] - 7:10, 25:5, 123:22, 127:21, 127:24

**similarly** [5] - 36:16, 38:12, 57:24, 123:8, 127:20

**simpler** [1] - 28:23

**simply** [4] - 7:23, 17:8, 33:16, 47:18

**singing** [1] - 122:13

**single** [1] - 100:6

**sit** [3] - 59:3, 99:17

**situation** [10] - 32:7, 78:20, 97:15, 97:19, 101:5, 101:16, 114:5, 129:24, 137:9, 142:6

**six** [3] - 79:18, 119:17

**sixteen** [2] - 16:10, 40:4

**slide** [2] - 26:1, 26:4

**slip** [1] - 82:21

**small** [1] - 66:17

**Smithsonian** [1] - 68:19

**smoother** [1] - 65:24

**so-called** [1] - 75:18

**Soberloff** [1] - 100:19

**someone** [4] - 12:21, 71:18, 86:10, 140:10

**sometimes** [2] - 66:12, 66:14

**somewhat** [1] - 134:1

**somewhere** [1] - 109:20

**soon** [3] - 76:24, 76:25, 116:22

**sorry** [6] - 9:25, 49:4, 61:13, 69:18, 117:4, 119:7

**sort** [3] - 13:16, 68:3, 68:6

**sounds** [1] - 90:16

**sources** [1] - 109:21

**South** [1] - 17:8

**speaker** [1] - 109:3

**speaking** [1] - 119:24

**speaks** [7] - 36:3, 36:4, 48:14, 48:22, 49:6, 120:21, 129:7

**special** [5] - 27:10, 71:24, 95:23, 128:13, 128:18

**specific** [6] - 34:7, 37:22, 58:17, 82:5, 102:24, 125:23

**specifically** [2] -

---

23:17, 38:15

**specifics** [1] - 42:22

**specified** [3] - 73:12, 77:22, 83:9

**speeding** [1] - 22:18

**spelled** [1] - 133:10

**spend** [32] - 6:22, 21:1, 21:9, 21:11, 22:12, 22:20, 23:4, 23:5, 24:3, 24:18, 24:19, 24:22, 24:24, 28:14, 28:15, 87:14, 88:8, 91:21, 92:2, 94:17, 94:18, 95:15, 96:3, 109:18, 109:25, 113:19, 113:20, 114:6, 122:9, 137:11, 137:22, 143:14

**Spending** [1] - 36:13

**spending** [17] - 23:2, 36:15, 47:19, 49:12, 55:17, 93:24, 107:24, 108:3, 110:15, 110:19, 111:12, 113:25, 114:6, 114:8, 122:1, 122:6, 144:18

**squad** [1] - 135:12

**staff** [4] - 4:25, 5:7, 78:5, 78:6

**stage** [1] - 122:14

**stand** [15] - 16:6, 16:9, 41:14, 47:9, 47:10, 47:16, 47:17, 85:19, 101:2, 123:14, 124:21, 125:1, 126:3, 146:7

**standing** [5] - 6:6, 7:24, 8:2, 58:22, 86:16

**stands** [2] - 126:7, 127:1

**Star** [2] - 29:6, 29:7

**staring** [1] - 144:3

**starred** [3] - 79:9, 119:16, 120:14

**start** [8] - 51:24, 110:15, 110:18, 111:12, 113:25, 114:3, 115:9, 132:25

**started** [4] - 55:23, 66:2, 98:15, 142:19

**starting** [2] - 110:17, 110:18

**starts** [2] - 64:20, 123:8

**state** [8] - 8:19, 64:19, 78:25, 106:4, 142:19, 142:22

---

**statement** [3] - 12:18, 85:14, 136:11

**statements** [1] - 31:5

**STATES** [2] - 1:1, 1:10

**States** [46] - 1:24, 26:7, 35:15, 49:13, 49:17, 49:20, 49:21, 50:4, 50:8, 54:4, 54:12, 54:17, 57:8, 57:15, 57:16, 57:17, 58:18, 58:20, 68:2, 68:10, 68:11, 68:25, 73:24, 75:3, 75:21, 78:23, 97:6, 105:5, 105:16, 105:19, 105:20, 105:25, 106:2, 106:11, 106:25, 107:3, 107:13, 107:15, 117:11, 122:23, 126:7, 134:14, 134:21, 147:5, 147:9, 147:11

**states** [5] - 16:14, 54:16, 79:1, 106:14

**status** [1] - 5:18

**statute** [17] - 18:12, 26:2, 31:4, 32:11, 32:14, 40:23, 53:24, 54:1, 60:3, 69:11, 69:13, 76:9, 93:9, 95:18, 105:9, 105:10, 131:20

**statutes** [1] - 117:17

**statutory** [1] - 34:3

**stay** [18] - 13:12, 62:2, 73:18, 89:21, 112:22, 115:16, 115:18, 115:22, 115:25, 116:14, 124:8, 124:10, 124:12, 124:15, 124:16, 124:23, 132:3, 132:8

**stayed** [2] - 110:12, 116:16

**stenographic** [1] - 147:15

**stenographically** [1] - 147:6

**step** [1] - 44:7

**steps** [1] - 14:1

**still** [14] - 10:13, 15:15, 21:4, 40:4, 64:8, 64:9, 82:2, 85:3, 112:3, 130:14, 131:12, 131:20, 134:18, 140:5

**stop** [1] - 35:13

**story** [1] - 124:13

**strange** [2] - 12:12, 134:1
**Street** [2] - 1:18, 2:6
**strike** [3] - 46:16, 75:2, 101:22
**strings** [2] - 28:3, 32:21
**strongest** [3] - 37:11, 62:15
**strongly** [3] - 41:20, 44:16, 117:18
**structure** [1] - 121:11
**structured** [1] - 43:17
**subcommittee** [2] - 108:17, 130:21
**Subgovernment** [2] - 47:3, 47:4
**subject** [19] - 21:14, 23:3, 23:6, 23:8, 25:12, 28:7, 53:3, 64:4, 64:21, 79:20, 90:13, 109:22, 109:24, 110:22, 111:8, 117:15, 128:23, 131:4
**submission** [4] - 33:11, 57:21, 60:12, 74:16
**submissions** [2] - 5:5, 99:2
**submit** [4] - 38:13, 61:7, 61:17, 131:8
**submitted** [5] - 29:6, 60:22, 75:14, 92:21, 131:16
**submitting** [1] - 111:23
**Subsection** [1] - 66:25
**subsection** [2] - 121:23, 121:25
**subsections** [1] - 41:23
**subsequent** [5] - 66:1, 66:2, 127:3, 127:16, 138:25
**Substance** [1] - 48:1
**Substances** [1] - 58:3
**substantive** [1] - 53:16
**successful** [1] - 17:3
**sudden** [1] - 14:15
**sue** [3] - 86:16, 87:20, 134:25
**sued** [2] - 45:20, 46:19
**suffered** [1] - 133:16
**sufficient** [3] - 26:18, 40:2, 138:15
**suggest** [3] - 32:4, 78:3, 83:20
**suggested** [1] - 104:7

**suggests** [1] - 27:4
**suicide** [1] - 135:25
**suit** [4] - 123:5, 134:24, 135:5, 137:24
**Suite** [1] - 2:6
**suits** [3] - 78:25, 122:21, 135:2
**SULLIVAN** [1] - 1:10
**Sullivan** [1] - 147:11
**sums** [2] - 133:18, 134:3
**Superior** [8] - 7:10, 9:20, 10:1, 10:8, 10:18, 91:4, 102:8, 111:20
**supervisor** [5] - 6:2, 6:10, 6:11, 6:22, 7:22
**supervisors** [1] - 114:10
**supervisory** [1] - 56:1
**support** [11] - 17:12, 19:1, 41:21, 43:6, 48:12, 65:15, 70:3, 97:3, 109:11, 126:10, 141:22
**supporting** [2] - 93:6, 138:3
**supports** [12] - 19:2, 34:11, 34:13, 34:16, 34:17, 48:17, 49:11, 51:3, 122:2, 125:18, 127:17, 141:22
**suppose** [3] - 5:24, 6:1, 112:13
**Supreme** [5] - 40:12, 62:1, 79:21, 120:8, 138:19
**surreply** [1] - 26:20
**surrounding** [1] - 65:10
**survivors** [1] - 134:6
**sustained** [3] - 133:19, 134:11, 135:21
**swallow** [1] - 58:20
**sworn** [1] - 99:23
**sympathize** [1] - 101:6
**system** [1] - 96:16

## T

**table** [4] - 53:5, 54:16, 63:6, 65:8
**tacit** [2] - 18:21, 18:24
**talks** [8] - 49:2, 49:23, 68:1, 80:4, 93:23, 105:5, 127:22, 127:23

**tandem** [2] - 37:19, 37:22
**tax** [9] - 36:24, 49:19, 55:17, 59:7, 141:3, 141:7, 143:18, 143:19, 144:19
**taxes** [7] - 22:13, 22:15, 22:17, 22:22, 91:24, 92:1
**taxing** [1] - 49:12
**tear** [1] - 141:10
**tears** [2] - 136:6, 139:15
**Tech** [1] - 62:4
**tempted** [1] - 13:10
**ten** [7] - 23:24, 51:13, 51:21, 51:23, 71:10, 71:22, 133:3
**ten-minute** [3] - 51:13, 51:21, 51:23
**tense** [2] - 36:3, 67:23
**term** [4] - 14:13, 106:17, 122:4, 125:20
**terms** [2] - 141:1
**terrorists** [1] - 133:16
**test** [1] - 84:5
**testify** [4] - 134:8, 135:8, 135:19, 135:20
**testimony** [1] - 83:3
**text** [7] - 26:1, 31:4, 41:20, 62:17, 64:25, 66:9, 69:13
**textual** [1] - 34:2
**THE** [231] - 1:1, 1:3, 1:10, 3:4, 3:11, 3:15, 3:23, 4:1, 4:6, 5:22, 6:10, 6:20, 7:19, 8:13, 8:16, 9:18, 9:22, 10:20, 11:3, 11:13, 11:18, 11:24, 12:2, 12:9, 12:20, 13:10, 13:19, 13:24, 14:25, 17:18, 17:23, 18:18, 18:25, 19:4, 19:9, 19:12, 19:17, 20:2, 20:24, 21:4, 21:8, 22:5, 22:11, 22:21, 23:1, 24:16, 25:14, 25:20, 25:24, 26:3, 27:3, 28:25, 29:5, 29:13, 30:2, 30:7, 30:12, 30:15, 30:17, 30:21, 30:25, 31:9, 31:20, 31:23, 32:20, 32:24, 33:6, 33:10, 33:16, 34:10, 34:14, 34:24, 35:7, 35:13, 35:18, 36:6,

36:19, 36:21, 37:1, 37:4, 37:8, 37:10, 37:13, 37:19, 38:3, 38:6, 38:19, 38:23, 39:1, 39:8, 39:17, 41:9, 41:24, 43:8, 43:17, 43:21, 44:1, 44:13, 44:21, 45:5, 45:11, 45:20, 46:8, 46:15, 47:12, 47:25, 48:8, 50:13, 50:18, 50:21, 51:12, 51:18, 51:20, 52:2, 52:20, 53:10, 53:17, 53:20, 55:22, 58:21, 58:24, 59:1, 60:4, 60:18, 60:23, 61:4, 61:8, 61:12, 62:9, 62:19, 63:13, 63:16, 63:19, 64:6, 65:12, 66:15, 66:20, 67:1, 69:15, 69:17, 69:21, 70:6, 70:11, 70:22, 71:12, 71:17, 72:3, 72:13, 73:1, 73:7, 80:22, 81:1, 81:8, 81:14, 81:16, 82:2, 84:8, 84:12, 84:17, 85:13, 85:17, 85:23, 86:3, 86:22, 87:24, 88:2, 89:6, 89:10, 89:17, 89:22, 90:2, 90:16, 91:23, 92:2, 92:9, 93:3, 95:25, 97:24, 98:11, 98:17, 98:21, 98:24, 99:7, 102:10, 108:5, 111:22, 112:1, 112:9, 112:12, 112:21, 113:2, 114:10, 114:14, 114:23, 115:1, 115:16, 116:3, 116:12, 116:23, 117:4, 117:18, 118:5, 118:7, 119:7, 119:13, 119:19, 120:6, 120:11, 120:15, 120:19, 120:25, 124:14, 125:9, 126:16, 128:2, 128:4, 128:9, 132:18, 132:24, 140:22, 141:10, 141:17, 141:25, 142:7, 144:1, 144:21, 145:2, 145:10, 145:14, 145:17, 146:3
**theme** [1] - 133:5
**themselves** [1] - 18:3

**therefore** [4] - 84:21, 94:17, 110:12, 124:6
**they've** [4] - 28:5, 101:8, 131:9, 135:9
**thinking** [3] - 100:17, 132:25, 137:7
**thinks** [1] - 100:6
**thirty** [5] - 19:24, 93:2, 99:16, 114:11, 140:20
**thirty-eight** [1] - 114:11
**thirty-five** [1] - 19:24
**thirty-three** [1] - 93:2
**Thomas** [4] - 10:21, 10:24, 100:21, 117:5
**thoughts** [2] - 133:1, 142:3
**threat** [1] - 25:3
**three** [5] - 78:3, 81:19, 85:16, 93:2, 108:22
**throughout** [1] - 23:21
**throw** [1] - 56:22
**thugs** [1] - 133:16
**tickets** [2] - 22:18
**tired** [2] - 92:6, 101:20
**Title** [4] - 73:15, 74:22, 76:10, 96:21
**title** [1] - 145:12
**to...enact** [1] - 73:22
**today** [13] - 13:5, 15:4, 16:6, 16:9, 41:17, 41:22, 69:18, 74:6, 86:23, 117:3, 135:11, 140:6, 146:3
**together** [2] - 54:2, 106:15
**token** [1] - 29:15
**toll** [1] - 138:14
**tomorrow** [1] - 146:4
**took** [9] - 4:17, 19:4, 55:24, 78:9, 78:15, 99:23, 107:18, 108:13, 135:23
**top** [1] - 71:21
**topics** [1] - 51:10
**tortured** [1] - 135:9
**total** [2] - 74:17
**totally** [2] - 42:25, 97:18
**touched** [1] - 25:14
**tough** [1] - 69:25
**towards** [1] - 38:22
**track** [3] - 66:3, 66:4, 115:2
**Traffic** [1] - 128:18
**transcribed** [1] - 147:15
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:20

**transcript** [3] - 145:24, 145:25, 147:14
**transcription** [1] - 1:21
**transform** [1] - 57:7
**transmission** [1] - 75:15
**treacherous** [1] - 90:11
**treasury** [15] - 24:4, 24:9, 25:17, 25:18, 25:22, 26:13, 26:18, 26:23, 27:1, 27:7, 27:11, 27:13, 28:15, 95:14, 109:21
**Treasury** [1] - 95:23
**treat** [1] - 57:16
**treated** [3] - 21:19, 23:25, 24:14
**treaty** [2] - 134:21, 136:18
**tremendous** [1] - 94:21
**tried** [2] - 65:22, 144:16
**tripart** [1] - 96:16
**tripart-type** [1] - 96:16
**trouble** [1] - 18:14
**troubled** [2] - 140:3
**true** [12] - 29:2, 30:7, 31:2, 31:23, 31:24, 41:3, 47:21, 122:18, 122:19, 123:7, 133:21
**truthful** [3] - 30:15, 30:17, 30:19
**try** [3] - 91:15, 136:2
**trying** [1] - 86:5
**tugs** [2] - 133:6, 141:18
**tune** [1] - 122:13
**turn** [3] - 15:14, 38:21, 97:17
**turned** [1] - 100:24
**turnout** [1] - 71:25
**twelve** [2] - 85:1, 117:23
**twelve-person** [1] - 85:1
**twice** [1] - 79:18
**two** [20] - 7:5, 15:7, 15:15, 15:19, 16:2, 45:13, 50:8, 50:15, 52:21, 53:4, 56:8, 60:15, 62:7, 68:22, 69:5, 81:19, 109:4, 126:23, 138:20, 138:23
**two-House** [2] - 15:15, 16:2

**type** [2] - 13:11, 96:16
**typewritten** [1] - 147:16

## U

**U.S** [9] - 48:20, 48:24, 79:12, 88:21, 89:4, 95:23, 99:24, 133:23, 142:22
**ultimate** [1] - 83:23
**unamended** [1] - 112:4
**unanimous** [6] - 19:21, 85:1, 102:5, 102:15, 104:7, 104:23
**unanimously** [1] - 61:5, 84:20, 100:5
**unaware** [1] - 13:20
**uncomplicated** [1] - 42:20
**uncontroverted** [5] - 30:21, 30:22, 31:22, 81:1, 81:2
**under** [25] - 8:11, 18:12, 21:21, 23:13, 25:17, 28:19, 39:15, 46:3, 46:11, 48:12, 58:6, 58:9, 59:18, 73:12, 80:2, 83:9, 85:15, 93:21, 94:2, 94:24, 98:10, 118:24, 122:21, 123:23, 126:9
**understood** [4] - 79:24, 80:17, 80:19, 84:5
**undisputed** [2] - 41:12, 76:13
**unemployment** [2] - 105:12, 107:2
**unfair** [3] - 92:3, 116:3, 116:4
**unfortunately** [2] - 4:22, 13:17
**unfounded** [1] - 44:5
**Uniform** [1] - 58:2
**unilateral** [1] - 20:14
**UNITED** [2] - 1:1, 1:10
**united** [1] - 1:24
**United** [45] - 26:7, 35:15, 49:13, 49:17, 49:20, 49:21, 50:4, 50:8, 54:4, 54:11, 54:17, 57:8, 57:15, 57:16, 57:17, 58:18, 58:20, 68:2, 68:10, 68:11, 68:24, 73:24, 75:3, 75:20, 78:23,

97:6, 105:5, 105:16, 105:19, 105:20, 105:25, 106:2, 106:11, 106:25, 107:3, 107:12, 107:15, 117:11, 122:23, 126:7, 134:14, 134:21, 147:5, 147:9, 147:11
**unjust** [2] - 92:3, 141:20
**unlawful** [9] - 6:21, 11:7, 11:18, 42:1, 70:9, 72:12, 72:21, 72:22, 112:2
**unless** [8] - 5:14, 28:1, 73:18, 76:1, 95:15, 98:1, 113:20, 119:7
**unlike** [1] - 48:4
**unlikely** [1] - 117:24
**unliquidated** [1] - 134:3
**unnecessary** [1] - 77:19
**unsure** [1] - 6:17
**untenable** [2] - 92:4, 95:10
**up** [33] - 9:24, 15:25, 26:4, 29:22, 32:18, 39:2, 48:7, 53:12, 53:24, 57:10, 58:20, 62:1, 65:23, 66:18, 67:7, 69:8, 72:24, 73:2, 88:5, 93:1, 98:7, 99:17, 106:4, 109:3, 110:13, 113:5, 115:14, 119:6, 121:11, 132:12, 135:10, 135:11, 140:23
**uphold** [3] - 99:23, 99:24, 132:2
**upright** [1] - 101:2
**upset** [1] - 144:3
**upwards** [1] - 16:13
**urge** [8] - 44:3, 51:6, 56:23, 67:5, 69:10, 69:11, 117:16, 126:1
**urged** [1] - 93:1
**urging** [4] - 52:6, 70:17, 72:16, 130:4
**uses** [2] - 67:3, 69:3

## V

**valid** [19] - 28:19, 28:24, 39:21, 70:16, 71:3, 91:10, 100:1, 108:15, 108:20, 110:11, 111:1,

112:20, 113:18, 118:3, 129:24, 130:10, 131:15, 142:15
**validity** [3] - 32:13, 100:7, 132:15
**various** [2] - 4:14, 4:18
**vast** [1] - 133:18
**verbatim** [1] - 52:6
**verified** [1] - 30:11
**verify** [1] - 13:23
**version** [1] - 72:24
**versions** [1] - 145:14
**versus** [4] - 3:6, 10:18, 34:25, 69:22
**vest** [1] - 77:8
**vested** [1] - 35:14
**vesting** [2] - 67:11, 127:22
**vests** [1] - 78:11
**veto** [3] - 84:22, 84:25, 85:3
**vetoed** [2] - 12:3, 84:25, 85:1
**VI** [3] - 73:15, 76:10, 96:21
**view** [17] - 4:22, 10:6, 10:8, 11:9, 11:14, 11:15, 12:14, 18:19, 18:20, 20:18, 30:24, 61:2, 71:15, 72:10, 85:8, 105:7, 143:2
**views** [14] - 44:16, 44:17, 70:19, 70:23, 71:1, 107:22, 109:2, 126:15, 129:10, 129:13, 133:14, 140:18, 140:25, 141:1
**Vincent** [1] - 3:6
**VINCENT** [1] - 1:6
**violate** [8] - 23:13, 25:6, 59:18, 76:4, 87:20, 93:10, 99:18
**violated** [1] - 42:24
**violates** [5] - 75:18, 77:22, 115:13, 117:12, 128:24
**violating** [2] - 7:23, 94:19
**violation** [8] - 75:7, 85:11, 88:24, 97:23, 104:6, 107:25, 111:5, 111:8
**violations** [2] - 7:1, 129:1
**virtually** [1] - 79:16
**virtue** [1] - 27:18
**vis-à-vis** [2] - 21:25,

22:1
**visited** [2] - 17:6
**void** [6] - 94:3, 94:20, 108:16, 129:4, 130:19, 130:25
**voiding** [1] - 86:15
**VOLCHOK** [1] - 2:11
**Volchok** [1] - 4:3
**vote** [14] - 18:12, 71:4, 85:1, 85:9, 104:4, 104:14, 107:20, 112:8, 113:7, 113:9, 113:16, 113:18, 117:22, 117:23
**voted** [3] - 76:22, 81:5, 84:20
**voters** [1] - 19:22
**votes** [2] - 32:10, 87:9
**vs** [2] - 1:5, 147:8

## W

**wage** [1] - 59:13
**wait** [5] - 14:10, 20:19, 20:25, 38:6, 52:17
**waits** [1] - 21:18
**waken** [1] - 135:10
**walking** [1] - 99:3
**Walter** [1] - 92:7
**wants** [11] - 15:1, 19:13, 20:8, 20:9, 68:25, 88:11, 99:20, 111:16, 113:23, 114:18, 117:24
**warning** [1] - 72:22
**warranted** [1] - 124:10
**Washington** [19] - 1:5, 1:15, 1:18, 1:25, 2:7, 29:6, 43:3, 53:21, 54:7, 54:21, 55:6, 56:2, 56:22, 57:5, 57:23, 58:13, 68:5, 105:7, 126:4
**WAXMAN** [1] - 2:10
**ways** [2] - 22:14, 41:5
**Wednesday** [2] - 1:5, 147:9
**week** [2] - 135:23, 136:1
**weekend** [1] - 140:17
**weighed** [1] - 4:14
**weight** [9] - 29:20, 30:12, 42:4, 44:23, 80:22, 82:24, 128:13, 128:18
**well-aware** [1] - 18:8
**well-meaning** [1] - 44:17
**well-pleaded** [2] - 6:15, 9:6

**well..** [1] - 9:18
**whatsoever** [1] - 76:12
**whereof** [1] - 147:17
**whip** [1] - 109:4
**WHITE** [1] - 2:10
**White** [1] - 4:5
**whole** [8] - 23:9, 37:25, 43:13, 91:16, 96:6, 105:20, 114:16, 143:4
**wholeheartedly** [1] - 70:3
**Wilmer** [1] - 4:3
**window** [2] - 96:6, 113:22
**winds** [1] - 101:2
**wins** [1] - 35:20
**Wisconsin** [1] - 1:14
**wish** [4] - 3:15, 4:19, 13:3, 139:17
**witness** [1] - 147:17
**won** [1] - 71:18
**wondered** [1] - 4:16
**wondering** [1] - 52:22
**word** [3] - 27:9, 73:14, 131:4
**words** [5] - 7:15, 58:13, 94:10, 109:7, 115:17
**Workers'** [2] - 54:24, 55:13
**works** [2] - 54:22, 129:18
**World** [1] - 62:4
**world** [1] - 134:8
**worried** [1] - 32:17
**worry** [3] - 15:12, 123:6, 123:17
**worth** [1] - 125:12
**write** [1] - 20:3
**writes** [2] - 52:7, 52:21
**writing** [1] - 136:25
**written** [2] - 33:4, 127:9
**wrongly** [1] - 47:13
**wrote** [3] - 33:21, 63:5, 100:9

## Y

**year** [11] - 92:23, 110:16, 110:17, 114:2, 114:3, 114:5, 114:20, 114:21, 116:10, 123:8, 132:14
**years** [49] - 6:24, 14:2, 14:3, 14:10, 14:11, 16:10, 23:24, 28:6,

29:7, 38:19, 40:5, 40:7, 40:12, 41:1, 65:12, 65:23, 66:11, 75:5, 77:3, 82:15, 82:25, 87:3, 87:4, 87:7, 92:18, 92:19, 93:1, 93:2, 99:16, 101:7, 101:8, 101:17, 103:17, 110:6, 112:7, 113:8, 115:8, 116:8, 116:9, 131:19, 131:24, 132:10, 133:3, 133:13, 133:17, 139:7
**yesterday** [1] - 74:7
**Yogi** [1] - 130:15
**yourself** [1] - 5:19
**yourselves** [1] - 3:8
**youth** [1] - 101:20

## Z

**Zoo** [1] - 68:4
**zoo** [2] - 68:15
**ZVENYACH** [1] - 2:9
**Zvenyach** [2] - 3:20, 82:9
**Zvenyach's** [1] - 82:9



OFFICE OF THE GENERAL COUNSEL
Council of the District of Columbia
1350 Pennsylvania Avenue NW, Suite 4
Washington, DC 20004
(202) 724-8026

Council of the District of Columbia, Committee of the Whole
Public Hearing on Bill 19-993, the "Local Budget Autonomy Act of 2012"
Testimony of V. David Zvenyach, General Counsel
November 9, 2012

Good afternoon, Mr. Chairman, and members of the Committee of the Whole. I am V. David Zvenyach, General Counsel for the Council of the District of Columbia. I am pleased to submit this testimony with respect to Bill 19-993, the "Local Budget Autonomy Act of 2012."

## Background

The Local Budget Autonomy Act ("Autonomy Act") proposes to amend the District of Columbia Charter to allow the Council to (1) change the District's fiscal year by act; and (2) adopt the District's local budget by act, subject to the 30-day Congressional review period set forth in section 602(c) of the Home Rule Act.

The issue of budget autonomy is not new. The proposal in the Autonomy Act to amend the Charter is, however, a novel approach to addressing the issue. And, as you know, there are some who doubt the legality of the approach set forth in the Autonomy Act.

For the reasons that I have set forth in the attached memorandum, however, I am of the view that the Autonomy Act is legally sufficient for Council consideration. In the interest of time, I will briefly summarize the points, and I will defer discussion of the Antideficiency Act to a fellow panelist.

But before I proceed, it is important to clarify that the legislation does *not* propose eliminating or otherwise altering Congress's authority to set the District's local budget. Indeed, I am aware of no proposal—before the Council or before Congress—that would remove Congress's ultimate authority to appropriate District funds as Congress sees fit. Rather, the Autonomy Act proposes giving the District Government the ability to function when Congress takes *no* action with regard to the District's budget.

## Use of the Charter-Amendment Process

To do so, the Autonomy Act would use the Charter amendment process set forth in section 303 of the Home Rule Act. That process has been used on 3 occasions, and earlier this week, the District voters ratified additional amendments to the Charter.

Testimony of V. David Zvenyach, General Counsel
Public Hearing on Bill 19-993, November 9, 2012
Page 2 of 3

In Council Period 2, the Council passed the Initiative, Referendum, and
Recall Charter Amendments Act of 1977. Under the Act, the Council partially
delegated its legislative authority to District voters such that voters could
initiate an act and suspend local legislation. The amendments also
authorized District voters to recall elected officials. Since going into effect in
1978, District voters have proposed more than 140 initiatives, 10 of which
have become law.

In 2000, the Council passed the School Governance Charter Amendment Act
of 2000, which reduced the number of members of the Board of Education
from 11 to 9, and which provided that only 5 of the 9 members be appointed.
Before the Amendment, the Board of Education consisted of 11 elected
members.

Ten years later, the Council passed the Attorney General for the District of
Columbia Clarification and Elected Term Amendment Act of 2010, which
added a new section 435 to the Charter establishing an elected Attorney
General for the District of Columbia.

Earlier this week, District voters ratified three additional Charter
amendments, concerning the ability of the Council to expel a member for
gross misconduct and prohibiting a Councilmember or Mayor from continuing
to serve if convicted of a felony while holding office.

Taken together, these Charter amendments reflect significant structural
changes to the District's local governance, from the Council's delegation of
authority to adopt and repeal local laws to the establishment of a new elected
official.

Accordingly, while the Council's power under section 303 has been used
sparingly, the power has been used to implement significant changes in the
governance and structure of the District's local affairs.

## Section 303

With respect to the language of section 303, there are several points that
must be made.

First, section 303(a) authorizes the Council to amend any part of the Charter
save for three explicit restrictions: 401(a), 421(a), and Part C. These
restrictions concern the establishment of the Council, the Mayor, and the
Judiciary, respectively.

It is significant, though not dispositive, that Congress did not make Part D
off-limits with regard to the Charter-amendment process. By omitting Part
D, Congress apparently did not intend to foreclose changes to the budget
process. For example, I am of the view that the Council could amend section
441 to change the District's fiscal year. Or the Council could eliminate the
line-item veto found in section 404(f). Both provisions relate to the budget

Testimony of V. David Zvenyach, General Counsel
Public Hearing on Bill 19-993, November 9, 2012
Page 3 of 3

process, and in my view are plainly within the Council's power to change
through the Charter amendment process.

Second, section 303(d) prevents the Council from enacting any law or
affecting any law with respect to which the Council may not enact any act,
resolution, or rule under the limitations specified in sections 601, 602, and
603.

Of those limitations, the most difficult hurdle is section 603(a), which is
susceptible to two primary interpretations. It <u>could</u> be read as a bright-line
prohibition of the ability of the Council to affect the budget process. Or it
could be read as a declaration that Congress maintains ultimate authority
with respect to the budget, and that the Home Rule Act as originally
approved meant to leave the budget process intact. In my view, the latter
reading is preferable and consistent with both the plain language and the
overall purposes of the Home Rule Act.

One of Congress's main purposes in adopting the Home Rule Act was "to the
greatest extent possible, consistent with the constitutional mandate [of
Article I], relieve Congress of the burden of legislating upon essentially local
District matters." In accordance with this purpose, courts have consistently
construed the limitations in Title VI narrowly.

Moreover, the plain language of section 603(a) indicates that it was intended
as a reservation of authority—not an explicit limitation on the Council. It is
naturally read as a statement that the provisions of the Home Rule Act, as
they relate to the budget process, were intended to restate current practice as
it existed at the time the Home Rule Act was initially approved.

## Conclusion

There can be no doubt that Congress intended to approve the entirety of the
District's budget, and that the District has operated under that scheme for
almost 40 years. The question before the Council is whether Congress
intended to foreclose the District from legislating on an entirely local issue
when Congress chooses to remain silent. In my view, to answer that question,
we must look not only to the text of the Home Rule Act, but its stated
purpose: to "relieve Congress of the burden of legislating upon essentially
local District matters." In light of that purpose, and for the reasons set forth
in the attached memorandum, the Autonomy Act is legally sufficient for
Council consideration.

Thank you for allowing me to offer this testimony. I am available if you have
any questions.

OFFICE OF THE GENERAL COUNSEL
COUNCIL OF THE DISTRICT OF COLUMBIA

1350 Pennsylvania Avenue NW, Suite 4, Washington, DC 20004 • (202) 724-8026

## MEMORANDUM

| | |
|---|---|
| To: | Chairman Phil Mendelson |
| From: | V. David Zvenyach, General Counsel |
| Date: | November 9, 2012 |
| Re: | Legal sufficiency of Bill 19-993, the Local Budget Autonomy Act of 2012 |

Bill 19-993, the Local Budget Autonomy Act of 2012 ("Autonomy Act"), is legally sufficient for Council consideration.

## I.    BACKGROUND

The Autonomy Act would amend the District of Columbia Home Rule Act ("Home Rule Act" or "HRA"),[1] to provide for local budget autonomy for the District government. Specifically, the Autonomy Act proposes amendments to the Charter that would allow the Council to (1) change the District's fiscal year by act; and (2) adopt the District's local budget by act, subject to the 30-day Congressional review period set forth in section 602(c) of the Home Rule Act.

## II.    OVERVIEW OF THE DISTRICT'S BUDGET PROCESS

Currently, the Home Rule Act requires affirmative Congressional action with respect to the entire District budget. The Autonomy Act would change the Charter to authorize the Council to adopt the District's local budget by act, and require that the District transmit the federal portion of its budget to Congress for inclusion in a federal appropriation.

Pursuant to section 442(a) of the Home Rule Act, the Mayor prepares and submits a proposed annual budget to the Council. Section 603(c) requires the Mayor to submit a balanced budget

---

[1] More specifically, the Autonomy Act proposes amendments to the "Charter" of the District of Columbia, which is set forth in Title IV of the Home Rule Act. HRA § 301.

and identify any tax increases which shall be required to balance the budget submitted. The Council is required to adopt such tax increases to the extent the budget is approved. The annual budget submitted must include, among other items, a multiyear plan for all agencies of the District government (as required under section 443) and a multiyear capital improvements plan for all agencies of the District government (as required under section 444).

Section 446, the provision that governs the Council's review of the budget, requires the Council to hold a public hearing on the Mayor's budget submission and, within 56 calendar days after receipt of the budget proposal from the Mayor, adopt a budget by act. The act is styled as a Budget Request Act and requires only one reading. If the Mayor approves the budget act, the Mayor submits it to the President for transmission to Congress.

Unlike other acts submitted to the Mayor for signature, the Mayor may exercise a line-item veto under section 404(f). If the Mayor disapproves an item or provision, the Mayor must attach to the act a statement of the item or provision which is disapproved and, within the 10-day period for approval or disapproval, return a copy of the act and statement with his or her objections to the Council.

In the event of a line-item veto, the Council has 30 calendar days to reenact a disapproved item or provision by a two-thirds vote of the members of the Council present and voting. If an item or provision is reenacted, the Chairman submits it to the President for transmission to Congress. If the Mayor fails to return timely a disapproved item or provision to the Council, he or she shall be deemed to have approved the item or provision and the Chairman submits it to the President for transmission to Congress.

Unlike other local legislation, the Budget Request Act does not become effective after a period of Congressional review—it never becomes law. Congress must appropriate all funds for the

**Chairman Phil Mendelson**
**November 9, 2012**
**Page 3 of 16**

District of Columbia by Congressional Act, which may, but is not required to, include some or all of the provisions of the Budget Request Act.

It is important to note to note that the Autonomy Act does *not* propose abrogating Congress's ultimate authority to set the District's local budget, or to prevent Congress from changing the District's local budget. What the Autonomy Act proposes is to authorize the District to establish its local budget without affirmative Congressional action. Instead, the local budget would be subject to passive review by Congress pursuant to section 602(c) of the Home Rule Act and the ultimate authority of Congress expressly reserved under section 601 of the Home Rule Act to affirmatively override a local budget established by the District.

More specifically, the Autonomy Act would principally amend section 446 to require the Council to pass a local budget within 70 days of receipt of Mayor's proposal. The local budget would require two readings and would be submitted for the 30-day Congressional review period. In essence, the local budget act would be equivalent to other Council acts.

## III.  BY ADOPTING THE HOME RULE ACT, CONGRESS INTENDED TO GIVE THE DISTRICT BROAD AUTHORITY TO GOVERN LOCAL AFFAIRS

Before addressing the specific provisions in the Home Rule Act relevant to the Autonomy Act, it is important to understand the overarching framework and animating purposes of the Home Rule Act.

When it adopted the Home Rule Act, Congress intended to give the District Government—and the Council in particular—broad authority to legislate on areas of local concern, while reserving its plenary constitutional authority.

Specifically, the Home Rule Act states that Congress's paramount purpose was to "grant to the inhabitants of the District of Columbia powers of local self-government…and, to the greatest extent possible, consistent with the constitutional mandate [of Article I], relieve Congress of the burden of legislating upon essentially local District matters."[2]

To do so, Congress generally vested the Council with the legislative power over "all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of [the Home Rule] Act."[3]

Although Congress explicitly restricted the Council's authority to legislate in certain areas of concern to Congress (found principally in Title VI of the Home Rule Act), these restrictions were not intended to foreclose the Council from exercising its core legislative functions. Rather, as the District of Columbia Court of Appeals recently observed, "[i]n view of [Congress's] broad delegation of authority and the policy of the Home Rule Act, we have held that limitations on the Council's legislative authority will be construed narrowly."[4]

## IV.   CONSISTENT WITH THE BROAD DELEGATION OF LEGISLATIVE POWER, THE COUNCIL HAS BROAD AUTHORITY TO AMEND THE CHARTER

Section 303 of the Home Rule Act authorizes the Council to amend the District's Charter, subject to ratification by District voters and passive review by Congress. Additionally, section 303 imposes two substantive limitations on the Council's authority to amend the Charter.

---

[2] HRA § 102(a).
[3] HRA § 302.
[4] *Washington, D.C. Association of Realtors, Inc. v. District of Columbia*, ___ A.2d ___, No. 11-CV-833, slip op. at 18 (quoting D.C. Official Code § 1-201.02) (internal ellipses and brackets omitted).

First, section 303(a) prohibits the Council from amending
sections 401(a), 421(a), and Part C of the Charter, which
concern the establishment of the Council, the establishment of
the Mayor, and the functioning of the judiciary, respectively.
The Autonomy Act does not purport to amend any of these
sections and, as discussed in section IV.A below, Congress's
inclusion of these specific prohibitions on the use of the Charter
amendment suggests that Congress did not mean to preclude
the District from amending Part D of the Charter.

Second, section 303(d) prohibits the Council from using the
Charter-amendment process to "enact any law or affect any law
with respect to which the Council may not enact any act,
resolution, or rule under the limitations specified in sections
601, 602, and 603." By its terms, section 303(d) only applies to
"limitations" set forth in those sections in Title VI, and the
question becomes, which provisions within those sections are
limitations. As discussed in section IV.B below, the limitations
set forth in sections 601-603 do not prevent the Council from
approving the Autonomy Act.

A.      **If Congress intended to foreclose amendments to
        Part D of the Charter, Congress could have done
        so affirmatively.**

Congress's express prohibition on the Council's use of the
Charter amendment process to amend Part C of the Charter
deserves special attention. And, although it is now repealed,
Title V of the Home Rule Act—which is *outside* the Charter
and therefore not subject to change through the Charter
amendment process—is instructive of Congress's intention with
regard to section 303. Both are discussed separately.

*Part C of the Charter*

Part C of the Charter establishes the District's local judiciary.
Specifically, in Part C, Congress vested the District's judicial
power in the District of Columbia Court of Appeals and the

Superior Court of the District of Columbia, provided for the manner by which District judges are appointed, and established the District of Columbia Judicial Nomination Commission. Congress also established the District of Columbia Commission on Judicial Disabilities and Tenure within Part C, and set forth a process for removing and suspending a District judge.

In section 303(a), Congress expressly prohibited the Council from amending Part C of the Charter. Had Congress intended to prevent the Council from amending the budget process, Congress could have done exactly what it did for Part C. It is a common (though not always decisive) principle of statutory interpretation: the expression of one thing, in this case Part C, is the exclusion of another.[5]

By omitting Part D from section 303(a), though, Congress may very well have intended to leave the Council with significant discretion to make changes to local budgetary matters through the Charter amendment process. For instance, under section 441 of the Charter, the District's fiscal year begins on October 1st and ends on September 30th. There is nothing in the Home Rule Act that suggests that the Council could not amend section 441 to establish a different fiscal year. Similarly, section 412 authorizes the Mayor to exercise a line-item veto of Budget Request Acts. But again, the Home Rule Act leaves no indication that the line-item-veto power is sacrosanct. Even section 446, which is at the heart of the local budgetary process, has provisions (such as the 56-day Council review period and reprogramming authority) that are susceptible to the Charter amendment process.

---

[5] *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993).

*Title V of the Home Rule Act*

It is also instructive that Congress actually did preclude the Council from affecting the now-repealed provisions of the District's budget process, the Federal payment provisions, found in Title V of the Home Rule Act.

Until 1997, the Home Rule Act provided a specific process by which the District government could request a Federal payment. Specifically, section 501(c) provided that:

> The Mayor shall submit his request, with respect to the amount request, of an annual Federal payment, to the Council. The Council shall by act approve, disapprove, or modify the Mayor's request. After the action of the Council, the Mayor shall, by December 1 of each calendar year, in accordance with the provisions in the Budget and Accounting Act, 1921 (31 U.S.C. 2), submit such request to the President for submission to the Congress. Each request regarding an annual Federal payment shall be submitted to the President seven months prior to the beginning of the fiscal year for which such request is made and shall include a request for an annual Federal payment for the next following fiscal year.

By virtue of the fact that section 501(c) existed outside of the Charter, the Council would not have the authority to amend the provisions in Title V through the Charter amendment process set forth in section 303. Had Congress intended to prevent the Council from affecting *any* portion of Part D of the Charter, it could have done so by including those provisions in Title V.

## B.      Limitations in sections 601-603

Section 303(d) prohibits the Council from using the Charter-amendment process to "enact any law or affect any law with

respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603." Each pertinent limitation in these sections—601, 602, and 603—is discussed separately.

*Section 601*

Section 601, which relates to Congress's retention of constitutional authority, provides that:

> Notwithstanding any other provision of this Act, the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by this Act, including legislation to amend or repeal any law in force in the District prior to or after enactment of this Act and any act passed by the Council.

Section 601 does not limit the Council's authority to act; rather, section 601 concerns the finality of the Council's actions. That is, section 601 reserves for Congress the right to take any legislative act affecting the District, including acts in conflict with those taken by the Council and even those set forth in the Home Rule Act.

Although section 601 serves as a clear reminder that Congress retains plenary authority to legislate on local matters, section 601 does not prevent the Council from exercising its legislative power consistent with the Home Rule Act. Again, the Autonomy Act would not alter the express reservation of the ultimate authority of Congress over the affairs of the District.

*Section 602*

In general, section 602 is where most limitations on Council can be found. Section 602 consists of three subsections, two of which require discussion.

Section 602(a) contains ten subject-matter limitations on Council actions. Of those 10 limitations, only the last (paragraph (10)) requires a closer look.

Paragraph (10) provides that the Council has no authority to "enact any act, resolution, or rule with respect to the District of Columbia Financial Responsibility and Management Assistance Authority established under section 101(a) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995 [D.C. Official Code § 47-391.01(a)]."

The Autonomy Act includes amendments to the Charter that introduce references to "control years" pursuant to the District of Columbia Financial Responsibility and Management Assistance Act of 1995. But, as introduced, the Autonomy Act plainly intends to avoid affecting the Authority or the budget process used during a control year.

Section  602(c) sets forth the "passive review" process for legislation. The Autonomy Act does not purport to alter section 602(c). Rather, the Autonomy Act would treat local budget acts in the same manner as other local legislation, subject to Congressional review.

Thus, section 602 does not present a limitation on the Council's ability to adopt the Autonomy Act.

*Section 603*

At first glance, section 603 presents the biggest hurdle for the Autonomy Act, as it includes specific limitations about the District's budget process. Upon close review, however, section

603 does *not* prevent the Council from amending the Charter to allow the District to adopt a local appropriation when Congress does not do so.

Most of section 603 does not affect the analysis of the Autonomy Act.[6] Indeed, only subsection (a) requires significant attention. Section 603(a) provides that:

> Nothing in this act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

This language is susceptible to two primary interpretations. Section 603(a) could be read as a bright-line prohibition of the ability of the Council to affect the budget process as set forth in Title IV. Alternatively, section 603(a) could be read as a declaration that Congress maintains ultimate authority with respect to the budget, and that the Home Rule Act as originally approved meant to leave the budget process intact. In my view, the latter reading is preferable and consistent with both the plain language and the overall purposes of the Home Rule Act.

As explained in section III above, one of Congress's main purposes in adopting the Home Rule Act was "to the greatest extent possible, consistent with the constitutional mandate [of Article I], relieve Congress of the burden of legislating upon

---

[6] There is a strong textual argument that subsections (b), (c), (d), and (f) are *limitations* on the District, while subsections (a) and (e) are merely an indication of Congress's intent with respect to the District. Because subsections (b), (c), (d), and (f) are not at issue with respect to the Autonomy Act, however, I am omitting a fuller discussion of this point.

essentially local District matters." In accordance with this purpose, courts have consistently construed the limitations in Title VI narrowly.

Moreover, the plain language of section 603(a) indicates that it was intended as a reservation of authority—not an explicit limitation on the Council. It is naturally read as a statement that the provisions of the Home Rule Act, as they relate to the budget process, were intended to restate current practice as it existed at the time the Home Rule Act was initially approved.

Accordingly, sections 601, 602, and 603 do not appear to foreclose the Council from pursuing local budget autonomy through the Charter amendment process.

## V.   THE COUNCIL HAS MADE SIGNIFICANT STRUCTURAL CHANGES TO THE CHARTER.

Although the Charter has been amended many times by Congress, the Council has only used its power under section 303 to amend the Charter through voter ratification on three[7] occasions: (1) to allow the public to propose ballot measures; (2) to amend the District's public-school governance structure; and (3) to make the District's Attorney General an elected official.

First, in Council Period 2, the Council passed the Initiative, Referendum, and Recall Charter Amendments Act of 1977,[8] which was ratified in a special election 1977. Under the Act, the Council partially delegated its legislative authority to District voters such that voters could initiate an act and suspend local legislation. The amendments also authorized District voters to recall elected officials.

---

[7] Technically, the first Charter amendment was considered to be two separate Charter amendments.
[8] Effective March 10, 1978 (D.C. Law 2-46; 24 DCR 199).

It is worth reflecting on the significance of this change. When it passed the Home Rule Act, Congress delegated its legislative powers to the Council; not to the electorate. Yet, in one of the earliest exercises of legislative power, the Council empowered District voters to propose and vote on local laws. Since going into effect in 1978, District voters have proposed more than 140 initiatives, 10 of which have become law.[9]

Then, in 2000, the Council passed the School Governance Charter Amendment Act of 2000,[10] which reduced the number of members of the Board of Education from 11 to 9, and which provided that only 5 of the 9 members be appointed. Before the Amendment, the Board of Education consisted of 11 elected members.

Ten years later, the Council passed the Attorney General for the District of Columbia Clarification and Elected Term Amendment Act of 2010,[11] which added a new section 435 to the Charter establishing an elected Attorney General for the District of Columbia.[12]

Finally, earlier this week, District voters ratified three additional Charter amendments as a result of the Board of Ethics and Government Accountability Establishment and Comprehensive Ethics Reform Amendment Act of 2011, effective April 27, 2012 (D.C. Law 19-124; 59 DCR 1862). The first of the three amendments concerned the ability of the Council to expel a member for gross misconduct, and the other two amendments concerned the ability of an elected official to remain in office if convicted of a felony while holding the office.

---

[9] Rosalyn Steward, *OGC Report: An Overview of D.C. Initiatives* (Nov. 2012).

[10] Effective July 07, 2000 (D.C. Law 13-159; 47 DCR 2212). Congress waived its review period in section 1 of Public Law No. 106-226, approved June 27, 2000 (114 Stat. 459).

[11] Effective May 30, 2011 (D.C. Law 18-160; 57 DCR 3012).

[12] *Id.* § 201(b).

**Chairman Phil Mendelson**
**November 9, 2012**
**Page 13 of 16**

Taken together, these Charter amendments reflect significant
structural changes to the District's local governance, from the
Council's delegation of authority to adopt and repeal local laws
to the District voters to the establishment of a new elected
official. Accordingly, while the use of the Council's power under
section 303 has been used sparingly, the power has been used
to implement significant changes in the governance and
structure of the District's local affairs.

# VI.   ADDITIONAL CONSIDERATIONS

## A.   Congress's legislative intent, though important, is not dispositive of the issue

Although I view the measure to be legally sufficient for Council
consideration, there is a contrary view. That view is grounded
in the assertions best captured in the dicta of *Hessey v. District
of Columbia Board of Elections and Ethics*, 601 A.2d 3, 8-9
(D.C. 1991)), that "the Council cannot authorize the spending of
local revenues; only Congress can" and that "[t]he legislative
history of the [Home Rule Act] makes clear that the [Home
Rule Act] left in place the pre-existing Congressional
appropriations process for the District government." *Id.* n.6.

This view has appeal precisely because the authors of the
Home Rule Act did not envision the District having local
spending authority. [13] In fact, the legislative record is perfectly
clear that Congress intended to "preserve Congress['s] complete
role in the review and appropriation of the entire District
budget."[14] This reservation of authority was apparently seen by
some as a constitutional requirement:

---

[13] House Committee on the District of Columbia, 93 Cong., 2d Sess.,
Home Rule for the District of Columbia, 1973-1974 (Comm. Print
1974).

[14] In Conference, Congress rejected the Senate's provisions for the
District budget and adopted the House provisions which "preserv[ed]
the Congressional appropriations provisions of existing law." *Id.* at
3056-57.

> [A]t the time this bill was presented to the House, I
> stated that in order to comply with the provision of the
> Constitution, delegation of home rule to the residents of
> the District must be given with the express reservation
> that the Congress may, at any time, revoke or modify
> the delegation in whole or in part and further that the
> Congress must take such action as in its wisdom it
> deems desirable with respect to any municipal action
> taken by the people or the Government of the District of
> Columbia. . . . In addition, Congress must, under the
> constitutional provision, retain the right to review and
> to appropriate the entire District budget approving of
> the necessary Federal payment and passing upon all
> reprograming requests.[15]

Congress therefore plainly meant to retain its authority to set
the District's budget, and section 603(a) leaves no doubt of
Congress's reservation of its ultimate budget authority.

But the authors of the Home Rule Act also understood that the
Charter would be subject to change, both by Congress and
through the Charter amendment process set forth in section
303.[16] Indeed, the Council's early adoption of the Initiative,
Referendum, and Recall Charter Amendments Act of 1977
rejected Congress's intent with regard to recall elections.
Specifically, as the Committee on Government Operations
explained:

> It appears from the legislative history surrounding the
> recall measure that [recall elections] did not enjoy wide
> or strong support in either the House or in the Senate.
> Section 496 of the House bill was not pushed by the floor
> managers in the conference or on the floor of the House.

---

[15] *Id.* at 3060 (Remarks of Congressman William H. Natcher,
Chairman of House Appropriations Committee Subcommittee on the
District of Columbia, to the House of Representatives on the
Conference Report).
[16] Since Home Rule, the Charter has been amended almost 50 times.

+

USCA Case #14-7067    Document #1500336        Filed: 07/01/2014    Page 409 of 470

This lack of support for the recall provision was a cause of its failure to be sustained in conference. This does not mean that recall is precluded, however, because, the Home Rule Charter does contain a procedure for its amendment and a recall provision could be added at this time, pursuant to section 303(a), (b), and 604 of the Home Rule Charter.[17]

Accordingly, even where Congress did not intend for a specific Charter amendment, the Council has applied section 303 broadly. And, as stated before, the Autonomy Act does not purport to remove or otherwise alter Congress's authority to review, alter, or otherwise affect the District's budget.

## B.      The Antideficiency Act

The other legal issue that has been identified is the relationship between the Autonomy Act and 31 U.S.C. § 1341 (the federal Antideficiency Act). Under the Antideficiency Act, no District officer or employee may "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). The ADA therefore requires that an "appropriation" exist before expending or obligating funds.

The term "appropriation" is understood generally to be the "[a]uthority given to federal agencies to incur obligations and to make payments from Treasury for specified purposes."[18]

---

[17] Committee on Government Operations, Committee Rep't No. 1, *Bill No. 2-2, Initiative and Referendum Amendments Act of 1977, renamed, Initiative, Referendum, and Recall Charter Amendments of 1977 and Bill No. 2-94, Recall of Elected officials Amendments Act, renamed, Charter Amendments Procedures Act of 1977*, at 11 (Mar. 16, 1977).

[18] Office of Gen Counsel, U.S. Government Accountability Office, GAO-04-261SP, Principles of Federal Appropriations Law 2-5 (3d ed. Jan. 2004).

**Chairman Phil Mendelson**
**November 9, 2012**
**Page 16 of 16**

As discussed above, it is a reasonable view that the Council,
through amendment of the Charter, could exercise its
legislative powers to appropriate local funds for local purposes.
This is bolstered by the fact that, when the Home Rule Act was
passed, Congress separated the District's General Fund from
the United States Treasury and authorized the Council to
create "additional special funds as may be necessary for the
efficient operation of the government of the District."[19]

## VII. CONCLUSION

For the reasons set forth above, the Autonomy Act is legally
sufficient for Council consideration.

I am available if you have any questions.

VDZ

---

[19] D.C. Official Code § 1-204.50.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| COUNCIL OF THE DISTRICT OF ) | |
| COLUMBIA, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | |
| ) | |
| VINCENT C. GRAY, in his ) | |
| official capacity as Mayor ) Civ. Action No. 14-655 (EGS) | |
| of the District of Columbia, ) | |
| ) | |
|     and ) | |
| ) | |
| JEFFREY S. DeWITT, in his ) | |
| official capacity as ) | |
| Chief Financial Officer for ) | |
| the District of Columbia ) | |
| ) | |
|     Defendants. ) | |
| _____ ) | |

**ORDER**

    For the reasons stated in the Memorandum Opinion issued on this date, it is hereby

    **ORDERED** that Plaintiff's Motion for Summary Judgment is hereby **DENIED**; and it is

    **FURTHER ORDERED** that Defendants' Cross Motion for Summary Judgment is hereby **GRANTED**; and it is

    **FURTHER ORDERED** that Mayor Vincent C. Gray, CFO Jeffrey S. DeWitt, the Council of the District of Columbia, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the

injunction, are hereby permanently **ENJOINED** from enforcing the

Local Budget Autonomy Act of 2012 pending further order of this

Court; and it is

      **FURTHER ORDERED** that the Court will not stay this Order.

      **SO ORDERED.**

**Signed:**      **EMMET G. SULLIVAN**
                **United States District Judge**
                **May 19, 2014**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| COUNCIL OF THE DISTRICT OF ) | |
| COLUMBIA, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | |
| ) | |
| VINCENT C. GRAY, in his ) | |
| official capacity as Mayor ) | Civ. Action No. 14-655 (EGS) |
| of the District of Columbia, ) | |
| ) | |
|     and ) | |
| ) | |
| JEFFREY S. DeWITT, in his ) | |
| official capacity as ) | |
| Chief Financial Officer for ) | |
| the District of Columbia ) | |
| ) | |
|     Defendants. ) | |
| ———————————————— ) | |

<u>**MEMORANDUM OPINION**</u>

In 2012, the Local Budget Autonomy Act of 2012 (hereinafter "Budget Autonomy Act"), D.C. Law 19-321, 60 DCR 1724, was enacted by the Council of the District of Columbia (hereinafter "Council"), signed by Mayor Vincent C. Gray, and ratified by voters of the District of Columbia (hereinafter "District") in an April 2013 referendum.  The law, if upheld, would grant the District the right to spend its local tax and fee revenue without seeking an annual appropriation from Congress.  Mayor Gray and Jeffrey S. DeWitt, Chief Financial Officer for the District of Columbia (hereinafter "CFO"), both passionate

1

advocates for budget autonomy, have refused to implement the

Budget Autonomy Act.  Although they wholeheartedly agree with

the Council as a matter of policy, they do not agree that the

Budget Autonomy Act is valid as a matter of law.  On the basis

of this refusal, the Council has sued the Mayor and the CFO in

their official capacities.  The Council seeks a declaration that

the Budget Autonomy Act is valid, and an injunction compelling

the Mayor and the CFO to comply with the law.

The fight for budget autonomy in the District is not new.

The District has had a measure of control over its own affairs

since the enactment of the Home Rule Act in 1973, and has been

fighting — *unsuccessfully* — for budget autonomy ever since.  In

1981, Congressional Delegate Walter Fauntroy introduced the

District of Columbia Budget Autonomy Act, which would, if

passed, have ended the congressional appropriation requirement

for locally derived funds.  Similar bills have been introduced

in nearly every Congress thereafter.  As recently as 2011 and

2012, bills were introduced in the House and the Senate that

would have provided for local control of the local portion of

the District's budget.[1]  These efforts have continued even after

---

[1] Those bills were withdrawn at the request of District leaders
because they would have altered District law by banning the use
of local funds for abortion, loosening gun control laws, and/or
prohibiting union security agreements.  *See* Mem. of Points and
Authorities of the Bipartisan Legal Advisory Group of the U.S.

2

the Budget Autonomy Act purportedly became effective.  The
President has included budget autonomy for the District in his
fiscal year 2013, 2014, and proposed 2015 budgets, and yet
another bill was introduced in Congress on April 10, 2014.

Despite this long history of seeking budget autonomy
through Congress, the Council now argues that since the Home
Rule Act was enacted in 1973, it has possessed the authority to
grant itself control over its own local spending.  This
argument, which the Council advances for the first time in this
litigation, simply cannot withstand judicial scrutiny.  As more
fully set forth below, it is contrary to the plain language of
the Home Rule Act, which prohibits the Council from changing the
role of the federal government in the appropriation of the total
budget of the District.  It cannot be reconciled with the
legislative history of the Home Rule Act, during which Congress
explicitly considered, and rejected, budget autonomy for the
District.  And it violates a separate federal statute, the Anti-
Deficiency Act, which prohibits District employees from spending
public money unless it has been appropriated by Congress.

This case presents a unique situation in which all involved
strongly support the policy of budget autonomy for the District
of Columbia.  Indeed, the policy arguments advanced by the

---

House of Representatives as *Amicus Curiae* at 11-13 (citations
omitted).

Council are extraordinarily powerful.  As all District residents know, the budget procedure in the Home Rule Act makes for extremely difficult governance in the District.  First, Congress habitually fails to enact a budget by the start of the October 1 fiscal year; it has done so on only three occasions in the last 25 years.  In the remaining 22 years, Congress has either passed a continuing resolution or no budget at all, leading to a shutdown.  Second, because of the lengthy congressional appropriations process, the District budget is necessarily outdated by the time it is enacted by Congress.  Finally, the uncertainty in the congressional appropriations process often negatively impacts assessment of the District's finances by bond rating agencies.  Notwithstanding these challenges, the District has demonstrated an unprecedented track record of fiscal responsibility in recent years, including seventeen balanced budgets, sixteen years of clean financial audits, and a reduction in the federal portion of the District's budget from over 40 percent to only one percent.  The Council makes a compelling argument that the time has come for budget autonomy.

As a native Washingtonian, the Court is deeply moved by Plaintiff's argument that the people of the District are entitled to the right to spend their own, local funds. Nevertheless, the Court is powerless to provide a legal remedy and cannot implement budget autonomy for the District.

Notwithstanding the sound policy preferences of conscientious District lawmakers, members of Congress, and the President, the Court must interpret and apply the law as enacted.  Both Congress and the President have expressed their support for budget autonomy for the District, but have failed to act to achieve that goal.  Congress has plenary authority over the District, and it is the only entity that can provide budget autonomy.

In sum, having carefully considered the parties' cross motions for summary judgment, the responses and replies thereto, the submissions by *amici*, the supplemental briefing requested by the Court, the applicable law, the oral argument, and the record as a whole, Plaintiff's motion for summary judgment is **DENIED** and Defendants' cross motion for summary judgment is **GRANTED.** Mayor Vincent C. Gray, CFO Jeffrey S. DeWitt, the Council of the District of Columbia, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are hereby permanently **ENJOINED** from enforcing the Local Budget Autonomy Act of 2012 pending further order of the Court.

I.   **Factual and Procedural Background**

   A.   <u>Local Autonomy in the District of Columbia and the
         Home Rule Act</u>

   The District of Columbia is "an exceptional community . . .
established under the Constitution as the seat of the National
Government." *District of Columbia v. Murphy*, 314 U.S. 441, 452
(1941).  The Constitution grants Congress the power to "exercise
exclusive Legislation in all Cases whatsoever, over such
District (not exceeding ten Miles square), as may, by Cession of
particular States, and the Acceptance of Congress, become the
Seat of the Government of the United States."  U.S. Const., Art.
I, § 8, cl. 17.  Pursuant to that authority, Congress
established the District of Columbia in 1801.  *See* District of
Columbia Organic Charter Act, ch. 15, 2 Stat. 103 (1801).  The
City of Washington was incorporated in 1802, and a local
government authorized to provide services was established.
Plaintiff's Mem. of Points and Authorities in Support of Motion
for Summary Judgment or Remand (hereinafter "Pl.'s MSJ") at 3.
From 1802 to about 1871, the local powers of the District were
expanded, and there was a trend toward increased self-
government.  *Id.; see also* Jason I. Newman & Jacques B. DePuy,
*Bringing Democracy to the Nation's Last Colony:  The District of
Columbia Self-Government Act*, 24 Aᴍ. U. L. Rᴇᴠ. 537, 541 (1975)
(hereinafter "Newman & DePuy").  In 1871, Washington City,

6

Georgetown, and Washington County were merged to create the District of Columbia, and Congress granted greater home rule authority to the District.  During that time, the Organic Act provided for a District Governor, appointed by the President, and a legislature that could exercise limited power.  *See District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 104-05 (1953).  However, this gradual increase was temporary, and in 1874 Congress imposed a commission system to govern the District.  *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 n. 19 (D.D.C. 2000), *aff'd*, 531 U.S. 941 (2000).  In 1878, Congress repealed the home rule provisions of the Organic Act and disbanded the territorial government entirely; the District was henceforth to be governed by a three-person commission appointed by the President.  *Id.*  Under this system of Government, "[l]egislative powers . . . ceased, and the municipal government [was] confined to mere administration."  *Metro R.R. Co. v. District of Columbia*, 132 U.S. 1, 7 (1889).  From 1878 to the 1970s, Congress exercised its plenary power through direct legislation for the District, with very little input from District residents.  *Banner v. United States*, 303 F. Supp. 2d 1, 4 (D.D.C. 2004), *aff'd*, 428 F.3d 303 (D.C. Cir. 2005).

This continued until 1973, when Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973)

(codified as amended at D.C. Off. Code § 1-201.01 *et seq.*), now known as the "Home Rule Act."  Pl.'s MSJ at 4.  The Home Rule Act was a compromise, granting "the people of the District of Columbia an opportunity in exercising their rights once more and yet with adequate safeguards for the Federal interest component."  Home Rule for the District Columbia, 1973-1974: Background and Legislative History of H.R. 9056, H.R. 9682, and Related Bills Culminating in the District of Columbia Self-Government and Governmental Reorganization Act, at 2106 (1974). Nevertheless, with the Home Rule Act, Congress expressed the intent to relieve itself to "the greatest extent possible, . . . of the burden of legislating upon essentially local District matters."  D.C. Off. Code § 1-201.02(a).  The grant of legislative authority to the District in the Home Rule Act is broad, *id.* § 1-203.02, but Congress included several restrictions to that authority in Sections 601, 602, and 603. These included congressional authority to veto District legislation and the authority to legislate for the District on any matter.  *Id.* § 1-206.01.  The Council of the District of Columbia, the main legislating body created by the Act, was prohibited from legislating in nine enumerated areas,[2] and

---

[2] The District may not impose any tax on federal or state property; lend public credit for a private undertaking; enact or amend any law that concerns the functions of the federal government or does not apply exclusively to the District;

Congress retained broad authority over borrowing, spending, and budgeting for the District. *Id.* §§ 1-206.02, 1-206.03. Congress also retained ultimate legislative authority over the District by providing that local legislation passed by the District government becomes law only after review by Congress.

Title IV of the Home Rule Act sets forth the District of Columbia Charter, which established the "means of governance of the District" upon ratification by District voters. D.C. Off. Code § 1-203.01. The Charter 1) establishes a municipal structure similar to a state constitution that would take precedence over other locally-enacted legislation; 2) provides a clear statement regarding the structure of the new government; and 3) provides the procedure for and limitations to the District's ability to amend the Charter. Newman & DePuy, 24 Am. U. L. Rev. at 576-77. The Charter also establishes a tripartite form of government for the District comprised of the Mayor, the Council, and the judiciary, and "the basic governmental structure within which [those entities] operate." *Id.* at 576.

The Charter sets forth the process for the enactment of local legislation. Most legislation becomes law after it is approved by a majority of the Council after two readings 13 days

_____

regulate the federal or District of Columbia Courts; impose a
personal income tax on nonresidents; permit the construction of
buildings that do not comply with height restrictions; or
regulate the Commission on Mental Health. D.C. Off. Code §§ 1-
206.02(a)(1)-(a)(8).

apart, signed by the Mayor (or approved over his or her veto), and sent to Congress for passive review.  If, after 30 days (or 60 days for changes to criminal laws), Congress does not affirmatively disapprove of the legislation, it becomes law. D.C. Off. Code §§ 1-204.04(e); 1-206.02(c)(1).

The District budget, by contrast, requires the active review of Congress.  The process for the enactment of the budget is set forth in Section 446 of the Act, which is included in the District Charter.  Section 446 provides that the Mayor must present a budget, which includes both locally derived and federal funds, to the Council.  The Council must hold a hearing and adopt a budget within 56 days of the transmittal from the Mayor.  The Mayor must sign the budget, or it must be approved over his or her veto, within 30 days.  The Mayor then transmits this budget, called the Budget Request Act, to the President to submit to Congress as part of the national budget.  Congress must enact affirmative legislation to appropriate expenditures in the District.  D.C. Off. Code § 1-204.46.  Further, the fiscal year of the District is identical to that of the federal government.  Section 446 also provides that "[n]otwithstanding any other provision . . . , the Mayor shall not transmit any annual budget or amendments or supplements thereto, to the President of the United States until the completion of the budget procedures" outlined in Section 446.  *Id.*  It also

10

fundamentally enshrines the role of Congress in the budget process, stating that "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by an Act of Congress, and then only according to such Act." *Id.*

The District Charter also created the General Fund of the District of Columbia in Section 450 of the Home Rule Act. D.C. Off. Code § 1-204.50. This section transferred revenue collected from local sources from the Treasury, where they were held prior to the enactment of the Home Rule Act, to the D.C. General Fund. *Id.* The Act also empowered the Council to "establish such additional special funds as may be necessary for the efficient operation of the government of the District." *Id.* In 1995, the Home Rule Act was amended by Congress to create the Office of the Chief Financial Officer. *See* District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104-8, 109 Stat. 97, 142 (1995). The CFO and the Mayor are tasked with the responsibility for administering the District's finances.

Like a state constitution, the Charter can be amended subject to a three-prong process delineated in Section 303 of the Home Rule Act. D.C. Off. Code § 1-203.03. The Charter is the only part of the Home Rule Act subject to amendment; "non-charter provisions are 'off-limits' to the local government."

11

Brief of *Amici Curiae* Jacques B. DePuy, Daniel M. Freeman, Jason I. Newman and Linda L. Smith in Support of Defendants Vincent C. Gray and Jeffrey S. DeWitt (hereinafter "DePuy Amicus") at 4. The Charter amendment procedure outlined in Section 303 is outside of the Charter, thus it is not subject to amendment.  To amend the Charter, the Council must first pass a proposed amendment.  Second, the amendment must be ratified by a majority of eligible District voters.  Finally, the Chairman of the Council must submit the amendment to the Speaker of the House and the President of the Senate for a 35-day period of passive review.  *Id.* § 1-203.03(a).  The amendment becomes law unless Congress passes a joint resolution disapproving of the proposed amendment within the review period. *Id.* § 1-203.03(b).  The Council's amendment authority is not absolute – it is subject to "the limitations specified in sections 601, 602, and 603 [of the Home Rule Act]."  *Id.* ¶ 1-203.03(d).

B.   The Local Budget Autonomy Act of 2012

The Council of the District passed the Local Budget Autonomy Act of 2012, which amends "the District of Columbia Home Rule Act to provide for local budget autonomy."  D.C. Law 19-321.  This Act purports to amend Section 446 of the Home Rule Act, which sets forth the procedure for appropriation of the District's budget by Congress.  The amended section changes the procedure for locally derived funds; it does not alter the

12

process for the federal portion of the District's budget.
Compl. ¶ 50.  Pursuant to the Budget Autonomy Act, the budget
process for the local portion of the District's budget has been
modified so that it is similar to that for most other District
legislation – *i.e.*, it is subject to passive review by Congress
after approval by the Council.  Pl.'s MSJ at 8.  If Congress
does not pass a joint resolution disapproving of the budget
within 30 days, it becomes law.  The Budget Autonomy Act writes
the President and the Mayor out of the local budget process,
providing that "the local portion of the annual budget shall be
submitted by the Chairman of the Council to the Speaker of the
House of Representatives."  Budget Autonomy Act § 2(e).

    The Budget Autonomy Act also alters the timeline in which
the Council must pass the budget.  The Council is required to
adopt the budget for the District "within 70 calendar days . . .
after receipt of the budget proposal from the mayor."  Budget
Autonomy Act § 2(e).  There are to be two readings of the
proposed budget, and those readings must be at least 13 days
apart.  Pl.'s MSJ at 8.  The Act also amends Section 441(a) of
the Home Rule Act to authorize the Council to change the fiscal
year of the District so that it runs from July to June rather
than October to September.  Budget Autonomy Act § 2(d).

    The Budget Autonomy Act was unanimously passed by the
Council and was signed into law by Mayor Gray on February 15,

13

**JA421**

2013.  Pl.'s MSJ at 9; Defs.' Mem. of Points and Authorities in
Support of Their Motion for Summary Judgment and in Opposition
to Plaintiff's Motion for Summary Judgment (hereinafter "Defs.'
MSJ") at 5.  In a letter sent to the Council prior to signing
the Budget Autonomy Act, Mayor Gray stated that while he "fully
and passionately support[ed] the goal of securing budget
autonomy for the District of Columbia as soon as possible[,]" he
believed that the Budget Autonomy Act as written would violate
the Home Rule Act.  Defs.' MSJ, Ex. 1 at 1.  He reiterated these
concerns in a signing statement that accompanied the Budget
Autonomy Act.  Defs.' MSJ, Ex. 1, Signing Statement. The Budget
Autonomy Act was then submitted to the D.C. Board of Elections
and Ethics for inclusion on the April 2013 ballot and the
Council filed a Notice of Public Hearing on the ballot language.
District of Columbia Attorney General Irvin Nathan responded to
the notice with a letter expressing his "serious reservations
about the legality of the amendment" and recommended that it be
excluded from the April 2013 ballot.  Pl.'s MSJ, Declaration of
V. David Zvenyach (hereinafter "Zvenyach Decl."), Exhibit A,
January 4, 2013 Letter from Irvin B. Nathan, at 1.  At the
conclusion of the public hearings and after considering the
arguments presented, the Board of Elections found no basis to
reject the Budget Autonomy Act and included it on the ballot.
Pl.'s MSJ at 9.  The Budget Autonomy Act was ratified by 83% of

14

voters in a special election in April 2013 (approximately 9% of the District electorate of 505,698 registered voters).  Defs.' Answer ¶ 5.  Congress took no action to affirmatively disapprove of the Budget Autonomy Act, thus it became law on July 25, 2013 and became effective on January 1, 2014.  *See* Pl.'s MSJ at 9.

After the Budget Autonomy Act became effective, Congressman Ander Crenshaw (R-FL), asked the Government Accountability Office (hereinafter the "GAO") to opine on its validity.  Pl.'s MSJ at 9.  On January 30, 2014, the GAO returned its opinion, concluding "that provisions of the Budget Autonomy Act that attempt to change the federal government's role in the District's budget process have no legal effect."  Defs.' MSJ, Ex. 2, January 30, 2014 GAO Opinion, at 2.

C.    The Instant Dispute

On April 8, 2014, the Attorney General issued a formal opinion advising the Mayor that he should not implement the Budget Autonomy Act and "advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary."  Pl.'s MSJ, Zvenyach Decl., Ex. B, Opinion of the D.C. Attorney General, at 9.  On April 11, 2014, both the Mayor and the CFO advised the Council in separate letters that they would decline to implement the Budget Autonomy Act.  Pl.'s MSJ at 10; Compl. ¶ 52.  Specifically, the Mayor notified the Council of the steps he would take:

15

> First, I will direct all subordinate agency District officials not to implement or take actions pursuant to the Act, which contravenes our Home Rule Charter and other federal law.  Second, I will veto any FY 15 budget transmitted by the Council that is not inclusive of both the local and federal portions of the budget, as required under the Home Rule Act. Third, as noted, to achieve compliance to the extent I am able with the Home Rule Act, I will transmit to the Congress and President the full District budget as it stands after the 56th day following transmission to you of the budget, whether or not the Council has taken a second vote.

Compl., Ex. C, April 11, 2014 Letter of Mayor Vincent Gray, at

3.  The CFO mirrored the Mayor's statements in his letter to the

Council, noting that he would not enforce the Budget Autonomy

Act absent a judicial determination of its validity:

> Absent such [determination], I will not make or authorize any payment pursuant to a budget that was approved in conformance with the Act.  I will also direct OCFO employees not to certify contracts or make payments under this budget given the potential civil and criminal penalties to which they, as individuals, would be subject under the federal Anti-Deficiency Act.

Compl., Ex. D, April 11, 2014 Letter of CFO Jeffrey S. DeWitt,

at 2.

In response to these letters announcing the Mayor and CFO's

intention not to enforce the Budget Autonomy Act, the Council

brought suit in the Superior Court of the District of Columbia

on April 17, 2014.  It filed a Motion for a Preliminary

Injunction on that same date.  Defendants immediately removed

the action to this Court.  Plaintiff filed a motion to remand

16

**JA424**

the action to the Superior Court, arguing that jurisdiction was lacking in this Court.  At a preliminary status hearing on April 22, 2014, with the consent of the parties, the Court consolidated the motion for preliminary injunction with a determination on the merits, including jurisdictional arguments, pursuant to Federal Rule of Civil Procedure 65(a)(2).  The parties have filed motions for summary judgment, and five groups of concerned individuals have filed *amicus* briefs to aid the Court in its determination of the important issues presented. The Court ordered the parties to file supplemental memoranda to respond to arguments made by *amici* in support of Defendants. The Court heard oral argument on the parties' cross motions on May 14, 2014.  Those motions are now ripe for determination by the Court.

## II.  Standard of Review

Summary judgment is appropriate in situations where the moving party has shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not

17

genuinely disputed.  *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).  That a factual dispute exists is not sufficient to bar summary judgment, rather, the dispute must be regarding a "material fact."  *See* Fed. R. Civ. P. 56(a).  For the purposes of summary judgment, "[a] fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  Moreover, the factual dispute must be "genuine," such that there is sufficient admissible evidence for a reasonable trier of fact to find for the non-moving party.  *Anderson*, 477 U.S. at 255.  The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  *See Celotex*, 477 U.S. at 323.

All parties to the instant dispute concur that there are no genuine issues of material fact before the Court.  Summary judgment is particularly appropriate in situations where, as here, a pure question of law that is ripe for decision is before the Court.  *See Wyoming Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001); *see also Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996).

**III. Discussion**

    A.   <u>This Court has Jurisdiction</u>

    Federal courts are courts of limited jurisdiction, *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994), and a case must be remanded to state court "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). Section 1331 confers on District Courts jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States, or where the controversy presents a "federal question." 28 U.S.C. § 1331. A case is only properly in federal court on the basis of a well-pleaded complaint; it "may not be removed to federal court on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (internal citations omitted).

    Federal courts also lack jurisdiction over claims that pertain only to the District of Columbia. "[F]or the purposes of [28 U.S.C. § 1331], references to the laws of the United States or Acts of Congress do not include laws applicable exclusively to the District of Columbia." 28 U.S.C. § 1366. Thus, "[w]hen Congress acts as the local legislature for the

USCA Case #14-7067    Document #1500336    Filed: 07/01/2014    Page 432 of 470

District of Columbia and enacts legislation applicable only to the District of Columbia and tailored to meet specifically local needs, its enactments should – absent evidence of contrary congressional intent – be treated as local law." *Roth v. District of Columbia Courts*, 160 F. Supp. 2d 104, 108 (D.D.C. 2001) (internal citations and quotation marks omitted).

Plaintiff argues that this case should be remanded to the Superior Court for the District of Columbia because this Court lacks jurisdiction over its claims, which it describes as exclusively local.  Pl.'s MSJ at 40.  Because Plaintiff contends that the Charter is applicable only in the District, it claims "federal question jurisdiction is unavailable." *Id.* at 41. Moreover, Plaintiff contends that the only bases for federal jurisdiction presented by Defendants are defenses, which further counsels in favor of remand.

The Court is persuaded by Defendants' arguments that this case unequivocally presents a federal question – whether the Council can unilaterally amend the District Charter to fundamentally alter the roles of the President and Congress with respect to the locally funded portion of the District's budget. This case is similar to *Thomas v. Barry*, 729 F.2d 1469 (D.C. Cir. 1984), where the Circuit considered a Home Rule Act challenge raised by employees of the District of Columbia Department of Employment Services who had been transferred from

the Department of Labor.  The District Court dismissed their claims on the grounds that federal jurisdiction was lacking. 729 F.2d at 1470.  On appeal, the Circuit noted that while the Home Rule Act applied to the District, it did not do so exclusively because "[m]any of the Act's sections apply directly to the federal not District government" and it was "thus a hybrid statute."  *Id.* at 1471.  The section of the Home Rule Act at issue was not exclusively local, according to the Court, because it impacted the "actual structure of the Department of Labor."  *Id.*

Plaintiff argues that this case is distinguishable from *Thomas*, because its "claim to relief is premised on the local obligations of local officials, as triggered by the budget process for local funds in the District Charter."[3]  Pl.'s MSJ at 43.  However, the budget process for the District necessarily includes federal entities, namely the President and Congress, the latter of which has an active role in appropriating the District budget.  The Budget Autonomy Act is thus far from the type of purely local legislation that the D.C. Circuit has found does not confer federal jurisdiction.  *See, e.g., Decatur*

---

[3] At the oral argument on May 14, 2014, the Court questioned Plaintiff regarding its argument that *Thomas* is distinguishable from the instant matter.  While Plaintiff did not concede that this Court has jurisdiction, it did explain its position that "if the Court were to rely on [*Thomas*], . . . it's an open question whether there's jurisdiction and that would certainly be one way to resolve it."  Transcript of Hearing at 10:25–11:2.

*Liquors, Inc. v. District of Columbia*, 478 F.3d 360 (D.C. Cir. 2007) (finding that the District Court could not exercise supplemental jurisdiction over a claim that all parties agreed was local, whether the legislation was invalid because the Council failed to read it twice before voting on it, as required by the Home Rule Act); *Dimond v. District of Columbia*, 792 F.2d 179, 187-88 (D.C. Cir. 1986) (holding that a challenge to the District's No Fault Insurance Law on the grounds that it changed the jurisdiction of the District of Columbia Courts and thus violated the Home Rule Act did "not fall within the traditional federal question jurisdiction" because the relevant sections of the Home Rule Act dealing with the District of Columbia Courts applied "exclusively to the District of Columbia"). Accordingly, the Court concludes that federal question jurisdiction exists over Plaintiff's claims.[4]

---

[4] Though not dispositive, the D.C. Circuit's decision in *Bliley v. Kelly*, 23 F.3d 507 (D.C. Cir. 1994), is instructive. There, several members of Congress sought a declaratory judgment that would have required the Council to resubmit the Assault Weapon Manufacturing Strict Liability Act to Congress for review pursuant to its authority to review District legislation under the Home Rule Act. 23 F.3d at 509-10. The District Court dismissed the action on the grounds that plaintiffs had failed to state a claim under 42 U.S.C. § 1983. *Id.* at 510. The Circuit reversed. In ruling on the merits, the Court considered the D.C. Court of Appeals' interpretation of the Home Rule Act, under which the congressional review period for District legislation would not be suspended by intervening legislation to repeal the legislation awaiting review. *Id.* at 511. The Court held that while it must defer to the D.C. Court of Appeals on interpretations of purely local law, it was not required to do

B.   <u>The Local Budget Autonomy Act of 2012 is Unlawful</u>

Plaintiff contends that the Budget Autonomy Act is a valid exercise of its authority to amend the District Charter by the procedure outlined in the Home Rule Act.  Defendants argue to the contrary that the Budget Autonomy Act is an unlawful exercise of the Council's Charter amendment authority pursuant to Section 303(d) of the Home Rule Act, which provides that the "amending procedure [in Section 303(a)] may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the *limitations* specified in sections 601, 602, and 603."  D.C. Off. Code § 1-203.03(d) (emphasis added).  Defendants contend that the Budget Autonomy Act's purported amendments to Section 446 violate Section 303(d) for three independent reasons, each of which would be sufficient for the Court to find that it is unlawful. Defs.' Reply at 6.  First, Defendants argue that the Budget Autonomy Act is a violation of Section 603(a) of the Home Rule

---

so on matters of federal law.  *Id.*  The Court reasoned that it was "self-evident" that such deference was not warranted in the matter at hand because "questions regarding Congress's reserved right to review District legislation before it becomes law concerns an exclusively federal aspect of the Act."  *Id.*  As Defendants persuasively argue, the Circuit's conclusion in *Bliley* "mandates the conclusion that the Council's claim of authority" to change the respective roles of Congress and the President with respect to the locally funded portion of the District budget "is likewise one of federal law."  Defs.' Reply in Support of Their Cross-Motion for Summary Judgment (hereinafter "Defs.' Reply") at 5.

Act, which prevents the Council from amending the Charter to change the respective roles of Congress, the President, and the Office of Management and Budget in the enactment of the District's total budget.  Second, Defendants argue that the Budget Autonomy Act violates Section 603(e) of the Home Rule Act because its amendments to Section 446 relating to the locally derived portion of the District's budget no longer comply with the Anti-Deficiency Act.  Finally, Defendants argue that the Budget Autonomy Act is unlawful under Section 603(a)(2) because it purports to amend the Anti-Deficiency Act, which is a federal law that is "not restricted in its application exclusively in or to the District."  D.C. Off. Code § 1-206.02(a)(3).

The Court is again persuaded by Defendants' arguments. Although the Home Rule Act grants authority to the Council to amend the District Charter, that authority is subject to the limitations in Sections 601, 602, and 603.  Plaintiff concedes that its ability to amend the District Charter is subject to the limitations in those sections; however, it argues that only some portions of Sections 601, 602, and 603 are limitations. Sections 603(a) and (e), according to the Council's theory, are instead rules of construction that were intended to guide the interpretation of the Home Rule Act as enacted in 1973.  This argument is contrary to the plain language of Section 303(d); the legislative history of Sections 601, 602, and 603; the

24

experience of almost 40 years of Home Rule; and common sense. Plaintiff also argues that Section 450 of the Home Rule Act is a permanent appropriation that meets the requirements of the Anti-Deficiency Act without requiring an appropriation from Congress. This argument is likewise contrary to the plain language of Sections 450 and 446 and federal appropriations law.  Because the amendments to Section 446 in the Budget Autonomy Act independently violate sections 603(a), 603(e), and 602(a)(3), they are unlawful and must be enjoined.

### 1.   Section 603(a)

Defendants argue that the Budget Autonomy Act is unlawful because it violates the limitations in Section 303(d), which prevent the Council from amending the District Charter to conflict with Section 603(a).  Section 603(a) provides:

> Nothing in this act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the *total* budget of the District of Columbia government.

D.C. Off. Code § 1-206.03(a) (emphasis added).  Section 303(d) unequivocally refers to Section 603 as a "limitation[]" on the Council's amendment authority and does not specify that only certain provisions of that section are to be treated as limitations.  Defendants therefore argue that Section 303(d) can

25

**JA433**

only be read to treat the entirety of Section 603 as a
limitation.  Defs.' MSJ at 15.

"Statutory construction must begin with the language
employed by Congress and the assumption that the ordinary
meaning of that language accurately expresses the legislative
purposes."  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469
U.S. 189, 194 (1985).  Here, the text of both Sections 303(d)
and 603(a) is clear – Section 603(a) is intended to be a
limitation on the Council's amendment authority.  The word
"limitation" is generally defined to mean "something that
controls how much of something is possible or allowed" or "the
act of controlling the size or extent of something:  the act of
limiting something."  Merriam-Webster Dictionary, available at
http://www.merriam-webster.com/dictionary/limitation (last
visited May 18, 2014); *see also Limitation*, CONCISE OXFORD AM.
DICTIONARY at 516 (2006 Ed.) ("a limiting rule or circumstance; a
restriction").  The text is also clear that Section 603(a) does
not make a distinction between the locally and federally funded
portions of the District's budget, but instead refers to the
"total" budget of the District, which is comprised of both
components.  Accordingly, "the most logical reading of the
phrase 'limitations specified in sections 601, 602, and 603' in
§ 303(d) is that it treats the sections *as a whole* as
limitations on the Council's authority, not just to the extent

26

**JA434**

that they explicitly state they are 'limitations.'"   Defs.' MSJ at 15-16 (emphasis in original).   And the most logical reading of Section 603(a) is that it prevents changes to the role of Congress and the President with respect to six areas related to the District's budget – preparation, review, submission, examination, authorization, and appropriation.

Where, as here, the statutory text is clear, there is no need for the Court to resort to legislative history.   *See, e.g., Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *Barnhill v. Johnson*, 503 U.S. 393, 401 (1992).   However, the legislative history of the Home Rule Act confirms the plain meaning of Section 603(a) and demonstrates the flaw in Plaintiff's interpretation of the statute.   *See Hessey v. District of Columbia Bd. of Elections and Ethics*, 601 A.2d 3, 8 n.6 (1991) (*en banc*) ("The legislative history of the Self-Government Act makes clear that the Self-Government Act left in place the pre-existing Congressional appropriations process for the District government.").   Though the Senate had passed several home rule bills in the years leading up to the enactment of the Home Rule Act, the House did not seriously consider such legislation until 1973.   DePuy Amicus at 7.   The initial bill drafted by the House District of Columbia Committee (hereinafter "Committee Bill") included budget autonomy for the District; however, the Committee Bill faced considerable resistance, especially from

27

JA435

Congressmen on the Subcommittee on District of Columbia Appropriations of the House Appropriations Committee, who were intimately involved in District affairs generally and the budget process in particular. *Id.* at 7-8. After it became clear that there was very little chance that the Committee Bill would pass, Congressman Charles Diggs, Chairman of the House Committee on the District of Columbia, took the unusual step of abandoning the original Committee Bill and offering a comprehensive substitute. *Id.* at 8-9. This substitute was referred to as the "Diggs Compromise." As Congressman Diggs explained in a "Dear Colleague" letter:

> The Committee substitute contains six important changes which were made after numerous conversations and sessions with Members of Congress and other interested parties. These changes clarify the intent of [the bill] and accommodate major reservations expressed since the bill was reported out.

Letter from Charles C. Diggs, *et al.* to Members of the House of Representatives (*reprinted in* 119 Cong. Rec. 33353 (Oct. 9, 1973)).

The main concession in the Committee Substitute Bill was the first change listed in the letter: "1. Budgetary process. Return to the Existing Line Item Congressional Appropriation Role." *Id.* It was understood by home rule supporters in Congress that this concession was a necessary condition for the passage of any bill. DePuy Amicus at 9-10; *see also id.*, Ex. A

28

(Docket No. 28-1), Jack Kneece, *Ford Insists Hill Run D.C.*
*Budget*, Washington Star-News, Oct. 16, 1973, at B-2 (quoting the
Vice President-designate as saying that "[i]n my view, this
particular provision of the bill is non-negotiable in the House-
Senate Conference"); *id.*, Ex. B (Docket No. 28-1), Jack Kneece,
*Diggs Ready to Deal on Home Rule Bill*, Washington Star-News, Oct. 5,
1973, at B-1 (noting that Congressman Diggs was "prepared to
continue detailed congressional oversight and control over the
D.C. budget as a means of 'reaching an accommodation' with home
rule foes"); *id.*, Ex. C (Docket No. 28-1), Editorial, *Home Rule*
*at Last*, Washington Star-News Oct. 11, 1973, at A-18 (describing the
process required to get powerful Congressmen on the District
Appropriations subcommittee to sign off on the Committee
Substitute Bill and stating that the "high price was ultimate
congressional control over the city's budget"); *id.*, Ex. F
(Docket No. 28-1), Editorial, *Home Rule:  One More Step to Go!*,
Washington Star-News, Dec. 2, 1973, at G-1 (explaining the changes
made by the Diggs Compromise, and stating that the Committee
Substitute Bill "falls far short of what . . . home rule
advocates had sought" but struck "a balance between the
conflicting desires of Congress to give District residents a
meaningful further measure of control over their own affairs
while at the same time retaining strong measures of

29

congressional oversight").[5]  As Congressman Thomas Rees explained
during the floor debate on the bill, the budget process in the
Committee Substitute Bill would not change the existing budget
process for the District:

> Really the relationship, if this legislation is
> passed, will be the same relationship that Congress
> now has with the District of Columbia budget, that no
> money can be spent by the District of Columbia. . . .
> This was the major compromise . . . so that we have no
> change at all on budgetary control when we are
> discussing who will run the budget of the District of
> Columbia.

119 Cong. Rec. 33390 (Oct. 9, 1973).

The Committee Substitute Bill was eventually approved in
the House after extensive debate.  DePuy Amicus at 10.  In
addition to the reservation of active congressional authority
over the District's budget, the Committee Substitute Bill also
added Sections 603 (a) and (e).  These sections are entitled
"Budget Process; limitations on borrowing and spending" and,
critically, appear in a portion of the Home Rule Act that cannot
be amended by a Charter Amendment.  *Id.* at 11-12.

The introductory language of Section 603(a) mirrors the
language of Section 602(b), which also begins with "[n]othing in

---

[5]  The Court may take judicial notice of newspaper articles that
explain the prevailing views on congressional retention of
budget authority and the importance of the Diggs Compromise to
the ultimate passage of the Home Rule Act.  *See Wash. Post v.
Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (noting that the
court could take judicial notice of newspaper articles
publicizing a criminal prosecution in deciding whether a plea
agreement should be sealed).

this Act shall be construed as . . . ."  D.C. Off. Code § 1-206.02(b).  Section 602(b) provides that "[n]othing in this Act shall be construed as vesting in the District government any greater authority over" the National Zoo, the National Guard of the District, the Washington Aqueduct, the National Capital Planning Commission, or any federal agency.  *Id.*  While there is no legislative history for Section 603(a), there is legislative history explaining Section 602(b) of the original Committee Bill, which remained largely unchanged between the Committee Bill, the Committee Substitute Bill (implementing the Diggs Compromise), and the Home Rule Act as enacted.  The legislative history of that section, therefore, is particularly instructive, especially as it "appears clear that, when Congress realized in October 1973 that it needed language implementing the Diggs Compromise's provisions on budgeting, it used in § 603 of the Committee Substitute familiar language borrowed from § 602 of the Committee Bill."  DePuy Amicus at 13.

The legislative history of Section 602 makes clear that Congress intended for the entire section, not just the enumerated limitations in Section 602(a), to serve as a prohibition on Council action.  *See* H.R. REP. No. 93-482 at 36-37 (Sept. 11, 1973).  In describing the specific areas listed in Section 602(a) in which the Council could not legislate, the Report notes that "[t]his section lists specific *prohibitions*

31

against the District Council's legislative authority, which
include *prohibitions* against [the listed activities]." *Id.* at
36-37 (emphasis added).  The Report further describes Section
602(b) as follows:  "Subsection (b) *prohibits* the Council from
exceeding its present authority over the National Zoological
Park, the District National Guard, the Washington Aqueduct, the
National Capital Planning Commission, or any other Federal
agency." *Id.* at 37 (emphasis added).  Congress used the word
"prohibition" to describe both sections despite the fact that
Section 602(b) begins with the phrase "[n]othing in this Act
shall be construed as," and the legislative history leaves no
doubt that the limitations in the section are intended to be
prospective.  Thus, the identical language in Section 603(a)
must also be read as a prospective prohibition on the Council's
authority.  It is a well-known canon of statutory construction
that the same phrase "appearing in several places in a statutory
text is generally read the same way each time it appears."
*Ratzlaf*, 510 U.S. at 143.  The legislative history of the Home
Rule Act provides no basis for the Court to depart from this
well-established canon of statutory construction.

Despite the very clear language of Section 603(a) and the
legislative history that reinforces that clear language, the
Council nonetheless argues that Section 603(a) is a rule of
construction, not a substantive limitation.  Plaintiff contends

JA440

that Section 603(a) explains only how the Home Rule Act was to
be construed in 1973 and does not prohibit the amendments to
Section 446 made in the Budget Autonomy Act.  Pl.'s MSJ at 30-
31; Pl.'s Consolidated Reply Mem. in Support of Pl.'s Motion for
Summary Judgment or Remand and Mem. in Opposition to Defs.'
Cross-Motion for Summary Judgment (hereinafter "Pl.'s Reply") at
26.  According to Plaintiff, because Congress was explicit
elsewhere in the Act when delineating areas in which the Council
could not legislate, it could not have intended for Section
603(a) to impose limitations on the Council's ability to amend
the budget process outlined in Section 446, which is located in
the amendable Charter.  Pl.'s MSJ at 31.  This is the only
reasonable reading of the text, according to Plaintiff, because
"the overall purpose of the Home Rule Act was to provide an
expansive legislative power coupled with a broad Charter
amendment power."[6]  Pl.'s Reply at 23.

---

[6] Plaintiff devotes a significant portion of its Reply to a
discussion of the legislative history of the amendment
provisions of the Home Rule Act.  *See* Pl.'s Reply at 11-18.
Plaintiff explains that the Senate and House versions of the
Home Rule Act contained very different amendment provisions –
the Senate version provided for limited amendment authority,
while the amendment authority in the House version was much
broader. *Id.* at 12.  The House version eventually made it into
the final bill.  *Id.* at 13.  Ultimately, this discussion is
irrelevant.  Nor is it directly relevant that Congress later
amended the Home Rule Act to relax the requirements for amending
the Charter – from active review by both houses of Congress to
passive review – after the Supreme Court's decision in *INS v.
Chadha*, 462 U.S. 919 (1983), which invalidated the legislative

33

The Council's argument, put simply, is not persuasive. Plaintiff's own counsel, V. David Zvenyach, has referred to Section 603(a) as a limitation, stating during testimony before the Committee of the Whole on November 9, 2012, that of the "*limitations* [in Section 303(d)], the most difficult hurdle is Section 603(a)."  Docket No. 38-1, November 9, 2012 Testimony of V. David Zvenyach, Public Hearing on Bill 19-993, at 3 (emphasis added).  He noted that there were two possible interpretations of Section 603(a):

> It could be read as a bright-line prohibition of the ability of the Council to affect the budget process. Or it could be read as a declaration that Congress maintains ultimate authority with respect to the budget, and that the Home Rule Act as originally approved meant to leave the budget process intact.  In my view, the latter reading is preferable and consistent with both the plain language and the overall purposes of the Home Rule Act.

*Id.* (emphasis in original).  While the Council's reading of Section 603(a) may indeed be "preferable" from a policy perspective, it is inconsistent with the plain language of the statute, the rules of statutory construction, and the legislative history of the Home Rule Act.  Section 603(a) is a

---

veto.  *See* Pl.'s Reply at 16.  Even assuming, *arguendo*, that the Council has broad authority to amend the District Charter, the only issue for the Court is whether the Charter amendment procedures allow the changes that the Council has made with respect to the local portion of the District's budget.

limitation that prohibits the very change the Budget Autonomy

Act purports to make.[7]

    2.  <u>Section 603(e)</u>

    Defendants also argue that the Budget Autonomy Act violates

Section 603(e) of the Home Rule Act and thus contravenes the

limitations to its Charter amendment authority in Section

303(d).  Section 603(e) provides that "[n]othing in this Act

shall be construed as affecting the applicability to the

District government of the provisions of . . . the [] Anti-

Deficiency Act."  D.C. Off. Code § 1-206.03(e).  The Anti-

Deficiency Act precludes "[a]n officer or employee . . . of the

District of Columbia government" from spending public monies

unless Congress makes "the amount available in an appropriation

or fund for the expenditure or obligation."  31 U.S.C. §

---

[7] At the oral argument on May 14, 2014, Plaintiff argued that Congress's silence and failure to pass a joint resolution disapproving of the Budget Autonomy Act could signify tacit approval of the changes the Budget Autonomy Act makes to Section 446 of the Home Rule Act.  However, congressional inaction does not make a law immune to judicial review.  *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 121 (1994)(noting that in the context of congressional approval of administrative regulations, "congressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute") (internal quotation marks and citations omitted).  Plaintiff points to dicta in the Supreme Court's denial of a stay in *Jackson v. D.C. Bd. of Elections and Ethics*, 559 U.S. 1301 (2010), as evidence of a contrary position.  However, in *Jackson* the Court stated that while congressional inaction counseled in favor of denying a stay, those "considerations are of course not determinative of the legal issues." *Id.* at 1302-03.

1341(a).  As enacted, Section 446 of the Home Rule Act mandates the procedure by which the District could comply with the Anti-Deficiency Act by prohibiting the obligation and expenditure of funds unless the spending has been "approved by an Act of Congress."  D.C. Off. Code § 1-204.46.

For the reasons set forth in Section III.B.1 *supra*, Section 603(e) is also a prospective limitation on the Council's authority to amend the District Charter pursuant to Section 303(d).  Like Section 603(a), Section 603(e) is not included in the District Charter and cannot be amended.  Though the Budget Autonomy Act only explicitly amends Section 446, it also effectively amends Section 603(e) by reading compliance with the Anti-Deficiency Act, which was previously included in Section 446, out of the Home Rule Act entirely.

Defendants argue that the Budget Autonomy Act can only be valid if the Court accepts Plaintiff's argument that Section 450 of the Home Rule Act, which establishes the D.C. General Fund, is an appropriation that satisfies the requirements of the Anti-Deficiency Act.  Defendants urge the Court not to accept that interpretation because it is contrary to both the plain meaning of Section 450 and federal appropriations law.  Defendants contend that Section 450 does nothing more than move funds from the Treasury to the D.C. General Fund subject to requirements in Sections 446 and 603(e) that those funds be appropriated and

36

comply with the Anti-Deficiency Act.  Thus, Defendants argue
that the Budget Autonomy Act is unlawful.

All public funds are subject to the appropriations process.
*See Am. Fed. of Gov't Empls., AFL-CIO, Local 1647 v. Fed. Labor
Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (hereinafter
"AFGE").  An appropriation has been made only "[i]f the statute
contains a specific direction to pay and a designation of the
funds to be used." 1 Office of General Counsel, United States
General Accounting Office, Principles of Federal Appropriations
Law (3d ed. 2004) (hereinafter "Principles of Appropriations
Law") at 2-16.[8]  While there are no magic words to signify that
an appropriation has been made, the statutory text must be clear
that funds are being appropriated.  Indeed, "[a] law may be
construed to make an appropriation . . . only if the law
specifically states that an appropriation is made."  31 U.S.C. §
1301(d).  Accordingly, an appropriation cannot be inferred.  *See*
Principles of Appropriations Law at 2-16.

---

[8] The parties disagree as to the level of deference that should
be given to GAO opinions.  The Court regards the GAO as an
expert, one whose opinions it will "prudently consider," but
that it has "no obligation to defer" to.  *Delta Data Systems
Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984).  Even
though GAO opinions are not binding, the Court will "give
special weight to [those] opinions due to [the GAO's]
accumulated experience and expertise in the field of government
appropriations."  *Nevada v. Dep't of Energy*, 400 F.3d 9, 16
(D.C. Cir. 2005) (internal quotation marks and citations
omitted).

37

Congress can make exemptions to the appropriations requirement through various means. *See AFGE*, 388 F.3d at 409. Congress can establish a revolving fund, which is "replenished by moneys from the public [and] constitutes an on-going appropriation which does not have to be renewed each year." *United Biscuit Co. v. Wirtz*, 359 F.2d 206, 212 (D.C. Cir. 1965) (internal citations omitted). Examples of such funds are a "stock fund" in the Treasury to fund military commissary purchases, *id.*, and the Postal Service Fund, which establishes a revolving fund in the Treasury that "shall be available to the Postal Service without fiscal-year limitation to carry out the purposes, functions, and powers [of the Postal Service]," 39 U.S.C. § 2003(a). Congress may also create a permanent appropriation, which is one that "is always available for specified purposes and does not require repeated action by Congress to authorize its use." Principles of Appropriations Law at 2-14.

Moreover, Congress may create a nonappropriated fund instrumentality (hereinafter "NAFI"), through which it makes the decision "not to finance a federal entity with appropriations." *See AFGE*, 388 F.3d at 409. A NAFI is instead funded "primarily from [its] own activities, services, and product sales." *Id.* (quoting *Cosme Nieves v. Deshler*, 786 F.2d 445, 446 (1st Cir. 1986). The fact that an organization receives money from its

38

own activities is not sufficient for designation as a NAFI; as "long as 'under the [] authorizing legislation Congress could appropriate funds if necessary,'" appropriations are still required. *Id.* at 409-10 (quoting *L'Enfant Plaza Props., Inc. v. United States*, 668 F.2d 1211, 1212 (Ct. Cl. 1982)). In determining whether a fund or entity is a NAFI, the Federal Circuit "has adopted a clear statement test," pursuant to which funds should be treated as requiring an appropriation unless there is "a clear expression by Congress" to the contrary. *Id.* at 410 (internal quotation marks omitted).

Plaintiff argues that the Budget Autonomy Act is lawful because Section 450 is a permanent or continuing appropriation that meets the requirements of the Anti-Deficiency Act. Alternatively, the Council suggests that the creation of the D.C. General Fund took District generated revenues out of the public fisc, thereby obviating the need for appropriation. Pl.'s MSJ at 20. Though Congress maintained what Plaintiff refers to as a "second-level requirement" that "expenditures out of the D.C. General Fund be affirmatively approved by Congress," that requirement was located in the District Charter and, according to Plaintiff, was subject to amendment. *Id.* at 16.

The Council offers no statutory, legal, or other support for this novel theory, nor can the Court find any. While Section 450 "gave the District authority to collect and deposit

39

JA447

local revenues, it did *not* give the District the ability to obligate or expend those funds." Defs.' Supp. Mem. at 4 (emphasis in original). Indeed, the weight of authority, and the text of the statute itself,[9] suggests that the creation of the D.C. General Fund did not constitute a permanent appropriation. The location of public money is not dispositive of this inquiry; whether public money is held in a separate fund in the Treasury or removed from the Treasury entirely, that money is still subject to the Anti-Deficiency Act. Simply removing funds from the Treasury does not satisfy the requirements of the Anti-Deficiency Act, which is silent regarding the location of public money (and does not even contain the word "Treasury").

---

[9] As Defendants point out, the Council's interpretation of the Home Rule Act would render it internally inconsistent, as the congressionally enacted versions of Sections 446 and 603(e) specifically note that all funds for the District – regardless of whether they are locally or federally generated – are subject to congressional appropriation. *See* D.C. Off. Code §§ 1-204.46 and 1-206.03(e). "It is a familiar canon of statutory construction that, 'if possible,' [the court is] to construe a statute so as to give effect to 'every clause and word.'" *Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)). Plaintiff's reading of Section 450 would not only make the Home Rule Act internally inconsistent, but it would also render Sections 446 and 603(e) as enacted superfluous because the transfer of District collected revenues from the Treasury to the D.C. General Fund alone constituted an appropriation. There is no reason to read the statute in that way, especially when its plain meaning and legislative history support an alternative reading that gives effect to each section.

The D.C. General Fund also cannot be considered a NAFI or revolving fund that would constitute an appropriation for the purposes of the Anti-Deficiency Act.  While Section 450 takes District generated revenues out of the Treasury and deposits them into the D.C. General Fund, nothing in that section (or elsewhere in the Home Rule Act) is a clear expression by Congress that the D.C. General Fund was not subject to appropriations.  *See L'Enfant Plaza*, 668 F.2d at 1212.  Nor is there any indication in the Home Rule Act that Congress could not appropriate funds for the District if necessary.  *See id.* The Home Rule Act in fact suggests the opposite.  It is a clear statement that Congress intended the D.C. General Fund to be appropriated.  *See* D.C. Off. Code §§ 1-204.46, 1-206.03(e).

This Circuit's decision in *Nevada v. Dep't of Energy*, 400 F.3d 9 (D.C. Cir. 2005), mandates the conclusion that Section 450 does not constitute an appropriation.  The Court considered whether Section 116 of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270 (hereinafter "NWPA"), which created a Nuclear Waste Fund, was a continuing appropriation.  400 F.3d at 13. The Nuclear Waste Fund was a "separate fund" in the Treasury created to finance the development of a nuclear waste repository and was funded with payments by regulated entities.  *Id.* at 11. After Yucca Mountain in Nevada was selected as the location of the repository, the NWPA was amended to provide financial

41

assistance to the state of Nevada out of the Nuclear Waste Fund. *Id.* (citing 42 U.S.C. § 10136(c)(1)).  Nevada interpreted the statute as providing a continuing appropriation, relying on language in the statute "that the Secretary shall make grants to the State of Nevada," *id.* at 13 (citing 42 U.S.C. § 10136(c)), and a provision specifying that such grants "shall be made out of amounts held in the Waste Fund," *id.* (citing 42 U.S.C. § 10136(c)(5).  Like the Council here, the State argued that "the mandatory phrase 'shall make grants' amount[ed] to a 'specific direction to pay,'" one that the GAO would treat as an appropriation.  *Id.* at 13.  The Court held that the Nuclear Waste Fund did not constitute a continuing appropriation because another section of the statute made "expenditures from the Waste Fund, including [] grants, 'subject to appropriations.'"  *Id.* In making this determination, the Court explained that it had found no authority to suggest that "a statute creating a funding source and ordering payment 'subject to appropriations' amounts to a continuing appropriation."  *Id.* at 14; *see also id.* ("[N]either Nevada nor we have identified any authority suggesting that a continuing appropriation exists when Congress creates a special fund but makes spending from it 'subject to appropriations.'").

The Council argues that *Nevada* is inapposite because it involved a special fund in the Treasury of the United States and

because the case did not arise under the Anti-Deficiency Act. Pl.'s Reply at 6 n.3.  However, Plaintiff's attempts to distinguish *Nevada* fail.  The Circuit held that a permanent appropriation is not statutorily created when another provision in the *same* statute makes funds subject to appropriations.  The location of the fund is irrelevant.  The D.C. General Fund, like the fund at issue in *Nevada*, has not been permanently appropriated because another section of the Home Rule Act, Section 446, requires that the Fund be appropriated.  It is, therefore, still subject to the requirements of the Anti-Deficiency Act.  Such a reading of Sections 450 and 446 also comports with the "broader principle that one should not lightly presume that Congress meant to surrender its control over public expenditures by authorizing an entity to be . . . outside the appropriations process."  *AFGE*, 388 F.3d at 410.  The Budget Autonomy Act, which removes the provisions in Section 446 that provide for compliance with the Anti-Deficiency Act, thus runs afoul of the limitations in Section 603(e) and the Anti-Deficiency Act.

> 3.   Section 602(a)(3)

Defendants argue that the Budget Autonomy Act is invalid for the additional reason that it violates Section 602(a)(3) of the Home Rule Act, which places another limitation on the Council's amendment authority under Section 303(d).  Section

602(a)(3) provides that the Council has no authority to "enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."  D.C. Off. Code § 1-206.02(a)(3). Defendants contend that the Budget Autonomy Act impermissibly amends an Act of Congress that is not restricted in its application exclusively to the District, namely the Anti-Deficiency Act.  Defs.' MSJ at 28-29.  Because the Budget Autonomy Act purports to change the procedure for the local portion of the District's budget to authorize spending without a congressional appropriation, it necessarily seeks to enact or amend an Act of Congress that is not restricted exclusively to the District of Columbia.  By its very terms, the Anti-Deficiency Act applies to the federal government and to the District.  *See* 31 U.S.C. § 1341.

For the reasons explained in Section III.B.2 *supra*, the Budget Autonomy Act does not comply with the requirements of the Anti-Deficiency Act, and the Council's attempts to characterize the D.C. General Fund as a permanent appropriation fail. Because the Council cannot amend the District Charter to exempt the local portion of the District's budget from the Anti-Deficiency Act pursuant to the limitations in Sections 602(a)(3)

and 603(e), the Budget Autonomy Act is unlawful by its terms and

as an exercise of the Council's amendment authority.[10]

---

[10] Defendants also argue that the Budget Autonomy Act violates
the first part of Section 603(a)(2) because it concerns
functions of the United States. Defs.' Reply at 6-7. According
to Defendants, "[b]udgeting and appropriations are
unquestionably 'functions' of Congress." Defs.' Reply at 7. To
support their claim, Defendants cite to two cases in which
budgeting and appropriations are referred to in dicta as
functions of the government. *See, e.g. Gross v. Winter*, 876
F.2d 165, 171 n.10 (D.C. Cir. 1989) (explaining that in the
context of determining whether an official has immunity from a
Section 1983 suit, budget decisions are "traditional legislative
functions"); *Hessey v. D.C. Bd. of Elections & Ethics*, 601 A.2d
3, 17 (D.C. 1991) (*en banc*) (referring generally to
appropriations as a function of the legislature). Because the
Budget Autonomy Act purports to change the role of the President
and Congress with respect to the locally funded portion of the
District budget, Defendants assert that it "is exactly the type
of change to a federal function, *i.e.,* a change to how
responsibilities are divided between federal and local
officials, that the limitation was intended to guard against."
Defs.' Reply at 7.

The Council argues that this reading of Section 603(a)(2) would
"gut [its] legislative authority" because it encompasses "any
District law with a non-ministerial federal effect." Pl.'s
Reply at 21. Plaintiff contends it would be prevented from
cutting taxes or amending the criminal code, and that even the
Initiative, Referendum, and Recall Charter Amendment Act of 1977
would be unlawful. *Id.* However, Plaintiff's dramatic reading
of Section 602(a)(3) has no basis in law or fact. Cutting taxes
would impact the total amount of District funds available for
Congress to appropriate, but it would not alter its function in
appropriating those funds. Nor would changing the criminal code
alter the function of the U.S. Attorney in prosecuting crimes.
Indeed, the District Charter already provides that the Council
can amend the District's substantive and procedural criminal law
subject to a 60-day, as opposed to 30-day, passive review period
by Congress. *See* D.C. Off. Code § 1-206.02(c)(2); *In re
Crawley*, 978 A.2d 608, 610-11 (D.C. 2009). While such actions
by the Council "might alter the background against which federal
officials act, neither would change federal officials'

45

**JA453**

**IV.   Conclusion**

Although the Council of the District of Columbia, the Mayor, and this Court are powerless to grant to the residents of the District of Columbia the full budget autonomy that *they* have demanded for almost forty years to spend *their* revenue collected from *their* local taxes and fees, the United States Congress and the President of the United States are — without a doubt — empowered to do so.

In view of the foregoing, the Court concludes that the Budget Autonomy Act is unlawful.  Plaintiff's Motion for Summary Judgment is hereby **DENIED** and Defendants' Cross Motion for Summary Judgment is hereby **GRANTED**.[11]  Mayor Vincent C. Gray, CFO Jeffrey S. DeWitt, the Council of the District of Columbia, its

---

*functions*, *i.e.*, those officials' roles, tasks, or responsibilities."  Defs.' Reply at 10 (emphasis in original).

The District of Columbia Court of Appeals came to the same conclusion in *In re Crawley*.  There, the Court considered whether the Procurement Reform Amendment Act of 1998 (the District's false claims act) impermissibly transferred prosecutorial authority from the U.S. Attorney to the Office of the Attorney General.  978 A.2d at 609-10.  The Court considered the legislative history of the Home Rule Act and determined that any law passed by the Council concerning the jurisdiction of the U.S. Attorney was to be understood as one that concerned the functions of the United States, and thus subject to Section 602(a)(3).  *Id.* at 615.  Likewise, the Budget Autonomy Act impermissibly affects a function of the United States.

[11] At the motions hearing on May 14, 2014, the Council represented that it would not seek a stay even if it sought an appeal.  Transcript of Hearing at 124:20-24.  In the absence of any request for a stay, the Court will not stay its order.

officers, agents, servants, employees, and all persons in active

concert or participation with them who receive actual notice of

the injunction, are hereby permanently **ENJOINED** from enforcing

the Local Budget Autonomy Act of 2012 pending further order of

this Court.  An appropriate order accompanies this Memorandum

Opinion.

       **SO ORDERED.**

**Signed:**    **EMMET G. SULLIVAN**
            **United States District Judge**
            **May 19, 2014**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COUNCIL OF THE DISTRICT OF
COLUMBIA,

                   Plaintiff,

      v.

VINCENT C. GRAY, in his official capacity
as Mayor of the District of Columbia,

         and

JEFFREY S. DeWITT, in his official capacity
as Chief Financial Officer for the District of
Columbia,

                 Defendants.

No. 1:14-cv-00655-EGS

Hon. Emmet G. Sullivan

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff Council of the District of Columbia appeals to the

U.S. Court of Appeals for the District of Columbia Circuit from this Court's judgment in favor of

Defendants.  Plaintiff appeals this Court's Order granting summary judgment to Defendants (and

denying summary judgment to Plaintiff) (Dkt. No. 43), and the Memorandum Opinion in support

thereof (Dkt. No. 44).

Dated: May 19, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP
MAYER BROWN LLP

By: */s/ Karen L. Dunn (with permission)*

   Karen L. Dunn
    D.C. Bar No. 1002520
   Alexander I. Platt
    D.D.C. Bar No. D00396
   BOIES, SCHILLER & FLEXNER, LLP
   5301 Wisconsin Avenue, NW
   Washington, D.C.  20015
   Telephone:  (202) 237-2727
   Facsimile:  (202) 237-6131
   Email:  KDunn@bsfllp.com

By: */s/ Brian D. Netter*

   Brian D. Netter
    D.C. Bar No. 979362
   Breanne A. Gilpatrick
    D.C. Bar No. 1018094
   MAYER BROWN LLP
   1999 K Street, NW
   Washington, D.C.  20006-1101
   Telephone:  (202) 263-3000
   Facsimile:  (202) 263-3300
   Email:  bnetter@mayerbrown.com

*Attorneys for Plaintiff Council of the District of Columbia*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

COUNCIL OF THE DISTRICT OF
COLUMBIA,

          Plaintiff,

   v.

VINCENT C. GRAY, in his official capacity
as Mayor of the District of Columbia,

     and

JEFFREY S. DeWITT, in his official capacity
as Chief Financial Officer for the District of
Columbia,

         Defendants.

</td><td>

No. 1:14-cv-00655-EGS

</td></tr>
</table>

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for the Council of the District of Columbia hereby certifies that on the 19th day of May 2014, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered counsel of record.

By:  */s/ Brian D. Netter*
        Brian D. Netter
         D.C. Bar No. 979362
        MAYER BROWN LLP
        1999 K Street, NW
        Washington, D.C.  20006-1101
        Telephone:  (202) 263-3000
        Facsimile:  (202) 263-3300
        Email:  bnetter@mayerbrown.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ──────────────────────── ) | |
| COUNCIL OF THE DISTRICT OF ) | |
| COLUMBIA, ) | |
| ) | |
|  Plaintiff, ) | |
| ) | |
|  v. ) | |
| ) | |
| VINCENT C. GRAY, in his ) | |
| official capacity as Mayor ) Civ. Action No. 14-655 (EGS) | |
| of the District of Columbia, ) | |
| ) | |
|  and ) | |
| ) | |
| JEFFREY S. DeWITT, in his ) | |
| official capacity as ) | |
| Chief Financial Officer for ) | |
| the District of Columbia, ) | |
| ) | |
|  Defendants. ) | |
| ──────────────────────── ) | |

**ORDER**

Pending before the Court is Plaintiff's Motion for
Clarification or, in the Alternative, for Partial Stay.
Demonstrating a remarkable degree of tenacity, but devoid of
legal merit, Plaintiff's motion seeks clarification as to
whether it can continue to enforce the Local Budget Autonomy Act
of 2012 (hereinafter "Budget Autonomy Act"), which the Court
held to be unlawful and permanently enjoined enforcement of in
an opinion and order dated May 19, 2014.  Despite this
injunction, Plaintiff argues that it should be permitted to
"pass the budget under two procedures," – (1) that mandated by

1

the Home Rule Act, which the District has followed for nearly 40 years; *and* (2) the new procedures for the locally funded portion of the District's budget in the Budget Autonomy Act, which this Court struck down earlier this week.  The Council states that it should be able to continue to enforce the unlawful and invalidated statute so that it does not "lose the authority to spend local money under the process dictated by local law [] if the D.C. Circuit reverses this Court's ruling."  Pl.'s Mot. at 1-2.

In its order, the Court permanently enjoined "Mayor Vincent C. Gray, CFO Jeffrey S. DeWitt, the Council of the District of Columbia, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction" from "enforcing the Local Budget Autonomy Act of 2012."  May 19, 2014 Order at 1-2.  The Court cannot comprehend how Plaintiff could read the Court's order as allowing it to pass and transmit to Congress a budget under the procedures outlined in the Budget Autonomy Act, as the Court clearly stated in its order that the Council is permanently enjoined from doing so.  Moreover, during the oral argument on the cross motions for summary judgment on May 14, 2014, Plaintiff stressed that what it needed from the Court was certainty.  *See* Transcript of Hearing at 124:10-11.  Surely, sending *two* budgets to Congress, pursuant to *two* different

2

procedures, requiring *two* types of congressional review, is the antithesis of the certainty and clarity that Plaintiff seeks.

The Court's order does not, as Plaintiff contends, "prohibit legislation from even being *passed*." Pl.'s Reply at 2 (emphasis in original). The Court, in a proper exercise of its jurisdiction over laws that do not pertain exclusively to the District of Columbia, *see* 28 U.S.C. § 1366; *Thomas v. Barry*, 729 F.2d 1469 (D.C. Cir. 1984) – an exercise of jurisdiction that Plaintiff effectively conceded at the oral argument on May 14, 2014, *see* Transcript of Hearing at 10:25-11:2 – determined that the Budget Autonomy Act, legislation that has already been *passed*, was unlawful and enjoined enforcement of that already-*passed* legislation. Plaintiff has cited no authority whatsoever to suggest that it is beyond the equitable power of this Court to enjoin enforcement of a law that is clearly unlawful, other than to cite to cases that are wholly inapposite regarding a court's inability to prospectively enjoin future legislation. *See, e.g.*, *McChord v. Cincinnati, N.O. & T.P. Ry.*, 183 U.S. 483 (1902); *New Orleans Water Works Co. v. City of New Orleans*, 164 U.S. 471, 472 (1896) (noting that once an unlawful ordinance is enacted, "equity [can] interfere, and, by injunction [] prevent the execution of such ordinance); *Hearst v. Black*, 87 F.2d 68 (D.C. Cir. 1936); *Assoc. Gen Contractors of Am. v. City of Columbus*, 172 F.3d 411, 415-16 (6th Cir. 1999) (explaining that

3

the District Court acted lawfully when it enjoined the enforcement of an unconstitutional city statute, but that it exceeded its equitable authority when it made passage of subsequent legislation subject to its review).  Indeed, the Council's arguments are based on little more than its vehement disagreement with this Court's ruling, and its hope that the Court of Appeals will reverse it.  That is not, however, a basis for continuing to act as though the Court's opinion and order have no effect, or are unclear.  Plaintiff's "hubris" in asking the Court to eviscerate its own decision so that the Council can continue to enforce the unlawful statute, is indeed "remarkable," to say the least.  Defs.' Opp'n at 2.

Nor can the Court understand why the Council is seeking a stay at this juncture, when it very clearly represented at the motions hearing on May 14, 2014 that it did not think "a stay would be warranted no matter what because what we need here is certainty."  Transcript of Hearing at 124:10-11.  However, in the interest of justice, the Court will consider Plaintiff's motion to stay.

In determining whether to stay an order pending appeal, the Court considers the same four factors as it would in resolving a motion for a preliminary injunction:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citations omitted); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842, n.1, 843 (D.C. Cir. 1977). On a motion to stay, "it is the movant's obligation to justify the court's exercise of such an extraordinary remedy." *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985).

The four factors have typically been evaluated on a "sliding scale," whereby if the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (citing *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1999)). While it is unclear whether the "sliding scale" is still controlling in light of the Supreme Court's decision in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), the Court need not decide that issue because the Council's request for a stay fails even under the less demanding "sliding scale" analysis of *Davenport*. *See Sherley*, 644 F.3d at 393.

The Council argues that a stay is warranted because it raises two serious legal questions. First, it claims that "[t]here are strong reasons to doubt this Court's exercise of

federal-question jurisdiction." Pl.'s Mot. at 2. Second, the Council argues that this Court's construction of the Home Rule Act and the Anti-Deficiency Act "conflicts with the authorities cited by the Council in its briefs to this Court." *Id.* at 3. "As an initial matter, the Court is not persuaded that merely raising a 'serious legal question' on the merits is sufficient for [the Council] to obtain a stay based on this factor." *In re Special Proceedings*, 840 F. Supp. 2d 370, 372 (D.D.C. 2012). Plaintiff fails to make any argument regarding its likelihood of success except to refer back to those made in its Motion for Summary Judgment, which the Court thoroughly considered and ultimately rejected in its May 19, 2014 Opinion. "Presented with no new information, authority, or analysis to persuade the Court to reconsider its [May 19, 2014] decision, the Court has no basis to conclude that [the Council] has demonstrated a probability of success on the merits." *Id.* at 373.

Plaintiff also argues that the remaining three equitable factors warrant a stay. According to Plaintiff, while Defendants will suffer no injury if the Council is allowed to pass a budget in conformance with the Budget Autonomy Act and transmit that budget to Congress, "it will lose the authority to spend local money under the process dictated by local law even if the D.C. Circuit reverses this Court's ruling." Pl.'s Mot. at 2. This injury is far from the "certain and great" injury

6

that is required in this Circuit.  *Cuomo*, 772 F.2d at 976

(explaining that even an irreversible change to the status quo

was not sufficient to warrant a stay).  Plaintiff's broad,

conclusory statements regarding the injury that it or the public

may suffer, and its equally broad and conclusory statements

regarding lack of the injury to Defendants, are not sufficient

to "justify the court's exercise of such an extraordinary

remedy."  *Id.* at 978.

    Accordingly, it is by the Court hereby

    **ORDERED** that Plaintiff's Motion for Clarification is hereby

**DENIED**, and it is hereby

    **FURTHER ORDERED** that Plaintiff's Motion for a Partial Stay

is hereby **DENIED**.

    **SO ORDERED.**

Signed:    **Emmet G. Sullivan**
         **United States District Judge**
         **May 22, 2014**

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(c), that on July 1, 2014, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: July 1, 2014                                    /s/ Brian D. Netter
                                                       Brian D. Netter