[ORAL ARGUMENT NOT YET SCHEDULED]

Nos. 14-7067

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COUNCIL OF THE DISTRICT OF COLUMBIA,

*Plaintiff-Appellant*,

v.

VINCENT C. GRAY, in his official capacity as Mayor of the District of Columbia, and JEFFREY S. DEWITT, in his official capacity as Chief Financial Officer for the District of Columbia,

*Defendants-Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

## BRIEF OF FORMER D.C. ATTORNEY GENERAL PETER J. NICKLES AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT AND REVERSAL

_____

Charles A. Miller
David M. Zionts
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, DC 20004–2401
(202) 662–6000
cmiller@cov.com

July 8, 2014                              *Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for *amicus curiae* certifies as follows:

A.  **Parties and *Amici*.** Except for the following, all parties and *amici* appearing before the district court and in this Court are listed in the Brief for Plaintiff-Appellant:

*Amici curiae* in support of Plaintiff-Appellant in this Court: Peter J. Nickles, Mark Tuohey, Melvin White, and Thomas Williamson.

**B.  Rulings Under Review.**  The ruling under review is the Order of the U.S. District Court for the District of Columbia (Sullivan, J.), docketed May 19, 2014, granting defendants-appellees' motion for summary judgment and denying plaintiff-appellant's motion for summary judgment, and the Memorandum Opinion in support of that Order.

**C.  Related Cases.**  *Amicus* and his counsel are unaware of any related cases.

## STATEMENT REGARDING CONSENT TO FILE AND
## SEPARATE BRIEFING

All parties have consented to the filing of this brief.[*]  Peter J. Nickles filed

his notice of intent to participate in this case as *amicus curiae* on July 3, 2014.

Pursuant to Circuit Rule 29(d), counsel for *amicus* certifies that a separate

brief is necessary.  As a former Attorney General for the District, *amicus* has a

unique perspective on the issues presented in this case, and in particular on the

broader principles of interpretation at stake that are central to the management of

the District's legal affairs.

---

[*] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than the *amicus* or his counsel contributed money intended to fund preparation or submission of this brief.

# TABLE OF CONTENTS

Page(s)

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE
          BRIEFING ............................................................................................... ii

TABLE OF CONTENTS........................................................................... iii

TABLE OF AUTHORITIES ...................................................................... iv

STATUTES AND REGULATIONS ........................................................... 1

INTEREST OF AMICUS CURIAE ......................................................... 1

INTRODUCTION AND  SUMMARY OF THE ARGUMENT ............................ 3

ARGUMENT ............................................................................................ 9

I.     The Budget Autonomy Act Is A Valid Charter Amendment......................... 9

       A.     Congress Delegated Broad Authority To The District's
              Residents To Amend Their Own Charter............................................. 9

       B.     Congress Did Not Enact A Sweeping Exception To Charter
              Amendment Authority That Precludes The District From
              Modifying Its Internal Budget Process. .............................................. 12

       C.     Purported Limitations On The District's Authority To Amend
              Its Own Charter Must Be Narrowly Construed. ................................. 17

II.    The Mayor's Approach Abandons Legal Principles Long Embraced
       By The District Government, And Threatens To Disrupt The District's
       Legal Affairs......................................................................................... 23

CONCLUSION ....................................................................................... 27

# TABLE OF AUTHORITIES[†]

Page(s)

## Cases

*Bergman v. Dist. of Columbia*,
  986 A.2d 1208 (D.C. 2010) ........................................................................18, 26

*Bishop v. Dist. of Columbia*,
  411 A.2d 997 (D.C. 1980) ...................................................................................24

*Dist. of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*,
  442 A.2d 110 (D.C. 1982) ............................................................................17, 24

*INS v. Chadha*,
  462 U.S. 919 (1983)...........................................................................................11

*Jackson v. Dist. of Columbia Bd. of Elections & Ethics*,
  999 A.2d 89 (D.C. 2010) ...................................................................................20

*Jenkins v. Wash. Convention Ctr.*,
  236 F.3d 6 (D.C. Cir. 2001) ...............................................................................19

*M'Culloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) .......................................................................3, 20

*NLRB v. Noel Canning*,
  __ U.S. __, No. 12-1281, slip op. 8 (June 26, 2014) ..........................................21

*United States v. Dickson*,
  40 U.S. 141 (1841)..............................................................................................19

*Wash., D.C. Ass'n of Realtors, Inc. v. Dist. of Columbia*,
  44 A.3d 299 (D.C. 2012) .........................................................................18, 23, 26

---

[†] Authorities upon which we chiefly rely are marked with asterisks.

iv

## Constitution

U.S. Const., Art. I, § 8, cl. 17..................................................................3

## Statutes

31 U.S.C. § 1341 ...............................................................................16

Act of Oct. 12, 1984, Pub. L. No. 98-473, 98 Stat. 1837 .........................11

D.C. Code § 1-204.46 .........................................................................16

*District of Columbia Self-Government and Governmental
    Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973)
    ......3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26

## Other Authorities

H.R. 9682, 93d Cong. .........................................................................13

*H.R. 10692, 93d Cong. ......................................................................14

H.R. Conf. Rep. No. 93-703 (1973)........................................................16

Louis Fisher, Cong. Res. Serv., RS22132, Legislative Vetoes After
    *Chadha* (2005), *available at* http://tinyurl.com/ChadhaCRS.............................11

Mem. from Irvin Nathan, Att'y Gen., to Vincent Gray, Mayor (Sept.
    27, 2013), *available at* http://tinyurl.com/ResFundMemo..........................25, 26

Mem. from Melissa D. Williams, Asst. Att'y Gen., to Gabe Klein,
    Dir., Dist. Dep't of Transp. (Mar. 5, 2010), *available at*
    http://tinyurl.com/DDOTMemo.......................................................................25

Mike DeBonis, *D.C. officials ponder whether to defy federal
    shutdown and keep city government open*, Washington Post, Sept.
    24, 2013, http://tinyurl.com/WaPoDCShutdown ...............................................26

Op. by Judith W. Rogers, Corporation Counsel, to Marion S. Barry,
    Jr., Mayor, 1980 D.C. AG LEXIS 27 (Apr. 21, 1980) ........................................24

## STATUTES AND REGULATIONS

Pertinent materials are contained in an addendum to the brief for plaintiff-appellant.

## INTEREST OF AMICUS CURIAE

From 2007 to 2011, *amicus curiae* Peter J. Nickles served in the District of Columbia government, first as General Counsel to the Mayor (2007-2008), and then as Attorney General for the District (2008-2011). During his tenure as Attorney General, *amicus* confronted first-hand the legal challenges the District faces as both a self-governing entity, and one subject to plenary congressional control. For example, *amicus* advocated on behalf of the District in its struggle to obtain voting rights in Congress, and for its authority to comply with the Supreme Court's Second Amendment decisions in a way that accounts for the District's unique public safety challenges. In a revealing episode demonstrating the unusual power Congress can wield over the District's internal affairs, *amicus* testified against an amendment to the District of Columbia House Voting Rights Act of 2009, which would have repealed the District's ban on semiautomatic weapons and other gun safety measures.

As Attorney General, *amicus* was both an advocate for home rule and for the rule of law. He believed, and continues to believe, that the District government should pursue all legally available avenues to achieving increased autonomy over

its own affairs.   Having studied the Home Rule Act, its legislative history, and relevant authorities, *amicus* concluded that the Budget Autonomy Act is one such measure: the District's residents did not exceed their legal authority when they amended the budget provisions of the D.C. Charter.   *Amicus* believes that his views on the Budget Autonomy Act, and his unique perspective on the broader dangers of the Mayor's interpretive approach to the Home Rule Act and D.C. Charter, may aid the Court in its deliberations.

## INTRODUCTION AND
## SUMMARY OF THE ARGUMENT

Chief Justice Marshall, rejecting a narrow interpretation of the Constitution that would disable the government from confronting new problems, issued one of the most enduring maxims of constitutional law: "[W]e must never forget that it is a *constitution* we are expounding." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819). Unlike the fifty states and the nation at large, the District of Columbia lacks its own constitution, and is required to look to Congress as its ultimate sovereign. U.S. Const., Art. I, § 8, cl. 17. But in a landmark, bipartisan achievement, Congress substantially redressed this anomaly. Not only did the Home Rule Act grant the District a foundational document – its Charter – but it further granted the District's residents broad authority to *change* that Charter. Passage of the Home Rule Act was nothing short of a constitutional moment for the District, and the Charter a constitution-like document that would be for the District to shape going forward.

This case requires the Court to interpret the breadth of the authority possessed by the District's residents over their own constitutional document. Both parties properly invoke the statutory text, the legislative history, and various canons of statutory construction. But it is also important to recall that the Home Rule Act is no ordinary statute. Rather, it was a unique enactment giving the District a measure of what all fifty states enjoy: the authority to shape its own

3

internal governance, not just at the moment of enactment but into the future.  When the Mayor reads into the Home Rule Act unfounded restrictions on that authority, he forgets that it is the *D.C. Charter* we are expounding.

1.   a.   Congress created the D.C. Charter to establish the "means of governance" for the District, and in an unusual act, conditioned the Charter on "acceptance" by the people of the District.  Critical to the type of self-government Congress sought to create was the principle that District residents would continue to have authority to amend "their" Charter.  While this amendment authority has certain narrow exceptions, Congress was primarily focused on procedural safeguards against overzealous changes.  Significantly, however, Congress in 1984 abandoned one such procedural hurdle – the requirement of affirmative congressional approval of amendments – without revisiting the District's expansive substantive power over the Charter.

b.  The Mayor erroneously argues that the Budget Autonomy Act is invalid because it falls within three purported "limitations" to the broad grant of amendment power.  First, he reads Section 603(a) as a limitation on future amendments to the Charter, even though by its plain terms it only clarifies that *the Home Rule Act* did not make any changes in existing law.  Although the Mayor reasons that Congress must have intended every provision of Section 603 to operate as a "limitation," the Act's structure and drafting history confirm that this

4

was not Congress's intent.  Critically, moreover, Congress considered and *rejected* a proposal by Representative Ancher Nelsen that *would have* operated as a limitation.  His bill provided that "there shall be no change made" to the budget process.  That proposal was rejected in favor of the adopted provision, confirming that the Home Rule Act itself made no change in the District's budget process. The final version of section 603(a) still served an important purpose – it memorialized that no changes were being made to the budget process, including the hotly disputed issue of how the *federal* payment would be determined – but it declined to adopt a prohibition on all future changes in the District's use of its own funds.

Second, the Mayor argues the Budget Autonomy Act is inconsistent with Section 603(e), which ensures compliance with the Anti-Deficiency Act. However, under the Budget Autonomy Act the District will only expend money from a "fund" pursuant to the terms of the D.C. Charter, as amended, and thus is fully consistent with the Anti-Deficiency Act.  The purpose of this provision, moreover, was to ensure that District officials would not spend beyond their means – not to micromanage the budget process.  Finally, the Mayor argues that the Budget Autonomy Act violates Section 602(a)(3) because Congress's role in appropriating funds for the District constitutes a "federal function."   This

expansive interpretation of "federal function" is at odds with the statute, and in fact has been rejected by the D.C. Court of Appeals.

c. Although the best reading of the Home Rule Act is that none of the Mayor's "limitations" applies, at most the Mayor has pointed to technical ambiguities in the statute. However, if the Court finds the Home Rule Act ambiguous, it should resolve the case according to the long-standing principle that restrictions on the District's authority under the Home Rule Act should be "narrowly construed." This principle follows from ordinary principles of statutory construction; the District's authority to amend the Charter is expressed as a broad grant of power, and "limitations" on that power simply an exception. Such exceptions to a general rule are strictly construed.

This principle has special force in the case of the Home Rule Act in light of the congressional purpose. In granting home rule to the District, Congress created a Charter with constitution-like status, and a natural corollary is that Congress intended the Charter to be *treated* like a constitution. First, as Chief Justice Marshall famously put it, constitutions are intended "to be adapted to the various crises of human affairs." To the extent Congress meant to give the District an *unadaptable* Charter, it would have said so clearly. Second, constitutions are premised on the consent of the governed, a premise Congress took unusually seriously in conditioning the Charter on District residents' ratification. Where

6

Congress intended to derogate from this principle by limiting future amendment authority, it again would have said so clearly.  Finally, ambiguous provisions of constitutions, in particular structural provisions, "require a regular course of practice" to settle them.  The narrow construction principle is just such a settled practice.  Moreover, Congress has powerful political weapons at its disposal if it believes the District has read the Charter's ambiguities to claim too much authority.  It intended any such issues to be resolved by federal-District dialogue (and perhaps an exercise of plenary congressional authority) – not a refusal by the Mayor to enforce a duly enacted Charter amendment.

    2.  The issues raised by the Budget Autonomy Act present just one respect in which the District's unique status results in legal complexities.  The principle that restrictions on District authority will be narrowly construed is critically important to navigating this environment, and has a venerable history in the District's governance.

    Not long after enactment of the Home Rule Act, Judge Rogers (at the time Corporation Counsel) embraced the legal principle that "any restrictions on the grant of self-government should be narrowly construed in accordance with the statutory purpose."  This tradition of defending the full breadth of authority granted by Congress has continued from administration to administration.  For example, during *amicus*' tenure as Attorney General, his office eschewed an aggressive

interpretation of "federal function" of the kind the Mayor now embraces. The current Attorney General has also been willing to interpret ambiguous provisions of the Home Rule Act in favor of District authority, appropriately defending the District's ability to utilize the reserve fund during a recent lapse in appropriations.

The Mayor's interpretive approach in this case, however, beyond its consequences for budget autonomy, could throw the District's legal affairs into disarray. A decision declining to narrowly construe purported "limitations" on District authority would create a conflict between this Court and the D.C. Court of Appeals. It could further call into question longstanding practices and create unforeseen problems in the day-to-day management of the District. Rather than embrace the Mayor's novel interpretive methods, the Court should affirm that the District's residents properly exercised their authority by amending "their" Charter.

## ARGUMENT

**I.    The Budget Autonomy Act Is A Valid Charter Amendment.**

    **A.    Congress Delegated Broad Authority To The District's Residents To Amend Their Own Charter.**

The Home Rule Act is an unusual piece of legislation, and the D.C. Charter an especially unusual instrument.  Rarely if ever does Congress condition its own laws on approval by referendum, but in this instance it asked D.C. voters to decide whether they would "accept the charter."  District of Columbia Self-Government and Governmental Reorganization Act ("Home Rule Act"), Pub. L. No. 93-198, § 703, 87 Stat. 774 (1973).  Like a constitution, the Charter "establish[es] the means of governance of the District."  *Id.* § 301.  And also like a constitution, it conditions this means of governance on "acceptance" by the people to be governed.  *Id.*  The resemblance between the D.C. Charter and a constitution is not an accident; members of Congress viewed the Charter as a document "the school children of the District" could read when "taught about their government."  Staff of H. Comm. on D.C., 93d Cong., Home Rule for the District of Columbia: Background and Legislative History ("LH") 207 (Comm. Print 1976) (statement of Rep. Donald Fraser).

Critical to the type of self-government Congress envisioned was the Charter's amendment process.  Rather than give the District one chance to accept or reject their Charter – the faux-self-determination of "one person, one vote, one

9

time" – Congress created a mechanism whereby the Council could propose, and the people "ratif[y]," changes to their government, subject of course to the continued oversight power of Congress.  Home Rule Act § 303(a).  Home rule was thus understood "as an ongoing process," under which the people "could continue to implement and update *their* charter."  LH 207 (statement of Rep. Brock Adams) (emphasis added).

Under this framework, the amendability of Charter provisions was the rule (Section 303(a)), and restrictions on this authority the narrow exception (Section 303(d)).  The legislative history makes clear that Congress viewed the amendment *procedure*, rather than any substantive limitations, as the key safeguard against overzealous amendments.  In a revealing colloquy, Representative Thomas Rees explained that certain provisions "are in the charter[] to keep from changing the rules" – not because amendments were substantively off-limits ("[a]nything is possible," Representative Rees conceded), but because "it would be a lot of trouble" procedurally.  LH 1066.  This relative disinterest in delineating Charter amendments that would be off-limits is borne out not just by the silence in the legislative history, but by the structure of the Home Rule Act itself: aside from the narrow provisions of Section 303(a) not relevant here, Congress did not even spell out distinct restrictions, but merely cross-referenced the limitations it had placed on the Council's legislative authority.

Congress's decision not to focus its energy on fleshing out substantive restrictions on Charter amendments is unsurprising.  As originally enacted, the Home Rule Act required congressional approval of all Charter amendments.  It would have been bizarre had Congress taken care to disable District residents from passing an enumerated list of particular amendments, when either House could simply pocket-veto any change it did not support.

Significantly, however, Congress abandoned this procedural hurdle in 1984, allowing the District's amendments to come into effect automatically unless Congress passes and the President signs a joint resolution of disapproval.  Act of Oct. 12, 1984, Pub. L. No. 98-473, § 131(b), 98 Stat. 1837, 1974.  While some change to the prior congressional approval process was required by the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983), the easiest and most modest change would have been to add a presidential approval requirement. Indeed, that is how Congress fixed many similar provisions rendered unconstitutional by *Chadha*.  *See* Louis Fisher, Cong. Res. Serv., RS22132, Legislative Vetoes After *Chadha* (2005), *available at* http://tinyurl.com/ChadhaCRS.  But not only did Congress instead relinquish substantial control over the amendment process, it did so without revisiting its prior decision not to heavily regulate the permissible subject matter of amendments.  Thus, Congress delegated to the District expansive authority over its

11

Charter in two steps: first in 1973 by creating an amendment procedure that relied mostly on procedural, rather than substantive, checks, and then deciding in 1984 to diminish the procedural hurdles without adding new substantive prohibitions.

    **B.**    **Congress Did Not Enact A Sweeping Exception To Charter Amendment Authority That Precludes The District From Modifying Its Internal Budget Process.**

Although District residents overwhelmingly ratified the Budget Autonomy Act, and Congress allowed it to come into effect under the passive review procedures Congress enacted in 1984, the Mayor concluded that it is null and void. He reached that conclusion in light of three purported "limitations" on the broad grant of amendment power. Read naturally, however, and particularly in light of the history of the statute, the Home Rule Act did not adopt the sweeping restrictions on District authority that the Mayor would impose.

1. <u>Section 603(a)</u>. The Mayor and the district court placed primary reliance on Section 603(a), which on its face is not a "limitation" at all. Instead, it simply clarifies that "[n]othing in this Act" – *i.e.*, the Home Rule Act – "shall be construed as making any change in existing law" with respect to the budget process. This provision means exactly what it says: that "this Act" did not change the budget process for the District. Nothing about that language purports to restrict the people of the District – in whose hands Congress largely left the Charter's fate – from altering "existing law" in the future.

The structure of the Home Rule Act confirms this interpretation. When Congress intended the provisions in sections 601, 602, and 603 to operate as limitations, it said so clearly. Section 602 enumerates a long list of subjects on which "the Council shall have no authority" to act. Other provisions of Section 603 expressly limit District authority by providing that certain bonds "shall [not] not be issued," and that "the Council shall not approve" a budget that exceeds District resources. Home Rule Act § 603(b)(1), (c). Even the title of Section 603 lays bare the fact that only some of its sub-sections are intended as limitations: the heading refers to "Budget Process," referring to Section 603(a), and then, separated by a semi-colon, "*Limitations* on Borrowing and Spending" (emphasis added).

The drafting history of Section 603(a) is further evidence that the provision was not intended to operate as an implicit limitation on future changes to the budget process. The original version of Section 603 introduced in the House did not contain current Section 603(a) or any precursor. It contained *only* limitations on borrowing and spending, and unsurprisingly was captioned "Limitations on Borrowing and Spending." H.R. 9682, 93d Cong. § 603 (as reported, Sept. 11, 1973) (LH 1317-20). Notably, Section 303(d) – which refers to the "limitations specified in sections 601, 602, and 603" – had already been drafted, and Congress never revisited its language. *Id.* § 303(d) (LH 1244). The district court found it relevant that Section 303(d) does not specify that only parts of Section 603 are

13

intended as limitations, but it disregards the fact that this language originated when everything in Section 603 *was* a limitation. It does not follow that provisions *subsequently* added to Section 603 must be read as limitations, even when such additional provisions are not stated as limitations.

The development of section 603(a) actually confirms that it was not meant to limit the District's authority as the Mayor now claims. As originally proposed by Representative Ancher Nelsen, Ranking Member of the House District Committee, the provision *would* have acted as a limitation. Using the "shall" language contained in other limitations, this version would have provided that "there *shall be no change made* in existing laws" with respect to the budget process. H.R. 10692, 93d Cong. § 416 (LH 2024) (emphasis added). But this version did not make it into the law. Instead, when House District Committee Chairman Charles Diggs introduced a compromise bill, the new version of Section 603(a) merely clarified that the Home Rule Act did not change the existing budget process. This amendment, and the rejection of the initial version proposed by Representative Nelsen, confirms that Congress *considered and rejected* the very limitation the Mayor now reads into the law.

Finally, although the compromise version of Section 603(a) did not create the forward-looking "limitation" Representative Nelsen sought, it was still significant. A key point of dispute when the Home Rule Act was under

consideration was whether federal payments to the District – at the time a substantial portion of its budget – would continue to be appropriated on a line-by-line basis, or only as "a lump sum unallocated Federal payment."  LH 1703 (statement of Rep. Nelsen).  Retaining line-by-line approval of the federal payment was a major victory for champions of federal oversight, and Section 603(a) memorialized that "existing law" on this important question would not change. *See* LH 3057 (statement of Rep. Diggs) ("The conference report *retains* complete congressional approval over the Federal payment with a thorough annual review . . . . I want to stress that there is nothing automatic about the Federal payment contained in this bill." (emphasis added)).  Notably, however, in clarifying the resolution of the federal payment issue, Congress had no need to enact a "limitation" on the District – the Charter does not (and could not) control how Congress allocates federal funds to the District, so the District could never exercise its amendment authority to compel Congress to make "lump sum" payments.  It was sufficient for achieving this congressional purpose to memorialize that no changes were being made to the existing budget process, without prohibiting future Charter amendments that would govern the District's use of its *own* funds.

    2.  <u>Section 603(e)</u>.  The Mayor and the district court also concluded that the Budget Autonomy Act is inconsistent with Section 603(e), which provides that "[n]othing in this Act shall be construed as affecting the applicability to the District

government" of the Anti-Deficiency Act.  Of course, the Budget Autonomy Act does not purport to relieve the District government from compliance with the Anti-Deficiency Act.  The Anti-Deficiency Act permits the District to spend money that is "available in an appropriation *or fund*," 31 U.S.C. § 1341(a)(1) (emphasis added); the Budget Autonomy Act amends the Charter to make the D.C. General Fund available for expenditure in the amount authorized by the Council.  D.C. Code § 1-204.46(c).  Far from "reading compliance with the Anti-Deficiency Act . . . out of the Home Rule Act entirely," JA 444, the Budget Autonomy Act simply updates the Charter to create a new means of compliance with the Anti-Deficiency Act.

The legislative history confirms that the purpose of Section 603(e) was to prevent the District "from violating the Federal Anti-Deficiency Act, prohibiting expenditures *beyond available resources*."  H.R. Conf. Rep. No. 93-703, at 80 (1973) (LH 3018) (emphasis added).  At the time, the District was heavily reliant on federal funding, and so ensuring that the District would not obligate unavailable federal funds was an important priority.  There is no indication, however, that Congress sought to freeze the District's ability to comply with the Anti-Deficiency Act a different way, *i.e.*, by spending "available resources" in a "fund" filled by its own taxpayers, rather than through an appropriation.

16

3.  <u>Section 602(a)(3)</u>.  Finally, the Mayor and the district court invoked Section 602(a)(3), which prohibits the District from enacting legislation "which concerns the functions or property of the United States."  Unlike Section 603(a), Section 602(a)(3) is a bona fide "limitation."  However, it cannot reasonably be interpreted to preclude any legislation, however local in focus, that might "change . . . how responsibilities are divided between federal and local officials."  JA 453 n.10.  The text speaks of federal *functions*, not officials; an official may be employed by the federal government but still perform certain "functions" that are directed only to local affairs.  As the D.C. Court of Appeals has recognized, "federal functions" are those "having national implications," as opposed to purely local ones.  *Dist. of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982).  When Congress appropriates money collected by the District, allowing District officials to spend it on District matters, it is not performing any federal function of national import.

### C.  Purported Limitations On The District's Authority To Amend Its Own Charter Must Be Narrowly Construed.

As discussed above, the best reading of the Home Rule Act is that nothing prevented District residents from amending the Charter's budget provisions.  At most, however, the Mayor has identified technical ambiguities in the Home Rule Act.  Perhaps Section 303(d) could be read to implicitly convert every provision of Section 603 into a "limitation" – although the text does not say so, and the drafting

history confirms that this was not Congress's intent.  Perhaps Section 603(a) could be read to bar the District from revisiting its budget process in 2013 – although the text states only that no changes were being made at the time, and Congress *rejected* a version of that provision that attempted to freeze the budget process in 1973. And perhaps – contrary to the Act's text and purpose – Section 603(e) could be read to limit the District to just one means of compliance with the Anti-Deficiency Act, and Section 602(a)(3) to mean that every federal official who undertakes some ministerial act for the District is performing a "federal function."  But these are strained readings that undermine rather than advance the aims of the Home Rule Act.  Even if they are plausible constructions of the text – *but see supra* § I.B – the Court should not adopt them.

Instead, if the Court finds the statute ambiguous and both the Council's and the Mayor's interpretations credible, it should resolve the case according to a "long-standing" interpretive principle that has guided District affairs: restrictions on the District government's authority to legislate under the Home Rule Act "must be narrowly construed."  *Bergman v. Dist. of Columbia*, 986 A.2d 1208, 1226, 1230 n.24 (D.C. 2010); *Wash., D.C. Ass'n of Realtors, Inc. v. Dist. of Columbia*, 44 A.3d 299, 303 (D.C. 2012) ("In view of this broad delegation of authority and the policy of the Home Rule Act, we have held that limitations on the Council's

legislative authority will be construed narrowly."); *see also infra* § II (discussing the history of this principle and its importance in District governance).

Simply as a matter of ordinary statutory construction, this interpretive principle follows from the structure of the Home Rule Act. A "consecrated . . . maxim in the interpretation of statutes," noted by Justice Story, applies here: "where the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly." *United States v. Dickson*, 40 U.S. 141, 165 (1841). Here, the "enacting clause" is quite broad: most provisions of the Charter "may be amended" using the prescribed ratification and passive congressional review process. Home Rule Act § 303(a), (b). The "proviso" is Section 303(d): the generally applicable procedure "may not be used" to enact laws subject to the "limitations specified in sections 601, 602, and 603." This proviso should be "construed strictly" – all doubt about whether a purported "limitation" applies should be resolved in favor of the broad rule allowing amendments.

The unique nature of the Home Rule Act and D.C. Charter gives this interpretive principle special force. As both this Court and the District of Columbia Court of Appeals have recognized, the Charter has a constitution-like status. *See Jenkins v. Wash. Convention Ctr.*, 236 F.3d 6, 12 (D.C. Cir. 2001) (recognizing that the D.C. Charter "is similar," at least "in some measure," "to a

state constitution"); *Jackson v. Dist. of Columbia Bd. of Elections & Ethics*, 999 A.2d 89, 123 (D.C. 2010) ("The Home Rule Act and the District Charter [] serve as a constitution for the District."). Congress recognized and intended this, going so far as to condition the Charter – its own piece of legislation – on the affirmative assent of the governed. *See supra* § I.A.

A natural corollary of the Charter's unique nature is that Congress intended the Charter to be *treated* like a constitution. This congressional purpose has several interpretive consequences. First, constitutions are meant to be enduring. Chief Justice Marshall's formulation still resonates: "We must never forget, that it is a *constitution* we are expounding, . . . a constitution intended to endure for ages to come, and, consequently, *to be adapted* to the various crises of human affairs." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 415 (1819) (second emphasis added). Constitutional theorists may debate whether a constitution should be "adapted" by interpretation alone, but all agree that a constitution should be subject to amendment by the people when times change. Congress understood and expected that the people of the District would need the ability to update their Charter in precisely this fashion. *See supra* pp. 9-10. Although Members of the Ninety-Third Congress likely did not have in mind an entity that would demonstrate sound fiscal management and largely free itself of federal funding, they sensibly created a Charter capable of adapting to changes they could not

foresee. To the extent Congress intended to derogate from this principle and create an *unchangeable* structure for the District, one unable to adapt the District's internal governance to new circumstances, it can be expected to have done so in unmistakable terms.

Second, constitutions are premised on the consent of the governed. Congress took this principle quite seriously in the case of the Home Rule Act, going so far as to require a local referendum to approve the Charter, and future referenda for Charter amendments. Any gaps in District residents' power to revise the structure of their own government would be quite anomalous. Once again, to the extent Congress intended this anomaly, it would have made itself crystal clear.

Third, it has long been understood that "'differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter . . . and that it might require a regular course of practice to liquidate & settle the meaning of some of them.'" *NLRB v. Noel Canning*, __ U.S. __, No. 12-1281, slip op. 8 (June 26, 2014) (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)). This "significant weight upon historical practice" is especially pronounced in the case of "working arrangements" among different organs of government. *Id.* at 6, 9. In creating an enduring Charter for the District, Congress would have anticipated that federal and District authorities would have to "liquidate and settle" aspects of

21

the District's governance through practice.  As discussed in more detail below, the principle of narrowly construing restrictions on the District's authority is such a practice, "liquidating and settling" an approach to ambiguous provisions of the Home Rule Act.

Moreover, the federal government has powerful political weapons at its disposal if it believes the District has gone too far.  This check, even more substantial than in the inter-branch separation of powers context, renders aggressively interpreted limitations on District authority unnecessary and counterproductive.  Indeed, if Congress in 1973 had anticipated a situation in which the District government pushed the envelope in an area of legal ambiguity, it would have expected its successors to act if they felt congressional prerogatives threatened.  It likely would *not* have expected the Mayor to invoke interpretive ambiguities against the District's own interests, leading to an internecine lawsuit playing out in federal court.[1]

Of course, the District is not a state, and its Charter is not a true constitution – Congress retains plenary authority.  Nonetheless, Congress exercised that

---

[1] This political check helps explain why the District did not amend the Charter's budget provisions before 2012.  While the Attorney General's prediction of a "punitive" congressional response (JA 156) did not come to pass, previous Councils could have reasonably feared such a reaction, particularly before the District had amassed a track record of responsible fiscal stewardship.  The District's failure to enact budget autonomy earlier is not a strike against its authority – it is a clear signal that the Home Rule Act's political safeguards were working.

authority to give the District's residents something quite close to a constitution. The Home Rule Act should be applied with this congressional purpose in mind. For this reason among others, the principle that restrictions on the District's authority should be narrowly construed – long recognized by the D.C. Court of Appeals – should be recognized in this Court.

Applied to this case, the narrow construction principle confirms the validity of the Budget Autonomy Act. All of the purported "limitations" on the District's amendment authority are at a minimum ambiguous. None of the Mayor's interpretations is so obvious from the face of the statute or legislative record that it can support overturning a Charter amendment ratified by an overwhelming majority of the people.

## II.     The Mayor's Approach Abandons Legal Principles Long Embraced By The District Government, And Threatens To Disrupt The District's Legal Affairs.

As *amicus* can attest, and the Mayor and Council would surely agree, navigating the legal complexities of the District's unique status is a challenge. This fact was apparent early in the life of the Home Rule Act, as the District government had to determine the scope of its authority. One critical aid in this endeavor, repeatedly affirmed by the D.C. Court of Appeals, is the interpretive principle that "limitations on the Council's legislative authority will be construed narrowly." *Wash., D.C. Ass'n of Realtors, Inc.*, 44 A.3d at 303.

This principle has a venerable history in the District's governance. Judge Rogers, during her tenure as Corporation Counsel, reasoned that where Congress "intended to prohibit the Home Rule Government" from taking a particular action, "it would have said so expressly, and not left the matter to mere implication." *Bishop v. Dist. of Columbia*, 411 A.2d 997, 999 (D.C. 1980) (quoting D.C. pet'n for reh'g en banc). The D.C. Court of Appeals agreed. *Id.* Judge Rogers again invoked this principle when asked whether the Council could, consistent with Section 602(a)(3) of the Home Rule Act, transfer certain responsibilities from the Secretary of Labor to District authorities. She concluded that it could, noting that "[a]ny restrictions on th[e] grant of self-government *should be narrowly construed in accordance with the statutory purpose*." Op. by Judith W. Rogers, Corporation Counsel, to Marion S. Barry, Jr., Mayor, 1980 D.C. AG LEXIS 27, at 9 (Apr. 21, 1980) (emphasis added). Again, the D.C. Court of Appeals agreed. *Dist. of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982) (refusing to "infer[]" that, when Congress decided in the Home Rule Act to retain the Secretary of Labor's role in administering private workmen's compensation, it intended to prohibit the District from later transferring that authority to itself).

From administration to administration, the District government has embraced this principle and defended the breadth of authority granted by Congress.

24

For example, during *amicus*' tenure as Attorney General, his office determined that the Council could repeal certain acts of Congress that would have impeded the District's streetcar program.  Mem. from Melissa D. Williams, Asst. Att'y Gen., to Gabe Klein, Dir., Dist. Dep't of Transp. (Mar. 5, 2010), *available at* http://tinyurl.com/DDOTMemo.  Since the streetcar route would traverse the National Capital Service Area, the government had to determine whether the Council's action would affect a "federal function" under Section 602(a)(3).  *Id.* at 7.  However, eschewing the aggressive view of that limitation the Mayor now embraces, *amicus*' office construed the provision narrowly in light of its purpose to protect "the conduct of Federal business."  *Id.* at 8.

The current Attorney General has also, outside the context of the Budget Autonomy Act, interpreted ambiguous provisions of the Home Rule Act in favor of District authority.  When the District's operations were threatened in 2013 by a lapse in appropriations (the "government shutdown" in common parlance), the Attorney General concluded that the Home Rule Act allowed the District to use the contingency reserve fund to continue operating.  Mem. from Irvin Nathan, Att'y Gen., to Vincent Gray, Mayor (Sept. 27, 2013), *available at* http://tinyurl.com/ResFundMemo.  He did so by advancing a non-obvious interpretation of the Home Rule Act: deeming the shutdown an "unexpected obligation[] created by Federal law."  *Id.* at 3.  He further dismissed the Anti-

Deficiency Act as an obstacle, inferring from a Charter provision that an annual appropriation for the reserve fund is not required.  *Id.* at 2-3.[2]  In the view of *amicus*, this interpretation was correct and appropriate, but it merely underscores the District's need for flexibility in interpreting the sometimes-ambiguous language of the Home Rule Act.

In this case, however, the Mayor reads sweeping limitations into the Home Rule Act, declining to defer to his constituents' amendment authority in case of doubt.  Beyond the consequences for budget autonomy, an affirmation of this interpretive approach could throw the District's legal affairs into disarray.  For one thing, a decision rejecting the rule that limitations on the District's authority are narrowly construed would create a conflict with the D.C. Court of Appeals, creating a precarious legal situation for the District on a fundamental question.  *See, e.g.*, *Wash., D.C. Ass'n of Realtors, Inc.*, 44 A.3d at 303; *Bergman*, 986 A.2d at 1208.  Moreover, considering the broad intersection of federal and local affairs in the District, aggressive expansion of the Home Rule Act's "limitations" could call into question longstanding practices.  The Mayor's expansive reading of the

---

[2] Significantly, the Attorney General appears to have considered the issue sufficiently close that days before issuing this opinion, he warned that continuing operations during the shutdown *would* violate the Anti-Deficiency Act.  *See* Mike DeBonis, *D.C. officials ponder whether to defy federal shutdown and keep city government open*, Washington Post, Sept. 24, 2013, http://tinyurl.com/WaPoDCShutdown.

"federal functions" limitation alone could cause major problems in the day-to-day management of the District.

The tradition of narrowly construing limitations on home rule, in addition to its legal pedigree, *see supra* § I.C, is entitled to deference simply as a settled practice. The federal government has never objected to this principle, and Congress has ample political tools to wield if it disagrees with the District's interpretation of its own authority. Rather than embrace the Mayor's novel interpretive methods, this Court should affirm the decision of the District's residents – by a margin of 83% to 12% – to "continue to implement and update *their* charter." LH 207 (statement of Rep. Adams) (emphasis added).

## CONCLUSION

For the foregoing reasons, the Budget Autonomy Act is valid, and the decision of the district court should be reversed.

Respectfully submitted,

   /s/ David M. Zionts

Charles A. Miller
David M. Zionts
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue NW
Washington, DC 20004–2401
(202) 662–6000
cmiller@cov.com

July 8, 2014                                   *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because it contains 5,992 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman and 14 point font.

   /s/ David M. Zionts
         David M. Zionts

July 8, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2014, I caused copies of the foregoing brief to be served by the Court's CM/ECF system, which will send a notice of the filing to all registered CM/ECF users.


　　　　　　　　　　　　　　　　　　　　/s David M. Zionts
　　　　　　　　　　　　　　　　　　　　David M. Zionts

July 8, 2014