ORAL ARGUMENT NOT YET SCHEDULED

No. 14-7067

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COUNCIL OF THE DISTRICT OF COLUMBIA,

*Plaintiff-Appellant*,

v.

VINCENT C. GRAY, Mayor of the District of Columbia;
JEFFREY S. DEWITT, CFO of the District of Columbia,

*Defendants-Appellees.*

_____


**BRIEF OF *AMICI CURIAE* PROFESSORS WILLIAM N. ESKRIDGE JR. AND CHARLES TIEFER IN SUPPORT OF PLAINTIFF-APPELLANT COUNCIL OF THE DISTRICT OF COLUMBIA AND SUPPORTING REVERSAL OF THE DECISION BELOW**

_____

On Appeal from the U.S. District Court for the District of Columbia, No. 14-cv-655
(Emmet G. Sullivan, District Judge)

_____

Jeffrey R. Babbin
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Tel.: (203) 498-4400
Fax: (203) 782-2889
jbabbin@wiggin.com

Counsel for *Amici Curiae*

## CERTIFICATE OF PARTIES, RULINGS,
## AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

A.    <u>Parties and *Amici*</u>. Except for the signatories to this brief, all parties, intervenors, and *amici* appearing before the district court and in this court are listed in the Brief of the Plaintiff-Appellant.

B.    <u>Rulings Under Review</u>.  References to the rulings under review appear in the Brief of the Plaintiff-Appellant.

C.    <u>Related Cases</u>.  This case was originally filed in the Superior Court for the District of Columbia (Civ. No. 14-2371).  Defendants-appellees removed to the U.S. District Court for the District of Columbia (No. 14-cv-655).  Other than those proceedings, there are no related cases in this Court or in any other court.

i

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
    PURSUANT TO CIRCUIT RULE 28(a)(1) ..................................................i

GLOSSARY OF TERMS ……………………………………………………. vii

STATEMENT OF *AMICI* INTEREST AND  CIRCUIT RULE 29(d)
    CERTIFICATE.................................................................................1

STATUTES AND REGULATIONS ………………………………………….. 2

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................2

I.     THE DISTRICT COURT'S TEXTUAL ANALYSIS IS FAULTY .............6

II.    THE HOME RULE ACT SHOULD BE CONSTRUED WITH AN
       EYE TOWARD ITS PRO-AUTONOMY PURPOSE................................14

III.   THE COUNCIL'S POSITION FINDS STRONG SUPPORT IN THE
       LEGISLATIVE RECORD AND DRAFTING HISTORY.........................22

CONCLUSION ......................................................................................28

CERTIFICATE OF COMPLIANCE....................................................29

CERTIFICATE OF SERVICE ...........................................................30

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*A.H. Phillips, Inc. v. Walling,*
324 U.S. 490 (1945)......................................................................4

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998)....................................................................10

*Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon,*
515 U.S. 687 (1995).....................................................................8

*City of Edmonds v. Oxford House, Inc.,*
514 U.S. 725 (1995)....................................................................22

*Commissioner v. Clark,*
489 U.S. 726 (1989)................................................................4, 22

*Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.,*
718 F.3d 488 (5th Cir. 2013) .....................................................10

*\*Entergy Servs., Inc. v. FERC,*
568 F.3d 978 (D.C. Cir. 2009).....................................................9

*Green v. Bock Laundry Mach. Co.,*
490 U.S. 504 (1989)....................................................................26

*\*Gregory v. Ashcroft,*
501 U.S. 452 (1991)....................................................................18

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006)....................................................................24

*\*INS v. Cardoza-Fonseca,*
480 U.S. 421 (1987)....................................................................24

*Authorities upon which we chiefly rely are marked with asterisks.

iii

*INS v. Chadha,*
    462 U.S. 919 (1983) ....................................................................................27

*Iowa Mut. Ins. Co. v. LaPlante,*
    480 U.S. 9 (1987) ........................................................................................20

*Loughrin v. United States,*
    slip op. (Supreme Court, June 23, 2014) ...........................................10

*Maracich v. Spears,*
    133 S.Ct. 2191 (2013) ...............................................................................22

*Michel v. Anderson,*
    14 F.3d 623 (D.C. Cir. 1994) ...........................................................1, 19, 20

*Michigan v. Bay Mills Indian Community,*
    134 S.Ct. 2024 (2014) ...............................................................................20

*Nw. Forest Res. Council v. Glickman,*
    82 F.3d 825 (9th Cir. 1996) ....................................................................26

*O'Donoghue v. United States,*
    289 U.S. 516 (1933) ..................................................................................19

*Santa Clara Pueblo v. Martinez,*
    436 U.S. 49 (1978) ....................................................................................20

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ..................................................................26

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) ..................................................................................10

*\*Tcherepnin v. Knight,*
    389 U.S. 332 (1967) ..................................................................................17

*United States v. Hayes,*
    555 U.S. 415 (2009) ..................................................................................14

*United States v. Lara,*
    541 U.S. 193 (2004) ..................................................................................20

*United States v. Spencer*,
   720 F.3d 363 (D.C. Cir. 2013) ........................................................... 10

*Will v. Michigan Dep't of State Police*,
   491 U.S. 58 (1989) ............................................................................. 18

**Constitutions and Statutes**

U.S. Const. art. I, § 8, cl. 17 ................................................................ 16, 19

16 U.S.C. § 462(k) ...................................................................................... 13

16 U.S.C. § 1540(e)(5) ............................................................................... 13

48 U.S.C. § 1423a ....................................................................................... 13

D.C. Budget Autonomy Act ................................................................... 7, 11

*Home Rule Act, Pub. L. No. 93-198

§ 102 ............................................................................................................ 16

§ 102(a) ..................................................................................................... 2, 4

§ 301 ............................................................................................................. 3

§ 303 ......................................................................................................... 3, 4

§ 303(a) [also cited as D.C. Off. Code § 1-203.03(a)] ........................ 3, 4, 12, 22

§ 303(b) [also cited as D.C. Off. Code § 1-203.03(b)] ............................ 26

§ 303(d) [also cited as D.C. Off. Code §§ 1-203.03(d)]
   ..................................................... 3, 4, 5, 6, 7, 8, 10, 11, 13, 14, 22

§§ 401-434 .................................................................................................... 3

§§ 401(a) and 421(a), and part C of Charter ............................................ 12

§ 434(c)(2) .................................................................................................. 13

§§ 441-455 .................................................................................................... 3

§ 446...........................................................................................12, 13

§§ 461-490 ........................................................................................3

§ 601 ........................................................................3, 6, 7, 8, 11, 13

§ 602 ........................................................................3, 6, 7, 8, 11, 13

§ 603 ............................................................. 3, 4, 6, 7, 8, 9, 10, 11

§ 602(a) [also cited as D.C. Off. Code § 1-206.02(a)] ...................4, 9, 13

§ 603(a) [also cited as D.C. Off. Code § 1-206.03(a)]
........................................................... 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 24

§ 603(b) [also cited as D.C. Off. Code § 1-206.03(b)].......................9, 13

§ 603(c) [also cited as D.C. Off. Code § 1-206.03(c)] ...................4, 9, 13

§ 603(d) ...........................................................................................13

§ 603(e) ...........................................................................................6, 7

§§ 701-704 ........................................................................................3

**Other Authorities**

*Federalist* No. 43 ..........................................................................19

*LH 2024 [*see* Glossary] ..................................................................24

*LH 2106 ......................................................................................15, 16

*LH 2107 ..........................................................................................16

*LH 3009 ..........................................................................................25

1A Singer & Singer, Sutherland Statutes and Statutory Construction
§ 20:22 (7th ed.)............................................................................22

*3 Singer & Singer, Sutherland Statutes and Statutory Construction
§ 60:1 (7th ed.) .......................................................................17, 22

## **GLOSSARY OF TERMS**

LH          Legislative History of the Home Rule Act, *reprinted in* Staff of H.
            Comm. on D.C., 93d Cong., Home Rule for the District of Columbia:
            Background and Legislative History (Comm. Print 1976).

District    District of Columbia

## STATEMENT OF *AMICI* INTEREST AND
## CIRCUIT RULE 29(d) CERTIFICATE[1]

Professor William N. Eskridge Jr. is the John A. Garver Professor of Jurisprudence at the Yale Law School.  He teaches and writes in the areas of legislation and statutory interpretation and, together with Professors Phillip Frickey and Elizabeth Garrett, is the author of the leading textbook on the subject.  Because he has resided in the District of Columbia for more than a quarter century and has been an active member of the District of Columbia Bar since 1979, Professor Eskridge has a special interest in District governance.

Professor Charles Tiefer teaches at the University of Baltimore School of Law.  He teaches and writes in the areas of legislation and statutory interpretation and is the author of the leading casebook on congressional procedure.  He formerly served as General Counsel of the House of Representatives, and in that capacity he briefed and argued *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), which upheld the constitutionality of the District's Delegate having a vote in the House's Committee of the Whole House.  He has a lengthy forthcoming article about the 2013 government shutdown and its exceptions and has been quoted extensively in the media on that subject.

---

[1] Pursuant to a blanket consent agreement, all parties have consented to the filing of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *amici curiae* confirm that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money to fund the preparation or submission of the brief, and no person other than *amici curiae* and their counsel funded preparation or submission of the brief.

Counsel certifies that it would have been impracticable for *amici* to have submitted a single *amicus* brief with others writing in support of the Council. *Amici*'s scholarly work gives them a distinct perspective on this case, and it is that perspective that this brief seeks to convey.

## STATUTES AND REGULATIONS

All statutes and regulations cited herein are contained in the Statutory Addendum to the Brief of Plaintiff-Appellant Council of the District of Columbia.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As its name implies, the Home Rule Act grants residents of the District of Columbia the right and responsibility to govern their own local affairs. The Act begins with a statement of purposes that explicitly sets forth this objective. *See* Pub. L. No. 93-198, § 102(a) (1973) ("Subject to the retention by Congress of the ultimate legislative authority over the Nation's Capital granted by article I, section 8, of the Constitution, the intent of Congress is to … grant to the inhabitants of the District of Columbia powers of local self-government."). For nearly a century, Congress had directly superintended the District's affairs, and it was ready to "relieve [itself] of the burden of legislating upon essentially local District matters" "to the greatest extent possible." *Id*.

Consistent with its self-governance objective, the centerpiece of the Act is a District Charter—a foundational document akin to a state constitution, which

"establish[es] the means of governance of the District." § 301.  The Charter, which comprises Title IV of the Act, describes the District's legislative, executive, and judicial institutions (§§ 401-434); its budgeting and financial arrangements (§§ 441-455); its borrowing authority (§§ 461-490), and more.  Though Congress drafted and passed the Charter, it did not impose it on the District.  Rather, Congress provided (in §§ 301 and 701-704) that the Charter would take effect only if District residents endorsed it in a popular referendum, which they ultimately did.

Crucially, while Congress and the District's voters meant for the Charter's provisions to be foundational, they did not intend for them to be immutable.  The Act includes a Charter amendment provision (§ 303) that creates a mechanism for the District government and District residents to participate in revising the Charter.  While Section 303 makes the Charter generally amendable, it carves out three specific provisions that are not subject to amendment (*see* § 303(a)), and it also declares that the amending procedure "may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603."  § 303(d).  Sections 601-603 come from the one portion of the Act (Title VI) where Congress sought to preserve a few aspects of the prior governance regime.  Section 601 clarifies that Congress may continue "to exercise its constitutional authority" to enact legislation for the District.  Meanwhile, portions of sections 602 and 603

3

delineate certain types of legislation that the District Council "shall have no authority to pass." § 602(a); *see also* § 603(c). Section 603 additionally declares that "[n]othing in th[e] Act shall be construed" as changing the roles of federal officials in the District's budgeting process. § 603(a).

The parties' principal dispute in this case concerns whether sections 303(d) and 603(a) together preclude the Council and District voters from amending the Charter to give the District more flexibility to spend its locally generated revenue. The district court held that the plain language of those provisions amounts to such a prohibition. *Amici* respectfully disagree.

As the foregoing introduction to the structure of the Home Rule Act demonstrates, the Act's general design is to create a constitution—the Charter—for the District, enabling "local self-government." § 102(a). As a general rule, the Charter can be amended, § 303, subject to the exceptions laid out in sections 303(a) and (d). The issue here is how broadly to construe sections 303(d) and 603(a). *Amici* submit that the district court erred in adopting a broad view of the exception. When a general policy is qualified by an exception, federal courts "usually read the exception narrowly in order to preserve the primary operation" of the policy, *Commissioner v. Clark,* 489 U.S. 726, 739-40 (1989), and do not extend a statutory exception to circumstances unless they are "plainly and unmistakably within its terms." *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493 (1945).

4

Budgetary matters, a core feature of "local self-government," are not "plainly and unmistakably" within the "terms" of the 303(d)/603(a) exception to the Charter's amending authorization. Good textual arguments support the Council's position that the Home Rule Act permits District-initiated amendments to the budgeting process outlined in the Charter. The language of sections 303(d) and 603(a), read in conjunction with the surrounding provisions and the Act's structure, is most sensibly construed to have preserved the preexisting federal role in the District's budgeting process, but to have left the door open to future amendments. The district court's contrary conclusion rests on questionable linguistic premises and fails to place the disputed provisions in their proper statutory context.

Other key indicia of meaning, including the statute's nature and purpose and its drafting history, strongly corroborate the Council's reading of the text. First, the Home Rule Act is a democracy-enhancing super-statute that should be construed to further its political autonomy objective unless the text clearly provides otherwise. Second, the drafting history suggests that Congress made a deliberate decision to permit future District-initiated budget process amendments. Because it erroneously believed that the statutory language foreclosed the Council's position, the district court gave short shrift to these important interpretive aids.

## I.    THE DISTRICT COURT'S TEXTUAL ANALYSIS IS FAULTY

According to the district court, the Home Rule Act is "clear":  It prohibits the District of Columbia's elected officials and voters from amending the District's Charter to give the District more flexibility to spend locally generated revenue. Op. at 26.  The court believed that the "plain language" of sections 303(d) and 603(a) (codified at D.C. Off. Code §§ 1-203.03(d) and 1-206.03(a)), read together, compels this conclusion.  *Id*. at 3.[2]  Section 303(d) provides that the Charter's amending procedure "may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603."  In the district court's view, that provision "unequivocally" means that these three sections "*as a whole* [are] limitations on the Council's authority," thus foreclosing any amendments inconsistent any and all of the sections' terms.  *Id*. at 25-26 (emphasis in original; internal quotation marks omitted).  The district court then read section 603(a) to "prevent[] changes to the role of Congress and the President with respect to six areas related to the District's budget—preparation, review, submission,

---

[2] The district court offered two additional reasons for rejecting the Council's position.  In the view of *amici*, the section 603(a) rationale is the most substantial one, and it is accordingly the focus of this brief.  Much of the analysis below, however, similarly applies to the district court's invocation of section 603(e).

6

examination, authorization, and appropriation." *Id*. at 27.  Because the Budget Autonomy Act seeks to make such a change, the district court held it invalid.

Upon review of the Home Rule Act's text, it is far from clear that *either* of these provisions has the meaning the district court attributed to them.  There are important signals in sections 303(d) and 603(a), and in the provisions that surround them, that point in the opposite direction.  The district court failed to grapple with these conflicting textual clues, which led it to truncate its statutory analysis.  Had the district court appreciated the weight of the arguments on the other side of the textual scale, it might have been more attentive to other interpretive guides—including purpose and legislative history—and recognized how powerfully those guides cut against its reading of the Home Rule Act.[3]

Start with section 303(d).  By referring to "the limitations specified in sections 601, 602, and 603," did Congress necessarily mean to convey that every aspect of those enumerated sections is a "limitation[]" on the Council?  The district court did not articulate any linguistic basis for that conclusion, presumably because there is none.  In ordinary parlance, the phrase "the X specified in Y" does *not* necessarily say or even suggest that everything in Y is an X.  To the contrary, there are many contexts in which the opposite inference is more natural.  A law clerk

---

[3] While this discussion focuses on section 603(a) since it is, in *amici*'s view, the most substantial of the Defendants' arguments, similar textual arguments apply with respect to section 603(e).

7

directed to apply all of "the canons specified in the dueling Supreme Court opinions in *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687 (1995)," would never think that every word or argument in those opinions must be a canon. The clerk would understand that those opinions *include* canons, probably alongside other material.

Or suppose that Congress had tweaked section 303(d) just slightly, so that, instead of referring to "limitations specified in sections 601, 602, 603," it spoke more generally of "limitations specified in this Act." Again, most readers would not take this language to mean that every provision of the Home Rule Act is a "limitation." They would instead conclude that a subset of the Act's provisions imposes limitations (and that Charter amendments must conform to them). Perhaps the fact that section 303(d) identifies a somewhat narrower universe of provisions in which limitations are "specified" somewhat weakens this subset inference. But it surely does not compel the opposite conclusion, as the district court suggested.

If section 303(d) does not require that every word of sections 601, 602, and 603 be regarded as a limitation on the laws the Council may enact, then the question becomes whether section 603(a) in particular should be viewed that way. There are good textual reasons to think not. For starters, taken at face value, the language of section 603(a) simply does not unambiguously limit what laws the

8

Council has authority to enact. What it restricts is a particular "constru[ction]" of the Home Rule Act—namely, a construction that would treat the Act "as making any change in existing law" concerning the federal role in the District budgeting process. In other words, it delineates a baseline. It directs courts to reject any argument that the Act itself ushered in a new budgeting regime.[4]

Other textual clues point in the same direction. First, adjacent provisions of section 603, as well as provisions of surrounding sections, are drafted using language that is more clearly and broadly prohibitory. *See, e.g.*, D.C. Off. Code § 1-206.03(b)(1) ("No general obligation bonds … shall be issued…"); § 1-206.03(c) ("The Council shall not approve any budget…"); *id.* 1-206.02(a) ("The Council shall have no authority to pass…"). That contrast is telling. It shows how easy it would have been for Congress to use such language had that been its intention. Treating section 603(a) to mean something different from those surrounding sections accords with the "interpretive maxim of meaningful variation." *Entergy Servs., Inc. v. FERC*, 568 F.3d 978, 984 (D.C. Cir. 2009). The Supreme Court has

---

[4] To illustrate, consider the following hypothetical: A lender sends a letter to its borrowers updating its repayment policies. It says that borrowers must now send payments to a new address, that the company will no longer accept cash, and that, if a borrower wants to extend her repayment period, she must complete an online loan amendment form. The letter then says, "Nothing in this letter shall be construed as making any change to your existing repayment schedule." Clearly, the right way to read this letter is as a clarification of the status quo. It does not limit a borrower's future ability to submit a loan amendment form to extend her repayment period.

"often noted that when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—th[e] Court 'presume[s]' that Congress intended a difference in meaning." *Loughrin v. United States,* slip op. at 8 (Supreme Court, June 23, 2014) (quoting *Russello* v. *United States*, 464 U. S. 16, 23 (1983)); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).

Second, the title of section 603—"budget process; limitations on borrowing and spending"—suggests that it includes two separate sorts of provisions: ones that delineate the budget process and others that limit borrowing and spending.  *Cf. Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 494 (5th Cir. 2013) ("Clauses separated by a semicolon are presumed to be independent clauses.") (internal quotation marks omitted).  While "the heading of a section cannot limit the plain meaning of the text," it can "shed light on some ambiguous word or phrase."  *United States v. Spencer*, 720 F.3d 363, 367 (D.C. Cir. 2013) (internal quotation marks omitted); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (internal quotation marks omitted) ("the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.").  And here, the title sheds considerable light on how to read sections 303(d) and 603(a):  the former targets provisions that serve as "limitations" on the District's authority, and the latter is surely a "budget

10

process" provision as opposed to one of the "limitations" identified in the section 603's title.

In any event, there is yet another reason to doubt that sections 303(d) and 603(a) prohibit amendments such as Budget Autonomy Act. Suppose that section 603(a) were a "limitation" on the laws the Council may enact, either because section 303(d) requires all of section 603's provisions to be viewed that way or because section 603(a) does use restrictive language. The district court assumed that, if section 603(a) is a "limitation," then the Charter cannot be amended to give the District more flexibility to spend its locally generated revenue. But that is not obvious. If section 603(a) is a limitation, the question would then be the following: "What sort of limitation is it?" The text indicates that it is merely a limitation on how the Home Rule Act may be "construed." Thus, in addition to preventing District officials from acting as if the Act had changed the federal role in the District's budgeting process, perhaps section 603(a) also prohibits them from enacting laws or rules that formally declare that the Act itself made such a change. But that does not mean that section 603(a) additionally prohibits the District from amending the Charter to make such a change prospectively.[5]

_____

[5] To put it another way, the reason that "the Council may not enact any act, resolution, or rule" altering the federal role in the District's budgeting process is *not* because of any provision of "sections 601, 602, or 603." It is because the

<small>(footnote continued)</small>

11

Finally, consider a holistic viewpoint: The structure of the Home Rule Act is at odds with the district court's analysis. Suppose Congress did want to "prohibit[] the Council from changing the role of the federal government in the appropriation of the total budget of the District," as the district court believed. Op. at 3. How would one expect Congress to achieve that objective? Congress had several straightforward and readily available options at its disposal:

- To begin with, it simply could have placed the provisions governing the federal role in budgetary matters somewhere other than the District Charter (Title IV of the Act). As the district court recognized, "[t]he Charter is the only part of the Home Rule Act subject to amendment." *Id*. at 11. Had Congress located the provisions elsewhere, it would have been crystal clear that they were not subject to the Charter amending procedure.

- Or, if Congress wanted the budgetary provisions to remain part of the Charter (where they would be presumptively amendable), it could have explicitly declared them unamendable. Congress did exactly that with respect to several other Charter provisions. Section 303(a) declares that the Charter "may be amended" "except sections 401(a) and 421(a), and part C of

---

Charter specifies the federal role (primarily in section 446). Thus, to change the role, the Charter must be amended.

12

[the Charter, governing the District judiciary]." Congress easily could have added section 446 to that list, but it did not.

- Or, if for some reason Congress did not like that approach, it certainly could have expressed itself more clearly in sections 303(d) and 603(a). In 303(d), for instance, Congress could have authorized only those amendments "not inconsistent with sections 601, 602, or 603," which at least would have made clear that it was referring to those provisions in their entirety. Variations on the "not inconsistent with" formulation are routine for legislative drafters. The phrase appears again and again in the U.S. Code, including in statutes enacted close in time to the Home Rule Act and, indeed, elsewhere in that very law.[6] Meanwhile, Congress could have drafted section 603(a) in the same prohibitory terms it used in sections 602(a), and 603(b)-(d), declaring that "the Council shall not change the existing role of federal officials in the District's budgeting process."

On the district court's telling, Congress instead chose to prohibit the Council from amending the Charter's budget provisions through the more roundabout and

---

[6] *See, e.g.*, 16 U.S.C. § 462(k) (enacted 1973; authorizing Secretary of Interior to perform acts "not inconsistent with sections 461 to 467 of this title"); 16 U.S.C. § 1540(e)(5) (enacted 1973); 48 U.S.C. § 1423a ("The legislative power of Guam shall extend to all rightful subjects of legislation not inconsistent with the provisions of this chapter[.]"); Pub. L. No. 93-198 (Home Rule Act), § 434(c)(2) (1973) ("The Commission may adopt such rules of procedures not inconsistent with this Act as may be necessary to govern the business of the Commission.").

opaque method of pairing the "limitations specified in" language of 303(d) with the "[n]othing in this Act shall be construed" language of 603(a). That may be within the bounds of plausibility. After all, not every statute is "a model of the careful drafter's art." *United States v. Hayes*, 555 U.S. 415, 429 (2009). But this text can more easily be read *not* to bar Charter amendments pertaining to the federal role in the District's budgeting process. At the very least, the textual points just discussed suggest that this Court should devote more attention to the Act's underlying purpose and drafting history than did the district court.

## II.   THE HOME RULE ACT SHOULD BE CONSTRUED WITH AN EYE TOWARD ITS PRO-AUTONOMY PURPOSE

The Home Rule Act is no mere run-of-the-mill statute. It is a law that addresses fundamental questions of political autonomy and self-governance for those who reside at the seat of our national government. Its underlying purpose, as expressed both in the statutory text and in the words of those who sought its passage, was to ensure that the District of Columbia's governmental structure aligns with the democratic values that underlie our constitutional system. The Act should be approached with this purpose in mind, and any interpretation of its provisions must be respectful of the Act's democracy-enhancing nature and its goal of "local self-government." In particular, consistent with established canons of construction, the default presumption should be that the Act gives District residents leeway to govern their own affairs. Conversely, constructions of the Act that

14

would interfere with local self-governance should be presumptively disfavored. These interpretive lenses, which the district court slighted if not ignored, cut strongly in favor of the Council's position.

Self-government and political autonomy are central themes in the legislative record. Representative Diggs, the House sponsor and committee chair who was the primary architect of the compromise that ultimately became the Home Rule Act, was especially eloquent and emphatic on this point. Discussing his compromise proposal on the House floor, he placed the legislation within the tradition of "consistent legislative efforts to achieve full citizenship for more and more Americans" and to implement "the enunciated ideals of the Founding Fathers." LH 2106.[7] Representative Diggs explained that, for the first century of this country's history, the District's residents had substantial autonomy over their local affairs—autonomy that Congress eliminated in the late nineteenth century. He lamented that "[t]he people of the District of Columbia are the only American citizens to have had their right to self-government taken away from them by Congress." *Id*. His compromise bill sought to restore the District's "democratic tradition" by offering the District's residents "an opportunity in exercising their

---

[7] The legislative history materials for Home Rule Act are collected in Staff of H. Comm. on D.C., 93d Cong., Home Rule for the District of Columbia: Background and Legislative History (Comm. Print 1976). Consistent with the Council's opening brief, this brief provides legislative history citations from this collected volume using "LH" followed by the collection page number.

rights once more" (while still retaining "adequate safeguards" in the form of ultimate congressional oversight). *Id*. Representative Diggs told his colleagues that "the stakes involved go to the very heart of the American system of government:" "The question is one of fundamental rights, the rights of citizens to elect their own local officials and run the affairs of their community themselves." *Id*. at 2107.

Congress incorporated these political autonomy objectives into the very text of the Act. In its statement of purposes at the beginning of the statute, Congress declared its "intent" to "grant to the inhabitants of the District of Columbia powers of local self-government," as well as to "relieve Congress of the burden of legislating upon essentially local matters" "to the greatest extent possible, consistent with the constitutional mandate," which grants Congress ultimate authority over District affairs. Pub. L. No. 93-198, § 102 (adverting to U.S. Const. art. I, § 8, cl. 17).

When Congress passes legislation of this nature, it should not be construed stingily. Rather, when the meaning of a provision is disputed, courts should presume that the better interpretation is one that accords with the legislation's democracy-enhancing objectives—here, fleshing out the District's "powers of self-government" (to use the statutory language). As a doctrinal matter, there are at least two distinct ways to articulate this notion—one that focuses on federal

government's important role in securing political rights and one that focuses on the need to limit federal power to avoid threats to such rights. It is telling that both of these approaches point to the same result in this case.

The first doctrinal approach involves "the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). While it may not always be apparent which statutes to classify as "remedial," statutes that Congress explicitly casts as measures to protect or expand political rights unquestionably fit the bill. And at the time of the Home Rule Act's passage, Congress itself would have had the expectation that the Act would be construed this way, as this was a time period during which the "remedial legislation" canon was especially in vogue. *See, e.g.*, *id.*; *see also* 3 Singer & Singer, Sutherland Statutes and Statutory Construction § 60:1 (7th ed.) [hereinafter "Sutherland"] ("The policy that a remedial statue should be liberally construed in order to effectuate the remedial purpose for which it was enacted is firmly established.") (citing examples).

The second doctrinal approach is to look to the interpretive canons that courts have deployed in cases where congressional overreach threatens political autonomy and local self-governance. In such cases, courts presume—sometimes very strongly—that statutes should not be construed to undercut these important values unless Congress has said so with unmistakable clarity. Perhaps the most

17

prominent examples involve federalism. The Supreme Court has said that federal enactments should not be construed to interfere with traditional state prerogatives unless Congress makes its intention to do so "unmistakably clear." *See, e.g.*, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989). This rule, the Court has explained, advances the core values behind the Constitution's federalist structure, such as "assur[ing] a decentralized government that will be more sensitive to the diverse needs of a heterogenous society," "increas[ing] opportunity for citizen involvement in democratic processes," "allow[ing] for more innovation and experimentation in government," and "check[ing] abuses of [federal] government power." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

Of course, States and the District have different constitutional statuses. But for purposes of identifying the interpretive principles applicable to the Home Rule Act, that difference is not significant. After all, the primary issue in the federalism cases is not whether Congress is acting beyond constitutional limits. Instead, the cases involve situations in which the Supremacy Clause authorizes Congress to "impose its will on the States." *Id*. at 460. The question is whether a statute should be construed as making such an imposition. And the Supreme Court has said that, given the benefits of decentralized self-governance, it "must assume" that Congress does not cavalierly subvert state authority. *Id*.

18

Likewise, even though the Constitution empowers Congress to "exercise exclusive Legislation" over the District of Columbia, U.S. Const. art. I, § 8, cl. 17, Congress should not be presumed to use its authority in ways that would undermine the political autonomy of the District's residents—people who are citizens of the United States and entitled to the full panoply of constitutional rights. *See, e.g.*, *O'Donoghue v. United States*, 289 U.S. 516, 541 (1933) ("The mere cession of the District of Columbia to the Federal government relinquished the authority of the states, but it did not take it out of the United States or from under the aegis of the Constitution."). The Framers themselves expected that the District's residents would govern their own local affairs. In *Federalist* No. 43 (a portion of which Representative Diggs quoted during the legislative debate, *see* HR 2106), Madison offered an assurance that residents of the capital would have "a municipal legislature for local purposes, derived from their own suffrages." Since the Home Rule Act was enacted to restore that local voice, its provisions should presumptively be read to advance that democratic purpose.

Consider two analogies. First, in interpreting the constitutional provisions that pertain to the District, this Court has noted that "the practice of the early Congresses relating to territorial delegates" can serve "as an interpretive aid." *Michel v. Anderson*, 14 F.3d 623, 631 (D.C. Cir. 1994). In *Michel*, the Court analogized the District and the territories, such as the "Northwest Territories,

19

[which] was created by statute during the first Congress." *Id*. The territories were expected to, and ultimately did, stepwise ascend the ladder of self-government, including handling their own budgets. This process of ascent involved self-organization, rising from democratic initiative from below. Recognizing Home Rule Act as a measure that expands democratic self-government for the District and also facilitates further expansions accords with the Framers' understanding of how non-state territories would mature as political units.

Second, "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that [the Supreme Court] has consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004). Yet the Court nevertheless interprets statutes governing Indian affairs with an eye toward the values of "tribal self-government" and autonomy. *See, e.g.*, *Michigan v. Bay Mills Indian Community*, 134 S.Ct. 2024, 2030-32 (2014); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978). The idea is that these values supply default rules—rules that function both descriptively and normatively. They suggest that a reading that limits self-governance (whether for Indian tribes or for D.C. residents) is less likely to reflect congressional intent that one that enhances it. And they provide a way for courts to heed an established constitutional or policy commitment when they

20

are uncertain about what Congress had in mind, placing the onus on Congress to clarify whether it indeed meant to act inconsistent with that commitment.

Two additional features of the Home Rule Act's budgeting provisions bolster the conclusion that they should presumptively be read to extend political autonomy rather than restrict it. First, Congress chose to structure some of the Act's key provisions in the form of a Charter that took effect only upon ratification by the District's voters, a process akin to the ratification of a state constitution. That congressional choice is highly unusual, and it makes the Act more than just a statute. It is also a foundational governing document for the District and establishes the framework for an ongoing democratic dialogue. Rather than retain exclusive control of District affairs and institutions, Congress created a way for District residents themselves to participate in modifying their governing framework as circumstances and preferences evolve over time. That promise of becoming stakeholders in the District's political future undoubtedly helped induce D.C. voters to approve the Charter in the first place. Construing the Charter's amendment provisions consistent with principle of democratic self-governance thus not only accords with Congress's explicitly stated pro-autonomy purposes, but also with the democratic aspirations of the voters responsible for giving the Charter legal force.

Second, consider the principle of construction that, "when Congress has enacted a general rule," courts "should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception." *Commissioner v. Clark,* 489 U.S. 726, 739 (1989); *see also Maracich v. Spears,* 133 S.Ct. 2191, 2200 (2013); *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 732 (1995); 1A Sutherland § 20:22 (7th ed.) ("Generally, [savings clauses, exceptions, and provisos] all … are strictly interpreted.").  Congress drafted the Charter amending procedures broadly:  The Act provides that the Charter "may be amended."  D.C. Off. Code § 1-203.03(a).  Section 303(d) is an exception.  As such, it should be read to pare back the Act's pro-amendment baseline only to the extent its plain text actually dictates that result—which it does not do with respect to budgeting.  The narrow construction rule has special force where, as here, the disputed exception is to a provision that itself should be generously construed (e.g., because it is democracy enhancing).  *See, e.g.*, 3 Sutherland § 60:1 (7th ed.) ("[E]xceptions to remedial legislation are strictly construed.").

## III.   THE COUNCIL'S POSITION FINDS STRONG SUPPORT IN THE LEGISLATIVE RECORD AND DRAFTING HISTORY

To a far greater extent that the district court recognized, the legislative history of the Home Rule Act also counsels in favor of interpreting the Act to authorize budget process amendments.  As with its analysis of the text, the district court's account of the Act's legislative history does not withstand scrutiny.  The

22

district court focused primarily on snippets from the formal legislative record and (more dubiously) from contemporaneous news accounts that establish only what no one in this case disputes—namely, that the Home Rule Act, as passed, did not grant budget autonomy to the District. *See* Op. at 3, 27-30. None of this material is particularly illuminating with respect to the pertinent question here: Did Congress leave the door open to future District-initiated amendments that would give the District more control over its local finances? While this brief does not offer a comprehensive account of the Act's drafting history, *amici* believe that at least three key aspects of that history, which the district court ignored or minimized, support the Council's position that the Act authorizes amendments to the budgeting process.

First, the legislative history bolsters the structural point made above: Had Congress actually wanted to preclude budget process amendments, it likely would have chosen other, clearer language. This point is not hypothetical. Congress in fact considered and ultimately rejected language that unequivocally would have barred budget amendments. Specifically, the substitute bill offered by Representative Nelsen, a home-rule opponent, included a provision that declared, "Notwithstanding any other provision of law, *unless specifically authorized or directed by Congress, there shall be no change made in existing laws*, regulations, or basic procedures and practices as they relate to the respective roles of [federal

23

officials] in … the preparation, review, submission, examination, authorization, and appropriation of the total budget for the District of Columbia." LH 2024 (H.R. 10692, § 416) (emphasis added). Representative Diggs, the House sponsor and a supporter of a broad autonomy for the District, chose to incorporate some of this language in his compromise bill, but his bill crucially uses a different introductory phrase. Rather than prohibiting changes to existing budgeting law "unless specifically authorized or directed by Congress," the Diggs compromise merely declares that "[n]othing in [the Act] shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of [federal officials] in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government." Pub. L. No. 93-198, § 603(a). The House ultimately voted against the Nelsen substitute and in favor of the Diggs compromise.

Congress's decision to embrace Representative Diggs' language over Representative Nelsen's is strongly reinforces the inference drawn above from the canon of meaningful variation. As the Supreme Court has put it, "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (internal quotation marks omitted); *see also Hamdan v. Rumsfeld*, 548 U.S.

24

557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation."). If Congress had sought to preclude budgeting amendments (as Representative Nelsen wanted), it very likely would have used his language. The most logical inference to draw from fact that Congress voted instead for different language is that Congress decided (as a compromise) to maintain the existing federal role in the budgeting process but leave the door open to future Council-initiated amendments. *Amici* are aware of nothing in the legislative history that offers an alternative explanation for this wording difference.

Second, language in the Conference Report is fully consistent with this understanding of the Act. Under the heading "Charter," the Report offers the following description of the bill that emerged from the House-Senate Conference (i.e., the final bill on which Congress voted): "Any change from an elected Mayor-Council form of government must be initiated by Congress and approved by the President…. *Any other changes* in the Charter shall be originated by the Council by act and then referred to referendum of the citizens of the District of Columbia." LH 3009 (emphasis added). Because Conference Reports are usually the final formal explanation that members receive before their ultimate vote on passage, they are among the most important and illuminating documents in the legislative record. Courts have called them "the most reliable evidence of congressional

25

intent" "apart from the statute itself." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999); *accord Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 519-24 (1989); *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 835 (9th Cir. 1996) ("[A] congressional conference report is recognized as the most reliable evidence of congressional intent because it represents the final statement of the terms agreed to by both houses.") (internal quotation marks omitted).  If the Conferees had wanted to convey to their colleagues that the Home Rule Act meant to preclude the Council from originating budget-related amendments, then this is the place where one would expect to see such a statement.  But instead the Report indicates just the opposite.

Finally, when examining the drafting history, it is important to recall and focus on the language of the Home Rule Act's Charter amendment provisions as they were enacted in 1973, not as they exist today.  Today, the amendment provisions permit the Council and D.C. voters to amend the Charter subject only to passive congressional review.  If Congress does not enact a joint resolution of disapproval, the amendment takes effect.  *See* D.C. Off. Code § 1-203.03(b).  This scheme dates not to 1973, but to 1984.  Before that time, the congressional role was an active one:  Charter amendments passed by the Council and ratified by D.C. voters did not take effect unless Congress affirmatively voted to approve them.  *See* Pub. L. No. 93-198, § 303(b).  Congress made the 1984 revision in the

26

wake of the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983), which called into question the constitutionality of the Act's original review procedure.

Accordingly, the pertinent interpretive question is not (as the district court suggested) whether Congress intended to allow the District to "unilaterally amend the District Charter." Op. at 20. (Even after 1984, the Charter amendment process remains subject to congressional oversight.) Instead, the question is whether Congress meant to allow the Council and D.C. voters to participate in amendment initiation—in other words, to put proposed amendments on Congress's agenda. This system was a step forward for District self-governance, but it would have been relatively unthreatening to opponents of home rule. It preserved their ability to thwart unwanted measures simply by stepping on one of the many brakes used to stop legislation from advancing through Congress. This reality makes it less plausible that skeptics of the Act would have conditioned their support on a narrowing of the subject matters eligible for amendment, and more reasonable to conclude that a congressional majority supported allowing District residents to participate in the amendment process for issues such as budgeting.

Ultimately, the most logical conclusion—one that accords with the text of the Act and honors its democracy-enhancing nature—is that the congressional compromise in 1973 was to make the Charter broadly amendable (including its

27

budgetary provisions) and leave it to Congress to decide whether to give legal force to the District's proposed amendments. It may now be easier than it was in 1973 for District-initiated amendments to take effect, but that is simply irrelevant when it comes to understanding the deal that was struck then.

## CONCLUSION

The judgment of the district court should be vacated or reversed.

Dated: July 8, 2014                              Respectfully submitted,

                                                 *s/Jeffrey R. Babbin*
                                                 Jeffrey R. Babbin
                                                 Wiggin and Dana LLP
                                                 One Century Tower
                                                 P.O. Box 1832
                                                 New Haven, CT 06508-1832
                                                 Tel.: (203) 498-4400
                                                 Fax: (203) 782-2889
                                                 jbabbin@wiggin.com

                                                 Counsel for *Amici Curiae*

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation of Cir. R. 32(a)(2)(C) because it contains 6,621 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: July 8, 2014                      *s/Jeffrey R. Babbin*
                                         Jeffrey R. Babbin

29

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(c), that on

July 8, 2014, the foregoing was electronically filed with the Clerk of the Court

using the CM/ECF system, which will send a notification to the attorneys of record

in this matter who are registered with the Court's CM/ECF system.


Dated: July 8, 2014                                     *s/Jeffrey R. Babbin*
                                                        Jeffrey R. Babbin


1/320/3090589.2

30