SCHEDULED FOR ORAL ARGUMENT ON OCTOBER 17, 2014

————————————

No. 14-7067

————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

COUNCIL OF THE DISTRICT OF COLUMBIA,
PLAINTIFF-APPELLANT,

v.

VINCENT C. GRAY, MAYOR OF THE DISTRICT OF COLUMBIA;
JEFFREY S. DEWITT, CHIEF FINANCIAL OFFICER
OF THE DISTRICT OF COLUMBIA,
DEFENDANTS-APPELLEES.

————————————

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————————

**BRIEF FOR APPELLEES MAYOR VINCENT GRAY AND
CHIEF FINANCIAL OFFICER JEFFREY DEWITT**

————————————

SETH P. WAXMAN
DANIEL S. VOLCHOK
Wilmer Cutler Pickering
Hale & Dorr LLP
1875 Pennsylvania Ave., NW
Washington, D.C. 20006
*Of counsel to Mayor Gray*


LAWRENCE S. ROBBINS
ERIC A. WHITE
Robbins, Russell, Englert,
Orseck, Untereiner & Sauber LLP
1801 K St., NW, Suite 411 L
Washington, D.C. 20006
*Of counsel to CFO Dewitt*

IRVIN B. NATHAN
Attorney General

ARIEL B. LEVINSON-WALDMAN
Senior Counsel to the Attorney General

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6609
todd.kim@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The plaintiff-appellant is the Council of the District of Columbia.  The defendants-appellees are Vincent C. Gray, Mayor of the District of Columbia, and Jeffrey S. DeWitt, Chief Financial Officer of the District of Columbia.

The five groups of amici who appeared in the district court are: (1) Alice M. Rivlin, Thomas M. Davis, and Anthony A. Williams; (2) a group of "Concerned D.C. Legal Professionals" (Marc Fleischaker, Ronald C. Jessamy, Carolyn B. Lamm, Charles A. Miller, Paul M. Smith, Daniel Solomon, and Bruce V. Spiva); (3) the D.C. Appleseed Center for Law and Justice, D.C. Vote, D.C. for Democracy, D.C. Fiscal Policy Institute, and League of Women Voters of the District of Columbia; (4) Jacques B. DePuy, Daniel M. Freeman, Jason I. Newman, and Linda L. Smith; and (5) the Bipartisan Legal Advisory Group of the United States House of Representatives.

The nine groups of amici who have appeared in this Court thus far are: (1) Alice M. Rivlin, Thomas M. Davis, and Anthony A. Williams; (2) a group of "Concerned D.C. Legal Professionals" (Marc Fleischaker, Ronald C. Jessamy, Carolyn B. Lamm, Daniel Solomon, Bruce V. Spiva, Melvin White, and Thomas Williamson, Jr.); (3) the D.C. Appleseed Center for Law and Justice, D.C. Vote, D.C. for Democracy, D.C. Fiscal Policy Institute, and League of Women Voters of

the District of Columbia; (4) Peter J. Nickles; (5) the Center On Budget and Policy Priorities, Kate Stith, Timothy M. Westmoreland, and David Kamin; (6) a group of "Local Government Law Professors" (David Schleicher, David A. Super, and Sheryll Cashin); (7) William N. Eskridge Jr. and Charles Tiefer; (8) a group of "Former Members of Congress and Congressional Staffers" (Ronald Dellums, Donald Fraser, Fortney Pete Stark, Johnny Barnes, David Julyan, Dale MacIver, and Nelson Rimensnyder); and (9) Jacques B. DePuy, Dan Freeman, Jason I. Newman, and Linda L. Smith.

B. *Ruling under review*.—This appeal is from the order and memorandum opinion of the United States District Court for the District of Columbia (Sullivan, J.), entered on May 19, 2014, in No. 1:14-cv-00655-EGS, issuing an injunction and granting summary judgment in favor of the defendants-appellees. Record Documents 43, 44; *Council of D.C. v. Gray*, ___ F. Supp. 2d ___, 2014 WL 2025078 (D.D.C. May 19, 2014). The district court on May 22, 2014, also issued an order denying the plaintiff-appellant's motion to clarify or in the alternative for a partial stay. Record Document 50.

C. *Related cases*.—The case on appeal has not previously been before this Court or any other court. Counsel are unaware of any other related cases currently pending in this Court or in any other court.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................2

STATEMENT OF THE ISSUE..............................................................................2

STATEMENT OF THE CASE................................................................................3

    1.    Congress's Reservation Of Power Over The District Of Columbia's Purse In The Home Rule Act. .........................................3

    2.    The Council's Attempt To Alter The Roles Of Congress And The President In The District's Budget And Appropriations Process.....................................................................................................6

    3.    Federal And District Officials' Recognition Of The Autonomy Act's Invalidity. ........................................................................9

    4.    Proceedings Below. ........................................................................11

SUMMARY OF ARGUMENT.............................................................................13

ARGUMENT ........................................................................................................17

    I.    Whether Congress Authorized The Council To Take The Budget Authority Long Reserved For Federal Actors Is A Federal Question...........................................................................................17

    II.    The Autonomy Act Violates Several Home Rule Act Provisions That Reserve For Congress The Power Of The Purse Over The District. .........................................................................................21

        A.    The Autonomy Act violates Section 603(a), which preserves the federal role in enacting the District's budget..................................................................................21

            1.    The text of the Home Rule Act establishes that Section 603(a) is a substantive, prospective limitation on the Council. ...............................22

2.   The legislative history confirms that Section 603(a) was enacted as a substantive, prospective limitation. .......................................................................29

a.   House proceedings. .............................................29

b.   Conference proceedings. ......................................37

c.   The dog that did not bark—for four decades. ......40

3.   Congress's general purpose of delegating broad authority yielded to its specific purpose of withholding budget authority. ..........................................43

B.   The Autonomy Act violates Sections 603(e) and 602(a)(3) in purporting to exempt the District from the Anti-Deficiency Act. .................................................45

1.   Section 450 created a fund for the District but did not make money in that fund available for expenditure. .................................................46

2.   Now agreeing that Section 450 does not authorize it to spend, the Council still fails to identify any act of Congress that does. ....................................49

C.   The Autonomy Act violates Section 602(a)(3) because it "concerns the functions … of the United States." ...................52

D.   If Congress had intended to allow the Council to take budget autonomy, it would have said so straightforwardly. ...................................................59

CONCLUSION ...................................................................61

# TABLE OF AUTHORITIES*

## *Cases*

*AFGE Local 1647 v. FLRA*, 388 F.3d 405 (3d Cir. 2004) .......................................46

*Banner v. United States*, 428 F.3d 303 (D.C. Cir. 2005) (per curiam)....................54

*Bender v. Jordan*, 623 F.3d 1128 (D.C. Cir. 2010) ........................................... 17-20

*Bliley v. Kelly*, 23 F.3d 507 (D.C. Cir. 1994) .................................................... 19-20

*Cannon v. United States*, 645 F.2d 1128 (D.C. Cir. 1981)..................................6, 26

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ..................................36, 44

*Chisom v. Roemer*, 501 U.S. 380 (1991)..................................................................40

*Cohens v. Virginia*, 19 U.S. 264 (1821) ..................................................................54

*Decatur Liquors v. District of Columbia*, 478 F.3d 360 (D.C. Cir. 2007)..............20

*DePierre v. United States*, 131 S. Ct. 2225 (2011) .................................................50

*Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986)............................20

*District of Columbia v. Greater Wash. Cent. Labor Council*, 442 A.2d 110 (D.C. 1982) ...................................................................................................... 54-55

*District of Columbia v. John R. Thompson Co.*, 346 U.S. 100 (1953) .....................3

*District of Columbia v. Wash. Home Ownership Council*, 415 A.2d 1349 (D.C. 1980) (en banc) ...................................................................................... 44-45

*Empire Healthchoice Assurance v. McVeigh*, 547 U.S. 677 (2006) .......................19

*Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459 (1945)....................................23

---

*       Authorities upon which we chiefly rely are marked with asterisks.

v

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1 (1983) .............18

*Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)..... 19-20

*Gross v. Winter*, 876 F.2d 165 (D.C. Cir. 1989).......................................................52

*Harrison v. PPG Indus.*, 446 U.S. 578 (1980).........................................................40

*Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270 (D.C. Cir. 1988) .........44

*Hessey v. D.C. Bd. of Elections & Ethics*, 601 A.2d 3 (D.C. 1991)
(en banc)...................................................................................................6, 26, 43, 52

*Holloway v. United States*, 526 U.S. 1 (1999) ........................................................26

*Humana Inc. v. Forsyth*, 525 U.S. 299 (1999)........................................................24

[*]*Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997) (per
curiam) ....................................................................................................................24

*In re Crawley*, 978 A.2d 608 (D.C. 2009) ............................................41, 50, 53, 57

*Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) ....................................................23

[*]*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)..........................................23

*Lincoln Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 856 F.2d 1558
(D.C. Cir. 1988).....................................................................................................36

*McConnell v. United States*, 537 A.2d 211 (D.C. 1988) .......................................50

*Milhouse v. Levi*, 548 F.2d 357 (D.C. Cir. 1976) ..................................................44

*Miller v. Clinton*, 687 F.3d 1332 (D.C. Cir. 2012)................................................40

*Moore v. District of Columbia*, 907 F.2d 165 (D.C. Cir. 1990) (en banc)..............37

*NRDC v. EPA*, 656 F.2d 768 (D.C. Cir. 1981) ......................................................25

*Narragansett Indian Tribe v. NIGC*, 158 F.3d 1335 (D.C. Cir. 1998)...................25

[*]*Nevada v. Dep't of Energy*, 400 F.3d 9 (D.C. Cir. 2005) ........................... 12, 47-49

*Nevada v. Hall*, 440 U.S. 410 (1979) ....................................................23

*NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014) ................................ 42-43

*Palmore v. United States*, 411 U.S. 389 (1973) ....................................3

*Ratzlaf v. United States*, 510 U.S. 135 (1994) .................................35, 38

*Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775 (D.C. Cir. 1998)......................................................................43

*Thomas v. Barry*, 729 F.2d 1469 (D.C. Cir. 1984)......................... 19-20

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001). ...........................................26

*United Biscuit Co. v. Wirtz*, 359 F.2d 206 (D.C. Cir. 1965)....................51

*U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir 2012) ..................... 22, 45-46

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)..........................60

### Constitutional Provisions

U.S. Const. art. I, § 8, cl.17...................................................................3

U.S. Const. art. I, § 9, cl.7.....................................................................52

U.S. Const. amend. XI ...................................................................... 22-23

### Statutes

28 U.S.C. § 1291 ....................................................................................2

28 U.S.C. § 1292(a)(1).............................................................................2

28 U.S.C. § 1331 ....................................................................................2

28 U.S.C. § 1441 ....................................................................................2

31 U.S.C. § 1101(1) .................................................................50

31 U.S.C. § 1108 ................................. 9, 11-12, 18, 29, 32, 50

31 U.S.C. § 1301(d) ..............................................................46

*31 U.S.C. § 1341................................. 4, 9-12, 16, 18, 38, 45-47, 49-52

31 U.S.C. §§ 1342, 1349-1351, 1514, 1517-1519 ..............45

31 U.S.C. § 1349 ....................................................................4

31 U.S.C. § 1350 ....................................................................4

Act of Feb. 21, 1871, ch. 62, 16 Stat. 419 .........................3, 48

Act of June 20, 1874, ch. 337, 18 Stat. 116 .........................3

Act of June 26, 1912, Pub. L. No. 62-201, 37 Stat. 139.....................3, 51

Act of Sept. 13, 1982, Pub. L. No. 97-258, 96 Stat. 877 ...........4

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5................9

District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (later retitled the Home Rule Act):

    § 102(a) ...........................................................................4, 44

    § 102(b) ...............................................................................4

    § 103(7) .............................................................................25

    § 103(15) ...........................................................................21

    § 201-204 ..........................................................................57

    § 302....................................................................................6, 21

    § 303....................................................................................6-7

§ 303(a) ........................................................................................25, 27, 39

*§ 303(d)................................................... 6, 21, 27-28, 31, 36, 39, 60

§ 404(a) ...................................................................................6, 21

*§ 446 ................................. 6-8, 10, 25, 27-29, 31-32, 38, 48, 51, 53

§ 450...............................................................................10, 12, 16, 46-49

§ 502 (repealed) ..............................................................................27

§ 601 ................................................................................5-6, 21, 27-28, 31

§ 602 ................................................................................5-6, 21, 27-28, 31

*§ 602(a)........................................................................................5, 23

§ 602(a)(2) ...................................................................................28

*§ 602(a)(3) ............................................. 1, 5, 12-13, 16, 45, 52-55, 58-59

§ 602(a)(4) ...................................................................................58

§ 602(a)(6) ...................................................................................58

§ 602(a)(9) ...................................................................................58, 60

§ 602(b) ...........................................................................28, 34-35, 57

*§ 602(c).........................................................................................8

§ 603...............................................................................5, 6, 21, 27-28, 31

*§ 603(a)...................................... 1, 5, 10, 12, 14-15, 21-29, 31-37, 39, 40, 42, 60

§ 603(c) .......................................................................................26, 38

§ 603(d) .......................................................................................38

*§ 603(e).................................................... 1, 5, 12, 15-16, 38, 40, 45, 51, 60

§ 737 (unenacted).........................................................29, 32

§ 752..................................................................................59

§ 761..................................................................................26

Local Budget Autonomy Act of 2012, D.C. Law 19-321, 60 D.C. Reg. 1724
(Feb. 15, 2013) .............................................2, 7-14, 16-23, 45-46, 49-50, 52, 58-60

## *Legislative History*

Staff of the House Committee on the District of Columbia, 93d Congress,
*Home Rule for the District of Columbia, 1973-1974: Background and
Legislative History* (Comm. Print 1974).....................................29-41, 51-52, 55-58

H.R. Rep. No. 113-172 (2013) ...................................................................9

H.R. Rep. No. 113-508 (2014) ...................................................................9

59 D.C. Reg. 11769 (Oct. 12, 2012) .........................................................7

60 D.C. Reg. 1724 (Feb. 15, 2013) ...........................................................7

60 D.C. Reg. 12135 (Aug. 23, 2013) .........................................................7

## *Other*

64 Comp. Gen. 756 (Aug. 8, 1985)............................................................49

67 Comp. Gen. 332 (Mar. 10, 1988) .........................................................47

Fed. R. Civ. P. 10(c) ...............................................................................18

GAO, B-114808, 1979 WL 12213 (Comp. Gen. Aug. 7, 1979).............................47

[*]GAO, *Principles of Appropriations Law* (3d ed. 2004) ...................................46-48

*In re D.C.—Local Budget Autonomy Amendment Act of 2012*, B-324987
(GAO Jan. 30, 2014) ....................................................9-10, 22, 45-46, 48

Office of Mgmt. & Budget, *Appendix, Budget of the United States
Government, Fiscal Year 2015* (2014) .................................................11

1A Singer & Singer, *Sutherland Statutory Construction* (7th ed. 2009) .................25

# GLOSSARY OF TERMS

| | |
|---|---|
| Autonomy Act | Local Budget Autonomy Act of 2012 |
| Br. | Brief |
| CFO | Chief Financial Officer |
| Committee | House Committee on the District of Columbia |
| Council | Council of the District of Columbia |
| District | District of Columbia |
| GAO | United States Government Accountability Office |
| GAO *Principles* | GAO, *Principles of Appropriations Law* (3d ed. 2004) |
| JA | Joint Appendix |
| LH | Staff of the House Committee on the District of Columbia, 93d Congress, *Home Rule for the District of Columbia, 1973-1974: Background and Legislative History* (Comm. Print 1974) |
| R | Record Document |

## INTRODUCTION

Only Congress can grant the District of Columbia the same authority to control its own budget that every state has, and that the District deserves. But thus far, Congress deliberately and expressly has withheld it.

In 1973, in the Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774, Congress gave the Council of the District of Columbia broad but limited legislative power. The limitations reserve Congress's exclusive authority in certain areas, and they control this case many times over. *First*, Congress made clear that the Council may not change the longstanding roles of Congress and the President in the District's budget and appropriations process. *Id.* § 603(a). *Second*, Congress reaffirmed that the District is subject to the Anti-Deficiency Act, and so may spend money only when authorized by act of Congress. *Id.* § 603(e). And *third*, Congress barred the Council from amending federal law "not restricted in its application exclusively in or to the District" or affecting "functions … of the United States." *Id.* § 602(a)(3).

The parties agree that these limitations embody a critical legislative compromise and that the Home Rule Act would not have passed without it. Under that compromise, Congress chose not to give the District budget autonomy, while granting Home Rule in certain important other respects. The Act thus includes

several limitations that prevent the Council from taking Congress's power of the purse by eliminating the need for federal legislation to enact the District's budget.

The Council violated each of these limitations in enacting the Local Budget Autonomy Act of 2012. The Council purported to change Congress's function concerning the "local portion" of the District budget process—meaning the portion derived from local sources like District taxes—from active (the District's "total budget" becomes law only when Congress affirmatively enacts it) to passive (the Council's budget becomes law unless both houses override it). It also purported to cut the President out of that process altogether, and to allow the District to spend funds without an appropriation by Congress.

The Council lacks authority to do any of these things. The Council cannot take budget autonomy; Congress must grant it.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1441. (The Council's contrary argument is discussed below.) This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court correctly found federal-question jurisdiction and held invalid the Local Budget Autonomy Act, which purports to repeal the requirement that Congress affirmatively enact the District's total budget, to

2

eliminate the President from the local budget process, and to divest Congress of exclusive authority to appropriate money for the District's budget.

## STATEMENT OF THE CASE

### 1.   Congress's Reservation Of Power Over The District Of Columbia's Purse In The Home Rule Act.

The Constitution empowers Congress "[t]o exercise exclusive Legislation" over the District.  U.S. Const. art. I, § 8, cl.17.  "The power is plenary." *Palmore v. United States*, 411 U.S. 389, 397 (1973).  Congress thus can legislate directly for the District or delegate legislative power.  *See District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 110 (1953).

In 1871, Congress created a local "legislative assembly" with express authority to enact appropriations for the District's operations.  Act of Feb. 21, 1871, ch. 62, §§ 5, 13-14, 16 Stat. 419, 420-23.  Congress dissolved this assembly in 1874.  Act of June 20, 1874, ch. 337, 18 Stat. 116.  Ever since, for 140 years now, Congress has withheld budget autonomy from the District government.  *See* Joint Appendix ("JA") 410-11, 415.

Indeed, Congress has underscored its retention of the power of the purse by making the Anti-Deficiency Act "applicable in all respects to appropriations made for and expenditures of and to all of the officers and employees of the government of the District."  Act of June 26, 1912, Pub. L. No. 62-201, § 9, 37 Stat. 139, 184. In its current form, the Anti-Deficiency Act provides:

3

(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—

> (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation ….

31 U.S.C. § 1341; Act of Sept. 13, 1982, Pub. L. No. 97-258, 96 Stat. 877, 923.  It is undisputed that only Congress can make money "available in an appropriation or fund for [an] expenditure or obligation" within the Act's meaning.  *See* JA411; Record Document ("R") 11-2, at 19-20.  Violations are punishable administratively and criminally.  31 U.S.C. §§ 1349, 1350.

As the 1982 passage of this version of the Anti-Deficiency Act suggests, Congress's control over the District's budget did not lapse in 1973 with the intervening District of Columbia Self-Government and Governmental Reorganization Act, later retitled the Home Rule Act, which created the present District government.  Congress stated its general purpose of "delegat[ing] certain legislative powers" to "relieve [itself] of the burden of legislating upon essentially local District matters," but "[s]ubject to [its] retention … of the ultimate legislative authority" and only "to the greatest extent" Congress deemed "possible."  Home Rule Act § 102(a) (codified at D.C. Code § 1-201.02(a)).  Congress contemplated "greater self-government," not total self-government.  *Id.* § 102(b).

The Home Rule Act thus included a delegation of legislative authority with specific limitations constraining the Council and reserving Congress's exclusive

authority, found in Title VI, "Reservation of Congressional Authority." Section 601, "Retention of Constitutional Authority," provides that Congress may amend or repeal any Council act. Home Rule Act § 601 (D.C. Code § 1-206.01). Section 602, "Limitations on the Council," provides that "[t]he Council shall have no authority to pass any act contrary to the provisions of this Act except as specifically provided," or to take particular actions including "[e]nact[ing] any act, or enact[ing] any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District." *Id.* § 602(a) (D.C. Code § 1-206.02(a)). Section 603, "Budget Process; Limitations on Borrowing and Spending," includes Sections 603(a) and (e):

> (a) Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, the Federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.
>
> …
>
> (e) Nothing in this Act shall be construed as affecting the applicability to the District government of the provisions of … the so-called Anti-Deficiency Act.

*Id.* § 603 (D.C. Code § 1-206.03).

The Home Rule Act emphasizes these limitations repeatedly. Section 302 (D.C. Code § 1-203.02) provides the District legislative power "[e]xcept as provided in sections 601, 602, and 603." Section 404(a) (D.C. Code § 1-204.04(a)) allows the Council to exercise this power "[s]ubject to the limitations specified in title VI." And Section 303 (D.C. Code § 1-203.03), which allows the District to amend the Charter found in Title IV, decrees in subsection (d): "The amending procedure provided in this section may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603."

Thus, in the 40 years since the Home Rule Act, as in the century before, the District's budget has been enacted, and the District has been allowed to obligate funds and make expenditures, only by affirmative acts of Congress. And because only Congress can grant budget autonomy, bills to do so have been repeatedly (and unsuccessfully) introduced there over the decades. JA410-11.

## 2.  The Council's Attempt To Alter The Roles Of Congress And The President In The District's Budget And Appropriations Process.

In the Home Rule Act, Congress "retain[ed] … the pre-home rule procedures for presidential review and submission for approval to Congress of the District's budget." *Hessey v. D.C. Bd. of Elections & Ethics*, 601 A.2d 3, 10 (D.C. 1991) (en banc); *accord Cannon v. United States*, 645 F.2d 1128, 1136-37 n.32 (D.C. Cir. 1981). In particular, in Section 446 (D.C. Code § 1-204.46), a Charter provision

6

entitled "Enactment of Appropriations by Congress," Congress required the Council to adopt a proposed budget for submission to the President and then Congress for potential modification and affirmative enactment. Congress unequivocally specified in Section 446: "No amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act."

In October 2012, the Council announced that it would consider the Local Budget Autonomy Act of 2012 ("Autonomy Act"), which would amend Section 446 and other Charter provisions. 59 D.C. Reg. 11769, 11770 (Oct. 12, 2012). An authorized Charter amendment takes effect after enactment by the Council, ratification by District voters, and layover with Congress for a time in which it may block the amendment by joint resolution. Home Rule Act § 303 (as amended).

Mayor Vincent Gray advised the Council that, while he "passionately support[s] the goal of securing budget autonomy," he had concerns about the Act's legality. JA132. The Council nonetheless passed it; the Mayor signed it despite his concerns, to allow citizens to express views on this important topic; and District voters approved it. 60 D.C. Reg. 1724, 1726 (Feb. 15, 2013); JA117. The Act completed the congressional review period on July 25, 2013. 60 D.C. Reg. 12135 (Aug. 23, 2013).

7

The Autonomy Act, if valid, would rework Section 446 radically with regard to the "local portion" of the budget, by transforming Congress's role from one of active enactment to one of passive review (as with ordinary Council legislation, Home Rule Act § 602(c)); eliminating the President's involvement; and shifting Congress's role in appropriating money to the Council. Autonomy Act § 2(e). This strike-and-score representation shows these substantial purported changes:

> Sec. 446. Enactment of ~~Appropriations by Congress~~ <u>Local Budget by Council</u>
>
> <u>…</u> The Council, within ~~56~~ <u>70</u> calendar days <u>…</u> after receipt of the budget proposal from the Mayor, and after public hearing, <u>and by a vote of a majority of the members present and voting,</u> shall by act adopt the annual budget for the District of Columbia government. <del>… Such budget so adopted shall be submitted by the Mayor to the President for transmission by him to the Congress.</del> <u>The federal portion of the annual budget shall be submitted by the Mayor to the President for transmission to Congress. The local portion of the annual budget shall be submitted by the Chairman of the Council to the Speaker of the House of Representatives pursuant to the procedure set forth in section 602(c).…</u> Except as provided …, no amount may be obligated or expended by any officer or employee of the District of Columbia government unless <u>…</u> such amount has been approved by ~~Act of Congress, and then only according to such Act~~ <u>an act of the Council (and then only in accordance with such authorization) and such act has been transmitted by the Chairman to the Congress and has completed the review process under section 602(c)(3)</u> ….

*Compare id. with* Home Rule Act § 446 (as amended by Congress). The Autonomy Act would also amend the Home Rule Act to authorize the Council to change the District's fiscal year. Autonomy Act § 2(d).

**3.    Federal And District Officials' Recognition Of The Autonomy Act's Invalidity.**

The House Appropriations Committee issued a report during the Autonomy Act's layover period.  H.R. Rep. No. 113-172 (2013).  It described "the recent referendum … as an expression of the opinion of the residents, only, and without any authority to change or alter the existing relationship between Federal appropriations and the District."  *Id.* at 39.  The committee recently reaffirmed that view.  H.R. Rep. No. 113-508, at 40 (2014).  And in January 2014, rather than give the Act effect, Congress appropriated the District's Fiscal Year 2014 budget including local funds, and for Fiscal Year 2015 indicated its expectation that the Council would "submit[] to Congress" a "[b]udget [r]equest" rather than enact a budget itself.  Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, tit. IV, 128 Stat. 5, 204-08; *id.* § 816, 128 Stat. at 246.

After the relevant House subcommittee's chair requested an opinion, the United States Government Accountability Office ("GAO") similarly concluded that "provisions of the [Autonomy Act] that attempt to change the federal government's role in the District's budget process have no legal effect."  JA119 (*In re D.C.— Local Budget Autonomy Amendment Act of 2012*, B-324987 (GAO Jan. 30, 2014)).  Applying its appropriations expertise and long-held views, GAO confirmed that the attempt to authorize the Council to appropriate money violated the Anti-Deficiency Act and the related Budget and Accounting Act, 31 U.S.C. § 1108,

which requires the District to submit appropriation requests to the President. JA124-26.  GAO rejected the argument that Congress's creation of a General Fund for the District in Section 450 of the Home Rule Act (D.C. Code § 1-204.50) allowed the Council to spend money without further congressional authorization: "Congress could not have intended to provide a permanent appropriation to the District in the Home Rule Act where, in the very same act, it provided [in Section 446] that funds would be available only with the approval of an act of Congress." JA127.  GAO further recognized that Section 603(a) prohibited the Council from altering federal entities' role in the District's budget process.  JA125.

In early April 2014, the District's Attorney General, Mayor, and Chief Financial Officer ("CFO") all opined that the Autonomy Act is invalid.  JA61-75. The Attorney General's formal opinion was that the Act has "no legal force" and that "adhering to it could" jeopardize District government employees, who could face "administrative and/or criminal penalties under the federal Anti-Deficiency Act."  JA61-62.  The Mayor informed the Council that he would direct executive-branch officials "not to implement or take actions pursuant to the [Autonomy] Act."  JA72.  The CFO indicated that his legal review also revealed the Act's invalidity, and that he would "not make or authorize any payment pursuant to a budget that was approved in conformance with the Act."  JA75.

10

Apparently recognizing the Act's invalidity, President Obama's Fiscal Year 2015 budget proposes that Congress amend the Home Rule Act "to provide the District local budget … autonomy."  Office of Mgmt. & Budget, *Appendix, Budget of the United States Government, Fiscal Year 2015* at 1287, 1292 (2014).

**4.    Proceedings Below.**

Earlier this year, the Council filed a complaint in the Superior Court of the District of Columbia seeking a declaration that the Autonomy Act is valid and injunctive relief against the Mayor and CFO.  JA23-24.  The complaint described and attached their opinions that the Act violates Home Rule Act limitations on the Council's authority and the Anti-Deficiency and Budget and Accounting Acts.  JA15-16, 21-22, 35-52.  The Mayor and CFO removed to the district court and the Council moved to remand.  JA7-10; R9.  The Mayor and CFO answered and counterclaimed for declaratory and injunctive relief.  JA76-116.

After a hearing, the district court confirmed jurisdiction and held the Autonomy Act unlawful.  JA409-55.  The court found that "this case unequivocally presents a federal question—whether the Council can unilaterally amend the District Charter to fundamentally alter the roles of the President and Congress with respect to the locally funded portion of the District's budget."  JA428.

On the merits, the court found many reasons to hold the Autonomy Act unlawful based on plain statutory language, legislative history, "the experience of

11

almost 40 years of Home Rule," and "common sense." JA432-33. *First*, Section 603(a) "prevents changes to the role of Congress and the President" with respect to the District's budget. JA435. "Section 603(a) is a limitation that prohibits the very change the [Autonomy Act] purports to make," and not merely a rule of construction regarding what Congress had done in the Home Rule Act. JA442-43. The "text is clear," and legislative history "confirms the plain meaning." JA435.

*Second*, Section 603(e) is another "limitation," requiring the Council to obey the Anti-Deficiency Act. JA444. The Autonomy Act "effectively amends Section 603(e) by reading compliance with the Anti-Deficiency Act … out of the Home Rule Act." *Id*. The court rejected the counterargument that Section 450, by establishing a General Fund for the District, provided permanent authorization for the Council to make appropriations. JA444-51. The argument is foreclosed by *Nevada v. Department of Energy*, 400 F.3d 9 (D.C. Cir. 2005), and "[t]he Council offers no statutory, legal, or other support for this novel theory." JA447-51. Even if Section 603(e) were inapplicable, the court concluded, the Council could not amend the Anti-Deficiency Act to exempt the District because Section 602(a)(3) prohibits it from amending federal law "not restricted in its application exclusively in or to the District." JA451-53.

12

*Third*, the Autonomy Act violates Section 602(a)(3) "because it concerns functions of the United States." JA453 n.10. The court agreed that "[b]udgeting and appropriations are unquestionably 'functions' of Congress." *Id*.

For all these reasons, the court granted summary judgment to the Mayor and CFO and enjoined all the parties from enforcing the Autonomy Act. JA407-08.

The Council sought clarification or a partial stay to allow it to continue to follow Autonomy Act processes. R47. The court rejected this motion as "devoid of legal merit." JA459.

## SUMMARY OF ARGUMENT

1. The district court properly exercised federal-question jurisdiction. The complaint raises a federal question by asking whether Congress authorized the Council to take budget authority long reserved for Congress. Indeed, the complaint seeks a declaration that the Autonomy Act comports with federal law— found in not just the Home Rule Act but also Title 31 of the United States Code— and an injunction requiring the Mayor and CFO to comply with the Council's view of those federal laws. Even if these laws were relevant only by way of defenses, federal courts have jurisdiction when federal questions "overwhelmingly predominate," regardless of whether the cause of action appears created by state law. This case, involving the Council's attempt to change the functions of federal actors, belongs in federal court.

13

2. The district court also correctly held that the plain language and legislative history of the Home Rule Act establish that the Autonomy Act is invalid, for many independent reasons.  Congress did not grant the Council unlimited authority to amend the Charter, but instead imposed restrictions that reserve for Congress the power of the purse over the District.

*First*, the Autonomy Act violates Section 603(a), which precludes any law changing the "basic procedure and practice" concerning the roles of Congress and the President in the District's budget process.  This provision establishes that no part of the Home Rule Act, including the Charter-amending procedures, may make such a change.  The Council errs in arguing that the provision is only a rule of construction and not a "limitation"—it is *both*.  Amendments to the Charter become part of the Act, and thus are subject to the limitation in Section 603(a), meaning they cannot "be construed" to affect federal actors' roles in preparing and authorizing the District's budget.  If Section 603(a) were not a prospective limitation, but merely a rule for how to construe the original Home Rule Act, it would be surplusage—and would have been placed in the part titled "Rules of Construction" rather than that titled "Reservation of Congressional Authority."

The legislative history cements this reading.  The Council concedes that in 1973 Congress intended to retain the authority to enact District budgets that it had exercised for a century—and also concedes that the Home Rule Act would not

14

have passed absent that critical condition.  It suggests nonetheless that Congress meant to allow the Council to *take* budget autonomy even if Congress would not *grant* it.  This is disproven by the legislative history.  The Council focuses on the House proceedings, but the portion on which it newly relies and the remainder both show that the House understood its bill to withhold from the Council any ability to assume budget autonomy, as part of the legislative bargain that made Home Rule possible.  Further, the conference proceedings establish that *Congress* understood Sections 603(a) and (e) as "prohibit[ions]" that "preserv[ed] the Congressional appropriations provisions of existing law."

Moreover, not a word of legislative history suggests that anyone shared the Council's novel theory of what Congress intended.  It is beyond reason that Congress would have enabled the Council to take appropriations authority for itself the moment after passage of the Home Rule Act without anyone in the voluminous legislative history ever suggesting that was Congress's intent.  Indeed, for nearly 40 years, the Council and Congress have operated under the Home Rule Act's terms, with Congress making appropriations annually.  And for decades District officials—ranging from its House delegate when the Act was passed to current Councilmembers—have urged Congress to give the District budget autonomy, because only Congress can do so.

15

*Second*, the Autonomy Act violates Section 603(e), which precludes any law "affecting the applicability" of the Anti-Deficiency Act to the District, and Section 602(a)(3), which prohibits the Council from exempting the District from that Act. Below, the Council's argument was that Section 450 of the Home Rule Act provided the affirmative authorization to spend from Congress that, it is undisputed, the Anti-Deficiency Act requires.  Section 450, however, created a fund but contained no specific direction to spend.  Indeed, the same act directed the Council *not* to spend from the fund without further authorization from Congress.

Changing positions, the Council now disavows reliance on Section 450 but identifies no other act of Congress that provided it authority to approve expenditures.  It appears to argue, circularly, that the locally enacted Autonomy Act *itself* provides the necessary authorization.  But Congress in the Home Rule Act prohibited Charter amendments that would alter the application of the Anti-Deficiency Act.  Thus, no Charter amendment can allow the Council to appropriate money without further act of Congress.

*Third*, the Autonomy Act violates Section 602(a)(3), which precludes any law affecting "the functions … of the United States."  The Home Rule Act itself indicates that Congress would retain the functions of enacting and appropriating funds for the District's budget.  These accordingly are functions of the United States, as 140 years of history and the legislative history confirm—particularly

16

since, as this Court has recognized, choices about the District's budget can affect *national* budgeting. The Council does not squarely confront the statutory text or relevant legislative history, but instead relies on inapposite precedent.

For each of these reasons, individually and especially together, the Court should conclude that the Autonomy Act is invalid.

## ARGUMENT

### I. Whether Congress Authorized The Council To Take The Budget Authority Long Reserved For Federal Actors Is A Federal Question.

Common sense and binding precedent each support federal-question jurisdiction over a suit asking a court to decide whether the Home Rule Act—an act of Congress—empowers the Council to take the budgetary functions Congress has reserved for itself for 140 years. "[A] case arises under federal law … if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) (internal quotation marks omitted). As the district court held, this case "unequivocally presents a federal question." JA428.

While the Council argues that its complaint does not mention federal laws expressly, Council Br. 24, the complaint centers on the Home Rule Act, which is an act of Congress that reserved budgetary authority for Congress. JA17-20. Moreover, the strategic failure to mention federal law cannot defeat federal-

17

question jurisdiction, *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 22 (1983), and the relief sought demonstrates the federal underpinnings of the complaint. The Council requests a declaratory judgment "that the [Autonomy Act] is legally valid as the law of the land" and "an injunction compelling Defendants to comply with the [Autonomy Act]." JA24. And it does so while describing how the Mayor, CFO, and Attorney General had opined that the Act is invalid and attaching (and hence incorporating) their letters indicating that the Act violates federal law—not just the Home Rule Act limitations on the Council's authority, but also the Anti-Deficiency and Budget and Accounting Acts. JA14-16, 21-22, 35-52; *see* Fed. R. Civ. P. 10(c). The Council's requests for relief necessarily require analysis of federal law.

Questions about whether the Autonomy Act is valid thus do not arise by way of defenses, but instead are an integral part of the Council's claims for relief. Declaring whether a law is "valid" requires measuring it against federal law that may render it invalid. And if the Mayor and CFO are correct, enjoining them to comply with the Act would be requiring them to violate federal law. The Council's complaint raises a federal question on its face.

In any event, even when (unlike here) the "cause of action … appears on its face to be one created by state law" only, "federal courts have jurisdiction when, as here, it is apparent that the federal questions overwhelmingly predominate."

18

*Bender*, 623 F.3d at 1130.  "[T]he state law claim must turn on an 'actually disputed and substantial' issue of federal law," and "federal jurisdiction must be 'consistent with congressional judgment about the sound division of labor between state and federal courts.'"  *Id.* (quoting *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005)).  This latter point "depends on such factors as the strength of the federal interest in a federal forum to resolve questions of federal law and whether federal jurisdiction would 'materially affect' the 'normal currents of litigation.'"  *Id.*  "Federal jurisdiction is favored in cases that present 'a nearly pure issue of law that could be settled once and for all and thereafter would govern numerous cases.'"  *Id.* (quoting *Empire Healthchoice Assurance v. McVeigh*, 547 U.S. 677, 700 (2006)) (alterations omitted).

This case satisfies that standard.  The litigation turns on a disputed question of federal law—whether the Autonomy Act is valid under Title 31 of the United States Code and Title VI of the Home Rule Act, "Reservation of Congressional Authority."  While this Court noted in *Thomas v. Barry*, 729 F.2d 1469 (D.C. Cir. 1984), that the Home Rule Act may be considered a "hybrid" federal and local statute because parts of it apply "exclusively" to the District, it also explained that "[m]any of the Act's sections apply directly to the federal not the District government …. Other sections of the Act similarly allocate functions between the federal and District governments."  *Id.* at 1471; *see also Bliley v. Kelly*, 23 F.3d

19

507, 511 (D.C. Cir. 1994) (finding "self-evident" that "questions regarding Congress's reserved right to review District legislation before it becomes law concern[] an exclusively federal aspect of the Act"). Title VI reserves to Congress authority over the District's budget, and the Autonomy Act concerns the "allocat[ion of] functions between the federal and District governments." *Thomas*, 729 F.2d at 1471. This local/federal interplay makes the question here a federal question under *Thomas*.

Given that the Council seeks to take budget authority from Congress, it can hardly be doubted that there is a federal interest in a federal forum to resolve questions of federal law. Indeed, as the district court saw, the close interaction of federal and local actors here distinguishes *Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986), and *Decatur Liquors v. District of Columbia*, 478 F.3d 360 (D.C. Cir. 2007), which concerned "purely local legislation" that did not meaningfully implicate federal interests or actors. JA429-30.

This case also presents a pure question of law, and its resolution would definitively resolve the question for the parties and not "'materially affect' the 'normal currents of litigation.'" *Bender*, 623 F.3d at 1130. This case "sensibly belongs in a federal court." *Grable*, 545 U.S. at 315.

**II.  The Autonomy Act Violates Several Home Rule Act Provisions That Reserve For Congress The Power Of The Purse Over The District.**

The Autonomy Act purports to amend the District's Charter.  Section 303(d) of the Home Rule Act, however, specifies topics that cannot be addressed by Charter amendment.  It expressly allows Charter amendments only subject to "the limitations specified in sections 601, 602, and 603."  Home Rule Act § 303(d); *see id.* §§ 302, 404(a).  The Autonomy Act violates these limitations.

**A.  The Autonomy Act violates Section 603(a), which preserves the federal role in enacting the District's budget.**

Section 603(a) provides:

> Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice relating to the respective roles of the Congress, the President, [and other federal actors] in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.

The Autonomy Act undisputedly "change[s] … existing law … relating to the respective roles" of Congress and the President regarding the District's "total budget," which includes both the federal payment and all locally raised revenues.  *See* Home Rule Act § 103(15) (D.C. Code § 1-201.03(15)).  The Council contends that Section 603(a) is not a "limitation" on its authority, but merely a "rule of construction" that explains how the 1973 version of the Home Rule Act was to be construed—and no more.  The text and structure of the act as a whole and its legislative history refute that contention.

21

1.   The text of the Home Rule Act establishes that Section 603(a) is
a substantive, prospective limitation on the Council.

As the district court held, "the most logical reading of Section 603(a) is that it prevents changes to the role of Congress and the President with respect to six areas related to the District's budget—preparation, review, submission, examination, authorization, and appropriation."  JA435.  The text is "clear."  *Id.* Indeed, GAO (whose opinion goes unmentioned by the Council and its *amici*) could "think of no more specific manner for Congress to specify in the Home Rule Act that Congress would retain a firm hand in the District's budget process." JA125; *see U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1349 (D.C. Cir 2012) (recognizing that GAO's "expert opinion" should be "prudently consider[ed]"). The thrust of Section 603(a) is plain: nothing in the Home Rule Act may be used as a vehicle for changing the budget processes that the Autonomy Act attempts to change.

The Council's semantic effort to distinguish between a limitation and a rule of construction fails.  A rule of construction, particularly one enacted as statutory text, *is* a limitation.   Contrary to the Council's view, such a rule is "forward-looking," Council Br. 28, as it limits how a statute may *ever* be read—with all the consequences that flow from that limitation.  Thus, language like that in Section 603(a) has long been regarded as imposing a substantive limitation.  The Eleventh Amendment, for example, provides that "[t]he Judicial power of the United States

22

shall not be construed to extend to any suit … against one of the United States by Citizens of another State."   It is firmly established that this amendment is an "explicit limitation on federal judicial power."   *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 467 (1945), *overruled on other grounds*, *Lapides v. Bd. of Regents*, 535 U.S. 613 (2002); *accord Nevada v. Hall*, 440 U.S. 410, 420 (1979). Similarly, the Supreme Court in *Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986), recognized that a statutory provision indicating that "nothing in [the Communications Act of 1934] shall be construed" to give the Federal Communications Commission certain authority constitutes *both* "a substantive jurisdictional limitation" *and* "a rule of statutory construction."   *Id.* at 373; *see id.* at 369-71, 374, 376-77 n.5.

Section 603(a) limits not only courts, which cannot interpret the Home Rule Act as making any of the specified changes, but also the Council, which cannot enact law that would result in the Act making any such change.  If the Autonomy Act were effective, the Home Rule Act (as amended) would be internally inconsistent: the new provisions would change pre-existing budget processes even though Section 603(a) says *nothing* in the Home Rule Act can be construed to do so.   Section 603(a) must prevail in that conflict because, per Congress, "[t]he Council shall have no authority to pass any act contrary to the provisions of this Act except as specifically provided."   Home Rule Act § 602(a).  Thus, unlike in

cases the Council cites addressing fundamentally different statutes, Council Br. 30-31, Section 603(a) is not a "savings clause" but a "limitation": it automatically nullifies *any* later Council attempt to change the Home Rule Act to alter pre-existing budget processes.

Binding precedent contradicts the Council's position that Section 603(a) pertains only to the Act as passed in 1973, not to subsequent attempts to amend it. In *Illinois Public Telecommunications Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997) (per curiam), this Court applied the Supreme Court's holding in *Louisiana Public Service Commission* that a "nothing ... shall be construed" provision in the Communications Act of 1934 imposed "substantive and interpretative limitations." 117 F.3d at 561. Crucially, this Court then held that these limitations applied to a later-enacted provision because that provision came in an amendment to the pre-existing act. *Id.*; *see Humana Inc. v. Forsyth*, 525 U.S. 299, 306-07 & n.7 (1999) (similar). Although this Court further recognized that it could find that Congress in that amendment overrode the original limitations, if Congress's intent was clear enough, 117 F.3d at 561-62, no such implied-repeal analysis is warranted here because, no matter the Council's intent, it cannot amend Section 603(a). Indeed, if the "nothing ... shall be construed" limitation in the Communications Act of 1934 presumptively applies to a later amendment *by Congress itself*, the parallel limitation in the Home Rule Act must apply to an attempted amendment *by the*

24

*Council*—a creature of Congress whose authority derives entirely *from* the Home Rule Act.

The Council's contrary argument below rested on its misstatement of the Home Rule Act's definition of the term "Act." The Council asserted that the term "this Act" is "expressly defined" as "the 1973 Act" and does not include "subsequent amending legislation." R11-2, at 30; R25, at 23. In fact, the provision the Council cited defines "act" to "include[] any legislation passed by the Council, except where the term 'Act' is used to refer to this Act or other Acts of Congress." Home Rule Act § 103(7). That definition does not exclude later amendments by the Council from the "Act." To the contrary, such amendments become part of the Charter "set forth in title IV" *of the Act*. *Id.* § 303(a). The Act thus embraces, rather than displaces, the "normal rules of statutory construction that construe a later amendment as if it were part of the original act." *Narragansett Indian Tribe v. NIGC*, 158 F.3d 1335, 1339 (D.C. Cir. 1998); *see NRDC v. EPA*, 656 F.2d 768, 781 (D.C. Cir. 1981) (citing cases); 1A Singer & Singer, *Sutherland Statutory Construction* § 22.35 (7th ed. 2009). Section 603(a) accordingly applies to putative Charter amendments and by operation of law limits what they can achieve.

Indeed, if Section 603(a) were not a prospective limitation, but merely a rule for how to construe the original Home Rule Act, it would be surplusage. Section 446 (as enacted in 1973) already made perfectly clear that the Act retained pre-

existing budget processes; Section 603(a) was not needed for that purpose.  *See Hessey*, 601 A.2d at 10; *Cannon*, 645 F.2d at 1136-37 n.32.  The Council's interpretation of Section 603(a) thus violates the canon disfavoring statutory interpretations that render provisions "superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Further, if Congress's true intent were merely to create a rule of construction, Congress would have placed the language in Section 603(a) elsewhere in the Act.  Part F of Title VII is *titled* "Rules of Construction."  It contains Section 761 (D.C. Code § 1-207.61), which directs how to construe the Act's provisions in light of other laws.  That part of the Act, not one called "Reservation of Congressional Authority," would be the logical location if the Council were right about Section 603(a).  *See Holloway v. United States*, 526 U.S. 1, 6 (1999) (considering "placement … in the statutory scheme").

Still further, other Home Rule Act provisions show that Section 603(a) was treated as a limitation on the Council.  Section 603(c) provides that the Council's proposed budget "shall identify any tax increases" needed "to balance the budget as submitted" and that "[t]he Council shall be required to adopt such tax increases *to the extent its budget is approved*" (emphasis added).  The fact that Section 603(c)—not part of the Charter—contemplates that Congress must "approve[]" the District's budget demonstrates that Congress meant to preclude Charter

26

amendments to alter that requirement. Similarly, Section 502 (D.C. Code § 47-3406 (Repl. 1997) (repealed))—also outside the Charter—specified fixed fiscal years ending on June 30, further showing Congress's intent to place basic budget matters beyond the Council's reach. Thus, read as a whole, the Home Rule Act unambiguously establishes that Section 603(a) limits the Council's authority.

The Council's remaining textual responses are weak (and inconsistent with its General Counsel's testimony that Section 603(a) is a limitation, JA390). *First*, the Council points to the heading of Section 603—"Budget Process; Limitations on Borrowing and Spending"—and posits that Section 603(a) fits the description before the semicolon and so is not a "[l]imitation." Council Br. 33. Semicolons, however, do not customarily denote mutual exclusivity. Section 603(a) *both* concerns "Budget Process" *and* is a "Limitation[] on … Spending." Moreover, although the Council never mentions it, the heading of Title VI (which includes Section 603) is more telling: "Reservation of Congressional Authority."

*Second*, the Council notes that Section 303(a) excludes certain Charter provisions from the amendment process, but not Section 446. Council Br. 31-34. But in Section 303(d), Congress also subjected the amendment process to "the limitations specified in sections 601, 602, and 603." Section 446 thus is not *categorically* unamendable, but may not be amended in violation of those *subject-matter* limitations. The scope of Section 303(a) thus does not suggest that the

Council may amend Section 446 in violation of the limitation in Section 603(a) any more than that the Council could amend Section 446 to allow "[l]end[ing] the public credit for support of any private undertaking" in violation of the limitation in Section 602(a)(2).

*Third*, the Council emphasizes that Congress did not use the same phraseology in Section 603(a) as in other "limitations." Council Br. 28-29. That is true, but unimportant. Congress was not required to use the same language every time, and in fact *did* use different language when it indisputably established different limitations on the Council. Section 601 is not phrased expressly as a limitation; rather, it reserves Congress's ultimate legislative authority. Yet it is identified as a "limitation" in Section 303(d), and the Council apparently concedes it is one. Council Br. 28. Section 601 supports the district court's conclusion that Section 303(d) "treats [Sections 601, 602, and 603] *as a whole* as limitations on the Council's authority, not just to the extent that they explicitly state they are 'limitations.'" JA434-35.

Moreover, the Council concedes that "Section 602(b) restricts [its] authority," even though it is another "[n]othing … shall be construed" provision that does not mention the Council. Council Br. 42. Thus, Congress's choice in Section 603(a) to use similar language actually shows that Congress *was* enacting a limitation. The legislative history, discussed next, reinforces this conclusion.

28

>    2.    The legislative history confirms that Section 603(a) was enacted as a substantive, prospective limitation.

>         a.    House proceedings.

In 1973, Home Rule proponents like Representative Charles Diggs, chair of the House Committee on the District of Columbia ("Committee"), faced substantial opposition to their effort to grant the District budget autonomy. Section 446 of the Committee's bill, "Enactment of Appropriations," would have done so. Committee Staff, *Home Rule for the District of Columbia, 1973-1974: Background and Legislative History* 1281 (Comm. Print 1974) ("LH"); *see* LH1468-69 (House Report). To facilitate this change, Section 737 would have amended the Budget and Accounting Act, which required the District to follow incompatible federal budget processes. LH1339; *see* LH1481 (House Report). A contemporaneous staff memorandum explained: "Without Section 737(a) [District officials] would not be able to develop their city budget and determine what expenditures should be made." LH2527-28.

Representative Ancher Nelsen, the Committee's ranking minority member, and others expressed concern that "Congress would abdicate its role in the budgetary control process for the Federal City." LH1573 (House Report dissent). When the Committee's bill was before the House, he proposed a substitute bill, cosponsored by Representative Edith Green. LH1975, 2432, 2451. The Nelsen

29

Substitute was not a "home rule" bill at all; it would have delegated only minimal

authority.  LH2027 (Section 503).  It also provided, in Section 416:

> Notwithstanding any other provision of law, unless specifically
> authorized or directed by the Congress, there shall be no change made
> in existing laws, regulations, or basic procedures and practices as they
> relate to the respective roles of the Congress, the President, the
> Federal Office of Management and Budget, the United States
> Department of the Treasury, the Comptroller-General of the United
> States, the District of Columbia Council, and the Commissioner in—
>
> > (1) the preparation, review, submission, examination,
> > authorization, and appropriation of the total budget for the
> > District of Columbia; ….

LH2024.  This was one of many proposed substitutes and amendments.  *See, e.g.*,

LH1843, 2035.   One of these, by Representative Green, contained identical

language.  LH2065.

Owing to such opposition, shortly before the House voted, Representative

Diggs found it necessary to bargain on this and other issues to win passage of a

Home Rule bill.  LH2084-85.  He and a Committee majority signed a "Dear

Colleague" letter proposing several compromises, the first of which was: "no

change in the congressional appropriation role" and "Return to the Existing Line

Item Congressional Appropriation Role."  LH2084; *see* JA190-91 (reporting his

willingness "to make [this] major concession"), 436-38 (citing other articles).

Representative Diggs introduced a substitute bill embodying these

compromises.  LH2228-2357; *see* LH1675-76.  This Committee Substitute was the

bill the House eventually passed.  LH2454-57.  As the Council has conceded, leaving Congress's appropriation role unchanged "was a necessary condition for the passage of any bill."  JA436; *see* JA251; R25, at 14.  Thus, the Committee Substitute altered Section 446 by retitling it "Enactment of Appropriations by Congress"; revising it to require the Council to propose annual budgets for enactment by Congress; and providing that "[n]o amount may be expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act." LH2285-86.

Critically, the Committee Substitute also added subsection (a) (as well as an anti-deficiency provision) to Section 603, under the heading "Limitations on Borrowing and Spending."  LH2319, 2322.  The decision to include Section 603(a) in a list of "[l]imitations" is telling, given that Section 303(d) in that bill, just as now, limited the Charter-amending procedure by reference to the "limitations specified in sections 601, 602, and 603."  LH2249.  Rather than confront this, the Council implies—incorrectly—that "Limitations on Borrowing and Spending" was the heading only "before" this change.  Council Br. 33.  Not until conference proceedings (discussed below) did the heading became "Budget Process; Limitations on Borrowing and Spending."  *Compare* LH2319 *with* LH2984.

Had the Committee wanted to retain Congress's existing role in the District's budget process while simultaneously granting the Council prospective authority to change that role through a Charter amendment, it would have stopped after revising Section 446. Adding a "rule of construction" would have done nothing to satisfy opposition concerns; it would have responded to an objection no one made. By going beyond Section 446 and placing an additional limitation on the Council's legislative authority, the Committee made its goal clear: to ensure that only Congress could change the budget and appropriations process.

That the Committee had this goal is confirmed by a related change in the Committee Substitute—elimination of Section 737 of the Committee's original bill. *Compare* LH1339 *with* LH2341. This was the proposed amendment to the Budget and Accounting Act needed to allow the Council to pass its own budgets (since the Council could not amend that Act itself). LH1481, 2527-28. Its elimination confirms that the Committee understood that budget autonomy had to await a further act of Congress.

Ensuing floor statements reflect that this was a common understanding. Representative William Natcher, chair of the Appropriations Committee's District of Columbia Budget Subcommittee, stated that Congress must "retain … appropriations power over the [District's] budget," and that the Committee Substitute did so and thus earned his vote. LH2113, 3060; *see* JA193 (reporting

that his "high price" was met).  Representative Thomas Rees, chair of the District Committee's Subcommittee on Revenue and Financial Affairs, agreed: "This was the major compromise over the weekend, so that we have no change at all on budgetary control …."  LH2187.  And Representative Joel Broyhill referenced the "agree[ment]" to "limit the [C]ouncil's authority insofar as budgetary control is concerned."  LH2383.

In the face of the district court's persuasive explanation of how "the legislative history … confirms the plain meaning of Section 603(a)," JA435, the Council shifts position on appeal.  Neither it nor its *amici* mentioned the Nelsen Substitute below; now that is the centerpiece of the Council's legislative-history analysis.  The Council emphasizes how Section 416 of the Nelsen Substitute and Section 603(a) of the Committee Substitute shared much language, but the former indicated "there shall be no change made" on budget matters whereas the latter indicated that "[n]othing in this Act shall be construed as making" such a change. Council Br. 36-38.

The history relating specifically to the Nelsen Substitute, however, confirms rather than refutes the district court's analysis.  Representative Nelsen was "pleased to note" that, under the Committee Substitute, "Congress will be in control of appropriations" and commended the "accommodations … made to the budgetary process."  LH2121, 2209; *see* LH2450-51 (thanking Representative

33

Diggs for "kind cooperation" in "trying to reach a goal").  Representative Green too understood that "major changes to conform to [their] substitute ha[d] been made in the appropriations process," and that "[t]he appropriation line item ha[d] been restored."  LH2186, 2209; *see* LH2451 (thanking Committee members who "vastly improve[d] the original committee bill").  Neither she nor Representative Nelsen objected that the language of Section 603(a) of the Committee Substitute differed materially from Section 416 in the Nelsen Substitute and the corresponding section in the Green Substitute, even though Congress's control over the budget had been the chief point of dispute.  LH2187 (Rep. Rees); *see, e.g.*, LH1555, 1571-76 (House Report dissent), 1703 (Rep. Nelsen), 2084 (Rep. Diggs); JA205 (reporting that, at later conference, "single most vital point of controversy" was who retained "all-important control of the purse strings").  Indeed, after the Nelsen Substitute was defeated, LH2451-54, both Representatives voted for the Committee Substitute.  LH2455-56.  The natural inference is that Section 603(a) carried forward the relevant substance of the Nelsen Substitute even if the language differed slightly.

Indeed, far from showing an intent to impose something other than a limitation, the "[n]othing … shall be construed" language that the Committee Substitute used mirrors that of another provision that the Committee undisputedly meant as a limitation—Section 602(b) in both the original committee bill and the

34

Committee Substitute (and the Home Rule Act).  LH1317, 2318.  This provision, which predates Section 603(a), states: "Nothing in this Act shall be construed as vesting in the District government any greater authority over [the National Zoo and other entities] … than was vested in [a predecessor local-government official] …."  Both the provision's placement from its inception in a section about "[l]imitations" LH377-78, and the House Report make clear that the Committee intended it as a "prohibit[ion]" on the Council's authority.  LH1477 ("Subsection (b) prohibits the Council from exceeding its present authority over the [National Zoo and other entities].").  Thus, as the district court reasoned, Sections 602(b) and 603(a), beginning with identical language, are both prohibitions: "It is a well-known canon of statutory construction that the same phrase 'appearing in several places in a statutory text is generally read the same way each time it appears.'"  JA440 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994)).

The Council responds that Congress does not normally "intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." Council Br. 37.  But the Committee did not in any meaningful sense "discard[]" what the Nelsen Substitute proposed.  Rather, even assuming it used Section 416 of that substitute as its model—a key but unproven point in the Council's analysis— the Committee *edited* the language to match the parlance of the bill, which used the "nothing … shall be construed" language as one way to express a limitation on the

35

Council's authority. *See Lincoln Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 856 F.2d 1558, 1561-62 (D.C. Cir. 1988) ("First, we are unconvinced of the utility of trying to second-guess why one or another body of Congress may have decided to eschew a particular statutory formulation in favor of another; second, were we to try …, we would be hard put to read too much significance in the differences that exist between the rejected and enacted language."); *cf. Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) ("[C]ircumstances evidencing congressional intent can overcome [interpretative canons'] force.").  Had they meant to discard any ongoing prohibition, the Committee Substitute's drafters would have omitted Section 603(a) entirely—or, at minimum, put it in the part of the bill addressing "Rules of Construction" (LH2357) and not in a section subject to Section 303(d) and headed "Limitations on Borrowing and Spending," in a title headed "Reservation of Congressional Authority."

Moreover, even if that had been the intent of the Committee Substitute's drafters, that was not how the *House* understood the bill it passed.  The Committee Substitute first was made available on October 9, 1973, and was officially introduced and passed the next day.   LH1676, 2228, 2358, 2454-57.   House members repeatedly complained about the rush and confusion in considering this lengthy, last-minute substitute.  *E.g.*, LH2087-91, 2096, 2150, 2195, 2208, 2358-60, 2379-80.  They likely did not focus on the subtle difference in phrasing from

36

the Nelsen Substitute that the Council now deems so important—especially since this was just one of many proposed substitutes and amendments. Far more likely, they focused on the real difference: the Nelsen Substitute delegated vastly less authority to the local government. *See* LH1724-25 (Rep. Diggs). And if any of them did focus on Section 603(a)—none mentioned it in the floor debate—they were assured (both on the floor and in the "Dear Colleagues" letter circulated the day before) that under the bill, Congress's budget and appropriations authority remained inviolate.

b.     Conference proceedings.

Even if the House had intended to allow the Council to amend the Charter to take budget autonomy, the conference proceedings show that *Congress* did not. The views of the conferees—who resolve House-Senate differences for Congress as a whole—deserve great weight. *See Moore v. District of Columbia*, 907 F.2d 165, 175-76 (D.C. Cir. 1990) (en banc).

Unlike the ultimate House bill, the Senate bill would have authorized the Council to enact appropriations for the District. LH2668. The conferees, chaired by Representative Diggs (LH3008, 3049), went with the House. Their Joint Explanatory Statement says: "The Conference substitute (sections 442-451, 603, 723, 743) adopts essentially the House provisions, *preserving the Congressional appropriations provisions of existing law*." LH3016 (emphasis added). The

37

conferees thus unambiguously indicated that pre-existing processes would be "preserv[ed]." That language is naturally read to mean that any change would require a further act of Congress.

If that were not enough, the conferees also discussed Section 603(e), a related "[n]othing … shall be construed" provision. The conferees characterized this provision as a "prohibit[ion]": "District of Columbia officers are also *prohibited (section 603(e))* from violating the Federal Anti-Deficiency Act, *prohibiting* expenditures beyond available resources." LH3018 (emphases added). Indeed, the Council concedes that Section 603(e) is a limitation, arguing that it "says … the District must comply with the Anti-Deficiency Act." Council Br. 57. Congress could not have meant to distinguish between these provisions whose key language is identical. *See* JA440; *Ratzlaf*, 510 U.S. at 143. Both were "prohibit[ions]."

Changes the conferees made to the House's bill are also telling. The conferees altered Section 603(c) to refer to how the Council's budget would have to be "approved." *Compare* LH2321-22 *with* LH2985. The conferees "clarif[ied]" Section 446, bringing it to its current form and further showing that Congress meant to keep close control over the budget process. LH3016; *compare* LH2285-86 *with* LH2969. And the conference added Section 603(d), which relates to the

38

budget process, and expanded the heading to "Budget Process; Limitations on Borrowing and Spending." *Compare* LH2319-22 *with* LH2984-85.

The Council does not address any of this, but rather focuses on irrelevant portions of House staff memoranda leading into the conference. Council Br. 38-40. To be sure, the conferees chose to give the District an amendable Charter, as the Council stresses (though, as the Joint Explanatory Statement indicates, the conferees changed Section 303(a) to prohibit Charter amendments altering the "elected Mayor-Council form of government," LH3009). The legislative history that the Council cites suggests that, going into conference, the House wished no limitations on that power beyond those in its bill, which included Section 303(d) and Section 603(a) (and many other limitations). LH2249, 2319. But as the district court concluded, that is "irrelevant." JA441 n.6. More relevant is House staff's emphasis, in one memorandum the Council cites, that Congress's retention of control over the District's "budget/appropriation process" was "[e]ssential for House approval." LH2931; *see also* LH3577 (similar from Vice President-designate Gerald Ford).

Representative Diggs accurately reported back to the House that the conferees had "retain[ed] in Congress the authority to review and appropriate the entire District budget." LH3031; *see* LH3036, 3051 (similar). Representative Nelsen confirmed that, in this respect, the conferees "conform[ed]" to the Nelsen

Substitute.    LH3075.    And on signing the Home Rule Act, President Nixon indicated: "final Congressional review of the District's appropriation process is retained under this measure."  LH3128.

A staff memorandum prepared soon after states:

> *The following additional restrictions are placed on the [Council's] legislative authority …, limiting:*
>
> …
>
> Any change in the respective roles of the Congress, the President, [and other federal actors] … in the preparation, review, submission examination, authorization, and appropriation of the total budget of the District of Columbia Government.  Sec. 603(a);
>
> …
>
> The application to the District of Columbia of … the so-called Anti-Deficiency Act, Sec. 603(e) ….

LH3941 (emphasis added).  That memorandum reflects the apparently universal understanding that Section 603(a) and (e) were "limit[ations]."

c.    The dog that did not bark—for four decades.

Where a proposed interpretation of a statute "makes so sweeping and so relatively unorthodox a change as that made here, … judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night." *Harrison v. PPG Indus.*, 446 U.S. 578, 602 (1980) (Rehnquist, J., dissenting); *accord Chisom v. Roemer*, 501 U.S. 380, 396 & n.23 (1991); *Miller v. Clinton*, 687 F.3d 1332, 1349-50 (D.C. Cir. 2012) ("[W]e must remark upon what is most

40

important about the legislative history: namely, what is *not* in it."); *see In re Crawley*, 978 A.2d 608, 617 (D.C. 2009) (applying principle to find that Home Rule Act did not work "dramatic change in established law").  In all the thousands of pages of legislative history, *no one* says that the Council could amend the Charter to take budget autonomy.

This is no coincidence.  The District fervently desired budget autonomy, then as now, and it was a critical issue to the public as well as Congress.  *See* JA187-93, 204-13.  If Congress had left the door open even infinitesimally for the Council to try a Charter amendment to achieve budget autonomy, *someone* would have said *something*.  No one did—not even Representative Diggs, who instead repeatedly confirmed that the Home Rule Act left budget control with Congress, with no qualification that a Charter amendment could cure the problem.  LH3031, 3036, 3051.  He had no incentive, when accused of "selling his soul" on this point, to admit the compromise was a "practical tactic" to obtain passage rather than claim the victory the Council posthumously ascribes to him—especially *after* the Act became law.   JA212; *see* JA210 ("Lack of Budget Authority Dismays Council").

In particular, no one suggested that Congress should allow such Charter-amendment attempts because, even if District voters ratified them, Congress could always block them until it changed its mind about budget autonomy.  To be sure,

41

amending the Charter was more difficult in 1973, when an amendment could become effective only with Congress's affirmative approval, than after a 1984 change to allow amendments that Congress failed to disapprove.  Council Br. 41.  Because Congress could more easily block an amendment in 1973, this argument goes, it did not need to preclude the Council from using the amendment process to grant the District budget autonomy.  It is doubtful that, if anyone posed the issue to Congress this way, it would have seen wisdom in fomenting the disappointment of an electorate that votes for an amendment with no chance of becoming law.  Moreover, whether or not Congress needed to exclude the issue from the amendment process is beside the point.  The point is that Congress *did* exclude it, through the adoption of Section 603(a), which continues to apply despite later change to the Charter-amendment process (and which was not altered in 1984).  Even if Congress may have thought it would allow budget autonomy in the future, Congress thus indicated that it would do so by its own act—not by allowing the Council to amend the Charter.

The absence of anyone voicing the Council's current theory continued for decades, so the district court properly considered "the experience of almost 40 years of Home Rule."  JA432-33.  Especially since the Charter functions like a constitution, JA283, 417, "the longstanding 'practice of the government' … can inform [the Court's] determination of 'what the law is.'"  *NLRB v. Noel Canning*,

134 S. Ct. 2550, 2560 (2014). For 40 years, the Council has submitted proposed budgets for Congress to modify and enact in its discretion, and advocates for budget autonomy have repeatedly sought relief from Congress, amid widespread recognition that only Congress could change things. JA410-11; *cf. Hessey*, 601 A.2d at 8 ("[T]he Council cannot authorize the spending of local revenues; only Congress can."). Much surprise would have greeted a theory that the Council could take budget autonomy during, for instance, the financial crisis that led Congress to establish a control board in 1995. *See Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 777 (D.C. Cir. 1998).

The Council fails to reconcile its legal theory with these lessons of history. It suggests that "political factors" explain why it did not try to amend the Charter's budget provisions before 2012. Council Br. 43 n.43. That explanation makes no sense. The desire for budget autonomy has always been important to the Council's constituents. And even if it was politically imprudent to use this supposed tool before 2012, there was no reason not to recognize the tool's existence. Budget-autonomy proponents were not lying in wait; instead, no one thought the Council's current theory correct.

> 3. Congress's general purpose of delegating broad authority yielded to its specific purpose of withholding budget authority.

The Mayor and CFO agree with the Council that Congress in the Home Rule Act intended to delegate legislative authority on most matters to the local

43

government.  Council Br. 34-35; *see* Home Rule Act § 102(a).  "Reference to these general purposes, however, cannot override the intent of Congress clearly expressed in the language and structure of the statute.  Application of broad purposes of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action."  *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 276-77 (D.C. Cir. 1988) (internal quotation marks omitted).  The expressions of direct legislative intent here make clear that Congress prevented the Council from taking budget autonomy, despite the general purpose of delegating broad authority.  *Cf. Milhouse v. Levi*, 548 F.2d 357, 362-63 (D.C. Cir. 1976) (rejecting argument that Home Rule Act shifted Attorney General's furlough authority at Lorton Reformatory to District government, even if Congress meant to confer "greater degree of autonomy").

In the end, the Council was ill-served by its General Counsel's view that "Congress's legislative intent … is not dispositive," JA403—especially since the Council is itself a *legislature*.  All the canons of construction and interpretative presumptions that the Council and its *amici* invoke cannot overcome the fact that these are all guides to help *discern*, not to override, legislative intent.  *See Chickasaw Nation*, 534 U.S. at 94.  As the D.C. Court of Appeals explained in rejecting a plea for deference to the Council's interpretation of a Home Rule Act limitation, the "central focus" must be "the intent of Congress."  *District of*

44

*Columbia v. Wash. Home Ownership Council*, 415 A.2d 1349, 1351 & n.5 (D.C. 1980) (en banc).  As the Council's General Counsel conceded, Congress's intent to exercise its plenary authority over the District by retaining the power of the purse is "plain[]."  JA404.

### B.    The Autonomy Act violates Sections 603(e) and 602(a)(3) in purporting to exempt the District from the Anti-Deficiency Act.

The Autonomy Act is independently invalid because it conflicts with the Anti-Deficiency Act and thus violates both Section 603(e) and 602(a)(3) of the Home Rule Act.  Section 603(e) provides that "[n]othing in this Act shall be construed as affecting the applicability to the District government of the provisions of … the so-called Anti-Deficiency Act."  And Section 602(a)(3) bars the Council from exempting the District from any statute—such as the Anti-Deficiency Act— "which is not restricted in its application exclusively in or to the District."

As GAO found, the Autonomy Act "stand[s] in direct conflict" with the Anti-Deficiency Act.  JA125.  That Act forbids any "officer or employee of … the District of Columbia" from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."  31 U.S.C. § 1341(a); *see also* 31 U.S.C. §§ 1342, 1349-1351, 1514, 1517-1519 (related restrictions).  It is undisputed that only Congress, not some other body, can make an amount "available" for expenditure.  JA411; R11-2, at 19- 20; *see Navy v. FLRA*, 665 F.3d at 1348 ("[A]ll uses of appropriated funds must be

45

affirmatively approved by Congress ….").  The Autonomy Act is inconsistent with the Anti-Deficiency Act because it would permit the local portion of the District's budget to be appropriated, and funds to be obligated and expended, pursuant to an act of the Council rather than an act of Congress.

>    1.    Section 450 created a fund for the District but did not make money in that fund available for expenditure.

The Council argued below that Section 450 of the Home Rule Act, which established the General Fund of the District, made the money in that fund permanently "available … for … expenditure," thus constituting a permanent appropriation that satisfies the Anti-Deficiency Act.  R11-2, at 21-22; R25, at 6-7; JA245.  As the district court concluded, that "novel theory" has no support. JA447.

To qualify as a permanent appropriation, a statute must "authorize both [1] the deposit and [2] the expenditure of a class of receipts."  JA127 (GAO opinion). An appropriation exists only "[i]f the statute contains a specific direction to pay and a designation of the funds to be used."  1 GAO, *Principles of Appropriations Law*, at 2-16 (3d ed. 2004) ("GAO *Principles*").  Moreover, "[a] law may be construed to make an appropriation out of the Treasury … only if the law specifically states that an appropriation is made …."  31 U.S.C. § 1301(d).  This clear-statement rule reflects "how jealously [Congress] guards the appropriations prerogative."  *AFGE Local 1647 v. FLRA*, 388 F.3d 405, 410 (3d Cir. 2004).  Thus,

46

"[a]n appropriation cannot be inferred or made by implication," 1 GAO *Principles*, at 2-16—a rule "even more important in the case of a permanent appropriation," GAO, B-114808, 1979 WL 12213, at *3 (Comp. Gen. Aug. 7, 1979).

No authority, meanwhile, supports the contention that a permanent appropriation requires only that Congress direct money to a fund, regardless of whether it also authorizes expenditures from that fund. The governing test sensibly requires that "[b]oth elements … must be present." 1 GAO *Principles*, at 2-17; 67 Comp. Gen. 332, 334 (Mar. 10, 1988). Congress segregates accounts for many reasons other than permanent appropriation. For example, Congress may wish to "ensure a consistent source of funding" for a particular program even while intending to retain annual control over how that funding is spent. *Nevada*, 400 F.3d at 15. Focusing solely on whether Congress has set up a fund, as the Council has, fails to distinguish a permanent appropriation that would satisfy the requirements of the Anti-Deficiency Act from statutes that create funds while retaining Congress's control over expenditures.

Section 450 contains no authorization for the expenditure of funds, much less the requisite specific direction to pay. Although it authorizes the deposit of local funds into the General Fund, it says nothing about spending those funds. Congress uses very different language when granting authority to obligate money without further action of Congress—such as in 1871, when it gave the District that

47

authority briefly.  Act of Feb. 21, 1871, ch. 62, §§ 13-14, 16 Stat. at 422; *cf.* 1 GAO *Principles*, at 2-17 to 2-20 (discussing such instances).

Indeed, when Congress enacted Section 450 in 1973, it made clear that it was *withholding* that authority.  Section 446, "Enactment of Appropriations by Congress," states unequivocally: "No amount may be obligated or expended by any officer or employee of the District of Columbia unless such amount has been approved by Act of Congress ...."  As GAO reasoned, Congress thus "could not have intended to provide a permanent appropriation to the District ... in the very same act."  JA127.

Even if GAO's expert view were ignored, this Court's precedent compels the same conclusion.  In *Nevada v. Department of Energy*, the Court rejected the argument that a statute materially indistinguishable from the Home Rule Act effected a permanent appropriation.  Like Section 450, the statute at issue in *Nevada* established a segregated fund with a dedicated revenue stream—there, a Nuclear Waste Fund financed by payments made by generators and owners of nuclear waste.  400 F.3d at 11.  And like Section 446, another provision provided that expenditures from the segregated fund were "subject to appropriations."  *Id.* Relying on a third provision that "the Secretary [of Energy] shall make grants" from "amounts held in the Waste Fund," Nevada argued that this fund was a permanent appropriation from which it could be paid without further appropriation

48

by Congress. *Id.* at 13. This Court's conclusion is applicable here: no "continuing appropriation exists when Congress creates a special fund but makes spending from it 'subject to appropriations.'" *Id.* at 14.

Nor does the analysis change simply because the fund is set up outside the Treasury, rather than in it—a ground on which the Council attempts to distinguish *Nevada*. Council Br. 58 n.50. GAO long has applied the same test for determining whether Congress has made a permanent appropriation where the fund is outside the Treasury. *E.g.*, 64 Comp. Gen. 756 (Aug. 8, 1985) (outside Treasury). The rationale for the test likewise does not depend on the fund's location. As the Home Rule Act illustrates, establishing a fund outside the Treasury hardly means Congress is relinquishing control over how that fund is spent.

> 2.     Now agreeing that Section 450 does not authorize it to spend, the Council still fails to identify any act of Congress that does.

Shifting positions again, the Council now says Section 450 created a fund but "did not give the District the authority to obligate or expend" funds. Council Br. 56 n.49. Instead, the Council appears to argue, circularly, that the Autonomy Act itself provides the necessary authorization. Council Br. 22, 51-52. That argument improperly assumes the conclusion that Congress authorized the Autonomy Act. But Congress manifestly did not authorize Charter amendments that would alter the application of the Anti-Deficiency Act.

49

The Council also implies that Congress's *passive* review of any budget is sufficient for the Anti-Deficiency Act, Council Br. 52, 53, but that argument fares no better.  An illegally enacted law does not change the legal status quo, and "congressional inaction does not make a law immune to judicial review."  JA443 n.7; *see, e.g.*, *DePierre v. United States*, 131 S. Ct. 2225, 2236 n.13 (2011).  Thus, courts have regularly deemed invalid Council laws that violated the Home Rule Act but survived passive congressional review.  *See, e.g.*, *Crawley*, 978 A.2d at 609 (invalidating 11-year-old Council law); *McConnell v. United States*, 537 A.2d 211, 215 (D.C. 1988) (finding that invalid Council law "could not—and did not—work an effective repeal of" federal law).

The point for Anti-Deficiency Act purposes is that Congress has never passed any act authorizing the Council itself to appropriate money for the District's expenditures.  The Budget Autonomy Act thus violates the Anti-Deficiency Act and, for related reasons, the Budget and Accounting Act, 31 U.S.C. §§ 1101(1), 1108, which requires the District to submit appropriation requests to the President.

To obscure the fact that Congress has never provided the necessary authorization, the Council makes two irrelevant arguments.  *First*, the Council argues that the Anti-Deficiency Act does not require an "annual" congressional appropriation.  Council Br. 53-55.  That is true, and the district court never held it does.  What the court recognized is that the Act requires affirmative congressional

50

authorization *of some sort* before the Council can obligate money.  JA445.  Thus, though Congress can create non-appropriated fund instrumentalities or other entities without need for annual appropriations, Council Br. 53-54, those entities' legal authority to function depends on affirmative indicia of congressional intent to allow expenditures—indicia that are wholly absent here, as the district court explained and the Council's authorities make clear.  JA445-49; *see, e.g.*, *United Biscuit Co. v. Wirtz*, 359 F.2d 206, 212-13 & n.12 (D.C. Cir. 1965) (applying statute that authorized expenditures).

So too the bills that would have granted budget autonomy not only gave the District a fund but also expressly allowed the Council to obligate money in it. LH1281, 1286 (House Committee bill Sections 446 and 451); LH2668, 2672 (Senate bill Sections 504 and 508).  Thus, although the Council finds it odd that the Senate bill had the language the conference adopted as Section 603(e), Council Br. 57-58; *see* LH3092, there is nothing odd about it: the bills would not have repealed the Anti-Deficiency Act but rather included provisions by which the Council could *satisfy* the Act (if the Council did not outspend its funds).  Congress ultimately rejected those provisions while affirming the Act's longstanding applicability, *see* Act of June 26, 1912, § 9, 37 Stat. at 184, and hence the ongoing need for an act of Congress to approve any District expenditure.

*Second*, the Council argues that the Constitution does not require an annual appropriation for funds kept outside the Treasury.  Council Br. 55-56.  The issue here is compliance with the Anti-Deficiency Act, not the Constitution.  Unlike the Appropriations Clause, U.S. Const. art. I, § 9, cl.7, the Act does not mention "the Treasury," and thus a formalistic inquiry into the location of particular funds is irrelevant to determining whether the Act's mandate has been satisfied.  Rather, the touchstone inquiry is whether Congress has specifically and clearly indicated its decision to make "an amount available … for … expenditure or obligation."  31 U.S.C. § 1341(a).  The Council cites nothing in which Congress has done so.

### C.     The Autonomy Act violates Section 602(a)(3) because it "concerns the functions … of the United States."

Section 602(a)(3) of the Home Rule Act provides that "[t]he Council shall have no authority to … [e]nact any act … which concerns the functions … of the United States."  This limitation also invalidates the Autonomy Act.

Budgeting and appropriating funds are governmental "functions."  JA453 n.10; *see, e.g.*, *Gross v. Winter*, 876 F.2d 165, 171-72 n.10 (D.C. Cir. 1989) (discussing "traditional legislative functions like budget decisions"); *Hessey*, 601 A.2d at 17 ("allocation and appropriation functions").  Under the Home Rule Act, a statute "concerns" the functions of the United States if it "affect[s]" those functions.  LH1444 (House Report) (construing Section 602(a)(3) to "prohibit[] the local Council" from "affecting the functions or property of the United States").

52

Finally, the reference to "the United States" in Section 602(a)(3) plainly encompasses the nation's legislature and chief executive. Together, these points demonstrate that the Council cannot alter Congress's or the President's roles in enacting the budget and appropriating funds for the District. *See Crawley*, 978 A.2d at 615 (quoting floor statement that "the Council could not enact legislation affecting the balance of … responsibilities between [federal and District prosecutors] because it would be altering a 'function' of the United States" (LH2151-52)).

Budgeting and appropriations must be "functions of the United States" within the meaning of the Home Rule Act given that Congress in Section 446 of the same act made clear that it intended to retain these functions for the federal government. Even if Congress's century of "control over the District's budget" did not "turn expenditure of local funds into a function of the United States," Council Br. 50, the Home Rule Act itself established that enacting and appropriating funds for the District's budget so qualify.

Once again, the Council does not squarely confront the statutory text. Before the district court, its position was that Section 602(a)(3) turns on "whether a law of national application is repealed or amended." R25, at 19. The Council wisely abandons that position, since the provision *also* applies to acts that

53

"concern[] the functions or property of the United States."   Home Rule Act § 602(a)(3).

And once again shifting positions, the Council now argues that Section 602(a)(3) pertains only to "national affairs."   Council Br. 44.  It thus continues to blur the distinction between the two categories of acts this provision prohibits. Section 602(a)(3) does not ask whether the "function[]" at issue is "restricted in its application exclusively in or to the District," but whether it is a function "of the United States."  Whether or not enacting the budget and appropriating funds for the District typically have "national" implications, it is plain that Congress retained these functions for the United States.  Moreover, even if the Council's "national affairs" test were valid, this Court has recognized that the District's local budget can affect national affairs: "in financing the District, Congress necessarily faces a choice between using revenues from local taxation and general revenues, *i.e.*, revenues largely derived from the states."  *Banner v. United States*, 428 F.3d 303, 311 (D.C. Cir. 2005) (per curiam); *see Cohens v. Virginia*, 19 U.S. 264, 429 (1821) (explaining that Congress in enacting legislation for District "exercises this particular power, like all its other powers, in its high character, as the legislature of the Union").

In support of its position, the Council relies on the D.C. Court of Appeals decision in *District of Columbia v. Greater Washington Central Labor Council*,

54

442 A.2d 110 (D.C. 1982).  Council Br. 44-46.  But this case is nothing like *Greater Washington*, which involved the District's repeal of a "local law enacted by Congress" to broaden workmen's compensation coverage.  442 A.2d at 116. There, the Secretary of Labor's "function … in the administration of [the act] [wa]s a purely local one." *Id.* at 117 & n.2.  The Secretary's administration of a "purely local" program is entirely different from the Council's arrogation to itself of Congress's quintessential appropriations function and diminution of the President's authority.  Moreover, even if the decision were on point, the analysis in *Greater Washington* is unpersuasive as it would nullify the first part of Section 602(a)(3), which deals with "functions … of the United States," and focus only on whether "federal laws that are national in scope" are in play—the subject of the second, independent part of Section 602(a)(3).  442 A.2d at 116.

Furthermore, the legislative history demonstrates that Congress in drafting the Home Rule Act understood that overseeing the District's fiscal affairs was a function of the United States.  From the outset, Representative Diggs announced that a "paramount" "area[] of interest and concern" was the "*[f]iscal affairs function*" and whether to "transfer[]" it from the federal "to the local government." LH8-9; *see* LH619 (Del. Walter Fauntroy) (referring to "Congressional function[s] of budget review and … appropriation"); LH1590 (House Report dissent) (recognizing "[Congress's] function of appropriating for the Federal payment").

55

After the conference committee, Representative Diggs explained that it "preserve[d] Congress['s] complete role in the review and appropriation of the entire District budget."  LH3036; *see* LH3016 (Joint Explanatory Statement).

Throughout the drafting process, Home Rule proponents and adversaries alike also emphasized Congress's "oversight" function regarding budgeting and appropriations.  *E.g.*, LH12 (Rep. Nelsen) (expressing concern should there be "little or no authorization or appropriation oversight by the Congress"); LH14 (Rep. Diggs) (recognizing "Congressional constitutional mandate for oversight and accountability"), 1747 (discussing "oversight functions"); LH1360 (Rep. John Breckinridge) (demanding "continuing assurance that the District's Funds (whether obtained from the Federal Government or the local taxpayers) are being handled in accordance with existing laws, and … its programs and planning are being conducted efficiently, effectively and economically").  In particular, they recognized how Congress has an interest in the District's budget beyond a local interest, given Congress's constitutional duty over the District, and the long history of federal aid.  *E.g.*, LH1571 (House Report dissent) ("Congressional oversight of the appropriation process is an acknowledgement by the Congress of its obligation to all the Nation's taxpayers, who give a substantial measure of financial support to the operation of the District of Columbia Government."); LH1761-62 (Rep. Diggs) (recognizing need for federal oversight in case of "runaway spending"); LH1800-

56

01 (Rep. Green) (similar); *cf. Crawley*, 978 A.2d at 612 (noting that Congress in 1874 dissolved District government "head[ing] down the road to bankruptcy").

Thus, even while Congress contemplated granting budget autonomy to the District, no one denied that, *unless* Congress did so, budgeting and appropriating for the District would remain "functions … of the United States."  In discussing the types of "local functions" the Council would assume, the House Report discussed instead how the Council would "settle pay and labor disputes, license occupations, establish laundry taxes, regulate motor vehicle inspections, oversee the administration of estates, amend health laws and regulations, [and] regulate interest and usury rates and consumer credit"—a list that includes nothing like assuming functions Congress expressly reserved for itself and the President.  LH1442; *see* LH1749, 2177-78 (similar).  And thus, in Title II of the Home Rule Act (D.C. Code §§ 1-202.01 to 1-202.04), Congress *itself* set forth, meticulously, how certain local functions previously handled by "quasi-Federal agencies" would be reorganized. LH1446 (House Report); *see* Home Rule Act § 602(b) (limiting Council authority, "except as otherwise specifically provided …, over any Federal agency").

The Council fails to address the pertinent legislative history, while taking the wrong lessons from the snippets it cites.  *First*, it quotes a proposal from the (pre-Home Rule) District executive branch.  Council Br. 46.  But Congress did not

endorse or adopt that proposal, which in any event was that "functions … related to federal operations in the District" would be "reserved to the federal level."  LH182.

*Second*, the Council says that Congress "contemplated" that the Council could amend the District of Columbia Code but not the United States Code. Council Br. 47.  That is not the rule Congress adopted, as it directly barred the Council from amending various D.C. Code provisions.  *E.g.*, Home Rule Act § 602(a)(4), (6), (9).

*Third*, the Council cites the Senate Report's indication that the Home Rule Act would confer powers "municipal as distinguished from those national in scope."  Council Br. 47; LH2724.  Although true, that does not suggest Congress intended to allow the Council to take budget authority from Congress.

*Fourth*, the Council notes that Congress in 1977 approved another Charter amendment supposedly indistinguishable in this regard from the Autonomy Act. Council Br. 47-48.  That too is irrelevant.  Congress could choose to approve that amendment without itself being bound by Home Rule Act limitations (much as it could, and should, give the District budget autonomy by affirmative legislation), and in any event neither Congress nor any court grappled with the question whether that amendment comported with Section 602(a)(3).  Moreover, that Charter amendment dealt with elections, and the Home Rule Act specifically gives

the Council plenary authority to legislate regarding elections. *See* Home Rule Act § 752 (D.C. Code § 1-207.52).

*Fifth*, the Council contends that, because draft bills that would have granted the District budget autonomy also contained Section 602(a)(3), budget matters cannot be functions of the United States. Council Br. 50. That is exactly backwards: it is *because* these are such functions that it was necessary for those bills to grant budget autonomy expressly. In those bills, Congress would have given the Council that autonomy, but the Council could not take it unilaterally.

Holding that the Autonomy Act violates the functions limitation would not "gut [the Council's] legislative authority"—an argument the district court properly rejected. JA453 n.10; *see* Council Br. 47. While enacting substantive law like a tax cut might alter the background against which federal officials act, it would not change federal officials' *functions*, *i.e.*, those officials' roles, tasks, or responsibilities. The Autonomy Act, by contrast, would eliminate Congress's active role—and *any* role for the President—in local budgeting and appropriations. Such a change is precisely what section 602(a)(3) is intended to prevent.

## D.    If Congress had intended to allow the Council to take budget autonomy, it would have said so straightforwardly.

The many problems with the Council's theory are independent, but they also reinforce each other. Even if each were not insuperable, the Council has nothing like an affirmative indication from Congress (or anyone in Congress) that the

District could obtain budget autonomy by Charter amendment.  To the contrary, Congress enacted Sections 603(a) and (e), placed them in a spot subject to Section 303(d), and withheld any authority to alter the functions of the United States while affirming that acts of Congress are needed to enact and appropriate funds for the District's budget.  And Congress did so without any hint that its intent was what the Council now advocates.

The Council's theory *at best* is that Congress left a loophole that provided authority for the Autonomy Act in a needlessly convoluted and unexplained manner, one that would invite substantial doubt and litigation about any budget autonomy Charter amendment.  In short, the theory is that Congress left budget autonomy on the other side of a minefield without giving anyone a map.

This claim is not credible.  Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not … hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  If Congress had intended to give the District a path to take budget autonomy at some later point without congressional action, it would have drafted the Home Rule Act differently.  *Cf.* Home Rule Act § 602(a)(9) (allowing criminal-law amendments after moratorium).  It would have acted clearly rather than putting in the crossfire thousands of District employees subject to Anti-Deficiency Act

60

penalties and untold District governmental programs subject to challenge unless their funding is unimpeachable. *See* JA305-13.

The far simpler explanation is the correct one: the Home Rule Act withholds the power of the purse from the Council, and the budget autonomy the District deserves must be given by a future act of Congress.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

SETH P. WAXMAN
DANIEL S. VOLCHOK
Wilmer Cutler Pickering
Hale & Dorr LLP
1875 Pennsylvania Ave., NW
Washington, D.C. 20006

*Of counsel to Mayor Gray*

LAWRENCE S. ROBBINS
ERIC A. WHITE
Robbins, Russell, Englert,
Orseck, Untereiner & Sauber LLP
1801 K Street, NW, Suite 411 L
Washington, D.C. 20006

*Of counsel to CFO Dewitt*

July 2014

IRVIN B. NATHAN
Attorney General

ARIEL B. LEVINSON-WALDMAN
Senior Counsel to the Attorney General

/s/ Todd S. Kim
TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6609
todd.kim@dc.gov

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

/s/ Todd S. Kim
TODD S. KIM

## CERTIFICATE OF SERVICE

I certify that, on July 31, 2014, a copy of the foregoing brief was served on all parties registered with the CM/ECF system.

/s/ Todd S. Kim
TODD S. KIM