ORAL ARGUMENT SCHEDULED FOR OCTOBER 17, 2014

No. 14-7067

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

COUNCIL OF THE DISTRICT OF COLUMBIA,
*Plaintiff-Appellant,*

v.

VINCENT GRAY, in his official capacity as Mayor of the District of Columbia, and JEFFREY S. DEWITT, in his official capacity as Chief Financial Officer for the District of Columbia,
*Defendants-Appellees.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

**BRIEF OF JACQUES B. DEPUY, DANIEL. M. FREEMAN, JASON I. NEWMAN, AND LINDA L. SMITH AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

_____

Kenneth A. Letzler
Gregory L. Schinner
Christopher A. Jaros
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC  20004
(202) 942-5000
Kenneth.letzler@aporter.com

*Attorneys for Messrs. DePuy, Freeman, and Newman and Ms. Smith*

## <u>CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for amici curiae certifies as follows:

**A.  Parties and *Amici***.  Except for the following, all parties and amici appearing before the district court and in this Court are listed in the Brief for the Appellees:

(1)     Bipartisan Legal Advisory Group of the U.S. House of Representatives; and

(2)     Leonard H. Becker and Wayne C. Witkowski

**B. Rulings Under Review**.  The ruling under review is the Order of the United States District Court for the District of Columbia (Judge Emmet Sullivan), docketed May 19, 2014, granting Defendants-Appellees' Motion for Summary Judgment and denying Plaintiff-Appellant's Motion for Summary Judgment, and the Memorandum Opinion in support of that Order.  The district court's order is found at Joint Appendix 407.

**C. Related Cases**.  *Amici* and their counsel are unaware of any other related cases.

**STATEMENT REGARDING**
**CONSENT TO FILE AND SEPARATE BRIEFING**

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* represent that all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), counsel for *amici* certify that a separate brief is necessary, because as persons intimately involved with the process by which the Home Rule Act was passed in 1973, *amici* are uniquely positioned to have information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide. The *amici* have clear recollection of the context in which the Act was considered and passed. As a result, *amici* respectfully submit that their expertise and perspective will assist the Court in evaluating this case.

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE*................................................................1

I.      SUMMARY OF ARGUMENT....................................................3

II.     THE LEGISLATIVE HISTORY ..............................................3

III.    ARGUMENT................................................................................22

  A.  Congress Intended To Preclude Amendment of the Budget Process
    Provisions........................................................................................22

      1.  The Purpose of the Diggs Compromise ...............................22

      2.  The Language That Implements the Diggs Compromise Forecloses
        Charter Amendment ...........................................................22

  B.  Council's Arguments Regarding Section 603(a)........................23

      1.  The Nelsen Substitute Does Not Guide Interpretation of Section
        603(a)....................................................................................23

      2.  No One Read the Bill the Way Appellants Do .....................25

  C.  Close Is Not Good Enough............................................................27

IV.     CONCLUSION ........................................................................30

# TABLE OF AUTHORITIES[1]

**Cases**                                                                 **Page(s):**

*Comm'r of Internal Rev. v. Lundy*, 516 U.S. 235 (1996) ........................................23

*Davis Cnty. Solid Waste Mgmt. v. U. S. Envtl. Prot. Agency*, 101 F.3d 1395 (D.C. Cir. 1996) .........................................................................................................23

*Dist. of Columbia v. John R. Thompson Co.,* 346 U.S. 100 (1953)..........................6

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .............................................................24

*Law v. Siegel*, 134 S. Ct. 1188 (2014) ....................................................................23

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ..............................................................23

## Statutes, Rules and Regulations

The Home Rule Act of 1973, Pub. L. No. 93-198, 87 Stat. 774:

§ 102..........................................................................................................................22

§ 302............................................................................................................................6

§ 303............................................................................................................................7

§ 303(a) .....................................................................................................................17

§ 401(a) .....................................................................................................................17

§ 404(e) .....................................................................................................................18

§ 421(a) .....................................................................................................................17

§ 446..........................................................................................................................11

§ 601..........................................................................................................................20

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

§ 602.................................................................................................20

§ 602(a)(1) ......................................................................................27

§ 602(a)(2) ......................................................................................27

§ 602(a)(5) ......................................................................................27

§ 602(b) ...............................................................................21, 22, 23

§ 602(c)(1) .......................................................................................17

§ 603.........................................................................12, 19, 20, 21, 26

*§ 603(a) ........................................... 18, 20, 21, 22, 23, 25, 27, 29

§ 603(b)(1)-(3) ................................................................................27

§ 603(c) ....................................................................................19, 27

§ 603(d) ....................................................................................19, 27

§ 603(e) ...........................................................................................27

## Legislative History

*Legislative History of the Home Rule Act, *reprinted in* Staff of H. Comm. on D.C., 93d Cong., Home Rule for the District of Columbia: Background and Legislative History (Comm. Print 1976) (LH, *see* Glossary):

LH 342-346 ......................................................................................26

LH 377-382 ......................................................................................26

LH 507 .............................................................................................26

LH 522 .............................................................................................26

LH 1243 .............................................................................................6

LH 1243-1244 ....................................................................................7

LH 1493 .............................................................................................8

LH 1476-1477 ...............................................................................................12

LH 1497 ...........................................................................................................8

LH 1498-1503 .................................................................................................6

LH 1568-1570 .................................................................................................8

LH 1559 ...........................................................................................................7

LH 1566 ...........................................................................................................8

LH 1715-1718 .................................................................................................7

LH 1724-1725 .............................................................................................8, 9

LH 1738-1741 ...............................................................................................26

LH 1975 ...........................................................................................................9

LH 2001-2008 .................................................................................................9

LH 2014-2015 .................................................................................................9

LH 2027 ...........................................................................................................9

LH 2083 ...........................................................................................................9

LH 2084 .........................................................................................................10

LH 2100 ...........................................................................................................7

LH 2101 ...........................................................................................................7

LH 2109…………………………………………………………………………5

LH 2112 ...........................................................................................................7

LH 2113 .........................................................................................................14

LH 2114 .........................................................................................................14

LH 2117 .........................................................................................................14

LH 2123 ...........................................................................................................7

LH 2128-2830 ...................................................................................................24

LH 2155 ...........................................................................................................12

LH 2164 ...........................................................................................................13

LH 2174 ...................................................................................................5, 6, 14

LH 2176 ...........................................................................................................14

LH 2183 .............................................................................................................8

LH 2187 ...........................................................................................................13

LH 2362-2376 ...................................................................................................15

LH 2364 .............................................................................................................8

LH 2380-2381 ...................................................................................................14

LH 2450-2451 ............................................................................................15, 16

LH 2453 ...........................................................................................................16

LH 2466 ...........................................................................................................18

LH 2467 ...........................................................................................................18

LH 2488 ...........................................................................................................18

LH 2899 ...........................................................................................................26

LH 2951-2952 ...................................................................................................18

LH 2955 ...........................................................................................................18

LH 2984 ...........................................................................................................18

LH 3009 ...........................................................................................................20

LH 3022-3025 .....................................................................................................7

LH 3040 .............................................................................................................7

LH 3051 ...........................................................................................................17

LH 3059-3060 ...................................................................................17, 18

LH 3075 .......................................................................................7, 19, 24

LH 3116 ...............................................................................................17

LH 3128 ...............................................................................................20

*LH 3939 .............................................................................................20

*LH 3941 .............................................................................................21

## Other Authorities

*H.R. 10692, 93d Cong., 1st Sess. (1973):

§ 301-303 ........................................................................................9

§ 311 ...............................................................................................9

§ 319 ...............................................................................................9

§ 401 ...............................................................................................9

§ 416 .............................................................................................25

§ 503(a) ..........................................................................................9

H.R. 9682, 93d Cong. 1st Sess. (1973)

§ 302.................................................................................................6

§ 303.................................................................................................7

*§ 602(b) .......................................................................................25

*Diggs Compromise

§ 303(a) .........................................................................................17

*§ 303(d) .......................................................................................12

§ 401(a) ................................................................................................17

§ 404(e) ...............................................................................................18

§ 421(a) ................................................................................................17

§ 446 ....................................................................................................11

§ 601 ....................................................................................................12

§ 602 ....................................................................................................12

§ 602(b) ...........................................................................................12,22

§ 602(c)(1) ...........................................................................................17

§ 603 ....................................................................................................11

*§ 603(a) .....................................................................................12, 20, 22

Michael Barone, *Washington is Partisan -- Get Used to It,* THE WALL STREET
JOURNAL, Oct. 18, 2013, at A13 ...............................................................4

Gerald Clarke, *Congress: The Heavy Hand of Seniority,* TIME,
Dec. 14, 1970, at 34 ................................................................................4

Editorial, *Home Rule at Last*, WASHINGTON STAR NEWS,
Oct. 11, 1973, at A-18.......................................................................10, 16

Editorial, *Home Rule: One More Step to Go!,* WASHINGTON STAR NEWS,
Dec. 2, 1973, at G-1 ...............................................................................11

Michael K. Fauntroy, *Home Rule for the District of Columbia*, in Democratic
Destiny and the District of Columbia, Concerned Professionals Br.
Attachment 009 ......................................................................................29

James V.Grimaldi, *A Reading Program's Powerful Patron*, WASHINGTON POST,
Dec. 20, 2007, at A1 ...............................................................................10

Colbert I.King, *Democracy for the District, Too*, WASHINGTON POST,
Sept. 29, 2001, at A27.......................................................................10, 16

Colbert I.King, *Where Did D.C.'s Dream Go Wrong?, This is Like a Bad Dream*, WASHINGTON POST, October 12, 1996, at A29 ............................29, 30

Jack Kneece, *Diggs Ready to Deal on Home Rule Bill*, WASHINGTON STAR NEWS, Oct. 5, 1973, at B-1 ...................................................................................9

Michael Moss, *Congressional Committee Update Who's New?,* ENVIRONMENT, April 1979, at 25 ....................................................................................4

Letter from Irvin B. Nathan to Councilmember Evans (July 9, 2013), *available at* http://www.dcappleseed.com/wp-content/uploads/2013/12/2013-OAG-Memo Council-Authority-to-Delay-Election.pdf……………………………… 28, 29

Jason I. Newman & Jacques B. DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act*, 24 AM. U. L. REV. 537 (1975)...........................................................................1, 6, 8

Cathe Wolhowe,  *Diggs Is Accused of 'Power Ploy,'* WASHINGTON POST, Oct. 8, 1973, at C1 ...................................................................................29

# GLOSSARY

| | |
|---|---|
| Act | The Home Rule Act of 1973, Pub. L. No. 93-198, 87 Stat. 774 |
| Appleseed Br. | Brief of *amici curiae* D.C. Appleseed Center for Law & Justice, D.C. Vote, D.C. Fiscal Policy Institute, and League of Women Voters of the District of Columbia |
| Committee | The House Committee on the District of Columbia |
| Concerned Pro-fessionals Br. | Brief for Concerned D.C. Legal Professionals As Amici Curiae |
| Council | The Council of the District of Columbia |
| District | The District of Columbia |
| Eskridge Br. | Brief of Amici Curiae Professors William N. Eskridge Jr. and Charles Tiefer |
| Former Legislators Br. | Corrected Brief for Former Members of Congress and Congressional Staffers As Amici Curiae |
| JA | Joint Appendix |
| LH | Legislative History of the Home Rule Act, *reprinted in* Staff of H. Comm. on D.C., 93d Cong., 2nd Sess., Home Rule for the District of Columbia: Background and Legislative History (Comm. Print 1976). |

## INTEREST OF *AMICI CURIAE*[2]

*Amicus* Jacques DePuy served as Counsel to the Subcommittee on Government Operations of the House District of Columbia Committee when the Act was passed. He is, with amicus Newman, co-author of the leading law review article on the Act, Newman & DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act*, 24 AM. U. L. REV. 537 (1975) ("Newman & DePuy"), one of the principal authorities relied upon by Council in the district court.

*Amicus* Jason Newman was involved in the home rule debate as counsel for the Self Determination Coalition, which supported home rule, and as a professor at the Georgetown University Law Center. He consulted with members of Congress and staff, helped draft provisions of the Act, and provided an opinion on the constitutionality of the Act included in the legislative history.

*Amicus* Daniel Freeman worked on the Act as Assistant Counsel to the House Committee on the District of Columbia. He is now a professor at American University and is author of "Home Rule and the Judiciary," Journal of the Bar Association of the District of Columbia.

---

[2] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* or their counsel contributed money intended to fund preparation or submission of this brief.

*Amicus* Linda Smith was a member of the Professional Staff of the House Committee on the District of Columbia. Ms. Smith worked closely with Congressman Thomas Rees on the budget and borrowing provisions of the Act.

Mssrs. DePuy, Newman and Freeman, and Ms. Smith (collectively, "Amici") were in 1973 and are today supporters of budget autonomy for the District. They believe, however, that it is Congress that must provide this, and Congress did not do so in 1973 either directly or through the charter amendment process. Amici have clear recollection of the legislative setting of the Act. Discussions with Amici and materials from their contemporaneous files have enriched the proffered brief.

## I.     SUMMARY OF ARGUMENT

Through much of 1973, advocates of home rule worked to give the District an elected government with budget autonomy. As debate approached, however, they feared the votes were not there. Through a compromise forged over the weekend of October 6-7, they obtained the crucial support of Congressman William Natcher. Natcher's price was preservation of line item appropriation by Congress, not the Council, and the satisfaction of his constitutional concerns.

Council and the amici supporting it (collectively "appellants") assert a new argument on appeal. They ignore Mr. Natcher's role and suggest instead that the key votes were between the Diggs Compromise and a substitute offered by Congressman Ancher Nelsen. They are wrong. The language implementing the Diggs Compromise satisfied Mr. Natcher's concern that budgeting could not be delegated consistent with the Constitution and, as Judge Sullivan ruled, put the budget beyond both Council's power and the Charter amendment process. Explaining the Act's passage without Natcher is like *Hamlet* without the prince.

## II.     THE LEGISLATIVE HISTORY

Congress operated differently in the middle of the twentieth century than it does today. Power flowed to, and the agenda of Congress was dominated by,

Members who had seniority and served as committee chairmen.[3] Coalitions across party lines could carry the day. "Northeastern liberals (with large labor-union and Jewish constituencies) and Midwestern conservatives coexisted in the Republican Party. Southern conservatives (with all-white electorates), Northern liberals and big-city machine hacks coalesced in the Democratic Party." Michael Barone, *Washington is Partisan -- Get Used to It,* THE WALL STREET JOURNAL, Oct. 18, 2013, at A13. Home rule supporters had to consider the possibility that such a cross-party coalition led by a powerful Chairman might defeat home rule.

For many years in the mid-twentieth century, the positions of Chairman of the House Committee on the District of Columbia and Chairman of the Subcommittee on District of Columbia Appropriations of the House Appropriations Committee were held respectively by Congressmen John L. McMillan of South Carolina and William H. Natcher of Kentucky. They had amassed power through seniority, by strong personal and political networks within the House, and by virtue of the fact that, unlike most members of Congress, Chairmen McMillan and Natcher spent the time on D.C. matters necessary to develop expertise and influence. While the Senate regularly passed bills that would

---

[3] *See, e.g.*, Gerald Clarke, *Congress: The Heavy Hand of Seniority,* TIME, Dec. 14, 1970, at 34; Michael Moss, *Congressional Committee Update Who's New?,* ENVIRONMENT, April 1979, at 25. Today, the situation is different. Power and influence have gravitated significantly to the Speaker, Majority Leader and Minority Leader in the House and to the Majority and Minority Leader in the Senate.

provide home rule for the District, the subject was anathema to Mr. McMillan and outside the jurisdiction of Mr. Natcher's Subcommittee.

Only in 1973, when Charles Diggs succeeded Mr. McMillan as Chairman and most of Mr. McMillan's committee allies were defeated or resigned, was home rule legislation given serious consideration by the House. Amicus DePuy was intimately involved in those efforts as counsel to the Subcommittee on Government Operations which drafted the House's home rule bill.

Mr. Diggs' committee was writing on a clean slate. They started work in February of 1973 and worked hard through July. Seventeen individuals and 35 organizations testified. LH2109. Proposals went through constant revision, from discussion drafts to a series of bills. H.R. 9056 introduced in June was quickly followed by H.R. 9682, which was reported out of the House District of Columbia Committee at the end of July.

Each proposed bill involved, as Judge Sullivan noted was the case with the final product, a compromise. JA 416. As Majority Leader Thomas ("Tip") O'Neill stated:  the aim was to "balance[]both the demands of District of Columbia residents to have the basic civil rights which all of us and our constituents enjoy and the demands to protect the predominant Federal interest in the Nation's

Capital." LH2174.[4] The Senate bill, the House Committee bill (H.R. 9682), and the bill that was ultimately passed all stopped short of full home rule, be it by limitation on the height of buildings in the District, the National Capital Planning Commission's veto in certain cases over what the City would like to do, or an inability to change the local court system. The difficult question was where to draw the line in setting the balance, a decision that needed to be made with an eye both to what was good policy and to what could command enough votes to pass the House.

The Committee bill proposed a significant measure of home rule. It called for an elected Mayor and an elected City Council with legislative power "extend[ing] to all rightful subjects of legislation within the District," subject only to enumerated limitations. H.R. 9682 §302, LH1243. This language tracked the wording of the 1871 Act delegating legislative power to a territorial government in the District, language that had been upheld by the Supreme Court in *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100 (1953). *See* LH1498-1503; Newman & DePuy at 541 (1871 Act created a territorial legislature).

The Committee bill would have given Council budget autonomy, ending the long-established procedure under which Congress appropriated the total District budget on a line item basis through Chairman Natcher's subcommittee. The Home

_____

[4] *See also* LH2153 (statement of Congressman McKinney).

Rule bill also contained a charter, the basic form of government for the District, which, subject to specified limitations, could be amended by the voters. H.R. 9682 §303, LH1243-1244.

In July, the Committee thought its bill could carry the House. By October, things looked different. The Bill had attracted resistance on a number of fronts and from a number of persons, including Chairman Natcher.[5] The bill would gut the power of his subcommittee, depriving it of line item control of the District's budget, which was substantial. LH2112 (discussing the D.C. budget). Chairman Natcher's concerns understandably focused on the bill's provisions affecting the budget and appropriations, and he articulated his opposition in constitutional terms.

Mr. Adams, chairman of the key subcommittee, had tried to defuse the constitutional issue via an opinion from Amicus Jason Newman at Georgetown Law Center. LH1498 *et seq*. Some members of Congress, however, were unconvinced. *See* LH1559, 1715-1718, 3022-3025, 3040.

Proponents of the bill faced a variety of additional objections. One was that the District "belongs to all the people of America" LH2101. *See also* LH2100, 2123. Another concern was the physical protection of Congress and the executive branch. The reason for a federal enclave dated to 1783, when the Continental

---

[5] Mr. Nelsen noted Mr. Natcher's opposition to the original Committee bill, H.R. 9682 (LH3075).

Congress had to flee Philadelphia after local and state officials refused a request for protection from disgruntled veterans of the Continental Army. *See* LH1493. Opponents of the bill thus wanted federal control over the local police department and the DC National Guard, noting that demonstrations against the government had been frequent in the late 1960s and early 70s. LH1493, 1566. Others wanted home rule limited to preserve the District of Columbia Court Reorganization Act of 1970, with specific concerns as to the judicial budget, who would appoint judges, LH1497, 1568-70, and who would prosecute felonies. LH1568.

Additionally, some of the lobbying efforts supporting the Committee bill had backfired. They were seen as tarring all opponents as racist and were termed by Members as "inept" (Hays, LH2364) and attempts at "political blackmail" (Green, LH2183).[6]

In October, even before the bill reached the House floor, Republican Ancher Nelsen, the ranking Minority Member of the House Committee, and Democrat Edith Green proposed complete substitutes. The Nelsen substitute, as Chairman Diggs noted, was "not a home rule proposal." LH1724. There was no provision for an elected mayor, and the bill lacked a broad grant of legislative power. Instead, an elected Council would function only in narrow, prescribed areas, often acting as an

---

[6] *See also* Newman & DePuy at 559 n. 112 (noting "the headway made by the opponents and a number of mistakes and occurrences which setback the proponents").

8

administrative agency, bound by the District of Columbia Administrative

Procedure Act.[7] "If enacted," Chairman Diggs noted, "it would have left the United

States Congress in a role of a 'District of Columbia City Council.' Such measures

as a bill to permit kite flying in the District of Columbia, which passed the 91st

Congress . . . would continue to require act of Congress." LH1724-25.

Proponents of the Committee bill thus faced a possible coalition of moderate

and conservative Democrats (Natcher, Green, and others) and Republicans.

Moreover, the bill was to be considered under a "rule" that permitted debate and

votes on a section by section basis. This "mean[t] home rule enemies could stall it

[the bill] by debating each [of its 88] section[s]," JA191, Jack Kneece, *Diggs

Ready to Deal on Home Rule Bill*, WASHINGTON STAR NEWS, Oct. 5, 1973, at B-1,

a situation that opened the door to obstructionism. LH2083. In this setting there

was considerable doubt that the Committee bill had enough votes to pass.

Chairman Natcher was the most important opponent. His position as

subcommittee Chairman, with control of significant appropriations, his wide

network of relationships particularly with Southern Congressmen, and his

unquestioned expertise in District matters made him a force to be reckoned with.

The *Washington Star* described him as "the single most influential member of the

---

[7] *See* H.R. 10692 § 401 and §§ 301-303, 311, which are subject to notice and comment rule making (§ 319) and § 503(a) (the elected council would have the same powers as the existing appointed council has). LH1975, 2001-08, 2014-15, 2027.)

House District Committee."[8] The then-head of Minority Staff for the Senate Committee on the District of Columbia and now Washington Post columnist Colbert King has referred to Mr. Natcher as "a powerful House Appropriations Committee baron" whose support was necessary "[t]o get home-rule skeptics behind the bill . . . ." Colbert King, *Democracy for the District, Too*, WASHINGTON POST, Sept. 29, 2001, at A27.

Thus, Chairman Diggs, after meeting with Mr. Natcher and consulting with members of his committee who supported home rule, abandoned the original Committee bill and offered a comprehensive substitute, commonly referred to as the Diggs Compromise. The objective was to turn Mr. Natcher from an opponent of the bill to a supporter. Mr. Diggs explained the compromise in an October 9, 1973, "Dear Colleague" letter to Members of Congress , LH2084:

> The Committee substitute contains six important changes which were made after numerous conversations and sessions with Members of Congress and other interested parties. These changes clarify the intent of H.R. 9682 and accommodate major reservations expressed since the bill was reported out.

---

[8] JA193, Editorial, *Home Rule at Last*, WASHINGTON STAR NEWS, Oct. 11, 1973 at A-18; *see also* James V. Grimaldi, *A Reading Program's Powerful Patron*, WASHINGTON POST, Dec. 20, 2007, at A1 ("Congress retains the right to approve the city's budget because it was the only way in 1973 that a powerful member of the House Appropriations Committee, Rep. William Natcher (D-Ky.), would agree to grant the District home rule.")

The first change listed, and the most important,[9] was preserving the jurisdiction of Mr. Natcher's subcommittee: "1. Budgetary process. Return to the Existing Line Item Congressional Appropriation Role." LH2084.

Language implementing this change took several forms. First, Section 446 now provided that "No amount may be [] expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only according to such Act." Second, language permitting the Mayor to reprogram funds from one item of appropriation to another was removed. Third, the Diggs Compromise deleted Section 737 of the Committee bill, which would have amended the Budget and Accounting Act so it no longer applied to the District. Finally, language was added to Section 603:

> (a) Nothing in this Act shall be construed as making any change in existing law, regulation, or basic procedure and practice to the respective roles that the Congress, the President, the federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission, examination, authorization, and appropriation of the total budget of the District of Columbia government.
>     * * *
> (e) Nothing in this Act shall be construed as affecting the applicability to the District government of the provisions of . . . the so-called Anti-Deficiency Act . . . .

---

[9] *See* JA205, Editorial, *Home Rule: One More Step to Go!,* WASHINGTON STAR, Dec. 2, 1973 at G-1 ("[T]he single most vital point of controversy was the House insistence that Congress retain -- much in the manner of the past -- the right to review and approve the annual District budget.").

The drafters put this language in a provision that is cross referenced by Section 303(d) of the Act. That section states that the charter amendment process "may not be used to enact any law or affect any law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in sections 601, 602, and 603." The new section 603(a) was placed in Title VI, "Reservation of Congressional Authority," in a section entitled "Limitations On Borrowing And Spending."[10] The introductory language used for the new Section 603(a)  "Nothing in this Act shall be construed as"  is identical to language in Section 602(b), which the section by section analysis of the earlier Committee bill made clear was intended as a "prohibition[]" on legislative action. LH1476-77.

Congressman McKinney, a member of the Committee, explained that:

> [T]he committee did not put those [provisions of the Diggs Compromise] into the [original committee] bill, because we did not feel they were necessary, and now we feel that for pragmatic political passage of a home rule bill they are.

LH2155. Committee member Thomas Rees described the Diggs Compromise as follows:

> I speak in favor of the form that is before us now. It is entitled 'Committee Print' and just came off of the presses today. I think that the committee print is a reasonable compromise, and especially in the area of what the relationship of the Committee on Appropriations and Congress will be to the

_____

[10] Appellants suggest that the caption of Section 603 is important in understanding congressional intent (App. Brief at 33), but fail to note that the language they rely on was not part of the Diggs Compromise considered and passed by the House.

District of Columbia. Really the relationship, if this legislation is passed, will be the same relationship that Congress now has with the District of Columbia budget, that no money can be spent by the District of Columbia. The appropriation is specifically authorized for that purpose by the Committee on Appropriations in the House and in the Senate.

This was the major compromise over the weekend, so that we have no change at all on budgetary control when we are discussing who will run the budget of the District of Columbia. I cannot say I am overjoyed by this compromise . . . . But it was the wisdom in the various sessions we had over the weekend that it would be best that we not change this and that the appropriations process be exactly the same appropriations process that we have now.

LH2187.[11]

The importance of enlisting Mr. Natcher's support, and the influence he had on other Members, is plain on the face of the House debate. Chairman Diggs began the debate on the Act but, after brief remarks and a short comment from Congressman Fraser, yielded the floor, not to a member of his committee, but to Mr. Natcher. Natcher made clear his understanding of the changes made by the Diggs Compromise as to budgeting and their importance. He said:

. . . to comply with the provision of the Constitution concerning the operation of our Nation's Capital, Congress must . . . retain in the Congress the appropriations power over the District of Columbia budget, Federal payment, and all reprogramming requests . . . . The bill . . . complies with the constitutional provision . . . , and the Chairman has assured me that the bill to be presented to the President . . . [*i.e.*, what will come out of the Conference] carries out all of the provisions that I have just mentioned.

---

[11] *See also* LH2164 (Mr. Fraser, stating that the Diggs Compromise contains "changes [which] will improve the chances of the bill.")

13

> Mr. Chairman, I support the bill . . . and respectfully request the committee [of the Whole, *i.e.*, the House] to approve the legislation.

LH2113.

Mr. Adams responded:  "I appreciate very much . . . the remarks of the chairman of the Subcommittee on Appropriations of the Appropriations Committee (Mr. Natcher) that this bill meets every constitutional test . . . ." LH2114. He added that, as a result of the changes, "the appropriation process stated by the gentleman from Kentucky has been left as it is." LH2117. Later that day, Majority Leader Tip O'Neill, after referring to the debate as a "historic occasion" and expressing his "strong support" for the bill, added "I also wish to congratulate the gentleman from Kentucky (Mr. Natcher) for the part I know he has played with the gentleman from Michigan (Mr. Diggs) in putting together an amendment or a compromise which will be offered on the floor tomorrow and which all of us are so happy [with] and hope will be accepted." LH2174.

Congressman Mann reminded Members of Mr. Natcher's support, noting that Members present for the beginning of the debate heard Mr. Natcher "throw his support to the bill, because of the protection of the Federal interest in the appropriations process." LH2176. Opponents, knowing of his influence, appealed to Mr. Natcher on procedural points. LH2380-81.

After extensive debate and significant efforts by the Majority Whip to convince members of the Democratic majority to vote for it, the Diggs

Compromise passed. Eleven amendments were then offered as to specific portions of the bill. They included such matters as open meeting provisions, whether the President or the Mayor should appoint local judges and the Chief of Police, and the creation of a federal enclave within the District. Two were accepted by Mr. Diggs, and two were passed over his objections. The balance were defeated.

Only at this point was the Nelsen substitute offered. Debate was brief, covering but two pages of the record, LH2450-2451, while the question of who should appoint judges consumed 15 pages. LH2362-2376. There was no need for extended debate. The issue was plain:  the Diggs Compromise afforded substantial home rule, with an elected mayor and an elected council with a broad grant of legislative power. The Nelsen substitute called for an appointed mayor and a Council whose legislative power was confined to narrow, defined categories. Mr. Nelsen made clear that his emphasis was on an appointed rather than elected mayor. LH2450. Chairman Diggs opposed, noting that "our product [the Diggs Compromise] is better and that it incorporates many of the principal things that concern both of us." *Id*. Congresswoman Green, co-sponsor of the Nelsen substitute, agreed on that point:  "most of the changes incorporated originally in our substitute are now in the committee bill, several of them offered over the weekend in the new committee print [the Diggs Compromise] and then amendments offered and approved today." LH2451. Those "amendments and

changes" she said "vastly improve the original committee bill." *Id*. The remaining

differences of importance between the two bills, she said, were the "appointment

of the Chief of Police and the appointment of the Mayor." *Id*.

There is nothing in the debate on these bills about differences between the

bills on Charter amendment. This is unsurprising. There was no Charter in the

Nelsen substitute to be amended. The Nelsen substitute was defeated, with Mr.

Natcher against. LH2453.

As the *Washington Star* observed, "the compromises maneuvered by Diggs

had won the full support of the single most influential member of the House

District Committee, Representative William H. Natcher. Natcher's high price was

ultimate congressional control over the city's budget -- and it was not the only

price paid." JA193, Editorial, *Home Rule at Last*, WASHINGTON STAR, Oct. 11,

1973 at A-18; *see also* Colbert King, *Democracy for the District, Too*,

WASHINGTON POST, Sept. 29, 2001, at A27 ("home rule . . . grew out of a deal cut

behind closed doors between . . . Natcher. . . and. . . Diggs. Here's how it went

down. To get home-rule skeptics behind the bill, Diggs had to satisfy Natcher, a

19-year Appropriations Committee veteran and D.C. budget subcommittee

chairman for 12 years. Natcher's condition for supporting home rule? The bill had

to retain congressional control over the D.C. budget and the federal payment.

Diggs bought it.").

The next step was a conference to resolve differences in the House and Senate bills, and it was incumbent on Chairman Diggs to preserve in the conference the elements that had allowed the bill to pass the House. He did that. As Senator Mathias noted, "[t]he House conferees made it quite clear . . . that their body wanted fiscal control to remain in Congress." LH3116. Mr. Diggs concurred: "when we went into that conference, we indicated to the conferees of the other body that if there was any nonnegotiable provision in this act, it was relative to the role of the Appropriations Committee of the Congress with respect to the Federal budget." LH3059. Thus, Mr. Diggs could report to the House that the "product [of the Conference] represents the preponderance of the House position. This conference report is faithful to the House version of the bill," LH3050, and "we have retained in the Congress the authority to review and appropriate the entire District budget . . . ." LH3051.

The Senate bill did not provide for Charter amendment. The House bill allowed amendments to the Charter portion of the Act (Title IV) subject to a lengthy list of exceptions. Ultimately the Senate accepted the House approach, although the list of exceptions got longer.[12] There is nothing in the Conference

---

[12] For example, the Conference added language to section 303(a) to put sections 401(a) and 421(a) beyond the reach of Charter amendment (*compare* LH2466, *with* LH2951-52) and added language in section 602(c)(1) to protect against Charter amendment the President's ability to sustain a Mayor veto that the Diggs

materials or Senate debate on the Conference Report referring to amendment of the

budget provisions or to the scope of 603(a).

The House debate on the Conference Report indicated that the Diggs

Compromise was in substance the same as the Nelsen substitute on budget issues.

The first Member Mr. Diggs called on to speak was, once again, Chairman

Natcher. He stated:

> I rise in support of the conference report . . . .
>
> I want to commend . . . [Mr. Diggs] and the Members of his committee for
> their accomplishments in passing this act through the House and faithfully
> carrying out their responsibilities to see that the House-passed provisions
> prevailed . . . in the conference.
>
> . . . at the time this bill was presented to the House, I stated that . . . Congress
> must, under the constitutional provision retain the right to review and to
> appropriate the entire District budget[,] approving of the necessary Federal
> payment and passing upon all reprogramming requests.
>
> Mr. Diggs and his committee have carried out the constitutional mandate in
> its entirety."

LH3059-60.

Mr. Nelsen, who had been a House conferee, agreed. He noted that Mr.

Natcher had opposed the original Committee bill and that he, Mr. Nelsen, "helped

[Mr. Natcher] get what he wanted. I think we were right -- congressional control of

appropriations and the budget  and those provisions are in there today. . . . . [I]n

---

Compromise had added to section 404(e). *Compare* LH2467 and 2488, *with*
LH2955 and 2984.

18

fact the conference report conforms in many respects with the Nelsen-Green bill with one large notable exception, partisan elections and an amendment to the Hatch Act." LH3075.

The principal point raised in the debate on the Conference Report was that the Senate provision for partisan elections had prevailed. Two members raised broader objections in an effort to defeat home rule entirely, but neither they nor any other speaker suggested that the budget provisions provided a basis to oppose the Committee Report or that the budget provisions could be repealed by Charter amendment.

Nor was there any discussion of a change in substance having occurred between the House-passed bill and the Conference Report via a change in the caption of Section 603 -- from "Limitations on Borrowing and Spending" to "Budget Process; Limitations on Borrowing and Spending."[13] The Joint Explanatory Statement of the Committee of Conference discusses the substantive differences between the House and Senate bills and the Conference bill, but not "clarifying, clerical, and conforming changes," suggesting that the change in caption was a clarifying, clerical or conforming change rather than substantive. LH3009.

---

[13] As Appellees note at 38-39, the change in caption accompanied changes in sections 603 (c) and (d) that involved budget process.

When the President signed the Act, he did so with the understanding that "final Congressional review of the District's appropriation process is retained under this measure." LH3128.

Thus, the Diggs Compromise, and in particular its emphasis on the "Return to the Existing Line Item Congressional Appropriation Role," succeeded in obtaining a significant measure of home rule for the District, although less than the original Committee bill envisioned. Without the compromise which persuaded Mr. Natcher to support the bill, and the agreement of the Senate to accept the House position on budgeting and appropriations matters, there is every reason to fear that the home rule effort would have been defeated in the House.

Shortly after passage, staff of the House District Committee prepared a memo entitled "Analysis of Reservation of Congressional Authority." LH3939. It noted the limitations on the legislative power of the Council found in sections 601 and 602 and then stated, in a section captioned "ADDITIONAL LIMITATIONS," that in section 603:

> *[R]estrictions* are placed on the legislative authority of the D.C. Council, *limiting*: …
>
> Any change in the respective roles of the Congress, the President, the Federal Office of Management and Budget, and the Comptroller General of the United States in the preparation, review, submission examination, authorization, and appropriation of the total budget of the District of Columbia Government. Sec. 603 (a).

LH3941 (emphasis added). This memorandum is part of the House legislative history materials designed "to give as complete a historical record as possible of the intention of the Members" and to "assist those who are applying the new law . . . to carry out the intent of the Congress." LHIII.

What is not found in the legislative history is also important:

- There is not a word suggesting that Congress understood that the continuation of Congressional power over the budget was intended only to apply "at this time" and could be changed by Charter amendment;

- There is not a word suggesting that language that is unquestionably intended as a prohibition in Section 602(b) ("Nothing in this chapter shall be construed as") operates only as a rule of construction in Section 603(a);

- There is not a word suggesting that the vote for the Diggs Compromise and against the Nelsen substitute was a vote for broad Charter amendment authority as to budget autonomy; and

- There is not a word suggesting that the addition of the phrase "Budget Process" in the caption of Section 603 that took place in the Conference process was intended to change the meaning of the

provision from that which had obtained when the House passed the

Diggs Compromise without that phrase.

## III.  ARGUMENT

### A.  Congress Intended To Preclude Amendment of the Budget Process Provisions

#### 1.  The Purpose of the Diggs Compromise

As described above, to get the bill passed Mr. Diggs gave Mr. Natcher everything he wanted. What Natcher wanted was a bill that satisfied his constitutional concerns that budgeting be done in Congress.[14] A bill that left the door open for a Charter Amendment would not have satisfied Mr. Natcher's constitutional concerns.

#### 2.  The Language That Implements the Diggs Compromise Forecloses Charter Amendment

The Compromise bill changed the section on budgeting and added new language (Section 603(a)) in a provision whose limitations bar charter amendment. The new language begins with the same words  "Nothing in this chapter shall be construed as" that appear in Section 602(b) and had been described in that context

---

[14]  Section 102 of the Act states "the intent of Congress is to delegate certain legislative powers to the government of the District of Columbia . . . ; and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters." The Diggs Compromise accords with Mr. Natcher's view of what could be done "consistent with the constitutional mandate." Council's Brief at 20 states, incorrectly, that the phrase "to the greatest extent possible" modifies the delegation of legislative power.

as a "prohibition" that would bar Charter amendment. *See* JA438-440 and pages 12 above.

Canons of statutory construction teach that similar language in the same act should be given the same meaning, particularly where sections are in close proximity and are related. *Law v. Siegel*, 134 S. Ct. 1188, 1195 (2014); *Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 250 (1996).

Council's argument that Section 603(a), unlike 602(b), is simply a rule of construction that adds nothing to the Act also runs afoul of the "well-established maxim of statutory construction that courts should avoid interpretations that render a statutory provision superfluous." *Davis Cnty. Solid Waste Mgmt. v. United States Envtl. Prot. Agency*, 101 F.3d 1395, 1404 (D.C. Cir. 1996); *accord TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

### B.    Council's Arguments Regarding Section 603(a)

1.    <u>The Nelsen Substitute Does Not Guide Interpretation of Section 603(a)</u>

On appeal, Appellants raise a new argument. They assert without citation that Section 603(a) was adapted from the Nelsen substitute and that the differences in the introductory language of the two compel a conclusion that Congress intended to permit Charter amendment. App. Br. 8-11, 36-38; Eskridge Br. 23-25; Former Legislators Br. 2, 18-23. They say "Congress in fact considered and ultimately rejected language that unequivocally would have barred budget

amendments," Eskridge Br. 23, and that "the most logical inference to draw from [this] fact . . . is that Congress decided (as a compromise) to maintain the existing federal role in the budgeting process but leave the door open to future Council-initiated amendments." *Id*. at 25.

Appellants at times give the impression that the Nelsen substitute was like the Senate bill, *i.e.*, it provided budget autonomy but no Charter amendment, and that the Diggs Compromise was thus a middle ground between the Nelsen substitute and the Committee bill. Former Legislators Br. at 2, 19.

In fact, the Nelsen Substitute was not a home rule bill. It had an appointed mayor, a powerless Council, and no Charter. A vote for Diggs and against Nelsen was a vote for substantial, but not complete, home rule, not a vote about charter amendment. Indeed, Mr. Nelsen claimed no difference between the bills on that point either before the vote, LH2128-30, or after, when he said the Conference bill "conforms in many respects with the Nelsen-Green bill." LH3075.

This is accordingly not a case like *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) where Congress "not only considered the respective temporal reaches of paragraphs (1), (2), and (3) of subsection (e) together at every stage, but omitted paragraph (1) from its directive that paragraphs (2) and (3) apply to pending cases only after having *rejected* earlier proposed versions of the statute that would have

24

included what is now paragraph (1) within the scope of that directive." (Emphasis in original)

Appellants also argue that the drafters of 603(a) must have intended a difference in meaning when they used language that departed from that in the Nelsen substitute. That does not follow, even assuming that the drafters of the Diggs Compromise worked from Nelsen Section 416 (as opposed to a common source). Persons looking to limit charter amendment would naturally look to language, like 602(b), already used to accomplish that goal, and not to language in the Nelsen bill that had no charter and hence no need for limitations on charter amendment.

Appellants also point to the fact that Charter amendment was harder at the time of enactment than it is today. *See, e.g.*, Council Br. at 12, 41. Why, they ask, would Congress care that Council could try to amend when an amendment was so easy to block. They ignore the contrary inference: why would home rule supporters want to take even a small risk of incurring Mr. Natcher's ire, and defeat of the bill, to preserve an essentially meaningless amendment route?

2.    No One Read the Bill the Way Appellants Do

The Former Legislators brief appears to suggest that contemporaneous recognition of a right to amend can be found in two places in the legislative history.

25

They say at 20 that a September 21, 1973 letter to Congressman Natcher characterized the Diggs Compromise as a "'reassuring amendment[]' intended to placate uneasy lawmakers by specifying that the bill would not provide the District with budget autonomy *at the time of its passage*." (Emphasis added). The problem with this assertion is, first, that the Diggs Compromise was created only over the weekend of October 6-7. A September 21 letter is obviously not discussing those provisions. And, there is literally nothing in the letter that says or implies that changes in budgeting provisions already made or that might be made would apply only "at the time of its passage." *See* LH1738-41.

The Former Legislators Brief claims further at 12-13 that staffer (and Amicus) DePuy said changes could be made in budgeting process by Charter amendment. They omit the fact Discussion Draft No. 2, about which Mr. DePuy was speaking, gave Council budget autonomy and had nothing like Section 603 that would limit Charter Amendment. The remarks occurred only in Committee and came almost four months before the release of the Diggs Compromise. *See* LH342-46, 377-82, 507, 522.

Council (at 38-39) cites to a House staff document recommending that Conferees allow "local council to amend all provisions of Charter", LH2899, and that only as a fall back should they consent to a provision that would make the budget provisions in Part D of the bill off limits. The first document is either

26

shorthand for adhering to the House position permitting Charter amendment subject to listed carve outs, or it is a position that the House conferees disregarded because the Conference Report does not allow amendment of "all provisions of Charter". Under either reading, this memo does nothing to undercut the conclusion that Section 603(a) limits the scope of Charter amendment. Similarly, it establishes little that Part D was not declared entirely off limits to Charter amendment when Sections 602(a)(1), (2), and (5) and Sections 603(a), (b)(1) - (3), (c), (d), and (e) all place portions of Part D beyond amendment.

Appellants' recounting of contemporaneous understanding omits a document that does speak to the issue, the staff memo that lists Section 603(a) as among the "limitations" that constitute "restrictions" on Council power, characterizations that compel affirmance. *See* pages 20-21 above.

### C.   Close Is Not Good Enough

Appellants argue that the Act is clear on its face and permits the Budget Autonomy Act. It is apparent, however, that they do not really believe that. For example, the Local Government Law Professors Br. states (at 15) that "[t]he question before the Court . . . requires the interpretation of ambiguous statutory language . . . ."[15] *See also* Br. of Nickles at 18 ("[I]f the Court finds the statute

---

[15]  The Local Government Law Professors Brief at 3, 10, 26 assumes that Congress borrowed from concepts of state/local law and asserts Judge Sullivan erred by

ambiguous and both the Council's and the Mayor's interpretations credible . . . .").
What Council and its supporters are really saying is that our cause is just. If we can
even get close, rule for us.

The Appleseed parties take this argument to, indeed well beyond, any logical
extreme. They assert at 4-5 that efforts to promote democracy in the District have
been "met with substantial opposition from key officials within the District
Government, most notably the District's Attorney General . . . ," referring to this
case and the *Zukerberg* litigation as to when the District's Attorney General will be
elected rather than appointed. The logic, if any can be divined, is that you should
rule for appellants here because the Attorney General assertedly opposed early
elections in *Zukerberg.*

Appleseed has its facts wrong. As shown in the Attorney General's July 9,
2013, letter to Council,[16] it was *Council* that "asked whether [it] may, by ordinary
legislation, set [a later] election date . . . ." The Attorney General said "I do not
recommend this course of action. The District's voters by a substantial margin
supported the Charter amendment creating an elected Attorney General and did so

---

ignoring state/local case law as it has developed over recent decades. As noted
above at 6, the language granting Council legislative authority came from an 1871
Act as interpreted by a 1953 Supreme Court case, and involving a territorial form
of government.
[16] Letter from Irvin B. Nathan to Councilmember Evans (July 9, 2013), *available at*
http://www.dcappleseed.com/wp-content/uploads/2013/12/2013-OAG-Memo-
Council-Authority-to-Delay-Election.pdf.

with the justifiable expectation of voting for one in 2014 who would take office in January 2015 concurrent with the next Mayoral term. In my view, their expectation should be respected and fulfilled." *Id.* at 1. He said that he could defend such an Act, but repeated that postponing the election "would be inconsistent with the expressed will of the District's electorate." *Id.* at 5. Council disregarded this advice and voted to postpone the election.

In the end, this case is not close. The legislative history of the Act along with fundamental canons of statutory construction conclusively establish that Section 603(a) acts as a prohibition. That is the way it was read for 40 years. That is why Michael Fauntroy wrote that "the end result was a bill that needed future *legislative* attention,"[17] why Mr. Diggs faced attacks for "selling his soul,"[18] and why the Post's Colbert King needed to refute "all the weeping and wailing about how the District was had by Congress" in the Act. Colbert I. King, *Where Did D.C.'s Dream Go Wrong?, This is Like a Bad Dream*, WASHINGTON POST, October 12, 1996, at A29. "[N]o one got snookered," wrote Mr. King; rather, "[g]etting a bill was more important than getting a perfect bill." *Id.* If the budget provisions of the Act had been simply a default, "at this time" only mechanism, then Mr. King,

---

[17] Michael K. Fauntroy, *Home Rule for the District of Columbia*, in Democratic Destiny and the District of Columbia, Concerned Professionals Br. Attachment 009 (emphasis added).
[18] JA212, Cathe Wolhowe, *Diggs Is Accused of 'Power Ploy,'* WASHINGTON POST, Oct. 8, 1973, at C1.

as Senate staff member at the time, would likely have written that it was Mr.

Natcher who got snookered. *Id.*

## IV.   CONCLUSION

The judgment of the district court should be affirmed.


Dated:  August 7, 2014            Respectfully submitted,

                          /s/ Kenneth A. Letzler
                          Kenneth A. Letzler
                          Gregory L. Schinner
                          Christopher A. Jaros
                          ARNOLD & PORTER LLP
                          555 12th Street, NW
                          Washington, DC  20004
                          (202) 942-5000
                          Kenneth.letzler@aporter.com

                          *Counsel for Messrs. DePuy, Freeman, and Newman and Ms. Smith*

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE**
**<u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6, 981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. Rule 32(a)(1).

I hereby certify this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007, in 14-point Times New Roman font.

Dated: August 7, 2014          __/s/ Kenneth A. Letzler_____
                               Kenneth A. Letzler
                               *Counsel for Messrs. DePuy, Freeman, and*
                               *Newman and Ms. Smith*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: August 7, 2014

   /s/ Kenneth Letzler
Kenneth Letzler
*Counsel for Messrs. DePuy, Freeman, and Newman and Ms. Smith*