ORAL ARGUMENT SCHEDULED FOR OCTOBER 17, 2014

No. 14-7067

# United States Court of Appeals for the D.C. Circuit

————————————

COUNCIL OF THE DISTRICT OF COLUMBIA,

*Plaintiff-Appellant*,

v.

VINCENT C. GRAY, in his official capacity as Mayor of the District of Columbia, and JEFFREY S. DEWITT, in his official capacity as Chief Financial Officer for the District of Columbia,

*Defendants-Appellees*.

————————————

## REPLY BRIEF FOR PLAINTIFF-APPELLANT
## COUNCIL OF THE DISTRICT OF COLUMBIA

————————————

On Appeal from the U.S. District Court for the District of Columbia, No. 14-cv-655
(Emmet G. Sullivan, District Judge)

————————————

Karen L. Dunn
Alexander I. Platt
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, DC 20015
(202) 237-2727

Brian D. Netter
Breanne A. Gilpatrick
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

GLOSSARY ................................................................................................. vi

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

ARGUMENT ................................................................................................. 4

I.      THE DISTRICT COURT LACKED JURISDICTION. ............................... 4

II.     THE BUDGET AUTONOMY ACT IS VALID. .......................................... 6

        A.      Section 603(a) Explains How To Construe The Changes Made
                To Existing Law By The Home Rule Act And Does Not
                Prohibit Future Changes. ................................................................ 6

                1.      Text and structure ...................................................... 7

                2.      Purpose ..................................................................... 14

                3.      Legislative history .................................................... 16

        B.      Section 602(a)(3) Distinguishes Between Local And National
                Functions And Spending Local Dollars Is A Local Function. ........... 23

        C.      The Anti-Deficiency Act Is Satisfied Because The Home Rule
                Act And Budget Autonomy Act Make The D.C. General Fund
                Available For Expenditure. .............................................................. 26

CONCLUSION ............................................................................................. 30

CERTIFICATE OF COMPLIANCE .................................................................. 32

CERTIFICATE OF SERVICE ......................................................................... 33

**TABLE OF CONTENTS—continued**

**Page**

ADDENDUM:

    Letter from Jeffrey S. DeWitt to Phil Mendelson (June 26, 2014) .............1a

    Memorandum from Frederick D. Cooke, Jr., Corporation Counsel, re
    Legal Consequences of Mayoral Exercise of Line Item Veto of a
    Budget Request Act (Mar. 30, 1989)...........................................................2a

# TABLE OF AUTHORITIES[*]

**Page(s)**

**CASES**

*Bender v. Jordan*,
 623 F.3d 1128 (D.C. Cir. 2010)................................................................5, 6

*\*Bishop v. District of Columbia*,
 411 A.2d 997 (D.C. 1980) (en banc) ...............................................14

*Delta Data Sys. Corp. v. Webster*,
 744 F.2d 197 (D.C. Cir. 1984)........................................................29

*\*Dimond v. District of Columbia*,
 792 F.2d 179 (D.C. Cir. 1986)..................................................4, 5, 6

*\*District of Columbia v. Greater Wash. Cent. Labor Council*,
 442 A.2d 110 (D.C. 1982) ...............................................................23

*Dorsey v. United States*,
 132 S. Ct. 2321 (2012)......................................................................12

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
 545 U.S. 308 (2005)........................................................................5, 6

*Greenhill v. Spellings*,
 482 F.3d 569 (D.C. Cir. 2007)............................................................5

*Ill. Pub. Telecomms. Ass'n v. FCC*,
 117 F.3d 555 (D.C. Cir. 1997) (per curiam).......................................9

*INS v. Chadha*,
 462 U.S. 919 (1983).....................................................................2, 29

*La. Pub. Serv. Comm'n v. FCC*,
 476 U.S. 355 (1986)............................................................................9

*Lichtenstein v. FTC*,
 194 F.2d 607 (9th Cir. 1952) ...........................................................10

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Loughrin v. United States*,
  134 S. Ct. 2384 (2014)................................................................8

*Narragansett Indian Tribe v. NIGC*,
  158 F.3d 1335 (D.C. Cir. 1998)................................................11

*Pierce v. Underwood*,
  487 U.S. 552 (1988)............................................................20, 21

*Seminole Tribe v. Florida*,
  517 U.S. 44 (1996)..................................................................9

*Walsh v. Brady*,
  927 F.2d 1229 (D.C. Cir. 1991)................................................20

CONSTITUTION

Appropriations Clause,
  U.S. Const. art. I, § 9, cl. 7....................................................25

District Clause,
  U.S. Const. art. I, § 8, cl. 17..................................................22

Eleventh Amendment,
  U.S. Const. amend. XI ............................................................9

STATUTES

47 U.S.C. § 152(b) .......................................................................9

*Home Rule Act of 1973, Pub. L. No. 93-198, 87 Stat. 774:
  § 102(a), D.C. Code § 1-201.02(a) ..........................................12, 14
  § 103(7), D.C. Code § 1-201.03(7)................................................11
  § 302, D.C. Code § 1-203.02 ....................................................12
  § 303(a), D.C. Code § 1-203.03(a) .....................................6, 11, 22
  § 303(d), D.C. Code §1-203.03(d)..................................................8
  § 402, D.C. Code § 1-204.02 ....................................................13
  § 404(f), D.C. Code § 1-204.04(f) ..............................................13
  § 441, D.C. Code § 1-204.41 ....................................................22
  § 446, D.C. Code § 1-204.46 ..............................................12, 22
  § 486, D.C. Code § 1-204.86....................................................13

iv

# TABLE OF AUTHORITIES—continued

**Page(s)**

§ 490(a)(6)(C), D.C. Code § 1-204.90(a)(6)(C) ...............................................13
§ 601, D.C. Code § 1-206.01 ..........................................................................8, 12
§ 602, D.C. Code § 1-206.02 ................................................................................8
§ 602(a), D.C. Code § 1-206.02(a) ...........................................6, 7, 8, 10, 11, 22
§ 602(a)(3), D.C. Code § 1-206.02(a)(3)...............................3, 20, 23, 24, 25, 29
§ 602(a)(8), D.C. Code § 1-206.02(a)(8)..............................................................4
§ 602(b), D.C. Code § 1-206.02(b)..............................................................16, 20
§ 603, D.C. Code § 1-206.03 ................................................................................8
§ 603(a), D.C. Code § 1-206.03(a) ......................... 3, 6, 7, 8, 10, 11, 12, 13, 14,
.................................................................... 16, 17, 18, 20, 21, 22, 24, 25, 29
§ 603(c), D.C. Code § 1-206.03(c) ..............................................................7, 13
§ 603(e), D.C. Code § 1-206.03(e) ............................................................27, 28

Initiative, Referendum, and Recall Charter Amendment Act,
    D.C. Law 2-46, 24 D.C. Reg. 199 .........................................................15, 16, 24

## OTHER AUTHORITIES

H.R. 9682, 93d Cong. § 737 (1973)....................................................................20

*H.R. 10692, 93d Cong. § 416 (1973)............................................................16, 17

Letter from Jeffrey S. DeWitt to Phil Mendelson (June 26, 2014) ........................13

Memorandum from Frederick D. Cooke, Jr., Corporation Counsel, re Legal
    Consequences of Mayoral Exercise of Line Item Veto of a Budget
    Request Act (Mar. 30, 1989) ............................................................................13

STAFF OF H. COMM. ON D.C., 93D CONG., HOME RULE FOR THE DISTRICT OF
    COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY (Comm. Print
    1976) ............................................................................. 12, 19, 20, 21

# GLOSSARY

| | |
|---|---|
| BLAG | Bipartisan Legal Advisory Group |
| Br. | Brief |
| CBPP | Center on Budget and Policy Priorities |
| Defs. | Defendants |
| GAO | Government Accountability Office |
| JA | Joint Appendix |
| LH | Legislative History of the Home Rule Act, as reprinted in STAFF OF H. COMM. ON D.C., 93D CONG., HOME RULE FOR THE DISTRICT OF COLUMBIA: BACKGROUND AND LEGISLATIVE HISTORY (Comm. Print 1976) |
| R.*x* at *y* | District Court Docket Entry *x*, at page *y*. |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Perhaps unwittingly, Defendants set forth the proper statutory standard in the second sentence of their brief: Under the Home Rule Act, in order to prohibit the District from initiating amendments to its Charter, Congress must have "deliberately and expressly" withheld that authority. Defs.' Br. 1. In creating the Charter—and delegating to the District the authority to initiate amendments and to place them before Congress—Congress made the entire Charter subject to the amendment process, *unless* one of its specified limitations applies.

Defendants cannot meet this standard. Because the absence of any express prohibition is fatal to their position, Defendants vigorously attempt to reframe the question and, in so doing, distort Congress's statutory scheme. The heading of the last section in Defendants' brief reveals this explicitly: "If Congress had intended to allow" a budget autonomy amendment, they say, "it would have said so straightforwardly." Defs.' Br. 59. But the statute says the Charter may be amended, unless a *limitation* is set forth straightforwardly.

Rather than abide by the statute Congress created, Defendants rely on atmospherics, attempting to create the false impression that the District is engaged in some dramatic power grab from Congress. Their rhetoric is grounded in two major misrepresentations, which must be corrected at the outset.

*First*, the District did not (and, indeed, could never) "take" anything from Congress.  When the District initiates the Charter amendment process, it uses authority delegated by Congress through a process designed by Congress that reserves a role for Congress.  Even then, it would be impossible for Congress to lose any power.  Congress retains plenary authority to direct how the District spends its money and at any time may alter or override any budget, repeal the Budget Autonomy Act, or even change the Charter amendment procedure, if it wishes.

*Second*, Defendants obscure the fact that the Charter amendment process that exists today is different than the amendment process Congress created in 1973.  At that time, District-initiated amendments could become law only if both Houses of Congress approved.  The provisions of the Home Rule Act in dispute here were drafted as part of that original regime and reflect the commonsense fact that Congress, knowing its permission was required, felt comfortable giving the District broad authority to initiate budget-related (and many other types of) amendments.

In 1984, after *INS v. Chadha*, 462 U.S. 919 (1983), Congress relaxed its role.  Although it would have been easy to satisfy *Chadha* by requiring approval via a joint resolution presented to the President, Congress instead opted to reduce its oversight of the District's use of this authority.  Pursuant to Congress's

2

determination, District-initiated amendments become law unless Congress and the President disapprove.  But just because Congress made it easier for District-initiated amendments to become law does not mean Congress reduced the District's authority to initiate amendments.  To the contrary, Congress did not alter the preexisting standard governing permissible amendments.

In the end, atmospherics cannot obscure the conclusion that none of the provisions Defendants cite stands as a bar to the District's placement of the Budget Autonomy Act before Congress.  Even the provision upon which they primarily rely, Section 603(a), goes only so far as to say that the 1973 Home Rule Act was not "making any change to existing law," leaving on the cutting-room floor language that would have provided "no change shall be made" to the budget process "unless specifically authorized or directed by the Congress."

Section 602(a)(3) requires the District to steer clear from Congress's national legislative authority, but spending money *raised by the District government itself* is a matter of local governance.  And Defendants' Anti-Deficiency Act challenge fails once their other arguments are answered because the Budget Autonomy Act, if within the District's amendment authority, satisfies the Anti-Deficiency Act's requirement of legal authority for expending or obligating money within the D.C. General Fund.

Perhaps Defendants' real quibble is with Congress, which, in 1973, created a broadly amendable Charter and declined to specifically limit District proposals related to the budget process; which, in 1984, relaxed its own role in the process; and which, in 2013, did not disapprove of the Budget Autonomy Act. If Congress is displeased with that result, Congress can step in and undo it at any time. Unless and until that happens, Defendants, like all other local actors, are bound to comply with the law.

## ARGUMENT

## I.   THE DISTRICT COURT LACKED JURISDICTION.

The district court should not have exercised jurisdiction over this case. Its jurisdictional finding was premised on a misreading of this Court's decision in *Dimond v. District of Columbia*, 792 F.2d 179 (D.C. Cir. 1986).

*Dimond* holds that a well-pleaded complaint that presents a dispute as to the obligations of local officials under laws applicable only to the District must be brought in Superior Court. The district court misread *Dimond* to concern only "the District of Columbia Courts." JA430. But one of the claims in that case was whether District legislation impermissibly altered the jurisdiction of *federal* courts in violation of Section 602(a)(8) of the Home Rule Act. Given that claim, Defendants are wrong to adopt the district court's position that *Dimond* "concerned 'purely local legislation' that did not meaningfully implicate federal interests or

4

actors." Defs.' Br. 20. And the district court was wrong to adopt a rule directly at odds with this Court's binding precedent, where that rule would permit *any* case challenging the scope of the District's authority to be brought in federal court.

In the alternative, Defendants rely on a new argument: Even though the Council's claim arises under District law, its "requests for relief necessarily require analysis of federal law" in a way that warrants the exercise of federal jurisdiction. Defs.' Br. 17-20. To the extent they are referring to the Home Rule Act as "federal law," *Dimond* establishes that this case does not arise under federal law for jurisdictional purposes. And to the extent Defendants would claim jurisdiction based on their Anti-Deficiency Act defense, federal jurisdiction "is resolved by looking to the legal basis of plaintiff's claim and emphatically *not* to anticipations of issues that might arise by way of defense." *Greenhill v. Spellings*, 482 F.3d 569, 575 (D.C. Cir. 2007).

There is a "special and small category" of cases as to which federal-question jurisdiction is available because of "uniquely substantial federal interests" underlying a nonfederal dispute. In *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), a quiet-title action was used to challenge the IRS's compliance with a federal tax-deficiency notice statute. And in *Bender v. Jordan*, 623 F.3d 1128 (D.C. Cir. 2010), a contract action was brought to challenge a bank's compliance with federal regulations. Both of those

5

cases presented "a nearly pure issue of federal law," without accompanying questions of fact or state law.  *Id.* at 1130.  This dispute, conversely, features District officials litigating the meaning of the Home Rule Act, a law applicable only to the District that, under *Dimond*, is not treated as a federal law for jurisdictional purposes.

And unlike those cases, Defendants have not identified a recurrent question likely to govern future cases in federal court.  Instead, they have warned that their decision to remove the case to federal court will prompt more *Superior Court* litigation (R.15 at 4-5), which counsels against the exercise of federal jurisdiction here.  Finding federal-question jurisdiction here would unnecessarily expand *Grable*'s "special and small category" to include any case involving the powers of the District Government where a federal defense is raised.

## II.    THE BUDGET AUTONOMY ACT IS VALID.

### A.    Section 603(a) Explains How To Construe The Changes Made To Existing Law By The Home Rule Act And Does Not Prohibit Future Changes.

If Congress had wanted to exempt the budget from the generally-applicable amendment process, it would have been easy enough—the budget would have been referenced in the list of items placed off-limits to amendment in Section 303(a) or Section 602(a), or the specific language of limitation found in those provisions would have been used in Section 603(a).

6

Defendants' position is that, even though Congress could have been direct in prohibiting proposals to change the budget process, it instead accomplished *the exact same result* in a roundabout fashion by providing that "[n]othing in this Act shall be construed as making any change in existing law." But the text, structure, purpose, and history of the Home Rule Act demonstrate otherwise.

### 1.    Text and structure

Our reading of the text of Section 603(a) is straightforward: Congress provided therein that the provisions of the Home Rule Act enacted in 1973 did not effect any change in the then-existing roles of various federal actors with respect to the District's budget processes. *It means what it says.*

Defendants respond that the statute, despite saying only that it was making no change to existing law, actually was prohibiting future use of the amendment process to alter the Charter's budget provisions. Defendants argue—implausibly— that despite glaring differences in language, Section 603(a) has the exact same effect as Section 602(a). But the Act (in Section 303(d)) places off-limits to the Council's amendment authority only a "law with respect to which the Council may not enact any act, resolution, or rule under the limitations specified in" Title VI. Section 602(a)'s language ties directly to that text, specifying that "*[t]he Council shall have no authority to pass any act*" relating to a list of topics. *See also* § 603(c) ("[t]he Council shall not approve" an unbalanced budget).

7

Section 603(a), by contrast, does not expressly refer to either the Council's authority or the scope of permissible Charter amendments, stating only that "*[n]othing in this Act shall be construed as making any change* in existing law" regarding the budget process.  The contrast with Section 602(a) could not be clearer.  As the Supreme Court recently reiterated, it is "often noted that when Congress includes particular language in one section of a statute but omits it in another—*let alone in the very next provision*—this Court presumes that Congress intended a difference in meaning." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (emphasis added) (internal quotation marks and alteration omitted).

Defendants cannot—and do not even try to—explain how the ordinary meaning of the words in Section 603(a) can support their conclusion.  Instead, they just assume and assert, with no foundation, that because Section 603(a) does not expressly authorize a budget autonomy amendment, it *must* be a prospective limitation on Charter amendments.  In support of that incorrect assumption, they offer two ill-conceived efforts at analogy.[1]

---

[1] Defendants do not even attempt to defend the district court's erroneous assumption that Section 603(a) must be a prospective limitation based on Section 303(d)'s reference to the "limitations specified in Sections 601, 602, and 603."  *Cf.* Eskridge Br. 7-8.

*First*, Defendants invent and then rebut the straw-man argument that "rules of construction" cannot also be "limitations," a contention that appears nowhere in our brief. They offer two "rules of construction" that supposedly have the effect of limiting authority. They point first to the Eleventh Amendment, claiming that it is phrased as a rule of construction but effects a limit on judicial power. Given the broad agreement that the construction accorded that Amendment bears no resemblance to its text (*cf. Seminole Tribe v. Florida*, 517 U.S. 44, 69 (1996) ("blind reliance upon the text of the Eleventh Amendment is to strain the Constitution") (internal quotation marks omitted)), the Amendment is particularly inapposite as a guide to statutory interpretation. In any event, what the Eleventh Amendment "construe[s]" is the "Judicial Power of the United States," so of course that provision impacts the scope of the "Judicial Power." But it hardly follows that, in declaring that the Home Rule Act made no change to "existing law," Congress was barring future use of the amendment procedure set forth elsewhere in the statute to revise the budget process.

In similar fashion, Defendants invoke the Communications Act of 1934, which provides that "nothing in this chapter shall be construed to apply or to give the Commission jurisdiction" over certain matters. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986) (quoting 47 U.S.C. § 152(b)); *see Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555 (D.C. Cir. 1997) (per curiam). Again, that

9

provision explains how to "construe" the FCC's "jurisdiction," so of course that provision has implications for the FCC's jurisdiction.

Unlike Defendants' examples, Section 603(a)—in contrast to Section 602(a)—does not explain how the Council's "authority" or "jurisdiction" must be construed.  It addresses how to resolve whether "this Act" was "making any change in existing law."  As we explained in our opening brief (at 29-30), such provisions, which are sometimes called "saving clauses," are used "to avoid any misunderstanding [about what] the Act" seeks to accomplish (*Lichtenstein v. FTC*, 194 F.2d 607, 610 (9th Cir. 1952)), and are presumed not to break new ground. The very existence of saving clauses disproves Defendants' assertion that "[a] rule of construction, particularly one enacted as statutory text, *is* a limitation."  Defs.' Br. 22.  But Defendants respond simply by begging the question and asserting that "Section 603(a) is not a 'savings clause' but a 'limitation.'"  *Id.* at 24.

Defendants' tortured approach to Section 603(a)—which causes them to avoid the actual language of the statute, encourages this Court not to read beyond the word "construed," and asserts circularly that this provision is a restriction on the Charter amendment authority—only serves to underscore their failure to identify a specified limitation.

*Second*, Defendants claim that when Congress said it was not "making any change in existing law" through "this Act," it meant that it was not "making any change in existing law" through future amendments to the Act, either.

What Defendants are actually arguing is that, rather than limit District-initiated amendments to the budget process by including the budget in Section 303(a) (listing unamendable Charter provisions) or Section 602(a) (listing limitations on the Council), Congress chose the bizarre approach of using the term "this Act" in Section 603(a) to encompass future Charter amendments. That interpretation strains credulity.[2]

In support of their position that "this Act" really means "this Act, including any future amendments to this Act," Defendants claim that the "normal rules of statutory construction * * * construe a later amendment as if it were part of the original act." Defs.' Br. 25 (quoting *Narragansett Indian Tribe v. NIGC*, 158 F.3d 1335, 1339 (D.C. Cir. 1998)). That speaks to a different issue—how to construe an *amendatory* act. After an amendment is adopted, it makes sense to presume that the amending Congress left the rest of the statute in place (as opposed to writing on

---

[2] Defendants appear to argue (at 25) that the definition of "this Act" includes "legislation passed by the Council." To the contrary, when capitalized, Congress defined "Act" to refer only to Acts of Congress, thereby confirming that Defendants are wrong in claiming that Congress used "this Act" to refer to Council-initiated Charter amendments. § 103(7).

a clean slate). But it makes no sense to presume how the original Congress wanted its statute to be construed after it was amended. The original Congress cannot know what future amendments will be enacted and "cannot bind a later Congress." *Dorsey v. United States*, 132 S. Ct. 2321, 2331 (2012).[3]

Defendants gesture at a series of additional arguments, in a fruitless attempt to find a textual hook for their position. They claim that the Council's position would make Section 603(a) "surplusage" in light of Section 446. Defs.' Br. 14. Section 603(a) plainly goes beyond the specifications of Section 446, speaking to additional government actors, additional budget processes, and the entirety of the Home Rule Act. In addition, it is clear from the circumstances of Section 603(a)'s enactment—in which it was added following an eleventh-hour political compromise about the budget process—that it also served as reassurance that the Home Rule Act was not doing any more or less than had been agreed upon.[4]

---

[3] Congress itself has amended the Charter's budget process nineteen times since 1973, never mentioning any conflict with Section 603(a). Thus, it is not the Budget Autonomy Act that renders the Home Rule Act "internally inconsistent" (Defs.' Br. 23), it is Defendants' reading of Section 603(a) to be a prohibition on amendments, something no one ever considered it to mean.

[4] Other portions of the Home Rule Act were added as intentional surplus to provide reassurance. For example, Sections 102(a), 302, and 601 all confirm that Congress retains its constitutional authority, which need not have been said at all, let alone three times. *Cf.* LH1739 (discussing the need for "reassuring amendments" to clarify congressional intent).

Next, Defendants say that, if Section 603(a) were really a rule of construction, it would have been located among the miscellaneous provisions in Title VII.  To be sure, Title VII includes boilerplate "Rules of Construction."  But interpretive rules specific to the Home Rule Act appear *throughout* the Act.  *See, e.g.*, §§ 402, 486, 490(a)(6)(C).  And this argument conflicts with Defendants' own recognition that Section 603(a) is a "rule of construction."  Defs.' Br. 14.

Finally, Defendants contend that Section 603(c) "contemplates that Congress must 'approve[]' the District's budget."  Defs.' Br. 26.  But in providing that the Council must adopt tax increases that would be necessary to balance the budget "to the extent its budget is approved," Section 603(c) speaks to approval *by the Mayor*, not approval *by Congress*.  *See* § 404(f).  Indeed, it has long been the position of the Office of the Attorney General that the Council must enact tax legislation to assure a balanced budget *before* the budget can be submitted to the President.  *See, e.g.*, Memorandum from Frederick D. Cooke, Jr., Corporation Counsel, re Legal Consequences of Mayoral Exercise of Line Item Veto of a Budget Request Act (Mar. 30, 1989) (Add. 6a-7a).  And just this year, CFO DeWitt refused to certify the District's Fiscal Year 2015 budget—which is required *before* submission of the budget to Congress—until the Council enacted legislation to adjust tax rates.  *See* Letter from Jeffrey S. DeWitt to Phil Mendelson (June 26, 2014) (Add. 1a).  In any event, passive approval by Congress is required under the Budget Autonomy Act.

13

Thus, just as Defendants have no plain-language argument based on Section 603(a) itself, neither are they able to find support elsewhere in the text of the Home Rule Act.

### 2.    Purpose

Defendants do not dispute that Congress's intent in enacting the Home Rule Act and granting the Charter was to "relieve Congress of the burden of legislating upon essentially local District matters" "to the greatest extent possible."  § 102(a). Nor do they offer a response to the repeated holdings of the D.C. Court of Appeals that, because of Congress's overarching purpose, only those limitations expressly articulated restrict the District's powers—"had (Congress) intended to prohibit the Home Rule Government from taking the action in question, it would have said so expressly, and not left the matter to mere implication." *Bishop v. District of Columbia*, 411 A.2d 997, 999 (D.C. 1980) (en banc) (internal quotation marks omitted) (finding that Congress "expressly and specifically withheld" the Council's authority to impose a commuter tax).

Instead of addressing these arguments—and explaining how Section 603(a) could possibly be treated as an express limitation in light of the neighboring provisions in which Congress *did* expressly limit the Council's authority—Defendants go after another straw man (actually, in this instance, a real man). Citing a 2012 memorandum from the Council's General Counsel, V. David

Zvenyach, they feign outrage that the Council wants to disregard "Congress's legislative intent."  Defs.' Br. 44.  Of course, that is not the Council's position, nor did Mr. Zvenyach take that view in his 2012 memorandum.  He explained—correctly—that the Charter amendment process, which includes Congress, may be used to propose amendments even if Congress would not have supported the substance of the amendment in 1973.  Indeed, Congress created the amendment process to enable the Charter to keep pace with changing times, not because it wanted to freeze all of its decisions in 1973.

To borrow Mr. Zvenyach's example, although there was a "lack of support" in Congress in 1973 for a provision to recall elected officials, that did not amount to a permanent ban on enacting a recall amendment, which occurred through the District-initiated amendment process in 1977 with enactment of the Initiative, Referendum, and Recall Act with Congress's affirmative approval.  JA404-05. Similarly, all of the "expressions of direct legislative intent" invoked by Defendants (at 44) concern Congress's decision not to grant budget autonomy in 1973, not the question this Court must resolve—which is whether Congress intended also to exclude the budget process from the Charter amendment authority.

On that question, Congress's overarching purpose is relevant because it underscores the correct default rule.  The amendment process applies to the entire Charter except to the extent Congress has "expressly" articulated otherwise.  No

15

one disagrees that Congress declined to grant budget autonomy in 1973—but none of Defendants' "expressions of direct legislative intent" shows that Congress went any further than that.  Defendants simply assume that if Congress did not support something in 1973, Congress intended to prohibit it permanently—but we know this is not true, not simply because of the Initiative, Referendum, and Recall Act, but also because such a rule would nullify the amendment authority altogether.

### 3.    Legislative history

Similar to their approach to the statutory text, Defendants' approach to the legislative history is to ignore or dismiss what Congress actually did, ultimately going so far as to argue that Congress was in a rush and therefore ignorant of the text it enacted.  They must do this because Congress considered and expressly *rejected* a prospective limitation on Council-initiated budget-related amendments, the precise limitation that Defendants argue Congress included in Section 603(a).

In the district court, Defendants and their *amici* introduced a new legislative history argument on the last day of the briefing schedule—that Section 603(a) was modeled on Section 602(b).  The district court adopted that argument.  JA438-40.  But we demonstrated in our opening brief that Section 603(a) was actually a modification of Section 416 of the Nelsen Substitute, as this strike-and-score comparison makes clear:

16

> ~~Notwithstanding any other provision of law, unless~~
> ~~specifically authorized or directed by the Congress, there~~
> ~~shall be no change made~~ <u>Nothing in this Act shall be</u>
> <u>construed as making any change</u> in existing law~~s~~,
> regulation~~s~~, or basic procedures and practices ~~as they~~
> relate<u>ing</u> to the respective roles of the Congress, the
> President, the Federal Office of Management and Budget,
> ~~the United States Department of the Treasury,~~ <u>and</u> the
> Comptroller General of the United States~~, the District of~~
> ~~Columbia Council, and the Commissioner~~ in * * * the
> preparation, review, submission, examination,
> authorization, and appropriation of the total budget ~~for~~ <u>of</u>
> the District of Columbia.

In crafting Section 603(a), the drafters *deleted* a requirement that changes to

the budget process needed to be "specifically authorized or directed by the

Congress," changed the tense of that provision from prospective ("there shall be no

change" in the future) to present tense (Congress was not "making any change" in

the present), and omitted references to government actors that would have been

needed only if the provision were to operate prospectively.

Defendants' response is that, despite these changes, Section 603(a) "carried

forward the relevant substance of the Nelsen Substitute" and was merely "*edited*"

"to match the parlance of the bill."  Defs.' Br. 34-35.  But this—quite obviously—

is wrong.  If, as Defendants insist (at 32), the House Committee added Section

603(a) to make it "clear" that "only Congress could change the budget and

appropriations process," it would have retained the Nelsen Substitute's

requirement that changes had to be "specifically authorized or directed by the

17

Congress."  And no style guide required the Department of Treasury, Council, and Mayor (then called the Commissioner) to be taken out of what became Section 603(a); rather, those entities were dropped because the limitation on future changes was deleted.  *See also* Members of Congress Br. 30-31 (demonstrating that the "nothing in this Act shall be construed" language must be read in its surrounding context; citing Home Rule Act examples).

Equally implausible is Defendants' argument that, even though the House rejected the Nelsen Substitute and adopted the Diggs Compromise—a political middle ground that neither granted budget autonomy at that time nor prohibited the District from proposing future amendments to the budget process—Members "likely did not focus on the subtle difference in phrasing" between the bills.  Defs.' Br. 36.[5]  But there is nothing "subtle" about deleting the express requirement that

---

[5] Defendants' approach to legislative history is not consistent.  For example, they argue that drafters did not focus on the modification of the Nelsen Substitute concerning Congress's own role but, instead, thoughtfully intended "this Act" to mean "this Act" plus future amendments.

They also argue that Members of Congress would have paid more attention to a Dear Colleague letter than to statutory language.  Even if this were true, the Dear Colleague letter supports our position.  In describing the compromise, Chairman Diggs summarized the budgetary compromise as "budgetary process— no change in the congressional appropriation role" and separately enumerated the "Additional Limitations on the Council," which he described with ordinary language of prohibition.  *See* JA130 ("City Council prohibited from changing" the functions of the U.S. Attorney or U.S. Marshal and "City Council is prohibited

(footnote continued)

future changes to the budget process needed to be "specifically authorized or directed by the Congress"—a crucial difference between the bills that Defendants refuse even to acknowledge in their brief.  By relying on Congress's supposed ignorance of its own statute, Defendants are effectively conceding that the text does not support them.

Defendants' affirmative claims regarding legislative history are equally misguided.  Although they claim to be endorsing the district court's analysis, they lead with the new argument that the omission of a provision governing the Budget and Accounting Act from the Diggs Compromise establishes that "the Committee understood that budget autonomy had to await a further act of Congress."  Defs.' Br. 32.  But Defendants fail to provide the reason why the provision was excluded from the Diggs Compromise, and that reason had nothing to do with budget autonomy.  In the Committee bill, there was no need for the District to follow the ordinary process for requesting appropriations of federal revenues, because that bill contemplated Congress contributing lump-sum subsidies to the District's budget.  LH1589-90.  As explained by Rep. Nelsen, that provision "would be wholly inappropriate if the Congress were to continue to assume its line-item review of the

_____

from making changes" to various criminal code provisions).  The contrast is clear.  *See also* Members of Congress Br. 22.

19

District of Columbia budget in appropriating *allocated* funds for the District."
LH1604.  So when line-item review was reinstated at Rep. Nelsen's request,
Section 737 was dropped.

Section 602(b), which was once Defendants' primary legislative history
argument, is now an afterthought.  Defs.' Br. 34-35.  Defendants still go through
the paces, claiming that because both Sections 602(b) and 603(a) begin with
"[n]othing * * * shall be construed," they were both "meant as a limitation."  *Id.* at
34.  In our opening brief, we explained that, whereas Section 602(b) explains how
to "construe[]" the "authority" Congress was "vesting in the District government"
(thereby explaining how to interpret Section 602(a)(3) as to borderline
federal/local entities like the Zoo), Section 603(a) explains how to "construe[]" the
"changes" Congress was "making" to "existing law."  Defendants have no answer.

Defendants also make supposed "legislative history" arguments about events
subsequent to the passage of the Home Rule Act.  So-called "subsequent legislative
history" is "oxymoronic," and "can add nothing."  *Walsh v. Brady*, 927 F.2d 1229,
1233 n.2 (D.C. Cir. 1991).  None of the references supplied by Defendants helps to
explain the meaning of Section 603(a).[6]

---

[6] Defendants invoke President Obama's budget autonomy proposal.  But that
proposal would grant *true* budget autonomy—without any congressional review—
so it plainly does not presuppose that the Budget Autonomy Act is invalid.  BLAG
(footnote continued)

20

Finally, Defendants lament the absence of direct statements in the legislative history about the future amendability of the budget process. If that is what they are looking for, it is unclear why they disregard evidence that House members entered the Conference with specific instructions to protect the District's authority to propose amendments to the budget process—an authority that would be meaningless if Section 603(a) of the House bill prohibited amendment proposals as to the budget process. LH2899. In any event, given the Home Rule Act's starting premise—that all provisions of the Charter are subject to the amendment procedure *unless* otherwise provided—Congress would not have been expected to discuss permissible future amendments. The focus was on prohibitions because everything not prohibited was permissible. And thus, the relevant absence in the legislative history is the absence of any express statement of a limitation on the Council's authority to propose amendments related to the budget process—that absence, together with the statutory text, is determinative.

---

Br. 21. They cite (at 9) a 2013 committee report characterizing the Budget Autonomy Act as advisory. But "it is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means." *Pierce v. Underwood*, 487 U.S. 552, 566 (1988). And they mention (at 40) a post-enactment memorandum by minority counsel. Such a memorandum is entitled to no weight and does not appear to address the relevant issue in any event.

21

\*     \*     \*

Setting aside all the noise, Defendants cannot respond to the essence of this dispute.  In 1973, Congress created a process for the District to propose amendments to the Charter, which presumptively applied to every provision of the Charter, including Sections 446 and 441.  Congress could have prohibited the District from initiating budget-related amendments through Sections 303(a), 602(a), or 603(a), but it did none of those things.  When it did address the budget process in Section 603(a), it voted down language that would have required Congress to "specifically authorize[]" any further changes, and chose instead a political middle ground where budget autonomy was not granted, but the District remained free to propose future budget-related amendments to the Charter, subject to Congress's consent.

Such a delegation was quite reasonable, even though the District government was new in 1973, because both Houses of Congress were required to approve District-initiated amendments.  While Congress's decision in 1984 to relax its role made it easier for District-initiated amendments to become law, it did not alter the meaning of the provisions here at issue, which have not changed since 1973 and continue to provide to the District the authority to initiate budget-related amendments.

22

**B.     Section 602(a)(3) Distinguishes Between Local And National Functions And Spending Local Dollars Is A Local Function.**

We showed in our opening brief (at 44-49) that Section 602(a)(3)'s prohibition concerning "the functions * * * of the United States" limits the Council's legislative authority with respect to national—as opposed to local—concerns.  That requirement effectuates Congress's intent to delegate District Clause powers, but not other constitutional powers, to the District government.

Consistent with our interpretation in this Court and below (JA272-74), the D.C. Court of Appeals has held that Section 602(a)(3) is directed at inherently federal functions and does not encompass inherently local functions performed by federal actors.  *See District of Columbia v. Greater Wash. Cent. Labor Council*, 442 A.2d 110 (D.C. 1982) (approving the transfer of a worker's compensation program from the Department of Labor and federal courts to the District government).  Although Defendants evidently disagree with the D.C. Court of Appeals, they do not dispute that *Greater Washington* binds this Court.  *See* Council Opening Br. 47-48; Appleseed Br. 16-17.

Even if the question were open for dispute, Defendants' objection to *Greater Washington* is unavailing.  Defendants say (at 55) that *Greater Washington* "would nullify the first part of Section 602(a)(3)," but we have already explained (Council Opening Br. 45-46) why they are wrong:  The reference to "functions or property

23

of the United States" only prohibits the District from enacting legislation that would interfere with national functions or property that happen to exist or take place solely within the District. Defendants have no response.

Defendants' position also inverts the design of the Home Rule Act, in much the same way as their position on Section 603(a). Because they cannot dispute that Congress sought to distinguish between "municipal" and "national" affairs, they respond (at 58) that the municipal-national divide does not suggest that Congress authorized a budget autonomy amendment. We do not contend that Section 602(a)(3) affirmatively authorized the District to propose to Congress a budget autonomy amendment. Because the question is whether Section 602(a)(3) prohibits it, their response is a non sequitur—one that further highlights their misconception that future amendments had to be pre-authorized by Congress.

Defendants also dismiss Congress's own understanding of the Home Rule Act's limitations. The Initiative, Referendum, and Recall Charter Amendment Act changed the District's budget process and was approved by Congress in 1977 with a concurrent resolution that was not presented to the President, under the Home Rule Act's original amendment process. *See* Council Opening Br. 47-48 & n.45 (explaining the amendment's changes to the budget process). That approval shows that, soon after the Home Rule Act was passed, neither the District nor Congress

24

viewed Section 602(a)(3) or Section 603(a) as an obstacle to using the Charter amendment process to change the District's budget system.[7]

Defendants say (at 54) that how the District spends its local money has implications for Congress's decisions to spend federal money.  But practically everything the District does has implications for the federal government, and that theory could not possibly explain why it would be permissible for the District to reduce local tax rates but not to spend money raised by local taxes.  Defendants suggest (at 56) that, even if the District's budget is *itself* a local matter, Congress's *oversight* of that budget is federal.  But Congress has the authority to oversee everything the District does, whether it relates to the budget or not, so that cannot be the driving force behind Section 602(a)(3).

On the relevant question, Defendants refer (at 55) to appropriations as a "quintessential" function of Congress.  The Constitution's Appropriations Clause does assign to Congress the responsibility to appropriate funds "from the Treasury," but it is not a "quintessential" function for Congress to appropriate locally raised monies from the D.C. General Fund.  Even before the Budget

---

[7] Defendants also distinguish the Charter amendment by saying that it "dealt with elections."  Defs.' Br. 58.  The amendment introduced voter referendums into the budget process in some circumstances, but it is unclear why that would change the analysis under Sections 602(a)(3) and 603(a).

Autonomy Act, the President's budget treated the District's finances as beyond the purview of federal affairs. *See* Center on Budget and Policy Priorities ("CBPP") Br. 5-11. Indeed, budget autonomy was the rule when the District was founded, and even Defendants concede (at 51) that Congress is *entitled* to delegate the authority, which demonstrates that the authority is not quintessentially Congress's at all.

### C.    The Anti-Deficiency Act Is Satisfied Because The Home Rule Act And Budget Autonomy Act Make The D.C. General Fund Available For Expenditure.

The Anti-Deficiency Act prevents federal and District officials from spending money they have not been authorized to spend. In the language of the statute, to make an "expenditure or obligation," there must be "an appropriation or fund" that is "available." As applied here, the District's General Fund is a "fund," so the only question is whether that fund can be made "available" under the budget process established by the Budget Autonomy Act. Because that is the central question in this case, Defendants' Anti-Deficiency Act objection rises or falls based on their broader—but incorrect—claim that the District was not authorized to pass the Budget Autonomy Act under the Home Rule Act.

Most of Defendants' response (at 46-49) is dedicated to defeating another straw-man argument—that the original Home Rule Act does not constitute a "permanent appropriation." As we argued below (JA245-47) and in our opening

brief (at 55-56), the existence of an "appropriation" is not constitutionally required because the money in the Fund is outside the Treasury. Moreover, it is not required by the Anti-Deficiency Act because the D.C. General Fund is a "fund" under that Act. Defendants now concede (at 52) that the Constitution has been satisfied and do not dispute that the Anti-Deficiency Act can be satisfied by either an "appropriation" or a "fund."

That leaves only the question of whether the spending is authorized. Congress authorizes spending in any manner of ways. It can authorize spending on an annual basis or on a permanent basis, in a specific amount or by a formula. It can delegate the authority to authorize expenditures or can disclaim the responsibility to manage an agency's finances at all. In each of these circumstances, the Anti-Deficiency Act is satisfied. *See* CBPP Br. 18-24.

Defendants do not dispute any of that. They even concede that the Home Rule Act's anti-deficiency provision, Section 603(e), was not drafted to ensure continued congressional involvement in the District budget process. They freely acknowledge that budget autonomy coexisted with Section 603(e) in the Senate bill. And they admit—contrary to the district court's decision (JA451-53)—that conferring budget autonomy "would not have repealed the Anti-Deficiency Act" but would only have changed *the method* "by which the Council could *satisfy* the Act (if the Council did not outspend its funds)." Defs.' Br. 51.

27

That ought to be the end of their challenge: Both parties agree that conferring budget autonomy on the District is consistent with the Anti-Deficiency Act and is consistent with Section 603(e). But Defendants claim that there is an "independent" problem here because the Anti-Deficiency Act supposedly requires "affirmative congressional authorization *of some sort* before the Council can obligate money." Defs.' Br. 45, 50-51.

Thus, their real point is that the Anti-Deficiency Act independently prohibits the District from initiating the amendment process granted by Congress because there must be affirmative congressional authorization. But that makes no sense. Reaching Defendants' Anti-Deficiency Act argument means that their arguments that the Home Rule Act places the budget process off-limits to amendment have failed. Thus, Congress authorized the District's budget system by (1) creating a process for the District to initiate Charter amendments; and (2) permitting the Budget Autonomy Act to enter into law. No principle of anti-deficiency law distinguishes between direct congressional action and the authorized actions of Congress's delegates. *See* CBPP Br. 19-24.[8]  And no such distinction would

---

[8] Defendants contend that "[i]t is undisputed that only Congress, not some other body, can make an amount 'available' for expenditure." Defs.' Br. 45. That is misleading. Even Defendants acknowledge that Congress can delegate the authority to make amounts available. As amended by the Budget Autonomy Act, the Home Rule Act supplies the necessary delegation. Thus, we do not argue that
(footnote continued)

advance the underlying purpose of the Anti-Deficiency Act, which is to ensure that executive officials properly execute lawful budgets—a purpose satisfied here because District officials are prohibited from outspending the D.C. General Fund. *See id.* at 25-31.[9]

Thus, there is nothing "independent" about Defendants' Anti-Deficiency Act argument at all. They are merely arguing, as elsewhere, that the Budget Autonomy Act was beyond the scope of the amendment authority. And just as that argument fails in the context of Sections 603(a) and 602(a)(3), it fails here, as well.

\*      \*      \*

Defendants make much of the fact that it took 40 years for a budget autonomy amendment to be enacted and for these legal issues to be joined. But that is just another rhetorical flourish—it is in the nature of amendments to be enacted when times have changed sufficiently to warrant them. And contrary to

---

passive review of the District's budget automatically satisfies the Anti-Deficiency Act. *Id.* at 50. Rather, the District's budgeting process satisfies the Anti-Deficiency Act because it was enacted pursuant to the procedure created by Congress in the Home Rule Act and its post-*Chadha* revision.

[9] The GAO opinion cited by Defendants performs none of this analysis. No deference is due to the GAO's conclusion (*Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 & n.1 (D.C. Cir. 1984)), so GAO's opinion is relevant only if it has the power to persuade. Defendants do not contend that the GAO's opinion is persuasive, and for good reason. GAO was apparently unaware that the District's revenues are maintained in a "fund" outside the Treasury and, thus, did not analyze any issue relevant to this case. JA118-29.

29

Defendants' insistence, Congress need not have pre-authorized amendments in 1973 in order for the District to initiate them today.  In this case, with the passage of time, there has been a 40-fold reduction in the federal payment and a strong fiscal track record for the District.  It has also meant bipartisan political support for budget autonomy both locally and nationally.  *See* Rivlin Br. 6-8.  Without this, no amendment could ever make it through the process designed by Congress, which affords the District the authority to initiate amendments on a broad range of topics but ensures that those amendments are reviewed by Congress before they become law.

## CONCLUSION

If Congress had intended to permanently bar the District from initiating budget-related amendments, it easily could have done so (as it did with other amendments).  It did not.  Thus, the District acted pursuant to authority delegated by Congress in 1973 when it initiated a budget autonomy amendment and placed it before Congress.  Congress then played the reviewing role it assigned to itself, allowing the Budget Autonomy Act—validly—to become law.

The judgment of the district court should be vacated or reversed.

Dated: August 14, 2014

/s/ Karen L. Dunn (*with permission*)
Karen L. Dunn
Alexander I. Platt
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, DC 20015
(202) 237-2727

Respectfully submitted,

/s/ Brian D. Netter
Brian D. Netter
Breanne A. Gilpatrick
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief

complies with the type-volume limitation because it contains 6,955 words,

excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R.

32(a)(1).  I further certify that this brief complies with the typeface requirements of

Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P.

32(a)(6) because the brief was prepared in 14-point Times New Roman font using

Microsoft Word.


Dated: August 14, 2014                              /s/ Brian D. Netter
                                                    Brian D. Netter


32

**CERTIFICATE OF SERVICE**

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(c), that on August 14, 2014, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: August 14, 2014                              /s/ Brian D. Netter
                                                     Brian D. Netter

33

**ADDENDUM**

# GOVERNMENT OF THE DISTRICT OF COLUMBIA

OFFICE OF THE CHIEF FINANCIAL OFFICER



**Jeffrey S. DeWitt**
Chief Financial Officer

June 26, 2014

The Honorable Phil Mendelson
Chairman
Council of the District of Columbia
1350 Pennsylvania Avenue, N.W., Suite 504
Washington, DC 20004

**Re:  Council's Proposed Budget and Financial Plan for Fiscal Year (FY)
2015 Through 2018**

Dear Chairman Mendelson:

I am writing to inform you that the Office of the Chief Financial Officer (OCFO) has reviewed carefully the Fiscal Year (FY) 2015 through 2018 Budget and Financial Plan in conjunction with the FY2015 Budget Support Act that the Council approved at its Legislative Meeting on June 24th.  This revised budget contains the adjustments I recommended in my June 18, 2014 letter to you and in our several discussions in recent weeks regarding the District's budget.  Accordingly, I hereby certify this FY 2015 through 2018 Budget and Financial Plan as balanced.

Again, I greatly appreciate the cooperation of you and your staff in working closely with OCFO staff and me on this important budget proposal on behalf of the District's residents and taxpayers.

Sincerely,

Jeffrey S. DeWitt
Chief Financial Officer

cc:    The Honorable Vincent C. Gray, Mayor of the District of Columbia
       All Members of the Council of the District of Columbia
       Jennifer Budoff, Council Budget Director
       Eric Goulet, Deputy Chief of Staff and Budget Director, Mayor's Office of
       Budget and Finance

---

John A. Wilson Building * 1350 Pennsylvania Avenue, NW * Suite 203 * Washington, DC 20004
Phone: (202) 727-2476 * Fax: (202) 727-1643 * www.cfo.dc.gov

1a

# *Memorandum*   •   Government of the District of Columbia

TO:        Richard C. Siegel          Office:  Corporation Counsel
              Director               Prepared By:  L&O:TB:JAR:cm
              Office of the Budget                (89-64)
                                              x-ref 84-59

FROM:     Frederick D. Cooke, Jr.
              Corporation Counsel, D.C.      Date: March 30, 1989

SUBJECT:  Legal consequences of mayoral exercise of line item
                  veto of a budget request act

      This is in reply to your oral request of March 23, 1989, for
legal advice on the following:

    (1)  What are the legal consequences of the Mayor's
          disapproval of items or provisions in the Fiscal Year
          1990 Budget Request Act adopted by the Council of the
          District of Columbia?

    (2)  If the Council fails to override a line item veto, is
          the Council required to enact tax increases needed to
          support the item restored by the veto?

    (3)  Does the Mayor's line item veto authority extend to
          items within the budget request of an agency that are
          not specified in the budget request act?

I

      The effect of a Mayoral veto of a Council revision to a line
item in the budget request act is to restore the original
request, and to require that the original request be included in
the budget submitted to the Office of Management and Budget,
unless the Council, by a two-thirds vote, reenacts the item or
provision (overrides the veto).

      The authority of the Mayor to veto a budget request act
adopted by the Council is set forth in section 404(f) of the
Self-Government and Governmental Reorganization Act of 1973
(Self-Government Act), D.C. Code § 1-227(f) (1987):

          In the case of any budget act adopted by
      the Council pursuant to Section 446 of this
      Act and submitted to the Mayor in accordance
      with subsection (e) of this section, the
      Mayor shall have power to disapprove <u>any
      items or provisions, or both,</u> of such act and
      approve the remainder. In any case in which

2a

2

the Mayor so disapproves of any item or provision, he shall append to the act when he signs it a statement of the item or provision which he disapproves, and shall, within such ten-day period, return a copy of the act and statement with his objections to the Council. If, within thirty calendar days after any such item or provision so disapproved has been timely returned by the Mayor to the Council, two-thirds of the members of the Council present and voting vote to reenact any such item or provision, such item or provision so reenacted shall be transmitted by the Chairman to the President of the United States. In any case in which the Mayor fails to timely return any such item or provision so disapproved to the Council, the Mayor shall be deemed to have approved such item or provision not returned, and such item or provision not returned shall be transmitted by the Chairman to the President of the United States. (Emphasis added).

Thus, section 404(f) clearly gives the Mayor the authority to veto line items in the budget request act, as it is returned to him by the Council. However, nothing in section 404(f) directly addresses the issue of the effect of such a veto on that item or provision in the budget as submitted to the Office of Management and Budget.

Other provisions of the Self-Government Act provide some guidance on this issue. Section 404(a), D.C. Code § 1-227(a) (1987), addressing the powers of the Council, states in part:

[E]xcept as otherwise provided in this Act, all functions granted to or imposed upon, or vested in or transferred to the District of Columbia Council, as established by Reorganization Plan Numbered 3 of 1967, shall be carried out by the Council in accordance with the provisions of this Act.

Similarly, section 422 of the Self-Government Act, D.C. Code § 1-242 (1987), states in part:

[E]xcept as otherwise provided in this Act, all functions granted to or vested in the Commissioner of the District of Columbia, as established under Reorganization Plan Numbered 3 of 1967, shall be carried out by the Mayor in accordance with this Act.

3

Thus, except where there is a clear Charter provision to the contrary, the provisions of Reorganization Plan No. 3 are to continue in full force and effect under Home Rule.

Section 403 of Reorganization Plan No. 3 (1967) sets forth the procedure to be followed in preparing the District's budget request to the Congress. It requires the Commissioner (the Mayor) to prepare a budget request and to submit it to the Council. The Council then reviews the budget and either returns it unchanged, in which case it is forwarded to the President, or makes revisions. When revisions are made, section 403 provides for the revised budget to be returned to the Commissioner (Mayor) who may concur in the revisions, and submit the revised budget to the President, or, as provided for in subparagraph 3, section 403(d) (set forth below), he may object to one or more of the Council's revisions. Section 403(d) reads as follows:

> If the Commissioner does not concur in any one or more of the revisions proposed by the Council he shall return the requests, together with the Council's revisions, to the Council and append a statement of the reasons for not concurring. If the Council, by a three-fourths vote of its members present and voting insists upon any one or more of its original revisions, it shall return the requests and revisions upon which it insists to the Commissioner within 5 days and so inform him, and he shall submit the requests, incorporating the revisions upon which the Council insists, to the Bureau of the Budget.[1] If such a three-fourths veto does not prevail or the Council does not act on the requests, the Council shall return the requests to the Commissioner and he shall submit them (without the revisions) to the Bureau of the Budget. (Emphasis added).

Thus, under the Reorganization Plan No. 3, a veto by the Commissioner of a Council revision to an item in the budget would restore the Commissioner's original proposal for that line item (assuming that the Council has not overridden the veto). In the event of a Mayoral veto of a Council revision, the amount originally requested by the Mayor had to be submitted to the Bureau of the Budget because the Mayor was constrained to submit to the Bureau of the Budget either the amount proposed by the Mayor or the amount as revised by the Council. Hence, if the Mayor originally requested $150,000,000 for a line item, the Council

---

[1] The functions of the Bureau of the Budget have been transferred to the Office of Management and Budget.

4

revised the amount to $130,000,000 and the Mayor vetoed that revision (and the veto was not overridden), the Mayor could not then insert a new amount, e.g. $140,000,000, for that line item. Instead, the original amount requested, $150,000,000 would be forwarded to the Bureau.

The legislative history of section 404(f) of the Self-Government Act lends support to the view that Congress intended that the pre-Home Rule budget procedure was to continue after passage of the Self-Government Act. Neither section 404(f) nor any similar provision was included in the House Bill, H.R. 9682. Nor was any similar language included in the original Senate legislation, S. 1435, when it was introduced on April 2, 1973. The District of Columbia objected to this in a memorandum provided to the Senate Committee on the District of Columbia which states:

> [S]ome provision must be made for line-item veto by the Mayor of budget revisions voted by the Council.  Section 403 of Reorganization Plan No. 3 of 1967 can serve as a model for the kind of veto process required.  A major requirement is that, if the Council does not override a line veto by the Mayor, the approved budget will reflect the Mayor's initial request for that item. This arrangement is now in effect under authority provided by Section 403(d) of the Reorganization Plan.  Home Rule - 1973: Hearings on S. 1435 Before the Senate Committee on the District of Columbia, 93rd. Cong., 1st Sess. 216 (1973)(Statement of the District of Columbia).

Subsequently, S. 1435 was amended to include section 325(f), which provided for a line item veto of the budget by the Mayor. The District government prepared a comparison of the House and Senate bills, and noted that the House version failed to provide for a Mayoral line item veto over budget bills as provided for by Reorganization Plan No. 3 of 1967.  The District also noted its preference for the Senate version of the bill because it provided for a continuation of the budget veto procedure then in effect. Report for the House Committee on the District of Columbia, 93rd. Cong., 2d Sess., Home Rule for the District of Columbia, 1973-1974, at 2864 (1974).  The District of Columbia statement indicates that it was understood when the Act was passed that the Senate language, essentially included as section 404(f)(2) of the Act, was intended to continue the budget veto procedures then in effect, further supporting the notion that the budget veto scheme in effect under Reorganization Plan No. 3 remains in effect today under the Self-Government Act, as amended.

5a

5

II

If the Council fails to override a line item veto, the Council is not required by the Self-Government Act to enact tax increases needed to support any increased expenditure levels restored by the Mayor's exercise of his veto authority. However, the Mayor could not submit a budget request which did not identify the revenues needed to support requested expenditures.

The District Government, like most municipal corporations, is required by the Self-Government Act to plan its expenditures on the basis of a balanced budget. Section 442(a)(1) of the Act, D.C. Code § 47-301(a)(1), requires the Mayor to prepare and submit to the Council an annual budget:

> on the assumption that proposed expenditures resulting from financial transactions undertaken on either an obligation or cash outlay basis for such fiscal year not exceed estimated resources from existing sources and proposed resources....

Section 603(c) of the Act, D.C. Code § 47-313(c), provides:

> The Council shall not approve any budget which would result in expenditures being made by the District Government, during any fiscal year, in excess of all resources which the Mayor estimates will be available from all funds available to the District for such fiscal year. The budget shall identify any tax increases which shall be required in order to balance the budget as submitted. The Council shall be required to adopt such tax increase to the extent its budget is approved. (emphasis added).

Section 603(d) of the Act, D.C. Code § 47-313(d), provides:

> The Mayor shall not forward for submission to Congress a budget which is not balanced according to the provision of subsection 603(c).

This provision of the Act was added in conference. It was one of the amendments to the House Bill, H.R. 9682, recommended by the conferees to clarify the procedures for submission of the budget to the Council and Congress. See H.R. Conf. Rep. No. 703, 93rd Cong., 1st Sess., pg. 1766 (1973). (As reported by the House, H.R. 9682 provided in section 442 that the budget prepared by the Mayor be submitted to the Council and Congress simultaneously.)

6

Thus, the budget approved by the Council must be supported by tax increases needed to balance it. But the requirement to enact the identified tax increases only applies to the budget as approved by the Council--a budget that includes items restored by the Mayor's exercise of his line item veto authority is not the budget adopted by the Council. On the other hand, the Mayor is not free to use his line item veto to request appropriations expenditures that would require tax increases which have not been identified by the Council. In those relatively rare instances where the Mayor's line item veto restores to the budget a larger amount then that approved by the Council and effectively unbalances the budget, this could result in deadlock, with no request submitted to the President.

III

The Mayor's line item veto authority extends to items or provisions in the budget request act adopted by the Council. It does not authorize the Mayor to veto a change made by the Council to an item within an agency's budget if that item was not specified or carried forward in the text of the budget request act.

It is clear from the language of section 404(f) that the Mayor's line item veto authority goes to items or provisions <u>in the budget request act</u> adopted by the Council, and not to items or provisions in supporting budget documents:

> In the case of any budget act adopted by the Council pursuant to section 446 of this Act and submitted to the Mayor in accordance with subsection (e) of this section, the Mayor shall have power to disapprove any items or provisions, or both, <u>of such act</u> and approve the remainder. (emphasis added).

Thus, if the Mayor wants, for example, to disapprove a change in the funding of the Fire Department contained in supporting budget documents, he must disapprove the entire appropriation requested for Public Safety and Justice in the text of the act.

The degree of detail contained in the budget request act submitted to the Council is committed to the discretion of the Mayor. To preserve his veto authority over particular items that may be revised by the Council, line item details may be included in the budget request act submitted by the Mayor. However, doing so may impair the flexibility needed during budget execution to respond to changing conditions and to efficiently carry out approved programs.

FDC, Jr.

7a